# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

MARVALLOUS KEENE,  :

                        Case No. 1:00-cv-421

         Petitioner,

                        District Judge Sandra S. Beckwith

     -vs-                      Magistrate Judge Michael R. Merz

BETTY MITCHELL, WARDEN,

         Respondent.      :

---

## REPORT AND RECOMMENDATIONS

---

        This is a habeas corpus action brought by Petitioner Marvallous Keene pursuant to 28 U.S.C. §2254 and seeking relief from both his conviction for aggravated murder with death specifications and his resulting death sentence.

        Mr. Keene is represented in this proceeding by counsel appointed pursuant to 21 U.S.C. §848(q) who did not represent him in any prior proceedings.

### Statement of Facts

        The Ohio Supreme Court described the facts and circumstances leading to Mr. Keene's indictment, trial, convictions, and adjudged sentence of death as follows:

> In December 1992, appellant was consorting with a group of people, including several juveniles, who at various times stayed at Bill McIntire's apartment at 159 Yuma Avenue, Dayton. This group included Laura Taylor, DeMarcus Smith, Nicholas Woodson, Heather N. Mathews, Wendy Cottrill, Marvin Washington, and Jeffrey Wright.

On December 24, 1992, appellant and Taylor enlisted Mathews to help them rob Joseph Wilkerson, an acquaintance of Taylor's. Taylor told Mathews that she had arranged for the three of them to go to Wilkerson's house on the pretext of having an orgy with Wilkerson.   Mathews agreed to take part in the robbery.

Appellant, Taylor, and Mathews walked to Wilkerson's house.  After a drink, Wilkerson and Taylor went to the bedroom.   After waiting briefly, appellant and Mathews followed them.   Wilkerson began to take his clothes off.   Taylor and Mathews pretended to do the same.

Appellant began to remove his own pants, then pulled them back up and drew a gun. He ordered Wilkerson onto the bed, then commanded Taylor and Mathews to tie Wilkerson's hands to the bed.

While appellant watched Wilkerson, Taylor and Mathews went through the house, looking for things to steal.    They took a microwave oven, a TV, a cordless phone, a curling iron, and a blow dryer, which they loaded into Wilkerson's Buick.   Wilkerson told appellant that he kept a .32-caliber derringer in the garage. Appellant found it and brought it back to the bedroom.

Appellant subsequently confessed that he shot Wilkerson in the chest with the derringer, after covering him with blankets to muffle the noise.

Taylor and Mathews, hearing the shot, returned to the bedroom and saw appellant holding the derringer.   Wilkerson's feet were shaking. Appellant handed the derringer to Taylor, but it would not fire again. So appellant gave Taylor his own gun, and Taylor shot Wilkerson in the head.     Wilkerson stopped shaking.     Appellant and his accomplices then left in the Buick. Appellant warned his accomplices not to tell Cottrill and Washington.

Later that evening, appellant, Taylor, and Smith went walking. Appellant and Smith were carrying guns.   Appellant later confessed to police that, as they were walking, they saw Danita Gullette at a public telephone.   Smith and appellant drew their guns, and Smith forced Gullette at gunpoint to take her shoes off.    Smith and appellant then shot Gullette.    Smith took her shoes and jacket. When they returned to the apartment, Taylor was wearing Gullette's jacket and Smith was carrying Gullette's shoes.

Later that night, Smith shot Mathews's boyfriend, Jeffrey Wright,

outside 159 Yuma. Appellant, Mathews, Taylor, and Smith then left in Wilkerson's Buick.

On December 25, appellant returned to Wilkerson's house and stole more items, including Wilkerson's other car, a Pontiac.   Also on December 25, Taylor robbed and murdered her former boyfriend, Richmond Maddox.

Early in the morning of December 26, Mathews drove the Pontiac to a BP service station, where appellant and Smith stole Kathie Henderson's car at gunpoint.   Appellant and Smith drove off in Henderson's car;  Mathews followed in the Pontiac.

Later that morning, Mathews drove the Pontiac to the Short Stop Mini-Mart, with appellant, Smith, and Taylor in the car.  Taylor went into the store, then came back to report that there were only two people inside.   Mathews handed a .32-caliber revolver to Smith; Smith and appellant were also carrying .25-caliber automatic pistols.  Appellant and Smith went into the store.

Sarah Abraham, whose family owned the store, was working behind the cash register. Appellant ordered her at gunpoint to open it. Abraham did so and removed $40, which she handed to appellant. Appellant shot Abraham in the head.   Several days later, Abraham died of her wound.   Smith also shot at two other people, Jones Pettus, a customer, wounding him, and Edward Thompson, a helper, both of whom survived and testified against appellant.

Later that day, Taylor and Mathews discussed "jumping" Cottrill because they  "thought she was telling on us."   According to Mathews' testimony, there was no discussion of shooting her. However, in a subsequent conversation with appellant, Taylor, Mathews, and Woodson, Smith said that "he was going to unload a clip in [Marvin Washington's] ass."   According to appellant's confession, Smith "thought that Wendy and Marvin were going to snitch about [Smith] shooting Jeff Wright."   The group discussed picking Washington and Cottrill up and taking them "to a park or something."

The group drove to 159 Yuma and picked up Washington and Cottrill.   They dropped Woodson off at his home, then drove to a gravel pit.   At the gravel pit, Smith ordered Washington out of the car, and appellant dragged Cottrill out.   Washington and Cottrill protested that they had not gone to the police or "snitched." Appellant

3

and Smith forced them at gunpoint to walk behind a pile of gravel. There, appellant shot Cottrill, and Smith shot Washington.

*State v. Keene,* 81 Ohio St.3d 646, ___, 693 N.E.2d 246, 250-51 (1998).

## State Court Proceedings

The Montgomery County, Ohio, grand jury indicted Mr. Keene on eight counts of aggravated murder -- two counts each for Joseph Wilkerson, Marvin Washington, and Wendy Cottrill; one count each for Danita Gullette and Sarah Abraham. The Wilkerson counts each carried six death specifications (course of conduct, escaping detection, two aggravated robbery, two aggravated burglary). The Cottrill counts each carried four death specifications (course of conduct, witness-murder, two kidnaping). The Washington counts each carried three death specifications (course of conduct, witness murder, kidnaping). The Gullette and Abraham counts each carried two death specifications (course of conduct, aggravated robbery). The indictment also included six counts of aggravated robbery, one count of aggravated burglary, one count of burglary, two counts of kidnaping, and two counts of attempted aggravated murder. All counts carried a firearm specification.

Waiving a jury, Mr. Keene was tried to a three-judge panel, which found him guilty on all counts. The panel found four death specifications as to Wilkerson's aggravated murder counts (course of conduct, escaping detection, aggravated robbery, aggravated burglary); however, the panel merged the "escaping detection" and felony-murder specifications. The panel found three death specifications on the Cottrill murder (course of conduct, kidnaping-principal offender, witness murder), three on the Washington murder (same), and two on the Gullette and Abraham murders (course of conduct, aggravated robbery). The Wilkerson, Washington, and Cottrill aggravated murder counts were merged so that only one remained for each victim, a total of five. After a

4

mitigation hearing, the panel sentenced appellant to death on each of the five counts.

Mr. Keene appealed from his convictions and sentences advancing thirty (30) assignments of error in which he alleged numerous prejudicial errors arising from the time of his arrest and questioning through the mitigation phase of his capital-murder trial:

## ASSIGNMENT OF ERROR NO. 1

The trial court erred in failing to conduct a hearing and allow discovery regarding the prosecutor's intent to purposely cause the marked racial disparity in capital charging decisions in Montgomery County, Ohio, in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 10, 16 and 20 of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. 2

The trial court erred by allowing Mr. Keene to be tried, convicted, and sentenced to death on an indictment which charged Mr. Keene with aggravated felony-murder based on accusations that he committed "burglary and/or robbery", in violation of the prohibition against duplicitous indictments, and deprived Mr. Keene of his rights to a unanimous verdict, as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. 3

The trial court erred by allowing Mr. Keene to be convicted and sentenced to death on an indictment which split the felony murder capital specification pursuant to Ohio Rev. Code Section 2929.04(A)(7) into two separate specifications, one of which accused him of being the "principal offender" the other of which alleged that he was *not* the principal offender but acted with the "prior calculation and design" thus forcing the court to consider *both* prongs of the capital specification of 2929.04(A)(7) and creating other hybrid felony murder aggravating circumstances that do not exist under Ohio law, in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 9, 10, 16 and 20 of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. 4

The trial court erred in finding that there was a "course of conduct" capital specification pursuant to Ohio Rev. Code Ann. 2929.04(A)(5),

when the state made a judicial admission at trial that the killing of
each victim was a separate transaction unrelated to the other
homicides in violation of the Eighth, Ninth, and Fourteenth
Amendments to the United States Constitution.

### ASSIGNMENT OF ERROR NO. 5

The trial court erred in failing to comply with the Ohio capital
sentencing statutes when arriving at Mr. Keene's death sentence in
violation of Ohio Rev. Code Ann. 2929.03 and .04, thus depriving
Mr. Keene of substantive and procedural due process in violation of
the Eighth, Ninth, and Fourteenth Amendments to the United States
Constitution, and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio
Constitution.

### ASSIGNMENT OF ERROR NO. 6

The trial court erred when it failed to suppress the statements of Mr.
Keene to the Dayton Police Department because the statements were
involuntary and Mr. Keene did not make a knowing and intelligent
waiver of his rights. The trial court's action denied Mr. Keene his
rights to a fair trial, due process and a reliable determination of his
guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth
and Fourteenth Amendments to the United States Constitution.

### ASSIGNMENT OF ERROR NO. 7[1]

The state failed to introduce sufficient evidence to convict Mr. Keene
of aggravated murder and therefore his conviction deprived him of
substantive and procedural due process as guaranteed by the Eighth,
Ninth and Fourteenth Amendments to the United States Constitution,
as well as Article I, Sections 1, 16 and 20 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 8

A capital defendant is denied his rights to a fair trial, due process and
a reliable determination of his guilt and sentence as guaranteed by the
Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United
States Constitution and Article I Section 10 and 16 of the Ohio
Constitution where other acts evidence is repeatedly introduced into
evidence.

### ASSIGNMENT OF ERROR NO. 9

---

[1]This Assignment of Error is unintelligible to the Court. The text is, however, accurately
quoted from Petitioner's Brief in the Court of Appeals.

6

The trial judge committed prejudicial error when he failed to recuse himself from the three-judge panel after stating on the record that he would in the event that Mr. Keene waive [*sic*] his right to trial in violation of Mr. Keene's right to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## ASSIGNMENT OF ERROR NO. 10

The trial court erred in failing to adequately inform Mr. Keene of the ramifications of a jury waiver and to assure that said waiver was knowing, intelligent and voluntary, in violation of the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

## ASSIGNMENT OF ERROR NO. 11

The sentence of death imposed on Appellant Keen[e] was unreliable and inappropriate. The death sentence in his case violates the Eighth and Fourteenth Amendments to the United States Constitution, Section 9 and 16 Article I of the Ohio Constitution and O.R.C. 2929.05.

## ASSIGNMENT OF ERROR NO. 12

The trial court erred in failing to suppress identification of Mr. Keene when the identification procedures employed in the case at bar where so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification in violation of the due process clause of the Fourteenth Amendment.

## ASSIGNMENT OF ERROR NO. 13

The trial court erred by allowing the state to introduce, over objection, repeated instances of victim impact testimony during *the culpability phase* of Mr. Keene's capital trial in violation of Ohio Rev. Code §§2943.042 and 2945.07, the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 9, 10, 16 and 20 of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. 14

The trial court erred by simultaneously sentencing Mr. Keene both on the charges of felony murder and on the same substantive underlying felony charges in violation of the double jeopardy clause of the United States Constitution.

## ASSIGNMENT OF ERROR NO. 15

The trial court erred by allowing Mr. Keene to be tried, convicted,

and sentenced to death on an indictment which charged eight separate capital specifications under Ohio Rev. Code Ann. §2929.04(A)(5), when there was only *one* "course of conduct involving the purposeful killing ... of two or more persons", thus artificially inflating the number of aggravating circumstances in violation of the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

### ASSIGNMENT OF ERROR NO. 16
In the event that this court should find that the robbery and burglary of Mr. Wilkerson arose from the same act or indivisible course of conduct, then the trial court erred by refusing Mr. Keene's request to merge these capital specifications, thus artificially inflating the number of aggravating circumstances in violation of the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

### ASSIGNMENT OF ERROR NO. 17
The trial court erred by failing to grant Mr. Keene's Motion to Dismiss the capital indictment against him on the basis of the Montgomery County Prosecutor's demonstrated racial bias in seeking the death penalty in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 18
The prosecutor's misconduct during Marvallous Keene's capital trial denied him his substantive and procedural due process right to a fair trial as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 19
The trial court erred by admitting the testimony of Nicholas Woodson which was inadmissible due to its irrelevancy, highly prejudicial nature, and its tendency to show propensity, in violation of [ ] Mr. Keene's right to substantive and procedural due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 2, 9, 16, and 20 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 20
The trial court erred by admitting evidence over objection when the state failed to show with reasonable certainty that physical evidence offered at trial was in substantially the same condition as it was at the

time of the crime. The admission of such evidence, which was also irrelevant, violated Mr. Keene's rights to due process, a fair trial and a reliable guilt verdict under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 21

A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution where gruesome and cumulative photographs are admitted into evidence where their prejudicial effect outweighs their probative value.

### ASSIGNMENT OF ERROR NO. 22

The trial court erred in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution when it over-sentenced Appellant to fifteen (15) years of actual incarceration instead of merging them into a single three (3) year term of actual incarceration.

### ASSIGNMENT OF ERROR NO. 23

The ineffective assistance of counsel provided to Mr. Keene violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 5, 9, 10 and 16 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 24

The trial court erred in proceeding to the penalty phase of Mr. Keene's capital trial when it lacked subject matter jurisdiction to do so since there were no validly established capital specifications, in violation of Ohio Rev. Code Section 2929.04(A), the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 10, and 16 of the Ohio Constitution.

### ASSIGNMENT OF ERROR NO. 25

The trial court erred by failing to spend an adequate amount of time performing its statutory obligation of weighing the aggravating circumstances against the mitigating factors during the deliberations in Mr. Keene's capital trial. This violated Mr. Keene's right to a fair trial and due process under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## ASSIGNMENT OF ERROR NO. 26

The trial court erred by denying Appellant Keene's Motion to Correct the Record in violation of Mr. Keene's rights to due process and reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## ASSIGNMENT OF ERROR NO. 27

The trial court erred by applying Ohio's definition of reasonable doubt, which allows the fact finder to return convictions based on a degree of proof below that required by the due process clause of the Fourteenth Amendment.

## ASSIGNMENT OF ERROR NO. 28

The trial court erred by sentencing Mr. Keene to death in violation of treaties to which the United States of America is a signatory and the Supremacy clause of the United States Constitution.

## ASSIGNMENT OF ERROR NO. 29

The trial court erred by interpreting Ohio law to *require* a mandatory death sentence in the instant case rather than deciding whether death was the appropriate punishment for Mr. Keene, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

## ASSIGNMENT OF ERROR NO. 30

The trial court erred in sentencing Marvallous Keene to death because the capital statutory scheme in Ohio is unconstitutional.

Joint App. Vol IX at Bates No. 003778-4122.


The Appeals Court affirmed Mr. Keene's conviction and sentence in all respects.

*State v. Keene,* No. 14375, 1996 WL 531606 (Ct. App. Montgomery Cty. Sept. 20, 1996).

Mr. Keene appealed to the Ohio Supreme Court where he raised twenty-three (23)

propositions of law[2]:

_____

[2] Although Mr. Keene's Propositions of Law are numbered I through XXVI, there is no Proposition No. II, Proposition No. IX, or Proposition No. XIV.

## PROPOSITION OF LAW NO. I

When a court refuses to permit discovery and a hearing upon the presentation of sufficient evidence of selective prosecution in Montgomery County, a capital defendant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution are violated.

## PROPOSITION OF LAW NO. III

The sentence of death imposed on Appellant Keene as [sic] unreliable and inappropriate. The death sentence in his case violates the Eighth and Fourteenth Amendments to the United States Constitution, Section 9 and 26, Article I of the Ohio Constitution and O.R.C. §2929.05.

## PROPOSITION OF LAW NO. IV

The trial court erred by allowing Mr. Keene to be tried, convicted, and sentenced to death on an indictment which charged Mr. Keene with aggravated felony-murder based on accusations that he committed "burglary *and/or* robbery", in violation of the prohibition against duplicitous indictments, and deprived Mr. Keene of his rights to a unanimous verdict, as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. V

The trial court erred when it failed to suppress the statements of Mr. Keene to the Dayton Police Department because the statements were involuntary and Mr. Keene did not make a knowing and intelligent waiver of his rights. The trial court's action denied Mr. Keene his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 2, 9, 16, and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. VI

The state failed to introduce sufficient evidence to convict Mr. Keene of aggravated murder and therefore his conviction deprived him of substantive and procedural due process as guaranteed by the Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 16 and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. VII

11

The trial court erred by allowing the state to repeatedly introduce other acts evidence at Mr. Keene's trial, and thus denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitutions.

### PROPOSITIONS OF LAW NO. VIII

The trial court committed prejudicial error when he failed to recuse himself from the three-judge panel after stating on the record that he would in the event that Mr. Keene waive[d] his right to trial [sic] in violation of Mr. Keene's right to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 2, 9, 16, and 20 of the Ohio Constitution.

### PROPOSITION OF LAW NO. X

The trial court erred in failing to suppress identification of Mr. Keene when the identification procedures employed in the case at bar were so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification in violation of the due process clause of the Fourteenth Amendment.

### PROPOSITION OF LAW NO. XI

The trial court erred by allowing the state to introduce, over objection, repeated instances of victim impact testimony during the culpability phase of Mr. Keene's capital trial in violation of Ohio Red. Code §§2943.041 and 2945,07, the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 9, 10, 16, and 20 of the Ohio Constitution.

### PROPOSITION OF LAW NO. XII

Simultaneously sentencing of the charges of felony murder and on the substantive underlying felony charge violates the double jeopardy clauses of the United States and Ohio Constitutions.

### PROPOSITION OF LAW NO. XIII

In the event that this Court should find that the robbery and burglary of Mr. Wilkerson arose from the same act or indivisible course of conduct, then the trial court erred by refusing Mr. Keene's request to merge these capital specifications, thus artificially inflating the number of aggravating circumstances in violation of the Sixth,

Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

## PROPOSITION OF LAW NO. XV

The prosecutor's misconduct during Marvallous Keene's capital trial denied him his substantive and procedural due process right to a fair trial as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 2, 10, 16 and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XVI

The trial court erred by admitting the testimony of Nicholas Woodson which was inadmissible due to its irrelevancy, highly prejudicial nature, and its tendency to show propensity, in violation of [ ] Mr. Keene's right to substantive due process as guaranteed by the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 2, 9, 16, and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XVII

The trial court erred by admitting evidence over objection when the state failed to show with reasonable certainty that physical evidence offered at trial was in substantially the same condition as it was at the time of the crime. The admission of such evidence, which was also irrelevant, violated Mr. Keene's rights to due process, a fair trial and a reliable guilt verdict under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I, of the Ohio Constitution.

## PROPOSITION OF LAW NO. XVIII

A capital defendant is denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution when gruesome and cumulative photographs are admitted into evidence when their prejudicial effect outweighs their probative value.

## PROPOSITION OF LAW NO. XIX

The ineffective assistance of counsel provided to Mr. Keene violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution and Sections 5, 9, 10 and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XX

When the state fails to establish any capital specifications, a trial court lacks subject matter jurisdiction to proceed to the penalty phase of a capital trial. Ohio Rev. Code Ann. §292904(A) (Banks-Baldwin 1995), the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 1, 5, 9, 10, and 16 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XXI

When a trial court fails to spend an adequate amount of time performing its statutory obligation of weighing the aggravating circumstances against the mitigating factors during the penalty deliberations, a capital defendant is denied the right to a fair trial, due process of law, and a reliable sentencing determination under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## PROPOSITION OF LAW NO. XXII

When an error in the trial record is brought to the attention of the trial court and the trial court denies a Motion to Correct the Record, a capital appellant is denied his rights to due process of law, and adequate appellate review, and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 2, 9, 16 and 20 of the Ohio Constitution.

## PROPOSITION OF LAW NO. XXIII

The trial court erred by applying Ohio's definition of reasonable doubt, which allows the fact finder to return convictions based on a degree of proof below that required by the due process clause of the Fourteenth Amendment.

## PROPOSITION OF LAW NO. XXIV

The trial court erred by sentencing Mr. Keene to death in violation of treaties to which the United States of America is a signatory in violation of the Supremacy Clause of the United States Constitution.

## PROPOSITION OF LAW NO. XXV

The trial court erred by interpreting Ohio law to require a mandatory death sentence in the instant case rather than deciding whether death was the appropriate punishment for Mr. Keene, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

## PROPOSITION OF LAW NO. XXVI

The death penalty authorized by the Ohio Revised Code deprives capitally-charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

Joint App. Vol. V at Bates No. 002011-2375.

The Ohio Supreme Court found that none of Mr. Keene's claims afforded a basis for reversing his convictions or sentences and the Court overruled all of his propositions of law. *State v. Keene,* 81 Ohio St.3d 646, 693 N.E.2d 246 (1998). The court also independently reviewed Mr. Keene's death sentences, as required by R.C. 2929.05(A) and affirmed the death sentences. *Id.* The United States Supreme Court denied certiorari. *Keene v. Ohio,* 525 U.S. 936 (1998).

Mr. Keene also pursued post-conviction relief pursuant to O.R.C. §2953.21. Mr. Keene raised sixteen (16) causes of action in his petition before the trial court:

## FIRST CAUSE OF ACTION

The judgment against Petitioner is void or voidable because the trial court's failure to grant Plaintiff's Motion for Change of Venue effectively **forced** Plaintiff to **involuntarily** waive his constitutional right to a jury trial in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## SECOND CAUSE OF ACTION

Petitioner Keene did not make a knowing, intelligent and voluntary waiver of his constitutional right to an **impartial** jury of his peers. The trial court's failure to adequately inform Petitioner of the ramifications of a waiver of this right amounted to a violation of Petitioner's Sixth, Eighth, Ninth, and Fourteenth Amendment rights; therefore, Petitioner's convictions are void or voidable.

## THIRD CAUSE OF ACTION

Petitioner Keene's capital convictions and sentence are void or voidable because the Supreme Court case of *United States v. Armstrong* renders the trial court's failure to grant discovery a violation of Petitioner's constitutional rights thereby making his convictions and sentences void or voidable. *United States v.*

15

*Armstrong*, (1996), 116 S. Ct. 1480.

## FOURTH CAUSE OF ACTION

By allowing Petitioner Keene to be tried, convicted and sentenced to death for felony murder allegedly committed during a burglary **and/or** robbery, the trial court violated the prohibition against duplicitous indictments and deprived Petitioner of his rights to a unanimous verdict, to substantive due process, to procedural due process, and in violation of constitutional prohibitions against double jeopardy. These actions by the State of Ohio violated Petitioner Keene's Sixth, Eighth, Ninth and Fourteenth Amendments, as well as violated Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution and the Double Jeopardy Clause of the United States Constitution.

## FIFTH CAUSE OF ACTION

The trial court erred in sentencing Petitioner Keene to death based on felony-murder specifications by failing to follow the O.R.C. §2929.04(A)(7) and the procedures required by Ohio law. These actions violated Petitioner's Fifth, Sixth, Eighth, Ninth and Fourteenth Amendment rights, as well as Article I, Sections 1, 9, 10, 16 and 20 of the Ohio Constitution and are therefore void or voidable.

## SIXTH CAUSE OF ACTION

The failure of Petitioner's trial counsel to object to the State's improper capital charging of Petitioner (by violating O.R.C. 2929.04(A)(7) amounted to ineffective assistance of counsel and therefore Petitioner's capital convictions and sentences are void or voidable.

## SEVENTH CAUSE OF ACTION

Prior to addressing Petitioner Keene's capital specifications under O.R.C. § 2929.04(A)(5), the State successfully argued that **all** of the homicides in Petitioner's case were **separate unrelated transactions.** After this judicial admission, the State was prohibited by the Doctrine of Judicial Estoppel from arguing that Petitioner had committed a "course of conduct" in violation of the capital specification in O.R.C. §2929.04(A)(5). The trial court's conviction of Petitioner under O.R.C. §2929.04(A)(5) was therefore in violation of Petitioner's Eighth, Ninth, and Fourteenth Amendment rights.

## EIGHTH CAUSE OF ACTION

The statements that Petitioner made to the Dayton Police while in

their custody were after an involuntary and therefore invalid waiver of Petitioner Keene's right to remain silent and the trial court's denial of Petitioner Keene's motion to suppress those statements amounted to a violation of his Fifth, Sixth, Eighth, Ninth and Fourteenth Amendment rights, as well as in violation of Article I, Sections 2, 9, 16 and 20 of the Ohio Constitution.  Based on this prejudicial, reversible error, Petitioner's convictions are void or voidable.

### NINTH CAUSE OF ACTION

The State's introduction in Petitioner's case of other acts evidence to show propensity to commit the crimes charges [*sic*] was so **extremely** prejudicial that it destroyed Petitioner's presumption of innocence and denied petitioner his constitutional right to a fair trial and to due process in violation as guaranteed Fifth, Sixth, Eighth, Ninth and Fourteenth Amendment rights and of the rights guaranteed him by Article I, Sections 10 and 16 of the Ohio Constitution.

### TENTH CAUSE OF ACTION

Petitioner was prejudiced by the trial judge's failure to recuse himself when there appeared to be impropriety and bias.  This action by the trial court judge amounted to a denial of Petitioner's right to a fair trial and to due process in violation of his Fifth, Sixth, Eighth, Ninth and Fourteenth Amendment rights and in violation of Article I, Sections 2, 9, 16 and 20 of the Ohio Constitution.

### ELEVENTH CAUSE OF ACTION

The judgment against Petitioner is void or voidable because his due process rights were violated when the trial court allowed evidence of eyewitness identification that was based on an extremely biased photo lineup and because failure of Petitioner's counsel to seek assistance of an expert witness on unreliable eyewitness testimony amounted to ineffective assistance of counsel.

