1                    <u>MICHAEL D. MCDONALD</u>, having been first

2                    duly sworn according to law, was examined

3                    and testified as follows:

4                              <u>DIRECT EXAMINATION</u>

5    BY MR. DUNDES:

6       Q.   Now could you state your name for the record,

7    please?

8       A.   It's Michael D. McDonald.

9       Q.   Would you spell your last name?

10      A.   M-C-D-O-N-A-L-D.

11      Q.   And where are you employed?

12      A.   Police Department, Dayton, Ohio.

13      Q.   And how long have you been employed there?

14      A.   About seven years.

15      Q.   And during that seven year period, what has your

16   duty been?

17      A.   Mainly uniform patrol.

18      Q.   And currently what is your duty?

19      A.   Detective, Bureau of Identification.

20      Q.   And how long have you been a detective in the

21   Bureau of Identification?

22      A.   About four months.

23      Q.   Prior to that four month period, what was your

24   duty then?

25      A.   Uniform patrol duty.

1    Q.    And I would like to direct your attention back to

2    June 22d of 1992, and ask you what your duty was at that

3    time?

4    A.    Uniform patrol duty, Fifth District.

5    Q.    And what area does the Fifth District encompass?

6    A.    Northwest Dayton.

7    Q.    What, what are the street perimeters?

8    A.    Riverside Drive, west to Gettysburg, or in that

9    general area, from Siebenthaler south to the north edge

10   of downtown.

11   Q.    And as a patrol officer do you ride in a marked

12   cruiser?

13   A.    Yes, I do.

14   Q.    And wear a uniform?

15   A.    Yes, that's right.

16   Q.    Do you have, also have a partner?

17   A.    That's right.

18   Q.    And on June 22d of 1992, did you have a partner?

19   A.    Yes, I did.

20   Q.    What was his name?

21   A.    Joe Wiesman.

22   Q.    I would like to direct your attention to the

23   evening of June 22d of 1992 and approximately 10:30 in

24   the evening and ask you where you were?

25   A.    Myself and Officer Wiesman were in the Five Oaks

1     area.

2        Q.    And on routine patrol?

3        A.    We had just cleared up a call in that area,

4     right.

5                    MR. ARNTZ:        Excuse me.   May we approach

6        the bench?

7                    THE COURT:        You may.

8                    (WHEREUPON, a side-bar conference was held

9        off the record.)

10                    MR. SLAVENS:        May we reapproach the

11        bench, your Honor?

12                    THE COURT:        Sure.

13                    (WHEREUPON, a side-bar conference was held

14        off the record.)

15                    THE COURT:        You may proceed,

16        Mr. Dundes.

17                    MR. DUNDES:        Thank you, your Honor.

18     BY MR. DUNDES:

19        Q.    I believe you testified you were on routine

20     patrol in the area of Five Oaks?

21        A.    That's right.

22        Q.    With Officer Wiseman?

23        A.    Wiesman.

24        Q.    Wiesman.   I'm sorry.

25                    Did you have occasion to hear over the radio

1    Lieutenant Steve Miller?

2      A.    Yes, I did.

3      Q.    And could you tell us how that came about?

4      A.    He called in over the radio that he was pursuing

5    a vehicle.

6      Q.    And did he give you any other information?

7      A.    He described the vehicle as a orangish red Monza.

8    And he also gave preliminary directions of travel.

9      Q.    Did he say where the vehicle was coming from?

10      A.    Coming from, I can't remember the block number of

11    Tennyson.

12      Q.    Did you get a description of how many individuals

13    were in the car?

14      A.    No, I didn't.

15      Q.    After you left the Five Oaks area, where did you

16    go?

17      A.    We began to head north toward the general

18    direction of the pursuit.

19      Q.    And did you have occasion to see Lieutenant

20    Miller around that time?

21      A.    After the pursuit turned south on Riverside, we

22    saw both the Monza and Lieutenant Miller at Riverside

23    and McOwen.

24      Q.    Were they coming south?

25      A.    They were southbound.

1    Q.    And did you follow them?

2    A.    We were -- no, northbound.  Made a U-turn and

3    then fell in behind them.

4    Q.    And how long did you follow them?

5    A.    About one second.  They were just pulling over on

6    McOwen at Riverside as we had turned around so.

7    Q.    Okay.  And did you go to McOwen and Riverside?

8    A.    That's right.

9    Q.    What did you find when you got there?

10   A.    Both vehicles were parked.  The Monza appeared to

11   be empty at that time, and Lieutenant Miller was

12   standing outside of his vehicle.

13   Q.    Could you tell if the Monza was running still?

14   A.    I don't know.

15   Q.    You testified that Lieutenant Miller was outside

16   of his vehicle?

17   A.    Right.

18   Q.    Did he have any suspects in custody at that time?

19   A.    No, I don't believe so.

20   Q.    Did he give you any indication as to where the

21   suspects exited?

22   A.    Wiesman exited our car after -- any conversation

23   would have to be testified to by Officer Wiesman.

24   Q.    Where you go from there?

25   A.    I took the car south on Riverside, turned onto

1    Helena, continued westbound until just short of Main

2    Street.

3       Q.    I'm sorry.  Could you repeat that.  I couldn't

4    hear.

