1    from the storm drain.  The property tag and property

2    inventory list were filled out by myself.

3        Q.    Just tell us so we know what it was that you did

4    remove from that storm drain?

5        A.    The following list of items were removed from the

6    storm drain, Ohio driver's license number Paul, X-ray

7    182004.

8        Q.    Just tell us the contents not the numbers.

9        A.    You don't want the number.  VISA card, public

10   library card, an Emery Air Freight I.D. cards, cards,

11   insurance card, car insurance card, a prayer card, an

12   Emery employee health card, three business cards, one

13   Click Photo card, four video rental cards, two Camelot

14   cards, one prescription form, one note with name and

15   phone numbers on it, one key and one black wallet key.

16       Q.    When you looked inside the storm drain, were the

17   contents of the storm drain that you collected scattered

18   away from the billfold that's in there?

19       A.    Yes, sir.  They were not inside the billfold.

20       Q.    And did you find any money?

21       A.    No, sir.

22       Q.    Just question concerning what I'm going to call

23   the tag here.  The brown tag is receipts from the other

24   exhibits?  I guess it's a larger card.

25       A.    It's basically an addendum to the tag.  There is

1    only five spaces on the property tag.

2      Q.    So this is?

3      A.    It's an extension of the property tag is all it

4    is.

5      Q.    The tag which is similar to the other exhibits.

6           Did you have an occasion sometime after being at

7    the storm drain to go back to an area of Helena and

8    collect a pair of blue jeans at 67, I think, Helena?

9      A.    Yes, it was the rear of 67 Helena next to the

10   garage.

11     Q.    Officer Smith, I would like to hand you some

12   photographs, State's Exhibit 49, 50, 51, 52, and 53.

13   Now, do those fairly -- first of all, do they all relate

14   to the subject matter we've been discussing which would

15   be 67 East Helena?

16     A.    Yes, sir, they do.

17     Q.    What there do you do?

18     A.    I was told there was a pair of blue jeans located

19   in the backyard near the back fence at the garage.

20   These were located, I'm not sure who they were located

21   by, but they asked me to photograph and collect these

22   blue jeans.  At which time I photographed the front of

23   the house to locate the location and then went back to

24   around the back into the backyard and photographed the

25   garage, the fence, the blue jeans and their location at

1    the back fence between the garage and the fence and the

2    back of the garage.

3        Q.    Now with reference to the, what you call the back

4    of the garage, which is actually, am I correct, this is

5    the door leading into the garage where you drive a car?

6        A.    You more or less refer to it as the alley side --

7        Q.    Great.

8        A.    -- of the garage.

9        Q.    This garage, so we can get oriented, well, the

10   front of the house faces what street?

11       A.    The front of the house faces Helena.

12       Q.    If you, you have the door of the garage faces the

13   alley but it also faces what next street?

14       A.    McOwen.

15       Q.    So the alley that is here, this garage is the

16   alley that would be in the same --

17       A.    It would be parallel between Helena and McOwen.

18       Q.    Okay.  And did you collect the blue jeans that

19   are depicted in this photograph?

20       A.    Yes, sir, I did.

21       Q.    Do the photographs 53, 52, 49, 50, and 51, do

22   they each respectively fairly, accurately, and correctly

23   represent the scene as depicted in each photograph?

24       A.    Yes, sir, they do.

25            (WHEREUPON, State's Exhibit 54 was marked for

1    identification.)

2       Q.    Sir, let me hand you for the record what's been

3    marked at State's Exhibit 54, and ask you to tell us

4    what that is, please.

5       A.    This is a package containing one pair of blue

6    jeans, property tag attached was filled out by myself.

7       Q.    Okay.  And are those the blue jeans that are

8    depicted in the photographs about which we have just

9    been discussing and testified?

10      A.    Yes, sir.  States here they were recovered at 67

11   East Helena Street.

12      Q.    If we open up that bag, we would find these blue

13   jeans in them?

14      A.    Yes, sir, you would.

15      Q.    And you marked these with the blue jeans?

16      A.    Yes, sir, I did.  You want --

17      Q.    We may as well.

18      A.    Okay.  The blue jeans and the marking.

19      Q.    R.S.

20      A.    R.J.S. 6/23 of '92.

21      Q.    All right.  One other item, State's Exhibit 35

22   for identification, picture -- it's a photograph?

23      A.    Yes, sir, it is.

24      Q.    Do you recognize what it's a photograph of?

25      A.    It's a photograph of the Cal-Westco 45 caliber.

1    Q.    Do you sometimes refer to this as a Bryco?

2    A.    Yes.

3    Q.    Does this photograph fairly, accurately, and

4  correctly representative of what is depicted in the

5  photograph?

6    A.    Yes, sir.

7              MR. SLAVENS:    That's all I have of this

8    witness, your Honor.

9              THE COURT:    Cross-examination.

10              MR. MONTA:    Thank you, Judge.

11

12              CROSS-EXAMINATION

13  BY MR. MONTA:

14    Q.    Officer Smith, what time were you dispatched out

15  to Helena?

16    A.    The original dispatch time?

17    Q.    Right.

18    A.    About three minutes after midnight.

19    Q.    Three after midnight?

20    A.    Uh-huh.

21    Q.    And when you arrived, did you report to anybody

22  in particular?

