1    A.    I looked on the floor and underneath the seats.

2    Q.    Okay.  Did you open the objects that were on the

3    floor and underneath the seats?

4    A.    I don't recall.

5    Q.    Did you look, for instance, in the glove

6    compartment?

7    A.    I do not recall, sir.

8    Q.    You may have but you don't remember?

9    A.    I don't remember.

10    Q.    Okay.  And you didn't look on top of the dash

11    there either?

12    A.    I'm sorry, I don't recall.

13    Q.    You didn't conduct what we call an inventory of

14    the items that were inside that car, did you?

15    A.    No, sir, I did not.

16    Q.    An inventory would be a listing of every item

17    inside the car, am I right?

18    A.    Yes, sir.

19    Q.    All right.  So if I'm correct, what you did is

20    you looked for a casing --

21    A.    Yes.

22    Q.    -- in the car?

23    A.    Yes, sir.

24    Q.    You weren't looking for anything else, were you?

25    A.    No, sir.

1    Q.    How much time did you spend looking in the car

2    that day?

3    A.    I don't know.

4    Q.    Well, would you have spent more or less than 10

5    or 15 minutes looking inside the car?

6    A.    I do not know.

7                MR. ARNTZ:        Thank you.  That's all.

8                THE COURT:        Redirect.

9                        REDIRECT EXAMINATION

10   BY MR. SLAVENS:

11   Q.    Officer Bryant, let me hand you what's been

12   marked as Defendant's Exhibit A, which this is your

13   sketch made by you at the time you were at 1912

14   Tennyson?

15   A.    Yes, sir.

16   Q.    Or from there?

17   A.    Yes, sir.

18   Q.    Is that correct?

19          And with reference to particular the location of

20   where the two shell casings were prior to your time of

21   collection, is this Exhibit A more accurate than the

22   photographs?

23   A.    No, sir.  I would say the photographs are more

24   accurate because the photographs are scale whereas my

25   sketch is not.

1    Q.   Okay.  And both shell casings are depicted, am I

2    correct, in photograph State's Exhibit 58?

3    A.   Yes, sir, they are.

4              MR. SLAVENS:     Thank you.  That's all I

5    have.

6              MR. ARNTZ:       No questions.

7              THE COURT:       Any recross?

8              MR. ARNTZ:       (Shook his head in the

9    negative.)

10              THE COURT:       You may step down.

11                        *  *  *  *

12              THE COURT:       Could I see counsel?

13              (WHEREUPON, a discussion was held off the

14    record.)

15              THE COURT:       Ladies and gentlemen of the

16    jury, the next witness is again like similar to last

17    night, a rather lengthy witness.  So I think what we

18    ought to do is go ahead and break for the day.

19                              Remember the usual

20    instructions from the Court not to discuss the case

21    among yourselves or with anybody else.  Don't form any

22    opinions, you have not heard all the testimony yet.

23    Remember to avoid any form of news media whether it be

24    radio, television, or newspaper.

25                              We don't have a very

1    pleasant weather report for tomorrow.  I'm just

2    cautioning everybody.  We are going to start tomorrow

3    at 9.  Remember, tomorrow is a half day.  Maybe you

4    will be lucky enough to get in and out of here before

5    it gets too bad.  I'm referring to snow.  But anybody

6    that lives in Dayton, Ohio, knows that our forecasters

7    aren't known for their accuracy when it comes to snow

8    predictions.  Be aware of that problem when you wake

9    up tomorrow morning, leave yourself some extra time.

10   Obviously, drive careful.  Get here safe and sound.

11   Start at 9.  We may go a little bit past the noon

12   hour, then we will be in recess for the rest of the

13   day tomorrow.

14                          Have a nice evening.  We

15   will see you back tomorrow.  We will try to get

16   started right at 9 o'clock.

17

18              (WHEREUPON, the proceedings for February 24,

19   1993, were then concluded at the hour of 3:58 p.m.)

20                          *   *   *   *

21

22

23

24

25

1                    (February 25, 1993 - Morning Session)

2                              9:17 a.m.

3                         IN CHAMBERS

4

5              THE COURT:        Let the record reflect we

6      are in chambers.   Present are prosecutors and defense

7      counsel.

8                              And the Court has had a

9      brief discussion with juror John Knox.   And he has

10     provided the Court with a letter from his doctor

11     indicating that he should be relieved from any further

12     jury duty due to stress problems and possible

13     emotional difficulties.   What I've just indicated is

14     not contained in the letter.   The stress problems and

15     emotional difficulties was indicated to the Court by

16     Mr. Knox.   The letter simply excused him from jury

17     duty at this time.

18                             In view of what the letter

19     says the situation is, the Court is of the opinion

20     that the juror probably should be excused.   However,

21     in view of the nature of the situation, the nature of

22     the case and in abundance of caution, at the request

23     of defense counsel, we will bring the juror in and

24     have him explain to the lawyers in his own words

25     basically, I presume, what he has already explained to

1          the Court not on the record.

2                              It's the Court's opinion

3          that the letter, it is from Dr. Moon, which will be

4          made a part of the record and a court exhibit, is

5          sufficient to excuse the juror without any further

6          inquiry.  Again, however, so that everyone feels that

7          their case is being fairly and impartially tried by

8          all concerned, I will permit a brief inquiry of the

9          juror and then make the final determination as to

10         where we go from there.

11              MR. SLAVENS:    If I may, is Dr. Moon a

12         medical doctor?  Is he a doctor that specializes more

13         so in the field of mental health?

