1  opinion as to whether or not those weapons are in fact

2  operable?

3     A.   Yes, both weapons are operable.  They both will

4  fire a discharge, a projectile by means of explosion.

5     Q.   Just so I'm clear, are, are each of those

6  weapons, did you state, 25 caliber handguns?

7     A.   Yes, they are in both that caliber.

8     Q.   And for the record, the State's Exhibit 38 I

9  think it is what I'm going to call the Bryco, so the

10  record is clear, what color is that?

11     A.   That's a black, black grips and black weapon.

12     Q.   You also, so the record is clear, State's Exhibit

13  43, the Raven, I'm going to use, what color or make is

14  that, not make, but color, I guess?

15     A.   The grip panels are an ivory color white and the

16  frame slide are a shinny metallic color.

17     Q.   Now, after you've test fired a weapon, such as in

18  this case with your, you may have mentioned this, with

19  reference to your ammunition that you test fire, do you

20  collect that ammunition or what do you do with it?

21     A.   I collect the cartridge casings and the bullets

22  fired in the bullet recovery tank and I put those in

23  boxes that I keep with each weapon, then I use those

24  fired bullets and cartridge cases for comparison

25  purposes.

1    Q.    In conducting that examination or at about the

2    time you were conducting the examinations initially with

3    those two guns, were you able to make a determination as

4    to whether or not either one of them, if not both,

5    produces gun powder residue at the time it's fired?  Did

6    I state the question correctly?

7    A.    Well, they will both produce gun powder residue.

8    I tested both of these weapons at a later time, not that

9    particular time, but at a later time.  I did have an

10   opportunity to test both of these weapons for gun powder

11   and gunshot residue, yes.

12   Q.    What did you conclude?

13   A.    Both of the weapons will discharge gun powder out

14   to approximately 36 inches.

15   Q.    Did you during your examination initially have

16   some clothing that was identified to you that was of

17   Mark McDonald's for examination?

18   A.    I received clothing identified as Mark McDonald's

19   for examination, yes, sir.

20   Q.    And did you receive from the coroner's office

21   bullets identified as recovered from during the autopsy

22   of the body of Mark McDonald?

23   A.    Yes, I did, sir.

24   Q.    Let me hand you what's been marked here as

25   State's Exhibit 67 for identification purposes, and ask

1    you if you can tell me what that is, please?

2       A.    It's an envelope.  It's got the coroner's tag on

3    it, coroner's case EX-92-1189 with the name Mark A.

4    McDonald.  It also has a property tag which I made out

5    which is in my writing.  It has my hand, my signature on

6    it.  And identifies as two projectiles recovered at the

7    time of the autopsy of Mark A. McDonald.  The envelope

8    contains two plastic vials.  And each plastic vial

9    contains a projectile.

10      Q.    Did you examine the vials and the contents of the

11   vial when you received those items?

12      A.    Yes, I did.  The vials both appear -- you mind if

13   I open it?

14      Q.    Go ahead, please.

15      A.    The vials both bear my initials, a number that I

16   gave the projectiles, and my initials on the

17   projectiles.

18      Q.    Is that true with the other one you just laid

19   down?

20      A.    Yes, sir.  Yes, sir.

21      Q.    Just for the, so the record is clear, with

22   reference to the vials, I want to refer you to the

23   labeling, if you will, printed label of the vial.  Are

24   you familiar with that labeling?  You seen that before?

25      A.    Yes, sir.  This is the label.  It's the same

1    labeling that was on the front of the envelope.  It's a

2    label that states that this is a, has a coroner's office

3    case number EX-92-1189, both vials have the same number

4    on it and they both have marked Mark A. McDonald, the

5    name of the person the projectiles were recovered from.

6       Q.    Now, with reference to those two projectiles of

7    State's Exhibit 67, did you conduct any, any test or

8    examination to assist you in arriving at any opinion

9    based upon a reasonable degree of scientific certainty

10   as to whether or not those projectiles were fired from

11   either of the weapons that you have examined as the

12   Bryco and the Raven?

13      A.    Yes, I did.  I did a microcontour analysis, a

14   bullet comparison under, using a comparison microscope,

15   and determined that both projectiles, both of these

16   bullets were fired from the Bryco to the exclusion of

17   all other weapons.

18      Q.    Did you in utilizing the -- well, strike that.

19          I want to ask you now a couple of questions with

20   regards to some clothing.  And ask if you had an

21   opportunity to look at some clothing which we have had

22   marked previously as State's Exhibit 12.  I want you to

23   take a look at this first.

24      A.    State's Exhibit 12 bears my initials on it over a

25   seal that I placed on the package when I replaced the

1    clothes that I examined inside the jacket or inside the

2    package.

3      Q.    Why don't we, before we go any further, why don't

4    we put, reassemble, if you will, these exhibits.

5           I think when you were testifying, you indicated

6    that those shells you are now placing back in those

7    vials, the shells that were in the vials in State's

8    Exhibit 67, I believe, were fired from the Bryco to the

9    exclusion of all others?

10     A.    To the exclusion of, to the exclusion of all

11   other firearms in the world.  The Bryco from this case

12   fired these bullets.

13     Q.    And there is no -- and that's a positive

14   assertion on your part.  It's not from the Raven?

15     A.    It's not -- no way possible could it be from the

16   Raven.

17     Q.    Now, I would like for you to take a look at the

18   contents, if you would, of State's Exhibit 12.  I would

19   like to really maybe direct your attention to a T-shirt.

