1    the transcript wherever that transcript may go, if

2    anyplace.

3                THE COURT:        Okay.  I think that's all

4    we need right now.  Let's do one more thing.

5                            Let the record further

6    reflect that at the request of defense counsel, the

7    Court has provided both the State and the defendant

8    with a copy, not to be removed from the courthouse, of

9    the pre-sentence investigation that was conducted on

10   the witness Polson as a result of his plea of guilty

11   in this case.  And further that, at the motion of the

12   defendant, the Court has provided counsel for the

13   defense a copy of the competency evaluation of Mr.

14   Polson for their examination.  Again, the document is

15   not to leave the courthouse.  The Court is aware of

16   the confidentiality of both of these documents.  And

17   in view of the defendant's arguments as to the

18   ultimate or basic fairness to defendant Howe, the

19   Court is simply providing counsel with copies for

20   their examination only and they will be returned to

21   the Court upon the conclusion of any examination of

22   the witness Polson and/or Elofskey.  The same requests

23   as it relates to pre-sentence investigation has been

24   made as it relates to Elofskey and a couple of other

25   potential state witnesses.  And we'll deal with those

1    at the time the witnesses are about to be called.  The

2    Court is not ruling in any fashion as to the propriety

3    or appropriate form of any question that may be asked.

4    We'll deal with those on a question by question basis

5    if it even becomes necessary.

6              MR. SLAVENS:    Shall we?

7              (WHEREUPON, in-chambers discussion was then

8    concluded.)

9

10    IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY

11                              10:04 a.m.

12              THE COURT:    Let the record reflect that

13    we are out of the presence of the jury.

14                              Does counsel for the

15    defendant have a motion in limine?  Do you want to

16    approach or do you want to do it from here?

17              MR. ARNTZ:    I would like to approach.

18              THE COURT:    All right.

19                         AT SIDE BAR

20              MR. ARNTZ:    There are several matters

21    regarding our client's personal background and

22    appearance which again we feel would be more

23    prejudicial than probative of anything in issue in the

24    trial.  Specifically, we are talking about whatever

25    attitudes he might have regarding race, people of

1  other races, his interest in the white supremacy or

2  Nazism, likewise, any and all tattoos which he might

3  be wearing, and, of course, the fact that he has

4  previous conviction of his own and was out on parole

5  when these things happened.  So we would ask the Court

6  to prohibit any of the State's witnesses, especially

7  the co-defendants, from offering any of that kind of

8  information during their testimony.  I think it could

9  well cause a mistrial if any of those matters were

10  raised by the State's witnesses.

11           THE COURT:      Any response?

12           MR. SLAVENS:     To one issue, I don't, I

13  mean, I understand what he's saying, if the witness

14  were to say something about a prior conviction, et

15  cetera.  I think, though, the fact that this defendant

16  if on parole, if it is mentioned by a witness

17  accidentally in response to a question, he's not been

18  instructed specifically not to say that.  If I tell

19  him not to say something, it's the prosecutor told me

20  not to say something, if he's asked that on the

21  defense.  Maybe if the Court were to, when the witness

22  comes in, instruct the witness, not in front of the

23  jury, but not to mention those things.  You can talk

24  to him and tell him, don't mention his parole, the

25  fact he's out.

1          THE COURT:        Is the defense making that

2    request?

3          MR. ARNTZ:        Yes, that would be a

4    practical means of doing it.  Now that request goes to

5    every State's witness from this point forward which

6    would include Tony Elofskey, detectives, and the like.

7          THE COURT:        Are you specifically

8    requesting that I also get into Nazism and white

9    supremacy?

10          MR. ARNTZ:        White supremacy, tattoos,

11    parole, his record.

12          THE COURT:        I think we are focusing --

13    the only problem with doing that, we are bringing that

14    immediately to his attention immediately prior to him

15    testifying.

16          MR. ARNTZ:        I understand.  We are

17    concerned that the mention of those matters could

18    cause a mistrial.  And the record should reflect that

19    two of the jurors are now black people, one is a black

20    male and one is a black female.

21          THE COURT:        Two black females.

22          MR. SLAVENS:      Two black males.

23          MR. ARNTZ:        It doesn't matter.

24          THE COURT:        All right.  At the request

25    of counsel, I will mention this to Mr. Polson.  We

1       will bring him in now.

2                   MR. SLAVENS:    I wouldn't do it in open

3       court.  I don't think you need to -- you can bring him

4       over here.  I would think, bring him at side-bar.

5                   MR. ARNTZ:    Sure.  Or in chambers or if

6       you made a record in the hallway, that would be fine.

7                   THE COURT:    Let's do it in chambers.  I

8       don't like the tightness over here.  I know the

9       deputies would get nervous.  We'll do it in chambers.

10      We will take another couple minutes and do it in

11      chambers.

12                  (WHEREUPON, a recess was taken.)

13

14                          IN CHAMBERS

15                  THE COURT:    Let the record reflect that

16      we are in chambers at the request of defense counsel

17      regarding the admonitions of the witness.

