1  speakers back there.

2    Q.    And I think you told me that the cassette tapes

3  didn't use to ride around loose on the bottom of that

4  car?

5    A.    No, they didn't.

6    Q.    And you don't remember any trash right around on

7  the bottom of that car?

8    A.    No, I didn't.

9    Q.    I'm sorry.

10    A.    No, I didn't.

11    Q.    So he had the speakers out and he had that case

12  with the cassette tapes out of his car while he was

13  cleaning it?

14    A.    Yes, he did.

15    Q.    Where was he cleaning it?

16    A.    On the corner of June and Fifth.

17    Q.    I'm sorry.

18    A.    On the corner of June and Fifth.

19    Q.    At the curb, right?

20    A.    Yes, right beside his house.

21    Q.    Was anyone else around while he was doing that?

22    A.    No, there wasn't.

23    Q.    You drink Mountain Dew?

24    A.    Every once in awhile.

25    Q.    I'm going to hand you what's been marked as

1  State's Exhibit 64, ask you to take a look at that and

2  tell us what that is if you know.

3    A.    A car.

4    Q.    Photograph of a car?

5    A.    Yes, it is.

6    Q.    Do you know that car?

7    A.    Yes, I do.

8    Q.    What car is that?

9    A.    Tony's.

10    Q.    You could tell that, can't you?

11    A.    Yes, I can.

12    Q.    How can you tell that?

13    A.    'Cause I been in it before.

14    Q.    Right.

15         How many times?

16    A.    Two or three times.

17    Q.    Only two or three times now, is that right?

18    A.    What I said earlier.

19    Q.    Now, look at the rearview mirror of that car.

20  Can you see that?

21    A.    Yes, I can.

22    Q.    And you're going to have to keep your voice up so

23  all these people can hear you.

24    A.    Yes, I can.

25    Q.    All right.  Is there anything hanging from the

1    rearview mirror of that car?

2      A.    Some little pictures on a string.

3      Q.    Some little pictures on a string.  What kind of

4    pictures?

5      A.    The kind you buy at auto shop.

6      Q.    Pictures of what?

7      A.    Women.

8      Q.    Pictures of women.  Okay.

9          Anything else hanging there that you can see?

10     A.    On the mirror?

11     Q.    Yes.

12     A.    Just the pictures.

13     Q.    Do you remember seeing an air freshener hanging

14   from the rearview mirror?

15     A.    Yes, I do.  It's a rainbow air freshener.

16     Q.    You can see that air freshener now?

17     A.    Yes, I can.

18     Q.    Okay.  You see the driver seat in that

19   photograph?

20     A.    Yes, I do.

21     Q.    And it's blue, isn't it?

22     A.    Yes, it is.

23     Q.    And you see anything right below and behind that

24   driver seat in that photograph?

25     A.    I do on the side where the door is and behind it.

1    Q.   Listen carefully.  I'm talking about behind the

2    driver seat on the floor, what do you see?

3    A.   Looks like some kind of bag or something.

4    Q.   What kind of a bag?

5    A.   I do not know.

6    Q.   Does it look like a paper bag?

7    A.   Yes, it does.

8    Q.   It looks like this bag right here, doesn't it?

9    A.   I don't know.  This is all crumbled up.

10   Q.   All crumbled up.  All right.

11        Now, I will hand you what's been marked as

12   State's Exhibit 66, and if you will compare these two

13   photographs to each other.

14   A.   That's the back floorboard of the car.

15   Q.   Right.  66 is below of some of the things you see

16   in 64, isn't it?

17   A.   Yes, it is.

18   Q.   No question that that looks like the same car?

19   A.   Yes, it is.

20   Q.   And you recognize 66 as Tony's car too, don't

21   you?

22   A.   Yes, I do.

23   Q.   All right.  Now, what do we see on the floorboard

24   behind the driver seat in 66?

25   A.   The garbage.

1    Q.    What kind of garbage?

2    A.    Mountain Dew bottles and a paper bag.

3    Q.    Mountain Dew bottle and a paper bag.  Do you see

4    anything else there?

5    A.    I don't know what that is.

6    Q.    Hum, something that you don't know what it is,

7    right?

8    A.    Yeah.

9    Q.    What about this big blue thing in the corner,

10   what is that?

11   A.    I don't know.

12   Q.    Carpeting?

13   A.    I don't know.

14   Q.    Ever seen that before in your life?

15   A.    No.

16   Q.    How about this tape cassette?

17   A.    No, I ain't never seen that before.

18   Q.    Never seen that either.

19         And there is just kind of some litter down there,

20   isn't there?

21   A.    Yes, there is.

22   Q.    In fact, there is two tape cassettes.  Do you see

23   that?

24   A.    Yes, I do.

25   Q.    There is a third one?

1     A.    Uh-huh.

2     Q.    This is the kind of Mountain Dew bottle you

3     drink?

