1    that time?

2      A.    Yes.

3      Q.    And at some point during the lying, you decide to

4    start telling the truth?

5      A.    That's right.

6      Q.    Now when you first began talking with the

7    detectives there, they were talking to you about what

8    had happened out at Richard Blazer's house, am I right?

9      A.    Yes.

10     Q.    That was the first topic that they were covering

11   with you?

12     A.    Yes.

13     Q.    They weren't talking to you about what had

14   happened to Mark McDonald, had they?

15     A.    That's right.

16     Q.    And of course they're interested in what happened

17   at Blazer's house because they had just chased or some

18   officers had just chased you from Blazer's house to the

19   point where you were captured?

20     A.    That's right.

21     Q.    But at some point while you were being

22   interviewed by the detectives about the Blazer case, the

23   topic shifted and they began to ask you questions about

24   the Mark McDonald's case?

25     A.    No.   They didn't ask me no questions.

1    Q.   Oh, somehow the topic shifted without anyone

2    asking any questions?

3    A.   That's right.

4    Q.   Did the topic of whether or not Blazer was a

5    homosexual come up?

6    A.   No, there wasn't.

7    Q.   And did the topic of whether or not McDonald was

8    a homosexual ever come up?

9    A.   No, there wasn't.

10    Q.   No one ever discussed that at any time?

11    A.   No, there wasn't.

12    Q.   Now your testimony today is something you have

13    prepared simply by thinking back over what has happened

14    during these last eight months, is that right?

15    A.   Of what I know that happened in the day in

16    question.

17    Q.   Okay.  You've met with the detectives back at the

18    time you were arrested?

19    A.   Yes, I did.

20    Q.   And they interviewed you and I guess after you

21    decided to tell them what they wanted to know, you

22    answered all of their questions?

23    A.   Yes, I did.

24    Q.   And you were willing to answer every question

25    they asked?

1      A.    Yes, I did.

2      Q.    And they believed what you were telling them at

3    that time?

4      A.    Yes, they did.

5                  MR. SLAVENS:      Objection to that.

6                  THE COURT:      Sustained as to form.

7    BY MR. ARNTZ:

8      Q.    You really don't know whether they believed you

9    or not, do you?

10     A.    No.

11     Q.    Okay.  And did it occur to any of these

12   detectives to ask you to write out a statement about

13   what you had done?

14     A.    No.

15     Q.    And to this day, eight months later, have you

16   ever written out a statement about what had occurred in

17   the McDonald case or the Blazer case?

18     A.    Not as I know of.

19     Q.    Not as you know of?

20     A.    Right.

21     Q.    You would know whether or not you wrote one out

22   or not?

23     A.    Yes.

24     Q.    As you sit there, do you remember writing one

25   out?

1    A.   Not as I know of.

2    Q.   Well, remember, I asked you about your memory

3  this morning?

4    A.   Yes.

5    Q.   Are you having a memory problem with that

6  question?

7    A.   If I wasn't, it wouldn't be your business.  Like

8  I said, no, as I know of, I cannot remember if I did one

9  or not at the moment.

10   Q.   You might have written out a statement for a law

11  enforcement officer and not be able --

12   A.   Ask law enforcement officer.

13   Q.   -- any law enforcement officer who was

14  investigating the case?

15   A.   Let me think.  No, I didn't.

16   Q.   Now, this plea bargain you entered into, we've

17  already agreed, I think, was something negotiated

18  between you and your attorney and the prosecutor, am I

19  right?

20   A.   Yeah.

21   Q.   Okay.  And I think you also told me you were

22  trying to make the best deal that you could for

23  yourself, am I right?

24   A.   The only deal I could get.

25   Q.   The only deal you could get.

1          And how many charges did you have originally when

2    you were indicted?

3      A.    I think five.

4      Q.    Five.

5          And the most serious charge you were indicted for

6    was aggravated murder, wasn't it?

7      A.    Yes, it was.

8      Q.    And you had two aggravated murder charges, didn't

9    you?

10     A.    Yes, I did.

11     Q.    And that is because you were responsible for the

12   murder of two people, am I right?

13     A.    Yes, I suppose so.

14     Q.    You suppose so?

15     A.    Yes.

16     Q.    Do you have some doubts about that now whether

17   you have any responsibility for the killing of two

18   people?

19     A.    I don't know.  Go ahead.

20     Q.    And these aggravated murder charges carry the,

21   what penalty?

22     A.    Life imprisonment.

23     Q.    Life imprisonment.

24          So each of those two aggravated murder charges

25   carried a life sentence, is that right?

1    A.    Yes, they do.

2    Q.    At one time you believed you were eligible for

3  the death penalty, do you remember that?

4    A.    Yes, I was.

5    Q.    When were you eligible for the death penalty in

6  this case?

7    A.    I think when I was first indicted.

8    Q.    How do you know that?

9    A.    Because it said it on my indictment.

10   Q.    Somewhere on your indictment it said you were

11  being charged with a capital death penalty?

