1    A.    Right.

2    Q.    And if I said you were in that house for five

3    minutes before there was trouble, would that be true or

4    false?

5    A.    False.

6    Q.    And what was it that caused Walter to take the

7    gun out of his pants?

8    A.    That was part of the deal.

9    Q.    So without any warning, he took the gun out of

10   his pants?

11   A.    Right.

12   Q.    And what did Walter say when he took the gun out

13   of his pants?

14   A.    Said, this is, this is a robbery.

15   Q.    This is a robbery?

16   A.    Right.  We want your money.  Something of that

17   nature.

18   Q.    Now, when you spoke to Detective Wade Lawson on

19   the videotaped interview, did you tell him the story

20   that Walter took the gun out of his pants and said, this

21   is a robbery?

22   A.    I'm not sure what I, exactly I said but, yeah, I

23   told him he pulled it out of his pants.

24   Q.    What was the very next thing that happened after

25   Walter took the gun out of his pants and said, this is a

1    robbery?

2       A.    Blazer said get out of my house three or four

3    times.

4       Q.    Well, did you ever tell the story to Detective

5    Wade Lawson that Walter said, don't move?

6       A.    I don't recall whether I did or didn't.

7       Q.    That could be yes or a no?

8       A.    Right.

9       Q.    And after Walter said this is a robbery and

10   Blazer said get out of my house, what is the very next

11   thing that happened?

12      A.    I opened up the double door or the big metal or

13   wooden door, whatever it is, I opened up the screen door

14   and I went out.

15      Q.    Did you have to unlock that door, either one of

16   them to get out?

17      A.    It was already unlocked.

18      Q.    Do you remember telling Detective Wade Lawson in

19   your videotaped interview that you unlocked the door to

20   get out?

21      A.    I don't remember.

22      Q.    Is it possible that you could have said that?

23               MR. SLAVENS:    Objection, your Honor.

24               THE COURT:    Sustained.

25

```
1    BY MR. ARNTZ:

2       Q.   So that could be a yes or no, either you did say

3    or you didn't?

4       A.   Right.

5                     MR. SLAVENS:      Objection to that too.

6                     THE COURT:      Overruled.

7    BY MR. ARNTZ:

8       Q.   And you went to the door for what reason?

9       A.   To leave the house and let Weston in.  My job was

10   to go start the car.

11      Q.   Well, now, wouldn't this be the time to duct tape

12   Blazer before you left the house and left Walter alone

13   with him?

14      A.   When I went out the house, Howe was supposed to

15   come into the house.  I'm supposed to go start the car.

16   I'm the get away man.

17      Q.   And the duct tape is still out in the car

18   somewhere?

19      A.   As far as -- I don't remember.  It might have

20   been in the car.  It might have been in -- Walt may have

21   had it.  I don't know.

22      Q.   So you turned, you're saying that you turn and

23   you leave the house with Walt in there with Richard, is

24   that it?

25      A.   Right.
```

1    Q.    And what are you doing?  What are you doing?

2    A.    I'm going to the car.

3    Q.    And you're running there?

4    A.    Kind of like a jog, quick walk.

5    Q.    Quick walk.

6          And Richard is running right behind you, isn't

7    he?

8    A.    No, he's not.

9    Q.    What's he doing?

10   A.    As far as I know he was still in the house when I

11   went out the house.

12   Q.    Well, at some point you did see Richard again,

13   didn't you, because you turned around?

14   A.    When I got to the other side of my car, open up

15   the driver door to get in, Blazer was coming out of the

16   house.

17   Q.    You remember that there is a front step there

18   outside the front door of that house?

19   A.    I don't think so but there might have been.

20   Q.    You don't know one way or the other?

21   A.    Right.

22   Q.    Do you remember whether or not there was a

23   sidewalk that runs from the front door of that house out

24   to the driveway?

25   A.    Yes, there is.

1    Q.    And you ran at least a couple of steps on that

2    sidewalk, didn't you, when you ran out of the house?

3    A.    Yes, I did.

4    Q.    And then you stepped on the grass on your way to

5    the car?

6    A.    I don't think so but I might have.

7    Q.    You don't remember whether you were on the grass

8    in the front yard on the way to the car or not?

9    A.    I don't think I even had to step into the grass.

10    Q.    So far as you know, you ran entirely on the

11    sidewalk to the car?

