1    question?

2    A.    Like I keep saying, I wasn't inside the house to

3    see if Polson shot him or not.

4                THE COURT:        All right.    Proceed, Mr.

5    Arntz.

6    BY MR. ARNTZ:

7    Q.    Was there any discussion of penalties for this

8    homicide when you were talking with Detective Lawson?

9    A.    I think 20 to life.

10   Q.    So the answer is yes?

11   A.    Pretty sure.

12   Q.    And who would it have been, who mentioned 20 to

13   life to you during the interview?

14   A.    Wade Lawson.

15   Q.    And did Detective Wade Lawson also tell you that

16   it would look better for you if you made a statement on

17   video?

18   A.    He told me it would, would look better for my

19   behalf if I made a video statement.

20   Q.    So the answer is, yes, he did say that to you?

21   A.    Yes.

22   Q.    And did Detective Wade Lawson tell you that it

23   would be better for you if you talked to him?

24   A.    Yes.

25   Q.    And were you given any advice by Detective Wade

1    Lawson about what to say on this videotape before the

2    videotape interview began?

3       A.    Just the truth.

4       Q.    Well, did he write any notes out on a piece of

5    paper which you used to refer to in making your

6    statement on the videotaped interview?

7       A.    No.

8       Q.    Do you remember testifying under oath last year

9    that you were given advice what to say on the videotaped

10   interview?

11      A.    Yeah, I said that just to clear my own name.

12      Q.    That was another lie under oath in order to try

13   to help yourself?

14      A.    Right.

15      Q.    That would be, I think, lie number six now, am I

16   right?

17      A.    Right.  A person is going to say anything to try

18   to get that statement suppressed.

19      Q.    The person who is desperate will say anything to

20   try to help himself out, wouldn't he?  Is that what you

21   said?

22      A.    I'm saying, trying to get rid of that video

23   statement.  You can't win a trial with a statement like

24   that.

25      Q.    So the statement you made last year that

1    Detective Lawson had written some notes out for you for

2    your videotaped interview was another lie?

3                    MR. SLAVENS:    Object, your Honor.  Asked

4      and answered.

5                    THE COURT:    I believe that one has.

6      Sustained.

7    BY MR. ARNTZ:

8      Q.    And do you recall testifying last year that the

9    detectives wanted to make sure your story matched

10   Walter's so they could get Weston?

11     A.    I remember saying that, but it's not true.

12     Q.    And do you remember testifying under oath last

13   year that the detectives wanted you to make sure your

14   story matched Walters so they could get Weston because

15   at that time Weston really wasn't saying anything?

16     A.    I remember saying that.  It's not true.

17     Q.    Now your interview with Detective Wade Lawson

18   began at 4:59 in the morning, is that right?

19     A.    That's when we started talking, yeah.

20     Q.    All right.  And we know that because that's the

21   time on State's Exhibit 72 in front of you, isn't it?

22     A.    Right.

23     Q.    Did Detective Wade Lawson promise to try to work

24   out a deal for you the same day that you made the

25   videotaped interview?

```
 1        A.    No, he did not.

 2        Q.    Do you recall testifying under oath last year

 3    that in fact he did offer to make a deal for you on that

 4    very same day?

 5        A.    I remember saying that.

 6        Q.    And that was another lie?

 7        A.    Right.

 8        Q.    More perjury?

 9        A.    Yep.

10        Q.    And there in fact came a time that you did submit

11    to a videotaped interview with Detective Wade Lawson,

12    didn't you?

13        A.    Right.

14        Q.    And that was in the presence of, I think it was,

15    Detective Spells as well?

16        A.    Correct.

17        Q.    And that was with your knowledge and your

18    consent, is that true?

19        A.    Right.

20        Q.    And you were aware at all times that that

21    videotape camera was operating when you were speaking

22    with Detective Wade Lawson at that time?

23        A.    Yes.

24              MR. ARNTZ:       I think this would be

25      appropriate time to move to play the video.
```

1           THE COURT:        Ladies and gentlemen of the

2      jury, we are going to play a videotape statement made

3      by this witness.  It's been marked as a Joint Exhibit

4      Roman Numeral I for the record.  And you'll note that

5      towards the end of the videotaped statement the Court

6      will eliminate from your hearing a very brief period

7      of time.  There is a conversation as to something that

8      is not relevant to this trial, so just disregard that.

9      I will be responsible to make sure you don't hear

10     that.  But other than that, we'll go ahead and proceed

11     with the playing of the videotape.

12              (WHEREUPON  the videotape was played.)

13  BY MR. ARNTZ:

14     Q.    Mr. Elofskey, you recognized what we just viewed

15  was the videotape of the interview you conducted with

16  Detective Wade Lawson, isn't that correct?

17     A.    Correct.

18     Q.    All right.  And to be clear about this, you had

19  an oral interview with Detective Wade Lawson before this

20  videotaped interview was created, didn't you?

21     A.    Yes.

22     Q.    And some amount of time passed between the oral

23  interview and the videotaped interview, didn't it?

