1 Q. When you say under cross-examination that you

2 were down for the robberies and not the shootings or the

3 murders, what did you mean by that?

4 A. I was down with robbing people.  As for killing

5 them, I wasn't down for that.  But I'm still charged

6 with it anyways.

7 Q. And you understand that --

8 A. Yeah.

9 Q. -- the form of the law, complicity, aider and

10 abettor, if two people go out and do one thing, both is

11 responsible for what the other one does?

12     MR. ARNTZ:   Objection.

13     THE COURT:   Overruled.  I will instruct

14 the jury at the appropriate time what all the law is.

15 A. Sure.

16 BY MR. SLAVENS:

17 Q. But that's your understanding?

18 A. Correct.

19 Q. That's what you explained to Mr. Arntz?

20 A. Correct.  That's what I -- I, I think the law was

21 passed in '78.

22 Q. Whatever.

23   And your lawyers explained that to you.

24 Q. All right.  And to your understanding, that same

25 law would apply to Walter Polson?

1  A. Correct. It would apply to anybody in our shoes.

2  Q. All right. Good point.

3    As you met with the detectives on June 21st, June

4 22d or June 23rd when you first talked to Detective

5 Lawson, other than what we've heard from you in regards

6 to what you said happened and on cross-examination by

7 Mr. Arntz and the video, have you ever once changed your

8 contention as to what happened?

9    MR. ARNTZ:  Objection.

10  A. No.

11    THE COURT:  Overruled.

12  A. Every time Detective Lawson talked to me, my

13 story remained the same.

14    MR. SLAVENS:  That's all I have.

15    THE COURT:  Recross-examination?

16    MR. ARNTZ:  No. Thank you very much.

17    THE COURT:  You may step down.

18        * * * *

19    THE COURT:  Ladies and gentlemen of the

20 jury, let's take an afternoon recess at this point in

21 time. Remember the usual instructions from the Court

22 not to discuss the case among yourselves or with

23 anybody else. Don't form any opinions, you have not

24 heard all the testimony.

25      We are going to have to

```
 1      stop right around 4:00.  We'll play it by ear if we

 2      are coming back in after 4:00, but we do need to take

 3      a break at 4:00.  Court has other matters.  The

 4      lawyers have other matters unrelated to this

 5      situation.  You might want to think about it if you

 6      want to call it a day at 4:00 or take another break at

 7      4:00 and come back for, say, a half hour or so say

 8      from 4:15 or quarter of 5.  Think about it.  Let

 9      Shirley know what your druthers are on the matter.

10                              Remember the instructions.

11      We'll see you back in 15 minutes.

12                  (WHEREUPON, a recess was taken.)

13

14            IN OPEN COURT - BEFORE THE JURY

15                              3:33 p.m.

16            THE COURT:        State may call its next

17      witness, please.

18            MR. DUNDES:       State will call Wade Lawson

19      to the stand.

20

21

22

23

24

25
```

```
 1                    WADE LAWSON, having been first duly

 2                    sworn according to law, was examined and

 3                    testified as follows:

 4                         DIRECT EXAMINATION

 5    BY MR. DUNDES:

 6       Q.    Would you state your name and spell your last

 7    name for the record?

 8       A.    Yes.  Wade Lawson, L-A-W-S-O-N.

 9       Q.    And where are you employed, sir?

10       A.    City of Dayton Police Department.

11       Q.    And how long have you been employed there?

12       A.    August 19th of this year it will be 24 years.

13       Q.    What does your current job duties entail?

14       A.    For the past 10 years I have been a homicide

15    investigator.

16       Q.    In the homicide squad?

17       A.    Yes, that's correct.

18       Q.    And could you tell the ladies and gentlemen of

19    the jury who makes up the homicide squad personnel?

20       A.    We have four investigators.  Myself, my brother

21    Tom Lawson, Detective Doyle Burke, Detective Tony

22    Spells.  That's the four investigators.  Our sergeant,

23    our immediate supervisor is Larry Grossnickle.

24       Q.    I would like to direct your attention back to

25    June 22d, 1992, and ask if you were working a homicide
```

1    squad on that date?

2       A.   Yes.  Yes.

3       Q.   Approximately 9:03 in the morning did you have

4    the opportunity to be dispatched to Findlay and Monument

5    streets?

6       A.   Yes, I did.

7       Q.   Why was that?

8       A.   A report of a homicide.

9       Q.   Is that in Montgomery County, State of Ohio?

10      A.   Yes, it is.

11      Q.   And when you got there, who else responded to the

12   scene?

13      A.   My brother Tom went, Sergeant Grossnickle,

14   Detective Spells, and also Detective Jim Rohrer, who

15   works the assault squad that associated with our squad.

16   He's not a homicide investigator but he responded.

17      Q.   Where was your location when you were dispatched?

18      A.   I was at our office, the Safety Building, 335

19   West Third Street.

20      Q.   Approximately how long did it take you to get to

21   the Findlay and Monument address?