### TWELFTH CAUSE OF ACTION

The trial court admitted cumulative, gruesome and inflammatory photographs the prejudice of which **far** outweighed the probative value, in violation of Petitioner's Constitutional rights and in violation of the Ohio Rules of Evidence.

### THIRTEENTH CAUSE OF ACTION

After an extensive mitigation proceeding, the trial [court took] just over one hour to weigh all of the mitigating factors [*sic*] against the aggravating factors before handing down a conviction of death, carrying the ultimate sentence.  This failure to adequately weigh the

17

appropriateness of a death sentence in Petitioner Keene's case was a violation of Ohio law and constitutional law and therefore Petitioner's capital sentences are void or voidable.

### FOURTEENTH CAUSE OF ACTION

O.R.C. §2929.03 is replete with unconstitutional defects. The section provides no standard of proof to apply to mitigating or aggravating circumstances and further provides no standard by which the finder of fact should balance these factors. The consideration of aggravating circumstances at the culpability phase of the trial (as was done in Petitioner's case) is unconstitutional.

### FIFTEENTH CAUSE OF ACTION

Petitioner's conviction and sentence are void or voidable because the culpability and mitigation phases of his trial were fraught with errors, rendering his sentence of death unreliable and inappropriate in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights as well as in violation of Article I, Sections 2,9,10 and 16 of the Ohio Constitution. These failures and errors made by counsel, the prosecutor, and the trial court were not corrected at trial. Furthermore, these mistakes were not corrected by the Second District Court of Appeals. These actors have failed to preserve Petitioner's right to a fair trial. Subjecting a human being to the ultimate penalty of death can never be the appropriate sentence in light of the above mentioned errors and woeful failures.

### SIXTEENTH CAUSE OF ACTION

Petitioner's convictions and sentences are void or voidable because the cumulative effects of the errors and omission[s] as presented in this petition in Paragraphs one (1) through two hundred thirty-six (236) have been prejudicial to the Petitioner and have denied the Petitioner his rights as secured by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.

Joint App., Vol. VII at Bates No. 003078-3155.

The trial court denied Mr. Keene's post-conviction petition. *State v. Keene,* No. 92-CR-3469 (Common Pleas Court of Montgomery Cty. Nov. 17, 1997); *see* Joint App. Vol. VII at Bates No. 003408-3414. Mr. Keene appealed the trial court's decision raising four (4) assignments of error in the Court of Appeals:

### FIRST ASSIGNMENT OF ERROR

The trial court erred in dismissing Petitioner's First Cause of Action which was based upon its failure to grant Plaintiff's Motion for Change of Venue and effectively forced him to involuntarily waive his constitutional right to a jury trial, in violation of the Fifth, Sixth and Fourteenth Amendments of the United States Constitution thereby rendering the judgment against petitioner void or voidable.

### SECOND ASSIGNMENT OF ERROR

The court erred in dismissing Petitioner's Second Cause of Action as Petitioner Keene did not make a knowing, intelligent and voluntary waiver of his Constitutional right to an impartial jury of his peers.

### THIRD ASSIGNMENT OF ERROR

The court erred in dismissing Petitioner's Fourth Cause of Action and by allowing the Petitioner to be tried, convicted and sentenced to death for felony murder allegedly committed during a burglary *and/or* robbery, the trial court violated the prohibition against duplicitous indictments and deprived Petitioner of his rights to a unanimous verdict, to substantive due process, to procedural due process, and in violation of constitutional prohibitions against double jeopardy.

### FOURTH ASSIGNMENT OF ERROR

The trial court erred in summarily dismissing Petitioner's post-conviction petition based on *res judicata* when it could not have been fully litigated on appeal and without affording the Petitioner the opportunity to conduct discovery and an evidentiary hearing in violation of the United States and Ohio Constitutions.

Joint App. Vol. VIII, Bates No. 003462-92.

The Court of Appeals overruled Mr. Keene's assignments of error and affirmed the trial court. *State v. Keene,* No. 16963, 1999 WL 55711 (Ct. App. Montgomery Cty. Feb. 5, 1999). The Ohio Supreme Court did not allow an appeal. *State v. Keene,* 85 Ohio St.3d 1496, 710 N.E.2d 716 (1999).

**Proceedings in this Court**

Mr. Keene filed his Notice of Intention to file his habeas Petition on August 19, 1999.

19

(Doc. 1). He filed his Petition on May 26, 2000, and originally raised twenty-eight claims for relief. (Doc. 20). On June 7, 2002, District Judge Beckwith adopted this Court's March 5, 2002, Report and Recommendations and granted in part and denied in part Respondent's motion to dismiss certain of Mr. Keene's claims as procedurally defaulted. (Doc. 73; 89). In doing so, Judge Beckwith dismissed as procedurally defaulted Mr. Keene's Seventh, Thirteenth, Twentieth, Twenty-Fourth, Twenty-Sixth, and Twenty-Seventh claims for relief. (Doc. 89). In addition, Judge Beckwith dismissed as procedurally defaulted Mr. Keene's Fifteenth claim only insofar as it makes a claim that the admission in evidence of a pair of Fila gym shoes was improper 'other acts' evidence, his Seventeenth claim to the extent that it is based upon the prosecution's statements regarding Jones Pettus during the mitigation phase, and Mr. Keene's Twenty-Fifth claim to the extent that it includes a claim that Ohio's death penalty scheme violates international law.

The following grounds for relief which Mr. Keene pleads in his Petition for Writ of Habeas Corpus remain for this Court's consideration[3]:

> 1. The trial court erred in failing to comply with the Ohio capital sentencing statutes when arriving at Mr. Keene's death sentence in violation of Ohio Revised Code §§2929.03 and 2929.04, thus depriving Mr. Keene of substantive and procedural due process in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.
>
> 2. The sentence of death imposed on Mr. Keene was unreliable and inappropriate, and thus his death sentence violates the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.
>
> 3. When a trial court fails to spend an adequate or reasonable amount of time performing its statutory obligation of weighing the aggravating circumstances against the mitigating factors during the

---

[3] The Court has, for ease of reading, converted the all-capital letters which appear in Mr. Keene's Petition to lower case letters with the appropriate capitalization.

penalty deliberations, and thus fails to give effect to mitigating evidence, a capital defendant is denied the right to a fair trial, due process of law, and a reliable sentencing determination under the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.

4.   The trial court erred by interpreting Ohio law to require mandatory death sentence rather than deciding whether death was the appropriate punishment for Mr. Keene, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

5.   When a court refuses to permit discovery and a hearing upon the presentation of sufficient evidence of selective prosecution in Montgomery County, a capital defendant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution are violated.

6.   The trial court erred by failing to grant Mr. Keene's Motion to Dismiss the capital indictment against him on the basis of the Montgomery County prosecutor's demonstrated racial bias in seeking the death penalty in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

7. [Dismissed]

8. The trial court erred in failing to grant Petitioner's motion for change of venue, effectively forcing him to involuntarily waive his constitutional right to a jury trial, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

9.   The trial court erred in failing to suppress identification of Mr. Keene when the identification procedures employed in the case at bar were so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

10.   When a trial court is aware of a capital defendant's propensity to acquiesce to authority figures, it is error to accept a jury waiver and permit a capital trial to proceed before a three judge panel, in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

11.  The trial court erred when it failed to suppress the statements of Mr. Keene to the Dayton police department because the statements were involuntary and Mr. Keene did not make a knowing and intelligent waiver of his rights.  The trial court's action denied Mr. Keene his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

12.  The trial court erred by admitting evidence over objection when the State failed to show that physical evidence offered at trial was in substantially the same condition as it was at the time of the crime.  The admission of such evidence violated Mr. Keene's rights to due process, a fair trail and a reliable verdict under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

13. [Dismissed]

14.  The State failed to introduce sufficient evidence to convict Mr. Keene of aggravated murder and therefore his conviction deprived him of substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

15.  The trial court erred by allowing the state to repeatedly introduce other acts evidence at Mr. Keene's trail, and thus denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. [As noted above, this Claim is dismissed insofar as it makes a claim that the admission in evidence of a pair of Fila gym shoes was improper 'other acts' evidence].

16.  The trial court erred by allowing the State to introduce repeated instances of victim impact testimony during the culpability phase of Mr. Keene's capital trail in violation of Ohio Rev. Code §§2943.041 and 2945.07, and the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

17.  The prosecutor's misconduct during Marvallous Keene's trail denied Mr. Keene his substantive and procedural due process right to a fair trial as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. [As noted

above, this Claim is dismissed to the extent that it is based upon the prosecution's statements regarding Jones Pettus during the mitigation phase].

18. The trial court erred by admitting the testimony of Nicholas Woodson which was irrelevant, highly prejudicial, used to show propensity, in violation of ... Mr. Keene's right to substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

19. The ineffective assistance of counsel provided to Mr. Keene violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

20. [Dismissed]

21. Simultaneously sentencing on the charges of felony murder and on the substantive underlying felony charge violates the double jeopardy clauses of the United States Constitution in violation of Mr. Keene's right to due process, in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

22. In the event that this Court should find that the robbery and burglary of Mr. Wilkerson arose from the same act or indivisible course of conduct, then the trial court erred by refusing Mr. Keene's request to merge these capital specifications, thus artificially inflating the number of aggravating circumstances in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

23. When an error in the trial record is brought to the attention of the trial court and the trial court denies a motion to correct the record, a capital appellant is denied his rights to due process of law, an adequate appellate review, and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

24. [Dismissed]

25. Ohio's death penalty scheme is unconstitutional and violated Petitioner Keene's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

[As noted above, this Claim is dismissed to the extent that it includes a claim that Ohio's death penalty scheme violates international law.]

26. [Dismissed]

27. [Dismissed]

28. Petitioner Keene was denied his right to counsel, due process, equal protection, a fair proceeding, an impartial tribunal, a reliable sentence, and an adequate corrective process during his post-conviction proceedings, in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

## Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 25, 1996. *Herbert v. Billy,* 160 F.3d 1131, (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997). Since Mr. Keene filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. §2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. §2254, as amended by the AEDPA, provides:

...
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254.

The AEDPA also provides that a factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e).   In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conlude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court."  28 U.S.C. §2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent.  *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).   A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply."  *Williams,* 529 U.S. at 407-08.  For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable."  *Wiggins v. Smith,* 539 U.S. 510, ___, 123 S.Ct. 2527, 2534-35 (2003); *Williams,* 529 U.S. at 407, 409.   An *unreasonable* application of federal law is different from an *incorrect* application of federal law.  *Id.* at 410

25

(emphasis in original).  In sum, Section 2254(d)(1) places a new constraint of the power of a federal court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer,* 537 U.S. 3 (2002).  Indeed, "contrary to" does not even require awareness of Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.  *Id.* at 8.  The AEDPA prohibits the overturning of state decisions simply because the federal court believes that the state courts incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2244(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts".

*Id.* at 366.

## Merits

### First, Second, Third, Fourth, Twenty-Second, and Twenty-Third Grounds for Relief

In his First, Second, Third, Fourth, Twenty-Second, and Twenty-Third Grounds for Relief, Mr. Keene alleges that, for various reasons, he was erroneously sentenced to death.

### FIRST GROUND FOR RELIEF

**The trial court erred in failing to comply with the Ohio capital sentencing statutes when arriving at Mr. Keene's death sentence in violation of Ohio Revised Code §§2929.03 and 2929.04, thus depriving Mr. Keene of substantive and procedural due process in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.**

26

The trial court improperly: (1) considered and weighed against Mr. Keene all five counts of aggravated murder and all aggravating circumstances to these counts rather than assessing the penalty for each individual count separately and considering only the aggravating circumstances related to a given count in assessing the penalty for that count; (2) considered and weighed against Mr. Keene non-statutory and unconstitutionally vague aggravators; (3) considered and weighed against Mr. Keene an aggravating circumstance that no longer existed because it had been merged into other aggravating circumstances; and (4) sentenced Mr. Keene to death, at least in part, on its erroneous belief that such a sentence was *required*.

These errors prejudiced Mr. Keene. For example, the effect of these errors was to unconstitutionally minimize the trial court's findings of "*seventeen separate [mitigating] factors* as permitted by R.C. 2929.04(B)7)." Return of Writ, Appendix at Bates 972 (Trial Court Sentencing Opinion)(emphasis added). This meant that the trial court failed to properly consider and give effect to this mitigation. *Pendry v. Johnson,* 532 U.S. 782 (2001). Had the trial court followed Ohio's death penalty scheme, there is a reasonable probability that it would have given proper consideration and effect to this mitigation, and found that the aggravating circumstances of each count did not outweigh, beyond a reasonable doubt, this mitigation.

In support of his First Ground for Relief, Mr. Keene argues that the trial court abandoned the statutory framework for capital punishment and instead relied upon arbitrary and capricious factors in violation of the Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution. Mr. Keene's position is that the trial court improperly: (1) weighed all five counts of aggravated murder and their capital specifications collectively against the numerous mitigating factors; (2) relied on non-statutory and unconstitutionally vague aggravating circumstances such as "cold and calculated planning" and "manner and means" of killing; (3) used an aggravating circumstance that no longer existed because it had been merged into other aggravating factors; and (4) believed the death sentence was mandatory.

## SECOND GROUND FOR RELIEF

**The sentence of death imposed on Mr. Keene was unreliable and inappropriate, and thus his death sentence violates the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

Mr. Keene's position is that the death sentence imposed upon him was unreliable and inappropriate because the several mitigating factors presented far outweighed the statutory aggravating circumstances of each capital count.

### THIRD GROUND FOR RELIEF

**When a trial court fails to spend an adequate or reasonable amount of time performing its statutory obligation of weighing the aggravating circumstances against the mitigating factors during the penalty deliberations, and thus fails to give effect to mitigating evidence, a capital defendant is denied the right to a fair trial, due process of law, and a reliable sentencing determination under the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.**

In support of this Ground, Mr. Keene points out that the record shows that the trial court panel retired to begin mitigation phase deliberations at 3:37 p.m. and returned at 4:55 p.m. the same day[4]. Mr. Keene's position is that the panel could not have properly considered the numerous mitigating factors nor properly weighed those factors against any aggravating circumstances in such a short period of time thereby violating its duty to do so.

### FOURTH GROUND FOR RELIEF

**The trial court erred by interpreting Ohio law to require mandatory death sentence rather than deciding whether death was the appropriate punishment for Mr. Keene, in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

---

[4] Mr. Keene alleges that the trial court panel actually returned from deliberations at approximately 4:40 p.m., and not 4:55 p.m. as reflected by the record. That allegation is the subject of Mr. Keene's Twenty-Third Ground for Relief.

28

Mr. Keene argues in support of his Fourth Ground for Relief that rather than properly weighing the mitigating factors against the aggravating circumstances as required by O.R.C. §2929.03, the trial court panel determined that "the law of this State *requires* the imposition of the death penalty upon the Defendant." Mr. Keene's position is that this effectively resulted in a mandatory death sentence and precluded the panel from engaging in a meaningful weighing process and prevented the panel from allowing itself discretion to exercise mercy.

### TWENTY-SECOND GROUND FOR RELIEF

**In the event that this Court should find that the robbery and burglary of Mr. Wilkerson arose from the same act or indivisible course of conduct, then the trial court erred by refusing Mr. Keene's request to merge these capital specifications, thus artificially inflating the number of aggravating circumstances in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene first points out that he has asserted his Twenty-Second Ground for Relief solely as an alternative to the unanimity argument he presents in his Twentieth Ground for Relief. Mr. Keene argues that if this Court rejects the unanimity argument of his Twentieth Ground and finds that he was not deprived of a unanimous verdict because the robbery and burglary of Mr. Wilkerson were a single act or course of conduct, then they should have been merged under the rule in *Jenkins v. State,* 15 Ohio St.3d 164 (1984) and that it was error for the trial court to fail to do so.[5]

### TWENTY-THIRD GROUND FOR RELIEF

**When an error in the trial record is brought to the attention of the trial court and the trial court denies a motion to correct the record, a capital appellant is denied his rights to due process of law, an adequate appellate review, and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth,**

---

[5] Because the Court has dismissed as procedurally defaulted Mr. Keene's Twentieth Ground for Relief, this Court addresses his alternate argument presented in his Twenty-Second Ground.

Eighth, Ninth and Fourteenth Amendments to the United States
Constitution.

In support of his Twenty-Third Ground for Relief, Mr. Keene argues that the trial
court erred by failing to grant his Motion to Correct the Record.  Mr. Keene alleges that while the
record indicates that the trial court panel retired at 3:37 p.m. to deliberate his sentence and that the
panel returned from deliberations at 4:55 p.m., in actuality, the panel returned at 4:40 p.m.  In
support of his motion to correct the record, Mr. Keene submitted his trial counsel's affidavit.
Presumably, Mr. Keene's position is that the fact that the trial court panel actually deliberated for
a shorter period of time than the record reflected is further proof that the panel failed to properly
weigh the mitigating factors against the aggravating circumstances.

### State court opinions

In its Sentencing Opinion, the trial court stated:

The evidence established that on December 24, 1992, the Defendant,
in the company of three other persons, by deception gained entrance
to the residence of Joseph Wilkerson ... for the purpose of stealing
property from him.  Upon gaining entrance, they forced Mr.
Wilkerson to lie down on the bed while his arms were tied to the head
of the bed.  The Defendant then shot Mr. Wilkerson through the heart
with his own gun.  The co-conspirators then stole various items of
property from the house and a Buick automobile.

Later that same day three of the co-conspirators, including the
Defendant, came upon Danita Gullette using a public telephone ...
where the Defendant and one of his co-conspirators, each armed with
a firearm, compelled Miss Gullette to turn over to them her jacket and
shoes after which they shot and killed her.

On December 25, 1992, the four co-conspirators returned to Mr.
Wilkerson's residence where they again ransacked the house and also
stole his Pontiac automobile.

During the early morning hours of December 26, 1992, these four
individuals observed Kathie Henderson putting air in her tires at a BP

30

service station ... where, after the Defendant threatened her with a firearm, they stole her Dodge automobile.

Just after day light on December 26, 1992, these same four people went to a Mini-Market ... where the Defendant and a male companion, each armed with at least one firearm. demanded and received money from Sarah Abraham and then the Defendant shot her once in the face then again in the heart after she had fallen to the floor, killing her.  The male companion, after demanding their money, shot at two other persons in the store, hitting one of them although that person survived.

Later that same day, the Defendant and his three companions decided that Wendy Cottrill and Marvin Washington were aware of some of their activities and to prevent their telling anyone about their activities, the four decided to kill those two persons.  They picked up both these persons, took them to an isolated area ... where Defendant put a gun in her mouth, shot and killed Miss Cottrill and his male companion shot and killed Mr. Washington.  Each of these victims was shot more than once and the shoes were taken from Wendy Cottrill's feet.

In the early afternoon of December 26, 1992, the Defendant and his two female companions were apprehended in the stolen Dodge automobile and the other male companion was apprehended a short distance away. ...

Witnesses for the Defendant established that the Defendant had a very loving mother and a loving brother with whom he was extremely close.  His maternal grandmother was also quite close to the Defendant and his brother as they were growing up and with whom he has a very warm relationship.  The Defendant's natural father abandoned the Defendant, his brother and mother soon after the Defendant was born.  A divorce followed.  The Defendants' mother remarried and that husband commenced a good relationship with both boys but then abruptly abandoned the family.  After that marriage was terminated by divorce, the Defendant's mother married a third time and before any solid relationship with the boys could be established, this third husband emotionaly [sic] mistreated the boys and their mother resulting in a third divorce.  Ultimately, when the Defendant was in his pre-teens, his mother married for a fourth time and that relationship has endured.

The Defendant and his entire family were very active in their church.

31

The Defendant and his brother participated in the youth group activities and sang in the youth choir and attended services regularly.

Following the death of his brother who was shot and killed while attempting a robbery, the Defendant became depressed and was disconsolate. His previous good attendance at school abruptly fell off and his good grades deteriorated to the point that he failed all his subjects in the final term of his senior year in high school resulting in his failure to graduate. Meanwhile, contact with his natural father, who resided in the Los Angeles area, was re-established. During the summer of 1992, the Defendant went for an extended visit with his father and step-mother and their small children. That visit evolved into his remaining in California where he entered high school. There he achieved good grades, received some special recognition and graduated. Following his graduation and with his father's assistance, he obtained a job with an asbestos removal company operated by a neighbor.

Meanwhile, the Defendant's maternal grandmother, with whom he had been so close, died. In August of 1992 a long planned family reunion took place in Dayton which the Defendant wanted to attend. Having purchased an automobile on which he still owed money, his father remonstrated with him about being responsible for his obligations, including some very substantial long distance phone bills which resulted from the Defendant's frequent calls to his mother and friends in Dayton. The newly re-established relationship terminated when his father gave him an ultimatum and the Defendant returned to Dayton.

After returning to live with his mother and his step-father in August, 1992, the Defendant obtained employment. That job was abruptly abandoned in early December and the Defendant moved out of his mother's home without explanation. He moved in with an acquaintance .... Thereafter, he began associating with street-wise people and finally with the three other Defendants in this action.

The panel having previously found the Defendant guilty of specifications under R.C. 2929.04(A)(3), (5), (7), and (8), it is necessary to address all mitigation circumstances developed by the evidence at that phase of this proceeding.

No evidence was offered under the statutory circumstances set forth in R.C. 2929.04(B)(1) or (2). While evidence was presented tending to establish that the Defendant suffered from conditions known as

"passive/aggressive personality" and "post traumatic stress disorder," the expert witness did not state to a reasonable degree of psychological probability that he "lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" as provided in R.C. 2929.04(B)(3). The Defendant did present evidence of seventeen separate factors as permitted by R.C. 2929.04(B)(7).

We find that the evidence established by a preponderance of the evidence the following:

The Defendant was nineteen years of age at the time of the events giving rise to these charges and while he was legally an adult, he nevertheless was emotionally immature at the time.

The Defendant had no history of involvement in the criminal justice system, either as a juvenile or as an adult.

To some extent, the Defendant came from a disfunctional [sic] family, i.e., he had no consistent father figure in his life. This fact was not of his making.

The tragic nature of his brother's death had a profound effect upon the Defendant. He became depressed, virtually gave up on his educational efforts for a time, and was morose and introspective.

During the period following his brother's death, the Defendant developed a condition known as "passive-aggressive personality disorder." This manifested itself in several ways: he appeared to pout, intentionally neglected his responsibilities and stubbornly refused aid from those around him. In addition, he frequently appeared angry and declined to trust any efforts to develop a close relationship with anyone.

The unexpected, although natural death of his grandmother seemed to accentuate these conditions and represented to him the termination of another close relationship.

The Defendant was demonstrating symptoms of post traumatic stress disorder following the death of his brother which was exacerbated by his grandmother's death. This was evidenced by his reexperiencing the traumatic loss of his brother as demonstrated by his frequent visits to the cemetery where his brother was buried.

33

When he went to live with his natural father in California, the Defendant showed marked improvement in all of these conditions in that he did well in school, achieved some honors, graduated and after a brief training period obtained and maintained employment. Although still not active socially with his peers, he did baby-sit and enjoy romping with his step-siblings and the neighbors' children. All of this abruptly terminated when his father gave him the ultimatum to either accept his responsibilities as an adult and forego a return to Dayton for the family reunion or in the alternative to go to Dayton and stay there. The Defendant perceived this as the second loss of his father.

However, upon his return to his mother's home he acted responsibly by getting a job and working regularly. He had apparently accepted the events of his life when he abruptly moved out of his mother's house, quit his job and began to associate on a regular basis with street-wise peers, including the other three people later involved in the series of events leading to this prosecution.

Of those three other people, the only other adult entered guilty pleas to all charges against her in exchange for the State's withdrawing the death specifications. The remaining two people involved are juveniles and by law are not subject to the death penalty. The evidence adduced at the first phase of this trial clearly demonstrated that while Heather Matthews, the other adult, fully participated in the chain of events culminating in the arrest of all four, she was not the principal offender in any of the homicides.

Following his arrest the Defendant wrote a letter to be read to the congregation of the church he had attended all his life expressing some remorse. Also, in his unsworn statement in the mitigation phase of this trial he expressed some remorse for what he had done.

Opinion testimony was presented that the Defendant would do well in a prison setting.

Finally, the testimony demonstrated that the Defendant historically was not a leader, but was characterized as a follower. In this respect, however, the evidence also revealed that the Defendant was and is reasonably intelligent and from his training at home and in the church was fully cognizant of the difference between right and wrong.

In conclusion, after fully and carefully considering all the evidence presented, the panel finds that the cold and calculated plans that were

developed, the deliberate execution of those plans and the manner
and means by which five people were killed, one of whom was a
former neighbor, two total strangers and two young associates, we
unanimously find beyond a reasonable doubt that the aggravating
circumstances found with respect to each aggravated murder count
outweigh the several mitigating factors established by a
preponderance of the evidence. Following these conclusions, the law
of this State requires the imposition of the death penalty upon the
Defendant.
...

Joint Appendix, Vol. II at Bates 967-76.

In addressing Mr. Keene's challenge of the trial court's imposition of the death

penalty, the Ohio Supreme Court stated:

In his second proposition of law, appellant argues that the three-judge
panel failed to conduct a proper sentencing analysis.

Appellant urges that the panel erred by referring to "the cold and
calculated plans that were developed, the deliberate execution of
those plans and the manner and means by which five people were
killed***." Appellant claims that these were "non-statutory
aggravating circumstances" and are unconstitutionally vague under
*Maynard v. Cartwright* (1988), 486 U.S. 356, 108 S.Ct. 1853, 100
L.Ed.2d 372, and *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct.
1759, 64 L.Ed.2d 398.

However, the panel's opinion recited the specific statutory
aggravating circumstances of which appellant was convicted. There
is no indication that the panel believed the "calculated," "deliberate"
nature of these murders or the "manner and means" of their
commission were aggravating circumstances. *See e.,g., State v.
Moreland* (1990), 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905.
Rather, the panel was explaining why the aggravating circumstances
outweighed the mitigating factors. *See State v. Stumpf* (1987), 32
Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

Appellant also argues that the trial court weighed a statutory
aggravating circumstance, R.C. 2929.04(A)(3), "that did not exist in
this case." Appellant was found guilty of an (A)(3) escaping
detection specification and an (A)(7) felony-murder specification as
to each of the Wilkerson aggravated murder counts. However, the

35

panel merged the (A)(3) specifications into the (A)(7) specifications.