5       A.    I said I went southbound on Riverside, turned

6    westbound on Helena and until I got to about a block

7    east of Main Street.

8       Q.    Did you have occasion to come into contact with

9    Officer Wiesman or Jackson at that time?

10      A.    After I turned the car around, I saw Officer

11   Wiesman and Jackson both running south across Helena

12   Street.

13      Q.    And did you follow up on that and go to them?

14      A.    I then exited the car and ran after, ran after

15   them, yes.

16      Q.    What did you find when you got to the Helena

17   location?

18      A.    Officer Wiesman had one subject on the ground and

19   was handcuffing him.  Officer Jackson was handcuffing

20   the second subject.

21            MR. DUNDES:    May I approach the witness,

22      your Honor?

23            THE COURT:    You may.

24   BY MR. DUNDES:

25      Q.    I'm showing you what's been previously marked as

1    State's Exhibit 33 for identification.  Could you tell

2    me what that is a photograph of?

3      A.    That's a photograph of the arrest scene at Helena

4    with me in the foreground.

5      Q.    What is this in the back right here?  Hold this

6    up so the jury can see.  What is there in this area

7    here?

8      A.    Those are the apartments there on Helena.

9      Q.    Approximately where were the suspects when you

10    arrived on the scene, if you know?

11      A.    One was just at the curb.  It would be just

12    outside of this picture.

13      Q.    And who was holding that suspect?

14      A.    Was Officer Wiesman.

15      Q.    Where was the other subject?

16      A.    The other subject was up closer in this area, up

17    here.  And that was Officer Jackson.

18      Q.    Officer Jackson's subject.

19            While you were there on the scene, did anyone

20    point out anything to you?

21      A.    Yes, Officer Jackson did.

22            (WHEREUPON, State's Exhibit 36 was marked for

23    identification.)

24      Q.    And what was it that he pointed out to you?

25      A.    A firearm.

1      Q.    Could you describe it for me?

2      A.    It was a black or blue small frame semiautomatic.

3      Q.    I will show you what's been marked as State's

4   Exhibit 36 for identification.  Could you tell me what

5   that is a photograph of?

6      A.    It's a photograph of the firearm that was pointed

7   out to me.

8      Q.    And could you describe what it looks like?

9      A.    Black or blue small frame semiautomatic.

10     Q.    For a reference point, what is this?

11     A.    A pile of what is probably dog feces.

12     Q.    I'm also showing you what's been marked as

13  State's Exhibit 35 for identification.  Could you tell

14  me what, what that is a photograph of?

15     A.    Photograph of that same weapon and dog feces.

16     Q.    Okay.  And do you recollect which officer that

17  was closest to?

18     A.    That would have been closest to Officer Jackson.

19     Q.    Okay.  Is he the one that pointed the gun out to

20  you?

21     A.    That's right.

22     Q.    Did you have the opportunity to assist Officer

23  Jackson?

24     A.    Briefly.

25     Q.    And what did you do?

1      A.    When he was about to handcuff the suspect, I put

2    my foot on the suspect's back to make sure he couldn't

3    get up.

4      Q.    How long did you do that?

5      A.    Oh, about two seconds.

6      Q.    After you did that, what did you do?

7      A.    I then went to where Officer Jackson pointed to

8    the ground where the gun was.  I stayed with the gun

9    until it was recovered by an evidence technician.

10     Q.    And approximately how long did that take?

11     A.    Oh, at least an hour, maybe an hour and a half.

12     Q.    Do you know which evidence technician recovered

13   the gun?

14     A.    Rick Smith.

15     Q.    Is he with the Dayton Police Department?

16     A.    That's right.

17     Q.    After you recovered the gun, where did you go?

18     A.    Downtown to the police department.

19     Q.    And what's the location of that?

20     A.    335 West Third.

21     Q.    And did you talk to anybody when you got there?

22     A.    We spoke with whatever other officers are down

23   there, Jackson and Gross, I believe.

24     Q.    Were you able to gain any information from them

25   that led you to further investigation in this case?

1    A.   At sometime, not too long after I got down there,

2    someone had told us that there was supposed to have been

3    a second gun.

4              MR. MONTA:        Object.

5              THE COURT:        I will sustain that last as

6      not being responsive to the question, first of all,

7      and instruct the jury to disregard it.

8    BY MR. DUNDES:

9    Q.   At the police station did you gain other

10   information that led you to further evidence in this

11   case?

12   A.   Yes, we did.

13   Q.   Where did you go from there?

14   A.   We went back to the arrest scene on East Helena.

15   Q.   And that would be the same apartment complex that

16   you've identified in State's Exhibit 33?

17   A.   That's right.

18   Q.   And would that be the same area that you

19   previously testified that you found a black gun in

20   State's Exhibit 35?

21   A.   That's right.

22   Q.   Okay.  And what did you find when you got out

23   there?

24   A.   Second firearm.

25   Q.   Did someone point it out to you?

1    A.    No, I stumbled upon it.

2         (WHEREUPON, State's Exhibit 37 was marked for

3    identification.)