23    A.    I contacted Sergeant Faulkner.

24    Q.    Can you see this okay?

25    A.    Yes, sir.

1    Q.    Do I need to bring it closer?

2    A.    That's fine.  I can see.

3    Q.    And after talking to Sergeant Faulkner, you went

4    and located this one gun, is that correct?

5    A.    It had already been located by the officers on

6    the scene.  All I did was photograph it and collect it.

7    Q.    Someone was standing there with it?

8    A.    Yes, sir.  Yes, sir.

9    Q.    Who was that?

10    A.    It was one of two younger officers.  I don't know

11    who they are.

12    Q.    And the first one you found was which?

13    A.    The Cal-West 25 caliber handgun.

14    Q.    Now you've located that as B, is that correct?

15    A.    That's correct.

16    Q.    Now, in this drawing, not to scale -- can you see

17    it?

18              (Jurors nodding.)

19    Q.    The distances are accurate though?

20    A.    The distances foot wise are accurate.  It's just

21    not drawn to scale.  We never as a rule draw a crime

22    scene sketch to scale.

23    Q.    This item of B, the Cal-Westco you've got 33 feet

24    and 3 inches from this line here.  Is that the line of

25    East Helena Street?

1    A.    That would be the curb.

2    Q.    There is a curb there?

3    A.    Concrete curb.

4    Q.    And later on you found this Cal, excuse me.

5    A.    The Raven.

6    Q.    The Raven.  The Raven which was 35 feet and 4

7    inches from the curb, is that correct?

8    A.    Yes, sir.

9    Q.    Approximately 2 feet ahead of the other one?

10   A.    Close.

11   Q.    And how far apart were they?

12   A.    Oh, they were approximately --

13   Q.    You don't have that on there?

14   A.    I don't have that on there.  I don't believe so.

15   Q.    Do you remember?

16   A.    They were just a few inches apart.

17   Q.    Could you, by looking at one, could you see the

18   other one right there?

19   A.    Well, not with a naked eye.  The grass was deep.

20   It was extremely dark.  Unless you were standing right

21   on top of them, you couldn't see them.

22   Q.    All right.  You also indicated that you looked at

23   the Monza automobile?

24   A.    Yes, sir.

25   Q.    Did you collect any evidence from that?

1      A.    No, sir, I did not.

2      Q.    Now this green and gray shirt was across the

3   street that I'm pointing a D on State's Exhibit 44,

4   which is your sketch, it's about 25 more feet across and

5   13 feet over?

6      A.    Yes, sir.

7      Q.    Do you happen to recall what size shirt that was?

8      A.    No, sir.

9      Q.    Was there anything in that shirt that would tell

10   you that?

11     A.    There may be a tag with the size on it.

12     Q.    Let's check.  Do you remember which exhibit

13   number that one was?  Let's see, 40.

14              THE COURT:       Put the number in the

15     record.

16              MR. MONTA:       It's number 40, I believe.

17     A.    It's got a 20 on it.  If that's the size.  I

18   guess that would be the size.

19   BY MR. MONTA:

20     Q.    This is a Traditionalist size 20.  The number 20

21   is there?

22     A.    The number 20 on the tag.

23     Q.    But no other identifying marks?

24     A.    As far as size?

25     Q.    Oh, maybe a name tag or something like that.

1    A.    Other than where I marked it and where someone at

2    the lab has marked it.

3    Q.    Okay.    Now let me ask you about the blue jeans.

4    If you could tell us what size those are.    And I will

5    find that number here in just a minute.    Well, look on

6    the sides here.

7    A.    The size tag has been removed.

8    Q.    Okay.    All right.    There is no other identifying

9    markings?

10    A.    Other than my initials and the date.

11    Q.    And let's see, do you recall -- anybody recall

12    what number that is?

13                THE COURT:        I do.

14                MR. MONTA:        What is it, Judge?

15                THE COURT:        54.

16                MR. MONTA:        So recorded.

17    BY MR. MONTA:

18    Q.    Now you indicated you came back and collected

19    this second gun at a different time?

20    A.    Yes, sir.

21    Q.    All right.    And what time was that?

22    A.    It was approximately 1:30.

23    Q.    What time was it when you went over to Brown and

24    Green street?

25    A.    It was around 3, 3:30.

1       Q.    In the morning?

2       A.    Yes, sir.

3       Q.    Same --

4       A.    A.m.

5       Q.    Same night?

6       A.    Yes, sir.

7       Q.    The next calendar day?

8       A.    Yes, sir.

9       Q.    Okay.  And sergeant, or not sergeant, Detective

10   Wade Lawson was there?

11      A.    Sergeant Grossnickle.

12      Q.    Sergeant Grossnickle.

13            Was anybody else there at that time?

14      A.    They had a suspect in the car with them.  I

15   believe it was a suspect.  Being an evidence technician

16   you are not always told everything.

17      Q.    In the case on this occasion you were not told

18   and you don't know who it was?

19      A.    I don't know who it was.

20      Q.    But somebody?

21      A.    Somebody.

22      Q.    And you went down in the storm drain and got the

23   items which are marked by number 48, is that correct?