14              THE COURT:    It's Dong S. Moon, M.D.,

15         Diplomate, with an "e" at the end, American Board of

16         Psychiatry and Neurology.

17              MR. SLAVENS:    Thank you.

18              THE COURT:    He's connected with New

19         Perspectives, Professional Counseling Center, office

20         at 111 West First Street.  And he's indicated in a

21         letter that not to hesitate to contact him if it

22         becomes necessary.

23                              Let the record reflect that

24         it's the Court's understanding that defense counsel

25         will waive the presence of Mr. Howe for purposes of

1        inquiry of the juror.

2                MR. ARNTZ:        That's correct.  I

3        discussed the situation with him and he understands he

4        has the right to be present during this brief

5        discussion with the juror but he voluntarily consents

6        not to be here.

7                THE COURT:        All right.  Now, anything

8        further for the record, Mr. Slavens?

9                MR. SLAVENS:      No.

10               (Pause in the proceedings.)

11               THE COURT:        Hi, Mr. Knox.  Just have a

12       seat right there.

13                                 Let the record reflect that

14       we are all still in chambers.  Present are defense

15       counsel and the prosecutor's office and Mr. Knox has

16       now been brought in.

17                                 Mr. Knox, first of all, I

18       don't want you to feel any problem here.  As I

19       indicated to you, that's one of the reasons I wanted

20       you to wait here.  The lawyers do have a couple of

21       questions that they would like to ask you and nobody

22       is going to badger you or anything else.  Don't feel

23       uncomfortable about it.  But this is, again, because

24       of the type of case that we are dealing with, this is

25       a normal type procedure.

1                                    Going in order, Mr. Slavens

2       at this point.  And we'll back up just a minute.

3                                    So that you know, Mr. Knox,

4       I have explained in very, very brief detail what you

5       advised me verbally.  I've also shown counsel the

6       letter from Dr. Moon, and so, so they know just

7       generally the situation.  I didn't get into any real

8       specifics.

9                                    Mr. Slavens, any questions?

10              MR. SLAVENS:    Just so I'm clear on what

11      the Court sort of earlier informed, I guess Dr. Moon

12      is treating you for mental health situation?

13              MR. KNOX:       Depression.

14              MR. SLAVENS:    Okay.  And that he's

15      indicated it's been, his treatment of you has been

16      occurring since sometime in the past?

17              MR. KNOX:       November of last year.

18              MR. SLAVENS:    '92?

19              MR. KNOX:       Two.

20              MR. SLAVENS:    All right.  And I think

21      everybody appreciates the fact you called this to our

22      attention.  You believe, and I think what the doctor

23      indicates, that it would not be wise for you to

24      continue serving as a juror?

25              MR. KNOX:       Yeah.  I had, I had a

1    Tuesday appointment with him as a normal, about a

2    month, once a month with Dr. Moon.  He's a

3    psychiatrist.  And once every two weeks with one of

4    his therapist.  Before, it was twice a week and the

5    last two months I've tapered off.  I've been doing

6    really good.  And this all resulted from getting laid

7    off for the second time from my company after they

8    moved me here.  This was this past October.  And

9    that's what brought this on.  And I've been doing real

10   good and so I didn't see any problem in showing --

11   coming.  And I been on a jury before.  And I thought,

12   you know, it would be my, I felt it was my obligation

13   to do that.  And then so I changed my regular

14   appointments from Tuesday during the day because I

15   told him I was in jury and to 5:15 last night for this

16   week to go see him.

17                       So after we recessed, I

18   waited and went over -- he's over here right on First

19   Street.  And I talked to him and I told him by the end

20   of the day yesterday, with all the testimony and

21   everything, you know, the immensity of everything, I

22   was really feeling really stressed out again, I mean,

23   to the point that if I continued, I really didn't feel

24   that I could by the end of the testimony and

25   everything, be in a good mental state.  So to say from

1    my past from what had happened before, because I had

2    anxiety attack or two from the previous stress, and I

3    didn't want to let it go any longer.  And he agreed

4    100 percent.  And, and his advice was that I should at

5    this time bring it to the attention of the Court.

6            MR. SLAVENS:    That's all I have.  I think

7    you explained it a little bit probably what you told

8    the Judge.

9            THE COURT:    Right.  That's pretty much

10   the same thing that Mr. Knox previously indicated to

11   the Court.

12                          Mr. Arntz or Mr. Monta?

13           MR. MONTA:    Thank you, Judge.

14                          Mr. Knox, this is basically

15   stress related, right?

16           MR. KNOX:    Right.

17           MR. MONTA:    And we are wondering if

18   this condition as it were would 'cause you to lose

19   concentration or maybe even distort what you're

20   hearing because of that?

21           MR. KNOX:    It, it has, from my past

22   experience, when it started, definitely, definitely

23   interferes with my concentration.

24           MR. MONTA:    Okay.

25           MR. KNOX:    And then when I get -- I'm

1    still on antidepressant medication and then I have

2    some mild tranquilizers that if, mainly at work, you

3    know, I will take one of those or two of those a day.

4    And so, yes, it would, it would, I think it would

5    influence or affect my concentration.  And, and, and

6    in the long run when we got -- I was thinking ahead to

7    the deliberation, is, is just not allow me to, to

8    concentrate on the whole process in light of the

9    seriousness of what I've seen in the last two days.