20     A.    The T-shirt or the jacket?

21     Q.    Well, first of all, did you examine each item?

22     A.    I examined both the T-shirt and the jacket for

23   gun powder or gunshot residue and any defects that would

24   be consistent with being caused by the passage of the

25   projectile.

1     Q.   Now with reference to the jacket, did you

2   determine whether or not it had any damage that would be

3   consistent with a projectile or bullets?

4     A.   Yes, both the jacket and the T-shirt have a hole

5   consistent with a bullet.

6     Q.   And did you conduct an examination for on each

7   item as to whether or not there was any, I think you

8   used the term, gun powder, and I'm going to use the

9   term, maybe I'm wrong, lead wipe?

10     A.   I tested the jacket for gun powder and for

11   anything that would be gunshot related.  Gun powder,

12   gunshot residue and for lead.

13     Q.   So before we go any further, what about when you

14   look for lead, what if you find lead, what does that

15   assist you in arriving at any conclusions, if so, what?

16     A.   To find vaporous lead on a piece of cloth,

17   vaporous lead being part of the discharge from the

18   firearm, it would help me to determine distance.

19   Finding lead, a lead ring around a hole would help me to

20   determine an entrance hole.  So I'm looking for lead in

21   two different forms.  Lead wipe, which would be caused

22   when the bullet passes through a cloth, or whatever, and

23   vaporous lead which would be part of the discharge

24   material, if a piece of clothing was close enough to

25   pick up that discharge material.

1    Q.  First of all, in this case reference to the

2  jacket, did you find any of those indicators?

3    A.  I found no gun powder, no gunshot residue, but I

4  did find lead wipe around a hole.

5    Q.  And with reference to, if we may, to the T-shirt,

6  did you find any of the similar related indicators?

7    A.  I found only lead wipe around the hole.

8    Q.  Does the lack of any, I think you used the term

9  vaporous lead, or, or gun related material other than

10  the lead wipe on either the jacket or the T-shirt cause

11  you to arrive at any definite conclusions based upon a

12  reasonable degree of scientific certainty?

13    A.  At the time of weapon discharge from the distance

14  from the muzzle of the weapon to the clothing would be

15  in excess of 36 inches or there would have to be some

16  other target that would block the passage of gun powder

17  or gunshot residue.

18    Q.  With reference to the T-shirt. I don't know if I

19  need to show it to you. You can if you're able to, are

20  you able to show us on the T-shirt where the bullet hole

21  is?

22    A.  The bullet hole on the T-shirt is where my finger

23  is pointing, which is in the left breast area, left

24  upper chest area.

25    Q.  Now, was the Windbreaker holding a similar

1    location?

2       A.    There would be the position of the hole in the

3    Windbreaker and position of the T-shirt are consistent

4    with the passage of only one projectile.

5       Q.    Do you want the jacket, sir?  You're welcome to

6    see if you can.  Are you able to show it to us?

7       A.    Yes, sir.  The hole is next to the zipper again

8    in the upper chest area provided that the jacket was not

9    zipped up.

10       Q.    All right.  But it's in the same chest area as

11    was in the T-shirt?

12       A.    It's in the upper chest area, yes, sir.

13       Q.    All right.  Thank you.

14          Let the record reflect the witness has

15    repositioned, if you will, the clothing back into the

16    sack and the sack is marked State's Exhibit 12.

17          Concerning your involvement in what I will call

18    this particular matter of Mark McDonald, as to your

19    involvement there in any way to a certain extent did you

20    receive from evidence technician Jan Burns any

21    photographs of footprints or tire markings?

22       A.    I received photographs that were taken at the

23    scene of footwear impressions, two particular footwear

24    impressions and photographs that depicted tire markings

25    that were also taken at the scene.

1     Q.   With reference to the tire marks photographs, did

2  you look at them to determine if they were of any

3  suitable purpose for your tool mark examination or the

4  examinations that you do as relate to that type of

5  matter?

6     A.   I examined the photographs to see if they had

7  comparative value and found they lacked sufficient

8  detail to draw any conclusions from.

9     Q.   Well, in regards to the footprint information you

10  received the photographs from Jan Burns, were they of

11  any value?  First of all, what did you have to -- strike

12  that.  The items that you have from Jan Burns relating

13  to footprints, were any of those items usable for you

14  for comparison purposes?

15     A.   One picture had sufficient clarity that it was

16  suitable for comparison purposes.  The second picture

17  was insufficient, had insufficient clarity for suitable

18  purposes.

19     Q.   Okay.  So one was of no value?

20     A.   One was of no comparative value at all.

21     Q.   One was of the, did have some value?

22     A.   Yes, sir, it was a good footprint.

23     Q.   Did you have an opportunity to compare that print

24  with clothing identified to you as from Mr. Polson or

25  Mr. Elofskey or Mr. Howe or Mr. McDonald?

1      A.    I compared the -- I took footwear impressions

2    from the right shoe of each from a bag of clothing

3    marked with each of the names you mentioned.

4      Q.    Go ahead.

5      A.    I also reviewed the photographs of Mr. McDonald's

6    shoes which were in the scene photographs.

7      Q.    Okay.

8      A.    None of the photographs that were in the scene

9    were consistent with the footprints that was submitted

10   to me.  None of the shoe wear impressions that I made

11   were the same tread wear design as the photograph taken

12   at the scene.  So none of the shoes matched the

13   footwear, the shoe prints that was found at the scene.