18                              Does the defense

19      specifically waive Mr. Howe's presence for the

20      purpose, limited purpose for this instruction from the

21      Court to the witness?

22                  MR. ARNTZ:    Yes, we would.

23                  (WHEREUPON, Mr. Polson was escorted into

24      chambers.)

25                  THE COURT:    All right.  Mr. Polson,

1    you're about -- let the record reflect Mr. Polson is

2    now in chambers.  Again, present are all counsel and

3    the deputies.

4                         Mr. Polson, the defendant

5    has requested, and I've agreed to do this, is to

6    caution you that when you're testifying in this case,

7    other than to follow the oath that you have been given

8    and to answer the questions truthfully, you're

9    specifically requested not to mention anything in

10   terms of Mr. Howe's personal beliefs on such subjects

11   as white supremacy, Nazism, racism --

12                  MR. POLSON:      Yeah.

13                  THE COURT:      -- the tattoos on his arms,

14   that type of thing, okay?  Do you understand what I

15   just said?

16                  MR. POLSON:      Yes, sir.

17                  THE COURT:      Just stay away from that

18   stuff.  It's got nothing to do with the case itself.

19                  MR. POLSON:      Yes, sir.

20                  THE COURT:      The other thing is not to

21   mention anything about his criminal record or the fact

22   that, you know, he's on parole.

23                  MR. POLSON:      Yes, sir.

24                  THE COURT:      All right.  Do you

25   understand that?

1           MR. POLSON:     (Nodding in the

2    affirmative.)

3           THE COURT:     Again, these matters, I'm

4    not advising you on anything that doesn't relate to

5    the case.  I'm just talking about these subject

6    matters, just stay away from them in your testimony.

7           MR. POLSON:     Okay.

8           THE COURT:     There should be no need for

9    them to come up anyway because, because of the nature

10   of what you're going to be testifying to.

11                  Now, do you have any

12   questions about what the Court has just indicated to

13   you?

14          MR. POLSON:     No, sir.

15          THE COURT:     All right.  Does that

16   satisfy the defense?

17          MR. ARNTZ:     Yes, sir.

18          THE COURT:     Anything from the State?

19          MR. SLAVENS:    No.

20          THE COURT:     Do we want the witness on

21   or off the witness stand before the jury is brought

22   in?

23          MR. SLAVENS:    May as well go now.

24          THE COURT:     Go ahead and put him on the

25   witness stand and we'll go from there.

1                              Wait.  For the record, Mr.

2      Polson, do you object to the television cameras

3      filming you as you testify?

4              MR. POLSON:      Yes, I do.

5              THE COURT:      Just so you understand,

6      they do have film of your court appearances.

7              MR. POLSON:      Yes.

8              THE COURT:      You specifically object to

9      them filming you while you are testifying?

10             MR. POLSON:      Yes, I do.

11             THE COURT:      All right.  That's fine.

12             (WHEREUPON, in-chambers proceedings were

13     then concluded.)

14

15     <u>IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY</u>

16             THE COURT:      Let the record reflect that

17     the witness has specifically requested that the news

18     media not film his testimony and obviously we're

19     dealing with experienced news media reporters and I'm

20     sure they will accommodate.

21             CAMERA MAN:      Audio is okay?

22             THE COURT:      Audio is permissible but

23     not the video.

24

25

1                     <u>BEFORE THE JURY</u>

2                                  10:14 a.m.

3              THE COURT:        Good morning, ladies and

4       gentlemen of the jury.

5              THE JURY:        Good morning.

6              THE COURT:        It's, it's a real tribute

7       that everybody has made it all right.  Let the record

8       reflect that all 13 jurors are here and have been here

9       for quite sometime here.  All right.  Again, it's a

10      tribute to you as individuals.  I'm sure I speak for

11      everybody when I say, thanks, that's a good job.

12                                  Is the State ready to

13      proceed?

14             MR. SLAVENS:      We are, your Honor.

15             THE COURT:        Defense ready?

16             MR. ARNTZ:        Yes, your Honor.

17             THE COURT:        You may call your next

18      witness.

19             MR. SLAVENS:      We call Walter Polson who

20      is already at the stand.

21

22

23

24

25

1                    WALTER DOUGLAS POLSON, having been first

2                    duly sworn according to law, was examined

3                    and testified as follows:

4                         DIRECT EXAMINATION

5      BY MR. SLAVENS:

6         Q.    Will you tell us your name, please?

7         A.    Walter Douglas Polson, Senior.

8         Q.    And where do you currently reside?  Where are you

9      currently staying?

10        A.    The City, Montgomery County Jail.

11        Q.    And before that, before the date of June 22d,

12     1992, where did you live then?

13        A.    123 Valley Street, Apartment 3.

14        Q.    And with whom did you live at 123 Valley Street?

15        A.    My oldest brother John Polson and my second to

16     the oldest brother Weston Lee Howe.

17        Q.    And, Mr. Howe, is your -- what type of brother if

18     you know?

19        A.    Stepbrother.

20        Q.    You see Mr. Howe present today?

21        A.    Yes, he is.

22        Q.    In this courtroom today, where is he seated

23     today?