4     A.    No, I drink out of a can.

5     Q.    You drink cans and not bottles?

6     A.    That's right.

7     Q.    What's the reason for that?

8              MR. SLAVENS:     Objection, your Honor --

9              THE COURT:     Wait a minute.  Wait a

10    minute.  Sustain the objection on the question.

11             MR. ARNTZ:     Would you care for me to

12    continue or take a break at this time?

13             THE COURT:     Let me see counsel a

14    minute.

15             (WHEREUPON, a side-bar conference was held

16    off the record.)

17             THE COURT:     You may proceed, Mr. Arntz.

18             MR. ARNTZ:     Thank you.

19    BY MR. ARNTZ:

20    Q.    Now, after Tony had cleaned the interior of his

21    car on June 21st when you say you first saw him --

22             MR. SLAVENS:     Objection, your Honor.  He

23    indicates clean, not had cleaned.  There may be a

24    difference.  He's trying to put words in the witness's

25    mouth.

1                    THE COURT:        Let's rephrase the

2      question.

3    BY MR. ARNTZ:

4      Q.    You tell me what Tony was doing when you first

5    saw him that day.

6      A.    Well, he had took some of the stuff out of his

7    car.  I don't know if he was finished cleaning it or not

8    at the time that we got there, but he was in the process

9    of trying to clean his automobile up.

10     Q.    All right.  And did he complete the cleaning of

11   his car?

12     A.    No, he didn't.

13     Q.    Apparently he didn't, did he, according to these

14   photographs?

15     A.    (Witness nodded in the affirmative.)

16     Q.    You have to speak so she can hear you.

17     A.    I suppose so.

18     Q.    You suppose so.

19           Well, when you rode around in his car on June

20   21st, did it look like this?

21     A.    I couldn't tell because it was dark out and it

22   was dark inside the car.

23     Q.    Well, you didn't see what the interior of the car

24   looked like that day because it was so dark out?

25     A.    I thought it was maroon.

1      Q.    I'm sorry?

2      A.    I thought it was maroon.

3      Q.    You thought what was maroon?

4      A.    The interior of the car.

5      Q.    But it is not, is it?

6      A.    No, it's not.

7      Q.    You want to change anything else you said about

8    the car?

9      A.    No, I don't.

10     Q.    You just don't have any idea at all what the

11   interior of that car looked like that night?

12     A.    No, I don't.

13     Q.    And what time did you get out of the car on June

14   21st or June 22d for the first time?

15     A.    I do not know.

16     Q.    Well, you got into the car on June 21st and went

17   out to Monument and Findlay, didn't you?

18     A.    Yes, I did.

19     Q.    You got out of the car sometime?

20     A.    It was early morning June 22d.

21     Q.    Right.

22           And Tony took you home?

23     A.    Yes, he did.

24     Q.    And he dropped you off?

25     A.    Yes, he did.

1    Q.    What time was that?

2    A.    During -- it was beginning to be daylight time.

3    Q.    Sun is out?

4    A.    No.   Just starting to turn daylight.

5    Q.    Was there enough daylight for you to see what the

6    car looked like when you got out?

7    A.    I was too tired to pay attention.

8    Q.    You're too tired to notice?

9    A.    Yes.

10    Q.    When you got into the car the second time on June

11    22d, what time was it?

12    A.    Pertaining to which situation?

13    Q.    Well, the next time you got into the car, which

14    was June 22d, what time was it?

15    A.    The time I went to the doctor's?

16    Q.    Yeah.

17    A.    Afternoon time.

18    Q.    I'm sorry.

19    A.    Afternoon time.

20    Q.    Afternoon now.

21          Was the sun out that day?

22    A.    Yes, it was.

23    Q.    And you rode to the doctor's in his car while the

24    sun was out so now you can see the interior of the car,

25    can't you?

1    A.    Yes, I can.

2    Q.    And now you can tell us what the interior of the

3    car looked like on June 22d, can't you?

4    A.    I didn't pay attention.

5    Q.    You didn't pay any attention?

6    A.    No, I wasn't.

7    Q.    And I guess when you came back from the doctor

8    and then you went out to Richard Blazer's house, you

9    didn't pay any attention at all to the interior of the

10    car during those times either?

11    A.    I didn't think it was necessary.

12    Q.    Well, it was necessary if you had to get in and

13    out of that car a few times in a hurry, isn't it?

14    A.    No, it isn't.   What does color have to do with me

15    getting in and out?

16    Q.    Let me ask you, now when you came out of Richard

17    Blazer's house, you were in a hurry to get into that

18    car, weren't you?

19    A.    Yes, I was.

20    Q.    And you had to jump into that -- what seat did

21    you get into?