12   A.    No.  It said life or death.

13   Q.    Life or death?

14   A.    So I, I assumed I had the death spec.

15   Q.    So you assumed you had the death spec on you.

16         When did someone clear that up for you?

17   A.    My lawyer came up and, up and said I didn't have

18  the death spec on me.

19   Q.    When did he say that to you?

20   A.    I don't know what day.

21   Q.    Well, do you know what month it was when you

22  first learned you were not eligible for the death

23  penalty?

24   A.    No, I don't.

25   Q.    Can you tell me whether that was this month or

1    last month?

2       A.    No.   It was neither month.

3       Q.    It was one month last year?

4       A.    Yeah.

5       Q.    Was it within a day or two after you had been

6    indicted or was it sometime last November or December?

7       A.    As I said earlier, I don't know what day or what

8    month.

9       Q.    You didn't make a point of remembering when it

10   was that you discovered that your life could not be

11   taken for this offense?

12      A.    Huh?   I didn't hear you.

13      Q.    You just can't remember at all when you were told

14   that?

15      A.    No, I didn't know what day or what month.

16      Q.    Now, the other charges that were brought against

17   you were one count of aggravated robbery for Mark

18   McDonald and is a second count of aggravated robbery for

19   Richard Blazer, am I right?

20      A.    That's right.

21      Q.    And what were the maximum possible penalties that

22   you could have received for committing those two

23   aggravated robberies?

24      A.    I have no idea.

25      Q.    You have no idea?

1          MR. SLAVENS:      Objection, your Honor,

2     that's what the witness' answer is.

3          THE COURT:      That's the answer.  Sustain

4     the objection.

5          MR. ARNTZ:      Okay.

6  BY MR. ARNTZ:

7   Q.   Well, whatever day that was you were talking with

8  your lawyer about whether your life could be ended, that

9  is whether this was a death penalty case, do you

10 remember whether you ever asked him what the penalty was

11 for aggravated robbery?

12  A.   No, I didn't ask him.

13  Q.   You mean all these eight months to this very day

14 you have never asked anyone what the penalty is for

15 aggravated robbery?

16  A.   That's right.

17  Q.   That's right?

18       Were you ever curious as to what might happen to

19 you if you were convicted of these two felonies?

20  A.   Yeah.

21  Q.   You were curious but not curious enough to ask

22 anyone?

23  A.   No.

24  Q.   No.

25       And I guess, likewise, you didn't care really

1  what penalty you might receive for the aggravated

2  burglary charge either?

3      A.   No.

4      Q.   You were completely indifferent to what kind of

5  penalty or punishment you might suffer if you were

6  convicted of these charges?

7      A.   Well, no.  I was more worried about the life, the

8  life sentences than I was those.

9      Q.   Worried about the life sentences.  You were

10  worried you might actually have to serve a life

11  sentence, isn't that it?

12      A.   Yeah.

13      Q.   In fact, you were worried you might actually have

14  to serve two life sentences for what you done?

15      A.   I never thought about that.

16      Q.   Well, Walter, you saw that you were eligible, in

17  fact, you were going to receive two life sentences if

18  you were convicted of two aggravated murders, am I

19  right?

20      A.   I thought I was going to get life, yeah.

21      Q.   Two life sentences?

22      A.   I didn't know that I was going to get two life

23  sentences.

24      Q.   All these eight months that you talked with your

25  lawyer, he never told you you were going to receive two

1  life sentences if you were convicted of two aggravated

2  murders?

3     A.    I don't recall.

4     Q.    You don't recall.

5           Was that important to you whether you served one

6  life sentence or two as a result of being involved in

7  these murders?

8     A.    Repeat the question.

9     Q.    Was it important to you whether you were going to

10  serve one life sentence or two for participating in

11  these murders?

12     A.    Yeah, it was important.

13     Q.    It was important.  But you don't remember whether

14  you ever asked anyone or anyone ever told you that you

15  would actually be given two life sentences if you were

16  convicted of both aggravated murders?

17     A.    Yeah, I guess so.  Yeah, you're right.

18     Q.    You guess somebody did tell you that?

19     A.    Yeah, you're right.

20     Q.    Well, do you remember whether somebody told you

21  that the life sentence in Ohio meant 20 years to life?

22     A.    Yeah.

23     Q.    Did that come back?

24     A.    Twenty years to the parole board.

25     Q.    Twenty years to the parole board.  And then what

1     happens at the parole board?

2        A.    Either you get flopped or you get released.

3        Q.    What was that word you used?

4        A.    Flopped.

5        Q.    What does that word --

6        A.    You either get extra time extended on or you get

7     released.

8        Q.    And each of these aggravated murder charges carry

9     a sentence of 20 years to life?