12    A.    As far as I know.

13    Q.    Where was the car?

14    A.    In the driveway.

15    Q.    Where in the driveway?

16    A.    All the way up against the house.

17    Q.    Touching the front garage door?

18    A.    Pretty much, about two or three feet away from

19    it.

20    Q.    Two or three feet back from the garage door?

21    A.    Right.  The bushes were blocking the car.  You

22    couldn't see the car.

23    Q.    Well, as I understand it, someone told Weston to

24    hide down in the back seat when you guys arrived there

25    at Tennyson, isn't that the way it was?

```
1                MR. SLAVENS:      Objection, your Honor.
2        That's not the testimony.
3                THE COURT:        I will sustain the
4        objection.
5                MR. ARNTZ:        I will withdraw it.
6    BY MR. ARNTZ:
7        Q.    Wasn't there a time there that Weston was
8    supposed to hide down in your back seat?
9        A.    I don't remember.
10       Q.    You don't remember that part at all?
11       A.    I don't remember.  All I know is that Blazer
12   would have thought it was kind of funny if three guys
13   pulled up and he was expecting two.
14       Q.    If you pulled that car up close enough to the
15   garage that the bushes blocked a view of that car from
16   inside Blazer's house, then Howe wouldn't have to hide
17   in the back seat, would he?
18       A.    There's a window there on the side of his house.
19   All you have to do is look out, he could see the whole
20   car.
21       Q.    Well, you're running out the front door now and
22   you don't know where Richard Blazer is, but at sometime
23   you see him again, don't you?
24       A.    Yes, I do.
25       Q.    And you turn around to see him, don't you?
```

1    A.    Right.

2    Q.    And where did you see him when you turned around?

3    A.    In the front by the house.

4    Q.    Can you be more specific?

5    A.    Coming out the front door.

6    Q.    I'm sorry?

7    A.    Coming out the front door.

8    Q.    Where were you standing when you say you saw

9    Richard coming out the front door?

10    A.    Opening up the driver door of my car.

11    Q.    All the way on the other side of the car?

12    A.    Yes.

13    Q.    And Richard was facing what direction?

14    A.    Toward the street.

15    Q.    Toward the street.

16         When you came out of Richard's front door, didn't

17    you see Weston?

18    A.    Yes, I did.

19    Q.    You saw his face down there?

20    A.    Huh?

21    Q.    You saw him down on one knee?

22    A.    Right.

23    Q.    You saw his face?

24    A.    Yep.

25    Q.    And you ran past him?

1    A.   Right.

2    Q.   And when you saw him down on one knee, where was

3  he?

4    A.   Where was he?  He was in, he was in the grass.

5    Q.   Now, you said Walter's condition at this time was

6  perfectly straight and sober as far as you know, is that

7  right?

8    A.   As far as I know.

9    Q.   Now, you know Walter does drink or take drugs?

10          MR. SLAVENS:    Objection, your Honor.

11          THE COURT:    Overruled.  If you know.

12    A.   I know he has a tendency to do drugs every once

13  in awhile.

14  BY MR. ARNTZ:

15    Q.   What kind of drugs does he have a tendency as far

16  as --

17    A.   As far as I know, marijuana and drinking.

18    Q.   Drinking what?

19    A.   Beer, wine coolers, alcohol.

20    Q.   But you don't know one way or the other whether

21  he had any of those things before you guys went to

22  Richard's house that day, do you?

23    A.   Like I say, I wasn't with him.

24    Q.   Now that front lawn, that front yard outside

25  Blazer's house slopes down from the house to the street,

1    doesn't it?

2       A.    Yes, it does.

3       Q.    You would know that because you been there

4    before?

5       A.    Right.  It's all sitting on the hill, so you know

6    that anyways.

7       Q.    And when you turned around and saw Blazer, where

8    was he standing?

9       A.    He was coming out the door.

10      Q.    Was he in the doorway?

11      A.    He just came out the door.

12      Q.    He was outside the doorway?

13      A.    Right.

14      Q.    Was he on the front step?

15      A.    Yes, step or concrete, whatever you want to call

16   it.  The sidewalk coming out to the driveway.

17      Q.    You say you saw Weston the same time you saw

18   Richard coming out of his house?

19      A.    Yes, I did.

20      Q.    And this is when you say Weston fired at him?

21      A.    Right.

22      Q.    From that position he had down on one knee?

23      A.    Yes.

24      Q.    Right.

25            And how close was Weston to Blazer when you say

1    you saw him firing?