24     A.    Yes.

25     Q.    How much time was that?

```
1      A.   A couple of hours.

2      Q.   A couple hours passed.

3           What were you doing during that couple hours

4    between the first and second interview?

5      A.   Sitting in the room.

6      Q.   Were you thinking about what you would say on the

7    videotaped interview?

8      A.   Not really.  Mainly had my head down on the table

9    trying to go to sleep.

10     Q.   And on that videotaped interview we just watched,

11   you saw yourself telling Detective Lawson that you

12   didn't even know Lee's last name, didn't you?

13     A.   I seen that.

14     Q.   And you saw yourself telling Detective Lawson

15   that the guy, Mark McDonald got out and was talking to

16   us.  You heard yourself say that word?

17     A.   Yes.

18     Q.   And you heard -- you testified today that Lee

19   Howe said to you, now? now? now? before he fired a gun

20   out your car window, do you remember that?

21     A.   Yeah.

22     Q.   And on the videotape interviewed you don't see

23   yourself saying that, do you?

24     A.   I think I said something of that nature.

25     Q.   You told us this morning you folks went to three
```

1  or four different locations to try to use that Green

2  Machine card, is that right?

3    A.   Yes.

4    Q.   On the videotaped interview you saw yourself

5  mentioning only the Oregon District and the Woodman

6  Drive area?

7    A.   Right.

8    Q.   And this morning you weren't sure whether you

9  told the story about everyone laughing about the first

10  incident afterwards and you saw yourself telling that

11  story on the videotape, didn't you?

12    A.   Yes.

13    Q.   And also this morning you weren't sure whether

14  you had told the story that Lee had shoved

15  Mr. McDonald's face down to the, the ground but you saw

16  yourself saying that on the videotaped interview, didn't

17  you?

18    A.   Yes.

19    Q.   And this morning you said you were unsure whether

20  Walt Polson carried a gun with him every day but you saw

21  yourself on the videotape telling Detective Wade Lawson

22  that Walter Polson did carry his gun every day, didn't

23  you?

24    A.   Yes.

25    Q.   Also on the videotaped interview you saw yourself

1    seated next to Detective Lawson while he was asking you

2    questions, didn't you?

3      A.    Right.

4      Q.    And you saw that he had his legs crossed and a

5    pad of some kind on his leg, didn't you?

6      A.    Right.

7      Q.    And he would be looking at his notes from time to

8    time while he was asking you questions on the videotape,

9    wasn't he?

10     A.    Right.

11     Q.    And you had your head down and you were looking

12   over at that pad yourself from time to time on that

13   videotaped interview, weren't you?

14     A.    I couldn't see the pad, what was written on it.

15     Q.    Are you denying that you looked at what was on

16   the pad while you were answering questions for Detective

17   Lawson during the videotaped interview?

18     A.    I answered them questions.  I didn't read them

19   off this, the --

20     Q.    If you testified under oath last year you were

21   reading notes off of Detective Lawson's pad during the

22   videotaped interview, that would be another lie?

23     A.    I said that just to try to get that videotape

24   erased.

25     Q.    When you said it, it was a lie, wasn't it?

1    A.    Right.  At that time it was.

2    Q.    That was lie number eight under oath?

3    A.    I think you got that already marked down.

4    Q.    Then when the interview was concluded, you told

5    the story earlier that Detective Lawson had suggested

6    that he could get a deal for you but today you say that

7    was a lie as well?

8    A.    Correct.

9    Q.    Your interview that we just watched occurred on

10   June 23rd, is that correct?

11   A.    Correct.

12   Q.    And on June 24th did you have any contact with

13   Detective Lawson?

14   A.    I might have.

15   Q.    Did you testify under oath here last year that

16   Detective Lawson came to see you the very next day on

17   June 24th without any warning?

18   A.    He came to see me a couple of days while I was in

19   there.

20   Q.    Did you testify that he came to see you in order

21   to talk to you about working out some kind of a deal?

22   A.    That was a lie I told the Court.

23   Q.    And that was another lie you told under oath in

24   order to help yourself?

25   A.    Right.

1    Q.    That would be perjury number nine?

2                MR. SLAVENS:    Objection to that, your

3    Honor.

4    A.    However many it is.

5                THE COURT:    Overrule the objection.

6    BY MR. ARNTZ:

7    Q.    Excuse me?

8    A.    I said how many ever it is.

9    Q.    If we counted up to eight now, this would be

10   number nine, wouldn't it?

11   A.    I guess.

12   Q.    And when Detective Lawson came to see you the

13   next time at the county jail, he was talking to you

14   about other murders that had occurred in Dayton, wasn't

15   he?

16   A.    Yes.

17   Q.    He was asking you questions about at least one

18   murder that occurred more than a year before this

19   incident on June 22d, wasn't he?

20   A.    Yes.

21   Q.    And later on he was asking you questions about

22   east side burglaries that had occurred in the past,

23   wasn't he?

24   A.    Yes.

25   Q.    And this was all within a very few days of your

1    June 23rd videotaped interview, wasn't it?

2      A.    Sometime around there.

3      Q.    And then there came a time when you began to send

4    written request forms asking that Detective Lawson come

5    speak to you again, isn't that true?