22      A.   Arrived at 23 minutes after 9.  Twenty minutes.

23      Q.   And who was on the scene when you got there?

24      A.   Sergeant Wyant was there, the uniformed sergeant;

25   two medic personnels; Martin Dorf, D-O-R-F, I believe it

```
 1    is; uniform officer; Officer Beam was there; coroner's

 2    investigator Dave Lett.  That's all I recall right

 3    offhand.

 4      Q.   Was there also a victim at the scene?

 5      A.   Yes.

 6      Q.   And did you have occasion to look at that

 7    particular victim?

 8      A.   Yes, I did.

 9      Q.   Could you describe the person to me, please?

10      A.   Yes.  The victim was a white male, appeared to be

11    young, middle twenties.  He was lying on his back,

12    facing, facing east.  His hands were -- elbows were bent

13    at 90 degrees up to the sides of his head.  Noticed he

14    had a pair of eye glasses in his left hand.  His left

15    hand was bloody.  The eye glasses were bloody.  His

16    right fist was sort of clinched, it was blood on the

17    fist also.  Noticed he was dressed in a Emery jacket,

18    black and white.  His jacket was a zip up jacket.  It

19    was open.  It had a white T-shirt on under this jacket,

20    had blood on the T-shirt, blood splattering.  And also

21    around the left nipple area, quite a bit of blood there,

22    a, what appeared to be a bullet hole in the shirt.  Also

23    had on blue jeans.  I noticed some blood along the right

24    front, the right leg, there is blood on the pants.  I

25    noticed he was wearing, I think, tan shoes, did not have
```

1    socks or belt on.

2              MR. DUNDES:        May I approach the witness,

3      your Honor.

4              THE COURT:        You may.

5    BY MR. DUNDES:

6      Q.    Showing you what's been marked previously as

7    State's Exhibit No. 4 for identification.  Could you

8    tell me what that is, please?

9      A.    Yes, this is a photograph.  And it's a photograph

10   of Mark McDonald as I saw him on June the 22d of last

11   year.

12     Q.    And are there any visible wounds on that

13   particular person?

14     A.    On the chest there is blood spot that I mentioned

15   here, yes.  Then, of course, the blood from the mouth

16   running down the front and off to the right side of his

17   face.

18     Q.    And those are wounds you just finished

19   describing?

20     A.    Yes, that's correct.

21     Q.    Also showing you what's been previously marked as

22   State's Exhibit 3 for identification, and could you tell

23   me what that is a photograph of?

24     A.    Yes.  This photograph shows entire body of Mark

25   McDonald as I saw him on that date.

1    Q.    I'm also showing you what's been previously

2    marked as State's Exhibit 9 for identification.    Could

3    you tell me what that is, please?

4    A.    Yes.    This is a photograph of Mark McDonald's

5    left hand where he's clinching the eye glasses.

6    Q.    Now those photographs fairly and accurately

7    depict the victim as you saw it on June 22d of 1992?

8    A.    Yes, sir, they do.

9    Q.    Did you also have the opportunity to speak with a

10   coroner's investigator?

11   A.    Yes.

12   Q.    And from your conversation with him, what did you

13   learn?

14   A.    Well, I was present when he examined the body at

15   that location and was present when keys were taken,

16   removed from Mr. McDonald's pocket on that date.

17   Q.    Who removed those keys?

18   A.    Mr. Lett.

19   Q.    And do you recall what he did with those keys?

20   A.    Yes, he kept the keys.    But we, there was car

21   parked nearby and he tried the keys -- the keys were

22   taken out of the pocket -- to the door to the car.

23   Q.    Now I'm showing you what's been previously marked

24   as State's Exhibit 6 for identification.    You testified

25   there was a car parked nearby?

1    A.   Yes.

2    Q.   Could you identify that photograph for me,

3  please?

4    A.   Yes.  This is a photograph of a blue '88 Mercury,

5  license C, Charlie, U, Union, V, as in Victor 750.  This

6  car is parked 167 northeast where we found the body.

7  And the keys that were removed from Mr. McDonald's

8  pocket did fit the door, to this door.

9    Q.   And does that picture fairly and accurately

10  depict the automobile as you saw it on that morning?

11    A.   Yes, sir, it does.

12    Q.   Now at that point did you occasion to run the car

13  registration?

14    A.   Yes.

15    Q.   And do you know the owner of the car from that

16  registration?

17    A.   Yes, Mark McDonald.

18    Q.   Was an address given?

19    A.   Yes, on Cheri Lynn Drive.

20    Q.   That's in Dayton?

21    A.   Yes.

22    Q.   After you learned the location of the

23  registration, did you go to that place, the residence?

24    A.   Yes.

25    Q.   And what did you find when you got there?

1    A.    Did not find anyone home at that house.

2    Q.    Did you have an opportunity to speak to anyone

3    out at that residence or in that area?

4    A.    Yes, spoke to a neighbor house that was nearby.

5    Q.    And from that conversation, were you able to

6    learn where the people that lived at the 6106 residence

7    were?

8    A.    I learned where the lady of the house worked,

9    yes.

10    Q.    And where was that?

11    A.    Allied Carpet on Main Street.

12    Q.    Is that her place of employment?

13    A.    It was, yes.

14    Q.    Do you remember her name?

15    A.    Yes, Sandra McDonald.

16    Q.    And is that the mother of the decedent in this

17    case, Mark McDonald?

18    A.    Yes.

19    Q.    Okay.  From there where did you go?

20    A.    Myself -- when I went to the house on Cheri Lynn,

21    I was with the coroner's investigator, Dave Lett.  Then

22    myself and Mr. Lett went to Allied Carpet where we

23    contacted Mrs. McDonald.