Later in its opinion, the panel wrote, "The panel having previously found the Defendant guilty of specifications under R.C. 2929.04(A)(3), (5), (7) and (8), it is necessary to address all mitigation circumstances developed by the evidence ***."

Appellant argues that this meant the panel was weighing the (A)(3) specifications – which, having been merged with the (A)(7) specifications, should not have been weighed. We disagree. On its face, the quoted sentence says nothing about weighing or considering the (A)(3) specifications. Rather, the panel was simply reciting the specifications of which it had found appellant guilty. Only a few pages earlier, the panel had stated that the (A)(3) specifications merged into the (A)(7) specifications. It cannot be rationally believed that the panel forgot about that and weighed the (A)(3) specifications.

Appellant's Eighth Amendment vagueness claim lacks merit. See *Tuilaepa v. California* (1994), 512 U.S. 967. 971-975, 114 S.Ct. 2630, 2634-2636, 129 L.Ed.2d 750, 759-761; *State v. Gumm* (1995), 72 Ohio St.3d 413, 417-418, 653 N.E.2d 253, 260.

In *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 894, paragraph three of the syllabus, this court held, "Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." Appellant claims that the panel weighed all the aggravating circumstances collectively against the mitigating factors rather than assessing the penalty for each individual count separately as Cooey requires.

The sentencing opinion states, "In conclusion, after fully and carefully considering all the evidence presented, *** we unanimously find *** that the aggravating circumstances found with respect to each aggravated murder count outweigh the several mitigating factors***."

The "with respect to each" language suggests that each count was evaluated separately. If any ambiguity remains, the verdict forms clarify it. The panel signed a separate verdict for each victim. The verdict on Count Four states, "We do find that the aggravating circumstances in the aggravated murder of Joseph Wilkerson outweigh the mitigating circumstances [sic]."... The same language is used with respect to Counts Six (Gullette), Ten (Abraham),

Seventeen (Cottrill), and Twenty (Washington). Thus, as to each individual aggravated murder, the panel made a specific finding that the aggravating circumstances present with respect to that aggravated murder outweighed the mitigating factors.

Finally, as part of his second proposition of law, as well as in his twenty-fifth proposition of law, appellant argues that the panel incorrectly believed that the death penalty was mandatory. The opinion states, "In conclusion *** we unanimously find beyond a reasonable doubt that the aggravating circumstances found with respect to each aggravated murder count outweigh the several mitigating factors established by a preponderance of the evidence. Following these conclusions, the law of this State requires the imposition of the death penalty ***.".

Clearly, the panel did not incorrectly believe that the death penalty was mandatory. Rather, it correctly believed that, having found aggravation to outweigh mitigation, it was required to impose the death penalty. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 595 N.E.2d 902, 912.

Appellants second and twenty-fifth propositions of law are overruled.

In his third proposition of law, appellant claims that the death sentence should not have been imposed in this case. Appellant argues that the mitigating factors outweigh the aggravating circumstances so that the death penalty is inappropriate and asks this court to reverse the sentence of death. Our independent sentence determination, infra, will resolve this issue.

## B. Duplicative Aggravating Circumstances

In his fourth proposition of law, appellant argues that Count Four was invalid because it charged him with murder during a "burglary and/or robbery." ... However, he conceded that he never raised this issue at trial. Consequently, it is waived, There is no plain error, because appellant was separately convicted of both aggravated burglary (Count One) and aggravated robbery (Count Two) with respect to Wilkerson. Therefore, the outcome would not clearly have been otherwise had the indictment been worded differently. *See, e.g., State v. D'Ambrosio* (1993), 67 Ohio St. 3d 185, 197-198, 616 N.E.2d 909, 919.

Appellant argues that this alleged error is "plain error per se," and

37

cannot be waived by lack of objection. We reject this claim, which is inconsistent with our precedents holding that similar alleged errors were waived. n3 Appellant's fourth proposition of law is overruled.

> n3 Appellant's claim is based on a misreading of *United States v. Beros* (C.A.3, 1987), 833 F.2d 455, and *State v. Johnson* (1989), 46 Ohio St.3d 96, 104, 545 N.E.2d 636, 644. In Beros, the question of waiver and plain error never came up because "a sufficient objection was made *** to preserve [the duplicity] issue for appeal." 833 F.2d at 458, fn. 3; *see also*, 833 F.2d at 462-463. Johnson does not discuss waiver or plain error at all with regard to the duplicity issue. *See* 46 Ohio St.3d 104-105, 545 N.E.2d at 644.

One of the specifications to Count Four alleged murder during an aggravated burglary; another alleged murder during an aggravated robbery. In appellant's thirteenth proposition of law, he argues that if this court rejects his fourth proposition of law on the ground that the aggravated robbery and aggravated burglary "were in fact the same event," then the aggravating circumstances based on them should have merged into one. However, we have rejected appellant's fourth proposition of law on other grounds. Consequently, appellant's thirteenth proposition of law lacks merit.

### C.  Length of Deliberations

The record shows that the three-judge panel retired to deliberate at 3:37 p.m. and returned with a sentencing decision at 4:55 p.m., one hour and eighteen minutes later. In his twenty-first proposition of law, appellant claims that the panel completed its deliberations too quickly. But he cites no authority for the proposition that an appellate court may second-guess whether the trier of fact deliberated long enough.

In his twenty-second proposition of law, appellant claims that the panel actually returned at 4:40 p.m., not 4:55 p.m. It is undisputed that, pursuant to App.R. 9(E), appellant filed a motion in the trial court to correct the record; in support, he adduced an affidavit by trial counsel stating that the panel returned at 4:40 p.m. The trial court denied the motion. Noting that the record was made "contemporaneously," the court declined to modify it based on the year-old recollection of trial counsel. Appellant argues that the trial court violated App.R. 9(E) by denying his motion.

App.R. 9(E) states in part, "If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by the court and the record made to conform to the truth."  Thus, "it is within the province of the trial court to resolve disputes about the record on appeal."  *State v. Schiebel* (1990), 55 Ohio St.3d 71, 81, 564 N.E.2d 54, 66.  Here, the trial court did resolve the dispute; it found the year-old recollection of the former counsel for an interested party insufficiently persuasive to impeach the stenographic record.  "Where it is supported by competent, reliable evidence, such ruling will not be reversed by a reviewing court absent an abuse of discretion." *Id.* at 82, 564 N.E.2d at 67.  Appellant's twenty-first and twenty-second propositions of law are overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 260-63.

The Ohio Supreme Court then engaged in a *de novo* review of the appropriateness of the imposition of the death penalty on Mr. Keene and stated:

Independent Sentence Review and Proportionality Analysis

Having affirmed appellant's aggravated-murder convictions, we now must independently determine whether the evidence supports the aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt with respect to each murder, and whether the death sentences are proportionate to those affirmed in similar cases.

After merger, Wilkerson's murder had three aggravating circumstances: course of conduct, aggravated robbery, and aggravated burglary.  Cottrill's murder and Washington's murder each had three aggravating circumstances: course of conduct, kidnapping, and witness murder.  Gullette's murder and Abraham's murder each had two aggravating circumstances: course of conduct and aggravated robbery.

We find that the evidence supports each of these aggravating circumstances.  All specifications were proven by appellant's confession, by strong physical evidence, and by the testimony of such eyewitnesses as Pettus, Thompson, Woodson, and Mathews.

In weighing aggravation against mitigation, we note that the penalty for each aggravated murder must be assessed separately; the

aggravating circumstances attached to a given count may be considered only with respect to that count. *Cooey,* paragraph three of the syllabus.

Appellant was nineteen years old at the time of the murders and appears to have been relatively immature. His youth is entitled to some weight under R.C. 2929.04(B)(4).

The trial court found that appellant lacked a significant history of criminal convictions or delinquency adjudications. This factor is entitled to weight under R.C. 2929.04(B)(5).

Dr. Robert Smith, a psychologist, testified that appellant has a "passive-aggressive personality disorder." He also diagnosed appellant with post-traumatic stress disorder ("PTSD"). Smith believed that appellant could adjust well to prison with support and counseling. In the county jail, appellant had a good disciplinary record and socialized with other inmates.

Under R.C. 2929.04(B)(3), a mitigating factor exists if "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Appellant claims his personality disorder and his PTSD qualify under this factor. We disagree. A personality disorder is not a "disease or defect". However, we accord this factor some weight, as the trial court did, under R.C. 2929.04(B)(7) (the catch all provision).

With respect to Cottrill and Washington, appellant argues that R.C. 2929.04(B)(1) applies, "Whether the victim of the offense induced or facilitated it." Appellant states that "there was evidence that both Wendy Cottrill and Marvin Washington were involved in criminal activities." Even if this was true, they were not involved in any of the crimes in this case. (They witnessed the shooting of Wright, but did not participate in that crime.) It is clear that Cottrill and Washington in no way "induced or facilitated" their own murders.

Appellant did not play the role of a follower with respect to Wilkerson's murder. Even if Taylor suggested the robbery, appellant was the leader during the robbery and murder. He was the only one who brought a gun. He ordered Taylor and Mathews to tie Wilkerson up. It was appellant who decided to kill Wilkerson – Taylor and Mathews were not in the bedroom when he fired the first bullet at point-blank range into Wilkerson's heart. Appellant handed Taylor

40

his gun to fire a second bullet. When that gun would not fire, appellant handed her another. When appellant, Taylor, and Mathews left, appellant drove the stolen car. He suggested taking the car to Detroit to sell it, and he told the others not to say anything to Cottrill and Washington.

As for the other murders, it is true that appellant did not instigate them. He did not begin shooting in the mini-mart robbery until Smith did. Smith also suggested robbing Gullette. We accord these circumstances some mitigating weight. However, appellant overstates his case by claiming that he "was not the principal offender in most of the murders." He was in fact a principal, as we have defined that term – i.e., the actual killer not a mere accomplice – in four of the five murders.

Appellant was born in 1973. On the day appellant's mother was released from the hospital after giving birth to him, appellant's father left home.

Appellant's mother married three times. Her second husband, James Douglas, habitually abandoned the family, disappearing for months at a time. This upset appellant, who "has really gathered a love [for] Douglas." When appellant's mother finally divorced her second husband (after he had been gone for a year), appellant was devastated. Her third husband drank to excess, gambled, and inflicted unspecified verbal and physical abuse on appellant's mother and her children.

Appellant developed a close relationship with his older brother, Maurice. However, Maurice was shot to death in 1991. Appellant became depressed and withdrawn and began to fail academically. although his grades had been better before.

After his brother was killed, appellant moved to California to live with his father. However, their relationship soured because appellant's father felt appellant was behaving irresponsibly. Appellant's father ultimately threw appellant out of his house.

Appellant did display some remorse: he wept during his confession. Retrospective remorse, however, is entitled to little weight. Indeed, we are inclined to doubt the sincerity of appellant's remorse, which slumbered while he murdered five people in succession, and awoke only after his arrest.

41

We find that several mitigating factors exist here, including appellant's youth, clean record, mental disorders, his remorse and confession, and the repeated, traumatic loss of father figures from his life.

Yet, we are faced with a defendant who murdered five people in three days. The course of conduct specification is common to all five murders, and it has great weight with respect to each. And while his family life has been troubled, he has also had the advantage of a hardworking, churchgoing mother and family. His mental disorders are entitled to some weight, but they did not substantially diminish his capacity to understand the criminality of his actions or to choose between right and wrong.

The aggravating circumstances are strongest with respect to the Cottrill-Washington murders. Murdering a witness to prevent his or her testimony strikes at the heart of the criminal justice system. Combined with the course of conduct and the kidnapping, these crimes clearly merit the death penalty; beyond a reasonable doubt, the aggravation outweighs the mitigation presented by appellant.

In the Wilkerson murder, the aggravating circumstances are aggravated burglary, aggravated robbery, and course of conduct. With respect to the two-felony-murder factors, we find especially noteworthy the cynical deception by which appellant and his accomplices induced Wilkerson to allow them into his home. Moreover, the mitigating factors with respect to Wilkerson's murder are weaker, because appellant played the leading role in that crime. We find, beyond a reasonable doubt, that the aggravating circumstances attached to Wilkerson's murder outweigh the mitigating factors.

Gullette's murder combined aggravated robbery with a course of conduct involving the murder of five people. In this case, we conclude that these two aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Finally, Abraham's murder has the same two aggravating circumstances as Gullette's. Again, we find beyond a reasonable doubt that aggravation outweighs mitigation.

Moreover, the death penalty for the Wilkerson, Gullette, and Abraham murders is proportionate in comparison with death sentences we have affirmed in cases combining multiple-murder specifications with aggravated robbery and/or aggravated burglary

42

specifications. *See, e.g.*, *State v. Gillard* (1997), 78 Ohio St.3d 548, 679 N.E.2d 276 (two victims); *State v. Lorraine* (1993). 66 Ohio St.3d 414, 613 N.E.2d 212 (nineteen-year-old defendant; two victims); *State v. Hawkins* (1993), 66 Ohio St. 3d 339, 612 N.E.2d 1227 (two victims); *State v. Montgomery* (1991), 61 Ohio St.3d 410, 419, 575 N.E.2d 167, 174 (two victims; twenty-year-old defendant with "violent and unstable family environment"); *State v. Dickerson* (1989), 45 Ohio St.3d 206, 543 N.E.2d 1250 (two victims; defendant proved diminished capacity).

Also, the death penalty for the Cottrill-Washington murders is proportionate to *State v. Lundgren* (1995), 73 Ohio St.3d 474, 653 N.E.2d 304 (multiple murder and kidnapping). Indeed, we have frequently affirmed death sentences in cases where multiple murder was the sole death specification. *See, e.g.*, *State v. Williams* (1997), 79 Ohio St.3d 1, 679 N.E.2d 646; *State v. Kinley* (1995), 72 Ohio St.3d 491, 651 N.E.2d 419; *State v. Sowell* (1988), 39 Ohio St.3d 322, 530 N.E.2d 1294 (one victim; one intended victim). n4

n4 This court did reject the death sentence in the multiple-murder case of *State v. Lawrence* (1989), 44 Ohio St.3d 24, 541 N.E.2d 451. However, in Lawrence, there were only two murders, each aggravated murder count carried only one death specification, and the mitigating factors were far stronger.

*Keene,* 81 Ohio St. 3d at ___, 693 N.E.2d at 265-67.

**Clearly established federal law**

The United States Constitution does not require that a sentencing authority use standards to evaluate and weight aggravating or mitigating circumstances. *Tuilaepa v. California*, 512 U.S. 967, 979 (1994); *see also, Walton v. Arizona*, 497 U.S. 639, 649-50 (1990); *Proffitt v. Florida*, 428 U.S. 242, 257-59 (1976). Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty". *Tuilaepa,* 512 U.S. at 979-80, *quoting, Zant v. Stephens,* 462 U.S. 862, 875 (1983). Within constitutional limits, the States enjoy their traditional

latitude to prescribe the method by which those who commit murder shall be punished. *Blystone v. Pennsylvania,* 494 U.S. 299, 309 (1990); *Romano v. Oklahoma,* 512 U.S. 1, 7 (1994). The presence of aggravating circumstances serves the purpose of limiting the class of death-eligible defendants and the Eighth Amendment does not require that such circumstances be further refined or defined by [the sentencer]. *Blystone,* 494 U.S. at 307, *citing, Lowenfield v. Phelps,* 484 U.S. 231, 244 (1988).

In *Woodson v. North Carolina,* 428 U.S. 280 (1976), the Supreme Court held that a state may not *automatically* require that the death penalty be imposed for certain murders. However, the Court has also held that *Woodson* does not preclude death sentencing statutes which, like Ohio's, require the imposition of death if statutory aggravating circumstances are found to outweigh mitigating factors. *Blystone,* 494 U.S. at 305. In addition, federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990).

Appellate court re-weighing of aggravating circumstances and mitigating factors may be used to cure a trial court's consideration of an invalid aggravating circumstance where other valid aggravating circumstances remain. *Romano,* 512 U.S. at 11; *see also Clemons v. Mississippi,* 494 U.S. 738 (1990). Whenever a sentence of death is imposed by a trial court in Ohio, an independent reweighing of the aggravating circumstances and mitigating factors by the Ohio Supreme Court is mandated by statute. Ohio Rev. Code § 2929.05(A).

**Analysis**

44

The thrust of Mr. Keene's argument with respect to his First, Third, Fourth, Twenty-Second, and Twenty-Third Grounds for Relief is that the trial and the Ohio Supreme Court violated his constitutional rights by erroneously considering invalid and unconstitutionally vague aggravating circumstances and by not properly weighing the evidence that he presented in mitigation or otherwise failing to properly weigh the aggravating circumstances versus the mitigating factors. These are essentially the same arguments that Mr. Keene raised before the Ohio state courts.

Mr. Keene has failed to identify any decision by the United States Supreme Court in which the Court held a death sentence violative of the Eighth Amendment under facts materially indistinguishable from the facts of his case. In other words, Mr. Keene has not pointed to any case in which the Supreme Court determined that a state court erred in considering an aggravating circumstance which the state court held to be validly applied under state law or in which the state court otherwise failed to properly perform the weighing process. Indeed, as noted above, the Supreme Court has recognized a State's latitude in this area.

Similarly, Mr. Keene has failed to establish that the Ohio Supreme Court resolved a question of law contrary to a controlling decision of the United States Supreme Court. Mr. Keene does argue that the Ohio Supreme Court acted contrary to *Maynard v. Cartwright,* 486 U.S. 356 (1988), when it considered the unconstitutionally vague non-statutory aggravating factors of the "cold and calculated" and "deliberate" way in which Mr. Keene committed the murders. However, a review of the Ohio Supreme Court's decision, *supra,* reveals that in rejecting this argument, the Ohio Supreme Court relied on *Tuilaepa* in which the United States Supreme Court noted that consideration of whether a defendant was a "cold blooded, pitiless slayer" was not constitutionally vague. *Tuilaepa,* 512 U.S. at 971-75, Indeed, *Tuilaepa* is on point and does not support Mr.

45

Keene's argument on the "cold and calculated" and "deliberate" issue.

Mr. Keene also alleges that the Ohio Courts contravened *Woodson v. North Carolina*, 428 U.S. 280 (1976), by determining that a death sentence is *required* by Ohio law when the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. However, contrary to Mr. Keene's argument, and as noted above, in *Blystone,* the United States Supreme Court held that *Woodson* does not preclude death sentence statutes like Ohio's which require the imposition of a sentence of death if the statutory aggravating circumstances outweigh the mitigating factors. That is precisely the conclusion that the Ohio courts came to in Mr. Keene's case; that is, both the trial court and the Ohio Supreme Court weighed the individual aggravating circumstances against the individual mitigating factors of each killing of which Mr. Keene was convicted and those courts determined that the aggravating circumstances outweighed the mitigating factors.

Mr. Keene also takes issue with the Ohio Supreme Court's independent review of the imposition of the death penalty. His position is that when that Court performed its independent review, it failed to consider and give appropriate weight to the mitigating evidence.

In its re-weighing of the aggravating circumstance against the mitigating factors in Mr. Keene's case, the Ohio Supreme Court considered separately the killings of Mr. Wilkerson, Ms. Cottrill, Mr. Washington, Ms. Gullette, and Ms. Abraham. That Court went on to identify the aggravating circumstances of each killing as well as the factors in mitigation. Finally, the Ohio Supreme Court engaged in a comparison of cases similar to Mr. Keene's case and noted that in those

cases it upheld the imposition of the death penalty.[6]  There is simply no indication that in the process

of its independent re-weighing of the aggravating circumstances and mitigating factors  the Ohio

Supreme Court determined that it was prohibited in any way from considering any of the mitigating

evidence which Mr. Keene presented to the trial court, that it did not consider the mitigating factors,

or that it considered any improper aggravating circumstances.

       Mr. Keene also seems to allege that the trial court committed error of a constitutional

dimension when it failed to correct the record to indicate that the panel returned from deliberations

at 4:40 p.m. and not at 4:55 p.m.  Mr. Keene's position is that the 4:40 p.m. return time indicates that

the panel did not spend  time sufficient enough to properly weigh the aggravating circumstances and

mitigating factors.

       In addressing this issue, the Ohio Supreme Court specifically noted that it is within

the province of the trial court to resolve disputes about the record and that where the trial court's

conclusion is supported by competent, reliable evidence, such ruling will not be reversed by a

reviewing court absent an abuse of discretion.  The Ohio Supreme Court essentially concluded that

the trial court did not abuse its discretion and that it properly determined that the stenographic record

was more persuasive evidence of the time the panel returned from its deliberations than was Mr.

Keene's counsel's affidavit which reflected his year-old recollection because the record  was made

contemporaneously to the trial proceedings and the affidavit, which was from former counsel for an

interested party, was insufficient to impeach that record.

       To the extent that Mr. Keene alleges that the trial court's short period of deliberation

---

[6]  The Ohio Supreme Court did note that it rejected the imposition of the death sentence in *Lawrence, supra,* which, like Mr. Keene's case, was a "multiple murder" case.  However, the Court also noted that *Lawrence* involved "only two murders", that each aggravated murder count carried only one death specification, and that the mitigating factors in *Lawrence* were far stronger than the mitigating factors in Mr. Keene's case.

is further proof that it did not properly weigh the aggravating circumstances and mitigating factors, this Court has already concluded that neither the trial court panel nor the Ohio Supreme Court committed error in their weighing processes. There is no clearly established federal law which requires a sentencing body to spend a minimum amount of time deliberating before reaching its conclusions in order to pass Constitutional muster.

In addressing the issues contained in Mr. Keene's First, Second, Third, Fourth, Twenty-Second, and Twenty-Third Grounds for Relief, the Ohio Supreme Court's decision did not result in one that was contrary to or which was an unreasonable application of clearly established federal law and those Grounds for Relief should be rejected.

**Fifth and Sixth Grounds for Relief**

In his Fifth and Sixth Grounds for Relief, Mr. Keene alleges that he was the subject of selective prosecution.

**FIFTH GROUND FOR RELIEF**

**When a court refuses to permit discovery and a hearing upon the presentation of sufficient evidence of selective prosecution in Montgomery County, a capital defendant's rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution are violated.**

Mr. Keene's argument in support of his Fifth Ground for Relief is that he presented to the trial court evidence of selective prosecution sufficient to warrant discovery on that issue. Mr. Keene's position is that the evidence he presented tended to show not only general discriminatory effect but also that racial discrimination played a role in his particular case. He claims that the trial court erred by failing to allow discovery on the issue of selective prosecution.

48

## SIXTH GROUND FOR RELIEF

**The trial court erred by failing to grant Mr. Keene's motion to dismiss the capital indictment against him on the basis of the Montgomery County prosecutor's demonstrated racial bias in seeking the death penalty in violation of the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.**

As to his Sixth Ground for Relief, Mr. Keene argues that he presented to the trial court sufficient evidence to establish that: (1) the Montgomery County Prosecutor has sought the death penalty almost twice as many times against African-Americans than against whites; (2) in Montgomery County, the population is 17% African-American, yet 64% of capital indictments have been against African-Americans.

### State court opinion

With respect to Mr. Keene's claim of selective prosecution, the Ohio Supreme Court wrote:

Discriminatory Prosecution

Appellant filed a motion in the trial court to dismiss the death specifications from the indictment for "discriminatory enforcement." Appellant claimed that the Montgomery County Prosecuting Attorney discriminates against black defendants in exercising his discretion to seek the death penalty. The trial court denied the motion to dismiss, and also denied appellant's requests for discovery and an evidentiary hearing on his discriminatory-prosecution claim.

In his first proposition of law, appellant claims that the trial court should have afforded discovery and a hearing on his discriminatory-prosecution claim. He relies on both Crim. R. 16 and federal constitutional law. We begin by analyzing his Crim. R. 16 claims.

Crim. R. 16(B)(1)(f) requires the prosecutor to disclose "all evidence *** favorable to the defendant and material either to guilt or punishment." According to appellant, evidence that the prosecuting

49

attorney has discriminated against black defendants in seeking the death penalty would be both "favorable" to him and "material to *** punishment."    Such evidence, appellant contends, would be "favorable" because it would support his claim of discriminatory prosecution.    And it would be "material to *** punishment," he contends, because it has to do with the prosecuting attorney's charging practices in seeking the death penalty.    Appellant therefore contends that any evidence in the prosecutor's possession that supports his claim of discrimination is discoverable under Crim. R. 16(B)(1)(f).

However, the history of the rule's language, "favorable to the defendant and material to guilt of punishment," suggests a different interpretation.    That phrase comes directly from *Brady v. Maryland,* (1963), 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-1197, 10 L.Ed2d 215, 218, which requires the state to disclose "evidence favorable to an accused *** where the evidence is material either to guilt or to punishment." We therefore conclude that the terms "favorable" and "material" in Crim. R. 16(B)(1)(f) have the same meaning as they do in *Brady* and its progeny.

Under *Brady,* "evidence favorable to an accused [and] *** material either to guilt or to punishment" is generally construed to encompass only exculpatory, mitigating, and impeachment evidence. "Thus the principles of *Brady* do not apply unless the evidence is material to mitigation, exculpation or impeachment.  *Calley v. Callaway* (C.A. 5, 1975), 519 F.2d 184, 221.

Appellant's selective-prosecution claim does not fall within those categories.    "A selective-prosecution claim is not defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong* (1996), 517 U.S. 456, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687, 689.    Similarly, appellant's selective-prosecution claim is not a "defense on the merits" to the death penalty; that is, the claim goes neither to appellant's eligibility for the death penalty nor to whether his offenses merit death.    Instead, his claim is that the death penalty may not be applied because the prosecutor sought it "for reasons forbidden by the Constitution."  *Id.*

We conclude that evidence relevant to a selective-prosecution claim is not "favorable to an accused [and] *** material either to guilt or to punishment" within the meaning of Brady and Crim.R. 16(B)(1)(f); therefore, such evidence is not discoverable under the rule.

Having rejected appellant's state-law claim, we must assess appellant's claim that the trial judge had a constitutional obligation to allow discovery.

In *United States v. Armstrong,* the court held that a defendant, in order to obtain discovery on a selective-prosecution claim, must "produce some evidence that similarly situated defendants of other races could have been prosecuted, but were not *** ." n1 517 U.S. at 469, 116 S.Ct. at 1488, 143 L.Ed.2d at 701.  The standard is deliberately "rigorous," 517 U.S. at 468, 116 S.Ct. at 1488, 143 L.Ed.2d at 701, because "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."  *Id.* at 464, 116 S.Ct. at 1486, 134 L.Ed2d at 698.