4    Q.    After you arrived on the scene the second time,

5    approximately how long did it take you to find the gun?

6    A.    No more than five minutes.

7    Q.    Handing you what's been marked as State's Exhibit

8    37 for identification.  Could you tell me what that is a

9    photograph of?

10   A.    It's a photograph of a small frame semiautomatic,

11   silver color with a white handle.

12   Q.    And does that fairly and accurately depict the

13   gun as you found it the second time out there?

14   A.    That's right.

15   Q.    I'm showing you again what's been marked as

16   State's Exhibit 35 and State's Exhibit 37.  Would you

17   look at both photographs.  Is there any question in your

18   mind those are two different guns?

19   A.    No question whatsoever.

20   Q.    Which one did you find first?

21   A.    The first one was the black gun next to the dog

22   feces.

23   Q.    And the silver handle, the second time?

24   A.    The silver one was the second one.

25   Q.    How long did you remain at the scene the second

1   time?

2       A.    Remained at the scene, 45 minutes, an hour, no

3   more.

4       Q.    And did you call an E-crew?

5       A.    That's right.

6       Q.    And do you know who came out?

7       A.    Officer Smith.

8       Q.    With the Dayton Police Department?

9       A.    Dayton Police Department, right.

10      Q.    Do you know whether or not he recovered the gun?

11      A.    Yes, he did.

12      Q.    Did you remain at the scene after Officer Smith

13  left?

14      A.    No.  We left the scene before he had finished.

15            MR. DUNDES:     Could I have a minute, your

16  Honor?

17            THE COURT:     You may.

18            (Pause in the proceedings.)

19            MR. DUNDES:     No further questions.

20            THE COURT:     Cross-examination.

21            MR. MONTA:     Thank you, Judge.

22

23

24

25

1                      <u>CROSS-EXAMINATION</u>

2    BY MR. MONTA:

3       Q.    Detective McDonald, is that right?

4       A.    That's good, yeah.

5       Q.    You stated on direct examination that the gun

6    pictured in Exhibits 35 and 36 was near Officer Jackson?

7       A.    That's right.

8       Q.    And he had a subject with him at that time?

9       A.    That's right.

10      Q.    And how far away from him was this gun?

11      A.    Estimate 5 to 10 feet.

12      Q.    Okay.  It wasn't way off in the bushes or

13   something like that?

14      A.    No.

15      Q.    Was it off to the side of him, in front of him,

16   behind him, what?

17      A.    It was off to the side.  If they were facing

18   south, it would have been on their east side.

19      Q.    Okay.  Is that left?

20      A.    That's left.

21      Q.    Okay.  And where in relation to that was the

22   other person who was being held?  That isn't the one you

23   hit your foot on, was it?

24      A.    No.  The other person was north at the curb which

25   would have been maybe 15 feet north of that location.

1    Q.    That is behind?

2    A.    Behind, right.

3    Q.    Okay.  So the gun was 5 to 10 feet just left of

4    where Jackson was and the other subject was 10 or so

5    feet behind?

6    A.    That's right.

7    Q.    Okay.  And what was the location of that?

8    A.    The location of --

9    Q.    Where you found the gun at 35 and 36.  Do you

10    want to see them again?

11    A.    No, it's not necessary.  It was on East Helena

12    Street.

13    Q.    All right.  When you came back later and you

14    happened upon this second gun, was that nearby there?

15    A.    That's right.

16    Q.    Where was it?

17    A.    The second gun was again 5 to 10 feet away from

18    where I found the first gun.

19    Q.    Okay.  Farther up as the people were lined up the

20    first time or farther back?

21    A.    I can't say.

22    Q.    You didn't have the other gun there for reference

23    point?

24    A.    It was no longer there.

25    Q.    Okay.  All right.  And is that the only area you

1    looked in?

2      A.    That's right, it's the only area I looked in.

3      Q.    Okay.  And when you say you stumbled upon it, you

4    were just looking and just happened to find it there?

5      A.    Right.

6      Q.    Did you look in that area before then?

7      A.    No.  Once I had found the first gun, not having

8    any reason to think there was another, I simply stayed

9    with that gun.

10     Q.    Okay. All right.  You stayed with that gun.  The

11   other one apparently was right nearby.

12          Did anybody search in that area or was anybody

13   conducting any search in that area before you left the

14   first time?

15     A.    No.  The only thing we were doing right in that

16   area was standing by that first gun.

17                    MR. MONTA:        Okay.  All right.  Thank

18     you.

19                                      No further questions.

20              THE COURT:        Any redirect?

21              MR. DUNDES:        Just one question, your

22     Honor.

23

24

25

1                    REDIRECT EXAMINATION

2    BY MR. DUNDES:

3      Q.    The area where the second gun was found, was it

4    very well lit?

5      A.    There was some lighting.  It wasn't, it wasn't

6    real well lit.  There was some indirect streetlighting

7    nearby.