24      A.    That's correct.

25      Q.    And you indicated in your direct testimony that

1    these items were not in a wallet although you found a

2    wallet?

3        A.    Yes, sir.

4        Q.    Were there other items down in that storm drain?

5        A.    Other than what was --

6        Q.    Other than what you brought in with you here

7    collected?

8        A.    There might have been junk, rocks, old cups,

9    trash of some sort.

10       Q.    Paper?

11       A.    Things of trash nature.  I guess you would say

12   things weren't of any value to me.

13       Q.    Did all the items that you collected, and you

14   listed a number of them, have any names on them?

15       A.    Yes, sir.

16       Q.    Did they all have names on them?

17       A.    Not all of them, I don't think.  Most of them I

18   believe either had names or some type of an identifier,

19   number, or such.

20       Q.    And so some of the items did not have a name or

21   identification on them?

22       A.    I couldn't tell you exactly which ones.  I

23   couldn't tell you exactly which cards or which.  Like I

24   doubt if the prayer card had a name on it other than

25   maybe that of Jesus.

1          MR. MONTA:      I have nothing further.

2          THE COURT:      Any redirect?

3                  <u>REDIRECT EXAMINATION</u>

4    BY MR. SLAVENS:

5      Q.    Of the cards that were in the sewer that were

6    collected by you, some did have names on them, is that

7    correct?  You told us that.

8      A.    Yes, they did.

9      Q.    Why don't we, so why don't we open that up and

10   take a look at it.

11     A.    The box is taped shut with my initials and the

12   date across the tape.  Where it was taped it was

13   initialed and dated.  A key was inside the wallet.  It's

14   marked by Hoyt Baumgardner, the man who did the latent

15   prints search.

16     Q.    They were collected so it could be printed?

17     A.    Yes, sir, this stuff was collected like the guns

18   almost, without actually handling the items, they were

19   slid into a evidence bag by me using my knife to slide

20   them in.  So I never touched them in case there were

21   latent prints.  One black wallet.  The photo I.D.

22   document holder, Emery Worldwide photo I.D. card.  It's

23   got Mark A. McDonald on it.  And it's got his

24   description, physical description.

25          This is a note and a prescription and a key that

1    were also recovered in there.

2    Q.   So the items in that -- so we know, the items

3    that you're now looking at were items that you removed

4    from the sewer and taken down to crime lab?

5    A.   Yes, sir.  These were all removed together at the

6    same time.

7         Radio Shack business card.  A State Farm

8    Insurance card with Mark A. McDonald as the insured.

9    Q.   That's all?

10   A.   Is that all you need?

11   Q.   Yeah.

12              MR. SLAVENS:    That's all I have, your

13   Honor, of this witness.

14              MR. MONTA:    No further questions.

15   Thank you.

16              THE COURT:    All right.  You may step

17   down.

18                             Thank you very much.

19              THE WITNESS:    Thank you.

20                   *  *  *  *

21              THE COURT:    Ladies and gentlemen of the

22   jury, we'll go ahead and take our afternoon break at

23   this time.

24                        Remember the usual

25   instructions from the Court not to discuss the case

1      among yourselves or with anybody else.  And we'll see

2      you back in approximately 15 minutes.

3

4                (WHEREUPON, a recess was taken.)

5                        *  *  *  *

6

7                IN OPEN COURT - BEFORE THE JURY

8                        3:14 p.m.

9                MR. SLAVENS:    We will call Steve Bryant.

10

11               STEVEN BRYANT, having been first duly

12               sworn according to law, was examined and

13               testified as follows:

14                      DIRECT EXAMINATION

15     BY MR. SLAVENS:

16       Q.   Will you tell me your name, please?

17       A.   Steven Bryant.

18       Q.   And are you employed, and if so, how?

19       A.   Yes, sir.  I'm a police officer, City of Dayton.

20       Q.   And as a police officer are you assigned to any

21     particular duty or function?

22       A.   Yes, sir.  I'm assigned to the mobile evidence

23     unit of the department.

24       Q.   What, generally speaking, do you do?

25       A.   I'm an evidence technician.  I process crime

1    scenes.

2      Q.    You do the same task as does, are you familiar

3    with, Rick Smith?

4      A.    Yes.

5      Q.    Or Jan Burns?

6      A.    Yes.

7      Q.    I would like to direct your attention to June 23,

8    1992, and ask if you can recall working that day?

9      A.    Yes, sir, I did.

10      Q.    And ask if on that day if you had an occasion to

11    meet Detective Tom Lawson at 1912 Tennyson in the City

12    of Dayton, Ohio?

13      A.    Yes, sir.

14      Q.    And do you recall at about what time you went

15    there?

16      A.    I arrived there approximately ten minutes till

17    twelve in the morning.

18      Q.    And while there, what did you do or what was your

19    purpose in going there?

20      A.    I was initially sent to the Tennyson address to

21    contact Detective Lawson.  Once I got there, he pointed

22    out two spent casings that were found in the front yard

23    of, of that address.

24      Q.    Let me hand you, sir, photographs that have been

25    marked State's Exhibit 55 for identification purposes

1    and tell us what that is, please.