10              MR. MONTA:        You feel you're able to

11   predict this because it has happened in the past?

12              MR. KNOX:        Right.

13              MR. MONTA:        Okay.  It's typical of that

14   type of problem?

15              MR. KNOX:        Right.  But that was three

16   and four months ago.  And the last two months, I been,

17   I've been doing real well, you know.  I've been

18   working through having these problems.  And that's why

19   I didn't think at that time through our questioning

20   that it was to be pointed out because I felt real good

21   about, you know, which I need to do, about myself and

22   my capabilities.

23              MR. MONTA:        You're saying then that the

24   testimony probably has, to you anyway, is much more

25   stressful than the voir dire type of dialogue?

```
 1                    MR. KNOX:          Right.  And, and much more
 2      involved in and detailed than, than I would have ever
 3      imagined 'cause the only other jury I sat on before
 4      was this shoplifting case, and that was, you know,
 5      pretty cut and dry, one or two witnesses.  And the
 6      biggest problem there was the deliberation and we got
 7      through that and came to a guilty verdict.  But with
 8      all the details here and trying to keep everything
 9      sorted out, by the end of the day yesterday when I
10      talked to Dr. Moon, I don't think it would be in the
11      fairness of, of the defendant.
12                    MR. MONTA:         In your mind do you believe
13      the tension is, at least for you, is building and
14      based on the experience before?
15                    MR. KNOX:          Right.
16                    MR. MONTA:         You feel that could keep
17      your concentration at the highest level?
18                    MR. KNOX:          Right.  Then what is
19      happening with these anxiety attacks when it gets to a
20      point, I get a physical stomach illness and I don't
21      want to get out of bed.  But like I said, that was
22      months ago.  And I didn't realize that it would -- I
23      really feel like I'm letting the Court down but I
24      needed to let you know.
25                    THE COURT:         I've indicated to you I
```

1      would much rather have you let us know than not let us

2      know.

3                  MR. KNOX:        Then wait until it creates

4      a problem.

5                  THE COURT:       Anything further?

6                  MR. MONTA:       I have nothing further.

7      That's very clear.

8                  MR. SLAVENS:     Nothing.

9                  THE COURT:       What we'll do is go back to

10     the jury room.

11                 MR. SLAVENS:     Is he with the other

12     members?

13                 THE COURT:       Yes.

14                 MR. KNOX:        But I haven't discussed

15     anything with them.

16                 THE COURT:       Right.  Instead of doing

17     that, why don't you go out the front and have a seat

18     by the, right out here in the front of my office.

19                 (WHEREUPON, Mr. Knox was excused from the

20     Judge's chambers.)

21                 THE COURT:       Does either counsel want to

22     be heard on this issue?

23                 MR. SLAVENS:     I think it's relatively

24     clear of what his condition is, your Honor.  I think

25     the Court can proceed accordingly.

1          MR. ARNTZ:       I think we'll leave it up

2     to the Court.

3          MR. MONTA:       I think we will stand mute

4     on this one.

5          THE COURT:       Well, the Court, in view of

6     the entire set of circumstances, regretfully will

7     excuse the juror and order that the 13th juror become

8     number, whatever number Mr. Knox is, and that the 14th

9     juror will be our last and lone alternate as we start

10    into a Thursday.

11         MR. MONTA:       Do we need --

12         THE COURT:       I want to go off the record

13    in a minute.  He made a very unusual request of me

14    which I will tell you about later.

15                              Off the record.

16         (WHEREUPON, a discussion was held off the

17    record.)

18

19         THE COURT:       Let the record reflect we

20    are in chambers and I believe we are going to discuss

21    the admissibility of some letters that were apparently

22    or allegedly written by the defendant to Mr. Walter

23    Polson.  The Court's been provided with three separate

24    documents purporting to be three separate letters from

25    the defendant to Walter Polson.

1          It's my understanding the

2    defendant, the defense attorneys on behalf of Mr. Howe

3    are waiving his presence for the purpose of this

4    discussion, is that correct, Mr. Arntz?

5          MR. ARNTZ:       That's correct.

6          THE COURT:       All right.  Mr. Slavens.

7          MR. SLAVENS:     Well, because this is, I

8    guess, an informal motion in limine, or something to

9    that effect, we would propose, and so the Court would

10   know and the record is clear, if, during the testimony

11   or during the testimony of Mr. Polson, I plan on

12   showing to him what I consider two separate documents.

13   I think three, there is three pages, one is the eight

14   and a half yellow page that I have.  It starts out,

15   quote, for Sunday, June 21, parens, Father's Day.

16         THE COURT:       I have that.

17         MR. SLAVENS:     Show him that document.  I

18   also plan to, for him to identify and also show him a

19   document that starts out, it's on a smaller, probably

20   maybe 4 by 8 white paper, single spaced, two of those.

21   One starts out, Walt, are you going to testify for me

22   on number 2 also?  And then the fourth side of that

23   page, if you will, starts, completes the term or ends

24   with, "flush this."  That is the total of two pages

25   front and back of each.  And I believe the witness

1      will be able to identify the documents and testify

2      about them and what he did as a result of receiving

3      the documents if anything.

4              MR. ARNTZ:      Before we begin to discuss

5      it, I want to make sure I have these pages in order.

6      One of these documents begins, Walt, are you going to

7      testify for me?

8              MR. SLAVENS:      Right.

9              MR. ARNTZ:      The very next side of that

10     document begins how?

11             MR. SLAVENS:      The flip side of that page

12     would start out, "got has wallet - started to."