14     Q.    Now, on or about June 23d or 4th, did you receive

15   other evidence to examine for your purposes as it might

16   have related to the Bryco and the Raven?

17     A.    I received some tape lifts to look at.

18     Q.    Okay.  All right.  And the tape lifts, were you

19   able to use any, make any determination or results of

20   receiving the tape lifts?

21     A.    On the tape lifts I was looking for burnt or

22   unburnt gun powder particles and I saw no evidence of

23   gun powder, burnt or unburnt, on any of the tape lifts.

24     Q.    Now, so the record is clear, were the tape lifts

25   identified to you on them as coming from Jan Burns from

1    a Monza automobile?

2       A.    Yes, they were.

3       Q.    With reference to that, are you -- you've

4    indicated that you drew some conclusions in regards to

5    the clothing about no gun powder vaporization process.

6    Maybe I'm using the wrong terms.  Are you able to arrive

7    at any conclusions as it relates to the automobile tape

8    lifts?

9       A.    There was no gun powder on the tape lifts.

10      Q.    The fact that there is no gun powder on the tape

11   lift, are you able to make any further determination

12   other than that?

13      A.    No, sir, other than the fact there is no gun

14   powder at all.

15      Q.    Okay.  All right.

16          Now on a different day, I would like to inquire

17   as to whether or not if you received for examination

18   purposes matters relating to a homicide occurring at, I

19   think it's 1912 Tennyson in the City of Dayton, Ohio?

20      A.    Yes, I did.

21      Q.    Okay.  I would like to hand you what has been

22   previously marked as State's Exhibits 59 and 60, and ask

23   if you were and able to tell me -- first of all, have

24   you ever seen those items and what they are, please?

25      A.    Exhibit 60 and Exhibit 59, I've seen them both.

1    Both of the envelopes bear my marking over the seal I

2    put on them when I put the evidence back into the

3    envelopes.  Exhibit 59 has two slide boxes.  Both slide

4    boxes contain my markings over my seal.

5       Q.   Now before we open it, you're welcome to do that,

6    on the two slide boxes that came out of State's Exhibit

7    59, is there some additional writing on there that is

8    not yours on the boxes, the front thereof?

9       A.   Yes.  This writing is marked S.L. Bryant on both

10   of them and they're marked as having been one spent

11   cartridge casing, homicide complainant Richard Blazer,

12   1912 Tennyson.  Same notation is on both marking.

13      Q.   So the record is clear, on these boxes that I'm

14   now holding that came out of State's Exhibit 59, does it

15   also give the date of 6/23/92?

16      A.   Yes, it does.

17      Q.   Please tell us what you find inside today from

18   those boxes?

19      A.   The box that Mr. Bryant has marked as box one

20   contains a 25 caliber cartridge casing that bears my

21   initials and the letter B on it.  That's my designation.

22   The box with Mr. Bryant's name and initial on it that

23   has box two, contains 25 caliber cartridge casing in it

24   that has C.H. and a C.H. on it.

25      Q.   You indicated earlier that you tested some

1    projectiles and discovered that they came from what I'm

2    going to call the Bryco.  When you used the term

3    projectile, does that include a casing or is a casing

4    something different?

5    A.    Casing is something different.  A cartridge has

6    four components.  Cartridge casing being one of them,

7    the bullet being the second component, the primer which

8    is part in the bottom end of the cartridge casing, and

9    the gun powder.  When a semiautomatic pistol, such as we

10   have in this case, fires, it leaves certain markings on

11   the back end of the cartridge casing and around the rim

12   of the cartridge casing.  During the firing process, it

13   ejects the cartridge casings in order to load it to get

14   ready for the next firing.  During the same process, out

15   the front of the weapon, out the muzzle, comes the

16   bullet.  The bullet picks up markings from the barrel as

17   it passes down the barrel and also you have a discharge

18   of gases which include gun powder burnt and unburnt and

19   other materials.

20        The cartridge casings are a separate piece of

21   evidence that you would look for when somebody

22   discharges a semiautomatic weapon.

23   Q.    Are you able through your experience in

24   examinations and knowledgeable to make a determination

25   as to whether or not either one of those two casings

1    that are now displayed in front of you came from either

2    one or either or any of the other exhibits specifically

3    known as the Raven or the Bryco?

4       A.    These two cartridge casings were fired from the

5    Bryco to the exclusion of all other weapons.

6       Q.    Okay.  Let me put those back.

7             Now I would like for you to take a look at what's

8    marked as State's Exhibit 60, please.

9       A.    State's Exhibit 60 is a slide box that bears my

10   initials.  It also has the designation from Mr. S.L.

11   Bryant, the date 6/23.  It says, 832 West Third Street.

12   It says under L.F. seat of 1978 Chevy Monza.  There is

13   other writing which would identify the car.

14      Q.    All right.  When it says Ohio Lic., is that, is

15   that what it says?  Did you read that or not?

16      A.    It says Ohio Lic.  I didn't read it.  Ohio Lic.

17   FDM-921.

18      Q.    Okay.

19      A.    The contents of the slide box is a 25 caliber

20   cartridge casing with my initials and AA on it.

21      Q.    And through your examination and observation,

22   testing, were you able to make a determination as to

23   whether or not that casing came through either or none

24   of the Bryco or, and/or Raven?