24        A.    Over there on my left.

25        Q.    And today what is he wearing?

```
 1      A.    Sweater.

 2                  MR. SLAVENS:     Let the record reflect the

 3      witness has indicated the brother Mr. Howe.

 4                  THE COURT:      It will so indicate.

 5    BY MR. SLAVENS:

 6      Q.    Walter Polson, how old are you?

 7      A.    Twenty-two.

 8      Q.    Did you grow up in the Dayton area?

 9      A.    Yes, sir.  Yes, I did.

10      Q.    And did you go to high school in Dayton, Ohio?

11      A.    Yes.

12      Q.    Did you graduate from high school?

13      A.    No, I didn't.

14      Q.    What high school did you primarily go to?

15      A.    Colonel White.

16      Q.    And to what grade did you attend high school?

17      A.    Tenth.

18      Q.    And during the time that you were growing up, did

19    you live with any of your family members?

20      A.    Yes, I did.

21      Q.    Who did you live with?

22      A.    My mother.

23      Q.    And what is her name?

24      A.    Linda Carol Long.

25      Q.    And as you were growing up going to high school
```

```
 1    or shortly after high school, did you at any time live

 2    with your stepbrother Mr. Weston Lee Howe?

 3      A.    During when?

 4      Q.    When you were growing up, where did Mr. Weston

 5    Lee Howe live or with whom?

 6      A.    With my grandmother.

 7      Q.    Do you know a person by the name of Tony

 8    Elofskey?

 9      A.    Yes, I do.

10      Q.    And how do you know him?

11      A.    Through my girlfriend.

12      Q.    And for approximately how long a time have you

13    known Mr. Elofskey?

14      A.    For a few years.

15      Q.    Now, I would like to take your attention to where

16    you lived before you moved into Valley Street, 123

17    Valley Street address.

18      A.    Yes.

19      Q.    For how long had you -- where had you lived

20    before you moved into Valley Street?

21      A.    Trailer court on Valley Street.

22      Q.    You know the name of the trailer court?

23      A.    No, I don't.

24      Q.    For how long did you live at the trailer court?

25      A.    I can't recall.
```

1    Q.    Before moving into Valley Street, did you and

2    Weston Howe move into Valley Street at the same time?

3    A.    No, we didn't.

4    Q.    Was he already living there with you when you

5    moved in?  Did you move in or he move in?  How did that

6    occur as to Valley Street?

7    A.    As to which, please?

8    Q.    Valley Street.

9    A.    I lived on Valley Street twice.

10   Q.    The last time.

11   A.    He was already living there.

12   Q.    I would like to ask you some questions about the

13   dates of June 22, 1992.  Do you recall those days?

14   A.    Yes, I do.

15   Q.    And I would like to inquire if on or about Sunday

16   evening of June 21st if you came in contact with a Tony

17   Elofskey?

18   A.    Yes, I did.

19   Q.    How did you do that?

20   A.    Me and my stepbrother walked over to where his

21   house was.

22   Q.    When you say your stepbrother, who are you

23   referring to?

24   A.    Weston Lee Howe.

25   Q.    You went over there.  What happened when you got

1    caught up with Mr. Elofskey?

2       A.    We asked him if he wanted to go cruising.    And I

3    told him I would give him some gas money if he took us

4    out to look for our girlfriends.

5       Q.    Do you have any idea as to what time this was?

6       A.    I think it might have been around 11, 11:30.

7       Q.    The ladies that were the girlfriends, do they

8    have names?

9       A.    Yes, they do.

10      Q.    What are their names?

11      A.    Angela Bazi (phonetic) and Terri Elofskey, Terri

12   Lynn Elofskey.

13      Q.    You call -- that's Terri Lynn Elofskey, is she

14   related to Tony Elofskey?

15      A.    Yes, she is.

16      Q.    Do you know what the relationship is?

17      A.    Cousins.

18      Q.    What kind of car are you in?

19      A.    A Monza.

20      Q.    Where was Tony Elofskey when you met up with him

21   in reference to his car?    What was he doing?

22      A.    Cleaning the inside of his car out.

23      Q.    Do you know what he was doing, if you know,

24   specifically?

25      A.    No, I don't.

1    Q.    Was he in the car?

2    A.    Yes, he was.

3    Q.    Where was he?  Where is this at that you made,

4    that you caught up with he and his car?

5    A.    On the corner of Gringo (phonetic) and East Fifth

6    Street.  No.  June and East Fifth Street.

7    Q.    Okay.  So what do the three of you do?  You leave

8    that location?

9    A.    Yes, we do.

10    Q.    And I guess when you leave that location, are you

11    in the automobile?

12    A.    Yes.

13    Q.    So what do you do?  What happens?

14    A.    Go out driving around for a couple of hours.

15    Q.    And when you say a couple hours, how many hours

16    are you really talking about?

17    A.    Well, we was out driving around all night.

18    Q.    Where were you located when you're in the car?

19    A.    At the time I was in the middle of the front

20    seat.

21    Q.    Okay.  And where is Mr. Elofskey and where is

22    Mr. Howe located?

23    A.    Mr. Elofskey was located on my left in the driver

24    seat and Howe was in the passenger seat.