22    A.    I got in the passenger side of the front.

23    Q.    Passenger side, okay.

24          And on the way out to Richard Blazer's house, you

25    rode in the back seat, didn't you?

```
 1      A.    No.  I rode into the front seat.

 2      Q.    You rode in the front seat?

 3      A.    Yes, I did.

 4      Q.    Did you on the way to Richard Blazer's house?

 5      A.    Yes.

 6      Q.    Did you ever ride in the back seat on the way to

 7   Richard Blazer's house or on the way leaving Richard

 8   Blazer's house?

 9      A.    No, I did not.

10      Q.    Never rode in the back seat?

11      A.    No, I didn't.

12      Q.    Have you ever ridden in the back seat of that

13   car?

14      A.    Yes, I have.

15      Q.    And that was the night Mark McDonald was shot?

16      A.    Yes, it was.

17      Q.    And that's when you say you were crouched down

18   behind the driver seat?

19      A.    Yes, I was.

20      Q.    And showing you again State's Exhibit 64, this

21   shows a part of the area where you would be crouched

22   down when Mark McDonald was killed.

23      A.    No, it doesn't.

24      Q.    It doesn't?

25      A.    No, it don't.
```

1    Q.    What about this photo number 66 with the Mountain

2    Dew bottle in it, is that part of the area where you

3    were crouched down when Mark McDonald was killed?

4    A.    No.    I was laying on the seat.    That was the

5    floorboard.

6    Q.    Now you were in the floorboard?

7    A.    I was laying down on the seat.

8    Q.    On your back or on your stomach?

9    A.    On my side.

10    Q.    On your side.

11    Well, then if Mark McDonald walked up to the

12    driver's window of Tony's car, he might see you --

13    A.    Yes, he might.

14    Q.    -- on the back seat?

15    A.    Yes, he might have.

16    Q.    Well, that's not a very good way to rob somebody,

17    is it?

18    A.    I guess not.

19    Q.    Well, when you were laying on your side, you say

20    in the back seat, were you facing the front of the car?

21    A.    Yes, I was.

22    Q.    Were you covered up?

23    A.    No, I wasn't.

24    Q.    You had nothing on you?

25    A.    Clothes.

1    Q.    But other than clothes, you didn't have anything

2    covering you?

3    A.    No, I did not.

4    Q.    Now if Tony said you had something covering you

5    up, is that true or false?

6                   MR. SLAVENS:        Objection, your Honor.

7                   THE COURT:        Sustained.

8                   MR. ARNTZ:        This will be a good time to

9       stop.

10                   THE COURT:        Ladies and gentlemen of the

11      jury, let's go ahead and take our lunch break.    The

12      Court has some other matters to deal with at one

13      o'clock.    Let's try to make it 1:15.

14                                    Remember the usual

15      instructions from the Court not to discuss the case

16      among yourselves or with anybody else.    Don't form any

17      opinions, you have not heard all the testimony.    We'll

18      do the best we can to get started promptly at 1:15.

19                   (WHEREUPON, a luncheon recess was taken at

20      12:13 p.m.)

21                                    *    *    *    *

22

23

24

25

1          (February 26, 1993 - Afternoon Session)

2                              1:39 p.m.

3                        <u>BEFORE THE JURY</u>

4          THE COURT:       Mr. Arntz, you may continue

5    cross-examination.

6          MR. ARNTZ:       Thank you.

7    BY MR. ARNTZ:

8     Q.    Walter, you told the prosecutor this morning that

9    the way you worked out your own case was to enter into a

10   plea, isn't that right?

11    A.    Yes.

12    Q.    Again, you're going to have to keep your voice up

13   so everyone on this jury can hear you.

14    A.    Yes.

15    Q.    And, Walter, when you entered this plea, you did

16   that with the help of your lawyer, didn't you?

17    A.    No.   That was my own decision.

18    Q.    I'm sorry.

19    A.    That was my own decision.

20    Q.    Your lawyer didn't help you with that decision at

21   all?

22    A.    No.

23    Q.    I see.

24          And did you work out that plea bargain all by

25   yourself then?

1    A.    No.  He asked me if I would take one or not and I

2    said yes.

3    Q.    And who worked out that plea bargain then if you

4    didn't do it?

5    A.    I don't know.

6    Q.    You don't know.  You don't think your lawyer had

7    anything to do with working out your plea bargain?

8    A.    Obviously he did.

9    Q.    And obviously a prosecutor had something to do

10   with working out your plea bargain, am I right?

11   A.    I don't know nothing about none of that.

12   Q.    Didn't you sign a form that contained your plea

13   bargain?

14   A.    Yes, with my lawyer.

15   Q.    With your lawyer?

16   A.    Not the prosecutor.

17   Q.    Not the prosecutor.  Okay.

18         And when was it you signed the form about your

19   plea bargain?

20   A.    Last time I was in court.

21   Q.    When was that?

22   A.    Let's see, about, I think it was in the second,

23   first or second week of February.

24   Q.    Well, this is the third week of February so that

25   would be last week or the week before?

1    A.    I think it was the week before.  I can't recall

2  what day.