10       A.    Yes.

11       Q.    Am I right?

12       A.    (No verbal response.)

13       Q.    What happens to you if you get convicted of two

14    aggravated murders?  What happens to the sentence, do

15    you know?

16       A.    What do you mean, what happens to the sentence?

17       Q.    Well, my question is, when do you go to the

18    parole board for the first time if you were convicted of

19    two aggravated murders?

20             MR. SLAVENS:    Objection, your Honor.

21    BY MR. ARNTZ:

22       Q.    If he knows.

23       A.    I don't know.

24    BY MR. ARNTZ:

25       Q.    You don't know?

1              THE COURT:        Well, overrule the

2     objection.   The answer is, he doesn't know.

3              MR. ARNTZ:        All right.

4     BY MR. ARNTZ:

5       Q.   Have you ever asked your lawyer when you might go

6     to the parole board if you were found guilty of two

7     aggravated murders?

8       A.   No, I didn't.

9       Q.   When you took the only deal you could get, which

10    was to plead to two aggravated murders, did you become

11    curious as to what kind of a sentence you might serve

12    for that?

13      A.   Yeah, in a way.

14      Q.   In a way.

15           Well, as you sit there, what kind of

16    incarceration do you expect to serve for having pled

17    guilty to two aggravated murders?

18      A.   Two life sentences.

19      Q.   And when do you expect to see the parole board

20    for the first time?

21      A.   Whenever I see them.

22              MR. SLAVENS:        Objection, your Honor.   He

23    said he doesn't know.

24              THE COURT:        Sustained.

25

1    BY MR. ARNTZ:

2    Q.    Well, when you pled guilty to two aggravated

3    murders in this courtroom a couple weeks ago, was there

4    anything said at the time about whether these two life

5    sentences would run together at the same time or whether

6    they would run one after the other?

7    A.    No.

8    Q.    Did anyone use the words concurrent or

9    consecutive in describing what kind of life sentences

10    you might receive?

11    A.    No, there wasn't.

12    Q.    And in your discussions with your lawyer these

13    eight months, he has never talked to you about whether

14    you could be made to serve the first 20 years to the

15    board and then a second 20 years to the board before you

16    are eligible for release?

17    A.    No, he never mentioned nothing about that.

18    Q.    When you decided to take this deal, did you not

19    have -- strike that.

20        Did you have any interest in seeing that these

21    two life sentences would be run together?

22    A.    Did I have any interest?

23    Q.    Yes, sir.

24    A.    Yes, I did have interest hoping that they would

25    be.

1    Q.    When we say run together, we mean no more than 20

2    years to the parole board, is that correct?

3    A.    Yes.

4    Q.    Because if those two sentences are not run

5    together, the way you want them run together, you might

6    wait 40 years to go to the parole board, is that right?

7               MR. SLAVENS:      Objection, your Honor.    He

8      said he didn't know.

9               THE COURT:      That's a different

10    question.    Overruled.

11    A.    What are you trying to say?    Repeat the question.

12    BY MR. ARNTZ:

13    Q.    You said you were interested in having these two

14    life sentences, 20 years to life, run together?

15    A.    Yes, I was.

16    Q.    So that you could go to the parole board in 20

17    years or so if you could.    Do you remember that?

18    A.    Yes.

19    Q.    Now, do you remember that you were also

20    interested in not having those sentences run one after

21    the other because you would wait a lot longer to go to

22    the parole board?

23    A.    That's right.

24    Q.    In fact, you could wait an extra 20 years to go

25    to the parole board, couldn't you?

1    A.    Yes.

2    Q.    And that would be a total of 40 years you would

3    have to wait to go to the parole board?

4    A.    Yes.

5    Q.    All right.  And how old are you now?

6    A.    Twenty-two.

7    Q.    Twenty-two.  And if you waited 40 years to go to

8    the parole board, how old would you be?

9    A.    Sixty-two.

10   Q.    And that would be most of your life, wouldn't

11   it --

12   A.    Yes.

13   Q.    -- to spend in prison?

14   A.    Yes.

15   Q.    And you thought that by pleading guilty to two

16   aggravated murders you had a better chance of having the

17   two life sentences run together, didn't you?

18   A.    It's better than going to prison on all the

19   charges and run separately 'cause then I will never get

20   out.

21   Q.    My question, Walt, was whether you thought at the

22   time you entered a guilty plea to two aggravated murders

23   you thought you had a better chance of having the two

24   life sentences run together at the same time?

25   A.    I was hoping that I would get the chance of

1   having them run together.

2      Q.   You were hoping to do, only do 20 years to the

3   parole board, that's why you took this deal?

4      A.   No.   I took the deal because I understand that

5   either I was going to do 20 to the board or the other,

6   you know, both of them, 40, 20 to 40 or however long it

7   took.

8      Q.   But you thought you might serve less time by

9   taking this plea bargain?