2        A.    Not very far away.

3        Q.    Pretty close up?

4        A.    Yeah, pointblank range.

5        Q.    Pointblank range, is that what you said?

6        A.    Yeah.

7        Q.    Just like he was pretty close up when you say he

8    shot McDonald through your car window earlier?

9        A.    Right.

10       Q.    Pointblank range again?

11       A.    Right.

12       Q.    And when, during all this, did Walter fire his

13   gun?

14       A.    Inside the house.

15       Q.    How many times did Walter fire his gun?

16       A.    Numerous times?  I didn't count them.

17       Q.    Well, are we talking about twice or three or four

18   or five times?

19       A.    I said I didn't count.  I didn't pay attention.

20   But the gun was fired inside the house.

21       Q.    Did he empty his clip?

22       A.    At the time I didn't know.

23       Q.    Did Weston empty his clip when you say you saw

24   him outside the house shooting?

25       A.    At that time I didn't know either.  I didn't pull

1    the clip out of the gun and check it.

2       Q.    And if you were already on the other side of your

3    Mazda when you say you saw Richard coming out of his

4    house, then by the time he was shot, you were already

5    inside your car, is that what you're saying?

6       A.    I was getting inside the car.

7       Q.    Well, were you sitting in your car waiting awhile

8    before the other two came into it?

9                    MR. SLAVENS:      Objection, your Honor.

10                   THE COURT:       Overruled.

11      A.    I was still standing outside the car where Blazer

12   was shot.

13   BY MR. ARNTZ:

14      Q.    You hadn't gotten in your car yet?

15      A.    Not yet.   I was trying to find which key went to

16   the ignition.

17      Q.    And Weston was somewhere out in the lawn, is that

18   it?

19      A.    Right.

20      Q.    And while you're fumbling for those ignition

21   keys, this is when Walt and Weston get into your car?

22      A.    That's when they get into a crossfire with Blazer

23   in the middle, then they jump in the car.   By that time

24   I had the car started.

25      Q.    But sometime after you started that car, Walt and

1    Weston had to get into it, am I right?

2    A.    Right.

3    Q.    How did they do that?

4    A.    Open the passenger door.

5    Q.    Who did that?

6    A.    Walt, I think.  Either one of them could have

7    opened that door.

8    Q.    Either one of them.  You don't know either way,

9    do you?

10   A.    Right.

11   Q.    This is when you backed out of the drive nice and

12   easy?

13   A.    No.  Quick and fast.

14   Q.    Well, don't you remember when you talked to

15   Detective Wade Lawson in your videotaped interview, you

16   said you back out of the driveway nice and easy?

17   A.    I backed out of the, out of the driveway, I

18   remember now I backed out pretty quick.  Wouldn't you?

19   Q.    And this is when you're leaving the scene of this

20   homicide.  And Walt is giving you some directions now,

21   isn't he?

22   A.    No.  I'm following my own.

23   Q.    Walt didn't tell you where to take a turn or

24   anything like that?

25   A.    No, he did not.

1     Q.    And this is when Walt tosses his gun back to

2    Weston in the back seat?

3     A.    Walt didn't toss the gun at all.  Weston had his

4    own and Walt had his own.

5     Q.    Okay.  And after the chase of your automobile,

6    this is when you bail out and run?

7     A.    Right.

8     Q.    And at some point you're taking your clothes off

9    to conceal who you really are, aren't you?

10    A.    Right.

11    Q.    You think if you get those outer clothes off, you

12    might get away with this?

13    A.    I did.

14    Q.    You did temporarily because you were hiding in an

15    alley for three or four hours, am I right?

16    A.    Right.

17    Q.    And have those deep feelings of regret and

18    remorse come back yet for the killing of the second man

19    yet?

20    A.    I was scared.  I wasn't really paying attention

21    to any regrets.  I was just scared.

22    Q.    Scared for yourself?

23    A.    I was thinking about my kid.

24    Q.    And when you thought it was safe, you got up in

25    that basketball uniform you put on that morning and went

1    jogging, didn't you?

2        A.    Yeah, I acted like I was a jogger.

3        Q.    And that was part of a plan for you not to be

4    recognized and caught?