6      A.    Correct.

7      Q.    And how many times did you do that?

8      A.    I don't know.  Ten times to a dozen.

9      Q.    I'm sorry?

10     A.    Ten times to a dozen.

11     Q.    Ten times you asked to talk to Detective Lawson

12   further about this?

13     A.    Yes.

14           MR. SLAVENS:      Objection, he's answered

15   it.

16           THE COURT:      Sustain the objection as to

17   the repetition.

18   BY MR. ARNTZ:

19     Q.    And in fact, when you began to fill out these

20   written request forms, you wanted to see Detective

21   Lawson with some urgency, didn't you?

22     A.    I just wanted to talk to him.

23     Q.    You say you merely wanted to talk to Detective

24   Lawson, there wasn't any urgency involved?

25     A.    It wasn't no emergency, if that's what you're

1  trying to get it.

2    Q.   I'm using the word urgency.  Do you know what

3  that means?

4    A.   No.

5    Q.   That you were interested in seeing him as soon as

6  possible?

7    A.   I wrote on the couple of jail request forms that

8  I wanted to see him.  You know, sometimes I wrote as

9  soon as possible, you know.

10    Q.   Are you finished?

11    A.   Yeah.

12    Q.   Do you recall writing that you also wanted to see

13  him very soon?

14    A.   I don't know what I wrote.  That's been almost

15  eight months.

16    Q.   Okay.  I show you what's been marked now as

17  Defendant's Exhibits B and C, and ask you to look at

18  those two pages and tell us what those are, if you know?

19    A.   Jail request forms.

20    Q.   And to be accurate, that is a copy of four

21  different jail request forms, isn't it?

22    A.   Only three are mine.

23    Q.   Only three of them are yours.  And which one of

24  them is not yours?

25    A.   This one right here.

1       MR. SLAVENS:      Objection, your Honor.

2       THE COURT:        Overruled.

3       MR. SLAVENS:      May we see them?

4    A.    You can tell it's not mine.  Look at the jacket

5    number on it.

6    BY MR. ARNTZ:

7    Q.    Do Exhibits B and C appear to be a true and

8    accurate copies of the jail request forms which you're

9    familiar with?

10   A.    They're jail request forms.  You can get them any

11   time in jail.

12   Q.    But the ones that you say are yours, are Xerox

13   copies of the original, aren't they?

14   A.    Yeah.

15   Q.    And these are true and accurate copies of the

16   original, aren't they?

17   A.    Yeah.

18   Q.    In other words, no changes have been made in what

19   was written there --

20   A.    Right.

21   Q.    -- is that correct?

22         Now on June 26th, that would be three days after

23   your videotaped interview with Detective Wade Lawson,

24   you sent a written request form out asking to speak to

25   T.G. Lawson very soon, am I right?

1    A.    That ain't mine.

2    Q.    That's the one you say is not yours?

3    A.    Correct.

4    Q.    Someone write this on your behalf?

5    A.    I don't know but that's not my jacket number.  My

6    jacket number is 6605-92, that's 88112-92.

7    Q.    You deny trying to reach Detective Lawson on June

8    26, 1992?

9    A.    I might have tried to reach him but that ain't

10   mine.

11   Q.    And, likewise, on July 11, 1992, you sent out a

12   jail request form which said, I wish to see Detective

13   T.G. Lawson, correct?

14   A.    Correct.

15   Q.    And, likewise, three days later on July 14th you

16   sent out another form saying, Detective T.G. Lawson, I

17   would like to talk to you as soon as possible, is that

18   right?

19   A.    Correct.

20   Q.    And one day later on July 15th you sent another

21   request form indicating you wanted to speak to T.G.

22   Lawson?

23   A.    Correct.

24   Q.    And so you say three of these are yours but the

25   fourth is not?

1    A.    Right.

2    Q.    And you also say you did this 10 or 11 times?

3    A.    Sometime around there.

4    Q.    And you wanted to see Detective Lawson in order

5    to talk about making a deal for yourself, isn't that

6    correct?

7    A.    Correct.

8    Q.    In fact, what was on your mind is discussing plea

9    bargaining with him, isn't that true?

10    A.    Correct.  But he told me he ain't the one to set

11    up the plea bargaining.  I would have to go through my

12    lawyers to get to talk to the prosecutor about that.

13    Q.    And which Detective Lawson are we talking about

14    now?

15    A.    Tom Lawson.

16    Q.    And that's the Detective Lawson who is sitting at

17    counsel table today?

18    A.    Yes.

19    Q.    And when would it have been, as best you can

20    tell, that this Detective Lawson told you that he

21    couldn't make any deal with you, you would have to make

22    your deal with the prosecutor?

23    A.    Do what now?

24    Q.    Well, we've already reviewed at least four dates

25    that you asked to see, three or four that you asked to

1    see the detectives, correct?

2      A.    Correct.

3      Q.    Which of those meetings would it have been that

4    Detective Lawson said you can't make a deal with me, you

5    have to make your deal with the prosecutor?

6                MR. SLAVENS:    Objection, your Honor.

7        It's not what the witness said.  He said he had to

8        talk to his lawyer.

9                THE COURT:    I will sustain it as to the

10       form.