24    Q.    And did you inform her of her son's condition at

25    that time?

1     A.     She was informed by the coroner's investigator in

2     my presence, yes.

3     Q.     Approximately how long were you with Sandra

4     McDonald?

5     A.     Ten minutes at the most I would say.

6     Q.     And did you have conversation with her?

7     A.     Yes.

8     Q.     And what was that?

9     A.     In regards to when she last seen her son.

10    Q.     Did you speak with her about going out to her

11    residence?

12    A.     Yes.

13    Q.     And when did you get out there?

14    A.     At 4 p.m. that same date.

15    Q.     And who was with you when you went out there?

16    A.     My brother Tom.

17    Q.     Was he also a Dayton homicide detective?

18    A.     Yes, he is.

19    Q.     Now you testified that you went out there.  What

20    did you do when you got there?

21    A.     Of course, we met with Mr. McDonald.  That's the

22    first time we met him.  And we advised the McDonalds

23    that we would like to look through Mark's room, which

24    they allowed us to do.

25    Q.     And did you find anything of significance in the

1    investigation?

2    A.    No.  No.

3    Q.    Okay.  I would like to direct your attention to

4    approximately 11:16 p.m. on June 22d, 1992, and ask you

5    if you were dispatched to Good Samaritan Hospital?

6    A.    Yes.

7    Q.    And why is that?

8    A.    On -- I was dispatched from my residence to the

9    hospital on a report of a shooting.

10   Q.    Approximately what time did you get to the

11   hospital?

12   A.    Thirty minutes later, probably.

13   Q.    And did you talk to anybody when you got there?

14   A.    Yes.

15   Q.    And from that conversation what did you learn

16   about the shooting victim?

17   A.    Learned that he had died at 11:20 p.m.

18   Q.    And did you learn how he had died?

19   A.    Yes.

20   Q.    How is that?

21   A.    He suffered two gunshot wounds, one in the chest,

22   one to the back of the head.

23   Q.    And did you know the residence of that victim?

24   A.    Yes.

25   Q.    How did you know that?

1     A.    That I had been provided to me by the dispatcher

2     when I was contacted.

3     Q.    Did you know the name of the victim at that time?

4     A.    Not until I got to the hospital, no.

5     Q.    And what was the name?

6     A.    Richard Blazer.

7     Q.    Did he live at 1912 Tennyson?

8     A.    Yes.

9     Q.    At that point, did you have occasion to go to

10    1912 Tennyson?

11    A.    Yes, I did.

12    Q.    Approximately what time?

13    A.    About quarter till midnight, I think is close.

14    I'm not sure the exact time, maybe ten minutes till

15    midnight.

16    Q.    Is that fairly close to Good Samaritan Hospital?

17    A.    Yes.

18    Q.    When you got to the scene of 1912 Tennyson, who

19    was present?

20    A.    Sergeant Grossnickle was there, evidence

21    technician Marshall Manning was there, Officer Watson

22    was there, Sergeant Larry Grossnickle and Tom was there.

23    Q.    Okay.  From there you were sent to East Helena

24    Avenue?

25    A.    Yes.  I was sent by Sergeant Grossnickle to 42

1    East Helena to meet with an evidence technician, Rick

2    Smith, at that location.

3        Q.    Okay.  What did you find when you got to East

4    Helena?

5        A.    I found that a gun had been recovered.  It was

6    there in the possession of Rick Smith.  I saw the gun.

7    And after having short conversation with him and

8    Sergeant Larry Faulkner, I left that location and went

9    like one block north to McOwen Street.

10       Q.    And what did you do at McOwen Street?

11       A.    I saw a car, a red Monza was parked on McOwen at

12   Riverside Drive.  The car was headed westbound on McOwen

13   along the north curb of McOwen, actually was in front of

14   69 McOwen.  It's a red Monza.

15       Q.    I'm showing you what's been marked previously as

16   State's Exhibit 32 for identification, could you tell me

17   what that is a photograph of?

18       A.    Yes.  This was a photograph of a house along the

19   north curb of McOwen and it shows two cars, a red Monza

20   that I mentioned and a blue car parked in front of this

21   Monza headed both westbound.

22       Q.    Is the red Monza the one you identified earlier

23   at the scene?

24       A.    Yes, that's correct.

25       Q.    Is there an apartment number on that particular

1    house?

2      A.    Well, I cannot see an apartment.  It looks like a

3    69.  I'm not sure.

4      Q.    Does that photograph fairly and accurately depict

5    the automobile as you saw it at that time?

6      A.    Yes.

7      Q.    Did you have occasion to run the license plate

8    registration on that car?

9      A.    Yes, I did.

10     Q.    And after running it, did you determine who it

11   was registered to?

12     A.    Yes, I did.

13     Q.    Do you have a name?

14     A.    Yes.

15     Q.    Who was that?

16     A.    The car was registered to Tony, middle, D as in

17   David, Elofskey.  License on the car, FMD-921.  That car

18   is registered to Tony Elofskey, address 1617 Mack

19   Avenue.

20     Q.    Was Mr. Elofskey at the scene at that time?

21     A.    No.

22     Q.    Do you know where he was?

23     A.    No.

24     Q.    Did you also have an occasion to look inside of

25   the vehicle?