> n1 *Armstrong* does not expressly state that the right to discovery on a claim of facially discriminatory prosecution is grounded in the Constitution (and hence applicable to state as well as federal prosecutions).  However, the parties to this case have proceeded on the assumption that the discovery right is constitutionally grounded.  We think that assumption correct, since the discovery right outlined in *Armstrong* derives from, and is meant to enforce, the Fourteenth Amendment's prohibition of racially discriminatory prosecutions.

Appellant failed to produce some evidence that similarly situated defendants could have been prosecuted but were not.

Appellant points to the treatment of his white co-defendant, Mathews.  Mathews was indicted with death specifications, but the prosecutor dropped the specifications in exchange for Matthew's testimony against appellant.  Why, appellant asks, did the prosecutor not bargain with him and seek the death penalty for Mathews?

Appellant was the triggerman in four of the five aggravated murders involved here.  Mathews was charged with only two of these murders.  In neither case did Mathews pull the trigger.  Indeed, the record discloses no clear evidence that Mathews actually intended the deaths of Wilkerson and Abraham.  Mathews, therefore, is not a "similarly situated" defendant.

Appellant also cites the case of three white defendants who went on what appellant describes as a killing spree involving the robbery,

burglary, and murder of two victims.  Appellant alleges that "the same" death specifications could have been lodged, yet the Montgomery County Prosecutor did not seek the death penalty. However, the state contends that the evidence against these defendants was significantly weaker than the evidence against appellant.  Two of the defendants received plea bargains and testified against the third; in spite of this, the third defendant was acquitted of one of the two murders.

Appellant claims that sixty-four percent of capital indictments in Montgomery County since 1981 have been lodged against black defendants, while the county's population was only seventeen percent black.  However, as the court of appeals noted, this statistic creates no inference of discrimination by itself.  Appellant did not show the percentage of black and white defendants in potentially capital cases who were indicted without capital specifications.  Without that, there can be no meaningful comparison.

Appellant's contrary argument appears to rest on a presumption that, if seventeen percent of the county's population is black, then blacks must have committed about seventeen (or, at any rate, substantially less than sixty-four) percent of potentially capital crimes.  Appellant argues that even to question that presumption would constitute forbidden racial stereotyping.  However, that cannot be correct, for the *Armstrong* court itself rejected a presumption " 'that people of all races commit all types of crimes.' " ... 517 U.S. at 469, 116 S.Ct. at 1488, 134 L.Ed2d at 701, quoting *United States v. Armstrong* (C.A.9, 1995), 48 F.3d 1508, 1516-1517.

In any event, statistical evidence does not satisfy *Armstrong's* requirement that the defendant identify similarly situated defendants who could have been prosecuted, but were not.  "The general rule [is] that in cases involving discretionary judgments 'essential to the criminal justice process' statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory propose."  *United States v. Olvis* (C.A.4, 1996), 97 F.3d 739, 746, quoting, *McCleskey v. Kemp* (1987), 481 U.S. 279, 297, 107 S.Ct. 1756, 1769-1770, 95 L.Ed2d 262, 281.  The state has no duty to explain such a statistical disparity.  *Olvis,* 97 F.3d at 746.

Appellant also points out that the Montgomery County Prosecuting Attorney has never obtained a death sentence against a white defendant.  This is quite irrelevant, however, since appellant claims discrimination in charging practices.

We conclude that appellant failed to show "some evidence" that similarly situated defendants of other races could have been charged with death penalty specifications but were not. Therefore, he did not establish a constitutional right to discovery on his claim.

Appellant also claims that he was entitled to an evidentiary hearing on his due-process claim. Again, he raises both a federal constitutional claim and a state-law claim.

Citing *United States v. Hazel* (C.A.6, 1983), 696 F.2d 473, 475, appellant contends that due process entitled him to a hearing because he presented sufficient facts to raise a reasonable doubt as to the prosecutor's purpose. However, for the same reasons that he was not entitled to discovery, he was not entitled to a hearing. The facts he presented do not raise a reasonable doubt as to the prosecutor's purpose.

Appellant further argues that Ohio law entitles a defendant to a hearing on any pretrial motion that "states the motion's legal and factual bases with sufficient particularity to place the prosecutor and the court on notice of the issues to be decided." For this assertion, he cites Crim. R. 12(B) and *State v. Shindler* (1994), 70 Ohio St.3d 54, 636 N.E.2d 319, syllabus.

However, *Shindler* involved a motion to suppress evidence found in a warrantless search. In that situation, the prosecutor bore the burden of proving the legality of the search. With a selective-prosecution claim, the burden is upon the defendant; the prosecutor is presumed not to have discriminated. "In order to dispel [that] presumption ***, a criminal defendant must present 'clear evidence to the contrary.' " *Armstrong,* 517 U.S. at 465, 116 S.Ct. at 1486, 134 L.Ed.2d at 698-699, quoting *United States v. Chem. Found., Inc.* (1926), 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed.2d 131, 143. We agree with the court of appeals that *Shindler* is distinguishable. Appellant's first proposition of law is overruled.

In his fourteenth proposition of law, appellant argues that the evidence he submitted was by itself enough to show racial bias on the part of the county prosecutor. Therefore, he argues, his convictions should be reversed. n2 Yet, appellant candidly admits that he "did not prove that the prosecutor purposefully intended to discriminate against him. Therefore, he has not met the burden for this type of claim as enunciated in *McCleskey v. Kemp ***.*"

n2 Presumably, appellant means his death sentences should be reversed; he makes no claim that the prosecutor's decision to prosecute him in the first place was tainted by discrimination.

This concession would seem fatal to appellant's claim. However, appellant argues that – despite *McCleskey* – he was not required to prove purposeful discrimination against him.

First, he argues that the state, by successfully opposing his motion for discovery and a hearing, made it impossible to establish discriminatory purpose. Thus, he argues, the prosecutor "waived the *McCleskey* requirements." But we can see no sense in penalizing the prosecutor for successfully opposing appellant's motion.

Next, appellant tries to distinguish *McCleskey* on its facts. But the requirement of proving purposeful discrimination was not a novel creation of the *McCleskey* court and cannot be limited to the specific facts of *McCleskey*. Rather, it is a basic and generally applicable principle of Fourteenth Amendment equal protection analysis that a party claiming an equal protection violation has the burden of proving purposeful discrimination. *McCleskey,* 481 U.S. at 292, 107 S.Ct. at 1767, 95 L.Ed2d at 278*, quoting Whitus v. Georgia* (1967), 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed2d 599, 603-604. *See also*, *Armstrong*, 517 U.S. at 465, 116 S.Ct. at 1487, 134 L.Ed2d at 699, quoting *Wayte v. United States* (1985), 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556.

Finally, appellant argues that we should construe the Ohio Constitution to require a finding of racially biased charging decisions in capital cases "upon a showing of disparate impact, without a need to prove the prosecutor's subjective intent." But appellant offers no textual analysis of the state constitutional provisions he purports to rely upon (Ohio Constitution, Article I, Sections 1, 9, 10, 16, and 20), cites no precedent construing those provisions as he suggests, and states no reason why we should so construe them.

Appellant concedes that he has not met his burden of proving that the prosecutor purposely discriminated against him in charging him with capital offenses, and he offers no persuasive reason to relieve him of this burden. We therefore overrule his fourteenth proposition of law.

*Keene,* 81 Ohio St. 3d at ___, 693 N.E. 2d at 252-55.

**<u>Clearly established federal law</u>**

In *United States v. Bass,* 536 U.S. 862 (2002), the Court reversed the Sixth Circuit

and in doing so reviewed and applied the established law concerning claims of selective prosecution

raised at trial:

> In *United States v. Armstrong,* 517 U.S. 456, 465 ... (1996), we held
> that a defendant who seeks discovery on a claim of selective
> prosecution must show some evidence of both discriminatory effect
> and discriminatory intent. We need go no further in the present case
> than consideration of the evidence supporting discriminatory effect.
> As to that, *Armstrong* says that the defendant must make a "credible
> showing" that "similarly situated individuals of a different race were
> not prosecuted." *Id.* at 645, 470 ... . The Sixth Circuit concluded that
> respondent had made such a showing based on nationwide statistics
> demonstrating that "[t]he United States charges blacks with a death-
> eligible offense more than twice as often as it charges whites" and
> that the United States enters into plea bargains more frequently with
> whites than it does with blacks." 266 F.3d at 538-539 (citing U.S.
> Dept. of Justice, The Federal Death Penalty System: A Statistical
> Survey (1998-2000), p.2 (Sept. 12, 2000)). ... Even assuming that the
> *Armstrong* requirement can be satisfied by a nationwide showing (as
> opposed to a showing regarding the record of the decisionmakers in
> respondent's case), raw statistics regarding overall charges say
> nothing about charges brought against *similarly situated defendants*.
> ... Under *Armstrong,* therefore, because respondent failed to submit
> relevant evidence that similarly situated persons were treated
> differently, he was not entitled to discovery.

*Id.* at 863-64(emphasis in original).

In *McCleskey v. Kemp,* 481 U.S. 279 (1987), the Court noted the basic principle that

a defendant who alleges an equal protection violation has the burden of proving "the existence of

purposeful discrimination". *Id.* at 293. The Court also noted that a corollary to that principle is that

a criminal defendant must prove that the purposeful discrimination "had a discriminatory effect" on

him. *Id., citing, Wayte v. United States,* 470 U.S. 598, 608 (1985). Stated differently, to prevail on

an equal protection claim, the criminal defendant must prove that the decisionmakers in *his* case

acted with discriminatory purpose. *McCleskey, supra.* In addition, while acknowledging that it has accepted statistics as proof of intent to discriminate in certain limited contexts, such as in the selection of the jury venire in a particular district and to prove statutory violations under Title VII of the Civil Rights Act of 1964, the *McCleskey* Court noted that decisions to prosecute are "unique in nature" and involve "infinite factual variations." *Id.* at 295-97. In addition, the Court noted the policy considerations behind a prosecutor's traditionally "wide discretion" suggest the impropriety of requiring prosecutors to defend their decisions to seek death penalties, "often years after they were made". *Id.* at 296. The Court determined that "[b]ecause discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 297.

### Analysis

Mr. Keene acknowledges that *Armstrong* and *McCleskey* are the United States Supreme Court's controlling decisions on the issue of selective prosecution. *See, e.g.,* Doc. 93 at 42-43. In rejecting Mr. Keene's claim of selective prosecution, the Ohio Supreme Court applied *Armstrong* and *McCleskey* and properly analyzed his claims pursuant to the *Armstrong/McCleskey* principles. For example, the Ohio Supreme Court specifically noted that pursuant to *Armstrong*, in order to obtain discovery on a selective-prosecution claim, a defendant must produce some evidence that similarly situated defendants of other races could have been prosecuted but were not and that Mr. Keene had failed to produce even "some" evidence of that nature. In rejecting Mr. Keene's argument that he was able to support his allegation of selective prosecution because the prosecutor treated his co-defendant Heather Mathews, a white female, differently than the prosecutor treated him, the Ohio Supreme Court noted that Mr. Keene was the triggerman in four of the five aggravated

murders while Ms. Mathews was charged with only two of the murders, those of Mr. Wilkerson and Ms. Abraham, that she did not pull the trigger in either of the two, that there was no clear evidence that Ms. Mathews actually intended the deaths of either Mr. Wilkerson or Ms. Abraham, and therefore Ms. Mathews was not "similarly situated" for the purposes of an *Armstrong*/*McCleskey* analysis. The Ohio Supreme Court also rejected Mr. Keene's attempts to identify other defendants as "similarly situated" because evidence against those individuals was "significantly weaker" than the evidence against Mr. Keene. Finally, the Ohio Supreme Court rejected Mr. Keene's attempt to use statistical data to establish his claim of selective prosecution on the basis that statistical data does not satisfy *Armstrong*'s requirement that the defendant identify similarly situated defendants who could have been prosecuted but were not.

As noted above, in *Armstrong,* the Court noted that decisions to prosecute are unique in nature and involve infinite factual variations. Therefore, the Court's analysis of claims of discrimination based on matters other than those involving selective prosecution are decidedly different and inapplicable . Therefore, Mr. Keene's reliance on the Court's findings in cases such as *Batson v. Kentucky,* 476 U.S. 97 (1986), which involved the selection of petit jurors; *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 (1977), which involved a zoning matter; and *Washington v. Davis,* 426 U.S. 229 (1976), an employment case, is misplaced.

In rejecting Mr. Keene's claim of selective prosecution, the Ohio Supreme Court identified, relied upon, and properly applied clearly established federal law. Mr. Keene's Fifth and Sixth Grounds for Relief should be denied.

**Eighth and Tenth Grounds for Relief**

In his Eighth and Tenth Grounds for Relief, Mr. Keene alleges error with respect to the waiver of his jury trial right.

## EIGHTH GROUND FOR RELIEF

**The trial court erred in failing to grant petitioner's motion for change of venue, effectively forcing him to involuntarily waive his constitutional right to a jury trial, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene essentially argues in support of his Eighth Ground for Relief that the "avalanche" of pretrial publicity surrounding his case prejudiced potential jurors thereby effectively denying his right to a trial by an impartial jury and therefore the trial court erred by failing to grant his Motion for Change of Venue.

## TENTH GROUND FOR RELIEF

**When a trial court is aware of a capital defendant's propensity to acquiesce to authority figures, it is error to accept a jury waiver and permit a capital trial to proceed before a three judge panel, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene acknowledges that the trial court questioned him regarding his understanding of his constitutional rights and that he signed a jury trial waiver form. The substance of his Tenth Ground for Relief is that the colloquy between him and the court and the waiver he signed were inadequate for purposes of waiving his jury trial right. Mr. Keene's position is that because of his "personality style" the trial court should have engage in a more detailed colloquy which entailed requiring Mr. Keene to "actively assert his understanding" of his rights.

### State court opinion

The Ohio Supreme Court addressed Mr. Keene's "acquiescence" allegation on direct

appeal and held:

> A waiver of a defendant's jury trial right must be voluntary, knowing, and intelligent. *State v. Ruppert* (1978), 54 Ohio St.2d 263, 271, 8 O.O.3d 232, 236, 375 N.E.2d 1250, 1255. In his ninth proposition of law, appellant argues that his jury trial waiver was invalid because of his "propensity to acquiesce to authority figures."

> The trial judge conducted the following colloquy with appellant:

>> THE COURT: First of all, do you understand that you are entitled to have your case tried to a jury of twelve people?

>> MR. KEENE: Yes, sir.

>> THE COURT: Do you understand that in that event you could not be convicted of any one or more of these charges unless all twelve jurors were to agree on your guilt?

>> MR. KEENE: Yes, sir.

>> THE COURT: Now, you have the right under the statutes and the Constitution of the State of Ohio to waive or give up that right by jury [sic ] and have your case tried to a court consisting of three judges. Do you understand that?

>> MR. KEENE: Yes, sir.

>> THE COURT: Now, after your discussion with your attorneys, do you understand that this is a constitutional as well as a statutory right to trial by jury?

>> MR. KEENE: Yes, sir.

>> THE COURT: And * * * you fully understand this right?

>> MR. KEENE: Yes, sir.

>> THE COURT: And you have discussed this with

> your attorneys on more than one occasion, I'm sure. Is that right?
>
> MR. KEENE:  Yes, sir.
>
> THE COURT:  And after giving careful consideration to it, is it your desire to waive--and again by that I mean give up your right to trial by jury and proceed before a three-judge panel?
>
> MR. KEENE:  Yes, sir.
>
> THE COURT:  Do you understand that the panel will consist of the Court--this Court * * * and two other judges to be designated by the Chief Justice * * * ?
>
> MR. KEENE:  Yes, sir."

Appellant signed a jury waiver in open court.   The trial judge then continued:

> THE COURT:   Before the Court accepts these waivers, Mr. Keene, has anyone promised you anything in order to get you to give up that right?
>
> MR. KEENE:  No, sir.
>
> THE COURT:   Has anyone threatened you or otherwise brought pressure upon you, twisted your arm, to get you to give up that right?
>
> MR. KEENE:  No, sir.
>
> THE COURT:  * * * I understand, therefore, that it's under careful consideration, consultation * * * with your attorneys that you feel it is in your best interests to proceed in this manner?  * * *
>
> MR. KEENE:  Yes, sir."

Appellant claims that this colloquy, and the written waiver that accompanied it, are insufficient to prove that he voluntarily, knowingly, and intelligently waived his right to a jury trial. Appellant bases this argument on Dr. Cherry's testimony from the

suppression hearing regarding appellant's "personality style." Cherry had testified that appellant was a "follower" and a "passive, dependent type." Therefore, Cherry believed, appellant could not be assumed to have understood his rights unless someone "required [him] to actively assert his understanding * * * ."

 Based on Dr. Cherry's opinion, appellant argues that the trial court should have conducted the colloquy so as to require him to "actively assert his understanding" of his jury trial right. Appellant claims that the trial court's "yes or no" questions elicited mere "mechanical responses" that do not demonstrate a genuinely knowing and intelligent decision on appellant's part.

Yet the trial court had already rejected Cherry's testimony as ill-founded. Cherry's testimony, rejected by the trial court, is simply not a sufficient basis for impeaching appellant's waiver.

Even if Cherry's opinion had been accepted, appellant cites no precedent requiring a trial court to take a defendant's individual "personality style" into account when inquiring into the validity of his jury waiver. Indeed, a trial court may accept a defendant's jury waiver without any such inquiry at all. "There is no requirement for a trial court to interrogate a defendant in order to determine whether he * * * is fully apprised of the right to a jury trial." *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. Accord *United States v. Martin* (C.A.6, 1983), 704 F.2d 267, 274. Appellant's ninth proposition of law is overruled.

*State v. Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 258-59.

### Clearly established federal law

     Trial by jury is fundamental to American criminal jurisprudence. *See Duncan v. Louisiana,* 391 U.S. 145, 149 (1968). The purpose of the jury trial is to prevent governmental oppression and arbitrary law enforcement. *Id.* at 155. The jury trial gives the defendant "an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge. *Apprendi v. New Jersey,* 530 U.S. 466, 548 (2000), *citing, Duncan,* 391 U.S. at 156. Trial by jury may be waived only where the defendant's waiver is voluntary, knowing,

and intelligent. *See Patton v. United States,* 281 U.S. 276 (1930).

> [T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances – even though the defendant may not know the specific detailed consequences of invoking it. A defendant, for example, may waive his right to remain silent, his right to a jury trial, or his right to counsel even if the defendant does not know the specific questions the authorities intend to ask, who will likely serve on the jury, or the particular lawyer the State might otherwise provide.

*United States v. Ruiz,* 536 U.S. 622, 629-30 (2002), *citing, Colorado v. Spring,* 479 U.S. 564, 573-75 (1987).


**Analysis**

Mr. Keene, through counsel, filed his Motion for a Change of Venue on February 1, 1993. *See* Joint Appendix, Vol. I at Bates 000069-70. On September 23, 1993, Mr. Keene waived his right to a jury trial in open court and executed a written waiver form. *Id.* at Vol. II, at Bates 000754; Transcript of Proceedings, Part I, Vol. VIII at 1-6. However, at the time Mr. Keene waived his right to a jury trial, the trial court had not yet ruled on his Motion for a Change of Venue. While it is true that the trial court "failed to grant" Mr. Keene's venue motion, neither did it deny it prior to Mr. Keene's waiving his jury trial right. Mr. Keene's position, then, seems to be that he had a right to know how the trial court would rule on his Motion for a Change of Venue before deciding whether to waive his right to a jury trial. However, Mr. Keene does not point to, nor is this Court able to find, any clearly established federal law which provides that a criminal defendant is entitled to have a change of venue motion decided by the trial court prior to the time the defendant makes a decision as to whether to waive his jury trial right.

62

In rejecting Mr. Keene's claim that the trial court erred by accepting his waiver of his right to a jury trial, the Ohio Supreme Court first noted that the evidence upon which Mr. Keene based his "personality style" argument, and which the trial court rejected, was not a sufficient basis for impeaching Mr. Keene's waiver[7].  The Ohio Supreme Court also noted that there is no requirement that a trial court interrogate a defendant in order to determine whether he is fully apprised of his right to a jury trial.  That Court's findings and conclusions are consistent  with clearly established federal law.  Specifically, *Ruiz* provides that the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances.  The colloquy between the trial court and Mr. Keene clearly demonstrates that Mr. Keene understood his right to a jury trial as well as the consequences of his waiver of that right.

   Mr. Keene's argument that the trial court erred by accepting his jury trial waiver because of his particular "personality style"suggests that in determining whether to accept that defendant's waiver of any rights, particularly the right to a jury trial, a trial court is bound to consider a criminal defendant's individual "personality style", as opposed to his competency. Again, however, Mr. Keene has not cited, nor has this Court located, any federal law which stands for that proposition.

   Finally, this Court notes that in his Petition, Mr. Keene cites extensively to pre-trial media reports  and relies, in part, on cases which address pre-trial publicity *vis-a-vis* venue issues. However, the Court also notes that Mr. Keene never raised the issue of pre-trial publicity in any state proceedings and he does not argue here that the three-judge panel was not able to conduct a fair trial

---

[7] This evidence was testimony which psychologist Eugene Cherry gave at a hearing on Mr. Keene's Motion to Suppress.  *See* Return of Writ, Transcript of Proceedings, Part I, Vol. V at 243-72.

63

and/or render a fair decision due to pre-trial publicity.

Mr. Keene's Eighth and Tenth Grounds for Relief should be denied.

### Ninth Ground for Relief

In his Ninth Ground for Relief, Mr. Keene claims that the trial court erred when it failed to suppress identification of Mr. Keene.

### NINTH GROUND FOR RELIEF

**The trial court erred in failing to suppress identification of Mr. Keene when the identification procedures employed in the case at bar were so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene's position is that Kathie Henderson's in-court identification of him was tainted by the process which the investigating police used during the investigation of the matters which are the subject of Mr. Keene's conviction. Specifically, Mr. Keene argues that Ms. Henderson, described only two (2) physical attributes of the individual who assaulted her, that she subsequently viewed a photographic array on one piece of paper, and that the array did not include any individuals who physically resembled Mr. Keene with regard to his distinctive hairstyle. Mr. Keene argues that such a procedure violated his due process rights because it was unduly suggestive and that it, in turn, tainted Ms. Henderson's in-court identification.

### State court opinion

In addressing Mr. Keene's claim with respect to the identification process, the Ohio Supreme Court determined:

> In his tenth proposition of law, appellant claims the testimony of Henderson, identifying appellant as the man who pointed a gun at her on December 26, was tainted by an improper photographic lineup and

64

should have been suppressed.  *See Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.

We note that, even if appellant were to prevail on this issue, Henderson's testimony was relevant only to Count Eight, which charged appellant with aggravated robbery for stealing Henderson's car at gunpoint.  Although appellant seems to contend otherwise, this issue does not affect his death sentences.

Henderson had described her assailant as having a "box" haircut. Appellant was the only suspect in the photo lineup with such a haircut.   Appellant argues, with some persuasiveness, that it was unnecessarily suggestive to arrange a lineup with only one distinctive box haircut in it.

The state argues that, even if the lineup was suggestive, Henderson's identification of appellant was reliable under the totality of the circumstances, and hence admissible.

We find reliability to be a close question on the facts of this case. However, assuming that the identification was erroneously admitted, the error was harmless.  Appellant confessed that he stole a car at the BP service station on the morning of December 26.    Mathews testified that she saw him do it.    Appellant was actually in Henderson's car when he was arrested. Moreover, the plates on that car belonged to Wilkerson's Pontiac, which appellant also admitted he stole;  the Pontiac, in turn, was found with one of Henderson's plates on it.   On this evidence, it is clear beyond a reasonable doubt that appellant would have been convicted on Count Eight even without Henderson's identification.   Appellant's tenth proposition of law is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 258.

### Clearly established federal law

A defendant can claim that a witness' pre-trial confrontation with him was "so unnecessarily suggestive and conductive to irreparable mistaken identification that he was denied

due process of law." *Stovall v. Denno,* 388 U.S. 293, 301-02 (1967)[8]. The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations is to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process. *Neil v. Biggers,* 409 U.S. 188, 199 (1972) (citations omitted).

Resolution of the issue must be determined based "on the totality of the circumstances". *Stovall, supra.* Each case must be considered on its own facts, and convictions based on eye witness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384 (1968). The primary evil to be avoided is "a very substantial likelihood of irreparable misidentification". *Id.* While this phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. *Neil,* 409 U.S. at 198 (citation omitted). It is the likelihood of misidentification which violates a defendant's right to due process. *Id.* Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. *Id.*

The factors to be considered in evaluating the likelihood of misidentification include

---

[8] The Court in *Newman v. Emerson Radio Corp.,* 48 Cal.3d 973, 986 (1989), suggested that *Stovall* had been essentially overruled by *Griffith v. Kentucky,* 479 U.S. 314 (1987). Assuming that the *Newman* Court's analysis is correct, the issue being addressed in *Griffith* was the retroactive application of new rules for the conduct of criminal prosecutions and was unrelated to the proposition for which this Court relies on *Stovall.*

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Id.* at 199-200.

Some federal constitutional errors can be deemed harmless. *Chapman v. California,* 386 U.S. 18 (1967). Since *Chapman,* the Supreme Curt has found only a few constitutional errors that are so fundamental as to be automatically reversible and not subject to the harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 306 (1991); *see also, Neder v. United States,* 527 U.S. 1 (1999)("we have recognized a limited class of fundamental constitutional errors that 'defy analysis by "harmless error" standards'"(*quoting, Fulminante,* 499 U.S. at 279)). Such "structural" errors include: the giving of an erroneous "reasonable doubt" instruction, *Sullivan v. Louisiana,* 508 U.S. 275, 281-82 (1993); the appointment of an interested party's attorney as a prosecutor for contempt charges, *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 809-14 (1987); the excusing of a juror for cause in a capital case who was not irrevocably committed to vote against the death penalty regardless of the facts and circumstances of the case, *Gray v. Mississippi,* 481 U.S. 648, 668 (1987); the unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery,* 474 U.S. 254, 263-64 (1986); the denial of the right to a public trial, *Waller v. Georgia,* 467 U.S. 39, 48-50 n. 9 (1984); the abridgment of the right to self-representation, *McKaskle v. Wiggins,* 465 U.S. 168, 177 n. 8 (1984); the complete denial of the right to counsel at trial, *Gideon v. Wainwright,* 372 U.S. 335 (1963); and trial before a biased judge, *Tumey v. Ohio,* 273 U.S. 510 (1927).