8      Q.    No direct lighting?

9      A.    No.

10              THE COURT:        Anything further?

11              MR. MONTA:        Nothing further.

12                                Thank you.

13              THE COURT:        You may step down.

14                          *  *  *  *

15

16              OTIS GROSS, having been first duly

17              sworn according to law, was examined and

18              testified as follows:

19                    DIRECT EXAMINATION

20    BY MR. DUNDES:

21      Q.    Could you state your name for the record, please?

22      A.    Otis Gross.

23      Q.    Would you spell your last name?

24      A.    G-R-O-S-S.

25      Q.    And where are you employed?

1      A.    City of Dayton Police Department.

2      Q.    How long have you been employed there?

3      A.    Almost ten years.

4      Q.    And what is your current duties as a Dayton

5    Police Officer?

6      A.    Street level duty.

7      Q.    And what is that?

8      A.    That's working in the uniform with a marked

9    cruiser.

10      Q.    Are you working by yourself?

11      A.    Yes, I am.

12      Q.    And which district are you assigned?

13      A.    The city's Fifth District located on Salem

14    Avenue.

15      Q.    How long have you been assigned to that district?

16      A.    A little bit over eight years.

17      Q.    I would like to direct your attention to June 22d

18    of 1992, and ask you if you were working as a Dayton

19    Police Officer on that date?

20      A.    I was.

21      Q.    On routine patrol?

22      A.    Yes.

23      Q.    In the Fifth District?

24      A.    Yes.

25      Q.    I would like to direct your attention to

1   approximately 11 p.m. in the evening and ask if you were

2   on patrol at that time?

3     A.   I was.

4     Q.   In a marked cruiser?

5     A.   Yes.

6     Q.   In the uniform of the day?

7     A.   That's correct.

8     Q.   Did you have occasion to be in the area of McOwen

9   and Helena streets?

10    A.   I did.

11    Q.   And why is that?

12    A.   Earlier that evening I heard a radio transmission

13  which eventually led to that area.  And after I was done

14  booking my prisoner that I had that night, I went to

15  that location.

16    Q.   What was that radio transmission?

17    A.   It was a transmission by Lieutenant Miller

18  stating that he had heard shots by his residence and

19  that he was following a vehicle.

20    Q.   Was there a broadcast where the vehicle ended up,

21  where it stopped?

22    A.   That is correct.

23    Q.   And would that be the McOwen and Helena area?

24    A.   That is correct.

25    Q.   Do you know approximately what time you arrived

1    there?

2       A.    A little past 11, 11 o'clock.

3       Q.    And when you arrived there, do you know who was

4    there at that time?

5       A.    When I arrived there, there was Sergeant

6    Faulkner, street officers Jackson, Wiesman, McDonald,

7    and two other subjects.

8       Q.    You say two other subjects, were these defendants

9    or people in custody?

10       A.    That's correct.

11              MR. DUNDES:      May I approach the witness,

12       your Honor?

13              THE COURT:      You may.

14       Q.    I'm showing you what's been previously marked as

15    State's Exhibit 33 for identification.  Could you tell

16    me what that is a photograph of?

17       A.    That's Officer McDonald standing between two

18    apartments on East Helena Street.

19       Q.    Is that the area where you responded?

20       A.    That is correct.

21       Q.    Now you've testified that Officer Wiesman and

22    Officer Jackson had two defendants in custody?

23       A.    That is correct.

24       Q.    Was one of the two defendants turned over to you?

25       A.    Yes, he was.

1     Q.   And do you know which one was turned over to you?

2     A.   Yes, I do.

3     Q.   Which one?

4     A.   It was Weston Lee Howe.

5     Q.   How do you understand that?

6     A.   Because I took Weston Lee Howe from Officer

7  Wiesman's car and transported him down to our

8  consolidated facility downtown and I got information

9  from him as to his identity.

10    Q.   Was that in the car on the way downtown?

11    A.   I believe it was after we got downtown.

12    Q.   Now the person that you took downtown and got

13  information from, is he in the courtroom today?

14    A.   Yes, he is.

15    Q.   Would you point to him and describe him for me,

16  please?

17    A.   Yes, I will.  He's seated at the defendant's

18  table in the light colored suit with the brownish hair.

19            MR. DUNDES:     Indicating the defendant

20    for the record, your Honor.

21            THE COURT:      It will so indicate.

22  BY MR. DUNDES:

23    Q.   Did the defendant in this case make any other

24  statements to you on the way downtown to the detective

25  office?

1    A.    No.

2    Q.    And what did you do with him when you got

3    downtown?

4    A.    Once I arrived downtown, I also arrived with

5    Officer Jackson who had the other individual with him,

6    and we took them to the second floor of our Safety

7    Building where they were each placed in separate rooms,

8    interview rooms.

9    Q.    Did you follow one another downtown?

10    A.    That is correct.

11    Q.    And Officer Jackson had who?

12    A.    He had a person named Walter Polson.

13    Q.    Now you put the defendant Howe in an interview

14    room in which location?

15    A.    It would be on the second floor of the Safety

16    Building.

17    Q.    Where is that located?

18    A.    335 West Third Street.

19    Q.    What did you do after you put him in the room?

20    A.    I advised him that detectives would be down later

21    to talk with him.  And he was placed in the room.  And I

22    sat out and remained in the hallway until the detectives

23    arrived later that morning.