2    A.    Yes.    This is the front of the house of 1912

3    Tennyson Avenue.

4    Q.    And then I would like to hand you what's been

5    marked as State's Exhibit 58, a photograph of what?

6    A.    This is a photograph of the front yard area with

7    two of Detective Tom Lawson's business cards.

8    Q.    And let me hand you State's Exhibits 56 and 57,

9    tell me what they are, please.

10    A.    These are closer up photos still of the business

11    cards.    And then next business card is a spent 25

12    caliber casing.

13    Q.    Did you have an opportunity to physically collect

14    the casing that's depicted in those latter two

15    photographs?

16    A.    Yes, sir.

17    Q.    Now do each of the four photographs that you just

18    testified about, 55, 58, 57 and 56, each fairly,

19    accurately, and correctly represent the scene as

20    depicted in the photographs?

21    A.    Yes, sir.

22    Q.    Now, sir, let me hand you what's been marked by

23    the red tag as State's Exhibit 59 and ask if you can

24    identify that for me, please.

25    A.    Yes.    This is a manila envelope containing two

1    spent 25 automatic casings that I recovered in the front

2    yard of 1912 Tennyson Avenue.

3        Q.   Will you open that up?  Here's a pair of scissors

4    right here.  Now inside the -- what would you call this?

5        A.   Manila envelope.

6        Q.   What did you find?  Go ahead.  What did you find

7    inside the manila envelope?

8        A.   Okay.  Inside the manila envelope is a, two small

9    white boxes into which I placed each of the spent 25

10   automatic casings.

11       Q.   Now the markings on the box, are they -- there is

12   some markings, it looks like explanatory language, is

13   that done by you?

14       A.   Yes.  These markings on the front are done by

15   myself.

16       Q.   Since you're talking about the front, generally

17   speaking, what does your markings say?

18       A.   On the box itself I would, I would put the date,

19   time I collected it, what's in reference to, what it is

20   that I collected, my name.

21       Q.   Okay.  Each box is one spent 25 automatic casing?

22       A.   Yes, sir.

23       Q.   Okay.  Why don't you put those back, please.

24            So the record is clear, those two casings are the

25   two casings that are identified in the earlier

1    photographs by Detective Lawson's business card?

2      A.    Yes, sir.

3      Q.    Okay.  Now, did you have an occasion on that day

4    also to go to a location known as Coffey's at 823 West

5    Third Street?

6      A.    Yes, sir.

7      Q.    And under whose instructions did you go there?

8      A.    It would have been Detective Tom Lawson.

9      Q.    And your purpose in going there was what, sir?

10     A.    To attempt to locate and photograph anymore spent

11   casings in a 1978 Chevy Monza.

12     Q.    And did you do that?

13     A.    Yes, sir, I did.

14     Q.    And prior to collecting the item or items, did

15   you take any photographs of that vehicle?

16     A.    Yes, sir, I did.

17            (WHEREUPON, State's Exhibits 61, 62, 63, 64

18   and 65 were marked for identification.)

19     Q.    Officer Bryant, let me hand you what's been

20   marked as State's Exhibits 61 and 62 and 63.  First of

21   all, they're each photographs?

22     A.    Yes, sir.

23     Q.    And of what are they're photographs?

24     A.    Photographs of a 1970 Chevy Monza.

25     Q.    And is that the car that you went to look at

1    after upon instructions by Detective Lawson?

2      A.    Yes, sir.

3      Q.    Do each of those photographs fairly, accurately,

4    and correctly represent the car as you saw it?

5      A.    Yes, sir.

6      Q.    So the record is clear, specifically where?  I

7    mean, this is at Coffey's tow shop?

8      A.    Coffey's Towing.  Coffey's Towing, yes, sir.

9      Q.    All right.  Now, I would like to hand you what's

10   marked as State's Exhibit 64 and 65, and ask if you can

11   tell me what those photographs are of?

12     A.    Okay.  Number 64 is a photograph of the interior

13   of the Monza itself with the driver's door open.

14           And 65 is a close up photograph of the left rear

15   floor behind the driver seat.  And then in photograph

16   number 65 is a spent 25 automatic casing.

17               (WHEREUPON, State's Exhibit 66 was marked

18   for identification.)

19     Q.    And let me also hand you another photograph,

20   State's Exhibit 66, and ask you to tell us what that is

21   a photograph of.

22     A.    This is also a photograph of the floor area.  It

23   would be the left rear floor behind the driver seat.

24     Q.    Now, in any of those photographs that you're now

25   looking at, is any object in there, identifiable object

1    which you removed from the car?

2      A.    Yes.

3      Q.    Can you point it out to us, please?

4      A.    So it would be right in this area here on Exhibit

5    No. 65 and that is a 25 caliber spent casing.

6      Q.    And that's -- is this a cassette, like a tape

7    cassette?

8      A.    Yes, sir.  And in Exhibit No. 66 you can also see

9    a little bit where I was a little bit back further so

10   you could get some perspective of its location.

11     Q.    In 66 you got the cassette and a pop bottle?

12     A.    Yes.

13     Q.    Now do the photographs 64, 65, and 66 each

14   fairly, accurately, and correctly represent the scene

15   depicted in those photographs?