13             MR. ARNTZ:      And the next document

14     begins with?

15             MR. SLAVENS:      I think what I would

16     classify maybe -- oh, it's got number 3 at the top.

17     It would be in numerical order.  "One of you - Tony -

18     yelled, get rid of the guns."

19             MR. ARNTZ:      And the next document

20     begins, "Tony bent down."

21             MR. SLAVENS:      Yeah.

22             MR. ARNTZ:      Okay.

23             THE COURT:      All right.

24             MR. SLAVENS:      And I presume the defense

25     objects or something that they wish to proffer?

1          MR. ARNTZ:       I guess our first comment

2    is, we are not clear as to which evidence rule the

3    prosecutor is, which evidence rule it is that the

4    prosecutor claims makes these documents admissible.

5    There are a number of different possibilities.

6          THE COURT:       Well, let's deal with it.

7    I'm concerned about the overall contents referring to

8    other matters that would not necessarily be

9    admissible, such as, in one document the parole

10   situation.

11         MR. SLAVENS:       That can be readily handled

12   by being redacted from this.  I think on the document

13   which is, "okay, hoss boss," it's two lines, portion

14   of the third line, that could be redacted.  I think

15   quite --

16         THE COURT:       Let me ask this question.

17   After the document is handed to the witness, what is

18   the witness going to do with the document?

19         MR. SLAVENS:       Going to say he received it

20   from Mr. Howe.

21         THE COURT:       And then that's it?

22         MR. SLAVENS:       Well, he's going to explain

23   what the document says.

24         THE COURT:       All right.  Where are we,

25   Mr. Arntz?

1          MR. ARNTZ:      Well, we provided the

2     Court, in a previous written motion, citations to

3     authority which would exclude this type of material as

4     not being statements made in furtherance of the

5     conspiracy.  And if that is the theory under which the

6     State is attempting to introduce the documents, we

7     feel that the case law is clear that should not be

8     permitted.

9          MR. SLAVENS:      I don't believe that's our

10    position this is in furtherance of a conspiracy.  And

11    I think this actually shows that the defendant on

12    trial was attempting to get this particular witness to

13    come to court and lie.

14         MR. ARNTZ:      Well, our position is this

15    is hearsay unless it's, it's available under some

16    hearsay exception and I think --

17         MR. SLAVENS:      It's not.

18         MR. ARNTZ:      The foundation is for the

19    prosecutor to indicate which exception they believe

20    makes this material admissible.

21         MR. SLAVENS:      Well, I disagree it's

22    hearsay.  It's statement from the defendant directly

23    to the witness.

24         THE COURT:      If I understand the State's

25    position, it falls under Rule 801(D), Statements which

1       are not hearsay, subsection 2.

2               MR. SLAVENS:    I don't have the particular

3       book in front of me.   If the Court would tell me the

4       gist of that.

5               (Judge handing the book to Mr. Slavens.)

6               MR. SLAVENS:    Yeah.   I think that is

7       applicable as well as is the direct statement of a

8       witness whether it be in writing or not.   Defendant --

9               MR. ARNTZ:    801(D)(1) is the prior

10      statement of a witness.   That does not apply because

11      that rule only applies where the witness testifies at

12      trial, that is, the declarant is a witness at trial.

13              THE COURT:    Right.

14              MR. ARNTZ:    And our client would have

15      to be the declarant.   He would have to testify in

16      order to qualify.   So if we focus on 801(D)(2)(a),

17      admission by a party-opponent, our first argument

18      under that rule is that this first document does not

19      qualify as an admission to anything.   The rules

20      distinguish between statements and admissions.   And

21      admissions are more specific than statements.

22      Admissions contain material which is in the nature of

23      a confession or directly incriminated toward oneself.

24      To the contrary, this document is, if anything,

25      exculpatory in its contents, so I don't think it

1    qualifies even as an admission by Howe if Howe wrote

2    it.

3            THE COURT:    Are you relying on

4    subsection (e) or (a) or both?

5            MR. SLAVENS:    Actually I'm not trying to

6    hedge, your Honor, but, no, I believe after reading

7    (a) and (e), that they do both apply.  This is a

8    definite statement, I submit, by the defendant.  And I

9    think (e) upon reading it in its entirety does also

10    imply contrary to what Mr. Arntz claims.

11            THE COURT:    Mr. Arntz, anything

12    further?

13            MR. ARNTZ:    Well, again, just as to

14    this first document dated June 21st, we don't feel

15    that it qualifies as an admission under 801(D)(2)(a).

16    Likewise, it doesn't qualify under 801(D)(2)(e)

17    because the case law we provided the Court indicates

18    that once co-conspirators have been discovered, that

19    their identities have been learned and they have been

20    arrested, these types of communications no longer

21    qualify in statements made in furtherance of the

22    conspiracy because the conspiracy technically no

23    longer exists.  They can't achieve the aims of the

24    conspiracy once they're all locked up in the county

25    jail.  That's what the case law says.  And we provided

1        the Court the cases that say that.

2                              We have some further

3        arguments about that document as well if the Court

4        wants to hear those.

5             THE COURT:       Well, I do.  I want to hear

6        whatever arguments -- you just talking about the one

7        now?

8             MR. SLAVENS:     Right.

9             MR. ARNTZ:       Right.  Just the one

10       because I think the two documents are of a different

11       nature.  They're not the same kind of material in

12       each.