25      A.    Yes.  This cartridge case was fired from the

1    Bryco to the exclusion of all other weapons.

2       Q.    That also includes the Raven?

3       A.    Yes, sir, that it's excluded.

4       Q.    All right.  Now I would like to hand you what has

5    been marked by three separate tags, three separate

6    envelopes, State's Exhibits 27-A, 27-B, and 27-C.  I

7    would like for you to take a look at those.  You're

8    welcome to separate them if you need to.  And tell us

9    whether or not you've ever seen any of those items

10   before?

11      A.    I've seen all three of the items, 27-A, 27-B, and

12   27-C.

13      Q.    Now with reference to, I would like for you to

14   take a look at 27-C and 27-A, please.

15      Q.    First of all, what is or how is or are those

16   envelopes as it relates to 27-C and 27-A designated?

17      A.    27-A is designated 1912 Tennyson, 6/22/92,

18   Richard Blazer, Officer M.B. Manning, one casing.

19         27-C is designated Richard Blazer, 1912 Tennyson,

20   M.B. Manning, one bullet.

21      Q.    I would like to go back to one as marked 27-A.

22   It says, casing on floor of living room, am I correct?

23      A.    Yes, sir, that notation is on the back of the

24   envelope.

25      Q.    All right.  And the 27-C also, one bullet and

1    front window west so designated?

2       A.    Yes, sir.

3       Q.    All right.  Now, based upon your examination,

4    experience, and testing were you able to determine

5    whether or not the casing and/or the projectile was

6    related in any fashion to either the Bryco or the Raven?

7       A.    The cartridge casing marked 27-A was fired from

8    the Raven to the exclusion of all other firearms.

9             The bullet marked 27-C has the class

10   characteristics as having been fired from a Raven pistol

11   but due to the mutilation that is on the projectile, I

12   cannot tell you what particular Raven would have fired

13   that.

14      Q.    So is it correct as to the projectile 27-C, you

15   can limit it to having been fired from a Raven?

16      A.    It has a class characteristics of a Raven, yes.

17      Q.    Are you basing that upon your experience that

18   excludes it from having been fired from a Bryco?

19      A.    Yes, sir.  The class characteristics of a Raven

20   you have a left-hand twist on the bullet.  Bryco using

21   the right-hand twist.  They don't match.  It's like

22   putting grapefruits and apples together, they don't mix.

23      Q.    All right.  Let's put those back so we don't...

24            Concerning what I'm going to call bullet, let me

25   call it a projectile.  Now, is there such -- what is a

1   core and what is a jacket?  Does that have any

2   significance to you in terms?

3     A.   Yes, sir.  The bullet jacket is an outer coating

4   that's put over a lead core.  The outer coating is put

5   over the lead core to encase of a semiautomatic bullet

6   to facilitate the loading and to cut down on lead

7   fouling that would be given off in a barrel when the

8   projectile is fired.

9     Q.   I would like for you to take a look at State's

10  Exhibit 27-B, please.  And first of all, the envelope is

11  marked, just for the record, is marked one bullet and

12  one metal jacket?

13    A.   Uh-huh.

14    Q.   The back on the packet, it's marked bullet and

15  jacket outside?

16    A.   Uh-huh.

17    Q.   Do you see that?

18    A.   Yes, I do.

19    Q.   When you examined this envelope, did it contain

20  correctly or technically a bullet and a metal jacket or

21  what did it contain when you looked at it?

22    A.   It contains a metal jacket and it contains a

23  bullet core.

24    Q.   And the bullet core is what part of a bullet?

25    A.   The bullet core is the lead inner part of the

1    bullet that you encase in the metal jacket to make a

2    complete bullet.

3       Q.   Okay.   Based upon your observation, did you look

4    at those items and conduct any examinations on them?

5       A.   Yes, I did.

6       Q.   Now on your, as a result of your examinations

7    were you able to make any determination as to whether or

8    not those two, the metal jacket and the bullet core are,

9    one, relate, and if so, are they also related in any

10   other fashion to the Bryco and the Raven?

11      A.   The bullet core and the bullet jacket are both 25

12   caliber.   They're both consistent with having one time

13   being one projectile.   The bullet casing, the jacket,

14   copper jacket was microscopically compared with the

15   projectiles, test projectiles from the Bryco and found

16   to match.   The bullet jacket, the bullet that this

17   jacket was part of was fired from the Bryco to the

18   exclusion of all other firearms in the world.

19      Q.   Okay.   When you say the jacket, you are referring

20   to the, to the copper portion?

21      A.   To the copper portion.   The copper portion is the

22   outer portion.   That's what comes in contact with the

23   barrel.   That's what picks up the individual

24   characteristics along with the class characteristics

25   that allows for a unique one to one comparison.

1    shirt.

2        Q.   Did you examine that shirt upon receiving it for

3    any gun powder residue, gun powder, I'm going to use the

4    term lead wipe or, and/or bullet holes?

5        A.   Yes, I did.

6        Q.   What did your examination reveal?

7        A.   I found bullet defects in the front and the back

8    of the shirt.

9        Q.   With reference to the defects in the front of the

10   shirt, are you able to point them out to us?

11       A.   The defect in the front of the shirt is in the

12   area where I'm pointing which is approximately 4 inches

13   over from the button seam and approximately 6 inches

14   down from the collar on the right panel, right chest

15   panel.

16       Q.   All right.  And were you able, from examining

17   that, to make any determinations?  I think you used the

18   term lead wipe earlier.