25    Q.    And when you talk about Elofskey, what name do

1    you call him?

2       A.    Tony.

3       Q.    So are you, are you, do you always stay up front?

4    Is there a point in time you move in the back seat?

5       A.    Later on I moved in the back seat.

6       Q.    Do you have occasion to be at the area what I'm

7    going to call the levee?  That when I use the term

8    levee, I'm referring to an area between Hedges Street,

9    Hedges bridge and Webster bridge, are you familiar with

10   that area over by the river?

11      A.    Yes, I know where it's at.

12      Q.    Are you familiar with Kettering Field area, the

13   baseball diamonds?

14      A.    Yes, I know where it's at.

15      Q.    What do you call that area?

16      A.    The levee.

17      Q.    Okay.  Do you have some, at sometime as you were

18   driving around all night long, do you go over there?

19      A.    Yes, we do.

20      Q.    Do you also have an occasion later on to go to a

21   location over at Findlay and Monument Street?

22      A.    Yes, we do.

23      Q.    Okay.  I'm going to ask you questions about that.

24            But before you got to Findlay and Market, do you

25   have an occasion to meet up with a guy, a person in sort

1    of a small blue car?

2      A.    Yes.

3      Q.    How did that develop?  What happened?

4      A.    Well, we was driving around.  So we decided we

5    wanted some money.  So we was going to go out and rob

6    somebody.  So Tony indicated, you know, the levee, said

7    go up there, we can rob a fag is what he said.

8            So we went to the levee and there was a guy

9    driving around.  So he said, dunk down or the guy

10   wouldn't stop and talk to him.  So at the time I was in

11   the back seat and Howe was in the front seat on the

12   passenger side.  We all hid.

13     Q.    What do you mean?  Explain to us.

14     A.    We dunk down in the seats.  And the guy pulled up

15   beside Tony Elofskey and they started talking, that's

16   Tony and the guy in the other car.

17     Q.    All right.  Did that conversation come to an end?

18   Did that conversation stop?

19     A.    Yes, it did.

20     Q.    After that conversation, what did the three of

21   you guys do?

22     A.    Drove around for a little bit longer but we still

23   stayed hidden because the car was following us and Tony

24   assumed he might stop and talk to him again.

25     Q.    So did you end up over on Monument and Findlay?

1      A.    Yes, we did.

2      Q.    Now, are you still ducked down?

3      A.    Yes, we are.

4      Q.    And does that include Weston Lee Howe?

5      A.    Yes.

6      Q.    Now when -- how are you ducked down?

7      A.    I'm laying down in the back seat on my side, on

8  my left side.

9      Q.    Do you have a gun at that time?

10     A.    Yes, I do.

11     Q.    What kind of gun did you have?

12     A.    A silver 25 automatic.

13     Q.    And how long had you had that gun?

14     A.    Since June 1st of '92.

15     Q.    And, well, about that, where did you get the gun

16  back on June 1st of 1992?

17     A.    Anybody's Pawn Shop on East Third Street.

18     Q.    As you're ducked down, where is Weston Lee Howe?

19     A.    Ducked down on the floorboard.

20     Q.    And can you explain to us how he was positioned?

21     A.    I couldn't see.

22     Q.    Did you know whether or not if at that time if

23  Weston Lee Howe had a gun?

24     A.    Yes, I did.

25     Q.    And did he or did he not have a gun?

1    A.    Yes, he did.

2    Q.    And do you know then what kind of a gun he had?

3    A.    It was a smaller, black 25 automatic.

4    Q.    You indicated that the car that you're in that's

5    Tony's car, you're being followed now by this other guy?

6    A.    Yes.

7    Q.    Do you end up going into what I'm going to call a

8    field over by Monument and Findlay Street bridge?

9    A.    Yes.

10    Q.    You know about the area about which I'm talking

11    about?

12    A.    Yes, we do.

13    Q.    When you go in there, tell us what happens after

14    that.

15    A.    Well, we parked.  And Tony said that the guy that

16    followed us also parked.  And he was heading up towards

17    the car.  Next thing I know I heard a voice coming into

18    the car, a different voice, from the driver side window.

19    At that time my brother, you know, had risen up from the

20    floorboard and they was sitting there talking,

21    Mr. Elofskey and this guy.

22    Q.    Now I call him Mr. Elofskey.  You can call him

23    Tony, whatever you want to call him.

24    A.    Tony and this guy was sitting there holding a

25    conversation and --

1    Q.   Did you tell us what you heard what the guy said?

2    A.   Just asked what was, you know, what was they

3  doing that night.  And they say, nothing, just out

4  messing around.  And he asked -- Tony asked him what was

5  he doing.  He said, just out, you know, driving around.

6  And next thing I know I heard gunshots.  And I rose up.

7  And as I was rising up, the guy was getting shot.

8    Q.   Did you see by whom?

9    A.   Yes, I did.

10   Q.   Tell us.

11   A.   My stepbrother Weston Howe.

12   Q.   What was he doing?  How was he doing what he was

13  doing?

14   A.   Well, he was facing forwards towards the driver

15  side from the passenger side seat and using his right

16  hand.