3    Q.    You were in court last time, this courtroom right

4  here a week before last?

5    A.    I think so.  I can't recall.

6    Q.    And that's when you entered your plea?

7    A.    Yes, I did.

8    Q.    With your lawyer?

9    A.    Yes, I did.  I did.

10    Q.    And the prosecutor was here too?

11    A.    Yes, he was.

12    Q.    And you also signed something with the

13  prosecutor's signature on it, didn't you?

14    A.    I didn't read, I didn't read his signature.

15    Q.    So the answer is, you don't know?

16    A.    I signed a piece of paper that my lawyer had read

17  off to me.

18    Q.    Your lawyer did what?

19    A.    Read off to me.

20    Q.    Your lawyer read it to you?

21    A.    Yes.

22    Q.    Can you read?

23    A.    Yes, I can.

24    Q.    How well can you read?

25    A.    Well enough to know what I'm reading.

1    Q.    Let's see, you dropped out of the school in the

2    11th grade?

3    A.    Tenth.

4    Q.    Tenth.

5          And one of the reasons you dropped out was

6    because you couldn't read so well?

7    A.    No, 'cause, wait, it was the crowds of people I

8    was hanging around.

9    Q.    What was wrong with the crowds of people you were

10   hanging around?

11   A.    I got influenced.

12   Q.    In what way were you influenced?

13   A.    Skipping school and stuff like that.

14   Q.    What, what other stuff like that?

15            MR. SLAVENS:    Your Honor, relevance.

16            THE COURT:    I will sustain the

17      objection.

18   BY MR. ARNTZ:

19   Q.    When you were skipping school, your grades were

20   dropping?

21   A.    Yes, they were.

22   Q.    One of those problems you were having in school

23   was with reading?

24   A.    All, in all of them.

25   Q.    I'm sorry.

1    A.    In, in all of my classes, I was failing all my

2    classes.

3    Q.    My question, was one of the problems that you

4    couldn't read well?

5    A.    No.

6    Q.    No.  Okay.  Pretty good reader then?

7    A.    No, not the best.

8    Q.    Not the best.

9         Well, one of the problems you have with reading

10   is problem you have with your eyesight, isn't that true?

11   A.    Yes, it is.

12   Q.    And one of the problems you have with your

13   eyesight, you just don't see very well, isn't that true?

14   A.    Small things.

15   Q.    Small things?

16   A.    Yes.

17   Q.    Now, can you see things far away better or things

18   up close better?

19   A.    Normally up close, as long -- anything small I

20   can't see far away.

21   Q.    Anything small you can't see far away?

22   A.    Right.

23   Q.    Am I right?

24   A.    Right.

25   Q.    Okay.  Well, can you see what's in my hand right

1    now?

2       A.    I think it's a lip balm or marker or something.

3       Q.    It's a breath freshener.  You can see that okay,

4    can't you?

5       A.    Yeah, I can see it.

6       Q.    Pretty small?

7       A.    Yeah, but not that small.

8       Q.    I'm about as far as I can get away from you,

9    aren't I?

10      A.    No, not unless you want to go back there.

11      Q.    But you saw that okay?

12      A.    Yes, I did.

13      Q.    Then when you want to read something, show the

14   jury what you have to do?

15      A.    Let's see.  What side do you want me to read

16   first?

17      Q.    You have to bring it close up to your face, don't

18   you?

19      A.    The above-named defendant appeared in open court

20   this 5th day of February, 1993.

21      Q.    Okay.  Walter, my question is, you have to hold

22   that close to your face to read it, don't you?

23      A.    Yes, I do.

24      Q.    Do you have glasses?

25      A.    I used to.

```
 1      Q.    You used to.

 2            What happened?

 3      A.    They got lost.

 4      Q.    When were they lost?

 5                  MR. SLAVENS:      Objection, your Honor.  I

 6      mean --

 7                  THE COURT:      Is this relevant, Mr.

 8      Arntz?

 9   BY MR. ARNTZ:

10      Q.    Let me ask you this question.  Did you have

11   glasses on June 22d of last year?

12      A.    No, I didn't.

13      Q.    They were already lost, weren't they?

14      A.    Yes, they were.

15      Q.    You couldn't see so well without the glasses as

16   compared to when you wear the glasses?

17      A.    Just like I could see you.

18      Q.    Okay.  Well, my question, I guess, do you see

19   better with or without glasses?

20                  MR. SLAVENS:      Objection.  It's been asked

21      and answered I don't know how many times.  It's even

22      with, even with the demonstration back here.

23                  THE COURT:      I don't need dissertations

24      from the attorneys.

25                              Overrule the objection.
```

1                                    Answer the question.  Do

2       you remember it?

3       A.    Repeat it, please.

4    BY MR. ARNTZ:

5       Q.    Do you see better with or without glasses?

6       A.    Like I say, with, of course.

7       Q.    Now, this morning we began when you told me that

8    you knew you were going to be cross-examined when you

9    came in here today, you remember that?