10                MR. SLAVENS:      Objection, your Honor.

11                THE COURT:      Overruled.

12   BY MR. ARNTZ:

13      Q.   Am I right?

14      A.   Repeat the question.

15      Q.   You thought you would serve less time in prison

16   if you took this plea bargain?

17      A.   No, it wasn't thinking, I was hoping.

18      Q.   You were hoping?

19      A.   Yes.

20      Q.   Well, what did the prosecutor do for you when you

21   agreed to plead guilty to two aggravated murders?

22      A.   What do you mean?

23      Q.   Well, you know what a bargain is, don't you?

24      A.   Yes, I do.

25      Q.   That's where each person gives the other person

1    something?

2      A.    Yes.

3      Q.    And you gave the prosecutor a plea of guilty to

4    two aggravated murders?

5      A.    Yes.

6      Q.    So in this plea bargain, what did he give you?

7      A.    He dropped the other charges.

8      Q.    He dismissed the aggravated robbery charge?

9      A.    Yes.

10     Q.    And he dismissed the second aggravated robbery

11   charge?

12     A.    Yes.

13     Q.    And he dismissed the aggravated burglary charge?

14     A.    Yes, he did.

15     Q.    And you weren't told that those could carry 10 to

16   25 years each?

17     A.    I had an idea of what they might have carried but

18   I wasn't for sure.

19     Q.    Well, you had an idea it was in the range of 10

20   to 25 years for each one of these felonies, didn't you?

21     A.    Between to five to ten.

22     Q.    Five to ten.

23           You already told me that you had been reading the

24   Ohio Revised Code to learn about the law.  Do you

25   remember that?

1    A.    About life sentences on aggravated murder.

2    Q.    You were aware this range of numbers 5, 6, 7, 8,

3    9, or 10 were the minimum numbers you could receive for

4    aggravated robbery, am I right?

5    A.    Yes.

6    Q.    You were also aware you could serve a maximum of

7    25 years for each aggravated robbery and the aggravated

8    burglary?

9    A.    I didn't know about the burglary.

10   Q.    I'm sorry?

11   A.    I didn't know about the burglary.

12   Q.    You didn't know what the maximum was on the

13   burglary?

14   A.    I didn't know what the penalty was period for

15   burglary.

16   Q.    All right.  But you knew that the aggravated

17   robberies could cause you to be incarcerated for as much

18   as 25 years on each one of those, didn't you?

19   A.    Yes, I did.

20              MR. SLAVENS:    Objection, your Honor.

21              THE COURT:    Overruled.

22   BY MR. ARNTZ:

23   Q.    What did you say?

24   A.    Yes, I did.

25   Q.    You knew that?

1  A. I knew the maximum.

2  Q. You knew the maximum was 25 years?

3  A. Yes.

4  Q. All right.  And if you were convicted of two

5 aggravated murders and aggravated robbery of Blazer and

6 McDonald, and of the aggravated burglary, did you ever

7 add up how much time you might serve for all of that?

8  A. I would never get out.

9  Q. I'm sorry?

10  A. I would never get out.

11  Q. Walt, my question, did you ever add up how much

12 time you might serve for that?

13  A. No, I had not.

14  Q. You would die in prison, wouldn't you?

15  A. Probably.

16  Q. You knew that, that's why you took this deal, am

17 I right?

18  A. No.

19  Q. You didn't care whether you died in prison or

20 not?

21  A. Yeah, everybody cares.

22  Q. Well, in addition to giving the prosecutor a plea

23 to two aggravated murders, you also gave him something

24 else, didn't you?

25  A. Like what?

1    Q.    Well, I'm asking you if you remember promising to

2    do anything else for him?

3    A.    I didn't promise nothing.  I said I would

4    testify.

5    Q.    Well, you promised you would testify, didn't you?

6    A.    I said I would testify.

7    Q.    In fact, if you weren't here today testifying,

8    this deal would be torn up and thrown away, wouldn't it?

9    A.    I have no idea.

10    Q.    Huh?

11    A.    I don't have no idea.

12    Q.    Didn't you sign a piece of paper saying this deal

13    would be torn up and thrown away if you don't come in

14    here and testified against your brother?

15    A.    It didn't say that I had to.

16    Q.    Well, you promised and agreed to, didn't you?

17    A.    But it didn't say I had to.

18    Q.    Well, what did you think would happen to you if

19    you said you would testify against your brother in this

20    trial and then went back on your word?

21    A.    I don't know.

22    Q.    You thought you could back out at any time and

23    the laugh would be on the prosecutor?

24    A.    No.

25    Q.    You're telling us that your lawyer never told you

1  that the deal was off if you didn't come in here and

2  testify against your brother?

3     A.    He didn't tell me but I thought that was the way

4  it was.

5     Q.    You knew that the deal was off if you didn't come

6  in here and testify against your brother, isn't that the

7  truth?

8     A.    Yeah.

9     Q.    All right.  In fact, the deal required you to

10  cooperate with the prosecutor in every way, didn't it?