5        A.    Right.

6        Q.    And you came up with that plan while you were

7    still scared to death there?

8        A.    Yes.

9        Q.    And I think you said you went, you made some

10    stops after you were jogging, you stopped at Vaughnee's

11    house?

12        A.    I stopped at Weston's and Walt's house first.

13        Q.    Then Vaughnee's house?

14        A.    Right.

15        Q.    Your cousin.

16              And eventually you get back to your own house,

17    don't you?

18        A.    Vaughnee's house is my house.  That's where I was

19    staying.

20        Q.    How did you get to Vaughnee's house?

21        A.    A friend of mine dropped me off there.

22        Q.    This is Leon Lewis?

23        A.    That's right.

24        Q.    And Leon Lewis is another jerk you used to go up

25    to the levee with?

1  A. I knew him. I ran around with him when I was

2 younger.

3  Q. Do you remember describing him to Detective Wade

4 Lawson as another jerk you used to go up to the levee

5 with?

6  A. I don't remember.

7  Q. And, of course, you talked to Leon Lewis in the

8 car there when he was driving you back to your house,

9 didn't you?

10  A. Yes, I did.

11  Q. And you told him a lot of lies?

12  A. Yes, I did.

13  Q. You told him that your car had been stolen?

14  A. Right.

15  Q. And you told him that you were worried about how

16 you would get your car out of impound?

17  A. Right.

18  Q. You were worried about the speakers in your car?

19  A. I don't remember.

20  Q. And you talked about your relationship about

21 Leon, did you?

22  A. No, I did not talk about the relationship at all.

23  Q. You talked with him about getting divorced?

24  A. Yes, because I was in the middle of a divorce at

25 that time.

1      Q.    And you talked with him about the fact that Walt

2    was out robbing crack dealers, didn't you?

3      A.    I don't remember.

4      Q.    Do you deny that you told Leon in the car on the

5    way to your home that Walt had been out robbing crack

6    dealers?

7      A.    I might have told him that, I might not have.  On

8    that night, I just told him anything.

9            MR. ARNTZ:        May we approach the bench a

10      moment?

11            THE COURT:        You may.

12                        AT SIDE BAR

13            MR. ARNTZ:        We've indicated to the

14      Court that we intend to show the videotaped interview

15      of this witness by Detective Wade Lawson at this time.

16            MR. SLAVENS:        If I may, your Honor, I

17      believe that the appropriate way to do the video is

18      through the witness who had given the foundation and

19      that would be one of the detectives.  We plan to do

20      that.  We also plan to show both videos through the

21      proper foundation with Detective Lawson.  And I think

22      by having them shown now through this witness, it's --

23      I'm not sure now is the correct time to do it.  I

24      recognize it's cross-examination.  I recognize that it

25      will be coming in, but I don't think now is the

1    appropriate time.

2           MR. ARNTZ:     This is all part of further

3    impeachment of this witness.  And I'm prepared to lay

4    the necessary foundation before we actually begin to

5    play the videotape.  I'm just suggesting that this is

6    the time in the cross-examination when we choose to do

7    it.  Whether or not the State intends to do the same

8    thing at a later point in time is irrelevant.

9           THE COURT:     All right.  Well, at least

10    get the foundation up to where you believe you got

11    enough foundation for the videotape to be played.

12    That will take a couple of minutes.  At least that

13    will get us up to that point.  I can listen to

14    argument.  We will recess for lunch, go from there,

15    have them ready to go when the jury is coming back,

16    assuming it's going to play.  Now continue at least in

17    terms of foundation.

18           THE COURT:     Is it marked?

19           MR. ARNTZ:     Do I understand you have a

20    separate for each interview?

21           MR. SLAVENS:     Right.

22           MR. ARNTZ:     Preferably to use that to

23    search through.