11   BY MR. ARNTZ:

12     Q.    When was it Detective Lawson told you that you

13   had to make your deal through your lawyers?

14     A.    I don't really, really don't know.  It's been so

15   long ago, I forgot.

16     Q.    If I said that you met with Detective Lawson on

17   June 28th, would that be true or untrue?

18                MR. SLAVENS:    Objection, your Honor.

19                THE COURT:    Overruled.

20     A.    Like I said, I don't remember what dates I met

21   with him, what dates I didn't.

22     Q.    All right.  You can't deny that you met with him

23   on the 28th?

24                MR. SLAVENS:    Objection, your Honor.

25     A.    Maybe I did and maybe I didn't.

1    Q.    Likewise, you don't deny that you met with him

2    the very next day on June 29th, do you?

3    A.    I met with him a couple five or six times.    I

4    don't remember which dates.

5    Q.    All right.  So you don't deny June 29th, do you?

6    A.    I'm not saying I did and I'm not saying I didn't.

7    I'm saying I don't know.

8    Q.    Likewise, you can't deny that you met with

9    Detective Lawson the very next day?  Again, there is the

10   third day in, in a row, June 30th, am I correct?

11   A.    Like I said, maybe I met with him, maybe I

12   didn't.

13   Q.    And, likewise, you met with him again on July

14   23rd, is that right?

15   A.    Same answer, I don't know.

16   Q.    But you don't deny meeting with him on July 23rd,

17   do you?

18   A.    I don't admit to it.  I don't admit I didn't.

19   Q.    Now each and every time you met with Detective

20   Lawson, regardless of what the dates were, there was a

21   discussion about whether or not you could get a plea

22   bargain in your own case, isn't that true?

23   A.    Correct.

24   Q.    And you're telling us that Detective Lawson said

25   you would have to make your plea bargain through your

1    lawyers, not with me?

2      A.    Right.

3      Q.    Then why would it be you kept asking him whether

4    he could make a plea bargain with you if the answer was

5    always the same?

6      A.    'Cause if he's on my side, maybe I could get a

7    better plea bargain than him not being on my side.

8      Q.    You thought Detective Lawson was on your side,

9    didn't you?

10     A.    Yeah.

11     Q.    And you wanted to keep him on your side, didn't

12   you?

13     A.    Correct.

14     Q.    By telling him what he wanted to hear, didn't

15   you?

16     A.    Right.

17     Q.    What he wanted to hear was that Weston Howe had

18   done the shootings?

19     A.    He wanted to hear the truth.

20     Q.    Well, isn't it true that originally -- strike

21   that.

22            When you talked to Detective Lawson during these

23   meetings, you, and in fact, specified to him on one

24   occasion that you wanted to get your own sentencing down

25   to 20 years if you could, isn't that right?

1    A.    Twenty years or under.

2    Q.    So the answer is yes?

3    A.    Yeah, I did.  But like I said, he can't.  It's

4    between my attorneys and the prosecutor's office on the

5    deal.  He couldn't help me in that.

6    Q.    One time when you called him over, you were not

7    only talking about how much time you could or how little

8    time you could do but also whether you could arrange to

9    get your automobile and speakers back.  Do you remember

10   that?

11   A.    Yep.

12   Q.    And on July 23rd when he came to see you,

13   Detective Lawson's purpose was to see whether your story

14   would stay the same or not, do you remember that?

15                MR. SLAVENS:       Objection, your Honor.

16   A.    I don't remember the dates.

17                THE COURT:         Overruled.

18   A.    Like I said, he's been over there off and on.   I

19   don't remember dates.

20   BY MR. ARNTZ:

21   Q.    Do you remember testifying under oath last year

22   that Detective Lawson came over to see you in order to

23   find out whether your story would stay the same or not?

24   A.    I might have.  I don't know.

25         Half the people in the courtroom can't remember

1    what they said eight and a half months ago.

2        Q.    Well, you have had the benefit of studying police

3    reports during that eight and a half months, haven't

4    you?

5        A.    Yeah.    I tore them up and threw them away too.

6        Q.    And when Detective Lawson would meet you this

7    number of times, you asked him, didn't you, whether he

8    wouldn't go talk to the prosecutor on your behalf?

9        A.    Yeah, I did ask him.    That's when he came out and

10   told me that I had to go through a lawyer.

11       Q.    And on at least one occasion he told you that he

12   would see if he could, could talk to the prosecutor and

13   get a deal for you, didn't he?

14       A.    My lawyers have to talk to the prosecutor to get

15   a deal.

16       Q.    My question is, on at least one occasion

17   Detective Lawson told you that he would see if he could

18   get a deal for you from the prosecutor, didn't he?

19       A.    I don't know.

20       Q.    Do you remember testifying under oath in this

21   courtroom last year that is in fact what happened?

22       A.    I remember testifying in here but I don't

23   remember half the things I said.

24       Q.    Page 271.    Do you remember these questions and

25   answers.

1      MR. SLAVENS:      Identify the questioner,

2   please.