1    A.    Yes.

2    Q.    What did you find with regard to the seating

3    arrangements?

4    A.    In the car the only thing I noted was some tapes

5    and speakers in the back seat behind the driver seat.

6    I, I did notice that on the passenger side the back of

7    the front seat, it was pushed forward was the main thing

8    that I noticed along with the car.

9    Q.    Could you tell from your observations whether or

10   not you had to push that seat forward to get out of the

11   rear seat, the person getting out of the rear seat?

12   A.    Yes, the person would, yes.

13   Q.    At that point did you return to the Safety

14   Building?

15   A.    Yes.

16   Q.    Okay.  Where again is that located?

17   A.    335 West Third Street.

18   Q.    When you get there, what do you do?

19   A.    I found that -- well, I already knew that two

20   people had been taken down to our office by the uniform

21   crews to be interviewed.  They were in room 275.

22   Officer Wiesman was there, Officers Jackson and Gross,

23   also there was a Walter Polson was in an interview room.

24   And I interviewed Mr. Polson.

25   Q.    Okay.  Now, you say you interviewed Mr. Polson.

1   Was that an oral interview?

2       A.   Yes.

3       Q.   Before you had occasion to interview him, did you

4   make general observations of his demeanor?

5       A.   Yes.

6       Q.   And could you tell the jury what that was?

7       A.   He appeared normal.  Did not appear to be

8   intoxicated.  Didn't smell any odor of alcohol about

9   him.  His speech was not slurred.  He walked without

10  staggering.  Didn't appear to be intoxicated.  Appeared

11  to be normal, calm.

12      Q.   Did you make at that time any promises to him --

13      A.   No.

14      Q.   -- to encourage him to talk?

15      A.   No.

16      Q.   Did you make any threats?

17      A.   No.

18      Q.   I'm showing you what's been previously marked as

19  State's Exhibit 70 for identification.  Can you tell me

20  what that is, please?

21      A.   Yes.  This is a Pre-Interview Form that was -- it

22  is a Pre-Interview Form.

23      Q.   Now, do you normally read this to individuals

24  before you interview them?

25      A.   Yes.

1    Q.   And do you -- let's look up here at the top where

2    it says your rights.   Is that where you specify the

3    charges relating to that particular person?

4    A.   Yes, that's correct.

5    Q.   Okay.   And on the left-hand side at the top,

6    what's up there?

7    A.   The name Walter D. Polson, address 121 Valley,

8    Apartment 3, then the social security number and date of

9    birth.

10   Q.   Is that the person that you're normally going to

11   interview for these particular charges?

12   A.   That's correct.

13   Q.   Before interviewing them, do you read each and

14   every one of these paragraphs and have them initial

15   them?

16   A.   I read the paragraph.   I do not have them initial

17   them.   I read the paragraph, ask, do they understand

18   each one before I proceed to the next one.

19   Q.   Your practice is not to have them initial it?

20   A.   I do not.

21   Q.   Do you have knowledge whether or not other

22   officers have them initial the paragraph?

23   A.   I've seen some, but I do not.

24   Q.   See below is called waiver of rights?

25   A.   Yes.

1        Q.    Do you read that to the suspect?

2        A.    Yes, I do.

3        Q.    After reading that, does he fill in approximately

4    how much schooling he's had?

5        A.    I fill it in if I'm reading the form to him.    I

6    asked the person that I'm interviewing when I get to

7    this point, how many years schooling have you completed,

8    then I insert that myself.

9        Q.    In this particular case, did you ask Mr. Polson

10   how many years of school?

11       A.    Yes.    Now, this was read to him in my presence by

12   Detective Tony Spells.    And, yes, I was present when

13   Detective Spells asked about his schooling.    And he

14   stated 11 years.    He put in -- well, Detective Spells

15   put in 11 up here.

16       Q.    It says witnesses down here.    Are there two

17   signatures?

18       A.    Right.

19       Q.    What names are listed as witnesses?

20       A.    First one is T.B. Spells and below that is my

21   name, Detective Wade E. Lawson.

22       Q.    You were present when Detective Spells signed it?

23       A.    Yes, sir, that's correct.

24       Q.    Now, there is a signature Walter Polson, is that

25   correct?

1 A. Yes.

2 Q. Were you present when Walter Polson signed it?

3 A. Yes.

4 Q. Now at any time while reading this Pre-Interview

5 Form to Walter Polson, did you have any part of this

6 covered?

7 A. No, absolutely not.

8 Q. He had free opportunity to read each and every

9 paragraph before he signed it?

10 A. Yes.  Yes, sir, he did.

11 Q. You testified that Tony Spells was present, is

12 that correct?

13 A. Yes.

14 Q. Did he cover any one of these paragraphs and keep

15 it from Walter Polson's sight before Walter Polson

16 signed it?

17 A. Absolutely not.  The form was on the table in

18 front of him.  No portion of it was covered.

19 Q. Then after reviewing each paragraph, did Walter

20 Polson agree to talk to you?

21 A. Yes.

22 Q. Without an attorney present?

23 A. Yes, he did.

24 Q. Before beginning your interview with Mr. Polson,

25 did you have any conversation with him specifically with

1    regard to any other suspects in the case?