In each of these cases, the error affected the framework of the trial so that it was

67

impossible to determine whether the result was correct.  That is, "[e]ach of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."  *Fulminante,* 499 U.S. at 310.  Put another way, these errors deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair.  *Neder,* 527 U.S. at 8-9 (citation omitted).

       In contrast to finding that some constitutional errors are so fundamental as to not be subject to the harmless error rule, the Supreme Court has found that certain constitutional errors *are* subject to harmless error review.  These include:  unconstitutionally overbroad jury instructions at the sentencing stage of a capital case, *Clemons v. Mississippi,* 494 U.S. 738, 752-54 (1990); admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause, *Satterwhite v. Texas,* 486 U.S. 249 (1988); jury instruction containing an erroneous conclusive presumption, *Carella v. California,* 491 U.S. 263, 266 (1989); jury instruction misstating an element of the offense, *Pope v. Illinois,* 481 U.S. 497, 501-04 (1987); jury instruction containing an erroneous rebuttable presumption, *Rose v. Clark,* 478 U.S. 570 (1986); erroneous exclusion of defendant's testimony regarding the circumstances of his confession, *Crane v. Kentucky,* 476 U.S. 683, 691 (1986); restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause, *Delaware v. Van Ardsall,* 475 U.S. 673 (1986); *Rushen v. Spain,* 464 U.S. 114, 118-18 n. 7 (1983), denial of defendant's right to be present at trial; improper comment on defendant's silence at trial in violation of the Fifth Amendment Self Incrimination Clause, *United States v. Hasting,* 461 U.S. 499 (1983); statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the

Due Process Clause, *Hooper v. Evans,* 456 U.S. 605 (1982); failure to instruct the jury on the

presumption of innocence, *Kentucky v. Whorton,* 441 U.S. 786 (1979); admission of identification

evidence in violation of the Sixth Amendment Counsel Clause, *Moore v. Illinois,* 434 U.S. 220, 232

(1977); admission of evidence obtained in violation of the Fourth Amendment, *Chambers v.

Maroney,* 399 U.S. 42, 52-52 (1970); denial of counsel at preliminary hearing in violation of the

Sixth Amendment Confrontation Clause, *Coleman v. Alabama,* 399 U.S. 1, 10-11 (1970).    In

*Fulminante,* the Supreme Court explained that:

> The common thread connecting these cases is that each involved
> "trial error"– error which occurred during the presentation of the case
> to the jury, and which may therefore be quantitatively assessed in the
> context of other evidence presented in order to determine whether its
> admission was harmless beyond a reasonable doubt.

*Fulminante,* 499 U.S. at 307-08.   The harmless error rule thus "promotes public respect for the

criminal process by focusing on the underlying fairness of the trail rather than on the virtually

inevitable presence of immaterial error."   *Satterwhite,* 486 U.S. at 256 (citations omitted).

In-court identifications are subject to harmless error analysis. *United States v. Wade,*

388 U.S. 218, 242 (1967).   In habeas corpus cases brought pursuant to §2254, the standard

governing harmless error for trial-type constitutional errors is the one articulated in *Kotteakos v.

United States,* 328 U.S. 750, 776 (1946).   *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993). If the

trial error had substantial and injurious effect or influence in determining the jury's verdict, the error

is not harmless.   *Kotteakos,* 328 U.S. at 776.   The inquiry cannot be merely whether there was

enough to support the result apart from the phase affected by the error.   *Id.*   It is rather, even so,

whether the error itself had substantial influence.   *Id.* at 765.   It is not enough, therefore, for the

district court to decide, based on the record, that the remaining evidence is "sufficient" for

69

conviction. *Id.* at 767. The issue is not whether the evidence against a petitioner was overwhelming; however, an overwhelming amount of evidence does go to the inquiry of whether the error had a substantial and injurious effect or influence on the jury's verdict. *Id.* at 764-64.

**Analysis**

First, this Court notes that Ms. Henderson's identification of Mr. Keene goes to his conviction for aggravated robbery, which was Count Eight of the indictment, and not for any of the aggravated murder convictions for which the death sentence was imposed.

At the June 25, 1993, hearing on Mr. Keene's Motion to Suppress, Transcript of Proceedings, Hearing on Motion to Suppress, Part I, Vol. 5, p. 5-32, and again at the October, 1993, trial of this matter, Transcript of Proceedings, Trail Phase, Part II, Vol. 2, p. 477-503, Ms. Henderson testified as follows: she and her husband owned a black 1989 Dodge Shadow; on the early morning of Saturday, December 26, 1992, she noticed that the right front passenger tire had an air leak; she drove the vehicle to the BP gas station at the corner of Salem Avenue and Free Pike in Dayton, Ohio, to put air in the tire; although it was not quite completely light outside, the gas station, including the air hose area, was well-lit; while she was putting air in the tire, a man approached her and asked her if she had a quarter he could have because he wanted to use the telephone; she told the man she did not have a quarter and he left the area; she felt as though something was "not right" and she looked up and saw two men—the one who had asked for a quarter and another—and heard the second one say to the first something to the effect of, "If you are going to kill her, come on"; the first man returned to where she was, pointed a gun at her, and told her, "You will die today"; she ran in a zig-zag pattern into the gas station and told the individuals in the station that someone was trying to kill her; someone called the police and when the officers

70

arrived, she gave them a description of the man who had asked her for a quarter and who later

pointed the gun at her which included his having light-colored skin, black hair, about her height,

deep eyes, and a "box-style" haircut; she also gave the police officers information about her 1989

Dodge Shadow which was now gone from the BP station; two (2) days after the incident,

specifically, on Monday, December 28, 1992, she went to the police station where she looked at

pictures on a piece of paper; that she immediately recognized the individual in photograph Number

5 as the man who had asked her for a quarter and who later pointed a gun at her; and the individual

in picture Number 5 was the only person with a "box-style" haircut. Ms. Henderson subsequently

made a courtroom identification of Mr. Keene as the man who had asked her for a quarter, who later

pointed a gun at her, and who said to her, "Today you will die."

        Considering the totality of the circumstances, the identification procedures employed

in this case were not "so unnecessarily suggestive and conductive to irreparable mistaken

identification" that Mr. Keene was denied due process of law. Ms. Henderson testified on two (2)

occasions—the hearing on the motion to suppress and the trial itself—that the area of the BP station

where Mr. Keene approached her the first time when he asked her for a quarter and the second time

when he pointed a gun at her and told her she would die, was well lit.  In addition, Ms. Henderson

had the opportunity to see Mr. Keene face-to-face at the time of each confrontation and shortly after

their confrontations, she described Mr. Keene to the police officers who responded to the scene.  Ms.

Henderson viewed the photo array only two (2) days after the incident at the BP station and without

hesitation, she immediately identified photograph Number 5 (a photo of Mr. Keene) as the

individual with whom she had the confrontations at the BP station.  These *Neil* factors weigh against

a substantial likelihood of misidentification of Mr. Keene.  Accordingly, the State did not violate

Mr. Keene's due process rights by employing an identification process which was unnecessarily suggestive.

As noted above, the Ohio Supreme Court determined further that even if it was error for the trial court to admit Ms. Henderson's identification of Mr. Keene, any such error was harmless. Assuming, then, that the trial court did err in admitting Ms. Henderson's identification of Mr. Keene, the question, then, is whether such trial error had a substantial and injurious effect or influence in determining the jury's verdict. If it did, then the error was not harmless.

At both the hearing on the motion to suppress, Transcript of Proceedings, Hearing on Motion to Suppress, Part I, Vol. 5, p.56-69, and again at the October, 1993, trial of this matter, Transcript of Proceedings, Trail Phase, Part II, Vol. 4, p. 813-37, Dayton Police Department Detective Sergeant John Huber testified that at the time the police stopped the 1988 black Dodge Shadow, Mr. Keene was driving the vehicle. The car did not have Ms. Henderson's plates of "FKD 727", but rather a front plate reading "FMB 186", a plate which had been issued to Joseph Wilkerson, a December 24,1992, homicide victim. Dayton Police Officer Wade Lawson testified at trial that Mr. Keene confessed to shooting Mr. Wilkerson. Transcript of Proceedings, Trail Phase, Part II, Vol. 5, p. 1156-1247. Mr. Keene confessed that he and DeMarcus "Skeet" Smith had shot Ms. Gullette and when he was arrested, Mr. Keene was wearing a red/white/gray plaid shirt which, it was later determined, belonged to Ms. Gullette. Mr. Keene also confessed that on December 25, 1992, the day after he shot Mr. Wilkerson, he returned to Mr. Wilkerson's residence and took his blue Pontiac Grand Am automobile. Mr. Keene confessed further that on December 26, 1992, he had been at the BP gas station, that he had pointed a gun at a woman, and that had taken the woman's car. *Id.* In addition, Mr. Keene admitted that later in the day of December 26, 1992, he

shot Ms. Abraham, the woman working in the mini-mart. *Id.*

In light of this overwhelming amount of evidence against Mr. Keene, particularly his own confessions, any error committed by allowing Ms. Henderson to make an in-court identification of Mr. Keene or by not suppressing her identification of Mr. Keene would not have had a substantial and injurious effect or influence on the court's verdict.

In considering Mr. Keene's claim on this issue, the Ohio Supreme Court properly applied controlling federal law and Mr. Keene's Ninth Ground for Relief should be rejected.

**Eleventh Ground for Relief**

In his Eleventh Ground, Mr. Keene argues that the trial court erred when it failed to suppress statements he made to the Dayton police.

### ELEVENTH GROUND FOR RELIEF

> **The trial court erred when it failed to suppress the statements of Mr. Keene to the Dayton police department because the statements were involuntary and Mr. Keene did not make a knowing and intelligent waiver of his rights. The trial court's action denied Mr. Keene his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

Mr. Keene alleges in support of his Eleventh Ground for Relief that the trial court erred by denying his motion to suppress evidence concerning statements he made to the Dayton police upon his arrest. Essentially, Mr. Keene claims that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights.

**State court opinion**

In addressing Mr. Keene's argument that his statements and confessions should have been suppressed, the Ohio Supreme Court said:

73

On December 26, 1992, appellant was arrested.    At the police station, he was taken to an interrogation room, where he sat for about three hours, until Detectives Tom Lawson and Wade Lawson arrived.   Tom Lawson administered Miranda warnings.    Appellant stated orally that he understood his rights. After the warnings were completed, appellant agreed to answer questions and signed a Dayton Police Department waiver form to signify that he understood his rights and was willing to answer questions.   He answered questions for forty-five minutes.  After that, the detectives recorded appellant's statement on videotape.   The next day, the detectives re-advised appellant of his rights and interviewed him again.

In his fifth proposition of law, appellant claims that the trial court should have suppressed his confessions of December 26 and 27, 1992, because the state did not prove that his waiver of Miranda rights on December 26 was voluntary, knowing, and intelligent.

Voluntariness is a legal question for a reviewing court to determine independently.   *See, e.g., Beckwith v. United States* (1976), 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1, 8. However, this court must defer to the trial court's factual findings, if those are supported by the record.   *See, e.g., State v. Wilson* (1996), 74 Ohio St.3d 381, 390, 659 N.E.2d 292, 303.

Appellant argues that police misconduct, combined with his own intoxication and "psychological deficits," rendered him unable to voluntarily waive his rights.   He claims that, on the day of his arrest, he ingested two fifths of wine, eighty ounces of beer, and several pills (Valium, Xanax, and Dalmane).   He claims that, despite his repeated requests, police denied him permission to use the bathroom for seven hours on December 26, until they were through interrogating him.

 As to police misconduct and intoxication, appellant's claims are based wholly upon his own self-serving testimony at the suppression hearing.  However, appellant's testimony was contradicted by several Dayton police officers.   The trial court accepted the police testimony as true and found that appellant's testimony was not credible.

 The court specifically rejected appellant's testimony that he was intoxicated.   The court noted that appellant had displayed a "lucid memory" in his own testimony.   Moreover, appellant was driving Henderson's car when he was arrested.   The trial court pointed out that, if appellant "had ingested the amount of wine and pills which he claims, * * * he would be unconscious and certainly not able to

operate a motor vehicle."

Based on police testimony and appellant's videotaped confession, the court found that appellant appeared "normal, alert * * * lucid and oriented"; that he "was in full command of his senses" and "aware of the seriousness of the charges"; and that he showed no signs of intoxication.

Moreover, the trial court found, contrary to appellant's testimony, that appellant was permitted, at his request, to use the bathroom before the December 26 interrogation. This finding was supported by the testimony of Detective Sergeant John Huber and Patrolman Herb Rogers, who escorted appellant to the bathroom about one-half hour after he was brought in. Also, Detective Wade Lawson testified that he permitted appellant to use the bathroom during his interrogation.

Since the hearing record supports the trial court's findings of fact, we are bound thereby. Thus, to the extent appellant's arguments rest on his own testimony, which the trial court disbelieved, they are invalid. *See State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719.

Appellant also claims that his waiver was not knowing and intelligent. On this issue, appellant relies upon the testimony of Dr. Eugene S. Cherry, a psychologist.

Dr. Cherry felt that appellant's waiver was not knowing and intelligent because the Dayton Police waiver form contains only one signature line. By signing, the suspect both acknowledges understanding of his rights and waives them. Because appellant is a "passive, dependent" personality, Cherry felt appellant could not be assumed to have understood his rights unless someone "required [him] to actively assert his understanding * * * ." To ensure that appellant really understood his rights instead of just going along, Cherry felt the police should have had appellant acknowledge his rights separately from waiving them.

Here again, however, the trial court rejected Dr. Cherry's testimony. The court had ample grounds to do so; Cherry admitted his opinion was "really not well established." Moreover, Cherry assumed that appellant's claim of intoxication was true; that claim was ultimately rejected by the trial court. Since we cannot second-guess the trial court's factual findings, appellant's reliance on Cherry's testimony is

misplaced.   Appellant's fifth proposition of law is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 257-58.

### Clearly established federal law

In *Miranda v. Arizona,* 384 U.S. 436, 467 (1966), the Supreme Court held that custodial interrogations are inherently coercive.  To combat this and to protect the Fifth Amendment privilege against self-incrimination, *Miranda* set forth procedures through which police officers should appraise defendants of their rights.  *See Moran v. Burbine,* 475 U.S. 412 (1986).  The *Miranda* warnings ensure that a suspect knows of his rights not to talk with the police, to have a lawyer present, and to discontinue talking at any time, as well as ensuring that the suspect is appraised that his statements can be used to secure his conviction.  *Id.*  A person can waive these rights, but *Miranda,* requires that the waiver be voluntary, knowing, and intelligent.  *Miranda,* 384 U.S. at 444.  The test for waiver "has two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Colorado v. Spring,* 497 U.S. 564, 573 (1987), *quoting, Moran,* 475 U.S. at 421.

A court should consider the "totality of the circumstances" of the interrogation to determine whether the suspect had the requisite level of comprehension.  *Spring, supra.*  It is not necessary that a suspect know and understand every possible consequence of a waiver.  *Id.* at 574.  Thus, when a suspect's voluntary decision to answer police officers' questions is made with

"requisite" comprehension of all the information required by *Miranda* (that he has the right to remain silent and to have an attorney present during custodial interrogation, and that his responses to police questioning can be used as evidence against him), his waiver is knowing and intelligent under *Miranda. See Id.* at 574-75.    If an individual effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him. *North Carolina v. Butler,* 441 U.S. 369, 372-76 (1979).[9]

Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). There is no reason to require more in the way of a "voluntariness" inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. *Id.* at 169-70. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. *Id.* (citations omitted). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. *Id.* (citations omitted). A defendant's mental condition, by itself and apart from its relation to official coercion, does not dispose of the inquiry into constitutional "voluntariness". *Id.* at 164.

**<u>Analysis</u>**

In rejecting Mr. Keene's *Miranda* claim, the Ohio Supreme Court's adjudication of the issue was not contrary to, or an unreasonable application of, clearly established federal law.

The trial court's, and ultimately the Ohio Supreme Court's, reliance on the testimony

---

[9] Although not an issue in the present matter, it is well settled that if a suspect requests counsel at any time during an interview to which he has agreed, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981).

from police officers Wade Lawson, Herb Rogers, and John Huber at the hearing on Mr. Keene's Motion to Suppress, all of which was consistent with those witnesses' trial testimony, and rejection of Dr. Eugene Cherry's and Mr. Keene's Motion to Suppress hearing testimony, was completely reasonable in light of those individuals' testimony. For example, in contrast to Mr. Keene's testimony, the police officers' testimony is consistent with each other with respect to Mr. Keene being permitted to use the rest room when he requested to do so, that each of Mr. Keene's rights was read to him, that he acknowledged his understanding of each one separately and apart from the other, that he waived each of his rights, that he was alert and oriented and did not appear to be under the influence of drugs or alcohol. *See* Hearing on Motion to Suppress, Part I, Vol. 5, p. 56-88 (testimony of John Huber); p. 106-21 (testimony of Herb Rogers); p. 124-83 (testimony of Wade Lawson). Further, Dr. Cherry acknowledged that his opinion was "really not well established". *Id.* at 243-72 (testimony of Eugene Cherry, Ph.D.).

The Ohio Court's decision is entirely consistent with the governing principle announced by the United States Supreme Court, to wit: that some police coercion is essential to establish an involuntary *Miranda* waiver. The totality of the circumstances surrounding the interrogation of Mr. Keene reveals both an uncoerced choice and a level of comprehension on Mr. Keene's part indicating that he effectively, that is, voluntarily, knowingly, and intelligently, waived his *Miranda* rights.

The Ohio Supreme Court properly applied controlling federal law when addressing the issue in Mr. Keene's Eleventh Ground for Relief and it therefore should be denied.

**Twelfth, Fifteenth, Sixteenth, and Eighteenth Grounds for Relief**

Mr. Keene alleges in his Twelfth, Fifteenth, Sixteenth, and Eighteenth Grounds for

Relief that the trial court committed various trial error.

## TWELFTH GROUND FOR RELIEF

**The trial court erred by admitting evidence over objection when the State failed to show that physical evidence offered at trial was in substantially the same condition as it was at the time of the crime. The Admission of such evidence violated Mr. Keene's rights to due process, a fair trial and a reliable verdict under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

Mr. Keene alleges in support of his Twelfth Ground that the trial court erroneously admitted into evidence a pair of Fila gym shoes which the state claimed belonged to Ms. Gullette, one of the victims. Mr. Keene's position is that the State failed to establish a proper chain of custody and therefore the shoes should not have been admitted.

## FIFTEENTH GROUND FOR RELIEF

**The trial court erred by allowing the state to repeatedly introduce other acts evidence at Mr. Keene's trial, and thus denied his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.[10]**

In support of this Ground, Mr. Keene argues that the trial court erred by admitting evidence which allowed the inference of "guilt by association". Specifically, Mr. Keene takes issue with the admission of evidence related to discussion of plans to rob people which led to the events surrounding Mr. Maddox's murder by Ms. Taylor, the attempted murder of Mr. Wright by Mr. Smith, a shooting, and linkage to personal effects of two murdered persons, *i.e,* Ms. Gullette's gym shoes and Mr. Wilkerson's vehicle.

---

[10]  As noted above, this Ground is dismissed insofar as it makes a claim that the admission in evidence of a pari of Fila gym shoes was improper 'other acts' evidence.

## SIXTEENTH GROUND FOR RELIEF

**The trial court erred by allowing the State to introduce repeated instances of victim impact testimony during the culpability phase of Mr. Keene's capital trial in violation of Ohio Revised Code §§2943.041 and 2945.07, and the Fifth, Sixth, Ninth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene claims that the trial court committed error when it admitted victim impact testimony during the guilt phase of his trial. Mr. Keene's position is that the trial court erroneously admitted Ms. Gullette's sister's [sic] testimony about how close a relationship she had with Ms. Gullette[11]. Mr. Keene also complains of the admission of Ms. Abraham's brother Michael Abraham's testimony about Ms. Abraham's marital status, the number of siblings she had, as well as the ages of her children and the fact that as a result of Ms. Abraham's death, one of the children had to live with one of Ms. Abraham's brothers. Mr. Keene also challenges the admission of Mr. Abraham's testimony about his initial visit to Ms. Abraham in the hospital and the experience of terminating her life support. Finally, Mr. Keene claims that the trial court erred by admitting Mr. Wilkerson's sister Debra Oxendine's testimony about Mr. Wilkerson going to the Detroit, Michigan area to see another sister's baby and by admitting Pamela Peavy's testimony that Mr. Wilkerson had come to her house on December 23, 1992, to bring her grandson a Christmas gift.

## EIGHTEENTH GROUND FOR RELIEF

**The trial court erred by admitting the testimony of Nicholas Woodson which was irrelevant, highly prejudicial, used to show propensity, in violation of Mr. Keene's right to substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth,**

---

[11]  Although Mr. Keene refers to Ms. Gullette's "sister", the testimony he references is that of Angela Martin. *See* Transcript of Proceedings, Trial Phase, Part II, Vol. 2, p. 342-52. However, Ms. Martin's testimony indicates that she lived with Ms. Gullette's brother Darryl Black and that she was a friend to Ms. Gullette. *Id.*

**and Fourteenth Amendments to the United States Constitution.**

In support of his Eighteenth Ground for Relief, Mr. Keene argues that the trial court erred by admitting Mr. Woodson's testimony because it was patently irrelevant, did not relate to any crime for which he (Mr. Keene) was being tried, and because it largely consisted of propensity evidence used to try to demonstrate that Mr. Keene was the "kind of person" who would commit murder.

### State court opinion

In addressing Mr. Keene's allegations with respect to evidentiary errors Mr. Keene claimed the trial court made, the Ohio Supreme Court said:

> Appellant claims in his seventh proposition of law that the state used "other acts" evidence to attack his character, violating Evid. R. 404(B), which reads, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however be admissible for other purposes ***."
>
> Appellant claims that the state erred by introducing evidence involving Taylor's murder of Maddox. Appellant had agreed to help Taylor rob Maddox, but there was no evidence that he was involved in the murder, and he was not charged with any crimes against Maddox.
>
> We agree that this uncharged crime was irrelevant. However, we find the error harmless. Appellant confessed to the five murders he was charged with. Evidence of his minor participation in Taylor's scheme to rob Maddox could not have done much further damage to appellant's character. Moreover, the prosecutor did not use the evidence to show that appellant was a person of bad character. Finally, the trier of fact was a three-judge panel. *See State v. Post,* (1987) 32 Ohio St.3d 380, 513 N.E.2d 754.
>
> Appellant also claims that evidence involving the shooting of Wright was "other acts" evidence. But this crime was clearly introduced for a valid purpose having nothing to do with appellant's character. One of the death specifications for the Cottrill-Washington murders

81

alleged that the victims were killed because they were witnesses to a crime – and Smith's shooting of Wright was the crime they witnessed. Therefore, the state did not violate Evid R. 404(B) by proving that Smith shot Wright.

Woodson testified that he saw appellant shoot an unidentified robbery victim, and that appellant told him about yet another shooting. The defense did not object, so these issues are waived. Appellant's seventh proposition of law is overruled.

Appellant's sixteenth proposition of law reargues issues raised in his seventh proposition of law with regard to Woodson's testimony. Appellant's sixteenth proposition of law is overruled.

In his eleventh proposition of law, appellant argues that the state introduced "victim impact" evidence in the guilt phase, where such evidence is inadmissible. *See, e.g., State v. Taylor,* (1990), 50 Ohio St.3d 24, 553 N.E.2d 576. However, appellant objected to only one of the alleged errors.

Over objection, Gullette's friend, Angela Martin, testified that she had a close relationship with Gullette and that they borrowed each other's clothes. However, the panel properly overruled the objection. Gullette had borrowed Martin's jacket the night she was killed; that was the same jacket stolen from Gullette, and Martin identified it. Martin's relationship with Gullette explains how Martin could identify the jacket and why Gullette was wearing it. Thus, it was relevant for a nonvictim-impact purpose.

As to other alleged "victim impact" testimony, appellant did not object, so these issues are waived. We overrule appellant's eleventh proposition of law.

In his seventeenth proposition of law, appellant argues that Gullette's Fila sneakers should have been excluded due to the state's failure to prove an unbroken chain of custody. However, the state was not required to prove a perfect, unbroken chain of custody. The break identified by appellant was minor. We find no error in the admission of the sneakers. (The alleged error would be harmless in any event. Appellant confessed to shooting Gullette while robbing her, and specifically described to police how Smith stole Gullette's sneakers after forcing her to take them off). Appellant's seventeenth proposition of law is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 259-60.

**Clearly established federal law**

Apart from circumstances giving rise to deprivation of a specific constitutional right, trial error will result in a constitutional violation only where it so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974). Only where the erroneous application of state law deprives a petitioner of a fundamental constitutional guarantee will a federal court inquire into the state court rulings. *Id.* State court ruling on the admission of evidence are not open to challenge in a federal habeas suit unless admission of the evidence undermines the fundamental fairness of the trial and thereby constitutes a violation of due process. *Pulley v. Harris,* 465 U.S. 37 (1984)      Absent a clear showing of abuse of discretion, challenges to the chain of custody go to the weight of the evidence, not its admissibility. *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990)*, cert. denied sub nom, Black v. United States,* 498 U.S. 1091 (1991). The Due Process Clause simply does not mandate that all government decisions comply with standards that assure perfect, error-free determinations. *See Mackey v. Montrym,* 433 U.S. 1, 14 (1979).

If the state chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no bar *per se. Payne v. Tennessee,* 501 U.S. 808, 827 (1991). In *Payne,* the Court determined that there was nothing unfair about the jury hearing testimony during the penalty phase regarding the loss experienced by the victim's family as a result of the murder. *Id.*; *see also, Jones v. United States,* 527 U.S. 373, 395 (1999).

The Sixth Circuit has also extended application of *Payne* to the guilt phase of the

trial. *See Byrd v. Collins,* 209 F.3d 846 (2000). A petitioner may only prevail where the victim impact evidence is "so unduly prejudicial that it renders the trial fundamentally unfair. *Payne,* 501 U.S. at 825.