24    Q.    Did you know what Officer Jackson was doing at

25    that time?

1    A.    Yes, he was in the hallway with me.

2    Q.    And what did he do with his suspect?

3    A.    He was in the interview room a couple doors down

4    from where I placed Mr. Howe.

5    Q.    Separate rooms?

6    A.    That is correct.

7    Q.    Did anyone go into those rooms after you and

8    Officer Jackson put the defendants in the rooms before

9    the detectives got there?

10    A.    Besides ourselves?

11    Q.    Besides yourselves?

12    A.    No.

13    Q.    And approximately when was it that the detectives

14    arrived?

15    A.    I believe it was around 1:30 in the morning.

16    Q.    Do you know the names of the detectives that came

17    down?

18    A.    It was Detective Lawson and Detective Tony

19    Spells.

20              MR. DUNDES:       No further questions.

21              THE COURT:       Cross-examination.

22              MR. MONTA:       Thank you, Judge.

23

24

25

1                          CROSS-EXAMINATION

2    BY MR. MONTA:

3        Q.    Good afternoon, Officer Gross.

4        A.    Good afternoon.

5        Q.    You transported Mr. Howe yourself, is that

6    correct?

7        A.    That is correct, sir.

8        Q.    And the time is about 11:30?

9        A.    It was somewhere after 11, quarter after 11,

10   somewhere around there.

11       Q.    And he was taken directly to this interview room?

12       A.    After arriving downtown, yes, sir.

13       Q.    And was he in your, I would say, your custody, I

14   guess for no better term, was he in your custody until

15   the detectives arrived then?

16       A.    Yes, sir.

17       Q.    All right.  And did he indicate to you at

18   sometime that after he was placed in the room that he

19   was claustrophobic?

20       A.    Yes.

21       Q.    And asked you to leave the door open?

22       A.    That's correct.

23       Q.    Did you do that?

24       A.    Yes, sir.

25       Q.    And no further activity happened then until the

1    detectives came?

2       A.    That is correct.

3       Q.    You remained outside; he remained inside?

4       A.    Yes, sir.

5                  MR. MONTA:        Okay.  Thank you.

6                  THE COURT:        Any redirect?

7                  MR. DUNDES:       No, your Honor.

8                  THE COURT:        You may step down.

9                                    Thanks.

10                          *   *   *   *

11

12                  RICK J. SMITH, having been first duly

13                  sworn according to law, was examined and

14                  testified as follows:

15                          DIRECT EXAMINATION

16    BY MR. SLAVENS:

17       Q.    Sir, will you tell us your full name, please?

18       A.    Rick J. Smith.

19       Q.    What is your employment or occupation?

20       A.    Police Officer with the City of Dayton.

21       Q.    And as a police officer for the city, do you have

22    occasion to collect evidence and go to crime scenes?

23       A.    Yes, sir, I do.

24       Q.    And you do that in the capacity as a patrol

25    officer or what?

1     A.    I'm an evidence technician.

2     Q.    Sir, in that capacity, I would like to inquire as

3   to if whether or not on June 22d, 1992, if you had

4   occasion to go to a location on initially, I believe, on

5   Helena Street in the City of Dayton?

6     A.    Yes, sir.

7     Q.    And more specifically, approximately 42 East

8   Helena?

9     A.    Yes, sir.

10    Q.    And when you got there, were you -- by the way,

11  do you work alone or with another person?

12    A.    No, sir, we work individually.

13    Q.    And while there did you have occasion to come in

14  contact with any, I'm going to call, patrol people?

15    A.    There were several.  I, I believe two police

16  officers and a sergeant there at the scene.

17    Q.    And do you recall who the two police officers

18  were?

19    A.    I'm not sure.  The sergeant was Faulkner.

20    Q.    And by the way, when you got there, what was the

21  status, if you will, of the scene?  By that I mean roped

22  off or not roped off?

23    A.    The scene had been taped off.

24    Q.    Now, I want to just show you a photograph called

25  State's Exhibit 33, and ask if that is the area on

1    Helena Street, of 42 East, that you went to?

2      A.    Yes, sir, it is.

3      Q.    Now, while there initially did you collect or

4    recover a weapon?

5      A.    Yes, sir, I did.

6      Q.    And I would like to hand you what has been marked

7    as State's Exhibit 35, a photograph.  First of all, let

8    me rephrase that.

9            I would like to hand you what's been marked

10   State's Exhibit 35, can you tell me what that is,

11   please?

12     A.    A Cal-Westco 25 caliber semiautomatic weapon.

13     Q.    That's depicted in the photograph?

14     A.    Yes, sir.

15     Q.    And is that the weapon that you initially

16   obtained?

17     A.    Yes, sir.

18     Q.    Now, sir, let me hand you a brown envelope that's

19   been marked as State's Exhibit 38 by the red tag, I will

20   ask you what that is?

21     A.    This is city of Dayton gun envelope.  It's what

22   we use to mark and tag our weapons with.  This is

23   weapons tagged inside this envelope and placed in the

24   property room.

25     Q.    Examine the contents of that now, if you will,

1    please.

2       A.     Inside the envelope is a Cal-Westco model 25

3    semiautomatic handgun.