16     A.    Yes, sir, absolutely.

17     Q.    Did you collect the casing?

18     A.    Yes, sir, I did.

19     Q.    Let me hand you what has been marked as State's

20   Exhibit 60 for identification purposes.  I want you to

21   tell me what that is.

22     A.    Okay.  This is manila envelope on the outside

23   where I indicated that it contains a spent 25 automatic

24   casing.

25     Q.    Let's open it up, please.

1     A.   And then inside the manila envelope again I have

2    the small white box that I placed the casing into.

3     Q.   Now just so we are clear, the box, I'm going to

4    use your term, the front of the box what you are now

5    looking at, what is it so we can refer to it later?

6    What does it say?

7     A.   The front of the box says the date, time that I

8    collected it, where I collected the casing, and it says

9    underneath left front seat of a 1978 Chevy Monza.

10     Q.   And you even got the license number there too?

11     A.   Yes.

12     Q.   That's your name on the box?

13     A.   Yes.  Then, and then I have my initials and the

14    last name.

15     Q.   And the casing is in there?

16     A.   Yes, sir.

17     Q.   Did you also on the same day, did you have

18    occasion to go to Good Samaritan Hospital and obtain

19    some clothing?

20     A.   Yes, sir, I did.

21     Q.   I would like to hand you what has been previously

22    marked for the record as State's Exhibit 13 which is now

23    in this marked State's Exhibit 13-A.  I want you to open

24    this up and take a look at the initial sack and the

25    contents of it.

1      A.    Okay.  Inside the bag, have the property card

2   that I completed when I picked up the clothing.  That's

3   my -- that's what it is.  My name, my badge number.

4      Q.    Now when you picked up this clothing from the

5   Good Samaritan Hospital?

6      A.    Yes.

7      Q.    Can you look at the clothing.  Did you mark the

8   clothing when you picked it up?

9      A.    Yes.

10     Q.    Take a look at the shirt.  You don't need to pull

11  it all the way out if you can see your markings.

12     A.    Yes.  This is my initial SLB.  And then the date

13  that I picked it up 6/23/92.

14     Q.    The same markings will be on the trousers?

15     A.    Yes.

16     Q.    Were they identified to you as being from

17  Mr. Blazer?

18     A.    Yes.

19     Q.    And put them back, please.

20            MR. SLAVENS:      That's all I have.  Thank

21  you very much.

22                              The other attorney may have

23  some questions.

24            THE COURT:      Cross-examination.

25            MR. ARNTZ:      Thank you.

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. ARNTZ:

3      Q.    Good afternoon, Officer Bryant.  I think you

4    began by telling us about being requested to come out to

5    the address on Tennyson in order to take some

6    photographs and recover some property, is that correct?

7      A.    Yes, sir, that's correct.

8      Q.    And it was Officer Tom Lawson, the detective, who

9    asked you to do that, is that right?

10     A.    Yes.

11     Q.    And that is Tom Lawson who is seated right here

12   at counsel table?

13     A.    Yes.

14     Q.    In the center?

15     A.    Yes.

16     Q.    All right.  And Detective Tom Lawson was more or

17   less in charge of the investigation at that point?

18     A.    As far as I know, yes.

19     Q.    So far as you knew and understood, he was the

20   lead detective at that point?

21     A.    Yes.

22     Q.    And that's why you were carrying out his

23   instructions that day?

24     A.    Yes, sir.

25     Q.    And you went out to the Tennyson address and

1    you've already told us about how you were shown some

2    casings and took these photographs of the casings.  Did

3    you do anything else out at that location?

4        A.    At Tennyson?

5        Q.    Yes, sir.

6        A.    Yes, sir.

7        Q.    What else did you do?

8        A.    I took measurements of the location where the

9    casings were found and made a diagram.

10       Q.    Okay.  When you say you took measurements of

11   where the casings were found, can you be more specific

12   and explain that a little bit?

13       A.    What, what I did was I took a measuring tape and

14   then tried -- I took measuring tape then made a rough

15   sketch on a pad of paper and then tried to indicate

16   where the casings were located on the sketch.

17       Q.    Okay.  Can you explain for the members of the

18   jury a little bit what you did physically with this

19   measuring tape, what did you do with it?

20       A.    I'm sorry.  I don't follow.

21       Q.    What did you measure from where to where?

22       A.    Oh, points of reference which would have been the

23   corner of the residence.

24       Q.    It would be, that would be the left end and the

25   right end of the residence as you look at it?

1    A.    Yes, sir.

2    Q.    Okay.  And you measured from the ends of the

3    residence to what point?

4    A.    To, I measured from each ends of the -- let me

5    start again.  I measured from each casing from one end

6    of the house and then from the same casing from the

7    other corner of the house and did likewise with the

8    second casing.

9    Q.    Please tell the members of the jury, if you will,

10   why did you do that.

11   A.    So in case if there is any question later on,

12   they would have a little bit more better descriptive

13   area of where I found it as far as location.

14   Q.    Okay.  You were trying to establish some sort of

15   accurate way of depicting exactly where those casings

16   were other than some sort of verbal description?