13            THE COURT:       All right.  Go ahead.

14       Proceed.

15            MR. ARNTZ:       Likewise, we feel that even

16       if, arguably, this first document was admissible under

17       801.(D)(2), that it is limited by Rule 613.  It must

18       be read in conjunction with 613.  613(B) provides

19       that:  Extrinsic evidence of a prior inconsistent

20       statement by a witness is not admissible unless that

21       witness is provided a prior opportunity to explain the

22       document.

23                              And of course the unique

24       situation here is that the alleged author of the

25       document is the defendant who has a constitutional

1   right not to testify in his own trial.  And this is a

2   document which would otherwise be clearly hearsay.  In

3   other words, the State is maneuvering him into the

4   position of taking the stand and either denying that

5   he wrote the document or explaining it.

6              THE COURT:       Mr. Slavens.

7              MR. SLAVENS:    Well, we're not talking

8   about prior inconsistent statement of a witness.  I

9   think again Mr. Arntz is stretching in that regard.

10                          As to how the most recently

11  quoted rule, I think 613 applies in this situation.  I

12  think it's clear this is a statement.  The evidence

13  will be clear this is a statement of the defendant and

14  it's admissible for appropriate and relevant purposes.

15             THE COURT:       I don't think Rule 613

16  applies in this particular situation.  The documents

17  themselves -- going back to your first argument, I'm

18  thinking out loud and talking on the record, is, well,

19  at this point I'm assuming, and correct me if I'm

20  wrong, Mr. Slavens, but it's the State's theory that

21  this is clearly a furtherance of the conspiracy

22  because it's a conjuring up of a story to be told at

23  trial.

24             MR. SLAVENS:    Well, that is correct.  I

25  think you also have to understand that a subsequent

1    witness by the name of Elofskey will be testifying

2    about also documents received from Mr. Howe wherein

3    the conjuring up, if you will, of the testimonial

4    basis also is developed by the defendant on trial in

5    this case.

6          THE COURT:     So this is not, this is

7    not, we are not talking about a -- first of all,

8    Mr. Howe is not the witness, so it's not a prior

9    inconsistent statement of a witness.  It would be if

10    you had a letter from Mr. Polson in your possession to

11    Mr. Howe, that this rule would quicken as if it was

12    inconsistent with what he testifies here.  That's the

13    way I interpret Rule 613.

14          MR. SLAVENS:     Yeah.

15          THE COURT:     But at this point in

16    time -- well, strike that.

17                Let me ask this question.

18    Are there some verbal conversations between Polson and

19    Howe that relate to these various documents either

20    preliminary or follow-up conversations at the jail

21    where they actually discussed the letters?

22          MR. SLAVENS:     Yes.  Their discussions are

23    some of what a limited nature due to the fact they're

24    both incarcerated, not like you and I speak.

25          THE COURT:     Mr. Arntz, well,

1    additionally with regard to this first document,

2    obviously, there is some, there are two to three

3    comments which at a minimum must be stricken even if

4    the Court should let the remainder of the document go

5    to the jury.  The bottom of the third paragraph on the

6    first page, the sentence about not mentioning about

7    the parole.

8              MR. SLAVENS:    I agreed with that.  We can

9    redact that.

10             MR. ARNTZ:    We probably agree.

11             THE COURT:    Polson is not going to read

12   it.  Let's assume I read this.  Polson is not going to

13   read the letter, is he?

14             MR. SLAVENS:    He's going to have to read

15   it to be able to identify -- he will have to look at

16   it in order to identify it.

17             THE COURT:    I understand that he's not

18   going to read to the jury its contents.

19             MR. SLAVENS:    No.

20             THE COURT:    We don't have to worry

21   about these kinds of things now.  We will deal with

22   them eventually.

23             MR. ARNTZ:    Did I misunderstand?  He's

24   not going to read them at all or --

25             MR. SLAVENS:    He's going to read them to

 1    identify them, not reading the entire document out

 2    loud.

 3            MR. MONTA:        On the stand reading some

 4    of it out loud?

 5            MR. SLAVENS:        Yeah, he will explain what

 6    it is.

 7            MR. ARNTZ:        We'll be objecting to that

 8    because the document will, will speak for itself.

 9    There's no need for anybody to read it or interpret

10    it.  It's just like any other document.

11            THE COURT:        Okay.  But that's, that's

12    the least of the issues here.

13            MR. ARNTZ:        We also feel with regard to

14    the second document, this one that begins, are you

15    going to testify for me?  That, likewise, there is

16    nothing in that document which is an admission by the

17    party-opponent, our client, that he committed any

18    criminal activity.  And again, this Rule 801(D)(2)(a)

19    speaks specifically of an admission rather than a mere

20    statement.  While it may qualify as a statement of

21    some sort, it is not an admission to anything.  It

22    cannot be admissible under that rule for that reason.

23            MR. SLAVENS:        The point is, the jury is

24    going to have an opportunity to compare these letters

25    with the documents we intend to offer when

1          Mr. Elofskey testifies.

2                    THE COURT:        Okay.  Go ahead, Mr. Arntz.

3     Anything further?

4                    MR. ARNTZ:        Well, I think what the

5     prosecutor just said is that perhaps this particular

6     document, or both of them for that matter, may not

7     qualify as admissions but if you only let us introduce

8     all of the other forthcoming letters from our next

9     witness Elofskey, then in context somehow all of these

10    documents, which individually do not constitute

11    admissions, will together as a group become an

12    admission to something.  And that is really

13    far-fetched.  The rule speaks of not of qualifying any

14    document in the context of a group of documents, it

15    speaks only of a statement which is an admission.  So

16    I think our position is the Court must qualify each

17    document one at a time and cannot make a ruling about

18    the documents as a group.  Each document either

19    qualifies or doesn't qualify under the rules.