19       A.   Yes, sir.

20       Q.   What, if anything, did you determine?

21       A.   I found no evidence of lead wipe around this

22   particular bullet hole.

23       Q.   And does that cause you to reach any conclusion

24   in regards to injury received or anything of that

25   nature?

1     A.    No, because it's still consistent with the bullet

2    hole.  The material in this shirt is synthetic

3    materials.  It's not a natural material such as we had

4    in the T-shirt.  And it's of a loose weave so it would

5    not wipe the outside of the bullet as tightly as the

6    jacket or the T-shirt in the prior exhibits.  So the

7    absence of a bullet wipe would not deter from making a

8    determination this is a bullet caused defect.

9         Microscopic examination can also reveal the

10    directionality, the type of injury, the, the

11    directionality and the type of injuries that the threads

12    received when it was struck by the projectile.

13    Q.    Now did you receive -- did you note any other

14    injury or damage, I guess would be the appropriate term,

15    for the shirt?

16    A.    Yes.  There are series of three holes in the back

17    of the shirt, in the back of the shirt.  They're

18    consistent with the passage of one projectile.  The

19    first one starts at the seam , then goes over.  You've

20    got two that are close together.  You've got the first

21    hole, there is approximately inch between the first and

22    the second hole, then you've got a second and third hole

23    in between those two defects.  You have approximately

24    quarter of an inch.  Okay.  There was visible lead wipe

25    on the seamed area and this also was present, showed

1    present when tested for the lead wipe chemically.

2        I also did test to determine if there was any

3    vaporous lead on this shirt.  There was none.  And I did

4    test chemical testing along with visual and microscopic

5    testing to find out if there was any gun powder residue

6    or unburnt gun powder on the shirt.  And it was negative

7    for those tests also.

8    Q.    All right.  Why don't you put that back, please.

9        Now, sir, I would like to hand you what has been

10   marked State's Exhibit 68.  I will ask if you can tell

11   me what that is, please?

12   A.    State Exhibit 68 is an envelope bearing a

13   coroner's tag EX-92-1192 with the name of Richard

14   Blazer.  It also has property card that I filled out

15   before putting this particular item in the Dayton Police

16   property room.  It also contains three plastic bottles.

17   Each plastic bottle bears a tag that reads as does the

18   tag on the front of the envelope, EX-92-1192, Richard

19   Blazer.

20   Q.    Now, you're familiar with the tag and --

21   A.    Yes, sir.

22   Q.    -- the tagging process of the county coroner's

23   office?

24   A.    Yes, I am.

25   Q.    Did you conduct an examination of the contents of

1    each of the three vials?

2      A.    Yes, I did.  Each of the three vials contains a

3    fired 25 caliber projectile.  Each one of those 25

4    caliber projectiles have my initials on it and a marking

5    where I performed an examination.

6      Q.    And based upon your examination, were you able to

7    make a determination as to whether or not any one of

8    those is in anyway relating having, having been fired

9    from either the Bryco or Raven?

10     A.    The first thing I did, match the bullets

11   themselves.  All bullets were fired from the same

12   weapon.  I then matched the bullets to the test bullet

13   fired from the Bryco.

14     Q.    And the matching of all those bullets with each

15   other and to the Bryco, does that indicate to you they

16   were fired from the Bryco to the exclusion of all other

17   or from the Bryco to the exclusion of all other weapons?

18     A.    Yes, the Bryco is the only weapon that could have

19   fired -- this particular Bryco is the only weapon that

20   could have fired these bullets.

21     Q.    All right.  All right.  You can put those back.

22           Now concerning your examination then, see if I'm

23   clear on this, of the bullets that are, are in all five

24   of the vials, the exhibits that you just talked about in

25   State's Exhibit 67, all came from the Bryco?

1      A.    That's correct.

2                    MR. SLAVENS:       That's all I have, sir.

3                    THE COURT:         Cross-examination.

4                    MR. MONTA:         Thank you, Judge.

5                        CROSS-EXAMINATION

6      BY MR. MONTA:

7      Q.    Good morning, Mr. Haemmerle.

8      A.    Mr. Monta.

9      Q.    At one point you had indicated that you received

10     nine tape lifts from an automobile?

11     A.    I received a number of tape lifts, yes, sir.

12     Q.    All right.  Was that from the 1978 Monza,

13     FMD-921?

14     A.    That's where it was indicated they were, yes,

15     sir.

16     Q.    And the indication was that there was no gun

17     powder residue?

18     A.    There was no gun powder or gun powder residue

19     found, yes, sir.

20     Q.    And you made an analysis by comparing the photos

21     of the shoe prints to those of Weston Howe, is that

22     correct?

23     A.    Yes, I did.

24     Q.    And that comparison did not yield a match, is

25     that correct?

1      A.   That's correct.

2      Q.   You indicated on your direct testimony that the

3   weapons that you've talked about, 25 caliber Bryco, 25

4   caliber Raven, will emit gun powder up to 36 inches, is

5   that correct?

6      A.   Yes, sir.

7      Q.   All right.  Is there some variable on that?

8      A.   Yes, sir.  In my report, my report reads

9   approximately 36 inches.  Thirty-six inches, the

10  farthest I could get the gun powder to go.

11     Q.   All right.  It will not go farther than that?

12     A.   No, sir.

13     Q.   That was based upon actual testing?

14     A.   Testing with both weapons, yes, sir.

15     Q.   Okay.  You did not talk about whether there is

16  any dispersal patterns?  Do these type of weapons emit

17  any characteristic patterns?