17   Q.   And how many shots did you hear?

18   A.   Three.

19   Q.   What happened then to the man who was standing

20  outside?

21   A.   He took off running.

22   Q.   And did he fall at any time before he took off

23  running?

24   A.   I don't know.  I don't recall.  I don't recall.

25   Q.   And so what did you do?

1    A.    Well, my brother took off after him, so I

2    followed them.

3    Q.    What do you mean you followed them?  How did you

4    do that?

5    A.    I took off after him too.

6    Q.    Did you get out of the car?

7    A.    Yes, I did.

8    Q.    And so you and your brother Weston Lee Howe go

9    after the man who has been shot?

10    A.    Yes.

11    Q.    Tell us what happened.

12    A.    Well, the guy fell, and he fell and we went and

13    we got his wallet.  And my brother was going to shoot

14    him again but his gun got jammed, so he asked me for

15    mine.  By that time we heard police sirens from an

16    ambulance.  And Tony pulled up and said, get in the car.

17    So I got in the car first into the back seat and he

18    followed me into the passenger side seat and we drove

19    off.

20    Q.    Could you see the man who had been shot?

21    A.    Yes, I did.

22    Q.    When you last saw him, what was he doing?

23    A.    Walking away.

24    Q.    How well was he walking?

25    A.    Weaving.

1    Q.    When you leave that area specifically, I'm

2    talking about the field.

3    A.    Yes.

4    Q.    Does the man, does the man's car, was it still

5    there when you left?

6    A.    Yes, it was.

7    Q.    When you leave that field in the car in which you

8    were in.

9    A.    Yes.

10   Q.    What's happening now?  Tell us about it.

11   A.    Well, we went through the wallet and we found a

12   Green Machine card.  So we asked Tony if he knew how to

13   use it.  He said, yeah, but he's doing the driving.  So

14   my brother didn't know how to use it.  I said I would

15   try.  So we went to several Green Machines that night

16   and tried to use it but didn't get nothing.

17   Q.    Do you know how many Green Machines you went to?

18   A.    I think three.

19   Q.    Okay.  Do you recall whether or not if one was

20   over by the Oregon District?

21   A.    Yes, it was.

22   Q.    Do you have any idea as to what time it's

23   becoming or what the status of daylight or dark on that

24   particular time?

25   A.    No, I don't.

1    Q.    At that particular time you're going to the Green

2    Machines?

3    A.    No, I don't.

4    Q.    After -- during the Green Machines, do you

5    ultimately do anything with the wallet?

6    A.    Yes, we drove around behind the Oregon and it was

7    thrown in a sewer.

8    Q.    From the wallet do you know whether or not there

9    was -- did you see any money in the wallet?

10    A.    Yeah, there was five dollars.

11    Q.    Who got that?

12    A.    My brother Weston Howe.

13    Q.    After the wallet was thrown in the sewer, is that

14    what you said?

15    A.    Yes.

16    Q.    Okay.  What do you three guys then next do?

17    A.    Well, we left and went back by the scene of the

18    crime to see if there was any cops around or anything on

19    our way towards the house or the apartment that we was

20    living in.

21    Q.    Now which street, again, the address again for

22    that place you were going to?

23    A.    123 Valley Street.

24    Q.    Okay.

25    A.    And by that time it was beginning to turn

1    daylight.  We drove by there.  And then we said, you

2    know, drop us off at the house, the apartment.

3        Q.    You say that to Tony?

4        A.    Yes.

5        Q.    Does Tony drop you off?

6        A.    Yes, he did.

7        Q.    And so you -- and do you and Weston then go into

8    the house?

9        A.    Yes, we did.

10        Q.    Or, or apartment or whatever?

11        A.    Yes.

12        Q.    Have you ever -- well, let me ask you, did you

13    have an occasion by that later on, did you go to

14    sometime later that day, now we are talking Monday the

15    daytime of the 22d, to go to a hospital?

16        A.    Yes, I did.

17        Q.    After leaving the hospital -- by the way, as

18    you're leaving the hospital, who are you with?

19        A.    Tony.

20        Q.    And are you in a car?

21        A.    Yes, we are.

22        Q.    And, again, whose car?

23        A.    Tony's.

24        Q.    When you're then with Tony after leaving the

25    hospital, do you have another occasion to go over to

1    what I'm going to call again the levee?

2     A.    Yes.

3     Q.    What happens then?

4     A.    Well, he was looking for a guy he knew.  And we

5    went over there and he ran into Mr. Blazer, which he

6    called Dick, and they stopped and they talked.

7     Q.    How do you do that?  How is that?

8     A.    He just pulls up beside him and they started

9    talking.

10    Q.    This is someplace over by the levee?

11    A.    Yes.

12    Q.    All right.

13    A.    And --

14    Q.    Do you have any idea, I mean, is it daylight in

15    the afternoon at this time?

16    A.    Yes.

17    Q.    So you could, you could see this person that is

18    called Dick?

19    A.    Yes.

20    Q.    And could you tell anything?  Could you hear the

21    conversation?