10      A.    Yes.

11      Q.    And you understood what was happening when you

12   were in court two weeks ago and entered your plea in

13   this courtroom, didn't you?

14      A.    Yes, I did.

15      Q.    And you've understood what was happening in your

16   own case all the way along, didn't you?

17      A.    Well, not really 'cause I was going through

18   competency hearings.

19      Q.    You were going through what?

20      A.    I was going through hearings and motions.

21      Q.    You used the word competency, didn't you?

22      A.    Motion hearings and motions.

23      Q.    Well, what sort of a competency hearing did you

24   have?

25      A.    I don't know.  I was going through filing

1    motions.

2      Q.   One of those motions was by you, you were

3    incompetent to stand trial, do you remember that?

4              MR. SLAVENS:    I object to that, your

5      Honor.

6              THE COURT:    Sustained.

7    BY MR. ARNTZ:

8      Q.   Well, let me ask you this.  Didn't you make a

9    claim in your own case that you couldn't understand the

10   court proceedings and assist your attorney?

11             MR. SLAVENS:    Objection, your Honor.

12             THE COURT:    All right.  Sustain the

13     objection.

14             MR. ARNTZ:    May we approach and make a

15     record on that?

16                      AT SIDE BAR

17             MR. ARNTZ:    The record should reflect

18     that Polson's attorney filed a suggestion of

19     incompetency and competency evaluations were

20     performed.  The conclusion was that he was competent

21     to stand trial.  Now, that was a legal claim made by

22     him through his agent, the attorney.  It would be just

23     like he had entered a plea of not guilty by reason of

24     insanity.  That plea is something that he is

25     responsible for, likewise the claim that he was

1       incompetent is something that he was aware of, knew

2       about, and consented to at the time it was filed.  I

3       think it's relevant when he now claims he understood

4       his plea bargain.

5                    THE COURT:       Any response?

6                    MR. SLAVENS:      Well, any plea offered in a

7       criminal case I would think the criminal defense

8       lawyer would indicate and agree it cannot be used in

9       any way against the guy.  This does not attack his

10      credibility whatsoever, which is the purpose of

11      cross-examination.

12                   THE COURT:       In any event, I've

13      sustained the objection.  Let's move on.

14

15                        BEFORE THE JURY

16      BY MR. ARNTZ:

17      Q.   Now last fall sometime when you were still

18      charged with these crimes, you were hearing voices,

19      weren't you?

20      A.   No, I wasn't.

21      Q.   Have you ever heard voices?

22      A.   When somebody talks to me.

23      Q.   Well, now, didn't you say last fall to, I think

24      it was, Dr. Kuehnl that you had been hearing voices for

25      three or four years?

1    A.    No, not as I recall.

2    Q.    Does that mean maybe you did say that to her or

3    you just don't remember that this morning?

4    A.    As far as I know, I didn't say it.

5    Q.    As far as you can remember this morning, you

6    never heard voices when you were alone?

7    A.    No.

8    Q.    Okay.  And you've never had any mental health

9    counseling?

10    A.    No, I haven't.

11           MR. SLAVENS:    Objection anyway, your

12    Honor.  I voice an objection to --

13           THE COURT:    I understand.  I'm going to

14    overrule it as to that one question.  The question has

15    been asked and answered.  Now we'll move on.  So

16    overrule it as to that question.

17  BY MR. ARNTZ:

18    Q.    Well, when they gave you the medicine to calm you

19    down in the county jail, that was after you tried to

20    kill yourself.  Do you remember that?

21    A.    Yes, I do.

22           MR. SLAVENS:    Objection, your Honor.

23           THE COURT:    If for no other reason, as

24    to the form of the question.

25

1   BY MR. ARNTZ:

2       Q.   Do you remember trying to kill yourself in the

3   county jail?

4       A.   I tried to hurt myself, yes, I remember that

5   part.

6       Q.   You were trying to hurt yourself but not to kill

7   yourself?

8               MR. SLAVENS:      Objection, your Honor.

9               THE COURT:       Sustained.

10  BY MR. ARNTZ:

11      Q.   All right.  In any event, when you tried to hurt

12  yourself, is that when the medics in the county jail

13  gave you this medicine to calm yourself down?

14      A.   Yes, they did.

15      Q.   And now that you've had your plea bargain, you're

16  not trying to hurt yourself?

17      A.   They took me off the medication once before.

18      Q.   The prosecutor asked you about the weapon that

19  you own or used and you told him that you own a Raven

20  handgun?

21      A.   Yes.

22      Q.   You told him you bought that at a pawn shop?

23      A.   Yes, I did.

24      Q.   Why did you buy that gun?

25              MR. SLAVENS:      Objection, your Honor, as

1      to why.

2                    THE COURT:        Overruled.  You can answer.

3      A.    Why did I buy the gun?  Or why did I buy that

4      specific kind?