11     A.    What do you mean?

12     Q.    Well, do you remember the words cooperation being

13  used when you signed that piece of paper agreeing to

14  take this deal?

15     A.    Yes.

16     Q.    What did the word cooperation mean to you?

17     A.    Cooperate.

18     Q.    Do whatever he asked, isn't that right?

19     A.    I suppose so, yes.

20     Q.    If you do whatever the prosecutor asks and

21  testify against your brother, your chances of getting

22  that life sentence run together with the other life

23  sentence improves?

24     A.    I have no idea if it does or not.

25     Q.    Oh, you think, you think that whether or not you

1    testify here today and cooperate isn't going to have any

2    effect at all on whether you receive one or two life

3    sentences?

4       A.    I said I haven't been promised nothing.

5       Q.    You haven't been promised nothing.  But, in fact,

6    your lawyer has talked to you about whether your chances

7    improve for one life sentence if you do everything?

8       A.    He didn't say anything about improving.

9       Q.    But you think it will improve?

10      A.    I don't have no idea if it will or not.

11      Q.    You have no idea.

12            Do you remember telling Mrs. Kuehnl that you

13   wanted to be a prosecutor yourself?

14      A.    I wanted to be a lawyer or a prosecutor, yes, I

15   did.

16      Q.    Do you remember telling Mrs. Kuehnl that you

17   thought the job of a prosecutor was to hang people?

18      A.    No.  To help people.

19      Q.    To help people.

20            And you're the kind of person who helps people?

21            MR. SLAVENS:    Objection, your Honor.

22      It's argumentative.

23            THE COURT:    Sustained.

24            MR. ARNTZ:    May I have just a moment?

25            THE COURT:    You may.

1          MR. ARNTZ:        Thank you.

2                             Okay, Walter, that's all I

3     have of you.  Thank you.

4          THE COURT:        Thank you.

5                             Redirect examination, Mr.

6     Slavens.

7          MR. SLAVENS:      I have just a couple of

8     questions.  It won't take too long.

9                   REDIRECT EXAMINATION

10    BY MR. SLAVENS:

11    Q.    And you were asked a question as to some

12    photographs about the automobile?

13    A.    Yes, I was.

14    Q.    And I think you were looking at photograph

15    exhibit number 64 and see if I'm wrong.  Let me show you

16    66 and 64.  I'm going to ask you, are these the

17    photographs that were shown to you, I don't know when,

18    this morning maybe, by attorney Arntz?

19    A.    Yes, they were.

20    Q.    These are two that he used?

21    A.    Yes.

22    Q.    Now, do you know where that car was when that

23    photograph was taken?  Can you tell, tell from that

24    photograph where the car is?

25    A.    No, I don't.

1    Q.   You don't know if this is a photograph of the car

2  over at McOwen Street or someplace after it's been with

3  the police for some days?

4    A.   I have no idea.

5    Q.   Now you indicated as to how you were, I think the

6  word was, ducked down in the back seat and I explained

7  that to you?

8    A.   Yes, I did.

9    Q.   When you were down in the back seat, where was

10  Weston Lee Howe?

11    A.   Ducked, he was crunched down on the front

12  floorboard on the passenger side.

13    Q.   How was he situated when Mr., when the guy we

14  call McDonald in the field came up to that car?

15    A.   I can't recall.  I didn't see him.

16    Q.   When you go into Mr. Blazer's house?

17    A.   Yes.

18    Q.   After you pulled out your gun, what does

19  Mr. Blazer, what does he do?

20    A.   He stood there for a few minutes then he said,

21  what is this?  Then he started screaming at Tony.

22    Q.   When you say screaming, do you mean screaming?

23    A.   Yelling.

24    Q.   What does Tony do?

25    A.   He says a few things back to him and starts to

1    turn around.

2      Q.    What does Mr. Blazer do?

3      A.    Follow him.

4      Q.    Now, when is it in this process that you fired

5    the gun?

6      A.    After Tony turned around.

7      Q.    You fired the gun and then Mr. Blazer still

8    leaves out the door?

9      A.    Yes.

10     Q.    When you were at the police station.

11     A.    Yes.

12     Q.    And you indicated you met Detective Lawson and a

13   Detective Spells?

14     A.    Yes, I did.

15     Q.    And they didn't lie to you, did they?

16     A.    No, they didn't.

17     Q.    They didn't trick you?

18     A.    No.

19     Q.    You tried to lie to them for a short time or

20   sometime?

21     A.    Yes, I did.

22     Q.    Then you told us what you told us today?

23     A.    Yes, I did.

24     Q.    Then you told them.

25            There is a lot of questions about the videotape.

1    And there is one question about whether or not you wrote

2    out anything to those detectives.

3      A.    Yes.

4      Q.    Rather than writing out something to those

5    detectives, you sat down with them, they put a camera on

6    you and they videotaped the interview of you, didn't

7    they?