24           MR. SLAVENS:     I don't know if I brought

25    it with me.

```
 1              MR. ARNTZ:       We'll do that after lunch.

 2              THE COURT:       When we come back, come

 3     back early, make sure it's set and ready to go.  In

 4     the meantime, do you need the exhibit physically to

 5     lay the foundation with this witness?

 6              MR. ARNTZ:       No.

 7              THE COURT:       I don't think -- you

 8     probably won't.  He's going to have to look at it

 9     though.

10              MR. SLAVENS:     That's the problem, I don't

11     know if this guy has ever seen it.

12              MR. ARNTZ:       Well, he can say whether or

13     not he recognizes it after viewing it.  I mean, it's

14     like any other document or any other exhibits to lay

15     the foundation and show it to him and see what he

16     says.

17              THE COURT:       Well, get him to the point

18     to where, then we'll go ahead, have a break for lunch

19     and have the videotapes, et cetera.

20

21                         BEFORE JURY

22              THE COURT:       Now, just a minute.

23     Apparently the witness wants to ask the Court a

24     question.  Is this about the case?

25              THE WITNESS:       (Nodding in the
```

```
 1        affirmative.)

 2                 THE COURT:      We are about ready to take

 3        a break.  Can you wait a couple more minutes here?

 4                 THE WITNESS:     (Nodding in the

 5        affirmative.)

 6                 THE COURT:     All right.

 7   BY MR. ARNTZ:

 8     Q.   Mr. Elofskey, I think we brought you up to the

 9   point where you had ridden home with Leon Lewis and had

10   the conversation in the car that we discussed?

11     A.   Well, I rode with Leon Lewis to the

12   co-defendant's houses.

13     Q.   I understand.  And Leon was a friend of yours,

14   we've established that?

15     A.   Right.

16     Q.   And Leon dropped you off at your house.  You went

17   inside.  And it was shortly after you went inside your

18   home that the police were there at the front door for

19   you, weren't they?

20     A.   About half hour to an hour after that.

21     Q.   Now, earlier you said an hour but now you're

22   saying maybe a half hour?

23     A.   It's a short, it was a period of time after that

24   'cause the cops seen me go into the house.

25     Q.   And there were a number of police officers there
```

1    at your front door?

2      A.    Right.

3      Q.    And when they were let into your house, they told

4    you why they were there?

5      A.    Right.

6      Q.    That you were wanted for aggravated murder?

7      A.    Right.

8      Q.    And were you read your rights at that time?

9      A.    Yes, I was.

10     Q.    Now you have previously testified in this

11   courtroom about this very case under oath, haven't you?

12     A.    Yes, I have.

13     Q.    And if I said that was on about September 4th of

14   1992, would that be more or less correct?

15     A.    Sometime around there.

16     Q.    Sometime last fall, wasn't it?

17     A.    Sometime around there.  I don't remember exact

18   date.

19     Q.    But it was sometime last year in 1992?

20     A.    Right.

21     Q.    And you testified as a witness in your own

22   defense from that very witness stand where you are right

23   now, didn't you?

24     A.    Right.

25     Q.    And you raised your right hand and swore to tell

1   the truth back on that date just like you did this

2   morning?

3     A.    Yes, I did.

4     Q.    And did you tell the truth that day under oath?

5     A.    No, I did not.

6     Q.    You lied a number of times under oath that day,

7   didn't you?

8     A.    Yes, I did.

9     Q.    And one of things you lied about under oath that

10  day to the Judge is when you said that no one had read

11  your rights to you when they came to your house to

12  arrest you, do you remember that?

13    A.    Yes, I do.

14    Q.    So the truth today is that the rights were read?

15    A.    Yes, they were.

16    Q.    Despite the fact that you lied under oath about

17  that last year?

18    A.    Right.

19    Q.    And when your rights are read, this is when you

20  asked to see a lawyer, am I right?

21    A.    I didn't ask to see no lawyer.

22    Q.    You never asked for a lawyer inside your own

23  home?

24    A.    No, I did not?  I didn't say anything.

25    Q.    I'm sorry?

1      A.   I didn't say anything.

2      Q.   Was that another one of the lies you told under

3   oath last year?

4      A.   Yes, it was.

5      Q.   And you were taken from your home in a cruiser

6   downtown to the police station, is that correct?

7      A.   Yes, I was.

8      Q.   And I think the officer who took you was a

9   Officer Wyant?

10     A.   Right.

11     Q.   And Officer Wyant more or less handed you off at

12  the police station to Detective Wade Lawson, is that

13  right?

14     A.   Right.

15     Q.   And this is when Officer Wyant said to Wade

16  Lawson that you had asked for a lawyer?

17     A.   He didn't tell Detective Lawson nothing.

18     Q.   And did you testify under oath last year that

19  Officer Wyant told Detective Lawson that you had asked

20  for a lawyer?

21     A.   Yes, I did.

22     Q.   Is that the third lie you committed as a witness

23  under oath last year?