3      MR. ARNTZ:      I believe this is Bob

4   Coughlin.

5   BY MR. ARNTZ:

6   Q.   These are requests by you to see Detective T.G.

7   Lawson, correct?

8      Answer:  Right.

9      And you wanted to see him again, why?

10      Answer:  To see if he made a deal for me yet.

11      Question:  Did he tell you that he was going to

12   make a deal for you?

13      Answer:  He said he was going to -- Answer -- to

14   look into getting me a deal.

15      Do you remember that testimony?

16      MR. SLAVENS:      Objection to this.  It's

17   not at all similar to what his previous questions

18   were.  He's talking about the prosecutor and everybody

19   else.

20      THE COURT:      Well, this is

21   cross-examination for impeachment on using the prior

22   testimony.  Overruled.

23   A.   Repeat the question.

24   BY MR. ARNTZ:

25   Q.   Do you remember the testimony I just read to you?

1    A.    Like I said, if I testified to that, I must have

2    said it.

3    Q.    All right.  Let's assume for a minute that you

4    said it if it's in this book.  And if you said it, was

5    it another lie under oath?

6    A.    Probably was.

7    Q.    Probably lying number ten?

8    A.    Probably.

9    Q.    Do you remember testifying on a second occasion

10   under oath last year that Detective Lawson promised he

11   would look into a deal with the prosecutor?

12   A.    Like I said, my attorneys have to go through that

13   deal.

14   Q.    So the answer is, you don't remember whether you

15   said that or not?

16   A.    Right.

17   Q.    And from time to time when he would come see you,

18   you would ask him what is the status of my deal, is that

19   right?

20   A.    I'd ask him if he could make me a deal.

21   Q.    And he would say to you, I ain't got nothing yet,

22   is that right?

23   A.    He, he can't get a deal for somebody.  The

24   prosecutor, it's between your lawyers, prosecutors and

25   the Judge.

1    Q.    But my question to you is, when Detective Lawson

2    would come see you, did he say, say to you that he

3    didn't have anything new for you yet but he was still

4    working on it?

5    A.    I don't remember.

6    Q.    290.  Do you remember this testimony?

7              MR. SLAVENS:    Questioner, please.

8              MR. ARNTZ:    Coughlin.

9    BY MR. ARNTZ:

10   Q.    Question:  Would you then tell him to go ahead

11   and work on the deal?

12            Answer:  No.  He said -- he would come to me and

13   said, I ain't got nothing new yet.  So I would go, okay.

14            Question:  Did he say he would look into the

15   deal?

16            Answer:  Something of that nature.

17            Question:  So how many times did he tell you

18   that?

19            Answer:  Every time he came over he would just

20   say, I ain't got any type of news yet on the deal but

21   I'm still working on it.

22            Question:  That would be four times then?

23            Answer:  Plenty of times.

24            Question:  Or five depending on if he talked to

25   you about the murders, you remember, you say on Tuesday?

1    Answer:  Yeah.

2    Do you remember that series of questions and

3    answers?

4    A.  I don't remember half the things I said.

5    Q.  Do you deny that you testified that way under

6    oath last year?

7    A.  Like I said, if it's written down in that

8    transcript, I must have said it.

9    Q.  And if you said that under oath last year, would

10   that be another example of perjury?

11   A.  Probably.

12   Q.  That would be number eleven on our list, am I

13   correct?

14   A.  If that's what it adds up to.

15   Q.  Now, the videotape was made with Detective Wade

16   Lawson and the meetings on those days afterwards

17   occurred with Detective Tom Lawson, is that right?

18   A.  Correct.

19   Q.  You first met Detective Tom Lawson briefly on the

20   very same day you made the video with Detective Wade

21   Lawson, true?

22   A.  Yes.  He was taking me up to the jail to be

23   booked in.

24   Q.  When he was taking you up, you up to the jail to

25   book you in, you folks had a friendly conversation with

1    each other, didn't you?

2        A.    We talked.

3        Q.    And you took a liking to him?

4        A.    What do you mean, took a liking?

5        Q.    Did you two get to take a liking to each other

6    and become friendly?

7        A.    Just talking.

8        Q.    The answer to that is yes or no?

9        A.    Answer is, we just talked, that's it.

10       Q.    And the prosecutor asked you whether at some

11   point in time you obtained an attorney, do you remember

12   that?

13       A.    I don't remember.

14       Q.    All right.  I think you told him that you had two

15   attorneys?

16       A.    Yeah, I got Robert Coughlin and Rudy Wehner.

17       Q.    Mr. Coughlin, one of your two attorneys, assisted

18   in negotiating your plea bargain for you?

19       A.    Yes.

20       Q.    And were you aware that Mr. Coughlin was a former

21   county prosecutor?

22       A.    Some, some type of prosecutor up in Huber Heights

23   or something of that nature.

24       Q.    You knew that, didn't you?

25       A.    Yeah, he told me about, about it.

1      Q.    When you were indicted, you were indicted for

2    five different counts or charges, weren't you?

3      A.    Ten, to be correct.

4      Q.    Ten?

5      A.    Five gun specs.

6      Q.    You were indicted for two aggravated murders, the

7    aggravated robberies, and one aggravated burglary, am I

8    right?