2        A.    Other than that the defendant was there on the

3    second floor also.

4        Q.    Now, you say the defendant, which defendant?

5        A.    Mr. Howe.

6        Q.    Do you know where any other suspects in the case

7    were located at that time?

8        A.    No.

9        Q.    Did you give Mr. Elofskey any facts that were

10   within your knowledge relating to this case?

11       A.    Mr. Polson?

12       Q.    I'm sorry.  Mr. Polson.

13       A.    No facts of the case.  I made a comment to him

14   before the interview started.  I made the comment that,

15   you know, you were picked up where this man was shot and

16   killed tonight.  You were picked up near where the car

17   was.  And I said we had a homicide this morning, I know

18   you are involved in that one also.  And I said, I want

19   you to tell me the truth about what happened.

20       Q.    Did you tell him where the homicide in the

21   morning was located?

22       A.    No.  I just said we had a homicide this morning.

23   I want you to tell me the truth about what happened.

24       Q.    Did you say anything to him about an automobile

25   that you had in your possession?

1    A.    Not -- as the conversation continued, yes, we

2    did.

3    Q.    And what was that?

4    A.    About the car we had on McOwen and it being

5    registered to, to Tony Elofskey.

6    Q.    Now, I know at that point you don't know whether

7    or not Tony Elofskey was arrested?

8    A.    Oh, Tony Elofskey was not in custody at that

9    time.

10    Q.    Now, during your conversations with Mr. Polson,

11    were you ever able to determine his part in the Mark

12    McDonald murder?

13    A.    Yes.

14    Q.    And from that conversation, were you able to tell

15    what the plan was with regard to Mark McDonald?

16    A.    Yes.

17    Q.    And what was that?

18              MR. ARNTZ:        I will object to this

19        portion.

20              THE COURT:        Sustained.

21              MR. ARNTZ:        Thank you.

22    BY MR. DUNDES:

23    Q.    Were you able to determine from your conversation

24    with Walter Polson if he along with Tony Elofskey and

25    Weston Howe were going to rob Mark McDonald?

1    MR. ARNTZ:    Same objection.

2    MR. SLAVENS:    Can we approach the bench,

3    your Honor?

4    THE COURT:    Yes.  Sure.

5    (WHEREUPON, a side-bar conference was held

6    off the record.)

7    THE COURT:    Ladies and gentlemen of the

8    jury, we've run into a legal question and it's

9    obviously right at 4 o'clock.  And as I indicated to

10   you earlier, the Court has other matters scheduled at

11   4 o'clock, as does counsel.  So it appears to be this

12   is a very logical time to take up this legal

13   discussion out of your presence while you're hopefully

14   relaxing somewhere else.

15   In any event, we'll go

16   ahead and recess for the evening at this point in

17   time.  We'll reconvene, we'll try to get started at

18   9:15 tomorrow morning.  I think it's safe to assume

19   tomorrow, being Tuesday, we will probably get into

20   Wednesday.  You should have the case sometime

21   Wednesday.  I just wanted to let -- when I say you

22   should have the case, that means you should be

23   deliberating the case sometime Wednesday.  Keep in

24   mind, there are several other steps in the process yet

25   to go and I will keep you advised as to each step but

1   that's the way it looks, at least as we speak.

2                          Have a nice evening.

3                          Remember the usual

4   instructions of the Court not to discuss the case

5   among yourselves or with anybody else.  Don't form any

6   opinions.  Keep away from any form of news media

7   relating to the case.  And we'll see you tomorrow

8   morning at 9:15:

9

10          (WHEREUPON, the proceedings for March 1,

11   1993, were then concluded.)

12                      *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (March 2, 1993 - Morning Session)

2                      9:29 a.m.

3    IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY

4

5          THE COURT:        All right.  Let the record

6    reflect we are out of the presence of the jury.

7                          And late yesterday

8    afternoon, which was Monday, March 1, the State

9    attempted to ask the witness, Detective Wade Lawson,

10   some questions relating to what has been labeled as

11   prior consistent statements made by a witness Polson.

12   There was then an off the record discussion and we

13   then took a recess for the day.

14                          Is the State prepared to

15   summarize on the record?  Let's not worry about the

16   formal wording of the question but the issue in

17   general.

18          MR. SLAVENS:      Yes, your Honor.

19          THE COURT:        Obviously, if the question

20   is not worded properly, that's a different issue.

21          MR. SLAVENS:      I think the Court

22   instructed -- we were not on the record yesterday but

23   at side bar.  I informed the Court, at least as to the

24   question subject matter of the detective was

25   admissible, the answer to, it would have been

1    admissible under a couple rules, one of 803, which

2    concerns the evidence rule, state of mind, if you

3    will, of the declarant.  And it's one of the

4    questions, re: Did the detective learn from Mr. Polson

5    what Mr. Polson's plan was?  And Evidence Rule 803(3)

6    basically states that a declarant's then existing

7    state of mind, emotion, sensation, or physical

8    condition, paren, such as intent, plan, motive,

9    design, et cetera, et cetera, are admissible even

10   though they are hearsay.