In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions. *Smith v. Mitchell,* 348 F.3d 177, 206 (6th Cir. 2003),*citing Harris v. Rivera,* 454 U.S. 339, 346 (1981). In a non-jury trial the introduction of incompetent evidence does not require a reversal in the absence of an affirmative showing of prejudice. *Smith, supra, citing United States v. Joseph,* 781 F.2d 549, 552-53 (6th Cir. 1986). A three-judge panel would not likely be misled by any improper evidence. *Smith, supra, citing Wickline v. Mitchell,* 319 F.3d 813, 823-24 (6th Cir. 2003).

## Analysis

With respect to the Fila gym shoes which is the subject of Mr. Keene's Twelfth Ground for Relief, Ms. Matthews testified that on the evening of December 24, 1992, she saw Mr. Smith carrying, and subsequently wearing, a pair of tennis shoes. Transcript of Proceedings, Part II, Vol. 1, p. 99. Ms. Matthews identified State's Exhibit 34-A as the tennis shoes at issue. *Id.* at 99-100.

Dayton Police Detective Terry Pearson testified that he arrested Mr. Smith at the residence located at 729 Kumler in Dayton. Transcript of Proceedings, Trial Phase, Part II, Vol. 4, p. 868. Prior to being transported to the police department offices, Mr. Smith put on a pair of gym shoes which Det. Pearson later found on his desk and which he marked with his initials and the date "12-26-92". *Id.* at 868-69. Det. Pearson identified State's Exhibit 34-A as those gym shoes. *Id.* at 869. Det. Pearson testified that Det. Lawson had put the gym shoes on his (Det. Pearson's) desk and

84

that when he saw them on his desk, they were not marked. *Id.* at 879.

Detective Wade Lawson testified that after Mr. Smith was arrested, he was taken to the police department in the Safety Building in Dayton where he (Det. Lawson) interviewed Mr. Smith. Transcript of Proceedings, Trial Phase, Part II, Vol. 5, p. 1180-81. During that interview, Mr. Smith directed Det. Lawson's attention to a pair of gym shoes which had already been removed from Mr. Smith's feet. *Id.* Det. Lawson took the gym shoes as evidence because they were the shoes that Ms. Gullette had been wearing at the time she was shot. *Id.* Det. Lawson testified that he marked each shoe with his initials and the date of "12-26-92", placed them on his desk, and that in his presence and at his request, they were later wrapped, tagged, and placed in the property room by Detective Pearson. *Id.* at 1181-82. Det. Lawson identified State's Exhibit 34-A as the sneakers about which he had testified. *Id.* at 1181.

At the time the State moved for admission of State's Exhibit 34-A, Mr. Keene's counsel objected on the grounds "of care, custody, and control of that item—the-chain-of-custody issue." Transcript of Proceedings, Trial Phase, Part II, Vol. 6, p. 1249. The court overruled that objection and admitted the gym shoes.

Even assuming that the trial court erred when it admitted the Fila gym shoes, the question is whether the admission of the shoes undermined the fundamental fairness of the trial and thereby constituted a violation of due process.

As noted above, challenges to the chain of custody go to the weight of the evidence, not its admissibility. The question becomes, then, whether the trial court could have properly convicted Mr. Keene even in the absence of the admission of the Fila gym shoes.

The evidence of Mr. Keene's guilt was nothing short of overwhelming. Mr. Keene

confessed to the five (5) murders with which he was charged and his confession was videotaped by the investigating officers. Mr. Keene provided great detail as to the murders and the events surrounding those murders. The details Mr. Keene provided were consistent with the evidence the police gathered during the investigation. In addition, Ms. Matthews provided testimony which substantiated Mr. Keene's confession as well as the details of the various killings. In particular Mr. Keene confessed to killing Ms. Gullette while robbing her and he specifically described how Mr. Smith stole Ms. Gullette's Fila shoes after forcing her to take them off.

Mr. Keene was tried by a three judge panel and, as noted above, even assuming that the Fila shoes were admitted in error, in the absence of any indication otherwise, it would be presumed that the panel would ignore the inadmissible evidence. In addition, as also noted above, the evidence of Mr. Keene's guilt was nothing short of overwhelming and the three-judge panel could have found Mr. Keene guilty even in the absence of the Fila gym shoes. Therefore, even if the trial court erroneously admitted the Fila gym shoes because of a questionable chain of custody, such error was not of such magnitude as to comprise a violation of Mr. Keene's constitutional rights.

As to the issue of "others act" evidence which is the subject of Mr. Keene's Fifteenth Ground for Relief, Ms. Matthews testified that on December 25, 1992, she, Mr. Keene, Mr. Smith, and Ms. Taylor were driving around and discussing ways to get money and robbing people when Ms. Taylor mentioned Mr. Maddox's name and the fact that "he had money". Transcript of Proceedings, Trial Phase, Part II, Vol. I, p. 135-45. Ms. Matthews testified further that the group agreed that Ms. Taylor would attempt to lure Mr. Maddox out of his home and to a hotel where the group would beat him up and take his things. *Id.* Ms. Matthews also testified that eventually she

drove the group to Mr. Maddox's home where Ms. Taylor got into Mr. Maddox's vehicle with him. *Id.* Mr. Maddox and Ms. Taylor drove off and she (Ms. Matthews), Mr. Keene, and Mr. Smith followed behind in the vehicle in which they were riding. *Id.* At some point, Ms Matthews saw Ms. Taylor jump out of Mr. Maddox's vehicle and the vehicle then hit a tree. *Id.* Ms. Matthews testified that when Ms. Taylor eventually got into the car with her, Mr. Keene, and Mr. Smith, Ms. Taylor acted kind of nervous, had blood on her hand, was shaking, and said, "I shot him." *Id.*

As to the attempted murder of Mr. Wright, Ms. Matthews testified that she and Mr. Wright had gotten into an argument during which he ripped the jacket she was wearing and which belonged to Mr. Smith. *Id.* at 100-05. Ms. Matthews testified that Mr. Smith got involved in the argument and eventually Mr. Wright and Mr. Smith went outside the residence in which the argument was taking place and Mr. Smith shot Mr. Wright. *Id.* Ms. Matthews also testified that Ms. Cottrill and Mr. Washington were present when the argument and subsequent shooting took place. *Id.* Ms. Matthew subsequently testified that she, Mr. Keene, Mr. Smith, and Ms. Taylor discussed the topic of Ms. Cottrill and Mr. Washington "snitching" and that there was further discussion about "jumping" Ms. Cottrill and "unloading a clip in [Mr. Washington's] ass." *Id.* at 134; 176-77. Eventually, Ms. Cottrill and Mr. Washington got into the vehicle with Ms. Matthews, Mr. Keene, Mr. Smith, and Ms. Taylor, and the group drove to an area Ms. Matthews described as a gravel pit. *Id.* at 178-90. Mr. Keene and Mr. Smith ordered Mr. Washington to get out of the car and they pulled Ms. Cottrill out of the car and walked them behind a pile of gravel. *Id.* Ms. Matthews heard Mr. Washington and Ms. Cottrill deny several times that they had "snitched" and then Ms. Matthews heard gunshots. *Id.*

Mr. Woodson testified at Mr. Keene's trial that on Christmas Day, 1992, he, Mr.

Keene, Mr. Smith, Ms. Matthews, and Ms. Taylor drove around in a car during which time Mr.

Smith told the group that he had shot a man in Englewood. Transcript of Proceedings, Part II, Vol.

2, p. 586-89. The trial court heard that testimony over Mr. Keene's counsel's objection. *Id.* at 589[12].

Mr. Woodson testified further that at one point, he saw someone he knew standing in an alley and

Mr. Keene told Mr. Woodson to "shoot up the alley" at that individual but that he (Mr. Woodson)

declined to do so. *Id.* at 591-94. Mr. Woodson also testified that the group then saw two men

walking across a bridge and he, Mr. Keene, and Mr. Smith got out of the car and attempted to rob

the men at which point the men began to run. *Id.* at 594-97. Mr. Woodson then testified that Mr.

Keene shot one of the men in "his butt or his leg" with a silver .25 automatic with a marble handle.

*Id.* at 597-98. Mr. Woodson testified that the group then drove to another location where he robbed

a man of $5.00 and then went to another location where Mr. Keene and Mr. Smith attempted to rob

another man but were unsuccessful in doing so. *Id.* at 598-606. Finally, Mr. Woodson testified

about his driving of Mr. Wilkerson's Buick when he was stopped by the police and taken to the

police station. *Id.* at 662-67.

It is true that Mr. Keene was not charged with any crimes related to Mr. Maddox and

therefore any testimony about talking about robbing which led to a discussion about Mr. Maddox

and subsequently to Mr. Maddox' murder was irrelevant as to Mr. Keene. Once again, however,

this Court notes that Mr. Keene voluntarily chose to be tried by a three-judge panel. He has not

provided any argument nor identified any facts which would provide the basis for rebutting the

---

[12] The record reflects that Mr. Woodson was testifying about the group riding around in the Buick automobile and talking about robbing people. *Id.* at 590-91. Mr. Keene's counsel stated: "I'm going to object here unless we've got somebody saying that they were going to do it and identifying them." Subsequently, Mr. Woodson identified the individuals who were in the automobile. *Id.* at 591. He also identified himself as the person whose idea it was to go out and rob people. *Id.* Mr. Keene's counsel lodged no further objection to Mr. Woodson's testimony.

88

presumption that a three-judge panel routinely ignores inadmissable evidence when making decisions.  Moreover, the overwhelming evidence of Mr. Keene's guilt provided a basis for the panel's verdict that Mr. Keene was guilty of those crimes with which he was charged and the admission of testimony related to Mr. Maddox' murder did nothing to render Mr. Keene's trial so unfair as to render his conviction and sentence a denial of due process.

With respect to the testimony about the murder of Mr. Wright by Mr. Smith, the Court notes that one of the death specifications Mr. Keene was charged with in the murders of Ms. Cottrill and Mr. Washington was that those victims were killed because they had witnessed the commission of a crime which crime was Mr. Smith's shooting of Mr. Wright.  Accordingly, the testimony about the facts surrounding Mr. Smith's murder of Mr. Wright was relevant to charges against Mr. Keene.  Therefore, the admission of that testimony did nothing to render Mr. Keene's trial fundamentally unfair as to be a violation of due process.

With respect to Mr. Woodson's testimony about the group riding around and talking about robbing people, as noted above, Mr. Keene's counsel lodged one objection to Mr. Woodson's testimony on that issue, essentially on the basis that it was vague with respect to identifying the individuals involved.  Mr. Woodson then identified the individuals as well as himself as the person whose idea it was to rob people.  Mr. Keene's counsel lodged no objection to Mr. Woodson's corrected testimony nor any objection to any of Mr. Woodson's remaining testimony on that issue.

As indicated above, the Ohio Supreme Court determined that Mr. Keene had waived any claim as to Mr. Woodson's testimony because trial counsel had failed to object to that testimony.  At this juncture, therefore, this Court must consider the issue of procedural default as it relates to Mr. Keene's claim of error as to the admission of Mr. Woodson's testimony.

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also, Simpson v. Jones,* 238 F. 3rd 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F. 3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright* 433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining whether a habeas claim is barred by procedural default. *Reynolds v. Berry*, 146 F. 3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F. 3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
> . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F. 2d at 138.

Ohio's contemporaneous objection rule — that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d 112, 364 N.E. 2d 1364 (1977); *see also, State v. Mason*, 82 Ohio St. 3d 144, ___, 694 N.E.2d 932, 951 (1998) — is an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F. 3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F. 3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982); *see also, Seymour v. Walker*, 224 F. 3d 542, 557 (6th Cir. 2000).

With these principles in mind, this Court concludes that Mr. Keene's claim with respect to the admission of Mr. Woodson's testimony is procedurally defaulted and therefore it is barred from federal habeas review. First, Ohio has a contemporaneous objection rule and Mr. Keene's counsel failed to contemporaneously object to Mr. Woodson's corrected testimony nor to any other parts of his testimony. Second, the Ohio Supreme Court specifically relied on the contemporaneous objection rule in determining that Mr. Keene had waived his claim as to Mr. Woodson's testimony. Third, the Sixth Circuit has determined that Ohio's contemporaneous objection rule is an "adequate and independent" state ground.

Turning to the "cause and prejudice" prong of a procedural default analysis, even assuming *arguendo* that Mr. Keene could successfully argue "cause", any argument that he satisfies

91

the "prejudice" requirement would fail.

Once again, the Court notes that Mr. Keene was tried by a three-judge panel. While this Court is not suggesting that a three-judge panel is capable of presiding over a completely error-free proceeding, the Court does recognize that while a three-judge panel may, and probably does, routinely hear inadmissible testimony, they would not likely be misled by any improper evidence and are presumed to ignore that evidence when making decisions. In addition, as noted above, the evidence against Mr. Keene was nothing short of overwhelming and that evidence included his own confession which the police videotaped, the forensic evidence, and Ms. Matthews' testimony with respect to, *inter alia,* the actual killings in which Mr. Keene was involved. Testimony as to Mr. Keene's involvement in activities peripheral to the crimes for which he was tried and convicted did not prejudice him nor his defense.

The subject of Mr. Keene's Sixteenth Ground for Relief is the trial court's admission of testimony from Ms. Gullette's sister [sic], Ms. Abraham's brother, Mr. Wilkerson's sister, and Mr. Wilkerson's neighbor.

The transcript of the trial before the three-judge panel reveals that the court permitted Angela Martin to testify over the objection of Mr. Keene's counsel. Transcript of Proceedings, Trial Phase, Part II. Vol.2, p. 342-53. However, the record also reflects that Mr. Keene's counsel did not object to the court hearing the now-complained testimony from Ms. Abraham's brother, *Id.* at 503-14, Mr. Wilkerson's sister, *Id.* at 334-41, or from Mr. Wilkerson's neighbor. *Id.* at 306-34.[13]

---

[13] The trial transcript reveals that Mr. Keene's counsel initially objected to Mr. Abraham's testimony and that the court overruled that objection. *Id.* at 504. However, a continued review of the transcript reveals that counsel made no "continuing objection", or any additional objections. *Id.* at 503-14. Nor did counsel object to any of Mr. Abraham's testimony about which Mr. Keene currently complaint; *to wit*: Mr. Abraham's testimony about his initial visit to Ms. Abraham in the hospital and the experience of terminating her life support. *Id.*

For the same reasons this Court gave in rejecting Mr. Keene's claim with respect to Mr. Woodson's testimony, *supra,* the Court concludes that Mr. Keene's claims with respect to Mr. Abraham's testimony, Ms. Oxendine's testimony, and Ms. Peavy's testimony is procedurally defaulted. Specifically, Mr. Keene's counsel failed to object to that testimony, the Ohio Supreme Court relied on the contemporaneous objection rule in determining that, with the exception of Ms. Martin's testimony, Mr. Keene had waived his claim as to all of the alleged victim impact evidence testimony, and Ohio's contemporaneous objection rule is an "adequate and independent" state ground for purposes of a procedural default analysis. In addition, and again assuming that Mr. Keene is able to establish the "cause" requirement, for the following reasons, this Count concludes that he cannot establish the "prejudice" requirement.

Mr. Abraham's testimony runs approximately twelve (12) pages. While some of his testimony indeed focuses on his family, that testimony provides background information as to how Ms. Abraham happened to be working at the Short Stop Mini-Market on the morning of December 26, 1992. The testimony which Mr. Abraham provided about seeing Ms. Abraham in the hospital and about the decision to terminate her life support runs approximately twenty-four (24) lines. That testimony supports the allegations that Ms. Abraham died as a result of the injuries she sustained on December 26, 1992. Accordingly, it was reasonable for the prosecutor to introduce Mr. Abraham's testimony for the purpose of establishing elements of the crimes committed against Ms. Abraham and can therefore be construed as other than "victim impact" testimony.[14]

Ms. Oxendine's testimony runs approximately seven (7) pages. *Id.* at 334-41. The

---

[14] Indeed, Mr. Abraham's testimony was short and pointed and was simply in response to the prosecutor's direct questions about seeing Ms. Abraham in the hospital on life support and as to when the life support was discontinued. *Id.* at 511-12.

focus of Ms. Oxendine's testimony was her role in describing and/or identifying Mr. Wilkerson's residence, certain of his possessions, his vehicles, and her family's request to have the Dayton Police Department investigate the status of Mr. Wilkerson's safety when he failed to appear for his family's annual Christmas gathering in Michigan. In other words, Ms. Oxendine's testimony was for the purpose of establishing the commission of the crimes against Mr. Wilkerson and the discovery of the crime as well as for linking Mr. Keene to the aggravated robbery, aggravated burglary, and killing of Mr. Wilkerson.

Ms. Peavy's testimony on direct examination extends for approximately nineteen (19) pages. *Id.* at 306-25. The testimony about which Mr. Keene complains, specifically that Mr. Wilkerson came to her home on December 23, 1992, to bring her grandson a Christmas gift, is approximately seven (7) lines in length. The focus of Ms. Peavy's testimony, of which the Christmas gift testimony is a part, is the establishment of a time-line with respect to the crimes committed against Mr. Wilkerson. In this context, the fact that Ms. Peavy mentioned a Christmas gift does not transform her testimony into "victim impact" testimony. Rather, it was introduced for other reasons.

The Court now turns to Ms. Martin's testimony.

As noted above, the Ohio Supreme Court determined that Ms. Martin's testimony as to her relationship with Ms. Gullette was introduced for non-victim impact purposes because it explained how Ms. Martin could identify the jacket Ms. Gullette was wearing at the time the crimes against her were committed. The jacket, in turn, was linked to Mr. Keene and Mr. Smith. In other words, the Ohio Supreme Court determined that the testimony from Ms. Martin about which Mr. Keene complains was not introduced as victim impact testimony.

Nevertheless, even assuming that Ms. Martin's testimony *is* victim impact testimony, the introduction of that testimony was not so unduly prejudicial as to render Mr. Keene's trial fundamentally unfair. Specifically, Ms. Martin's testimony is approximately nine (9) pages in length. Transcript of Proceedings, Trial Phase, Vol. II at 342-52. The focus of Ms. Martin's testimony was for purposes of establishing how Ms. Martin could identify the jacket Ms. Gullette wore at the time she was killed as well as a time line for the events which let to Ms. Gullette's killing. Ms. Martin's testimony about her close relationship with Ms. Gullette is approximately three (3) lines in length and far from the focus of her testimony. *Id.* at 344.

As to the issues Mr. Keene raises in his Twelfth, Fifteenth, Sixteenth, and Eighteenth Grounds for Relief, the Ohio Supreme Court's conclusions are not contrary to nor an unreasonable application of, clearly established federal law.

Mr. Keene's Twelfth, Fifteenth, Sixteenth, and Eighteenth Grounds for Relief should be overruled.

### Fourteenth Ground for Relief

In his Fourteenth Ground for Relief, Mr. Keene challenges the constitutional sufficiency of the evidence presented during his trial.

### FOURTEENTH GROUND FOR RELIEF

**The State failed to introduce sufficient evidence to convict Mr. Keene of aggravated murder and therefore his conviction deprived him of substantive and procedural due process as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

Mr. Keene argues in his Fourteenth Ground for Relief that there was constitutionally insufficient evidence to sustain his convictions for aggravated murder. Specifically, Mr. Keene

argues that: (1) the State failed to prove that Ms. Cottrill and Mr. Washington were witnesses to an offense under the aggravator of "being a witness to an offense and being killed to prevent testimony in a criminal proceeding"; (2) there was no evidence that he was the actual killer of Mr. Wilkerson; (3) there was insufficient evidence to prove that Mr. Keene was the actual killer of Ms. Gullette; and (4) the evidence presented was not sufficient to prove the elements of the attempted aggravated murder of Ms. Henderson.

### State court opinion

In addressing his claims of insufficiency of the evidence, the Ohio Supreme Court wrote:

Evidentiary Sufficiency

In his sixth proposition of law, appellant contends that the state failed to adduce sufficient evidence to prove his guilt of certain death specifications.

A. Wendy Cottrill--Marvin Washington

Counts Sixteen, Seventeen, Nineteen, and Twenty charged appellant with the aggravated murders of Cottrill and Washington. Each count carried a death specification under R.C. 2929.04(A)(8), charging that appellant murdered the victims "to prevent [their] testimony in any criminal proceeding." Appellant claims that the state failed to prove the (A)(8) specifications. However, his claim is based on a patent misreading of R.C. 2929.04(A)(8).

Under R.C. 2929.04(A)(8), it is an aggravating circumstance that "[t]he victim * * * was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding * * * or * * * in retaliation for his testimony in any criminal proceeding." (Emphasis added.)

The state's evidence showed that appellant murdered Cottrill and Washington because they had seen Smith shoot Wright. However, appellant claims that, if he killed the victims to prevent their testimony against Smith, the (A)(8) specification does not apply.

96

According to appellant, the specification would apply only if he killed them to prevent them from testifying against appellant.

Appellant's argument is inconsistent with the plain language of the statute.  R.C. 2929.04(A)(8) says "any criminal proceeding."  No language limits it to cases where the victim witnessed a crime committed by his killer.  Nor would such a limitation make sense: appellant's reading of R.C. 2929.04(A)(8) would shield an organized-crime assassin who murdered witnesses to protect his fellow gangsters.

Appellant argues, "Under the State's logic, anyone could be charged with a capital specification as long as the individual they [sic] murdered, at one time, was a witness to a crime."  That is incorrect.  The (A)(8) specification applies only where the murder was committed "to prevent [the victim's] testimony * * * or * * * in retaliation for his testimony." (Emphasis added.)

The state adduced sufficient evidence to permit a finding that appellant killed Cottrill and Washington to prevent them from testifying against Smith. Therefore, the evidence supports appellant's conviction on the (A)(8) specifications.

### B. Joseph Wilkerson

Appellant contends that he was not proven to be the principal offender in this murder because the coroner did not testify that his bullet caused Wilkerson's death.  Appellant appears to assume that the state had to prove appellant's bullet was the sole cause of death. We disagree.  We have said that "principal offender" means "the actual killer."  *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746.  However, we have never held that it means "the sole offender."  There can be more than one actual killer--and thus more than one principal offender--in an aggravated murder. *See State v. Joseph* (1995), 73 Ohio St.3d 450, 469, 653 N.E.2d 285, 300 (Moyer, C.J., dissenting in part and concurring in part).

The coroner testified that Wilkerson died of multiple gunshot wounds and that appellant's shot to Wilkerson's heart would by itself have killed Wilkerson. Thus, the fact that Taylor finished Wilkerson off does not alter appellant's role as a principal offender.

### C. Danita Gullette

Some evidence indicates that the shots fired by appellant in this

killing may not have been fatal by themselves. Appellant said in his confession that he fired "not that many" shots at Gullette. The two bullets recovered from Gullette's body were fired from two different guns, which means appellant shot her at least once, but it is unknown which gun he fired. The coroner stated that only one of Gullette's wounds would have been immediately fatal by itself.

Nonetheless, the coroner testified that Gullette died of "multiple" gunshot wounds. His testimony supports an inference that appellant's shots at least contributed to Gullette's death. Thus, we hold that the evidence was sufficient to prove that appellant was a principal offender in the Gullette murder. *See Holsemback v. State* (Ala.Crim.App.1983), 443 So.2d 1371, 1381- 1382; *Cox v. State* (1991), 305 Ark. 244, 248-249, 808 S.W.2d 306, 309; *People v. Bailey* (1996), 451 Mich. 657, 676-678, 549 N.W.2d 325, 334.

### D. Kathie Henderson

Finally, appellant contends that the state failed to prove the attempted aggravated murder of Kathie Henderson. However, appellant was never charged with that crime. Only Counts Twelve and Fourteen of the indictment charged appellant with attempted aggravated murder. The bill of particulars shows that those counts related to the attempted aggravated murders of Pettus and Thompson, respectively. The only count charging appellant with a crime against Henderson was Count Eight, which charged aggravated robbery--not aggravated murder. We overrule all aspects of appellant's sixth proposition of law.

*Keene,* 81 Ohio St.3d at___, 693 N.E.2d at 255-56.

### Clearly established federal law

Pursuant to *In re Winship,* 397 U.S. 358 (1970), the relevant question with respect to claims of constitutionally insufficient evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). This standard must be applied with explicit reference to the substantive elements of the criminal offense

as defined by state law.  *Id.* at 324 n. 16; *see also, York v. Tate,* 858 F.2d 322, 327 (6th Cir. 1988);

*Scott v. Perini,* 662 F.2d 428, 432 (6th Cir. 1981).

<u>Analysis</u>

Mr. Keene's arguments before this Court in support of his Fourteenth Ground for

Relief are essentially the same arguments he presented on appeal to the Ohio Supreme Court.  Mr.

Keene argues first that the state failed to prove that he killed potential witnesses against *him* and

therefore he should not have been charged with a death specification pursuant to O.R.C.

§2929.04(A)(8).  However, §2929.04(A)(8) provides that it is an aggravating circumstance that

"[t]he victim ... was a witness to an offense who was purposely killed to prevent his testimony in *any*

criminal proceeding ...".  (emphasis supplied).  Contrary to Mr. Keene's argument, application of

O.R.C. §2929.04(A)(8) is not limited to the situation where the victim witnessed a crime committed

by his killer.  As noted above, the state's evidence, presented by way of Ms. Matthew's testimony,

established that Ms. Cottrill and Mr. Washington were killed because they had witnessed Mr. Smith

shoot Mr. Wright and there was suspicion that they had "snitched" as to what they had witnessed.

This Court concludes that in light of that evidence, *any* rational trier of fact could have found the

essential elements of O.R.C. §2929.04(A)(8) beyond a reasonable doubt.  The State was not required

to establish that Ms. Cottrill and Mr. Washington were killed because they had witnessed Mr. Keene

commit a crime.  The Ohio Supreme Court's decision on this issue was not contrary to or an

unreasonable application of clearly established federal law nor did it result in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented during trial.

Mr. Keene's second argument is that he was charged with the aggravated felony

murder of Mr. Wilkerson during the course of an "aggravated burglary and/or aggravated robbery,

and with being the principal offender in the murder" but that in *State v. Penix,* 32 Ohio St.3d 369, 371, 513 N.E.2d 744 (1987), the Ohio Supreme Court determined that in order to be eligible for the death penalty as the principal offender, the defendant must have been the actual killer and that the state failed to prove that he was Mr. Wilkerson's actual killer.  Mr. Keene's position is that Mr. Wilkerson was moving after Mr. Keene shot him through the pillows, that Ms. Taylor then fired a shot at Mr. Wilkerson, and that it was after Ms. Taylor shot him that Mr. Wilkerson stopped moving. Mr. Keene concludes that it was, therefore, Ms. Taylor, and not he, who was Mr. Wilkerson's actual killer.