4       Q.     Also in the sack?

5       A.     Magazine and three live 25 caliber rounds.

6       Q.     Now, when you collected what is shown in State's

7    Exhibit 35, can you explain to us how you did that?

8       A.     Yes, sir.   The string on the weapon was attached

9    by me at the scene.   As a matter of fact, there is still

10   a piece of grass on the string.   This is done to protect

11   the weapon for latent prints which may be on the weapon.

12   I then take the weapon to the crime lab where it is

13   submitted to the laboratory personnel.   And they place

14   the gun in a machine that superglues the weapon and

15   hardens the prints, that way the prints can be collected

16   from the weapon.

17      Q.     So after you, I'm going to use the term string

18   the weapon, if you will.

19      A.     Uh-huh.

20      Q.     You keep it in your possession until it's done

21   until you physically transport it to the crime

22   laboratory?

23      A.     That's correct.

24      Q.     When you collected this particular weapon, can

25   you tell us what then was the status of the clip,

1    whether it was there, a clip there or did you examine?

2      A.    The magazine was in the weapon.  I did not

3    examine to see if it was loaded or how many rounds.  To

4    do so would have caused me to have to handle the weapon,

5    possibly ruin any latent prints that were on the weapon.

6      Q.    So after you transported this particular gun down

7    to the crime lab, certain tests are conducted on it?

8      A.    Yes, sir.

9      Q.    How do you know that that particular gun is this

10   gun in the photograph?

11     A.    The weapon is always marked.  My initials are on

12   the barrel and the date.

13     Q.    Now when do you place your initials on the

14   barrel?

15     A.    Immediately upon receiving it from either Bud

16   Haemmerle or Tim Duerr, whichever one to actually

17   processes the weapon at the crime lab.

18     Q.    After it's marked and tagged by you then with

19   reference to the envelope that's marked as State's

20   Exhibit 38, do you do anything with that?

21     A.    With --

22     Q.    The envelope itself?

23     A.    The envelope itself is taken, the gun envelope

24   and everything is submitted to the, the property room.

25     Q.    Okay.  So the weapon in the, physical weapon in

1    State's Exhibit 38 is in fact the weapon depicted in the

2    photograph of 35?

3    A.    Yes, sir.   When I photographed this and collected

4    it, I recorded the serial number for my report; and this

5    is the same serial number.

6    Q.    So the record is clear, what is the serial number

7    of what I'm going to call the black gun?

8    A.    The Cal-Westco black 25 automatic, serial number

9    002073.

10    Q.    Now when you see the gun there at the crime, at

11    the scene where it's photographed, you make a notation

12    as to its serial number?

13    A.    Yes, sir, I do.

14    Q.    Now, while at the area of 42 East Helena, did you

15    have an occasion to collect any items, I want to say, of

16    clothing or clothing types?

17    A.    Yes, sir.   Included in the scene which stretches

18    from the north curb and sidewalk area south through 43

19    East Helena, I collected a shirt and also what appeared

20    to be black nylon stocking material.

21    Q.    Excuse me.

22    (WHEREUPON, State's Exhibit 41 was marked for

23    identification.)

24    BY MR. SLAVENS:

25    Q.    Now, let me hand you now what's been marked as

1      State's Exhibit 41.  First of all, is that a photograph?

2         A.    Yes, it is.

3         Q.    And what is that photograph?

4         A.    A photograph of 42 East Helena taken from

5      approximately midway in the street.  And it shows a

6      black nylon stocking material, also the sidewalk and the

7      secured area by crime scene tape.

8         Q.    I want to back up.  Your earlier photograph,

9      State's Exhibit 33 that we used just a few seconds ago

10     when you were testifying?

11        A.    Yes, sir.

12        Q.    Are, or is in either of those two photographs the

13     stocking material depicted in either of those two

14     photographs?

15        A.    It's depicted in both.

16        Q.    Okay.  That's where -- is it in the one we first

17     used?

18        A.    It's State's Exhibit 33, it's in the lower

19     right-hand corner between the sidewalk and the curb and

20     the grassy area.  And it's almost the center picture on

21     Exhibit 41.

22        Q.    Up by the curb, same location?

23        A.    Same location.  It's just a different camera

24     angle.

25        Q.    So the record is clear, does State's Exhibit 41

1   and State's Exhibit 33 each fairly, accurately, and

2   correctly represent the scene?

3       A.   Yes, sir, they do.

4       Q.   Now, I would like to hand you an item that's been

5   marked as State's Exhibit 40, and I will ask you to tell

6   me what that is, please?

7       A.   That is a gray-green striped shirt that was found

8   on the right, across from 42 East Helena on the north

9   side of the street several inches north of the north

10  curb of Helena Street.

11      Q.   By the way, during your time out there, did you

12  have an occasion to prepare or follow up with what I'm

13  going to call a scene sketch?

14      A.   Yes, sir.  All this evidence was located by

15  measurements and was, crime scene sketch was completed

16  by myself.

17      Q.   Now, let me, just so the record is clear, show

18  you State's Exhibit 39.

19      A.   It's a close up of the shirt, same shirt depicted

20  in State's Exhibit 40.