17   A.    That's correct.

18   Q.    It would be a whole lot better to have some sort

19   of mathematical or scientific measurement in order to

20   describe more precisely where the casings were located?

21   A.    That's correct.

22   Q.    That's why you were doing the measurements?

23   A.    Yes, sir.

24   Q.    And after you made these measurements from either

25   end of the house to both casings, what did you then do?

1    A.    Wrote it down.

2    Q.    I think you said you made out a sketch or

3  diagram?

4    A.    Yes, sir.

5    Q.    On this diagram did you indicate what

6  measurements you came up with after you measured from

7  both ends of the house to the casings?

8    A.    Yes, it would have been marked on the diagram.

9    Q.    Now this diagram, was this the only diagram that

10  you prepared at that time?

11    A.    For this, for this Tennyson address?

12    Q.    Yes, sir.

13    A.    As far as I know, yes.

14    Q.    The diagram that you prepared, is that something

15  to your knowledge has been blown up to look like these

16  diagrams you see down here in the courtroom?

17    A.    I do not know, sir.

18    Q.    You don't know it's been enlarged by anyone?

19    A.    No, sir, I do not know.

20    Q.    Okay.  And when you drew this diagram, was it

21  precisely in proportion?

22    A.    No, sir.

23    Q.    Did you try to make it appear roughly in

24  proportion?

25    A.    That's what the measurements are for because the

1    proportionments may not always work out.

2       Q.    Okay.

3              (WHEREUPON, Defendant's Exhibit A was marked

4    for identification.)

5    BY MR. ARNTZ:

6       Q.    Officer Bryant, showing you now what has been

7    marked as Defendant's Exhibit A, for the record will you

8    take a look at that and tell us what it is if you know?

9       A.    This would be the rough sketch that I made out

10   there on Tennyson.

11      Q.    All right.  More particularly, this is a xerox

12   copy of the original sketch, isn't it?

13      A.    Yes, sir.  Yes, sir, it is.

14      Q.    This is not the original but it's a copy?

15      A.    Yes, that's right.

16      Q.    Does this copy appear to be in the same form as

17   the original?  In other words, have there been any

18   changes or alterations made on the copy as compared to

19   what the original would look like?

20      A.    Not that I can tell, no.

21      Q.    Nothing has been added or taken away from that

22   diagram as it looks to you today?

23      A.    No, sir.

24      Q.    No changes have been made?

25      A.    Not that I can tell, no.

1    Q.    I take it then the Defendant's Exhibit A would be

2    a fair and accurate representation of what the original

3    looked like if we had that here today, is that true?

4    A.    Yes, sir.

5    Q.    Now on Defendant's Exhibit A, if I can hold this

6    up a little bit, you see this here.  You've drawn the

7    front of the Tennyson house, the sidewalk coming from

8    the front door out to the driveway, and the driveway, am

9    I right?

10    A.    Yes, sir.

11    Q.    And that would be this area in here?

12    A.    Yes.

13    Q.    Okay.  Can you all see this?

14              (Jurors nodding.)

15    Q.    And then also on this diagram you've indicated

16    where the front door is located, correct?

17    A.    Yes.

18    Q.    As well as two windows, one on either side of the

19    front door?

20    A.    Yes.

21    Q.    This window to the right of the front door as you

22    look at the front of the residence, do you know whether

23    that is the window that is part of the living room of

24    that residence?

25    A.    No, sir, I do not.

1    Q.   You don't know what room that is?

2    A.   No, sir.

3    Q.   And then also on this diagram you have two small

4    rectangles marked number one and number two, don't you?

5    A.   Yes, sir.

6    Q.   Okay.  And number one and number two are the

7    casings which were shown to you when you went to that

8    address?

9    A.   Yes, sir.

10   Q.   Those are the two casings that you took

11   photographs of and that you identified here a minute

12   ago?

13   A.   Yes, sir.

14   Q.   Now those casings are, start with one of them,

15   casing number two on your diagram is almost in a line

16   with the sidewalk as it first comes out of the front

17   door, isn't it?

18   A.   On the sketch itself, yes, sir.

19   Q.   Now this sidewalk as it comes out of the front

20   door of that residence makes an elbow turn.  In other

21   words, it turns from the front door over to the

22   driveway, doesn't it?

23   A.   Yes.

24   Q.   And that's depicted on your diagram?

25   A.   Yes.

```
 1        Q.    All right.  And shell casing number two, at least

 2   on your diagram, is in line with the they the sidewalk

 3   begins as it comes out the residence at the front door,

 4   is that right?

 5        A.    Yeah, that's the way it's, the way that I plotted

 6   it.

 7        Q.    Okay.  When you say that's the way you plotted

 8   it, you mean that's the way you found it and measured it

 9   that day?

10        A.    No.  I don't do them to scale because the -- I, I

11   put the measurement in there.

12        Q.    And when you say, for instance, this diagram is

13   not to scale, the size of the casing you've drawn here,

14   these two little rectangles are not porportionate, not

15   to the sidewalk or the house you drew, correct?

16        A.    Yes.

17        Q.    The casings are drawn much larger than they would

18   be if they were porportionate drawing?

19        A.    True.

20        Q.    But where you have located casing numbers one and

21   two on the diagram, is that roughly where you found them

22   in relation to where the driveway was located, where the

23   sidewalk was located and where the front of the house is

24   located?

25        A.    I just put it in there the best I possibly could.
```

1     Q.    Where you have number one and number two drawn

2   here, that is in the front yard of that residence, isn't

3   it?