20                    MR. SLAVENS:      If I may, your Honor.  If

21    you go back to the last (D)(2)(e), I don't think that

22    any of the rules interpret the term, statement, in a

23    singular fashion.  I think you have to look at it in

24    totality.

25                    Basically, what you have,

1    what we would submit, this is relevant for there's

2    going to be inferences either on sometime that this

3    witness, Mr. Polson, is lying.  And the evidence will

4    be that even in the opening statements and even on his

5    direct testimony he stated he's never been asked to

6    lie by the State of Ohio.  The only person that asked

7    him to lie is Mr. Howe.

8           MR. ARNTZ:     To rely what the prosecutor

9    just said, the Court looks at 801(D)(2), that

10   paragraph begins with the words, the statement --

11   801(D)(2)(a) begins with the words his own statement.

12   801(D)(2)(b) begins with the words, a statement.

13   Likewise, (c) begins with, a statement.  (d) is, a

14   statement.  And (e) a, a statement.  So the rule is

15   clear that the Court must review each "statement"

16   singularly in deciding whether it is admissible.

17          MR. SLAVENS:     I think that's

18   preposterous.  Even if you take a look at the

19   definition of statement, which is defined in 801 --

20          THE COURT:     Right.

21          MR. SLAVENS:     -- in the staff notes that

22   relate to it, and even talk about conduct as a

23   statement, and what Mr. Monta would have one do is

24   each time a person makes some conduct, he would be

25   broken down into frame like a movie and you can only

```
 1      put in one portion of it at a time and I think

 2      that's --

 3             MR. ARNTZ:       Well, there again,

 4      801(A)(1) is specific.  It says that a statement is an

 5      oral or written assertion, singular and not plural.

 6      That's what, exactly what we have here.

 7             THE COURT:       Well, let me ask this

 8      question.  Is it your position, Mr. Arntz, that if the

 9      State had a letter from a person saying, and I'm

10      summarizing, on Easter Sunday I was in California with

11      my brother.  And that's all it says.  No admission

12      against interest other than that statement.  And has

13      another letter to another person or even the same

14      person saying on Easter Sunday the same year I was in

15      Dayton, Ohio, in a local pub with Mike, John, and

16      Raymond.  That in and of itself is not an admission.

17      What you're saying to me then is, and I'm articulating

18      right into the record here, that neither of those

19      statements would be admissible under the rules as you

20      are presently reading them.

21             MR. ARNTZ:       Well, I think that's

22      correct, if you interpret the rule literally.  But I

23      don't think you even have to reach that because the

24      State hasn't made any showing that any documents when

25      compared are contradictory to each other as you
```

1    suggest.  There is no showing that these documents

2    contradict each other in that sense constituted

3    admission in view of your contradiction, if I

4    understand what you're saying.

5              THE COURT:        Right.

6              MR. ARNTZ:        We don't even have that

7    here.

8              THE COURT:        Do you have a response to

9    that, Mr. Slavens?

10             MR. SLAVENS:      No.  Well, I do.  And he's

11   not one hundred percent correct.  The contradiction

12   is -- in fact in the letter there are some

13   contradictions when you read them in their entirety.

14   And one of the glaring contradiction is the fact when

15   he speaks to Mr. Elofskey, he, Mr. Howe, is telling

16   Mr. Elofskey that Polson did the shootings and when

17   he's talking to Mr. Polson, he's telling Mr. Polson

18   that if they stick together and say that, that it was

19   Elofskey that did the shootings, point in fact, he

20   knows he's the party that's accused of doing himself

21   the shooting.

22             MR. ARNTZ:        Now, to --

23             MR. SLAVENS:      That's basically it.

24             MR. ARNTZ:        If that was the content of

25   the letters to Polson as compared to the letters to

1    Elofskey, that still isn't the case that the Court

2    suggested where the defendant says, I was in one town

3    one day and another town another day because in both

4    of the letters to Elofskey and Polson, our client

5    denies shooting anybody.  He does not incriminate, if

6    I recollect correctly.

7            MR. SLAVENS:     I don't.

8            MR. ARNTZ:       If I recollect correctly,

9    he does not admit to killing anybody in any letter.

10   So the fact that he makes dissimilar noninculpatory

11   statement doesn't make those admissions to anything.

12   Now those letters could be used to impeach him if he

13   testified and say, well, on one day he said --

14           THE COURT:       I understand all of that.

15   But we're dealing now with the State of Ohio, State of

16   Ohio's case in chief.

17           MR. ARNTZ:       When he doesn't testify,

18   the rules, only admission if it's in the nature of an

19   admission to something.

20           THE COURT:       Any other arguments on

21   either of these?

22           MR. ARNTZ:       Well, only that the Court

23   cannot rule on the admissibility of these two

24   documents based upon some argument that in context

25   with other documents, they are admissible unless and

1     until the Court reviewed all of the other documents.

2     If the Court is going to entertain that theory, you

3     would have to read every one of these documents,

4     entertain arguments to the whole group.

5           MR. SLAVENS:    And that can easily be

6     done.  We only intend with Elofskey, that there is one

7     document.  I can go get it.