18     A.   Yes, sir, they do.

19     Q.   And what are those?

20     A.   Well, the closer the, the closer the target is to

21  the muzzle, the smaller and denser the pattern is for

22  both burnt and unburnt gun powder and vaporous lead.  As

23  the distance between the muzzle and the target, the

24  cloth increases, the patterns spread out, you are going

25  to lose the smoke, vaporous lead, those types of

1       materials at somewhere, depending on the cartridge, the

2       type of gun powder that was in it, you're going to lose

3       those at approximately one foot to eighteen inches.

4       You will still have the burnt and unburnt gun powder

5       which will carry farther because they're heavier.  You

6       will as again as the distance from the muzzle to the

7       cloth increases past that one foot to eighteen inches,

8       these particulates spread out and become less dense and

9       then you lose those altogether at 36 inches.

10          Q.   In layman's term, it fans out?

11          A.   It fans out real big.

12          Q.   After 3 feet they disappear?

13          A.   Yes, sir.

14          Q.   Now, and you did examine the clothing marked Mark

15      McDonald and Richard Blazer?

16          A.   Yes, sir, I did.

17          Q.   All right.  And in both those instances you found

18      no evidence of residue?

19          A.   That's correct.

20          Q.   All right.  So without something right in between

21      or whatever those objects would have been 36 or more

22      inches away from the muzzle?

23          A.   That's correct.

24          Q.   All right.  You indicated the term lead wipe

25      meaning an entrance hole of a bullet?

1      A.    That's an indicator of an entrance hole, yes,

2    sir.

3      Q.    What would that say about an exit hole, if

4    anything?

5      A.    It would tell me which.  If I have a piece of

6    cloth, I would, I could do both sides of the cloth.

7    Whichever side has the bullet wipe on it would be an

8    indicator of the entrance.  So lack of any other

9    testing, that would be one indicator of an entrance as

10   opposed to an exit.

11     Q.    Okay.  So you could tell by looking at one if

12   there is any lead wipe around the hole on one side or

13   the other that would indicate which direction it came

14   from?

15     A.    Yes, sir.

16     Q.    Okay.  You talked about a term directionality.

17   What does that mean exactly?

18     A.    We have a three hole series.  We have an

19   entrance, exit, and a reentrance hole.  Based on the way

20   the lead wipe was on the hole while two of the holes,

21   two of the three holes, I was able to say which holes

22   were exit holes and which holes were entrance holes.

23   And looking at the lead smear on one rim of one of the

24   holes, indicated that the bullet struck at in a

25   particular direction coming across the shirt, in this

1    case, across the seam and causing the first hole, then

2    the other two holes in that shirt.

3        Q.    Okay.  Am I correct then in saying that this

4    helps you determine the angle at which the bullet was

5    fired or the angle in which it entered whatever object?

6        A.    I can tell you it did not strike obliquely.  It

7    striked at an angle.  I can't give you specific angles,

8    no, sir.

9        Q.    Can you tell or differentiate as to whether it

10   was an angle or directly straight in?

11       A.    Yes, sir.

12       Q.    You can do that?

13       A.    Yes.  It was not straight.  Straight in would

14   give me one hole.  Where I have a series of holes which

15   would indicate coming across the material as it entered.

16       Q.    You're talking about that one particular three

17   hole pattern?

18       A.    Yes, sir.

19       Q.    All right.  Now can you make any conclusion as to

20   the other bullet holes that you talked about in this

21   case, for instance, in the Mark McDonald clothing?

22       A.    Those all appeared to be straight in shots,

23   straight into the cloth, as the cloth, straight in

24   relationship to the cloth to the muzzle of the weapon.

25   I would have no way of telling how that cloth was in

1    relationship to the body that it was covering.

2        Q.    The direction of the body, yes, sir?

3        A.    Yes, sir.

4        Q.    But you cannot tell whether it was left, right,

5    up or down?

6        A.    No, sir.

7        Q.    All right.  At that angle, I mean?

8        A.    Yes, sir.  I cannot tell that, sir.

9        Q.    Okay.  And the same would be true of the other,

10    in the Richard Blazer's shirt?

11        A.    Yes, sir.

12        Q.    Okay.  Of the two bullets that you found, one

13    was, I believe, in the windowsill and the other one, or

14    from the windowsill, you said came from a Raven, is that

15    correct?

16        A.    One bullet was matched to a Raven.

17        Q.    Were there any foreign substances attached to

18    that bullet?

19        A.    Yes, there was glass embedded on the nose.

20    That's -- the glass is what destroyed the fine

21    striations or markings.  I would need to do a further

22    comparison.

23        Q.    And you did this through microanalysis of some

24    sort?

25        A.    Yes, sir.

1    Q.   How about the other one, the one you talked about

2    the bullet jacket?

3    A.   No, sir.  That was deformed from hitting a hard

4    object, sir.

5    Q.   Okay.  And there was no residue of any object on

6    it, so you were unable to analyze what that was?

7    A.   That's correct.  There were no foreign materials

8    either on the bullet jacket or in the lead itself.

9    Q.   Did you do any analysis or lift any fingerprints

10   or pass them on?

11   A.   Yes, I did.  I took lifts from both weapons and

12   passed the print cards on to the latent prints section

13   of our laboratory.