22    A.    Yeah, a little bit.

23    Q.    Tell us what you heard.

24    A.    Tony just asked him if he called him later on

25    this evening, would he be able to lend him a little bit

1    of money.  And he said possibly.  So Tony asked him for

2    his phone number and he give it to him.

3        Q.    So then where did you and Tony go?

4        A.    After that we headed back to the apartment

5    building.

6        Q.    This is the one on Valley Street?

7        A.    Yes, it was.

8        Q.    Now, at Valley Street, do you ever have an

9    opportunity or do you at Valley Street with Tony and

10   yourself and anybody else discuss what you're going to

11   do with this guy named Dick?

12       A.    Yes.

13       Q.    And with whom do you discuss?

14       A.    Me, Tony, and my brother Weston.

15       Q.    And where does this conversation take place?

16       A.    Up by the bathroom in the apartment.

17       Q.    Okay.  Are there other people there or do you

18   recall?

19       A.    Yeah, there is other people there but they wasn't

20   in the conversation that we was having.

21       Q.    And generally speaking, what was the

22   conversation?

23       A.    About robbing Mr. Blazer.

24       Q.    And by the way, when you were back at the levee

25   and Tony was talking to Mr. Blazer.

1    A.    Yes.

2    Q.    Were you introduced to him?

3    A.    Yes, as Tom.

4    Q.    Does it develop later on or sometime that you

5 three guys go over to Mr. Blazer's place?

6    A.    Yes.

7    Q.    Before going to Mr. Blazer's place, is there any,

8 do you recall whether or not there was any telephone

9 call made to Mr. Blazer?

10    A.    Yes.  Me, Tony Elofskey, and my girlfriend Terri

11 Lynn walked to the phone booth and Tony called.

12    Q.    Now you say the phone booth, where is this phone?

13    A.    At the corner of Valley and Troy at the gas

14 station.

15    Q.    There is no phone at the apartment on Valley

16 Street?

17    A.    No, there is not.

18    Q.    What time did you, did the three of you leave to

19 go to Mr. Blazer's?

20    A.    I can't recall, but it was dark out.

21    Q.    Pardon me?

22    A.    I can't recall, but it was dark out.

23    Q.    How do you get from Valley Street to Mr. Blazer's

24 place?

25    A.    Tony drove us over there.

1    Q.    And at this time did you have a gun?

2    A.    Yes, I did.

3    Q.    And what kind of gun did you have?

4    A.    A silver 25 automatic.

5    Q.    Do you know whether or not Weston Lee Howe had a

6 gun?

7    A.    Yes, he did.

8    Q.    And which gun is that?

9    A.    The black 25 smaller automatic.

10    Q.    What were you guys to do when you got there?

11    A.    Well, me and Tony was supposed to go in and I was

12 supposed to hold Mr. Blazer up with my gun and as I did

13 that, Tony was supposed to let Mr. Howe in.  And after

14 that, after we all were inside, we were supposed to take

15 things of value like money, VCRs, TVs, stereos, extra

16 money.

17    Q.    You were going to rob him?

18    A.    Yes.

19    Q.    Okay.  Tell us what happened.  Well, had you ever

20 been there before?

21    A.    No, I haven't.

22    Q.    Is there -- explain to us, if you can, how the

23 car was parked?

24    A.    We pulled in the driveway.  We was facing the

25 garage.

1    Q.    And how are you and Tony and Weston Lee Howe

2    situated or located inside the car?

3    A.    Tony is in the driver seat.  I'm in the passenger

4    seat and Weston is in the back seat.

5    Q.    Does the car come, I guess, a stop, a halt by the

6    garage?

7    A.    Yes, it does.

8    Q.    What then do you and Tony do?

9    A.    Well, at that time Blazer was looking out his

10   window, so we had my brother hide down in the seat.  Me

11   and Tony got out of the car and walked up to the house.

12   Q.    Had you ever seen before that day at any time

13   Mr. Blazer standing up to see his full size?

14   A.    No, I haven't.

15   Q.    Tell us what happens after -- well, how do you

16   guys get into the house?

17   A.    Well, Mr. Blazer opened up the door and he, you

18   know, let us in.  So we walked on in.  And we followed

19   him to the living room.  At that time him and Tony

20   started having an argument or disagreement about some

21   money.  And so I pulled out my gun.  And he just sit

22   there and looked at me, so I fired a shot towards the

23   window.  And that's when he started yelling, get the "F"

24   out of my house.

25   Q.    So he starts yelling at you two guys?

1      A.    Yes.

2      Q.    And what has, at the time you pulled out your

3    gun, what, if you know, has Tony done, if anything?

4      A.    He turned around and started walking away.

5      Q.    Is this before or after your shot or at the same

6    time Mr. Blazer starts yelling or what?

7      A.    Just during the time that I fired the shot.

8      Q.    As you fired the shot, what is Mr. Blazer doing

9    or what does he do immediately after that?

10     A.    Starts cussing out Tony.  And he followed Tony to

11   the door.

12     Q.    All right.  Now you indicated you were in the

13   what room, please?

14     A.    Living room.

15     Q.    Can you explain to us the furniture, what you saw

16   in there?