5  BY MR. ARNTZ:

6      Q.    Why did you buy a gun?

7      A.    Because I had a tendency of having people after

8  me.

9      Q.    Because people were after you?

10      A.    Yes.  For protection.

11      Q.    You needed to protect yourself with a gun?

12      A.    This is America.

13      Q.    When did you buy this gun to defend yourself

14  against the people who were after you?

15      A.    June 1st.

16      Q.    June 1st of 1992?

17      A.    Yes, I did.

18      Q.    That would be just three weeks before Mark

19  McDonald was killed?

20      A.    Yes.

21      Q.    And just three weeks before Mr. Blazer was

22  killed?

23      A.    Yes.

24      Q.    And that is the time when you were in danger from

25  someone?

1    A.    Previous.   Before that.

2    Q.    But you were apparently still in danger from them

3    in June of 1992?

4    A.    Yes, I was.

5    Q.    Were these crack dealers you were in danger from?

6    A.    No, it wasn't.

7    Q.    Who was it?

8    A.    People that like when I was going out with other

9    girls, their parents and friends and ex-boy friends and

10    stuff like that.

11    Q.    Girlfriend's parents were threatening your life?

12    A.    Well, not the mothers but, you know, the fathers.

13    Q.    Were you using crack back at the time that you

14    bought this gun?

15    A.    No, I was not.

16    Q.    You weren't dealing with crack dealers when you

17    bought this gun?

18    A.    No, I was not.

19    Q.    You weren't using heroin?

20    A.    No, I was not.

21    Q.    You weren't lacing marijuana with --

22         MR. SLAVENS:     Objection.   I voice an

23    objection.   I would like to be heard.

24         THE COURT:     All right.

25

1                            AT SIDE BAR

2              MR. SLAVENS:    I'm assuming that there is

3    some good faith basis for the foundation behind these

4    questions that the lawyer is asking.

5              MR. ARNTZ:    This is a case from our

6    court of appeals which refers to, inquired into drug

7    use about the time of the offense.

8              MR. SLAVENS:    By asking if he doesn't --

9    never mind.

10              THE COURT:    That's why I did not pursue

11   that you were objecting on the first two, the third in

12   which is what, marijuana laced with something.

13              MR. SLAVENS:    Do you have a good faith

14   basis?

15              MR. ARNTZ:    Right here.  It's in the

16   report that we both got this morning, if you read it.

17              THE COURT:    Okay.  Is that question --

18   was that question answered on the record?

19              MR. ARNTZ:    No.

20              THE COURT:    The Court will overrule the

21   objection.

22                          BEFORE THE JURY

23              THE COURT:    Would you repeat or

24   rephrase the question, Mr. Arntz?

25              MR. ARNTZ:    Yes, sir.  Thank you.

1    BY MR. ARNTZ:

2      Q.   Back at the time you bought this gun in early

3    June of 1992, were you using crack cocaine, heroin, or

4    marijuana laced with embalming fluid?

5      A.   No, I was not.

6      Q.   None of those substances?

7      A.   No, I was not.

8      Q.   You weren't using any illegal narcotics at that

9    time?

10     A.   No, I was not.

11     Q.   Had you been using those things before and then

12   stopped?

13          MR. SLAVENS:    Objection, your Honor.  We

14     are talking about any time back in June.  I don't see

15     any relevancy what occurred then as to the event of

16     June 22d.

17          THE COURT:    All right.  I'm going to

18     permit one more question in this area.

19                     Do you remember the

20     question?

21     A.   Yes, I do.

22          THE COURT:    What's your answer?

23     A.   No, I haven't.

24   BY MR. ARNTZ:

25     Q.   Now, on June 21st or on June 22d, 1992, had you

1    smoked marijuana?

2        A.    No, I haven't.

3        Q.    Had you used heroin?

4        A.    No, I haven't.

5        Q.    Had you used marijuana laced with embalming

6    fluid?

7        A.    No, I hadn't.

8        Q.    Had you used crack cocaine?

9        A.    No, I haven't.

10       Q.    What about Tony Elofskey?

11       A.    I don't know.

12       Q.    Well, let me see.  Have you seen people who are

13   under the influence of crack cocaine before?

14       A.    Yes, I have.

15       Q.    And you've seen people who are under the

16   influence of marijuana before, haven't you?

17       A.    Yes, I have.

18       Q.    And you've seen people who were under the

19   influence of heroin, have you, before?

20       A.    No, I haven't.

21       Q.    You know about that crack cocaine and that

22   marijuana?

23       A.    Yes.

24       Q.    But not the heroin.

25             Well, you would be able to recognize, wouldn't

1    you, a person who was behaving under the influence of

2    crack cocaine or marijuana?

3      A.   Probably, yes.

4      Q.   And you were with Tony quite a bit June 21st and

5    June 22d, weren't you?

6      A.   Yes, I was.

7      Q.   And you don't have any idea in this world whether

8    he appeared to be under the influence of anything those

9    days?