8      A.    Yes, they did.

9      Q.    And as part of the agreement called, call it a

10   bargain or whatever the defense counsel wants to call

11   it, you pled guilty to two counts of aggravated murder

12   each carrying a life penalty, didn't you?

13     A.    Yes, I did.

14     Q.    And as part of that agreement was for you to come

15   in court and to testify truthfully, wasn't it?

16     A.    Yes, it was.

17               MR. SLAVENS:    Thank you.  That's all I

18     have.

19               THE COURT:    Recross.

20               RECROSS-EXAMINATION

21   BY MR. ARNTZ:

22     Q.    Walter, what would happen if you came into this

23   courtroom and said now that your brother did not shoot

24   these two people?

25               MR. SLAVENS:    Objection, your Honor.

```
1              THE COURT:        Sustained.
2  BY MR. ARNTZ:
3    Q.   Walter, part of the agreement is that you testify
4  consistently with what you last told the detectives,
5  isn't that true?
6              MR. SLAVENS:       Objection, your Honor.
7              THE COURT:        Overruled.  You can answer
8    that.
9    A.   What is consistently mean?
10 BY MR. ARNTZ:
11   Q.   Well, the question is, you last told the
12 detectives that your brother killed both of these
13 people, didn't you?
14   A.   Yes, I did.
15   Q.   And part of the understanding here is that you
16 come into this courtroom and tell a jury that your
17 brother killed those people, isn't that true?
18   A.   Tell them the truth.
19   Q.   Well, and part of the agreement is that you tell
20 them that your brother did this, isn't that true?
21   A.   Tell them the truth.
22              MR. ARNTZ:        May I ask the Court to
23   direct the witness to answer the question?
24              THE COURT:        Well, there is a problem
25   with the way it's worded.
```

1                        Do you understand the

2     question?

3     A.    Yes, I do.

4              THE COURT:      Mr. Polson, do you want to

5     explain your answer?

6     A.    The truth of what happened that night was that my

7     brother did shoot both of them men.

8     BY MR. ARNTZ:

9     Q.    And your brother wanted them dead for some

10    reason?

11    A.    I don't know what he wanted.

12    Q.    He didn't have any reason to want them dead?

13    A.    I don't know.  I ain't in his mind.

14    Q.    Tony was the one who wanted money, isn't it?

15    A.    We all wanted money.

16              MR. SLAVENS:      We are arguing and going

17    beyond the scope.

18              THE COURT:      This is beyond the scope,

19    Mr. Arntz.  Sustain the objection.

20    BY MR. ARNTZ:

21    Q.    And when you left Richard Blazer, you thought

22    that he was dead?

23    A.    I didn't have no idea if he was or not.

24    Q.    No idea.

25              He was laying there in front of his house and he

1    wasn't moving, was he?

2              MR. SLAVENS:     Objection, your Honor.

3              THE COURT:     If he knows.  Overruled.

4    A.   He was laying there but I don't know if he was

5    dead or not.

6              MR. ARNTZ:     Thank you.  That's all.

7              MR. SLAVENS:     That's all I have.

8              THE COURT:     All right.  Before the

9    witness is excused, why don't I go ahead and excuse

10   the jury for the weekend.

11                        Let me see counsel as to

12   what time we want to start on Monday.  That's the only

13   thing we are going to be talking about.  We are done

14   for the day other than what time we are going to start

15   Monday morning.

16              (WHEREUPON, a side-bar conference was held

17   off the record.)

18              THE COURT:     Ladies and gentlemen of the

19   jury, we will go ahead and take our evening recess

20   now, which obviously involves the entire weekend of

21   Saturday and Sunday.  And we'll reconvene Monday

22   morning at 9 o'clock.  Now the weather forecast is

23   supposed to be good, so hopefully we won't have any

24   problems Monday but keep an eye on the weather.  As we

25   know, anybody lives in Dayton, Ohio, for more than a

1    couple of days, things can change in a hurry.  We will

2    reconvene.  I assure you we will start promptly at 9

3    o'clock, all right.

4                        Now, it is the weekend.

5    There will be media coverage of the case over the

6    weekend.  I'm just going to simply tell you that

7    straight up.  Stay away from it, no newspaper, no

8    radio or television.  We know the cameras were here

9    this morning.  Keep away from all three channels.  You

10   never know when something is going to pop up in a

11   promotion in the middle of a TV show.  I'm not telling

12   you not to watch television.  I'm simply telling you

13   to stay away from any news coverage because, as you

14   all know, they weren't even here in the afternoon.

15   And that's exactly one of the reasons, among many

16   others, why you're instructed not to view any news

17   media coverage.  You're hearing all the facts as

18   they're presented in the courtroom.  You're hearing

19   them all, not just part of it.

20                        Now, again, remember the

21   usual instruction from the Court not to discuss the

22   case among yourselves or with anybody else.  Don't

23   form any opinions.