24     A.   Yes, it was.

25     Q.   And also when you were testifying at the hearing

1    last year, you told the story about having drunk ten

2    quart or some amount of Budweiser before you went out to

3    Richard's house?

4      A.    Yes.

5      Q.    And was that true or not?

6      A.    That was the truth.

7      Q.    And you heard Detective Wade Lawson testify under

8    oath that was not true, didn't you?

9                MR. SLAVENS:     Objection to that.

10               THE COURT:     I'm not sure how that could

11     have been.  Could you rephrase the question, Mr.

12     Arntz?

13   BY MR. ARNTZ:

14     Q.    Well, Detective Wade Lawson denied that story

15   that you had drunk or that you appeared to have had

16   imbibed some alcohol at the time you were brought to

17   him, do you recall?

18               MR. SLAVENS:     Objection to that question,

19     your Honor.

20               THE COURT:     I have to sustain it, Mr.

21     Arntz.  I'm willing to listen at the side if you want.

22   BY MR. ARNTZ:

23     Q.    In any event, you're now with Detective Wade

24   Lawson and he's going to start interviewing you about

25   this aggravated murder that you're under arrest for?

1      A.    Right.

2      Q.    Correct?

3            And the way he does that is to review with you

4      what is called a Pre-Interview Form, am I right?

5      A.    Right.

6      Q.    And that is the Pre-Interview Form, which has

7      been marked State's Exhibit 72 and shown to you earlier

8      by the prosecutor?

9      A.    Yes, it is.

10     Q.    And this is not the original, is it?

11     A.    No.

12     Q.    This is a Xerox copy of the original?

13     A.    Right.

14     Q.    But you see your signature there at the bottom,

15     don't you?

16     A.    Yes.

17     Q.    Please tell the ladies and gentlemen of the jury

18     what time your Miranda Rights were read to you by

19     Detective Wade Lawson?

20     A.    4:59 in the morning.

21     Q.    4:59 a.m. on June 23rd, is that right?

22     A.    Correct.

23     Q.    And after having had your rights read to you,

24     this is when Detective Lawson began to ask you some

25     questions?

1    A.    Yes.

2    Q.    And this is when you began to lie to him?

3    A.    Right.

4    Q.    And first thing you did was deny knowing anything

5    about this?

6    A.    Right.

7    Q.    And how many times did you deny to Detective Wade

8    Lawson that you knew anything about this when he began

9    to interview you?

10   A.    Numerous times.

11   Q.    Well, would it have been as many as ten times?

12   A.    I don't think quite that many.

13   Q.    Do you remember testifying here under oath last

14   year that you lied to him ten times and saying that you

15   were not present and didn't know anything about that?

16   A.    I don't know about ten times but it was quite a

17   few.

18   Q.    And this was the bull crap story, I think you

19   called it?

20   A.    Yes.

21   Q.    And from the bull crap story that you didn't know

22   anything about this, you went on to another story,

23   didn't you?

24   A.    Yes, I did.

25   Q.    And the second story was that your car had been

```
 1   stolen?
 2       A.   The first story was my car was stolen.
 3       Q.   First you said you didn't know anything and that
 4   your car had been stolen?
 5       A.   Right.
 6       Q.   That was the story you cooked up with Leon Lewis
 7   earlier in the day?
 8            MR. SLAVENS:      Objection to that, your
 9       Honor, cooked up with.
10            THE COURT:      Sustained as to form of the
11       question.
12   BY MR. ARNTZ:
13       Q.   That's the same story you were telling Leon Lewis
14   in his car when he was taking you home earlier, right?
15       A.   Right.
16       Q.   You worked that story out before you met
17   Detective Lawson?
18       A.   Yes.
19       Q.   And you already had in mind that you would tell
20   that story and lie to him when you were interviewed
21   later at the police station?
22       A.   Right.
23            MR. ARNTZ:      Would this be a good place
24       to stop?
25            THE COURT:      Let's go ahead and do it.
```

```
 1                            Ladies and gentlemen of the

 2      jury, what we are going to do after lunch, we are

 3      going to have to set up a video camera and we are

 4      going to try to do this during the noon hour, not

 5      cameras, the unit over here.  That's not to watch soap

 6      operas in the afternoon.  We will try to set that up

 7      during the noon hour so we can get right, get right to

 8      it.

 9                            But in any event, let's

10      take our noon break at this point in time.

11                            Remember the usual

12      instructions from the Court not to discuss the case

13      among yourselves or with anybody else.  Don't form any

14      opinions, you have not heard all the testimony.

15                            Let's try to reconvene at

16      1:15.

17

18             (WHEREUPON, a luncheon recess was taken.)

19

20

21

22

23

24

25
```