9      A.    Correct.

10     Q.    And you added something there, you said you had

11   gun specs as well?

12     A.    There's a gun spec on each case.

13     Q.    So you had a gun specification on each of these

14   four counts, didn't you?

15     A.    Each five counts.

16     Q.    Excuse me, five counts.

17           And what kind of a sentence did each of the gun

18   specifications carry?

19                MR. SLAVENS:    Objection, your Honor.

20                THE COURT:    Could I see counsel a

21     minute?

22                (WHEREUPON, a side-bar conference was held

23     off the record.)

24                THE COURT:    You may proceed, Mr. Arntz.

25

1    BY MR. ARNTZ:

2      Q.    I think my last question was whether you knew

3    what period of incarceration or sentence each of these

4    gun specifications carry?

5      A.    I -- they carry three years a piece for each gun

6    spec, total of 15 years.

7      Q.    You think that would count for a total of 15

8    years in and of itself, is that right?

9      A.    Do what now?

10     Q.    You think that the total of the gun

11   specifications themselves would constitute or total up

12   to 15 years?

13     A.    Correct.

14     Q.    How much time did the aggravated murder carry?

15     A.    It carries 20 to life for each one.

16     Q.    What was the maximum sentence you could receive

17   on the aggravated robbery charge?

18     A.    I don't know what it carries.  I think 7 to 25,

19   something like that, 10 to 25.

20     Q.    You think it could be as much as 10 to 25?

21     A.    Somewhere around there.  I don't remember.

22     Q.    Do you recall your lawyer told you it carries as

23   much as 10 to 25 as a maximum sentence?

24     A.    All I remember was that murders carry 20 to life.

25     Q.    You remember the 25 years was the maximum number

1    on that aggravated robbery, don't you?

2      A.    I seen people get 7 to 25 and I've seen them get

3    10 to 25 in the last eight and a half months.

4      Q.    You were hoping to get something like seven, were

5    you?

6      A.    I was hoping to get the best.

7      Q.    The best.  What would be the best here?

8      A.    The least amount of time.

9      Q.    The least amount.

10         And what you were able to get was a dismissal of

11    both aggravated robberies, weren't you?

12      A.    Correct.

13      Q.    So you will never serve a sentence for that

14    aggravated robbery?

15      A.    You never know.  You go to the parole, they may

16    send you down for another five years.

17      Q.    This Judge will never be able to sentence you for

18    that aggravated robbery?

19      A.    Not that I know of.

20      Q.    Because it's been dismissed for you, hasn't it?

21      A.    It's still on my record as being there.

22      Q.    Likewise, you will never get this extra three

23    years for the gun which was used in the first aggravated

24    robbery, will you?

25      A.    I will never get no time for none of the times.

1    Q.  You will never get any time for the gun involved

2  in that first aggravated murder, will you?

3    A.  No.  Why should I?  I didn't have a gun in the

4  first place.

5    Q.  And you will never catch any time at all for the

6  gun used in the second aggravated murder, will you?

7    A.  Why should I get time for a gun?  I didn't have a

8  gun.  It's your client that had the gun.

9    Q.  And you will never serve a day for that second

10  aggravated robbery or for the gun involved in that

11  second aggravated robbery, is that correct?

12    A.  Correct.

13    Q.  And, likewise, you will never serve one day for

14  the aggravated burglary which occurred or the gun which

15  was used when they claim that an aggravated burglary

16  occurred, am I right?

17    A.  Correct.

18       But if you look at it right, you will notice that

19  if it wasn't for your client, that the most I would be

20  facing is just the two robbery charges not murder

21  charges.

22    Q.  You're just a victim of circumstances, is that

23  it?

24    A.  What I was saying, I was down for the robberies,

25  I wasn't down with the murder.  Your client did the

1    murders.

2    Q.    You were down with the robberies but not the

3    murders.  Are you telling me again you pled to two

4    charges for things you didn't do?

5    A.    Well, it's the state law.  From what I hear, it's

6    a state law if you go along with the murder and someone

7    shoots and kills them, you're just as guilty.

8    Q.    If you were convicted of everything here, you

9    could get 23, plus 23, plus 9 for 3 more guns, plus as

10   much as 25, 25, and 25 for the agg. robberies and the

11   aggravated burglaries and two life sentences over and

12   above that, am I right?

13   A.    Correct.

14   Q.    Have you ever added all that up?

15   A.    It's, yeah, it's too much time.

16   Q.    What did it come to?

17   A.    About 130 years to 200 and some.

18   Q.    You'd die in prison if you caught all that time,

19   wouldn't you?

20   A.    Possibly.

21   Q.    You didn't want that to happen, obviously?

22   A.    Correct.

23   Q.    And that's why you made the deal that you did?

24   A.    I made the deal that I did because I didn't want

25   to try, try to get a risk of getting all that time.

1      Q.   Well, you couldn't get all that time if you

2   weren't guilty of some of those things, would you?

3      A.   I'm guilty of everything because I was there.

4      Q.   You're guilty of all those charges but the

5   prosecutor dismissed three-fifths of it for you?