11                        But more importantly, we

12   would like to point out to the Court that under

13   cross-examination of, of Mr. Polson and also later

14   Mr. Elofskey, that there were inferences, suggestions,

15   directly and indirectly, that those witnesses have

16   altered, fabricated or have given an inconsistent

17   statement during the time of their testimony.  We

18   therefore believe that Rule 801(D)(1) applies, which

19   is specifically labeled, a witness's prior consistent

20   statement and explains under what circumstances those

21   prior statements, albeit consistent, now are

22   admissible.  And that is the direct purpose of the

23   questions related to Detective Wade Lawson as it

24   relates to his interview with Walter Polson and of

25   Elofskey.

1            THE COURT:     Mr. Arntz.

2            MR. ARNTZ:     If the Court please, we had

3    an objection, three parts to those later couple

4    questions at the end of the day.

5                  The first part of our

6    objection goes to the fact that we feel that this is

7    hearsay.  We do not agree that 801(D)(1) permits

8    questions of that type.  And we referred the Court to

9    a case, <u>State vs. Smith</u> found at 34 Ohio App. 3d 180,

10   a Richland County case (1986).  That case stood for

11   the proposition, the timing of the prior consistent

12   statement may be determinative of the question.  When

13   facts giving rise to the motive to falsify existed

14   before the disputed consistent statements.  The

15   exemption does not apply.

16               And we feel in this case

17   those statements allegedly made by either Polson or

18   Elofskey to either of the detectives were made at a

19   time when there were certainly a motive to falsify,

20   therefore, that exemption from the hearsay proposition

21   would not be available to the State.

22             Secondly, the prosecutor's

23   reliance on the hearsay exception 803(3) is misplaced

24   as well.  He describes that exception as state of mind

25   but actually it is labeled mental condition.  And

1     803.3 expressly excludes, quote:  a statement of

2     memory or belief to prove the fact remembered or

3     believed.  And that is the purpose for which the State

4     is offering these statements is to argue that because

5     of statements was made by either Polson or Elofskey,

6     that therefore indicates that the statement substance

7     is true at that time.  803(3) expressly excludes the

8     use of a statement for that kind of a purpose.

9                              And our third objection

10    goes to the form of these questions.  Because the form

11    of the questions suggests or implies the truth of the

12    matter asserted.

13                              For instance, I believe one

14    of the questions yesterday asked Detective Lawson, as

15    a result of his conversation with Mr. Polson he had,

16    quote, determined, unquote, that something had

17    happened.  And the only way Lawson could have

18    determined that by implication was because he relied

19    on the truthfulness of what Polson told him.  So,

20    again, the form of the question is important because

21    it suggests the very truthfulness of the answer which

22    constitutes hearsay.

23              THE COURT:      All right.  Again, the

24    Court will deal with the question on a question by

25    question basis.  And based upon the last statement by

1    Mr. Arntz, if the record does not reflect, assuming

2    that a question such as that was asked, that that is

3    the wording of the question, the Court would sustain

4    that type of an objection based upon the reason stated

5    by defense counsel.  However, assuming the question is

6    properly worded, the Court believes that Rule

7    801(D)(1), clearly applies in this situation,

8    particularly in view of the cross-examination of the

9    witness Polson and Elofskey and addressing simply, I

10   think a review of that cross-examination would

11   indicate, although the possibility does exist as to

12   the reasons and motivation to lie at a particular

13   moment in time, may have existed earlier.  It was

14   certainly brought up to date with the, the issue of

15   the plea negotiations and the plea bargaining and the

16   potential each of the defendants could each receive.

17                    In addition, the case

18   relied upon by the defendant, State vs. Smith, a

19   review of that case shows that it's clearly not

20   applicable in this present situation.  And without

21   getting into the merits of that case, I find that has

22   totally no value whatsoever as the citation on this

23   issue in this case.  Perhaps in a factually similar

24   case to the Smith matter, it would be considered but

25   at least not under the state of the evidence in this

1    particular case.

2              MR. ARNTZ:      If the Court please, may we

3    have a continuing objection then to the State

4    eliciting the statements, the prior statements of

5    either Polson or Elofskey in this matter?

6              THE COURT:      I have no objection to

7    that.

8                              Mr. Slavens, do you have an

9    objection?

10             MR. SLAVENS:    No objection.

11             MR. DUNDES:     No objection.

12             THE COURT:      That way we can run smooth.

13   The record will reflect this area of testimony has

14   been objected to by the defendant.  And assuming now

15   the continuing objection goes to the general subject

16   matter, not necessarily to the individual question or

17   the form of the question or any other objection that

18   the defense may have.

19             MR. ARNTZ:      I understand.

20             MR. SLAVENS:    We don't disagree.  We

21   concur.

22             THE COURT:      Now with that then, is the

23   State ready to proceed?

24             MR. DUNDES:     Yes, your Honor.

25             THE COURT:      Defense ready?

1           MR. ARNTZ:        Yes, your Honor.

2           THE COURT:        Anything else for the

3    record while we are waiting on the jury?

4           MR. ARNTZ:        None that I know of.

5

6           IN OPEN COURT - BEFORE THE JURY

7                              9:40 a.m.

8           THE COURT:        Good morning.

9           THE JURY:         Good morning.

10          THE COURT:        Detective Wade Lawson is

11   still on the witness stand.  And you will recall we

12   broke yesterday evening, we have revolved some of the

13   legal matters that were, that were brought forth.

14   That's one.  Well, that's the major reason for the

15   slight delay here this morning.