David M. Smith, M.D. (Dr. Smith), Montgomery County's deputy coroner and forensic pathologist, testified at Mr. Keene's trial that there were two (2) gunshot wounds in Mr. Wilkerson's body—a contact wound in the mid-portion of the chest to the left and a contact wound just behind the right eye in the anterior right temple region of the head.  Transcript of Proceedings, Trial Phase, Part II, Vol. V, p. 1031-42.  Dr. Smith testified further that he determined that Mr. Wilkerson was alive at the time the chest wound was inflicted but that he could not determine, based on autopsy findings alone, whether Mr. Wilkerson was alive when he was shot in the head. *Id.* at 1046.  Dr. Smith then testified that the opinion he held to a reasonable degree of medical certainty was that Mr. Wilkerson died as the result of multiple gunshot wounds. *Id.* at 1047-48.  Dr. Smith noted that in this case, either of the two gunshot wounds, individually, would have been fatal. *Id.* at 1094.

When viewed in the light most favorable to the state, Dr. Smith's testimony and opinion, coupled with Ms. Matthew's testimony, support the conclusion that Mr. Wilkerson died as the result of multiple gunshot wounds, either of which could have been fatal, that Mr. Keene

inflicted one of those gunshot wounds, and therefore Mr. Keene was a principal offender with respect to Mr. Wilkerson's killing.

Next, Mr. Keene argues next that the court improperly found him guilty of the actual murder of Ms. Gullette. Mr. Keene's position is that the evidence failed to prove that he fired the fatal shot.

Dr. Smith testified that there were seven (7) gunshot wounds in Ms. Gullette's body and that she died as the result of multiple gunshot wounds. *Id.* at 1049-1061. Dr. Smith testified further that he removed two (2) bullets from Ms. Gullette's body which he marked for identification as DG1 and DG2, each of which came from different guns. *Id.* Dr. Smith noted that DG1 was the bullet that came into Ms. Gullette's upper right side and traversed into her abdomen and DG2 was the bullet that was in Ms. Gullette's thigh. *Id.* Dr. Smith testified that excluding the wound caused by DG1, the likelihood of death would have been severely lessened. *Id.* at 1096.

The evidence does not establish with certainty which gun Mr. Keene used to shoot Ms. Gullette and therefore it is not known for certain whether he was responsible for inflicting the wound caused by DG1 or the wound caused by DG2. However, Mr. Keene confessed that he and Mr. Smith each shot Ms. Gullette and then took her shoes and jacket. This confession, coupled with Dr. Smith's testimony that Ms. Gullette died as the result of "multiple gunshot wounds", provided a basis for the trial court to conclude, beyond a reasonable doubt, that Mr. Keene contributed to Ms. Gullette's death and that he was therefore a principal offender in her killing.

Mr. Keene's final argument in support of his Fourteenth Ground for Relief is that while he was charged with the attempted aggravated felony murder of Ms. Henderson, the evidence was not sufficient to prove the elements of attempted aggravated murder beyond a reasonable doubt.

Counts Twelve and Fourteen of the Indictment were the only Counts which charged Mr. Keene with attempted aggravated murder. Joint Appendix, Vol. I at Bates 000023-24. The September 15, 1993, Bill of Particulars reflects that Count Twelve of the Indictment relates to Jones Pettus and Count Fourteen relates to Edward Thompson. *Id.,* Vol. II at Bates 000580-82. Mr. Keene was charged in the Eighth Count of the Indictment with a theft offense, *Id.,* Vol. I at 000020-21, and the Bill of Particulars reveals that the Eighth Count relates to Kathie Henderson. *Id.,* Vol. II at 000574-75. Mr. Keene was not charged with the attempted aggravated murder of Ms. Henderson and his argument that the evidence was not sufficient to prove the elements of attempted aggravated murder beyond a reasonable doubt has no basis in fact.

In addressing Mr. Keene's allegations of insufficiency of the evidence, the Ohio Supreme Court findings and decision are not contrary to nor an unreasonable application of, clearly established federal law and therefore Mr. Keene's Fourteenth Ground for Relief should be overruled.

**Seventeenth Ground for Relief**

In his Seventeenth Ground for Relief, Mr. Keene alleges several incidents of prosecutorial misconduct.

**SEVENTEENTH GROUND FOR RELIEF**

**The Prosecutor's misconduct during Marvallous Keene's trial denied Mr. Keene his substantive and procedural due process right to a fair trial as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.**

In his Seventeenth Ground for Relief, Mr. Keene alleges that the prosecutor made several inflammatory derogatory remarks during closing argument in the guilt phase including:

Mr. Monta began his closing argument by telling this Court a truth, the truth that life is precious, and indeed we all know how precious

102

life is. I submit to you that the evidence has shown that that is a truth that is not held by this defendant, because only a person without regard for or concern for or appreciation of the value of human life could commit the crimes that this defendant has committed.

Mr. Keene also argues that during guilt phase closing argument, the prosecutor improperly made statements expressing his opinions about the horrific nature of the crimes in order to appeal to the court's emotion and secure a conviction:

I'm sure that all of you have asked yourselves at least once during the course of this trial, ... how's it possible that he could have committed all of those brutal, heinous, violent crimes during such a short period over Christmas of last year....

Mr. Keene alleges that the prosecutor's statement that defense counsel did not assert that Mr. Keene was innocent was improper:

[I] would like to point out one very important factor, and that is in everything he said, every point that he made, every piece of evidence that he called to the attention of this Court, not once did his words or the evidence ever indicate that this defendant is not guilty of the crimes with which he has been charged.

The next claim of prosecutorial misconduct which Mr. Keene makes is that during closing argument, the prosecutor vouched for the credibility of the state's witness, Edward Thompson, and that it is improper for a prosecutor to express his personal belief about the credibility of a witness. Mr Keene also argues that the prosecutor improperly used Jones Pettus' confusion to gain sympathy from the Court:

But I submit to you that Jones Pettus was important for this Court to see and to hear far more than what he had to say, but because he epitomizes the helplessness and vulnerability of each and every one of the witnesses killed by this defendant.

Mr. Keene also claims that the prosecutor's comments in closing argument that the only reason the State did not have better witnesses was because of the defendant were improper

comments:

> [We] were left here with those witnesses given to us by this
> defendant.  The State of Ohio would have loved to have put on Joe
> Wilkerson to testify about what happened in his home or Danita
> Gullette to tell us what they did as she talked on the phone, or Sarah
> Abraham to say what occurred after the two walked into her store
> early on Saturday morning, or Wendy Cottrill to explain to us what
> was said and what it felt like to be there deserted in that gravel pit
> with these two people holding guns.

Mr. Keene's next argument is that the prosecutor repeatedly injected improper victim impact evidence into the culpability phase of the trial and over the objection of counsel, the court heard that evidence.  Specifically, Mr. Keene alleges that it was improper for the prosecutor to inject testimony from: (1) Mr. Wilkerson's sister about Mr. Wilkerson going home to see his sister's baby; (2) Pamela Peavy, Mr. Wilkerson's neighbor, that Mr. Wilkerson came to her house after he got off work on December 23rd to bring her grandson a Christmas gift; (3) Danita Gullette's sister [sic] about how close they were; and (4) Ms. Abraham's brother Michael Abraham about his initial visit to her in the hospital, about the painful experience of terminating her life support,  and about details of Ms. Abraham's family.

Mr. Keene also argues that the prosecutor made improper comments during closing argument in the mitigation phase which urged the court to ignore mitigating factors:

> As to defendant's lack of a prior criminal conviction, I ask this Court
> to consider what possible weight can be given to that in light of the
> fact that during a course of conduct which took less than 60 hours
> this defendant killed not one, not two, not three, not four, but five
> human beings.

Mr. Keene alleges that the prosecutor turned his faith into a non-statutory aggravating circumstance arguing that the reason Mr. Keene committed murder was because he "turned his back on God" by failing to follow the Commandments and being "ungrateful for the gifts that God ... tried

104

to give him." Mr. Keene also alleges that the prosecutor made other statements which were appeals to religion and far outside the boundaries of proper prosecutorial behavior when he told the court that, "I'm sure that the congregation likewise taught him all ten of God's Commandments including 'Thou shalt not steal' and 'Thou shalt not kill'" and that turning to God in prayer was evidence that the defendant had no remorse and asked that this be used against him.

Mr. Keene also argues that the prosecutor grossly mischaracterized mitigation evidence by stating that the mitigating evidence offered by Mr. Keene did not "justify" the killings:

> Are we supposed to believe that this defendant's being raised without his natural father, or having lost his elderly grandmother when he was 19, or that even the death of his brother somehow made him or justified the fact that he got two guns and set on a shooting spree over the Christmas holiday which resulted in the deaths of five innocent people.

Mr. Keene also argues that the prosecutor impermissibly downplayed the mitigation evidence Mr. Keene presented by telling the court that Mr. Keene was "lucky" to have the kind of father he did and that many young men would be grateful to have the kind of support he had when the evidence was that Mr. Keene's father left the family the day Mr. Keene was brought home from the hospital and that he had little to no contact with his father until it was convenient for his father to allow him back into his life.

Mr. Keene's final challenge to the prosecutor's comments is that the prosecutor attempted to denigrate the testimony of the defense's psychologist by characterizing it as "nonsense".

**State court opinion**

In addressing Mr. Keene's prosecutorial misconduct claims, the Ohio Supreme Court

said:

> In his fifteenth proposition of law, appellant claims prosecutorial misconduct.
>
> In guilt-phase closing arguments, the prosecutor described the crimes as "brutal, heinous, violent," and stated that "only a person without regard for or concern for or appreciation of the value of human life could commit" such crimes.   But a prosecutor may denounce the defendant's wrongdoing.   *See State v. Bissantz* (1982), 3 Ohio App.3d 108, 113, 3 OBR 123, 129, 444 N.E.2d 92, 98.
>
> The prosecutor described Edward Thompson as "one of the best witnesses any of us has seen in quite awhile."   Appellant claims the prosecutor was improperly "vouching" for Thompson's credibility. However, the prosecutor's statement was not a voucher:  it neither implied knowledge of facts outside the record nor placed the prosecutor's personal credibility in issue.
>
> The prosecutor's allegedly improper statement concerning Jones Pettus was not objected to, and any issue was therefore waived.
>
> Finally, the prosecutor stated that "we are left here with those witnesses given to us by this defendant," and the prosecution "would have loved to have put on" Wilkerson, Gullette, Abraham, and Cottrill as witnesses.   We see nothing improper in this statement.
>
> Appellant further argues that the prosecutor introduced "victim impact" evidence in the guilt phase.   This claim, which simply reargues appellant's eleventh proposition of law, was waived at trial, and lacks merit.
>
> Finally, appellant argues that the prosecutor made improper comments during penalty-phase closing arguments.  As appellant did not object to any of the arguments to which he objects here, the issue is waived.   None of the alleged errors amounted to plain error. Appellant is therefore not entitled to an adjudication on the merits of his arguments in this regard.
>
> In sum, appellant's fifteenth proposition of law is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 263-64.

## Controlling Federal Law

The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips,* 455 U.S. 209 (1982). The relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness so as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 171 (1986).

> Before habeas relief is granted, the prosecutor's statements must be so egregious as to render the trial fundamentally unfair. This determination is to be made by evaluating the totality of the circumstances surrounding each individual case.

*Lundy v. Campbell,* 888 F.2d 467, 474 (6th Cir. 1989).

To decide the question, the court must first decide whether the complained-of-conduct was in fact improper. *Frazier v. Huffman,* 343 F.3d 780 (6th Cir. 2003)(citation omitted). A four-factor test is then applicable to any conduct the Court finds inappropriate: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *Id.* at 791 (citation omitted). The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir, 1982).

A prosecutor may not comment on a criminal defendant's failure to testify. *Griffin v. California,* 380 U.S. 609 (1965). It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts that are not in evidence and which are prejudicial. *Byrd v. Collins,* 209 F.3d 486, 535 (6th Cir. 2000)(citation omitted). However, prosecutors must be given leeway to argue reasonable inferences from the evidence. *Id.* (citation

omitted).   It is improper for a prosecutor in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant.  *United States v. Krebs,* 788 F.2d 1166, 1176 (6th Cir. 1986)(citation omitted).   Comments on a witness' credibility or that the state has met its burden of proof are both improper.  *United States v. Fullerton,* 187 F.3d 587, 592 (6th Cir. 1999).

### Analysis

None of the allegedly improper statements which the prosecutor made in the closing arguments in either the guilt or mitigation phase of Mr. Keene's trial impinged upon a particular provision of the United States Constitution.  The relevant question, therefore, is whether the alleged prosecutorial misconduct so infected Mr. Keene's trial with unfairness as to make his resulting conviction and death sentence a denial of due process.  To answer that question, the Court must apply the four-part test described above.

As to the first part of the applicable test—whether the prosecutor's remarks tended to mislead the jury or prejudiced the defendant—this Court again notes that Mr. Keene waived his right to a trial by jury and requested, and was tried by, a three-judge panel.  As noted above, a three-judge panel would not likely be misled by any improper evidence. *Wickline,* 319 F.3d at 823-24. *A fortiori*, a three-judge panel would be less likely misled by any improper argument of counsel.  This factor weighs against Mr. Keene's argument.

In applying the second factor of the *Frazier* test—whether the prosecutor's conduct and remarks were isolated or extensive, the Court notes that the prosecutor's closing arguments in the mitigation phase of Mr. Keene's run some thirty-one (31) pages in the transcript.  Transcript of Proceedings, Trial Phase Part II, Vol. 6, p. 1266-82; 1292-1306.  The prosecutor's remarks during the guilt phase about which Mr. Keene complains runs a total of approximately 34 lines, or about

one and one-half page of transcript. *Id.* at 1292-93; 1302; 1298-99. Even assuming the prosecutor's remarks during closing argument in the mitigation phase about which Mr. Keene complains were improper, it is clear that they were not the central focus of the prosecutor's argument, nor did they consistently misrepresent facts in evidence or witness testimony. In other words, the prosecutor's remarks were essentially isolated and certainly not extensive. This factor also weighs against Mr. Keene's position that there was prosecutorial misconduct with respect to the prosecutor's closing argument in the mitigation phase of his trial.

This Court concludes that in the context of the prosecutor's entire closing argument during the mitigation phase, the prosecutor most likely made the complained-of remarks deliberately. The third prong of the *Frazier* test weighs in favor of Mr. Keene's claim of prosecutorial misconduct.

In weighing the fourth and final prong of the *Frazier* test—whether the evidence against the defendant was strong—the Court reiterates its previous determination that the evidence against Mr. Keene was overwhelming. *See,* Ninth Ground for Relief, *supra.* This factor weighs against Mr. Keene with respect to his claim of prosecutorial misconduct based on the prosecutor's closing argument at the guilt phase of the trial.

Mr. Keene argues next that the prosecutor engaged in misconduct when he repeatedly injected improper victim impact evidence into the culpability phase of the trial. This Court has previously noted that, with the exception of Angela Martin's testimony, any claims Mr. Keene has relating to victim impact testimony are procedurally defaulted. *See,* Sixteenth Ground for Relief, *supra.* In addition, the Court's Analysis of Mr. Keene's Sixteenth Ground for Relief as to the admission of Ms. Martin's testimony is applicable to his present claim.

With respect to Mr. Keene's claim of prosecutorial misconduct based on the prosecutor's closing argument during the mitigation phase of the trial, the Court notes first that counsel made no objection to any of the argument about which Petitioner now complains. Transcript of Proceedings, Mitigation Phase, Part III, at 486-99; 515-522.[15] The Ohio Supreme Court addressed Mr. Keene's failure to object and as discussed, Ohio's contemporaneous objection rule is an independent and adequate state ground for relief and Mr. Keene's claim with respect to the prosecutor's closing argument in the mitigation phase of the trial has therefore been procedurally defaulted.

Even assuming that Mr. Keene had not procedurally defaulted on this claim, application of the four-part *Frazier* test indicates that Mr. Keene's claim as to prosecutorial misconduct in the closing argument of the mitigation phase of the trial is not well taken.

First, as noted above, a three-judge panel would be less likely misled by any improper argument of counsel. Second, the prosecutor's arguments in the mitigation phase of the trial run approximately 20½ pages in the transcript and those portions about which Mr. Keene complains occur throughout the prosecutor's argument and are arguably central to the theme of that argument.[16] *Id.* That leads to the conclusion that, as to the third prong of the *Frazier* test, the prosecutor made the complained-of remarks deliberately and not accidently. Once again, with

---

[15] The only objection Mr. Keene's counsel made during the prosecutor's closing argument in the mitigation phase of the trial was to the prosecutor's argument that it was "impossible to conceive of any set of facts ... that would cry out for the imposition of the death penalty" more than the aggravating circumstances in the present case. The trial court sustained that objection and indicated that the court would disregard the prosecutor's "cry out" statement.

[16] As an aside, this Court notes that it was Mr. Keene's counsel who first brought up the topic of Mr. Keene's attendance at and association with his church during his direct examination of Mr. Keene during the mitigation phase. *See,* Transcript of Proceedings, Mitigation Phase, Part III, Vol. 2, at 294; 298; 304; 308; 336-37. In addition, Mr. Keene's counsel included Mr. Keene's church-related activities in his closing argument in the mitigation phase. *Id.* at 498; 503; 511; 512.

respect to the fourth *Frazier* factor, the evidence against Mr. Keene was nothing short of overwhelming and that factor weighs against Mr. Keene's argument. This Court concludes that the fact that Mr. Keene was tried by a three-judge panel, coupled with the overwhelming amount of evidence against Mr. Keene, outweighs the other two *Frazier* factors.

The Court finds that the Ohio Supreme Court's decision is not contrary to clearly established federal law nor did the Ohio court unreasonably apply clearly established federal law to Mr. Keene's claim of prosecutorial misconduct. Mr. Keene's Seventeenth Ground for Relief should be rejected.

### Nineteenth Ground for Relief

In his Nineteenth Ground for Relief, Mr. Keene raises an ineffective assistance of trial counsel claim. There is considerable overlap between other of Mr. Keene's underlying claims and his ineffective assistance of trial counsel claim. Therefore, the Court will postpone consideration of Mr. Keene's Nineteenth Ground for Relief until after the Court considers his other claims.

### Twenty-First Ground for Relief

In his Twenty-First Ground for Relief, Mr. Keene challenges his sentences on double jeopardy grounds.

### TWENTY-FIRST GROUND FOR RELIEF

**Simultaneously sentencing on the charges of felony murder and on the substantive underlying felony charge violates the double jeopardy clauses of the United States Constitution in violation of Mr. Keene's right to due process, in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.**

In support of his Twenty-First Ground for Relief, Mr. Keene argues that a felony

murder charge pursuant to O.R.C. §2903.01 contains all of the elements necessary to prove the

underlying felony of aggravated robbery under O.R.C. §2911.01 and therefore the state could not

prove that he "purposely cause[d] the death of another while committing ... aggravated robbery"

without first establishing all of the elements necessary to prove aggravated robbery.  Mr. Keene's

position is that it is a violation of the Double Jeopardy Clause to simultaneously punish him for both

felony murder based on robbery and the very same robbery.

### State court opinion

In addressing the Double Jeopardy claim which Mr. Keene raises here, the Ohio

Supreme Court said:

> In his twelfth proposition of law, appellant claims it is double
> jeopardy to sentence him for both felony-murder and the underlying
> felony, as the trial court did with respect to the Wilkerson, Gullette,
> and Abraham murders.    However, felony-murder under R.C.
> 2903.01(B) is not an allied offense of similar import to the underlying
> felony.  *See, e.g., State v. Moss* (1982), 69 Ohio St.2d 515, 520, 23
> O.O.3d 447, 450, 433 N.E.2d 181, 186;  *State v. Bickerstaff* (1984),
> 10 Ohio St.3d 62, 66, 10 OBR 352, 355-356, 461 N.E.2d 892, 895-
> 896*;  State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d
> 1237, 1242.    That being the case, R.C. 2941.25 authorizes
> punishment for both crimes, and no double jeopardy violation occurs.
> *See Moss* at 521-522, 23 O.O.3d at 451, 433 N.E.2d at 186-187, and
> paragraph one of the syllabus.  Appellant's twelfth proposition of law
> is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 264-65.

### Clearly established federal law

The Double Jeopardy Clause of the United States Constitution affords a defendant

three basic protections:

> It protects against a second prosecution for the same offense after
> acquittal.  It protects against a second prosecution for the same
> offense after conviction.    And it protects against multiple

punishments for the same offense.

*Brown v. Ohio,* 432 U.S. 161, 165 (1977), *quoting North Carolina v. Pearce,* 395 U.S. 711, 717 (1969).  Where consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishment for the same offense.  *Brown,* 432 U.S. at 165.

In both the multiple prosecution and multiple punishment contexts, where the two offenses for which the defendant is punished or tried cannot survive the "same elements" test, the double jeopardy bar applies.  *United States v. Dixon,* 509 U.S. 688, 698 (1993), *citing Brown,* 432 U.S. at 168-69; *Blockburger v. United States,* 284 U.S. 299, 304 (1932)(multiple punishment); *Gavieres v. United States,* 220 U.S. 338-342 (1911)(successive prosecutions). The same-elements test, sometimes referred to as the "*Blockburger*" test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offense" and double jeopardy bars additional punishment and successive prosecution.  *Dixon,* 509 U.S. at 696.

When assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes.  *See Missouri v. Hunter,* 459 U.S. 359 (1983). Many states use causation of serious bodily injury or harm as an element defining a distinct offense of aggravated robbery.  *Jones v. United States,* 526 U.S. 227,236 (1999)(citations omitted).  By a default rule in Ohio's state law, the "recklessness" standard of culpability applies to the "serious physical harm" element of  aggravated robbery offense contained in O.R.C. §2911.01 .  *See Robertson v. Morgan,* 227 F.3d 589, 594 (6th Cir. 2000).

### Analysis

At the time of Mr. Keene's trial and sentencing O.R.C. §2903.01(B), one of the

statutes under which he was prosecuted,  provided in relevant part:

**2903.01 Aggravated murder; specific intent to cause death**
...
(B)  No person shall purposely cause the death of another ... while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.
...

In addition, O.R.C. §2911.01 provided in relevant part:

**2911.01 Aggravated robbery**

(A) No person, in attempting or committing a theft offense ... or in fleeing immediately after the attempt or offense, shall do any of the following:

 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

  (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

  (3) Inflict, or attempt to inflict, serious physical harm on another.

(B) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.
...

Finally, the applicable version of O.R.C. §2941.25 read:

**2941.25  Multiple counts**

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a

separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In applying the *Blockburger* test, it becomes clear that O.R.C. §2903.01(B) contains an element not contained in O.R.C. §2911.01. Specifically, in order to find that Mr. Keene had committed an offense in violation of O.R.C. §2903.01(B), the state was required to prove that, *inter alia,* he purposely caused the death of another. That element of "purposely caus[ing] the death of another" is not an element contained in O.R.C. §2911.01. On the other hand, subsections (A) and (B) of O.R.C. §2911.01 contain the element of possessing, displaying, brandishing, indicating possession of, or using a deadly weapon or dangerous ordnance, an element absent from O.R.C. §2903.01. Further, subsection (C) of O.R.C. §2911.01 contains the element of inflicting or attempting to inflict serious bodily harm, an element absent from O.R.C. §2903.01. In addition, O.R.C. §2903.01(B) contains the element of "purposely" with respect to causing the death of another while the "recklessness" standard of culpability applies to the "serious physical harm" element of aggravated robbery offense of O.R.C. §2011.01. The Ohio statutes related to aggravated murder and aggravated robbery survive the *Blockburger* same-element test and therefore the Double Jeopardy bar does not apply. Mr. Keene was properly sentenced pursuant to O.R.C. §2941.25(B), *see Hunter, supra*.

The Ohio Supreme Court's finding on this claim was not contrary to or an unreasonable application of clearly established federal law and his Twenty-First Ground for Relief should be overruled.

### Twenty-Fifth Ground for Relief

Mr. Keene alleges in his Twenty-Fifth Ground for Relief that the Ohio death penalty

scheme is unconstitutional.

## TWENTY-FIFTH GROUND FOR RELIEF

**Ohio's death penalty scheme is unconstitutional and violated Petitioner Keene's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene alleges in his Twenty-Fifth Ground for Relief that Ohio's death penalty is unconstitutional for various reasons[17].

### State court opinion

In addressing Mr. Keene's constitutional challenges to Ohio's death penalty scheme, which challenge primarily revolved around the sentencing phase, the Ohio Supreme Court said:

In his second proposition of law, appellant argues that the three-judge panel failed to conduct a proper sentencing analysis.

Appellant argues that the panel erred by referring to "the cold and calculated plans that were developed, the deliberate execution of those plans and the manner and means by which five people were killed * * * ." Appellant claims that these were "non-statutory aggravating circumstances" and are unconstitutionally vague under *Maynard v. Cartwright* (1988), 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372, and *Godfrey v. Georgia* (1980), 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398.

However, the panel's opinion recited the specific statutory aggravating circumstances of which appellant was convicted. There is no indication that the panel believed the "calculated," "deliberate" nature of these murders or the "manner and means" of their commission were aggravating circumstances. *See, e.g.*, State v. Moreland (1990), 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905. Rather, the panel was explaining why the aggravating circumstances outweighed the mitigating factors. *See State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

---

[17]   As already noted several times, the Court has dismissed this claim to the extent that it includes Mr. Keene's claim that Ohio's death penalty scheme violates international law.

Appellant also argues that the trial court weighed a statutory aggravating circumstance, R.C. 2929.04(A)(3), "that did not exist in this case." Appellant was found guilty of an (A)(3) "escaping detection" specification and an (A)(7) felony-murder specification as to each of the Wilkerson aggravated murder counts. However, the panel merged the (A)(3) specifications into the (A)(7) specifications.

Later in its opinion, the panel wrote, "The panel having previously found the Defendant guilty of specifications under R.C. 2929.04(A)(3), (5), (7) and (8), it is necessary to address all mitigation circumstances developed by the evidence * * * ." (Emphasis added.)