21      Q.   Do each of these photographs, 39 and 40, fairly,

22  accurately, correctly represent the scene depicted in

23  these?

24      A.   Yes, sir, they do.

25           (WHEREUPON, State's Exhibit 42 was marked for

1    identification.)

2      Q.    Now, Officer Smith, I would like to hand you

3    what's been marked by the red tag State's Exhibit 43

4    (sic).  Will you tell us what that is, please?

5      A.    State's Exhibit 43 is a package containing the

6    black nylon stocking material and one green and gray

7    striped shirt that we just saw in the photographs.

8      Q.    So what's in the bag is in fact what's in the

9    photographs?

10     A.    Yes, sir, it is.

11     Q.    Just so we are clear, can we take a quick look at

12    the items.  I don't know if we have, yeah, we have a

13    pair of scissors.

14     A.    The green shirt, green and gray striped shirt, I

15    should say, and the black nylon stocking material is in

16    this bag.  My initials are on the taped seal.

17     Q.    Now there is -- it's knotted?

18     A.    Yes, sir, it is.

19     Q.    That was the condition it was in when you

20    collected it?

21     A.    It's exaclty in the same condition as when I

22    collected it.  There is still grass attached to it.

23     Q.    Okay.  Let's put it back in.

24     A.    The bag that this was placed in was marked on the

25    taped seal.  I could not mark the stocking material, so

1    the shirt however should be marked by me.  We may have

2    done that too, yes, right here.

3       Q.   On the label it says Traditionalist, which is the

4    name of the label, I guess, is your mark there?

5       A.   Yes, sir.  My initials are on it in black ink.

6       Q.   And -- all right.

7            Now I would like to inquire as to if whether or

8    not you had an occasion to go from, I think I said it's

9    42 East Helena back to the corner of McOwen and

10   Riverside?

11      A.   Yes, sir, I did.

12      Q.   And there did you view any automobile?

13      A.   Yes, sir, I did.

14      Q.   And I would -- did you take photographs of that

15   automobile?

16      A.   Yes, sir, I did.

17      Q.   I would like to hand you what's been marked

18   previously as, by red tag, State's Exhibits 30, 29, 31,

19   and 32, and ask you, first of all, are those photographs

20   each which were taken by you?

21      A.   Yes, sir, they were.

22      Q.   And what do they depict?

23      A.   They depict the custom painted Chevrolet Monza,

24   appeared to be hand painted maybe with spray cans.  The

25   vehicle -- I was informed this is the vehicle that was

1    chased by Lieutenant Miller.

2        You need the license number?

3    Q.   Please, so the record is clear.

4    A.   License number on the Monza was Frank Marry

5    Dayton 921 and that's an Ohio registration.

6    Q.   Did you -- were you present or did you know --

7    did you have the car towed, let me ask you that?

8    A.   Yes, sir.

9    Q.   And to where was the car towed, if you know?

10   A.   I believe it was towed to Coffey's but if I could

11   check my notes real quick, I could let you know.  Yes,

12   it was towed to Coffey's towing.

13   Q.   Now, did you ever have after handling or during

14   the automobile, ever have an occasion to go back over to

15   42 East Helena to obtain another weapon?

16   A.   Yes, sir.  I was called back to 42 East Helena to

17   recover a second weapon, a Raven Arms 25 caliber

18   automatic.

19   Q.   Just so -- well, let me show you what's been

20   marked previously as State's Exhibit 37.  I want you, if

21   you can, to identify that.

22   A.   This is the Raven Arms chrome plated 25

23   automatic.

24   Q.   A photograph of?

25   A.   The photograph of.

1     Q.   Okay.  Now did you collect this weapon in a

2    similar fashion as you did the Cal-Westco?

3     A.   In the same identical manner.

4          (WHEREUPON, State's Exhibit 43 was marked for

5    identification.)

6     Q.   Now, sir, let me hand you what's been marked by

7    the red tag as State's Exhibit 43.

8     A.   43 is also City of Dayton Police Department Gun

9    Envelope, contains a Raven Arms 25 ACP automatic pistol,

10    cartridge, serial number 1559350.  This was filled out

11    by me.

12     Q.   Let's take a look at the contents, please.

13     A.   Obtained in the gun envelope, Raven Arms 25

14    automatic.  The magazine is still in the weapon.  The

15    magazine is empty.  Serial number on the weapon that I'm

16    looking at in my hand is 1559350.  Also in the bag are

17    five live 25 caliber ACP rounds.

18     Q.   When you collected the, the gun, the 25 caliber

19    automatic, was the magazine in the gun?

20     A.   Yes, sir, it was.

21     Q.   Tell us what you did, how you did?

22     A.   Identically as the same with the Cal-Westco

23    weapon.  The string was tied around the trigger guard

24    and the gun was picked up like that.  Recorded the

25    serial number here, which is called the back strap of

1    the weapon.  It was submitted to the crime lab along

2    with the Cal-Westco.

3       Q.   So those guns go over to the crime lab at the

4    same time?

5       A.   Yes, sir.

6       Q.   And the fingerprint tests are conducted on the

7    guns?