4     A.    Yes.

5     Q.    And on your diagram you don't have a street, do

6   you?

7     A.    No, sir.

8     Q.    The street would be along here at the bottom of

9   the diagram?

10    A.    Yes, sir.

11    Q.    And can you give me some idea where casing number

12  one, for instance, would be located in relation to the

13  sidewalk and the street?  Would it be closer to the

14  sidewalk or to the street, the casing number one?

15    A.    I think it would be closer to the sidewalk.

16    Q.    Closer to the sidewalk?

17    A.    Yes, sir.

18    Q.    Okay.  And casing number one is some distance yet

19  away from the sidewalk as compared to casing number two,

20  isn't it?

21    A.    Yes, sir.

22    Q.    Now neither one of these casings, one or two, is

23  on the sidewalk obviously?

24    A.    Correct.

25    Q.    All right.  And neither casing number one and

 1    number two is near the front door, is it?

 2      A.    That's just the way I have it in my sketch.    I

 3    don't know what you're trying to get at.

 4      Q.    I'm asking you where you found them.   You didn't

 5    find either of these casings near the front door, did

 6    you?

 7      A.    No.   They were found in the grass in the front

 8    yard.

 9      Q.    You don't have any reason to believe they were

10    moved before you got there?

11      A.    No, sir.

12      Q.    In fact, your understanding was just the opposite

13    that where you found them is where they would be found

14    by some other law enforcement officer?

15      A.    Yes, sir.

16      Q.    Okay.   Now the second thing you did that day a

17    little bit later, I think you told us, was that you went

18    to Coffey's Towing, again, at the instruction of

19    Detective Lawson?

20      A.    Yes, sir.

21      Q.    Okay.   Now Detective Lawson told you to go to

22    Coffey's Towing for what purpose?

23      A.    To check to see if there might be any other

24    evidence such as spent casings in a Chevy Monza.

25      Q.    Now when he told you to check to see if there

1    were any casings in a Chevy Monza, did you understand

2    him to say the casings actually were in that car?

3        A.    I believe he said that he was going to go and

4    look first but I'm not certain.

5        Q.    Okay.  To be fair, he did not indicate to you

6    that he knew for a fact there were any casings in that

7    car, did he?

8        A.    I don't recall, sir.

9        Q.    Okay.  This is not the first time you been out to

10   Coffey's Towing, was it?

11       A.    No.

12       Q.    How many times had you been to Coffey's Towing

13   before this?

14       A.    Several.

15       Q.    Quite a few?

16       A.    Yes, sir.

17       Q.    And why was that?

18       A.    We have recovered stolen cars, I get sent out

19   there to process them.  I get sent to process cars in

20   other types of crime.

21       Q.    When you say process cars, would that include

22   searching for evidence as in this case?

23       A.    Photographs, checking for fingerprints, looking

24   for evidence.

25       Q.    So you been out to Coffey's Towing quite a few

1    times prior to this looking for evidence there, is that

2    true?

3       A.    Yes, sir.

4       Q.    And that would be evidence of all kinds of

5    things, stolen cars, and other such things?

6       A.    Yes, sir.

7       Q.    All right.  Now why is this evidence to be found

8    at Coffey's Towing?  In other words, why did these

9    things get located at Coffey's Towing for you to go out

10    and look at them?

11      A.    Coffey's Towing has one of the contracts with the

12    City of Dayton Police Department and when we have a

13    vehicle towed, depending on the location in the city,

14    depends on who is going to get the contract for it to

15    tow.

16      Q.    Your understanding is that Coffey's Towing has a

17    contract with the City of Dayton to do what?

18      A.    Tow vehicles.

19      Q.    Tow vehicles.  And those vehicles, many of them

20    contain evidence in criminal cases, is that true?

21      A.    A lot of times, yes.

22      Q.    A lot of times.  In fact, the vehicles themselves

23    are evidence sometimes?

24      A.    Yes, sir.

25      Q.    When that vehicle was at Coffey's Towing, it was

1     there pursuant to someone's instructions, wasn't it?

2     A.   Yes, sir.

3     Q.   And who would that be?

4     A.   I do not know, sir.

5     Q.   Would it be your understanding that some law

6     enforcement officer would have instructed that vehicle

7     be taken out to Coffey's Towing?

8              MR. SLAVENS:    Objection, your Honor.  He

9     said he didn't know.

10           THE COURT:    Sustain the objection.

11    BY MR. ARNTZ:

12     Q.   Well, typically is it a law enforcement officer

13     who directs a vehicle be towed to Coffey's Towing in

14     that situation like this?

15              MR. SLAVENS:    Objection to typical.

16           THE COURT:    Overruled.  You can answer.

17     A.   Could you repeat the question?  I'm sorry.

18    BY MR. ARNTZ:

19     Q.   Typically or customarily isn't it just the case

20     that some detective says, take this car out to Coffey's

21     Towing and they would send Steve Bryant out to look at

22     it, isn't that the way it happens?