8           THE COURT:    Let's do that and see where

9     we are.

10           (WHEREUPON, a discussion was held off the

11     record and then in-chambers proceedings were then

12     concluded.)

13

14          <u>IN OPEN COURT - BEFORE THE JURY</u>

15                10:49 a.m.

16           THE COURT:    Good morning, ladies and

17     gentlemen of the jury.  Obviously, we are a little

18     later this morning than we originally anticipated.

19     We've had a series of events develop.  The first of

20     which, as you will notice, juror number ten, Mr. Knox,

21     is no longer with us.  He has been excused for

22     personal reasons.  And the practical impact to you is

23     very definitely on Ms. Merriman who now will become

24     juror ten.  So if you will take that seat over there.

25     And, Ms. Elam, I realize you're probably used to that

1    position.  Do you prefer to stay there or do you want

2    to move over here to the normal 13th juror?

3              MS. ELAM:       I will move over there.

4              THE COURT:      Why don't you move over

5    here then.

6              MS. ELAM:       Okay.

7              THE COURT:      So that is an explanation

8    for part of the delay.  The other portion of the delay

9    was through no one's fault.  We were dealing with some

10   legal issues.  Hopefully, and they're not, as we

11   speak, resolved at this point, but they will become

12   resolved, obviously, in order to keep going.  And

13   these things happen in any trial.  I just want you to

14   understand that delays do occur and it's to make sure

15   that everything is proceeding appropriately and

16   according.  And, again, we are still going to be

17   recessing around the noon hour.  The Court has these

18   other matters to deal with this afternoon.

19                            I'm sure you are all aware

20   of the weather.  We will talk about that when we are

21   done for the day.

22                            In any event, I believe the

23   State's ready to call its next witness.

24             MR. SLAVENS:    We are, your Honor.

25             THE COURT:      Is the defense ready?

1          MR. MONTA:        We are.

2          MR. ARNTZ:        Yes, sir, we are.

3

4          CARL H. HAEMMERLE, having been first duly

5          sworn according to law, was examined and

6          testified as follows:

7                    DIRECT EXAMINATION

8    BY MR. SLAVENS:

9      Q.   Sir, would you tell us your name, please?

10     A.   Carl H. Haemmerle, H-A-E-M-M-E-R-L-E.

11     Q.   And what is your profession and/or occupation?

12     A.   I'm a Firearms and Tool Mark Examiner at the

13   Miami Valley Regional Crime Laboratory in Dayton, Ohio.

14     Q.   And for how long have you been with the Miami

15   Valley Regional Crime Laboratory?

16     A.   It will be five years next month, sir.

17     Q.   And you made reference to the term, I think you

18   said, firearms examiner and tool mark examiner?

19     A.   Yes, sir.

20     Q.   How long have you been so designated?

21     A.   For five years, sir.

22     Q.   And what is a firearms examiner and/or a tool

23   mark examiner?

24     A.   My, my job at the laboratory is to examine

25   weapons that come into the laboratory, test weapons for

1    function, see if they're in proper working order, seeing

2    to test firing to make sure they're operable, do bullet

3    and cartridge case comparison, ammunition component

4    identification, powder patterns and distance

5    determinations from clothing.

6            I do -- I process all firearms and tool mark

7    evidence for fingerprints.  If any are found, I then

8    lift the prints and send the cards to another

9    department.

10           I also am responsible for footwear and tire

11   impression evidence, tool mark evidence, restoring

12   serial numbers, tool mark impressions.  Basically

13   anything that has to do with a firearm or generated by a

14   mark left by a tool comes into my section of the

15   laboratory.

16   Q.    And have you had any training, specialized

17   training to prepare you for your field that you've been

18   working on now for five years?

19   A.    Yes, I have.

20   Q.    And explain to us briefly a little bit about your

21   educational background as it relates to your specialized

22   field of firearm and tool mark examination?

23   A.    I served under Mr. David Taulbee who was the

24   firearms and tool mark examiner at the crime lab.  He

25   had 20 years of experience when he trained me.  There

1    are no colleges or schools you get this experience at.

2    You basically have to learn it under a competent

3    examiner.

4          Along with learning your trade under an examiner,

5    there are schools you go to.  I been to training from

6    the Alcohol Tobacco and Firearms.  I've also been

7    through training with the FBI in gun powder and gunshot

8    residue detection.  That's for the gun powder patterns.

9    I've also been through training with the FBI in

10    classification of fingerprints and processing and

11    lifting latent fingerprints.  I've also received

12    training through the Ohio Bureau of Criminal

13    Identification in tool mark identification.  Also attend

14    workshops given by the Association of Firearms and Tool

15    Mark Examiners, which is the association for persons in

16    my profession which I'm a member of that profession or

17    of that association.  So I basically had an ongoing

18    training process.  It's an ongoing process.  If there is

19    something that is new that comes out in the field, there

20    is a school present, you sign up and go to the schools.

21          And in, in accordance with that, for five years

22    prior to becoming a staff at, the staff member at the

23    laboratory, I was a police officer assigned to the

24    Dayton Police Academy and I did four years as a range

25    officer.  So I was already familiar with firearms

1    through that profession.  And I also had training from

2    Smith & Wesson, Glock, Mossberg, and Sigsauer as a

3    armorer for their weapons and their types of weapons.

4       Q.   You mentioned the term Smith & Wesson and Glock

5    and a few others.  Are those concerns manufactures of

6    weapons?