14   Q.   Those were distinct prints as you recall?  Did

15   they look like they had value to, in your expertise?

16   A.   They didn't look like they had value but then I'm

17   allowed to make, I've been trained to make them but

18   that's not my field in our laboratory.

19   Q.   Okay.  Are you familiar with the terms soot,

20   tattooing, scorch, stippling?

21   A.   Yes, I am.

22   Q.   Are you an expert in or qualified to make any

23   determinations on those or have expertise?

24   A.   I have given opinions on them in the past, sir.

25   Q.   Are those similarly indicators of distance of

1    bullet entry and exit of a projectile from a muzzle?

2    A.    Entry, not exit.

3    Q.    Entry.  Exit from the muzzle?

4    A.    Exit from the muzzle.  Entry, when you're talking

5    about stippling or powder.  Tattooing, it would be

6    entering the skin.

7    Q.    Okay.  And are there basic distances at which we

8    would expect tattooing, scorching or stippling either

9    from the Bryco or Raven?

10    A.    There are but I cannot tell you the specifics

11    because I was not asked to conduct any type of test

12    relative to these two 25 automatics with regard to how

13    far powder would go to embedded skin.

14    Q.    Do you know, based generally upon your expertise

15    and knowledge, when they would be similar to the

16    distances which you have given for the gun powder

17    residue?

18    A.    Stippling will not go into skin.  As far as gun

19    powder will deposit onto cloth.  Stippling into skin has

20    a more limited, much more limited range because you have

21    to drive in order to produce powder.  Stippling you have

22    to drive the unburnt gun powder at a sufficient speed to

23    embed into skin.

24    Q.    And the same -- would the same apply to soot or

25    tattooing or scorching?

1    A.    Tattooing and stippling are the same.  Soot and

2    scorching are the deposits.  Well, scorching would be

3    the burning from the muzzle.

4    Q.    Right.

5    A.    Which would be quite limited.

6         And the soot, soot and other deposits would be

7    the same thing that I'm looking for on the clothing when

8    I do a visual and microscopic viewing of the clothing,

9    which I did.

10   Q.    Soot is similar term to gun powder residue then?

11   A.    Yes, it's part of the same components.

12            MR. MONTA:      If I might have a moment,

13   Judge.

14            THE COURT:      You may.

15   BY MR. MONTA:

16   Q.    All right.  Mr. Haemmerle, when we talked about

17   the bullet in the Blazer matter where the directionality

18   indicated an oblique angle.

19   A.    But it indicated an angle that was across the

20   seam.

21   Q.    Okay.  That was in the right back?

22   A.    I would either have, have to see the shirt or

23   refer to my notes.

24         It was the one in the back of the shirt, yes,

25   sir.

1    Q.    Without getting the shirt out right now, do you

2    recall whether that gave you an indication or allowed

3    you to draw a conclusion as to the direction from which

4    the bullet was fired?

5    A.    I would have to refer to my notes.  I did not

6    state one in my report.

7    Q.    Do you have your notes with you?

8    A.    Yes, I do.

9    Q.    Would you refer to those?

10   And you've referred to them.  Go ahead.

11   A.    It would be coming from a downward, a slight

12   downward angle across the body.

13   Q.    Okay.

14   A.    If I could, if you would turn around.  I could

15   use you as the model.

16   Q.    Use me as the model, how does that sound.  Why

17   don't you come down here.  It will be a little easier.

18   I will stand here.

19   A.    If you're standing here, it's going to be coming

20   at an angle from --

21   Q.    You're indicating from the right shoulder?

22   A.    Right shoulder, downward angle.  I didn't measure

23   any angles across the body in the direction this way.

24   Q.    And exiting --

25   A.    -- into the body.  I have --

```
 1                    (Counsel and witness speaking
 2      simultaneously.)
 3                    THE COURT:      Who's going to go here?
 4        A.    I have an entrance into the shirt, an exit from
 5      the shirt, and it reexited into the shirt.
 6        Q.    Moving toward the middle of the back area?
 7        A.    Yes.
 8        Q.    Okay.  Good.
 9              Do you know whether there was any results of that
10      when you sent the prints to the lab?  Do you have
11      knowledge of the results?
12        A.    To the best of my knowledge, they were negative.
13      There was nothing.  No prints of value were found on
14      either set of lifts.
15        Q.    Okay.  And those are from the Bryco and the
16      Raven, is that correct?
17        A.    That's correct.
18        Q.    So, so no prints came back which would match
19      Weston Lee Howe?
20        A.    That's correct.
21                    MR. MONTA:      Thank you.  Nothing
22        further.
23                    THE COURT:      Any redirect?
24                    MR. SLAVENS:      Just a couple areas.
25
```

1                        <u>REDIRECT EXAMINATION</u>

2       BY MR. SLAVENS:

3          Q.    You make reference to gun power residue dispersal

4       pattern?

5          A.    Yes, sir.

6          Q.    Things of that nature.  Gun powder residue we'll

7       say with reference to the tape lifts, it came from the

8       automobile, I mean the Monza?

9          A.    Yes, sir.

10         Q.    When gun powder residue falls, if it falls,

11      wherever it falls not on the person or clothing, is the

12      material that has fallen, if it does fall, you help me

13      out, if it doesn't, is that permanently affixed to

14      wherever it would land?

15         A.    It would lay on top or be caught possibly between

16      a loose fine weave.  It would be like taking very fine

17      pieces of dirt and sprinkling over your carpet or on

18      your rug or on a chair.