17     A.    Let's see, there is like a love seat, I think, on

18   the front wall where the window is.  There is a couch

19   right there in the doorway, well, right beside the

20   doorway of where you come into the living room from the

21   outside in the dining room.  There is a big screened TV

22   over in the far corner of the living room.  And Mr.

23   Blazer's chair is in between the TV and the love seat on

24   the far wall on the other side.

25     Q.    After your shot occurred, where do you go?

1     A.   Pertaining to who?

2     Q.   Where do you go?  What do you do?

3     A.   I followed Mr. Blazer and Tony.

4     Q.   And you followed them where, please?

5     A.   Outside.

6     Q.   How does that happen?

7     A.   Tony went out first, Mr. Blazer went out second,

8  and I went out third.

9     Q.   And tell us what happens.

10    A.   Well, as Tony was going outside, Mr. Blazer

11  followed, and I was right behind him, directly behind

12  him.  And as me and him was exiting outside, he got

13  shot.

14    Q.   What did you see?

15    A.   My brother was stooped down on the sidewalk

16  beside the bush on one knee and he shot him.

17    Q.   Do you know how many times?

18    A.   I heard about maybe three or four shots.

19    Q.   What happened to Mr. Blazer?

20    A.   He took a couple more steps down then he fell

21  face first.

22    Q.   Pardon me?

23    A.   Face first.

24    Q.   As you're coming out the door or behind

25  Mr. Blazer?

1    A.   Yes.

2    Q.   Do you, how do you, after he falls, how do you

3  get over him or what do you do?

4    A.   Well, I jumped from the step that I was at down

5  to the sidewalk that was leading out to the garage and

6  the driveway that we was parked in and took off towards

7  the car.

8    Q.   Can you tell us -- well, when you -- do you know

9  whether or not your brother was wearing anything?

10    A.   Yes, he was.

11    Q.   What was he wearing?

12    A.   He was wearing a blue jean jacket and some blue

13  jeans and he had a black stocking, a black pantyhose.

14    Q.   How was he wearing that?

15    A.   Over his head.

16    Q.   You indicated you were running towards the car.

17  Do you get to the car?

18    A.   Yes.

19    Q.   Do all of you get to the car?

20    A.   Yes.

21    Q.   Do you know in what order?

22    A.   Tony was first, and I got to the car second

23  'cause I opened the door and my brother got in second.

24  As I open the door, he slid in, and then I got in third.

25    Q.   Where did you sit?

1    A.    Same place.  I was passenger side seat in the

2    front.

3    Q.    Where, after you get in, where is Tony and where

4    is Weston?

5    A.    Tony be the driver seat and Weston is in the back

6    seat.

7    Q.    What you guys doing now?

8    A.    Driving away.  Then I noticed there was a car

9    following us and --

10    Q.    Tell us how you drive away so we all understand.

11    A.    We backed out of the parking lot and started

12    heading towards Salem Avenue.

13    Q.    When is it that you noticed that you're being

14    followed?

15    A.    A couple blocks I noticed there was a white

16    unmarked police car following us.

17    Q.    What you guys saying or doing at this time?

18    A.    Well, first, at first we was trying to figure out

19    if it was a cop car, if it was an unmarked cop car, if

20    it was following us or not.  Well, after awhile, well,

21    after a few minutes we figured out it was following us.

22    So we picked up, we gradually picked up a little more

23    speed just in case to see.  He picked up speed as we did

24    so we knew he was following us.

25    Q.    So what happens?

1    A.   Well, I think Tony knew that we couldn't outrun

2    him so what we did was try to get as far as we could.

3    So we drove down Salem Avenue and hit Catalpa, went down

4    Catalpa towards Main Street, then across Main, down

5    Riverside, down to Riverside to McOwen, that's where the

6    car stopped.  We got out and we ran.

7    Q.   Now let's take it from the time after you get

8    into the car to, I'm talking about from the shooting

9    there where you called Mr. Blazer.  Do you know the

10   address or the street?

11   A.   No, I don't.

12   Q.   From what I'm going to call the Blazer shooting

13   occurred until you got out of the car on McOwen, what,

14   if anything, occurs with the pantyhose and the guns?

15   A.   Well, I handed my gun to my brother and we, we

16   told him to put them underneath his seat because the

17   seat in the back came up.  And that's all that was said

18   about them.

19   Q.   The car comes to a stop.  I guess you guys bail

20   out or what?

21   A.   Yes.

22   Q.   Do you know where Tony goes?

23   A.   No, I didn't.

24   Q.   Where do you go?

25   A.   I followed my brother through a field.

1    Q.    You say field, what do you mean?

2    A.    A section between two houses, a big empty lot.

3    Q.    And do you go through there?  What, what happens

4    to you guys?

5    A.    We hopped a couple of fences.  As we was running

6    across Helena Street, that's where we got caught at.

7    Q.    And you're caught, do you know, by police, by

8    police?

9    A.    Yes.

10    Q.    Did these, do these police officers, were they in

11    uniform?

12    A.    Yes, they were.

13    Q.    After you're caught, are you taken to a police

14    cruiser?