10     A.   During the time he was with me, no, he wasn't.

11     Q.   And you were perfectly straight yourself?

12     A.   Yes, I was.

13     Q.   Hadn't even had a drink of alcohol?

14     A.   'Cause I went to the hospital.  They took blood

15   out of my arm.

16     Q.   Well, my question was, had you even had a drink

17   of alcohol?

18     A.   No, I hadn't.

19     Q.   Well, if I -- let me ask you this.  On June 22d,

20   Tony did not appear to you as if he had drunk a quart of

21   Budweiser, did he?

22     A.   No, he didn't.

23     Q.   You would know what a person would look like and

24   act like if they drunk a quart of Budweiser?

25     A.   It depends on how much it takes them to get

1    drunk.

2        Q.    Well, my question is, do you have any idea what a

3    person would look like and act like if they drank a

4    quart of Budweiser?

5        A.    No, I don't.

6        Q.    You don't have any idea?

7        A.    No.

8        Q.    So you wouldn't be able to tell us whether Tony

9    behaved on June 22d as if he drunk that or not?

10       A.    That's right.

11       Q.    And back on June 22d you, yourself, were in the

12   habit of drinking whatever you could?

13       A.    But I wasn't drunk that day.

14       Q.    Was that a yes?

15       A.    On what part?

16       Q.    Were you in the habit of drinking whatever you

17   could?

18       A.    No.

19       Q.    No?

20       A.    No.

21       Q.    Do you remember a Detective Lawson, now not this

22   Lawson but the other Detective Lawson, asking you

23   whether you were on drugs on June 22d, 1992?

24       A.    Yes.

25       Q.    You know why he asked you that question?

1          MR. SLAVENS:      Objection, your Honor.

2          MR. ARNTZ:       If he knows.

3          THE COURT:        Well, that's the way it's

4    worded.  I will overrule the objection.  You can

5    answer that yes or no.

6    A.    What?  When was I supposed to be asked this

7    question from Lawson?

8    BY MR. ARNTZ:

9    Q.    Well, first, do you remember being asked by

10   Detective Wade Lawson whether you had been taking drugs?

11   A.    Yes, I do.

12   Q.    On June 22d, 1992?

13   A.    Yes, I do.

14   Q.    Okay.  And when he asked you that question, you

15   were on videotape, weren't you?

16   A.    Yes.

17   Q.    You now remember that?

18   A.    He didn't ask me when I was on videotape.

19   Q.    He didn't?

20   A.    No, he didn't.

21   Q.    Have you seen that videotape since June?

22   A.    Yes.  I can tell you Wade Lawson didn't take it.

23   Q.    Anybody else ask you that question on the

24   videotape?

25   A.    As far as I know, I don't recall.

1    Q.   But you remember that someone asked you that

2    question on June 22d?

3    A.   Yes, they did.

4    Q.   But you don't have any idea why they would ask

5    you that question?

6    A.   See if I was under the influence of drugs.

7                MR. SLAVENS:    Objection.

8                THE COURT:    If you know.

9    A.   Yeah, to see if I was under the influence of

10   drugs.

11   BY MR. ARNTZ:

12   Q.   Do you remember telling Lori Campbell that you

13   don't drink alcohol at all?

14   A.   Who's Lori Campbell?

15   Q.   Well, a young lady who came over and interviewed

16   you in the county jail a few weeks ago.

17   A.   Okay.  Yes, I remember her.

18   Q.   Now, do you remember telling her that you don't

19   drink alcohol at all?

20   A.   Yes, I did.

21   Q.   That's what you said to her?

22   A.   Yes.

23   Q.   And was that true or was that a lie?

24   A.   It depends on when I was supposed to be drinking.

25   Q.   Let's talk about all kinds of alcohol.  If you

1  told Lori Campbell you don't drink alcohol at all, would

2  that be a true statement or a false statement?

3     A.    It's true now.

4     Q.    Well, it's true today?

5     A.    Yes, it is.  I stopped drinking back in January

6  of 1992.

7     Q.    What happened in January that made you get on the

8  wagon?

9     A.    New Year's resolution.

10     Q.    You kept that New Year's resolution all the way

11  up to February 1993?

12     A.    Yes, I have.

13     Q.    Didn't drink a drop in 1992, did you?

14     A.    No.

15     Q.    Have pretty strong will power, do you?

16             MR. SLAVENS:     Objection, your Honor.

17             THE COURT:     Sustained.

18  BY MR. ARNTZ:

19     Q.    We talked this morning about whether or not you

20  were an impulsive person.  Do you remember that part?