24                        I think that it's safe to

25   tell you that we'll get into Tuesday.  I'm trying to

1    give you as much advance notice as possible at this

2    point.   We are not that far behind however, but I

3    wanted you to know now it's a safe assumption we'll be

4    in session on Tuesday.

5                         The only other instruction

6    is have a nice, safe weekend.   See you Monday morning.

7

8                (WHEREUPON, the proceedings were then

9    concluded for February 26, 1993, at the hour of 4:23

10    p.m.)

11                         *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (March 1, 1993 - Morning Session)

2                              IN CHAMBERS

3                    THE COURT:        Let the record reflect we

4        are in chambers and Mr. Elofskey will be brought in.

5                                      Does Mr. Howe specifically

6        again waive his right to be present for this brief

7        caution of the witness?

8                    MR. ARNTZ:        Yes, we would.

9                    THE COURT:        Present are all counsel.

10                                     Good morning, Mr. Elofskey.

11                                     Mr. Elofskey, the only

12       reason you're brought in -- we did this with

13       Mr. Polson also -- obviously, you're going to be

14       testifying under oath.

15                   MR. ELOFSKEY:     Right.

16                   THE COURT:        You simply tell the truth

17       according to the oath.  I want to caution you simply

18       not to mention a few things such as racism.  We are

19       talking about Mr. Howe.  Anything as it relates to his

20       philosophies of racism, Nazism, his interest in the

21       white supremacy, keep away from the fact that you know

22       that he's on parole.  In other words, just don't

23       discuss things that aren't related to the case itself.

24                   MR. ELOFSKEY:     Okay.

25                   THE COURT:        Just answer the questions

1     the lawyers ask you.

2                         There is another area here,

3     the tattoos.  You obviously got a tattoo.  We all know

4     that Mr. Howe has got some tattoos also.  Keep away

5     from things that aren't connected with the case.

6               MR. ELOFSKEY:    Okay.

7               THE COURT:       All right.  Anything from

8     counsel?

9               MR. SLAVENS:     No.  I think the caution

10    was in regards to the fact that Mr. Howe's previously

11    been convicted.

12              THE COURT:       Right.

13              MR. SLAVENS:     Was in prison and on

14    parole.

15              THE COURT:       Keep away from any

16    reference to that while you're testifying.  Do you

17    understand?

18              MR. ELOFSKEY:    Yeah.

19              THE COURT:       Fair enough?

20              MR. ELOFSKEY:    Also, is my two attorneys

21    here?

22              THE COURT:       I do not know.  Did you

23    want them here?

24              MR. ELOFSKEY:    Rudy Wehner, I told him I

25    didn't want the camera in the courtroom.

```
1              MR. SLAVENS:    That's been -- I told that
2         to the camera people.  I don't think they're even
3         here.  I haven't heard.  I think they left.
4              THE COURT:      That was the same thing.
5              MR. SLAVENS:    Take a quick look.
6              (WHEREUPON, Mr. Dundes left the room.)
7              THE COURT:      I advised them not to film
8         the witness because that's your right.  You do not
9         have to be filmed.  They are permitted to take audio,
10        that's the voice, but not the camera.
11             MR. ELOFSKEY:   Right.
12             MR. DUNDES:     They're not in there.
13             THE COURT:      They're not in there.
14        Don't worry about it.
15                             We will proceed.  Why
16        don't you put him on the witness stand and we'll go
17        from there.
18
19             (WHEREUPON, in-chambers proceedings were
20        then concluded.)
21
22
23
24
25
```

1                    IN OPEN COURT - BEFORE THE JURY

2                                        9:26 a.m.

3                    THE COURT:        Good morning, ladies and

4        gentlemen of the jury.

5                    THE JURY:        Good morning.

6                    THE COURT:        I see everybody made it

7        safely.  I hope everybody had a nice weekend.

8                                        Would you swear the witness

9        in first.

10

11                    TONY DWAYNE ELOFSKEY, having been first duly

12                    sworn according to law, was examined and

13                    testified as follows:

14                    DIRECT EXAMINATION

15    BY MR. SLAVENS:

16      Q.   Will you tell us your name, please?

17      A.   Tony Dwayne Elofskey.

18      Q.   You're going to have to speak a little louder so

19    we can hear you.

20      A.   Tony Dwayne Elofskey.

21      Q.   How old are you?

22      A.   Twenty-one.

23      Q.   Did you grow up in Dayton, Ohio, area?

24      A.   Yes, I did.

25      Q.   Did you go to high school in the Dayton, Ohio,

1    area?

2       A.    Most of it.

3       Q.    And to what high school did you go to in Dayton,

4    Ohio, area?

5       A.    Last one was Stivers.

6       Q.    And what grade did you get to at Stivers?

7       A.    Last school I attended to was Tecumseh, New

8    Carlisle.  I made it to tenth grade.

9       Q.    Are you familiar with the person by the name of

10   Walter Polson and another person by the name of Weston

11   Lee Howe?

12      A.    Yes, I am.

13      Q.    And concerning Mr. Walter Polson, do you recall

14   approximately when it was that you first met him?