1    <u>IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY</u>

2

3              THE COURT:        Let the record reflect that

4    the videotape deposition or videotape statement of the

5    witness will presently be, shortly be played to the

6    jury at the request of defense counsel.  I believe

7    it's going to be marked as a joint exhibit, is that

8    correct?

9              MR. SLAVENS:      That's fine.

10              THE COURT:        Let the record further

11    reflect there is a reference in the tape to the

12    defendant's parole situation at the end of the 7:36

13    time.  The Court will eliminate that from the jury's

14    view.  It will be dedacted from what they hear and the

15    Court will proceed to turn the sound of the video back

16    on at precisely 7:37 as it shows on the video

17    statement thereby eliminating not only the reference

18    to the parole situation but the reasons given by the

19    witnesses as to his concern regarding the parole and

20    his friendship with the defendant.

21                        Mr. Arntz.

22              MR. ARNTZ:        That is fine.

23              THE COURT:        Is that agreeable to you?

24              MR. ARNTZ:        That is.

25              THE COURT:        Mr. Slavens.

1              MR. SLAVENS:      To the extent we have
2     something to say about it, your Honor, we understand
3     what the Court is doing.  This is the videotape that
4     has been looked at.  I will ask the Court Reporter
5     when she gets through to mark it, I guess, a Joint
6     Exhibit A.
7              THE COURT:      Roman numerals.
8              MR. SLAVENS:      Joint Exhibit Roman Numeral
9     I.
10              THE COURT:      Are we ready for the jury?
11     You will have to answer yes for the record, Mr.
12     Slavens.
13              MR. SLAVENS:      Yes, your Honor.
14              THE COURT:      I realize I caught you
15     there in a moment.
16                              Defense ready?
17              MR. MONTA:      We are.
18              THE COURT:      Let the record further
19     reflect that the Court Reporter will not, will not be
20     taking down verbatim what's said.  The tape will speak
21     for itself.
22
23
24
25

1   to you and what you said to them, if anything, before

2   you signed State's Exhibit 3.  You are in the interview

3   room, it's now after 4 a.m., Detective Spells and

4   Detective Wade Lawson enter the interview room and what

5   is the first thing, again, that they say to you?

6           Answer:  They told me that Howe and Polson have

7   made video statements against me saying that, pointing

8   me out that I was there and I was the triggerman.

9           Do you remember testifying that way last year

10  under oath?

11      A.   Like I said before, if it's in the testimony, I

12  must have said it.

13      Q.   If you said it, was it the truth or another lie?

14      A.   I don't know.  Half the stuff I said was a lie.

15  I was just trying to get that statement suppressed.

16      Q.   You were lying under oath to help yourself?

17      A.   Yes.

18      Q.   How many lies do you think you told under oath

19  last year to help yourself?

20      A.   Numerous.

21      Q.   You understand that every time you lied in the

22  courtroom under oath, you're committing another crime?

23      A.   Yeah.

24              MR. SLAVENS:     Objection, your Honor.

25              THE COURT:       Sustained.

```
 1    BY MR. ARNTZ:

 2       Q.    No one has ever suggested to you that you will

 3    ever be charged with lying under oath?

 4       A.    Do what now?

 5       Q.    No one has ever suggested to you that you will

 6    some day be charged with a crime of lying under oath?

 7       A.    No.

 8       Q.    Were your fingers crossed when you took the oath?

 9              MR. SLAVENS:      Objection, your Honor.

10              THE COURT:       Overruled.

11       A.    No, they weren't.

12    BY MR. ARNTZ:

13       Q.    You were hoping not to get caught in your lies

14    though, weren't you?

15       A.    Right.

16       Q.    And you're hoping that these people believe you

17    today while you testify, don't you?

18       A.    They can believe what they want to believe.

19       Q.    And you're testifying today to try to help

20    yourself just like you were testifying under oath last

21    year to try to help yourself, am I correct?

22       A.    Explain to me how I'm trying to help myself.

23       Q.    Well, now, you entered into a plea bargain with

24    the prosecutor in order to try to help yourself in your

25    own case, didn't you?
```

1      A.    You call 20 to life a plea bargain.

2      Q.    Well, you accepted that, didn't you?

3      A.    It's either that or go to trial and risk getting

4    more time than that.