6      A.   I'm guilty of the robberies, yeah, but I wasn't

7   guilty of the murders, but still, if -- since you're a

8   lawyer, you should know that.

9      Q.   That's --

10      A.   If you're down with a robbery, that's like

11   somebody goes in a bank, I go in the bank and some, say

12   for instance, a girl is waiting outside driving a car, I

13   go robbing the bank.  I accidently shoot the teller and

14   kill the man or woman, the teller.  She's just as

15   guilty, she's the getaway woman, she's as guilty as I

16   am, she may have pulled the trigger herself.

17      Q.   If you pled guilty to two aggravated murders, how

18   much time do you expect you're going to serve?

19      A.   Hopefully they get together as one.  So that

20   means I go to the parole board anywhere between 14 years

21   and 28 years.

22      Q.   You figured out exactly how long it's going to

23   take you to get to the parole board now?

24      A.   Pretty much.

25      Q.   You think you can get to the parole board in as

1    little as 14 years under this deal, am I right?

2    A.    It could be, it could be 28 years.

3    Q.    Well, let me ask you, how do you expect these two

4    charges to get run together so you could be released by

5    the parole board in 14 years?

6    A.    Go in there and do what's expected of me.

7    Q.    What's expected of you is to come in here and

8    testify that Weston Howe did these shootings, isn't it?

9    A.    What it's expected of me is to come in, tell the

10   Court what happened.

11   Q.    If you were to come in here and say Weston didn't

12   do these murders, I did or somebody else did, you

13   wouldn't get those two sentences run together the way

14   you want, would you?

15   A.    I probably wouldn't get any.  The deal that I

16   wrote would be off if I came and perjured off.

17   Q.    Your deal would be off if you didn't get --

18          MR. SLAVENS:      Objection.

19          THE COURT:      Sustained.

20   BY MR. ARNTZ:

21   Q.    You already told us, that the 11 or more times

22   that you perjured yourself under oath last year when you

23   took the oath to tell the truth from that very same

24   witness stand, that those things occurred because you

25   were trying to help yourself, is that right?

1   A.   I tried to get the video suppressed and thrown

2   out.

3   Q.   And you were trying to help yourself I think you

4   told me a little bit ago?

5   A.   Right.

6   Q.   And you're trying to help yourself now, aren't

7   you?

8   A.   I can't help myself right now.

9   Q.   How do we tell when you're telling the truth and

10  when you're lying under oath?

11              MR. SLAVENS:    Objection, your Honor.

12              THE COURT:    Sustain the objection.

13  BY MR. ARNTZ:

14  Q.   In fact, you also expect that if things go as

15  planned and you play your cards right, the prosecutor

16  will actually recommend, recommend on your behalf, that

17  the two sentences be run concurrently?

18  A.   He's not going to recommend anything.  He's just

19  not going to oppose it.

20  Q.   Oh, in other words, the prosecutor at the time of

21  your sentencing could say to the Judge, we oppose

22  running Elofskey's two life sentences together so he can

23  go to the parole board in 14 years?  He could do that?

24  A.   He could but he couldn't either.  That's between

25  him and Judge Dodge here.

1    Q.    But your understanding is that part of your deal

2    here today is that if all goes well, the prosecutor will

3    appear on your behalf at sentencing and say, we don't

4    oppose if you give him two concurrent life sentences

5    instead of making them run one after the other?

6    A.    I don't -- I'm not the prosecutor's mouth piece.

7    He can come in here and say, run them wild or run them

8    together at this time.  That's his, his choice.  It's up

9    to the Judge to go along or go against it.

10   Q.    You talked earlier how Walter would carry

11   sometimes a gun loaded or unloaded, and you, yourself,

12   had access to a gun, didn't you?

13   A.    I had a gun a couple years ago but as of now, no.

14   Q.    When you had that gun a couple years ago, that's

15   when you and Walter were going out as a team doing

16   things, isn't it?

17   A.    Yeah, we shot out car windows with BB guns, which

18   is over in the past and I've done time for.

19   Q.    And, for instance, when the two of you were

20   running around with loaded guns and shooting things,

21   Weston wasn't around during that, was he?

22   A.    No, but them are BB guns, them aren't real guns.

23   Q.    That's when you and Walter was running around as

24   a team.

25                MR. SLAVENS:      Objection.

1       THE COURT:        Sustained.  Sustain the

2   question.  Ask questions.

3   BY MR. ARNTZ:

4       Q.    In fact, the truth is you were convicted of

5   carrying a concealed weapon back in 1990, isn't that

6   true?

7       A.    Yes, I was.

8       Q.    And I think you told me if these two life

9   sentences don't get run together, it's going to be at

10  least 40 years, you think, before you go to the parole

11  board?

12          MR. SLAVENS:        Objection, your Honor.

13      Asked and answered.

14          THE COURT:        Overruled.  That will

15      stand.

16      A.    You get --

17  BY MR. ARNTZ:

18      Q.    I'm sorry?

19      A.    You get 14.  You get on 10 year sentence or 20

20  year sentence, you only do 14 'cause you get all that

21  good time with it, but then the parole board can go,

22  could go ahead, flop you back for 5.