16                              Detective Lawson, you're

17   still under oath.

18          DETECTIVE LAWSON:  Yes.

19          THE COURT:        And, Mr. Dundes, you may

20   continue.

21          MR. DUNDES:       Thank you, your Honor.

22

23

24

25

1           (Direct Examination - Continued)

2                   WADE LAWSON

3    BY MR. DUNDES:

4    Q.    The best way to start, Detective Lawson, I would

5    like to direct your attention to an oral interview that

6    you had with Walter Polson on June 22d of 1992 at

7    approximately 1:20 in the morning.  And I would like to

8    ask you what you said to him at that time.

9    A.    Yes.  First thing I recall saying to Mr. Polson,

10   I know you were involved in this homicide earlier this

11   evening, arrested short time after you run from the car.

12   I know you were involved in the homicide over at, over,

13   that happened earlier over at Monument and Findlay.  I

14   want you to tell me about both of them.

15   Q.    At that point was he willing to talk to you?

16   A.    Yes, he was.

17   Q.    What did he tell you with regard to the Mark

18   McDonald homicide?

19   A.    Stated earlier, was actually Sunday, late Sunday

20   night or Sunday evening, he and his brother, half

21   brother, the defendant Mr. Howe, had walked over from

22   the vicinity of Valley and Troy Street, where they were

23   staying over on East Fifth Street over at that location.

24   They met up with Tony Elofskey and had rode around in

25   Tony's car.  They wanted to rob somebody.  And they

1    drove over to the river levee off Helena Street.  And

2    that Tony Elofskey was driving the car, this red Monza,

3    Tony's car.  And that Mr. Polson said that he was in the

4    back of the car.  He was ducked down in the back so

5    nobody could see him.  And his brother, the defendant,

6    was in the front seat.  He was ducked down in the front

7    so if they met somebody on the river levee, the only

8    person would be seen would be the driver, the person

9    that they would only see.

10    Q.    Did they tell you why they were ducked down?

11    A.    Yes.

12    Q.    What was that?

13    A.    That nobody would approach them on the river

14    levee if three people were in the car.  So they had to

15    make it appear that only one person was in the car.

16         Went on to say that as they were on the river

17    levee, a person in the car did pull up and did talk with

18    Tony Elofskey.  Polson, of course, said he stayed down

19    in the back of the car and his brother in the front.

20    Then, they drove away.  Then this car was following

21    them.  He was aware that the car was following them.

22         And then they got to a field.  He called it

23    Monument and Findlay Street.  They arrived first and

24    parked.  And he said he stayed down in the back of the

25    car.  And his words to me was that his brother was

```
1    acting as if he was giving a blow job to Tony Elofskey.

2         And he stated the person walked up to the car of

3    a white male with glasses on.  When he did, the

4    defendant, his brother, shot the man three times.

5    Q.   Now, did Mr. Polson tell you whether or not he

6    had a gun himself?

7    A.   He said he had a gun, yes.

8    Q.   And what type of gun?

9    A.   25 caliber semiautomatic.

10   Q.   Did he describe it to you?

11   A.   Yes.

12   Q.   And what was the description of that gun?

13   A.   It was a chrome plated cream or nickel plated gun

14   with white handle.

15   Q.   Was it also a Raven?

16   A.   It was a Raven, yes.

17   Q.   Did he tell you what type of gun that Mr. Howe

18   had?

19   A.   Yes.

20   Q.   What type of gun was that?

21   A.   It was also a 25 caliber handgun.  It was black

22   or blue steel.

23   Q.   Was it a Bryco?

24   A.   Right.

25   Q.   What, if anything, did he tell you that Mr. Howe
```

1    did at that time?

2      A.    Well, after, after firing three shots to the man

3    that was standing at beside the driver's door of the

4    car, when he was shot, he stated his brother shot the

5    man three times actually past Elofskey's face.  He would

6    have been holding the gun past Elofskey and shot the

7    man.  Then he said both he and Polson and -- he and Howe

8    jumped out of the car.  The man took off running after

9    he was shot.  That they chased him and the man fell and

10   that they went through his pockets, took his, actually

11   said his brother took the billfold out.  He and Polson,

12   stated that he ended up with the wallet.  They brought

13   it back to the car and left the man at that location,

14   that Tony Elofskey pulled out and picked them up, they

15   jumped back in the car and left that location.

16     Q.    Okay.  Did he tell you where they went from

17   there?

18     A.    Yes.  They first went down on Wayne Avenue to a

19   Green Machine and tried to use one of the cards that

20   they obtained from the victim's billfold, Mark

21   McDonald's billfold.  Then I believe went to Woodman

22   Drive.  They tried to use, to use this Green Machine

23   card or this money card unsuccessfully.

24     Q.    I'm sorry?

25     A.    Unsuccessfully.  They didn't get any money.

1    Q.    Did he tell you what they did with the wallet or

2    billfold after that?

3    A.    Yes, he did.

4    Q.    What did he say?  What was that?

5    A.    They drove back down to the Oregon District.  He

6    was not sure of the exact location that his brother, Mr.

7    Howe, threw the billfold and contents down the sewer.

8    Q.    And did you have opportunity to go out and look

9    for the billfold?