Appellant argues that this meant the panel was weighing the (A)(3) specifications--which, having merged with the (A)(7) specifications, should not have been weighed. We disagree. On its face, the quoted sentence says nothing about weighing or considering the (A)(3) specifications. Rather, the panel was simply reciting the specifications of which it had found appellant guilty. Only a few pages earlier, the panel had stated that the (A)(3) specifications merged into the (A)(7) specifications. It cannot be rationally believed that the panel forgot about that and weighed the (A)(3) specifications.

Appellant's Eighth Amendment vagueness claim lacks merit. *See Tuilaepa v. California* (1994), 512 U.S. 967, 971-975, 114 S.Ct. 2630, 2634-2636, 129 L.Ed.2d 750, 759-761; *State v. Gumm* (1995), 73 Ohio St.3d 413, 417-418, 653 N.E.2d 253, 260.

In *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus, this court held, "Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." Appellant claims that the panel weighed all the aggravating circumstances collectively against the mitigating factors, rather than assessing the penalty for each individual count separately as Cooey requires.

The sentencing opinion states, "In conclusion, after fully and carefully considering all the evidence presented, * * * we unanimously find * * * that the aggravating circumstances found with respect to each aggravated murder count outweigh the several mitigating factors * * * ." (Emphasis added.)

The "with respect to each" language suggests that each count was evaluated separately. If any ambiguity remains, the verdict forms

clarify it.   The panel signed a separate verdict for each victim.   The verdict on Count Four states, "We do find that the aggravating circumstances in the aggravated murder of Joseph Wilkerson outweigh the mitigating circumstances [sic]."   (Emphasis added.) The same language is used with respect to Counts Six (Gullette), Ten (Abraham), Seventeen (Cottrill), and Twenty (Washington).   Thus, as to each individual aggravated murder, the panel made a specific finding that the aggravating circumstances present with respect to that aggravated murder outweighed the mitigating factors.

Finally, as part of his second proposition of law, as well as in his twenty-fifth proposition of law, appellant argues that the panel incorrectly believed that the death penalty was mandatory.   The opinion states, "In conclusion * * * we unanimously find beyond a reasonable doubt that the aggravating circumstances found with respect to each aggravated murder count outweigh the several mitigating factors established by a preponderance of the evidence. Following these conclusions, the law of this State requires the imposition of the death penalty * * * ." (Emphasis added.)

Clearly, the panel did not incorrectly believe that the death penalty was mandatory.   Rather, it correctly believed that, having found aggravation to outweigh mitigation, it was required to impose the death penalty.   *See State v. Lawson* (1992), 64 Ohio St.3d 336, 349, 595 N.E.2d 902, 912.

Appellant's second and twenty-fifth propositions of law are overruled.

In his third proposition of law, appellant claims that the death sentence should not have been imposed in this case.   Appellant argues that the mitigating factors outweigh the aggravating circumstances so that the death penalty is inappropriate, and asks this court to reverse the sentence of death.   Our independent sentence determination, *infra,* will resolve this issue.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d at 260-62.

## Clearly Established Federal Law and Analysis

First, the Court notes that Mr. Keene, of course, can raise only those challenges to

the constitutionality of capital punishment and Ohio's death penalty statute that he fairly presented

118

on direct appeal to the Ohio appellate courts. *See Buell v. Mitchell,* 274 F.3d 337, 367 (6th Cir. 2001). Any claims that Mr. Keene has not so presented are procedurally defaulted. *Id.* However, even if this Court reviews the merits of these procedurally defaulted arguments, it comes to the same conclusion as it does in reviewing the arguments that Mr. Keene has preserved for review, which is that Ohio's death penalty does not violate the United States Constitution. *Id.*

Second, this Court notes that the Sixth Circuit has continued to reject challenges to the constitutionality of Ohio's death penalty statutes including many of the challenges Mr. Keene raises in this Petition. *See Buell, supra; Scott v. Mitchell,* 209 F.3d 854, 884-85 (6th Cir.), *cert. denied,* 531 U.S. 1021 (2000).

The Court now turns to Mr. Keene's specific challenges.

Mr. Keene's first two challenges to the constitutionality of Ohio's death penalty scheme is that it allows the death penalty to be imposed in an arbitrary and discriminatory manner. This claim has been rejected by the Sixth Circuit *Buell,* 274 F.3d at 367.

In his third challenge to the constitutionality of Ohio's death penalty scheme, Mr. Keene alleges that the scheme is unconstitutional because it is neither the least restrictive nor an effective means of deterrence. On the authority of *Gregg v. Georgia,* 429 U.S. 153 (1976), Mr. Keene's argument is not well taken. *See also, Madrigal v. Bagley,* 276 F.Supp.2d 744 (N.D.Ohio 2003).

Mr. Keene argues that Ohio's death penalty scheme is unconstitutional because it does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty. The United States Supreme Court has never held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence.

119

*Buchanan v. Angelone,* 522 U.S. 269, 276 (1998). In addition, this Court notes that the Ohio statutory scheme clearly places the burden of proving by a preponderance of the evidence the existence of any mitigating factors on the defendant in a capital case. O.R.C. §2929.03(D)(1). This does not offend the federal constitution. *See Walton v. Arizona,* 497 U.S. 639, 649-51 (1990).

Mr. Keene's next argument is that Ohio's death penalty scheme is unconstitutionally vague because the language "that the aggravating circumstances ... outweigh the mitigating factors" invites arbitrary and capricious jury decisions and instead the jury must be given "specific and detailed guidance" and be provided with "clear and objective standards" for their sentencing discretion to be adequately channeled. On the authority of *Tuilaepa,* 512 U.S. at 979, *Walton,* 497 U.S. at 649-50, and *Proffit v. Florida,* 428 U.S. 242, 257-59 (1976), Mr. Keene's claim fails.

Next, Mr. Keene alleges that Ohio's death sentence scheme is unconstitutional because its open discretion scheme risks that constitutionally relevant mitigating factors that must be considered as mitigating will not be factored into the sentencer's decision and therefore it fails to provide adequate guidelines to sentencers and fails to assure against arbitrary, capricious, and discriminatory results. The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan,* 522 U.S. at 276. Mr. Keene's argument is rejected on the authority of *Buchanan.*

Mr. Keene's next argument is that the Ohio death penalty statutes are unconstitutional on the basis they do not meet the requirements of *Furman* and its progeny because juries do not understand their responsibilities and apply inaccurate standards for decision. On the authority of *Coleman v. Mitchell,* 268 F.3d 417 (6th Cir. 2001), *cert. denied,* 535 U.S. 1031 (2002), and *Buell v.*

120

*Mitchell,* 274 F.3d 337 (6th Cir. 2001), Mr. Keene's position is not well taken.

Mr. Keene's next challenge to the Ohio death penalty statutes is that they are unconstitutional because they require proof of aggravating circumstances in the liability phase of the bifurcated proceedings. In *Lowenfield v. Phelps,* 484 U.S. 231 (1988), the United States Supreme Court settled this question and rejected the argument Mr. Keene raises here.

Mr. Keene alleges next that the Ohio death penalty statutes are unconstitutional because they impose an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial because a defendant who pleads guilty or no contest benefits from a trial judge's discretion to dismiss the specifications "in the interest of justice" and there is no corresponding provision for a capital defendant who elects to proceed to trial. This argument is rejected on the authority of *Corbitt v. New Jersey,* 439 U.S. 212 (1978).

Next, Mr. Keene argues that Ohio's death penalty statutes are unconstitutional on the basis that they require submission of the pre-sentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant and this mandatory submission prevents trial counsel from giving effective assistance and prevents the defendant from effectively presenting his case in mitigation. In *Jamison v. Collins*, 100 F.Supp.2d 647, 764 (S.D. Ohio 2000), the court addressed this issue:

> Under Ohio law, the right to present mitigating evidence during the penalty phase of a capital trial belongs to the capital defendant. *See* Ohio Rev. Code § 2929.04(B). Neither the trial court nor the prosecutor may comment on the mitigating factors listed in § 2929.04(B) that the defendant does not raise during the penalty phase. *See State v. DePew*, 38 Ohio St.3d 275, 289, 528 N.E.2d 542, 557 (1988). Nonetheless, if a defendant relies on § 2929.03(D)(1) to gather mitigating evidence, the reports thereby prepared are presented to the jury and the judge without any redaction of irrelevant or prejudicial information. Use of this provision, then, essentially takes

121

> away from the defendant the right to channel the mitigating evidence described in § 2929.04(B).
>
> Although the provision is troubling to this Court, we cannot hold that Ohio's death penalty scheme is unconstitutional because of it. We reach this conclusion based on the fact that a defendant is not required to request a presentence investigation report or a mental examination. *See* Ohio Rev. Code § 2929.03(D)(1); *Buell*, 22 Ohio St.3d at 138, 489 N.E.2d at 808-809. In addition, the Court notes that Ohio Revised Code § 2929.024 allows a trial court to provide funds to an indigent defendant for investigative services, experts, and other services necessary in the preparation of a defense. Therefore, an indigent defendant is not required to resort to § 2929.03(D)(1). *Cf. State v. Esparza*, 39 Ohio St.3d 8, 16-18, 529 N.E.2d 192, 200-203 (1988) (Brown J., dissenting). For these reasons, we conclude that § 2929.03(D)(1) is not unconstitutional.

Rejection of the same claim was affirmed by the Sixth Circuit Court of Appeals in *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). Mr. Keene's claim is rejected on the bases of the above-cited authorities.

Mr. Keene also challenges the constitutionality of the Ohio death penalty statutes on the basis that their definition of mitigating factors violates the reliability component of the Eighth Amendment in that it allows "any other factors that are relevant to the issue of whether the offender should be sentenced to death" to be introduced as mitigation because they permit the sentencer to convert a mitigating factor into reasons for imposing death. The Sixth Circuit rejected this argument in *Cooey v. Coyle,* 289 F.3d 882, 926 (6th Cir. 2002), *cert. denied,* 528 U.S. 947 (2003).

Mr. Keene's next argument is that the Ohio death penalty statutes are unconstitutional because they fail to genuinely narrow the class of individuals eligible for the death penalty. The United States Supreme Court rejected an argument similar to Mr. Keene's in *Lowenfield,* 484 U.S. at 321; *see also, Buell,* 274 F.3d at 337.

In his next argument, Mr. Keene alleges that the Ohio death penalty statutes are

unconstitutional because they repeat as an aggravating circumstance factors that distinguish aggravated felony-murder from murder and they do not reasonably justify the imposition of a more severe sentence on felony-murderers but rather give the prosecuting attorney and the sentencing body unbounded discretion that maximizes the risk of arbitrary and capricious action and deprivation of a defendant's life without substantial justification. The Supreme Court of the United States rejected this argument in *Lowenfield, supra.*

Mr. Keene claims that the Ohio death penalty statutes are unconstitutional because they allow the felony murderer to be treated more severely than the killer who kills with prior calculation and design. The Court rejects this argument on the authority of *Tison v. Arizona,* 481 U.S. 137 (1987).

Next, Mr. Keene argues that Ohio's death penalty statutes are unconstitutional because they allow the nature and circumstances of the offense to be incorporated into the factors to be weighed in favor of death. In *Lowenfield, supra,* the United States Supreme Court rejected this argument. *See also Buell, supra.*

Mr. Keene's next challenge to the Ohio death penalty statutes is that they are unconstitutional because they make the selection factors in aggravation too vague. In *Cooey v. Coyle,* 289 F.3d 882, 927-28 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003), the Sixth Circuit rejected this same challenge to the Ohio death penalty scheme.

Mr. Keene argues next that the Ohio death penalty statutes are unconstitutional because there is substantial doubt as to whether the data it requires be reported to the courts of appeals and to the Ohio Supreme Court is adequate, thereby prohibiting adequate appellate review. In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), *cert. denied sub nom Coleman v. Bagley,* 535

123

U.S. 1031 (2002), on the authority of, *inter alia, McClesky v. Kemp,* 481 U.S. 270 (1987), the Sixth

Circuit rejected a similar challenge to Ohio's proportionality review scheme.

Mr. Keene's final argument is that the Ohio death penalty statutes are

unconstitutional because they authorize execution by a "current of electricity" and this mode of

punishment offends contemporary standards of decency by inflicting unnecessary pain and suffering.

Courts have consistently upheld the constitutionality of the death penalty in general, *Gregg,* 428

U.S. at 187, and by electrocution in particular. *In re: Kemmler,* 136 U.S. 436 (1890); *Buell v.

Mitchell,* 274 F.3d 337 (6th Cir. 2001). Nevertheless, Mr. Keene's argument regarding electrocution

is moot as the current version of Ohio's death penalty scheme provides for execution in Ohio only

by lethal injection. *See* O.R.C. §2949.22 (eff. Nov. 21, 2001).

In addressing Mr. Keene's constitutional challenges to the Ohio death penalty

statutes, the Ohio Supreme Court's conclusion was not contrary to nor an unreasonable application

of clearly established federal law and therefore Mr. Keene's Twenty-Fifth Ground for Relief should

be overruled.

### Twenty-Eighth Ground for Relief

In his Twenty-Eighth Ground for Relief, Mr. Keene raises a challenge to Ohio's post-

conviction process.

### TWENTY-EIGHTH GROUND FOR RELIEF

**Petitioner Keene was denied his right to counsel, due process, equal protection, a fair proceeding, and impartial tribunal, a reliable sentence, and an adequate corrective process during his post-conviction proceedings, in violation of Mr. Keene's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene alleges in support of his Twenty-Eights Ground for Relief that O.R.C.

124

§2953.21, Ohio's post-conviction relief statute, does not provide an adequate corrective process due to the limitations placed on the remedy by the Ohio Supreme Court as stated in *State v. Perry,* 10 Ohio St.2d 175, 226, N.E.2d 104(1967):

> Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment or conviction, or on an appeal from that judgment.

*Id.,* Syllabus ¶9.

> In support of his arguments, Mr. Perry points to statistical information which reflects the few instances in which the Ohio trial and appellate courts have granted relief in post-conviction proceedings and which also reflects the fact that the Ohio Supreme Court has never accepted jurisdiction to hear a capital post-conviction case. Mr. Keene also argues that Ohio's post-conviction process puts a petitioner in a "Catch 22" situation because he cannot obtain a hearing until he demonstrates adequate proof of a constitutional violation, but he cannot utilize the means to gather the proof until he submits to the court sufficient proof of the constitutional violation. Mr. Keene's arguments as to this Ground for Relief are general and he does not identify specifically how the Ohio post-conviction scheme failed in his case.

### Clearly established federal law and Analysis

The states have no constitutional obligation to provide post-conviction remedies. *See Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987). Habeas corpus is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings. *Kirby v. Dutton,* 797 F.2d 245, 246 (6th Cir. 1986). Stated differently, federal habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief. *Greer v. Mitchell,* 264 F.3d 663, 681 (6th Cir. 2001), *cert denied,* 535 U.S. 940 (2002).

Mr. Keene is attempting to do exactly what *Kirby* and *Greer* prohibit. In other words,

his challenge of Ohio's post-conviction relief process is not cognizable in federal habeas. Accordingly, Mr. Keene's Twenty-Eighth Ground for Relief should be overruled.

**Nineteenth Ground for Relief**

As noted above, in his Nineteenth Ground for Relief, Mr. Keene alleges ineffective assistance of trial counsel.

### NINETEENTH GROUND FOR RELIEF

**The ineffective assistance of counsel provided to Mr. Keene violated his rights to a fair and impartial jury trial and sentence, as guaranteed by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.**

Mr. Keene argues in his Nineteenth Ground for Relief that his trial counsel's performance was deficient in several ways during the pre-trial phase as well as during the guilt and mitigation phases of the trial. Specifically, Mr. Keene alleges that at the pre-trial and trial stages, his counsel erred in the following ways: (1) permitting Mr. Keene to waive a jury (Tenth Ground) and failing to properly advise Mr. Keene in this regard; (2) failing to request dismissal of the improper aggravator of "burglary and/or robbery" in Count Four (Twentieth Ground); (3) failing to adequately investigate and present evidence of racial bias in prosecutions in Montgomery County (Fifth Ground); (4) failing to object to Mr. Keene being tried and convicted on felony-murder and the duplicative underlying felonies (Twenty-First Ground); (5) failing to request dismissal of felony-murder specifications which did not comport with the requirements of O.R.C. §2929.04(A)(7) and *State v. Penix,* 32 Ohio St.3d 369 (1987)(Fourteenth Ground); (6) failing to object to prosecutorial misconduct (Seventeenth Ground); (7) failing to object to improper other acts evidence (Thirteenth

[*sic*] Ground[18]); (8) failing to object to repetitive, gruesome photographs used by the State (Thirteenth Ground); (9) failing to attempt to seat a jury, after the trial court deferred ruling on their motion to change venue until that time (Eighth Ground); (10) failing to obtain a full ruling from the trial court on all requests for discovery of information pertaining to racial bias in the prosecutions in Montgomery County (Fifth Ground); and (11) failing to obtain and present expert testimony at Mr. Keene's suppression hearing to show that his confession was involuntary, because Mr. Keene was under the influence of alcohol and drugs (Eleventh Ground).

Mr. Keene also alleges that during the mitigation phase, his trial counsel's performance was deficient in the following ways: (1) permitting Mr. Keene to waive a jury, (Tenth Ground), and failing to properly advise Mr. Keene in this regard; (2) failing to request the trial court to disregard Count Four (which improperly charged Mr. Keene with "burglary **and/or** robbery")(Twentieth Ground); (3) failing to object to the imposition of the death penalty as violative of treaties entered into by the United States of America, and thus, as violative of the Supremacy Clause of the United States Constitution (Twenty-Fifth Ground); and (4) failing to object to prosecutorial misconduct (Sixteenth Ground).  Mr. Keene's position is that there was no reasonable strategic basis for his trial counsel's acts and omissions, that counsel's acts and omissions prejudiced him, and that counsel's failure to act did not favor him in any way.

### State court opinion

In addressing his ineffective assistance of counsel claim, the Ohio Supreme Court said:

> In his nineteenth proposition of law, appellant claims that his trial counsel rendered ineffective assistance.  To demonstrate ineffective

---

[18] Mr. Keene's "other acts evidence" claim is pled in his Fifteenth Ground for Relief.

assistance, an appellant must show that counsel's performance fell "below an objective standard of reasonable representation." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.    He must also demonstrate prejudice--i.e., "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.*, paragraph three of the syllabus.    "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington* (1984), 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698.

Appellant lists various objections he thinks his counsel should have made at trial.    However, he fails to show that any of these omissions constituted ineffective assistance.

Appellant argues that his counsel should have moved to dismiss Count Four, the felony-murder of Wilkerson, because the averment was worded in the alternative ("[aggravated] burglary and/or [aggravated] robbery").    However, failure to so move was nonprejudicial.    Appellant was also charged with murdering Wilkerson under Count Three (prior calculation and design). Dismissal of Count Four would have left Count Three intact, and the panel ultimately found appellant guilty on that count.    Thus, dismissal would have meant only that appellant would have been sentenced on Count Three instead of on Count Four.

Appellant also argues that counsel should have requested the court not to consider Count Four in the penalty phase, because of the "and/or" language.    However, by then--after Count Three had been merged into Count Four--it was too late to make such a request, which would have provoked justifiable charges of "sandbagging."

Appellant's other claims also fail.    It was not deficient for appellant's counsel to forgo a double jeopardy claim that was inconsistent with binding precedent.    *See, e.g., State v. Moss* (1982), 69 Ohio St.2d 515, 23 O.O.3d 447, 433 N.E.2d 181, *infra*.    Nor was it deficient performance not to request Judge Brown's recusal just because he presided over the suppression hearing.    *See State v. Gillard* (1988), 40 Ohio St.3d 226, 229, 533 N.E.2d 272, 276; *cf. Withrow v. Larkin* (1975), 421 U.S. 35, 56, 95 S.Ct. 1456, 1469, 43 L.Ed.2d 712, 728-729.

Declining to interrupt the prosecutor's argument with objections, or failing to object to certain evidence, was not deficient performance,

especially in a bench trial. "A trial is not a law-school examination.
* * * [N]o one will reward you for making every possible objection."
McElhaney, Clutter (Mar.1991), 77 A.B.A.J. 73. *See State v.
Campbell* (1994), 69 Ohio St.3d 38, 43-44 and 52-53, 630 N.E.2d
339, 347 and 352-353; *State v. Holloway* (1988), 38 Ohio St.3d 239,
244, 527 N.E.2d 831, 837. Nor do such failures undermine one's
confidence in a verdict supported by extensive forensic evidence,
eyewitness testimony, and appellant's videotaped confession.

Failing to argue that the death penalty violates international law is not
ineffective assistance, given the dearth of legal authority supporting
that argument. (See discussion of twenty-fourth proposition of law,
*infra*.)

Appellant has shown neither deficient performance nor prejudice
with respect to any of his ineffective-assistance allegations.
Therefore, his nineteenth proposition of law is overruled.

*Keene,* 81 Ohio St.3d at ___, 693 N.E.2d 264.

### Clearly established federal law

The governing standard for effective assistance of counsel is found in *Strickland v.
Washington*, 466 U.S. 668, 687 (1984):

A convicted defendant's claim that counsel's assistance was so
defective as to require reversal of a conviction or death sentence has
two components. First, the defendant must show that counsel's
performance was deficient. This requires showing that counsel was
not functioning as the "counsel" guaranteed the defendant by the
Sixth Amendment. Second, the defendant must show that the
deficient performance prejudiced the defense. This requires showing
that counsel's errors were so serious as to deprive the defendant of a
fair trial, a trial whose result is reliable. Unless a defendant makes
both showings, it cannot be said that the conviction or death sentence
resulted from a breakdown in the adversary process that renders the
result unreliable.

With respect to the first prong of the *Strickland* test, the Supreme Court has
commanded:

Judicial scrutiny of counsel's performance must be highly deferential.
. . . A fair assessment of attorney performance requires that every

> effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689.

> As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to overcome confidence in the outcome.

*Id.* at 694; *see also, Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F. 3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F. 2d 1177 (6th Cir. 1987). Counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton*, 24 F. 3d 823, 828 (6th Cir. 1994). Indeed, strategic choices by defense counsel are "virtually unchallengeable." *Buell v. Mitchell,* 274 F. 3rd 337, 359 (6th Cir. 2001), *quoting Meeks v. Bergen*, 749 F. 2nd 322, 328 (6th Cir. 1984). As to the prejudice prong, the test is whether counsel's errors have likely undermined the reliability of, or confidence in, the result. *West v. Seabold*, 73 F. 3d 81, 84 (6th Cir. 1996), *citing Lockhart v. Fretwell*, 506 U.S. 364 (1993). Counsel is constitutionally ineffective only if [his or her] performance below professional standards caused the defendant to lose what he otherwise probably would have won. *United States v. Morrow,* 977 F. 2d 222 (6th Cir. 1992).

**<u>Analysis</u>**

       This Court has addressed and rejected many of the claims underlying Mr. Keene's ineffective assistance of trial counsel claims as set forth above. Consequently, the Court will not

130

address anew the ineffective assistance of counsel claims related to the pretrial and guilt phases which are numbered 1, 3, 4, 5, 6, 7, 9, 10, and 11, *supra*. In addition, the Court will not again address anew the ineffective assistance claims related to the mitigation phase which are numbered 1 and 4. *supra.*

The first of Mr. Keene's ineffective assistance of counsel claims that this Court will address is his claim that counsel were ineffective because they failed to request dismissal of the improper aggravator of "burglary and/or robbery" in Count Four of the Indictment. In addressing this claim, the Ohio Supreme Court noted that counsels' failure to so move did not prejudice Mr. Keene. Specifically, the court determined that Count Three of the Indictment charged Mr. Keene with murdering Mr. Wilkerson with prior calculation and design while Count Four charged him with the felony murder of Mr. Wilkerson. The court noted that even if Count Four were dismissed, Count Three would have remained intact, that the panel ultimately found Mr. Keene guilty on that count, and therefore Mr. Keene would have been sentenced on Count Three instead of on Count Four. Mr. Keene has not provided this Court with even a hint as to how counsels' failure to request dismissal of the improper aggravator of "burglary and/or robbery" in Count Four of the Indictment prejudiced him or why the Ohio Supreme Court's conclusion on this issue was not a proper application of controlling federal law, specifically, *Strickland.*

Mr. Keene's next claim of ineffective assistance of counsel is based on counsels' failure to object to the state's repetitive introduction of gruesome photographs. The Ohio Supreme Court rejected this claim of ineffective assistance essentially on the basis that Mr. Keene's trial was to the bench and not a jury and that any such failure did not undermine one's confidence in a verdict supported by extensive forensic evidence, eyewitness testimony, and a videotaped confession.

Again, Mr. Keene has not indicated how counsels' failure to object to the state's repetitive introduction of gruesome photographs prejudiced him in view of the fact that he was tried by a panel of three judges and in view of the extensive forensic evidence, eyewitness testimony, and videotaped confession.  Nor has Mr. Keene pointed out why the Ohio Supreme Court's decision is an improper application of *Strickland*.

As to the mitigation phase, Mr. Keene argues that counsel were ineffective by failing to request the trial court to disregard Count Four of the Indictment which improperly charged him with "burglary and/or robbery".  For the same reasons the Court gave in rejecting Mr. Keene's first claim of ineffective assistance of counsel in the pretrial and penalty phases, *see, supra,* the Court rejects Mr. Keene's current claim of ineffective assistance of counsel.

The final claim of ineffective assistance of counsel which the Court will address is Mr. Keene's claim that counsel were ineffective because they failed to object to the imposition of the death penalty as violative of treaties entered into by the United States of America and thus as violative of the Supremacy Clause of the United States Constitution.  However, given the fact that Sixth Circuit law recognizes that Ohio's death penalty scheme does not violate international law as applicable to the States through the Supremacy Clause, *Buell v. Mitchell*, 274 F. 3rd 337, 367 (6th Cir. 2001)**,** Mr. Keene's counsels' failure to object to the imposition of the death penalty on the basis that it violates international law did not prejudice Mr. Keene.

The Ohio Supreme Court did not fail to properly apply clearly established  federal law in addressing Mr. Keene's claims of ineffective assistance of counsel nor did it come to a conclusion that was contrary to clearly established federal law.  Accordingly, Mr. Keene's Nineteenth Ground for Relief should be overruled.

132

**Conclusion**

It is therefore recommended that Petitioner Marvallous Keene's Petition for Writ of

Habeas Corpus be dismissed with prejudice.

August 25, 2004.

s/ **Michael R. Merz**
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Keene v. Mitchell\Keene_Merits.wpd