8       A.   Yes, sir.

9       Q.   Okay.  And do you, do you give the gun themselves

10   to somebody?

11      A.   These weapons were submitted in a locker, a

12   series of lockers that hold evidence.  I submit it to

13   the locker along with proper paperwork, including a

14   routing sheet that's supplied by the crime lab.  And

15   then that routing sheet is delivered to the desk at the

16   crime lab where either Bud Haemmerle or Tim Duerr will

17   receive it.  They know what the number is, what locker

18   it's in.  Retrieve it and sign off on the inventory

19   sheet and they test it.  Then it goes back into that

20   locker and I receive the routing sheet back and then I

21   know what locker it's in.  I take it from there and put

22   it in the property room.

23      Q.   And then with all the time prior to this before

24   you even as you picked it up you made notation as to the

25   serial number?

1    A.    Yes, sir, I did.

2    Q.    Now on the Raven, do your initials appear

3    anyplace there?

4    A.    Yes, sir.   On the barrel portion of the weapon,

5    my initials and the date.

6    Q.    And that was placed there after you came back

7    from the locker?

8    A.    That's correct.

9    Q.    Why don't we reassemble that.

10    With reference to State's Exhibit 37, that's the

11    photograph of the Raven, does this fairly, accurately

12    and correctly depict the weapon?

13    A.    The Raven Arms 25.

14    Q.    I believe you indicated that you did prepare what

15    I called earlier a scene sketch?

16    A.    Yes, sir.

17    (WHEREUPON, State's Exhibit 44 was marked for

18    identification.)

19    Q.    Now, Officer Smith, I want to show you, as I

20    stand here and hold it up, what's been marked as State's

21    Exhibit, by the red tag, 44?

22    A.    Yes, sir.

23    Q.    I ask if you can tell me what this is I'm

24    holding?

25    A.    This is a crime scene sketch of the area in front

1    of number 40 and 42 East Helena Street.  This depicts

2    the location of the evidence I collected at that scene.

3    It would be the two handguns, the black stocking, and

4    the shirt.

5        Q.    On here could you -- I think this is north?

6        A.    Yes, sir.

7        Q.    What is that?  Your legend.  All right.

8              Now, this is not the size of your scene sketch?

9        A.    No, sir, it's been blown up.

10       Q.    But is this a fair, accurate, and correct

11   reproduction of your scene sketch?

12       A.    Yes, sir, it appears to be.

13       Q.    Is this fair, accurate representation of the

14   scene as to how you collected the evidence from where

15   the items were collected?

16       A.    Yes, sir, it is.

17       Q.    Officer Smith, I would like to inquire also now

18   as to whether or not if during your work hours then if

19   you were ever later contacted to go to an area over on

20   Brown Street in the Oregon District?

21       A.    Brown and Green, yes, sir.

22       Q.    When you went there, did you meet with any of the

23   homicide detectives?

24       A.    Yes, sir.  I believe it was Wade Lawson and

25   Sergeant Grossnickle.

1    Q.    And when you went to Brown and Green, what there,

2    if anything, did you do?

3    A.    I crawled down into a storm drain and recovered a

4    wallet and the wallet contents.   And I believe the man's

5    name was McDonald that they belonged to.

6    Q.    Did you have an opportunity to take any

7    photographs?

8    A.    Yes, sir, I did.

9    Q.    Officer Smith, let me show you what's been marked

10   by the red tag as photograph State's Exhibits 45, 46,

11   and 47.   I will ask you to, to explain to us what those

12   photographs depict?

13   A.    State's Exhibits 45, 46, and 47 are the location

14   of the storm drain sewer where the wallet and its

15   contents were located.

16       The picture here, the background --

17   Q.    That's what number for the record, please?

18   A.    45.   And the flash of the camera bouncing off the

19   stop sign has made the background rather dim.

20   Q.    Using that photograph and orient us using that

21   photograph as to where the storm drain might be or is?

22   A.    Yes, sir.   The -- if you look at the other

23   photographs that are clear, you can see that there is a

24   mailbox here and a mailbox here and the storm drain is

25   in between.   You can see both mailboxes in the

1    photograph.

2       Q.   In the photograph it shows more of a wider

3    view --

4       A.   Yes, sir.

5       Q.   -- of the building?

6       A.   It was taken from north of the intersection.

7       Q.   And you indicated that you went inside the storm

8    drain?

9       A.   Yes, sir.  The lid of the storm drain had been

10   removed, I believe, by the detectives.  And I

11   photographed the contents that were laying on the bottom

12   of the storm drain and then entered the storm drain and

13   collected these items.

14                (WHEREUPON, State's Exhibit 48 was marked

15   for identification.)

16      Q.   Concerning -- before we get off the subject, I

17   want to go back to the three photographs, 45, 6, and 7

18   and ask you, do each one of them fairly, accurately, and

19   correctly represent the scene depicted?

20      A.   Yes, sir.

21      Q.   Now I would like to hand you what's been marked

22   State's Exhibit 45 for identification, 48, excuse me,

23   and ask you to tell me if you are familiar with the

24   contents of that item?

25      A.   State's Exhibit 48 is a box containing the items