23     A.   Sometimes.

24     Q.   Yeah, okay.

25           'Cause the car doesn't drive itself.  Coffey's

1    has to take it and someone has to tell Coffey's to come

2    and get the car, right?

3      A.    Yes, sir.

4      Q.    That's formally a law enforcement person?

5      A.    Yes, sir.

6      Q.    Okay.  And the car may or may not contain

7    evidence?

8      A.    Yes, sir.

9      Q.    All right.  And the car may or may not be

10   evidence itself?

11     A.    Yes, sir.

12     Q.    All right.  And when you went out to Coffey's

13   this day, it was because you understood there may or may

14   not be evidence in the car?

15             MR. SLAVENS:    Objection.  This has been

16     asked and answered.

17             THE COURT:    Overruled.

18   BY MR. ARNTZ:

19     Q.    Am I right?

20     A.    Yes, sir.

21     Q.    And when you went to Coffey's Towing, you were

22   alone, I take it?

23     A.    Yes.

24     Q.    Okay.  And you looked into the interior of the

25   vehicle, obviously?

1  A. Yes, sir.

2  Q. All right.  Did you actually get into the car

3 yourself?

4  A. I looked in the car, yes.

5  Q. Did you get into the car yourself?

6  A. As far as what you mean by get into, sir?

7  Q. Well, did you step into the car?

8  A. I would have had to put part of my person in the

9 car such as my head to look under the seat or look on

10 the floor.

11  Q. Did you step into the car?

12  A. That, I couldn't say for certain.

13  Q. You put your hands in the car, didn't you?

14  A. Yes.

15  Q. Okay.  And you took these photographs on the same

16 day you were out there to look into the car, correct?

17  A. Yes.

18  Q. Okay.  And do these photographs depict the

19 condition of the car when you first arrived there?

20  A. Yes.

21  Q. Except that you had to open the driver's door to

22 take this picture?

23  A. Yes, sir, that's correct.

24  Q. And when you opened the driver's door to this

25 State's Exhibit No. 64, you were able to see certain

1    things inside the car, weren't you?

2       A.   Yes, sir.

3       Q.   And one of the things you saw inside the car was

4    one or more objects hanging from the rearview mirror in

5    that car, am I right?

6       A.   Yes, sir.

7       Q.   What are those objects?

8       A.   I believe an automobile deodorizer thing to hang

9    up to make it smell good.

10      Q.   And what numbers of objects are hanging there

11   from that rearview mirror?

12      A.   I don't know.  It looks -- I don't know.

13      Q.   Do you see at least three?

14      A.   Yes, sir.

15      Q.   You can see those clearly on State's Exhibit 64,

16   can't you?

17      A.   Yes, sir.

18      Q.   And those three objects we are talking about

19   appear to be squarish cards of some kind?

20      A.   I would say so, yes.

21      Q.   All right.  And it looks like they're people on

22   those cards?

23      A.   Yes.

24      Q.   All right.  Also when you looked into that car,

25   you saw what its general cleanliness was like, didn't

1  you?

2     A.    Yes, sir.

3     Q.    And what was its general cleanliness like?

4     A.    Well, it wasn't the cleanest car I've seen.

5     Q.    Kind of a dirty car, right?

6     A.    It wasn't the cleanest car I've seen.

7     Q.    Well, you seen things all over the floorboard?

8     A.    Yes, sir.

9     Q.    That's true in the front and back of the car?

10    A.    Yes.

11    Q.    Looking behind the driver seat, what do you see

12 down there behind the driver seat on the floorboard?

13    A.    Pop bottle and some type of bag.

14    Q.    And then if we look at State's Exhibit No. 66, we

15 see an enlargement or a close-up of that same area on

16 the floorboard behind the driver seat, don't we?

17    A.    Yes, sir.

18    Q.    Same thing that's depicted in 64?

19    A.    Yes, sir.

20    Q.    Right.

21          And what we have is a close-up of the junk, if

22 you will, on the bottom of that car floorboard?

23    A.    Yes.

24    Q.    And you mentioned pop bottle and a bag and looked

25 like a, tape cassettes?

1    A.   Cassette tape and then a spent casing.

2    Q.   More than one cassette tape cartridge?

3    A.   Yes, sir.

4    Q.   And what is this here?

5    A.   Carpeting, possibly.

6    Q.   Carpeting, okay.

7         And all these things were right behind the driver

8    seat on the floorboard when you found that car, am I

9    right?

10   A.   All those things were there when I got there,

11   yes, sir, that I took pictures of all things were out

12   there.

13   Q.   Did you see any stereo speakers in that car?

14   A.   I don't recall.

15   Q.   Does that mean you don't remember?

16   A.   I do not recall, sir.

17   Q.   Could there possibly be one more stereo speakers

18   in the rear of that car?

19   A.   It's possible, I don't recall.

20   Q.   It could have been there but you don't remember?

21   A.   No, sir, I don't.

22   Q.   Also, when you were looking into that car, did

23   you actually search the interior of that car?

24   A.   You mean, did I look underneath the seats?

25   Q.   Did you search all around inside the car?