7       A.   Yes.  Those are manufactures of weapons.

8       Q.   Have you ever had an opportunity to testify in

9    court concerning your examinations, your firearms

10   examinations, tool mark examinations on prior occasions?

11      A.   Yes, I have.

12      Q.   Approximately how many times have you so

13   testified?

14      A.   Fifty-five times in common pleas court in the

15   State of Ohio.

16      Q.   Now, sir, I would like to direct your attention

17   to whether or not if you ever received in your offices

18   any weapons concerning, and I'm going to hand them to

19   you, what I'm going to call a Raven Arms and Bryco.  I

20   will hand you items that have been marked State's

21   Exhibit 43.  And while you look at that, I will also

22   place in front of you another item that's been marked

23   State's Exhibit 38.

24      A.   State's Exhibit 43 bears my initials, the date

25   that I, I put the weapon back in the gun envelope.  My

1   initials are under the slide of this weapon.  That's

2   where I commonly mark semiautomatic weapons.

3      Q.   What exhibits are you referring to?

4      A.   This is Exhibit No. 43.  It had a Raven Arms

5   serial number 1559350.  It also contains an envelope

6   with five 25 caliber cartridges.  Each one of these

7   cartridges are in a plastic bag that has my initials and

8   my seal.  And the seal is unbroken.  And my initials are

9   also on the magazine that would hold the ammunition when

10  you load it into this particular weapon.  All of that is

11  Exhibit 43.

12     Q.   Before you, concerning Exhibit 43, and are you

13  familiar with the, I don't know what the word would be,

14  I want to say the holding capacity for the magazine for

15  the Raven is?

16     A.   Yes, sir.

17     Q.   That gun would, with the magazine fully loaded,

18  it would hold how many bullets?

19     A.   The magazine would hold six cartridges.

20     Q.   And when you received it, how many cartridges did

21  it contain?

22     A.   The magazine contained four cartridges.  One

23  cartridge was in the chamber of the weapon.

24     Q.   And with reference to the Exhibit 38 -- if you

25  would, obviously, I want you to keep those items

1    separate.

2      A.    The Exhibit 38 bears my initials and my mark on

3    it.  My initials are also under the rear of the slide on

4    this particular weapon.  This weapon is a model 25.

5    It's a Bryco by Cal-Westco.  It's a serial number

6    002073.

7      Q.    And what is the -- when you received it, what

8    else did you receive?

9      A.    When I received it, it was hanging up by the

10   string.  And it had a magazine with two 25 caliber

11   cartridges in the magazine and one cartridge in the

12   chamber.   The cartridge, when I finished with them, put

13   them in the plastic bag, sealed the plastic bag and also

14   marked the magazine.

15     Q.    While on, on there, the Exhibit 38, the Bryco,

16   what is the capacity of the clip, holding capacity of

17   that clip?

18     A.    Seven.

19     Q.    Now, when you received either one of those two

20   weapons, did you mention they were on a string or at

21   least one was?

22     A.    They were both.

23     Q.    And did you initially conduct any test in efforts

24   to locate what I'm going to use the term latent

25   fingerprints?

1    A.    First thing I did was processed these weapons for

2    latent fingerprints using the cyanoacrylate,

3    C-Y-A-N-O-A-C-R-Y-L-A-T-E, commonly referred to as the

4    supergluing method.  I then, after processing them with

5    superglue, dusted them for prints and took several tape

6    lifts from each of these weapons.

7    Q.    Now, when you take the tape lift from each of the

8    weapons at that time, do you know whether or not those

9    tape lifts are usable for any identification purposes?

10    A.    No, I do not evaluate the tape lift.  If I find

11    something on a weapon that would look like it would have

12    the remotest possibility of any type of ridge detail, I

13    pass it on.

14    Q.    Did you ever have an opportunity to determine the

15    operability of those weapons?

16    A.    Yes, I did.  After, after processing them for the

17    fingerprints, I took them down to the shooting lab,

18    which is in my lab I have in the basement of our

19    laboratory, I have a range.  And I fired several bullets

20    into a water recovery tank.  I recovered bullets from

21    each weapon and the cartridge casings fired in each

22    weapon for later comparison purposes.

23    Q.    Do you fire your own ammunition or do you fire

24    the ammunition that was already in the magazine?

25    A.    No.  I fire my own ammunition, sir.

1    Q.   By the way, on the, I guess it's the Raven, how

2    many bullets are there and how many did you recover from

3    the Raven?

4    A. · Five.

5    Q.   So when you received the Raven, it had five

6    bullets in it?

7    A.   Four in the magazine and one in the chamber.

8    Q.   Okay.  Now, you were indicating how you

9    determined, I guess, the operability of those weapons?

10   A.   Yes, sir.

11   Q.   And did you do that?

12   A.   Yes, sir.  I did an operability check on them.  I

13   looked to see if there was gun powder present in the

14   barrel.  Both weapons had gun powder in the barrel.  I

15   also looked to see if there was gun powder on the breech

16   face or under the extractor.  The breech face would be

17   the part of the weapon that holds the cartridge into the

18   chamber.  And there was powder in the breech face area.

19   And also looked for powder under the extractor.  The

20   extractor is the part that pulls the cartridge case out

21   of the fired cartridge case out of chamber.  And

22   underneath both extractors there was gun powder present,

23   gun powder residue present.

24   Q.   And based upon, upon that examination and also

25   based upon your firing the weapons, did you arrive at an