19         Q.    Or table top?

20         A.    Or table top.

21         Q.    If it were to land on a table top, does

22      environment factors effect it staying there?

23         A.    I could blow it off if I could puff on it.  I

24      could wipe it away.  It's not permanently affixed in.

25      It hasn't been driven in with any force.  It just fell

1    there.

2    Q.    And would the dispersal pattern of a weapon or

3    more particularly where a weapon is or actually the

4    muzzle of the weapon is at the time the gun is fired

5    have any effect upon the gun powder residue falling

6    wherever it may fall?

7    A.    Well, sure.    It would have a great effect.

8    Q.    Does gun powder, does it, if the gun is fired,

9    say an automatic, does the gun powder residue just fall

10    down from immediately below where the gun is or is it

11    forced out in part of the dispersal pattern?

12    A.    It's part of the dispersal pattern.    It's going

13    to be going at the same velocity as the projectile is

14    going.    It doesn't carry as far because it doesn't have

15    the weight.

16    Q.    You made reference as to the angulation or

17    directionality of a bullet going into the body of

18    Mr. Blazer, or Mr. Monta, used him as sort of a model

19    and you had him standing up?

20    A.    Yes, sir.

21    Q.    And you explained to us where that bullet was in

22    his clothing and how it may have entered his body and so

23    forth.    Are you able to tell us what was the position of

24    Mr. Blazer's body when he received that injury?

25    A.    No, I cannot.    I was not at the scene.

1      Q.    Are you able to tell us if that is the first,

2    second or third bullet that went into his body?

3      A.    I have no way of telling, sir.

4              MR. SLAVENS:      That's all I have, sir.

5    Thank you very much.

6              THE COURT:      Any recross?

7              MR. MONTA:      We have nothing further.

8                              Thank you, Mr. Haemmerle.

9              THE COURT:      Thank you very much,

10   Mr. Haemmerle.

11                         *  *  *  *

12             THE COURT:      Ladies and gentlemen of the

13   jury, as you know we've got to go ahead and break now

14   for the day.  So enjoy your afternoon.  Everybody is

15   waiting to go outside and see what it's doing, if

16   anything.

17                              But in any event, let's get

18   in here tomorrow, I'm going to tell you 9:30 tomorrow

19   morning.  I'm going to really try to start at 9:30,

20   okay.  I know everybody is saying, sure, Judge.  But

21   it really hasn't been all that bad.  We've missed here

22   and there a little bit.  This morning was a little

23   longer than usual.  In the big scheme of things we are

24   not that far behind in terms of the time.  Obviously,

25   we will be getting into Monday, however.  I wanted you

1    to know that now.

2                Now, go ahead and break for

3    the day, reconvene tomorrow morning, 9:30.  Leave

4    yourself plenty of time if there is bad weather.

5                Remember the usual

6    instructions not to discuss the case among yourselves

7    or with anybody else.  Don't form any opinions, you

8    have not heard all the testimony yet.  And avoid any

9    form of news media whether it be radio, television, or

10    newspaper.  Well, have a nice evening and we'll see

11    you back tomorrow morning at 9:30.

12           (WHEREUPON, the proceedings for February 25,

13    1993, were then concluded at the hour of 12:13 p.m.)

14                        * * * *

15

16

17

18

19

20

21

22

23

24

25

```
 1              (February 26, 1993 - Morning Session)

 2                            9:42 a.m.

 3                        IN CHAMBERS

 4

 5              THE COURT:        Let the record reflect that

 6     we are in chambers.   Present are all counsel.

 7                            First of all, does the

 8     defendant waive his right to be here for the purpose

 9     of this quick ruling?

10              MR. ARNTZ:        Yes, sir, we would.

11              THE COURT:        All right.   Let the record

12     reflect that the defendant has filed a motion in

13     limine objecting to the use of letters that have been

14     written by, allegedly written by the defendant

15     Mr. Howe to one or both of the co-defendants Polson

16     and Elofskey.

17                            Let the record reflect

18     further that the Court has examined the letters and

19     entertained the arguments of the State of Ohio and the

20     defense on this issue and at this point sustains the

21     motion in limine as it relates to the letters and

22     further as it relates to the State's case in chief.

23     The proposed evidence would have been brought through

24     Mr. Polson and Mr. Elofskey by the State by using

25     these letters.   I think what I will do for the record
```

1    is attach, place the copies of the letter that the

2    Court has received into a manila folder.  We will mark

3    it as a Court Exhibit and it can go along with the

4    file.

5                        The Court then sustains the

6    motion in limine prohibiting the State from using

7    these documents in the State's case in chief.

8    Obviously, depending on cross-examination and the

9    defendant's case itself, this ruling could, could

10   change.

11                       Anything for the record,

12   Mr. Arntz, on this issue?

13           MR. ARNTZ:      No, thank you.

14           THE COURT:      Mr. Slavens.

15           MR. SLAVENS:    The Court used the term

16   letters and then another time used the term documents.

17   What I've been proposing are some, it's a written

18   communication of some sort.  Just so the record is

19   clear, when you say letters, you're referring to the

20   written communications which I have given defense

21   counsel, some of which has been specifically shown to

22   the Court earlier in a previous motion in limine.

23           THE COURT:      Again, so it's very clear

24   for the record, have them placed into an envelope and

25   marked as a Court Exhibit so they'll go with the, with