15    A.    Yes, I am.

16    Q.    Do you see your brother Weston?

17    A.    Not until I got downtown.

18    Q.    And, well, I'm talking about the time in the

19    police cruiser out at Helena.

20    A.    Yes.

21    Q.    From there where are you taken?

22    A.    Downtown.

23    Q.    Okay.  When, after you're caught, do you next see

24    your brother?

25    A.    Downtown behind the police -- downtown behind the

1    city jail in police cars.

2       Q.    Okay.  So are you, at that time are you in the

3    same car he's in?

4       A.    No, I'm not.

5       Q.    From being downtown outside in a police car, are

6    you by the police station?

7       A.    Yes.

8       Q.    Where are you taken to then?

9       A.    Up to the second floor.

10      Q.    And where, where are you placed?

11      A.    In a little room so I could talk to the

12   detectives.

13      Q.    And other than seeing your brother out there at

14   the, in the police car outside, when next after that do

15   you see him?

16      A.    When we went to court.

17      Q.    When was that?

18      A.    I think on the 24th of June.

19      Q.    So from the time of your time you were being

20   caught until you went to court on the 24th, you only saw

21   your brother that one time and that's outside the police

22   station?

23      A.    Yes.

24      Q.    From the time you were caught until you go to

25   court on the 24th, do you ever talk to your brother?

1    A.    No.

2    Q.    After you were caught -- well, strike that.

3          As you're running from the car until you're

4    caught, do you know then at that time where Tony is?

5    A.    No, I don't.

6    Q.    When is the next time after the three of you get

7    out of the car at McOwen do you next see Tony Elofskey?

8    A.    On June 24th at court.

9    Q.    When after the time the three of, of you bail out

10   of the car do you next have an opportunity to even talk

11   to Tony Elofskey?

12   A.    Well, we said hi in court.   That was about it.

13   Q.    You indicated that you were in the police

14   station, you were waiting for the detectives?

15   A.    Yes.

16   Q.    Do you meet with some detectives?

17   A.    Yes, I did.

18   Q.    Do you know with what detectives you meet?

19   A.    Detective Lawson and Detective Spells.

20   Q.    Now this is, this the Detective Lawson that you

21   met?

22   A.    No.

23   Q.    Is there another Detective Lawson?

24   A.    Yes, his brother.

25   Q.    When you meet with Detective Lawson, do you meet

1    with him in that one, the room you were in initially?

2       A.    No, they gradually took me from that room and

3    took me into another one.

4       Q.    And what does Detective Lawson do?

5       A.    Came in and talked to me.

6       Q.    Pardon?

7       A.    Came in and talked to me.

8       Q.    Okay.  And does he give you any form?

9       A.    Pertaining to what?

10      Q.    Your rights.

11      A.    Yes.

12      Q.    Okay.  Can you explain that to us, please?

13      A.    Well, they read them to me and he asked me if I

14   understood each one of them as I read them off and I

15   told him I did.  And he asked me if I wanted to sign it,

16   so I signed it.

17      Q.    And did he ask you if you wanted to talk to him

18   about what happened at Mr. Blazer's place?

19      A.    Yes, he did.

20      Q.    Did he ask you if you wanted, if you wanted to

21   talk to him about anything that happened at Findlay and

22   Monument Street?

23      A.    No, he didn't.

24      Q.    Did you talk about that?

25      A.    Yes, I did.

1      Q.    Walter, let me hand you a piece of paper, got a

2   red tag on it, it says State's Exhibit 70, that's what

3   it says.

4      A.    Okay.

5      Q.    Can you see that?

6      A.    Yes, I can.

7      Q.    Can you read it okay?

8      A.    Yeah.

9      Q.    Do you recognize whether or not your signature is

10  on that document?

11     A.    Yes, it is.

12     Q.    And that signature is placed on there by you?

13     A.    Yes, it was.

14     Q.    As the detectives explained to you your rights?

15     A.    No.  Afterwards.

16     Q.    Okay.  Did they trick you in any fashion to talk

17  to them?

18     A.    No, they didn't.

19     Q.    And what did you say to Detective Lawson and

20  Spells?

21     A.    I just told them how everything happened.

22     Q.    Did you tell them the same things you told us

23  today here in court?

24     A.    Yes, I did.

25     Q.    During the time that you met with the detectives,

1 did you tell them about the plan that you had with the

2 guy that was following you all?

3  A. Yes.

4  Q. Did you tell the detectives about the plan that

5 you had in regards to what you were going to do to

6 Mr. Blazer?

7  A. Yes, I did.

8  Q. Did you -- did the detectives ask you to explain

9 what gun you had?

10  A. No, they didn't.

11  Q. Did you have an opportunity, an occasion to leave

12 with the detectives and go to where the billfold had

13 been discarded?

14  A. Yes, I did.

15  Q. When you were with detectives and you indicated

16 you went to the place where the billfold had been

17 discarded?

18  A. Yes.

19  Q. At that time did you know where Tony Elofskey

20 was?

21  A. No, I didn't.

22  Q. At any time in your conversations with Detective

23 Lawson, that would be the other Lawson, did they ever

24 tell you any of the details of anything that they had

25 found out in their investigation, any of these cases?