21     A.    Yes, I do.

22     Q.    Despite the fact of whether or not you were an

23  impulsive or nervous person, you were able to abstain

24  from even a single drop of alcohol throughout the entire

25  calendar year of 1992?

```
 1              MR. SLAVENS:     Objection.  All this has
 2     been asked and answered.
 3              THE COURT:     I will sustain the
 4     objection.
 5   BY MR. ARNTZ:
 6     Q.   Walter, let's go to June 21st of 1992.  And I
 7   think this morning you began by telling the prosecutor
 8   that you were out walking and that was a Sunday
 9   afternoon, wasn't it?
10     A.   I was out walking?
11     Q.   Weren't you out walking on Sunday afternoon, June
12   21st, 1992?
13              MR. SLAVENS:     Objection to that, your
14     Honor.  If he's indicating that's the testimony or if
15     that's the question, I can't follow.
16              THE COURT:     Why don't you ask the
17     question, Mr. Arntz.
18   BY MR. ARNTZ:
19     Q.   Let me ask you this question.  There were some
20   kind of an argument between you and your girlfriend on
21   June 21st, 1992, is that right?
22     A.   Yes, there was.
23     Q.   Who was the girlfriend?
24     A.   Terri Lynn Elofskey.
25     Q.   Okay.  On that day Tony Elofskey's cousin was
```

1    still your girlfriend?

2       A.    Yes, she was.

3       Q.    This is the girl who lives in a half of a double

4    where Tony lives in the other half?

5       A.    Yes.

6       Q.    Now you and she had an argument and she

7    disappeared?

8       A.    Yes.

9       Q.    She took off, am I right?

10      A.    Yes.

11      Q.    And you went to look for her?

12      A.    We went to look for her.

13      Q.    You and who went to look for her?

14      A.    Me and my brother.

15      Q.    Now, why was your brother along?

16      A.    Because him and his old lady had a previously

17   argument the same time and she took off with my old

18   lady.

19      Q.    This wasn't any kind of a plan, was it?

20      A.    No, it wasn't.

21      Q.    And the two of you walking along and you just run

22   into Tony Elofskey?

23      A.    No.  We went there to look for them.

24      Q.    You went deliberately to Tony's house?

25      A.    No.  Next door to Tony's.

1    Q.    Next door.  You didn't even check in Tony's house

2    to see if she was there?

3    A.    No.

4    Q.    How was it that you met Tony several years ago?

5    A.    School.

6    Q.    I'm sorry?

7    A.    School.

8    Q.    You were in school together?

9    A.    No, not school together but I was in school when

10   I met him.

11   Q.    What school is this?

12   A.    I was in Colonel White.

13   Q.    Colonel White, okay.

14        Did you ever find your girlfriend that afternoon?

15   A.    That night, no, I didn't.

16   Q.    Okay.  So you can't turn up your girlfriend and

17   this is when you decide to go out, as you say, cruising

18   around?

19   A.    Yes, we went cruising around.

20   Q.    Okay.  What time is this, do you think, that the

21   three of you go out cruising around?

22   A.    About between 10 and 11 o'clock, 10, 10:30, 11

23   o'clock in the evening.

24   Q.    Tony is driving?

25   A.    Yes.

1    Q.   And what places do you go out cruising around?

2    A.   Just driving around until we stopped over at my

3    brother's dad's house and he said that the girls called.

4              MR. SLAVENS:    Objection, your Honor, to

5    what someone else may have said.

6              THE COURT:    I will sustain the

7    objection at least at this point.  Just tell what you

8    did.

9    A.   Like, I was --

10             MR. ARNTZ:    I can ask a different

11   question.

12             THE COURT:    Okay.

13   BY MR. ARNTZ:

14   Q.   Without saying what he said, I understand you

15   talked to your brother's dad?

16   A.   He talked to his dad.  I was out in the car.

17   Q.   And, again, your brother's dad's is not your dad,

18   is it?

19   A.   No, he's not.

20   Q.   So you're out cruising around, you stopped and

21   you see your brother, talk to your brother's dad.  What

22   is the next thing that happens?

23   A.   He came back to the car and said the girls were

24   over at Tony's, Tony's wife's house.

25   Q.   Okay.  And do I understand that the three of you

1    then drove to Tony's wife's house?

2      A.    Yes, we did.

3      Q.    And what happened there?

4      A.    Nothing.

5      Q.    Did you go inside?

6      A.    No, we didn't.

7      Q.    You just stopped outside the house and then drove

8    off?

9      A.    We stopped outside.  Tony went up to the porch.

10     Q.    Came back to the car?

11     A.    Yeah.

12     Q.    And then what happened?

13     A.    Went to their apartment.

14     Q.    What apartment is this?

15     A.    The one we lived in.

16     Q.    Okay.  Now, at some point a decision is made, as

17   I understand it, that there is going to be a robbery?

18     A.    That was later on down the road.

19     Q.    I'm sorry?

20     A.    That was later on down the road.

21     Q.    Later on down the road?

22     A.    Yes.

23     Q.    So these stops where your brother talks to his

24   dad and Tony goes into a house and comes out, those

25   stops don't have anything to do with preparing for a