15      A.    Back around '88 or '89.

16      Q.    And the person you know as Weston Lee Howe, when

17   did you ever first see or hear or get to know of him?

18      A.    Well, recently mainly.

19      Q.    Did you ever run around with Mr. Howe, Weston Lee

20   Howe?

21      A.    Recently.  Right before this case started.

22      Q.    When you say before the case started --

23      A.    Before I caught the case.

24      Q.    Let me be more specific.  In regards to June 22d,

25   1992, before that date, did you ever run around with Mr.

1    Howe?

2      A.    No.

3      Q.    I would like to ask you some questions about that

4    particular date and the days around that, the day before

5    and a couple days after.

6            Specifically, I would like to direct your

7    attention to the date of Sunday, June 21st, 1992, and

8    ask if you recall sometime during that evening being

9    contacted or meeting up with Mr. Polson and Weston Lee

10   Howe?

11     A.    Yes, I do.

12     Q.    And where did that occur?  How did that occur?

13     A.    It happened on the side of June Street, which is

14   up off of east end of Dayton.  And they asked me to go

15   look for their girlfriends.

16     Q.    And you say off of east --

17     A.    Off East Fifth Street.

18     Q.    What is at June and Fifth Street?

19     A.    My cousin's house.

20     Q.    And had you been staying there?

21     A.    Yes, I have.

22     Q.    When you make reference to Weston Lee Howe, do

23   you see the person who you were referring to as Weston

24   Lee Howe present today in this courtroom?

25     A.    Yes, I do.

1     Q.   And for the record today, where is he located?

2     A.   Sitting over there at the table with the white

3  shirt on, gray tie.

4             MR. SLAVENS:    Let the record reflect the

5  witness has indicated the defendant, your Honor.

6             THE COURT:    It will so indicate.

7  BY MR. SLAVENS:

8     Q.   Approximately what time was it that this occurred

9  that you met up with Mr. Weston Lee Howe and Walter

10  Polson?

11     A.   It was late.

12     Q.   What were you doing?

13     A.   I was going home.

14     Q.   And do you recall what you were specifically

15  doing when they came up to you?

16     A.   Putting my kicker boxes in the trunk of my car.

17     Q.   When you say kicker boxes, what do you mean?

18     A.   Stereo speakers.

19     Q.   How were you doing that and why were you doing

20  that?

21     A.   Keeping them from getting stolen.

22     Q.   And how do you do that?

23     A.   Just unplug them and stick them in the trunk.

24     Q.   And where was your car at that time when this

25  occurred?

1    A.    At the corner of June Street.

2    Q.    Oh, okay.  And so you were asked to go look for

3    the girlfriends?

4    A.    Yes.

5    Q.    Do you know their names of the girlfriends?

6    A.    Angie Bazer and Terri Lynn Elofskey.

7    Q.    And Terri Lynn, is she related to you?

8    A.    She's my cousin.

9    Q.    So what happened?

10    A.    We went looking for them and didn't find them.

11    Q.    And what do you all do then after you don't find

12    the ladies?

13    A.    I took them two to their house, which is on

14    Valley Street, where they found their girlfriends at.

15    Q.    And about what time was that?

16    A.    In the early morning hours, probably around one

17    or two.

18    Q.    Then what happened after that?

19    A.    I went home.

20    Q.    And I would like to direct your attention to a

21    time over on, you were with those individuals and talked

22    about, Monument and Findlay, do you recall that?

23    A.    Yes, I do.

24    Q.    I want to ask you some questions about what

25    occurred over there at that location.  I want you to

1    tell us what happened.

2        A.    We pulled up in the parking lot.    There was, I

3    didn't know the guy's name at that time, now, I now know

4    it as Mark McDonald.    We were going to rob him.

5        Q.    Where did you first meet up with this guy who you

6    referred to as Mark McDonald?

7        A.    DeWeese Parkway.    Not DeWeese Parkway, Deeds

8    Parkway.

9        Q.    Where is that?

10        A.    It's in between Webster and Helena.

11        Q.    Tell us how you first met up with Mr. McDonald.

12        A.    We were over in the queer park, levee, whatever

13    you want to call it.    We were over there looking for a

14    fag to rob.

15        Q.    And who was with you at that time?

16        A.    Weston Lee Howe and Walter Polson.

17        Q.    And when you met up with Mr. McDonald, did you

18    have any conversation with him when you first met up

19    with him?

20        A.    Briefly.

21        Q.    How did that occur?

22        A.    What do you mean?

23        Q.    Well, how do you talk to or have a conversation

24    with Mr. McDonald briefly over at by the levee?

25        A.    Just talk about normal things.