5      Q.    So you pled guilty to something you didn't do, is

6    that it?

7      A.    I pled guilty to aggravated murder.  I didn't

8    shoot nobody.  But since I was down with the robbery,

9    I'm just as guilty as doing the murder.

10     Q.    You think you're responsible for the murder

11   although you didn't think you had any part in it?

12           MR. SLAVENS:    Your Honor, the witness has

13     answered.

14           THE COURT:    I will sustain that

15     objection.

16   BY MR. ARNTZ:

17     Q.    Do you know what perjury is?

18     A.    Yeah.

19     Q.    What is perjury?

20           MR. SLAVENS:    Objection, your Honor.

21     A.    Lying on --

22           THE COURT:    Overruled.

23   BY MR. ARNTZ:

24     Q.    I'm sorry?

25     A.    Telling a lie on the stand.

1      Q.    Like you did last year?

2      A.    Yeah.

3      Q.    Numerous times I think you said?

4      A.    Right.

5      Q.    If you commit perjury here today, is your plea

6   bargain still on, do you think?

7      A.    Nope.

8      Q.    Well, now, you just told me that no one has told

9   you you will be prosecuted for perjury for all the lies

10   you told under oath last year.  You think if you lie

11   under oath today no one will prosecute you for those

12   lies also?

13      A.    Maybe they will, maybe they won't.

14      Q.    You don't really care either way, do you?

15      A.    What do you mean?

16      Q.    So long as you help yourself, you don't care?

17      A.    I'm not helping myself in no way here.

18      Q.    When you talked with Detective Lawson, were you

19   also led to understand that Polson was saying that you

20   drove the car and you shot the guys?

21      A.    No.

22      Q.    295.  You recall this question and answer last

23   year when you were testifying under oath?

24              MR. SLAVENS:    Identify the question,

25      please.

```
 1              MR. ARNTZ:        295.

 2              MR. SLAVENS:      Identify the question,

 3      please.

 4              MR. ARNTZ:        Question number 2.

 5              MR. SLAVENS:      No, the questioner.

 6              MR. ARNTZ:        I believe it was Bob

 7      Coughlin.

 8   BY MR. ARNTZ:

 9      Q.   Question:  They weren't telling you about what

10   both of these guys were putting on you, they were

11   telling you about what Polson said?

12           Answer:  They told me that Polson said he drove

13   the car and I went in and shot these guys and Howe was

14   agreeing to some points of speculation.

15           Do you remember that answer?

16      A.   Part of it.

17      Q.   And was that truthful on your part last year when

18   you testified that way under oath?

19      A.   I did testify to that.

20      Q.   Is that in fact what the detectives said to you

21   when they interviewed you last year or was that another

22   lie?

23      A.   That was another lie.

24      Q.   That would be lie number five on our list, right?

25      A.   I guess that's what it's up to.
```

1    Q.    And sometime during your interview with Detective

2  Wade Lawson you actually told Wade Lawson that it was

3  Walter Polson who shot Richard Blazer, didn't you?

4    A.    Polson was inside the house when the first

5  gunshots were sounded.

6    Q.    Mr. Elofskey, my question is, you actually told

7  Detective Wade Lawson in your interview that Walter

8  Polson was the one who shot and killed Richard Blazer?

9    A.    He shot Blazer inside the house.

10    Q.    So the answer is, yes, you did say that?

11    A.    Yeah, I did say that because Blazer was shot

12  inside the house, then Blazer came outside the house

13  where he was shot at again.  Whether Polson hit him or

14  not inside the house, I don't know because I wasn't in

15  there to find out.

16    Q.    My question to you is whether you told Detective

17  Wade Lawson that Walter Polson shot Richard Blazer

18  inside that house?

19    A.    Like I said, Polson fired shots inside the house,

20  whether he hit Blazer or not, I don't know.

21    Q.    Question is, whether you said that Walter Polson

22  shot Richard Blazer in the house, yes or no?

23                MR. SLAVENS:    Objection, your Honor.

24                THE COURT:    Overruled.

25                              Do you understand the