23      Q.    You think the parole board will let you loose --

24          MR. SLAVENS:        Objection to what he

25      thinks, your Honor.

1      THE COURT:        Sustained.

2    BY MR. ARNTZ:

3      Q.    Well, you --

4      A.    Parole board isn't going to let nobody loose on

5    14 years on two aggravated murders charge.

6      Q.    You been sitting in that chair all day to get

7    those numbers down, haven't you?

8      A.    What do you mean getting them down?

9      Q.    By helping yourself?

10     A.    I'm not helping myself at all.

11     Q.    Well, you think your attorney, who is a former

12   prosecutor, did a good job in negotiating a plea

13   bargain?

14     A.    Personally, I don't think he did a damn thing.

15     Q.    He should have gotten you a better deal than

16   that?

17     A.    Yeah, for being a driver of the car.

18           He's got his job to do.  I've got mine to do.

19           MR. ARNTZ:        That's all.

20                             Thank you.

21           THE COURT:        Any redirect?

22

23

24

25

1    <u>REDIRECT EXAMINATION</u>

2    BY MR. SLAVENS:

3    Q.    Since the date of June 22d, 1992, have you ever

4    seen in its entirety the video that was played today?

5    A.    I seen it one time.

6    Q.    And in its entirety?

7    A.    Yeah, with both my lawyers present.

8    Q.    Okay.  All right.  And was it sometime after you

9    were indicted?

10   A.    It was after I was indicted, yes.

11   Q.    Okay.  Do you know now approximately when that

12   would have been that you would have seen the videos?

13   With reference to the date of June 22d, do you have any

14   idea it was in July or August or do you know?

15   A.    I think it was around September.  I'm not sure.

16   Sometime after, three months after I was here.

17   Q.    There's been some discussion in regards to a time

18   that you testified in this court.  So the record is

19   clear, you testified, am I correct, at a motion to

20   suppress hearing?

21   A.    Correct.

22   Q.    And you have only testified that one time in this

23   case?

24   A.    Correct.

25   Q.    Before today?

1     A.    Correct.

2     Q.    And when you testified at that one hearing, all

3     of the questions that were asked of you by defense

4     counsel here, Mr. Arntz, as you read from the

5     transcripts were -- were all of those questions and

6     answers, questions presented to you by your attorney?

7     A.    Yes, they were.

8     Q.    And at the motion to suppress hearing, were you

9     claiming that the police had somehow or another

10    mistreated you in informing you of your rights and

11    obtaining the statements from you?

12    A.    I claimed a lot of things that wasn't true.

13    Q.    The purpose of the hearing, and correct me if I'm

14    wrong, was to get the statements that you made to

15    Detective Lawson, Wade Lawson, and the videotape

16    excluded from evidence --

17    A.    Correct.

18    Q.    -- at your trial if you were to have a trial?

19    A.    Right.

20    Q.    Now going back to June 22d, or 23rd more

21    specifically, when you do meet with the detectives, how

22    do they treat you?

23    A.    They treated me pretty good.

24    Q.    Do they explain to you that you're being looked

25    at as a candidate for the charge of aggravated murder as

1    it related --

2    A.    They told me that's what I was charged with.

3    Q.    -- and that related both to Mr. McDonald --

4    A.    McDonald and Blazer.

5    Q.    And they didn't hold anything back from you?

6    A.    No.

7    Q.    And when you pled guilty, you knew the penalties

8    at that time?

9    A.    Correct.

10   Q.    Now you pled guilty, and it's dated on here, I

11   believe.

12   A.    February 5 -- February 13th, I think, 12th, or

13   something like that.

14   Q.    That says the above-named defendant appeared in

15   open court this 10th of February, 1993.  Would that be

16   close to being correct?

17   A.    Correct.  Or sometime in there.

18   Q.    And when you talked to the detectives, there was

19   a part in the video as to how you thought Polson had

20   fired some shots inside the Blazer house?

21   A.    Correct.

22   Q.    And how there was some shots fired by Weston Lee

23   Howe, who you called Lee, outside of the Blazer house?

24   A.    Correct.

25   Q.    Also, on the video though, there was some

1    discussion in regards, I think you even did a

2    demonstration, as to where Weston Lee Howe was and how

3    he was situated at that time McDonald was shot?

4       A.    Right.

5       Q.    And do you recall seeing the video as to how you

6    demonstrated that?

7       A.    Yeah.

8       Q.    And those things occurred in your car?

9       A.    Correct.

10      Q.    And I think, am I correct on, and on the video

11   you indicated that both after the shooting as to

12   McDonald, that Weston Lee Howe and also Walter Polson

13   ran after Mr. McDonald?

14      A.    Correct.

15      Q.    And I think it was corrected on the video.  It

16   indicated Polson was the one who went up and you saw

17   them next with the billfold or at least property of

18   Mr. McDonald?

19      A.    Yes.

20      Q.    You weren't trying -- well, strike that.

21           And as you sit here today, you, you recognize

22   that your sentencing is to be determined by Judge Dodge?

23      A.    Right.  He's the one that says run them together

24   or run them wild.  That's his choice.  He makes up his

25   own mind, nobody else can.