10   A.    Yes, I did.

11   Q.    And approximately when was that?

12   A.    Left our office probably about 10 after 2 a.m.  I

13   think we found the billfold at 2:40 a.m.

14   Q.    Was it in the Oregon District?

15   A.    Yes, at northwest corner of Brown and Green

16   Street.

17   Q.    At that time did you retrieve the wallet?

18   A.    I called for -- I can see -- we checked several

19   sewers.  He wasn't sure the exact location within a few

20   block area.  And myself and Sergeant Larry Grossnickle

21   along with Mr. Polson in the car, we checked probably

22   six or seven or eight sewers.  And then at this

23   particular one, I, with my flashlight in the sewer, I

24   could see a billfold and identification scattered out in

25   the sewer.  And we called for an evidence technician.

1       Officer Rick Smith met us at 2:50 a.m.  And he pulled

2       the cap off the sewer and recovered this property and,

3       of course, I could see the identification and so forth

4       at that time.

5           Q.   Now you said that you could see the

6       identification.  Could you tell the name on the

7       identification?

8           A.   Yes.

9           Q.   What was that name?

10          A.   Mark McDonald.

11          Q.   Then Rick Smith at that time collected the

12      evidence?

13          A.   Yes, he did.

14          Q.   And where did you go from there?

15          A.   Headed back to our office.

16               On the way, we had, we asked Mr. Polson if he

17      would just show us where the homicide happened earlier

18      that morning or the morning before.  And he directed us

19      to Monument and Findlay Street.  And after going by that

20      location, returned to the Safety Building.

21          Q.   Now, did you also have the opportunity to talk to

22      Mr. Polson with regard to the murder of Richard Blazer?

23          A.   Yes.

24          Q.   And what did you tell him with regard to that

25      particular murder?

1     A.    I didn't tell him anything.  I just told, we knew

2   he was involved in it and wanted him to tell the truth

3   about it.

4     Q.    Did he tell you the truth about it?

5     A.    Yes.

6     Q.    And what did he say to you?

7     A.    Stated that --

8              MR. ARNTZ:          Excuse me.  We will object.

9              THE COURT:          I will sustain the

10   objection.

11             MR. ARNTZ:          Thank you.

12   BY MR. DUNDES:

13    Q.    Did Walter Polson tell you who was with him at

14   1912 Tennyson?

15    A.    Yes.

16    Q.    And who was that?

17    A.    Tony Elofskey and Weston Howe.

18    Q.    I'm sorry.  I couldn't hear you.

19    A.    Tony Elofskey and Weston Howe were with him.

20    Q.    And what did he say about when they first met up

21   that evening?

22    A.    He said they had first met the person who

23   referred to as Dick about 6 o'clock that Monday evening,

24   June 22d on the river levee.  And that he and -- Polson,

25   Elofskey had been together.  Howe was not with them at

1  that time.  But they, the two of them were riding around

2  on the levee and they met the person that Tony Elofskey

3  new as Dick.  He knew Dick's name.  Polson said he,

4  being Polson, did not know the man but Elofskey did.

5  And they had some -- he had some conversation with him,

6  went their separate ways.  He and Elofskey stayed

7  together.

8       Later that evening they met up with Mr. Howe over

9  by Valley and Troy Street and the three of them decided

10  they would go rob Mr. Blazer.  And that a phone call was

11  made by Elofskey to Mr. Blazer.  Polson further stated

12  that Elofskey had introduced him, being Polson, as Tom.

13  And the call was made from a pay phone, an outside pay

14  phone.  And that he asked Mr. Blazer if, if the two of

15  them could come over to his house.  And he agreed that

16  they could.  So they all three, being Polson, Elofskey,

17  and Howe drove over there and in Elofskey's Monza.  And

18  that their plan was to rob Mr. Blazer.  Go inside, the

19  two would go inside.  Polson said, I had my gun.  My gun

20  was tucked down the front of my pants.  That me and

21  Elofskey was going inside.  Once inside, I was going to

22  pull the gun, leave my brother in the car.  Said we were

23  going to take him to a Green Machine, make him take

24  money out of his account.  He said his brother, being

25  Mr. Howe, had also stated that he wanted to take his TV

1    and stereo.

2         Stated once they got there, that Mr. Blazer did

3    come to the door and let them in.  Walked in the living

4    room.  Stated when he did, he pulled out this 25

5    automatic.  Stated he had a gun.  He knew that his

6    brother, Mr. Howe, had a gun out in the car.  Elofskey

7    did not have a gun, according to Polson.  And that when

8    he pulled the gun out, he fired one shot and that

9    Mr. Blazer -- Elofskey ran out the door first followed

10   by Mr. Blazer.  Polson said he was the last one to go

11   out the door.  Stated that when Mr. Blazer ran out the

12   front door of his house, that his brother, Mr. Howe,

13   shot him, several shots, shot Mr. Blazer several times

14   just as he ran out the door.

15        Stated they got into the car and drove away.  And

16   that a car began following them.  Followed them several

17   blocks until they got on Riverside and McOwen where they

18   jump out of the car.

19   Q.   Now, you told us earlier that Walter Polson told

20   you that only two of them were going to go out to

21   Richard Blazer's, at least that's what they told Richard

22   Blazer?

23   A.   Right.

24   Q.   Did they -- did he tell you why he said that to

25   Richard Blazer?