1    A.    Well, that's the two that he had met on the

2  levee.  That's all, that was all that he was expecting.

3    Q.    Did he tell you whether or not Richard Blazer

4  knew that Howe was coming out?

5    A.    He said he did not, he did not know Howe was

6  coming.

7    Q.    And did Walter Polson tell you what type of gun

8  he had again in this homicide?

9    A.    Yes.

10    Q.    And again what type of gun was that?

11    A.    The chrome or nickel plated Raven, 25 caliber

12  semiautomatic.

13    Q.    And did he tell you it's the same gun that he had

14  in the Mark McDonald's homicide?

15    A.    Yes, he did.

16    Q.    Did he tell you what type of gun that Weston

17  Howe, Jr. had?

18    A.    Yes, a black or blue steel 25 caliber

19  semiautomatic.

20    Q.    And was it the same gun used in the Mark

21  McDonald's case?

22    A.    Yes, same gun.

23    Q.    Okay.  I would like to direct your attention to,

24  back to 4:05 in the morning, and ask you if you were

25  back at the Safety Building at that time?

1       A.   Yes, I was.

2                 MR. DUNDES:     Could I have a minute, your

3       Honor?

4                 THE COURT:     You may.

5    BY MR. DUNDES:

6       Q.   Let me back you up for, for a second, if I could,

7    Detective Lawson.  The conversation that you just told

8    us about with Walter Polson, was that after you went out

9    to where the wallet was or before?

10      A.   Before?

11      Q.   Before that?

12      A.   Yes.

13      Q.   And then you proceeded out to find the wallet?

14      A.   That's correct, yes.

15      Q.   And from finding the wallet, did you return to

16   the Safety Building?

17      A.   Yes, I did.

18      Q.   At that time did you do anything with regard to a

19   broadcast on Tony Elofskey?

20      A.   Yes.

21      Q.   What was that?

22      A.   At 4:05 a.m. on June the 23rd, I made a broadcast

23   for to have Elofskey picked up.  And I put the

24   information out that he could possibly be found at a

25   corner house at Fifth, East Fifth and June Street.

1    Q.   And do you know whether or not he was found

2    there?

3    A.   Yes, he was found.

4    Q.   And was he arrested at that location?

5    A.   He was arrested at the corner house.  It was 1801

6    East Fifth Street.  He was arrested by Officers Caserta

7    and Wyant at about 20 minutes after 4.

8    Q.   Did they return him to the Safety Building?

9    A.   Yes, they did.

10   Q.   Did they return him to you?

11   A.   Yes, they did.

12   Q.   At that point did you have the opportunity to

13   interview him?

14   A.   Yes.

15   Q.   To your knowledge, was he separated from Walter

16   Polson at that time from when he was arrested at least

17   from when he came into your view?

18   A.   Oh, absolutely.

19   Q.   And Polson was separated from him?

20   A.   Yes.

21           MR. DUNDES:      May I approach the witness,

22    your Honor?

23           THE COURT:      You may.

24   BY MR. DUNDES:

25   Q.   I'm handing you what's been previously marked as

1    State's Exhibit 72 for identification.  Could you tell

2    me what that is, please?

3        A.    Yes.   It's the Pre-Interview Form that I read to

4    Tony Elofskey on June the 23rd at 4:59 a.m. at 335 West

5    Third Street.

6        Q.    Is there a name on the left-hand corner?

7        A.    Yes.

8        Q.    And that's what name?

9        A.    Tony Elofskey.

10       Q.    And does this rights form spell out the charges

11   that the person is being interviewed for?

12       A.    Yes.

13       Q.    What were the charges?

14       A.    Aggravated murder.

15       Q.    Did you read each and every paragraph on this

16   form to Tony Elofskey?

17       A.    Yes, I did.

18       Q.    Did he tell you that he understood it?

19       A.    Yes.

20       Q.    At the bottom there is a waiver of rights.   Did

21   you read that to him?

22       A.    Yes.

23       Q.    Did he tell you that he understood it?

24       A.    Yes, he did.

25       Q.    And where it talks about the amount of schooling,

1     did you fill that in?

2        A.    I filled in the number 10.  I asked him how many

3     years of schooling he had completed.  He told me 10.  I

4     wrote it in, 10 there.

5        Q.    Now, I see down on the left-hand corner there is

6     a spot for witnesses.  Are there two names there?

7        A.    Yes.

8        Q.    And what are those?

9        A.    Top one is Detective Wade E. Lawson and below

10    that is Detective T.B. Spells.

11       Q.    What's this in the right-hand corner also a spot

12    for signature?

13       A.    Tony DeWayne Elofskey.

14       Q.    And did he sign that in your presence?

15       A.    Yes, he did.

16       Q.    Now after going through this Pre-Interview Form

17    and reading his rights to him, did he decide to talk to

18    you?

19       A.    Yes.

20       Q.    And at any time in reading this form to him, did

21    you obscure any part of the form?

22       A.    Absolutely not.

23       Q.    He had full visual view of the form?

24       A.    Yes, sir.  It was on a table in front of us.

25       Q.    Okay.  Let me ask you this.  When you first

1    observed Mr. Elofskey, did you have the opportunity to

2    make any observations of his demeanor?

3      A.    Yes.

4      Q.    And what was that?

5      A.    He appeared normal.  He was calm when I first met

6    him.  Did not appear to be intoxicated.  Didn't smell

7    any alcohol about him.  There wasn't, he wasn't walking

8    without any trouble.  His eyes were not watering or

9    bloodshot.  He appeared normal.

10     Q.    At the beginning of the interview, did you say

11   anything to him?

12     A.    Yes.

13     Q.    And what was that?

14     A.    I told him that I knew he was involved in the

15   matter that evening, the homicide on Tennyson Avenue.

16   Told him we had his car off Riverside Drive.  Told him

17   that we had Weston Howe and Walter Polson.  Both had

18   given statements admitting their involvement, and also

19   implicating him in that homicide and also the homicide

20   of Mark McDonald at Monument and Findlay Street.

21     Q.    And at that point did he decide to talk to you?

22     A.    Yes, he talked to me.

23     Q.    And what did he say to you?

24     A.    Said that he was not involved.

25     Q.    And did he continue with that story?

1    A.    Yes.   He stated that Mr. Howe and Mr. Polson had

2   been driving his car and that he had been over on Troy

3   and Valley Street and they hadn't brought his car back.

4   And he really didn't know what they gotten into but he

5   was not involved in it.

6    Q.    At any time did he change that particular story?

7    A.    Yes, just after a few minutes, really very brief

8   sometime he changed.

9    Q.    What did he say to you then?

10   A.    He admitted that he was involved in both

11  homicides.

12   Q.    What did he tell you with regard to the Mark

13  McDonald homicide?

14   A.    That the three of them had been together, Mr.,

15  being Mr. Howe and Mr. Polson and Tony Elofskey.   And

16  that Tony was driving the car.   They were on the river

17  levee looking for somebody to rob.   And that Mr. Howe

18  was ducked down in the front seat so he couldn't be

19  seen.   And Mr. Polson was in the back.

20         And that as they were riding around, he saw a

21  white man driving a little blue car.   And the car pulled

22  up and he talked to the driver of the car.   The man

23  didn't get out of the car.   They talked car to car.   And

24  the car driven off and came back just a short time

25  later.   Then Elofskey said he pulled out and this car

1    followed him.  And he gave me street by street.  I

2    cannot recall.  Webster Street, it was on Leo Street,

3    Leo on over to Stanley, across Stanley to Findlay.  Very

4    specific, this route.

5            And once he got over to Monument across the

6    Findlay Street bridge, he turned left back into the

7    field alongside the river and that he backed into a,

8    what he called a parking spot.  He described there's a

9    sign there, a no dumping, I believe he said.  He told me

10   exactly where he backed in.  And that the blue car,

11   which was following him, also pulled in and he was

12   backed in.  The blue car pulled in and stopped.

13           The driver of the blue car got out.  It was a

14   white man with glasses.  And he stated at that time the,

15   the defendant, Mr. Howe, who's still ducked down, had

16   his 25 handgun tucked under Elofskey's leg right in

17   behind the knee here.  And that as this man approached

18   the car, that Howe pulled a gun up and shot him as soon

19   as he, as soon as he walked up.  I asked Elofskey if, if

20   he had any conversation with this man prior to being

21   shot.  And he stated, no, that he didn't.  That the

22   defendant shot him as soon as he walked up.  And said

23   the man threw his hands up and that Howe shot him three

24   times.  Stated the man, after being shot, took off

25   running and that Mr. Howe and Mr. Polson jumped out of

1    the car and ran after him, caught him and threw him on

2    the ground.  And Elofskey stated he then pulled out the

3    car and picked them up and came back with the car with

4    the man's billfold.

5        Q.    Did he tell you where they went after that?

6        A.    Yes, to the, to the Oregon District.  They tried

7    to use the Green Machine card on Woodman Drive and again

8    tried to use it.  It wasn't able to get any money.  Then

9    he stated, driven back down to the Oregon District and

10   the defendant had thrown the billfold and contents down

11   the sewer.

12       Q.    Did he tell you where they went after that?

13       A.    After that he stated that he dropped them, Polson

14   and Howe, off and then he went on home.

15       Q.    Did he go any other place at that time other than

16   besides home?  Did he tell you where he went?

17       A.    Not, not that I recall.

18       Q.    Did he tell you when he next met up with Walter

19   Polson?

20       A.    That, that Monday afternoon that he had, that he

21   had taken Walter Polson to the hospital.  Walter shot

22   himself in the foot a couple weeks prior to that.  They

23   had -- he had taken Walter to the hospital.  I think the

24   toe.  But he decided not to be treated when he got

25   there.

1         They continued to ride around.  And 6 p.m. they

2   ended back up on the levee, riding up on the river levee

3   again as they had been the night before.  That's when he

4   ran into the person he knew as Dick.

5      Q.   And is Dick, Richard Blazer?

6      A.   Right.

7      Q.   Did he tell you if they had conversation at that

8   time?

9      A.   Yes.

10     Q.   And what was that conversation?

11     A.   That he had given him a call sometime and that he

12  had taken Dick's phone number and written the phone

13  number down.  And really that was about the extent of

14  it.

15     Q.   Did he tell you where he went from the levee?

16     A.   Well, they continued to ride around for a while.

17  Then he ended back up on, on Troy Street where Mr. Howe

18  was.

19     Q.   And did he tell you what his conversation was

20  with Mr. Howe at that time?

21     A.   Yes.

22     Q.   And what was that conversation?

23     A.   Well, the three of them, Elofskey and Polson and

24  Howe, had, they all had a conversation.  They decided to

25  go rob Mr. Blazer.  And that they decided that Tony

1  should call Mr. Blazer and set it up that he and Polson

2  could come over.  He would be expecting him.  And once

3  they got there, they hadn't -- once they got there, that

4  Elofskey and Polson would go inside leaving Mr. Howe in

5  the car.  He knew that Polson had a gun.  He knew that

6  Howe had a gun.  He stated he did not have a gun.

7  Elofskey did not have a gun.  And once they got inside,

8  that Polson was to pull the gun on Mr. Howe (sic) and

9  that Elofskey was to go outside, get the car started and

10  let Mr. Howe come into the house.  And that they were to

11  take him to the Green Machine, take his TV and stereo

12  and rob him.

13     Q.    Did he tell you what happened when they arrived

14  at 1912 Tennyson?

15     A.    Yes.

16     Q.    And what was that?

17     A.    That, that when they pulled up, that Mr. Blazer

18  was looking out the window, saw them pull up and that he

19  did allow them, open the door and allowed them to come

20  into the house.  And once they went in the front door,

21  they turned into the living room and immediately Polson

22  pulled his gun from the front of his pants, and he said

23  he shot, shot Mr. Blazer.  And Elofskey said at that

24  point he said, I ran out the front door.  Mr. Blazer ran

25  out behind him.  And that Mr. Howe was by the bushes

1   just outside the front door.  And that Mr. Howe shot

2   Mr. Blazer several times.  They got into the car, drove

3   off.  And a large white car began following them and

4   continued to follow them until where he pulled the car

5   and everybody jumped out of the car.  He said he hid for

6   a while.  Ended up taking his jacket off and blue jeans.

7   I think he had sweat pants or shorts under his blue

8   jeans.  He left that clothing there in an alley.  And he

9   finally made it back over to Troy Street.

10      Q.   Did Mr. Elofskey tell you whether or not the gun

11   that Walter Polson had at 1912 Tennyson was the same gun

12   that Elofskey had with him in the Mark McDonald

13   homicide?

14      A.   Yes, same gun.

15      Q.   Did he also tell you that the gun Howe had was

16   the same gun that Howe had in the Mark McDonald

17   homicide?

18      A.   Yes.

19      Q.   After talking to Mr. Elofskey, did you have

20   occasion to make a videotape interview or videotape

21   interview?

22      A.   Yes.

23      Q.   I'm handing you what's been previously marked as

24   Joint Exhibit I for identification.  Could you tell me

25   what that is, please?

1      A.    Yeah.    This is a copy of the original tape that I

2   took, interview with Tony Elofskey.    It was taken at

3   1718 a.m. on June the 23rd of last year.

4      Q.    Did Mr. Elofskey tell you where he had left the

5   clothes --

6      A.    Yes.

7      Q.    -- that he had taken off?

8            And where was that?

9      A.    In an alley between Helena and McOwen, west of

10   Riverside Drive.

11      Q.    And did you direct an evidence crew out to that

12   scene?

13      A.    Yes.

14      Q.    And which crew was that?

15      A.    Rick Smith.

16      Q.    Detective Lawson, did you have an opportunity to

17   book Walter Polson and Tony Elofskey into the

18   detective's section?

19      A.    Yes, I booked both, both men.

20      Q.    Did you also have an occasion to mark and tag the

21   clothes they were wearing?

22      A.    Yes.

23            (WHEREUPON, State's Exhibit 76 was marked for

24   identification.)

25      Q.    Showing you what's been marked as State's Exhibit

1   76 for identification, could you tell me what that is,

2   please?

3       A.   Well, this is a, a brown package containing pair

4   of blue jeans, a white T-shirt and a pair of black gym

5   shoes.   This is clothing worn by Walter Polson at the

6   time he was arrested.   This clothing was placed in the

7   property room by me.

8       Q.   Why don't you open it up for me.

9            Now, are these the clothes that Walter Polson was

10  wearing when you interviewed him?

11      A.   Well, yes, this is his clothing.   There's my

12  initials where I marked the shirt on the 23rd of June of

13  last year.   My initials here where I marked the T-shirt

14  on June the 23rd of last year.   Yes, these are his shoes

15  and pants.

16               MR. SLAVENS:    If it please the Court, 76,

17      I want the record to show we are going to put it in a

18      clear plastic bag.   We can have it marked as 76-A at

19      the appropriate time.

20               THE COURT:    All right.

21  BY MR. DUNDES:

22      Q.   Showing you what's been previously marked as

23  State's Exhibit 75 for identification, could you open

24  that up please and tell me what that is?

25      A.   This is a bag containing a pair of gym shoes, a

1    pair of black shorts and a multi-color top.  I think

2    it's a multi-color top clothing and shoes worn by Tony

3    Elofskey when I first saw him on the morning of June the

4    23rd.  His clothing was taken from him and placed in the

5    property room by me.

6        Q.   Could you look inside and tell me if that's what

7    is enclosed, please?

8        A.   Yeah, this is a shirt.  Here's my initials W.L.,

9    and the date 6/23 of '92.  And the pants also has my

10   initials W.L., 6/23 of '92.  These are the Georgetown

11   shorts that he was wearing and a pair of gym shoes that

12   has my initials on the inside, W.L., 6/23 of '92.  These

13   are the shoes, shirt and pants that Tony Elofskey was

14   wearing when he was brought to me.

15       Q.   Now, Detective Lawson, you testified that you did

16   an oral interview of Walter Polson, is that correct?

17       A.   Walter Polson, yes.

18       Q.   And between the time that you orally interviewed

19   Walter Polson and Tony Elofskey, did they have any

20   contact?

21       A.   No, no.

22       Q.   Now, you testified that you orally interviewed

23   Tony Elofskey?

24       A.   Yes.

25       Q.   And then later videotaped his interview?

1       A.    That's correct, yes.

2       Q.    During any of those periods of time, did Walter

3   Polson, Weston Howe, or Tony Elofskey have any contact?

4       A.    No, no.

5                   MR. DUNDES:        Could I have a minute, your

6       Honor?

7                   THE COURT:         You may.

8                   MR. DUNDES:        No further questions.

9                   THE COURT:         Cross-examination.

10                  MR. ARNTZ:         Thank you.

11

12                        CROSS-EXAMINATION

13   BY MR. ARNTZ:

14      Q.    Good morning.

15      A.    Good morning, sir.

16      Q.    Detective Lawson, you're a detective in the

17   homicide section of the Dayton Police Department, are

18   you not?

19      A.    That's correct, yes.

20      Q.    For how long have you had that assignment?

21      A.    Ten years.

22      Q.    And your brother Tom Lawson seated here with the

23   prosecutors is also a detective assigned to the homicide

24   section, is he not?

25      A.    That's correct, yes.

1  Q. And for how long has he been so assigned?

2  A. Three, three and a half years, I think.

3  Q. And would any portion of the ten years that you

4 have been a homicide detective overlap with the three or

5 so years that he has been a homicide detective?

6  A. Yes.

7  Q. And, in fact, the two of you will occasionally

8 work together on a case, won't you?

9  A. That's correct, yes.

10  Q. And it would be fair to say the two of you have

11 worked together on this case, wouldn't it?

12  A. Absolutely, yes.

13  Q. All right.  And let me take you, if I may, to,

14 first, to your interviews with Walter Polson.  You

15 interviewed him orally and then on videotape, correct?

16  A. Yes, sir, that's correct.

17  Q. And, of course, you have not viewed the videotape

18 recently or have you?

19  A. I've -- I have not seen all the, recently, the

20 whole tape, that's correct.  Parts of it.

21  Q. You've seen parts of it, okay.

22  And in the course of your investigation of this

23 case, you created certain reports of your findings and

24 the things that you did, is that correct?

25  A. That's correct.

1    Q.    And your reports also contain things that were

2    said to you by people you interviewed, am I right?

3    A.    Yes, that's correct.

4    Q.    And do you have those reports available to you

5    today?

6    A.    They're available, yes.

7    Q.    And if I should ask you a question which would

8    cause you to want to review those reports, in order to

9    answer my question, will you ask for the reports?

10    A.    Well, I will, to see what you're going to ask me

11    first.

12    Q.    If necessary, I want you to understand you are

13    free to review your reports.

14    A.    I understand.

15    Q.    And, Detective Lawson, let me ask you first a

16    couple of things about your conversations with Walter

17    Polson, either on or off video, when you talked to him

18    about the McDonald matter.

19          At the conclusion of his story when Polson leaves

20    McDonald and gets into Elofskey's car and Elofskey's car

21    leaves the scene at Monument and Findlay, what did

22    Polson tell you about Mark McDonald's condition at that

23    time?

24    A.    As I recall, he was down to the ground as they

25    left.

1  Q.   You certainly don't recall that he told you a

2  story that McDonald was up and walking and staggering,

3  that kind of thing?

4  A.   Polson or Elofskey said he was staggering.  The

5  other said he was down.

6  Q.   Is it your testimony now you don't remember which

7  one said which?

8  A.   I said, as I recall, I recall right now that he

9  said he was down.  Because he had had him down taking

10  his billfold from him.

11  Q.   And then with regard to the Richard Blazer story

12  which Polson told you.  As I understand it, he told you

13  that Elofskey had called Blazer and told Blazer that

14  Elofskey and Polson would be coming over to his house,

15  is that correct?

16  A.   That's correct, yes.

17  Q.   And apparently Polson told you that Elofskey had

18  given Blazer a false name for Walter?

19  A.   That's correct.

20  Q.   Told Blazer that Walter's name was Tom?

21  A.   That's correct.

22  Q.   And what did Polson tell you about the reason

23  that Elofskey gave Blazer a false name for Walter?

24  A.   I don't recall the reason he gave that name.

25  Q.   And what, according to Polson, reason did

1  Elofskey give Blazer for the visit that he and Polson

2  were going to make to Blazer's house?

3    A.    That they knew that Mr. Blazer was a homosexual,

4  and for they had met before, Elofskey and him had, had

5  contact in the past and was coming over for that reason.

6    Q.    You may have misunderstood me.  My question is,

7  according to Polson, what reason did Elofskey give

8  Blazer for the visit by Elofskey and Polson to Blazer's

9  house?

10    A.    That they were just going to go over for a visit.

11    Q.    Now, did Polson ever tell you the story that he

12  and Elofskey were going to Blazer's house in order to

13  take gas money from him for cruising?

14    A.    No.

15    Q.    Have you ever heard that story before?

16    A.    No.

17    Q.    And again according to Polson, did he tell you

18  that when he and Elofskey first entered Blazer's house,

19  Polson took his gun out virtually just after they

20  entered?

21    A.    Did Polson tell me that?

22    Q.    Yes, sir.

23    A.    Yes, sir, he did.

24    Q.    And did he also tell you that he did not know how

25  many shots he himself fired?

1    A.    No.  He fired one shot.

2    Q.    Did he also tell you that he did not know how

3  many shots his stepbrother supposedly fired?

4    A.    Yes.

5    Q.    He wasn't sure how many shots had been fired at

6  Blazer outside the house, isn't that true?

7    A.    That is true, yes.

8    Q.    He didn't tell you three or four or anything of

9  that kind, did he?

10    A.    Several shots.  He didn't tell me anything

11  exactly.

12    Q.    Didn't tell you that anyone had emptied the clip

13  out of the gun outside of Blazer's house, did he?

14    A.    I don't recall if he made that exact comment.

15    Q.    All right.  And now with regard to your

16  conversations with Tony Elofskey.  Had Tony told you

17  that he and Walter had lived together on and off for at

18  least a couple of times prior to June of last year?

19    A.    No, not that I recall.

20    Q.    Had he told you that he and Elofskey -- I'm

21  sorry.  Had Elofskey told you that he and Polson had

22  become friends when they first met at the Dayton

23  Workhouse back in 1990?

24    A.    No, we did not discuss that.

25    Q.    You had not been aware they had been incarcerated

1   together and that's how they hooked up?

2     A.   We didn't discuss that.

3     Q.   Did you become aware that Polson and Elofskey

4   were closer together than Polson or Elofskey to Howe?

5     A.   I got that impression, yes.

6     Q.   One of the reasons you got that impression was

7   because when you talked to Walter Polson in the

8   videotaped interview, I'm sorry, when you talked to Tony

9   Elofskey in the videotaped interview, he wasn't even

10   able to give you Weston Howe's last name, was he?

11     A.   I don't recall that.  I would have to play the

12   interview.

13     Q.   And when you talked to Tony Elofskey about the

14   Mark McDonald killing, it's true, isn't it, that Tony

15   Elofskey told you that Walter was actually covered up

16   inside Tony's car?

17     A.   That Walter was covered up?

18     Q.   Yes, sir.

19     A.   He said he was ducked down in the back seat.  I

20   don't recall him saying that he was actually covered up.

21   That he was hiding in the back seat.

22     Q.   And do you recall testifying in this matter last

23   year under oath?

24     A.   Yes, sir, I do.

25     Q.   And do you recall some dialogue or question and

1  answer last year while you were under oath on the topic

2  of whether or not Walter was covered up inside Tony's

3  car out on Monument and Findlay?

4     A.    I don't recall that.  It's possible.

5     Q.    158.  I will ask you whether you recall this

6  question and this answer.

7           Question:  Briefly state, not in all detail but

8  what did he state at that time?

9           Answer:  Well, he admitted that he had been

10 present during both homicides.  He readily admitted

11 that.  I asked him to begin with the one that happened

12 at Monument and Findlay.  And he said he had been riding

13 around --

14                MR. SLAVENS:     Your Honor, I'm voicing an

15    objection.

16                THE COURT:       You want to be heard on

17    this?

18                MR. SLAVENS:     Yes.

19                THE COURT:       Approach.

20                (WHEREUPON, a side-bar conference was held

21    off the record.)

22                THE COURT:       The objection is overruled.

23                                 You may continue, Mr.

24    Arntz.

25                MR. ARNTZ:       Thank you.

1    BY MR. ARNTZ:

2       Q.    Detective, I was asking you whether you recall

3    making this answer under oath last year while testifying

4    in this matter.

5            Quote:  And he said he had been riding around in

6    his Mazda with Mr. Howe and Mr. Polson, sat up on the

7    river levee.  And Polson was in the back seat covered up

8    so nobody could see him and that Howe was in the front

9    seat ducked down.  Do you recall testifying to that

10   effect?

11      A.    I do not recall, actually recall saying that.  If

12   that answers your question.  My recollection is that

13   Polson was hiding in the back seat.  As I'm testifying

14   now, I don't recall saying that he was covered up.

15      Q.    So my reading you from the transcript of the

16   hearing in question does not refresh your recollection

17   as to what you said?

18      A.    I don't doubt that's what I testified to.  Your

19   question was, do you recall that, and I don't.

20      Q.    My next question, do you deny that Walter Polson

21   told you either he or Elofskey that Polson had been

22   covered up inside?

23      A.    Oh, no, I don't deny.  I'm sure they told me

24   that.

25      Q.    As I understand it, Elofskey also told you the

1    story that McDonald was shot through his driver's door

2    window as he walked up to the driver's door?

3        A.    That's correct, yeah.

4        Q.    Do you recall whether or not Tony Elofskey also

5    told you the story that after the shooting, he and

6    others were laughing about it?

7        A.    Yes, I recall something about that.

8        Q.    And now with regard to the Richard Blazer

9    homicide, do you remember when speaking to Tony Elofskey

10   that Tony told you that when he and Walter went to the

11   front door of Richard Blazer's house, that Richard

12   Blazer didn't allow him into their house?

13       A.    He did not tell me that.

14       Q.    All right.  You indicated that you had your

15   reports available to you here today.  Do you have those

16   with you?

17       A.    I know what the report says, sir.

18       Q.    Did you not prepare a report to the effect that

19   once they got there, Dick didn't allow them into the

20   residence?

21       A.    Yes, that's what --

22               MR. DUNDES:      Your Honor, I'm going to

23       have to object to the use of the police report on

24       cross-examination.

25               THE COURT:      Well, in view of the prior

1    rulings of the Court, I'm going to permit this as it

2    relates to conversations between the officer and

3    either Polson or Elofskey.  So it will be overruled.

4        A.    Yes, sir, that's what the report says but that is

5    incorrect.  I did not say that.  He did not tell me

6    that.  When I called this report in, the girl that typed

7    that report, I said Mr. Blazer did allow them into the

8    house.  She typed the report that didn't allowed into

9    the house.  That is totally incorrect.

10    BY MR. ARNTZ:

11        Q.    So your testimony is then that is a typographical

12    error only?

13        A.    Yes, sir, that's correct.

14        Q.    And your testimony is that Tony Elofskey never

15    did say that to you?

16        A.    Absolutely.  He did not say that to me.

17        Q.    Likewise, do you recall that at one point Tony

18    Elofskey actually told you that Walter Polson shot

19    Richard Blazer?

20        A.    I'm sorry.  Ask me again.

21        Q.    That Tony Elofskey told you that Walter Polson

22    shot Richard Blazer?

23        A.    Yes, he said that.

24        Q.    And, in fact, you repeated that when testifying

25    under oath last year?

1    A.    If you say so.

2    Q.    And I believe when you spoke with Tony Elofskey,

3    he indicated to you that he made arrangements to be

4    driven back to his home after he got away following the

5    Blazer shooting?

6    A.    Yes, that's correct.

7    Q.    And, in fact, you went and interviewed a man

8    named Leon Lewis about how it was that Tony got back to

9    his home at that time?

10   A.    I did interview him, yes.

11   Q.    And Leon Lewis talked to you about a conversation

12   he had in his car with Tony Elofskey while he was taking

13   Tony back home?

14   A.    Yes, he did.

15   Q.    And there was some conversation about Walter

16   being out robbing crack dealers?

17   A.    That's correct, yes.

18   Q.    And also in that same conversation Tony had told

19   Leon that Tony's car had been stolen and he didn't know

20   where it was.

21           MR. DUNDES:    Judge, I'm going to object.

22   There's been no testimony about an interview with Leon

23   Lewis on direct examination.

24           THE COURT:    Now, wait a minute.  Who is

25   this conversation with, Mr. Arntz?

1    MR. ARNTZ:    This is Detective Lawson

2    relating what Leon Lewis told him about a conversation

3    Lewis had with Tony Elofskey.

4    THE COURT:    All right.  At this point

5    in time I'm going to deal with it on a question by

6    question basis.  What has already been testified to

7    will be permitted.  But I thought we were still

8    involved with a conversation with the officer and

9    Walter Polson.

10    All right.  Let's proceed.

11 BY MR. ARNTZ:

12    Q.    You indicated that when you first met with, with

13 Elofskey, it was after he was brought to you by, I think

14 you said it was, Officer Wyant or another officer who

15 arrested Elofskey at his home?

16    A.    Wyant and Caserta, yes.

17    Q.    And when Wyant and Caserta brought Elofskey to

18 you there in the police department, did either one of

19 them lead you to believe that Elofskey had asked for a

20 lawyer at that time he had been arrested?

21    A.    No, sir, they did not.

22    Q.    And when you began to talk to Tony Elofskey, of

23 course, you reviewed the Miranda Rights Pre-Interview

24 Form with him, didn't you?

25    A.    Yes, I did.

1    Q.   And that has previously been marked as State's

2    Exhibit No. 72 and shown to you here today?

3    A.   It is 72.  And it was shown to him, yes.

4    Q.   And, of course, you are familiar with this

5    particular form, aren't you?

6    A.   Yes, sir.

7    Q.   'Cause you use this form a number of times in

8    order to interview people?

9    A.   I have, yes.

10   Q.   At the bottom portion of this form entitled

11   waiver of rights is the portion which indicates whether

12   or not an individual is willing to speak to you without

13   an attorney present, isn't that correct?

14   A.   Yes, sir, that's correct.

15   Q.   All right.  And is it true that you covered up

16   the waiver of rights section of that form when Tony

17   Elofskey signed the form?

18   A.   No, sir, that is not true.

19   Q.   And do I understand you to say that when you

20   completed that form with Tony and began to speak to him,

21   that he readily told you what he said was happening out

22   at the homicide sites?

23   A.   No, that's not true either.

24   Q.   All right.  Did he enter any denials to you that

25   he didn't know anything about what had happened?

1    A.   At first he denied having any knowledge of what

2    happened.

3    Q.   And, in fact, the truth is that he denied that a

4    number of times, didn't he?

5    A.   For a short time.  Several minutes.  I'm not sure

6    just exactly how long it was.

7    Q.   And after he tried to deny his knowledge of these

8    things to you, that's when he eventually turned around

9    and began to tell you what he said had occurred?

10    A.   Well, after a few minutes, he changed his story

11    and said he wanted to tell me the truth about what

12    happened.

13    Q.   All right.  And your first interview with him

14    began at approximately 4:59, is that correct?

15    A.   That's correct.  That's when I read this form to

16    him, yes.

17    Q.   We knew it was 4:59 because that's the time you

18    wrote on State's Exhibit 72, the Miranda Rights

19    Pre-Interview Form?

20    A.   That's the time I wrote down here.

21    Q.   Do you recall when you testified last year under

22    oath on this topic you were asked some questions about

23    whether or not Tony had initially denied knowing

24    anything that went on out at that homicide sites?

25    A.   As I testified here, he initially denied being

1    involved or knowing anything about it.  I'm sure that's

2    what I testified to last year.  It's the truth.

3       Q.   I will ask you whether you recall this question

4    and answer from your testimony last year at page 172.

5            Question --

6                 MR. SLAVENS:     Objection, your Honor.

7       May we approach?

8                 THE COURT:      You may.

9                 (WHEREUPON, a side-bar conference was held

10      off the record.)

11   BY MR. ARNTZ:

12      Q.   I will ask you specifically whether you recall

13   this dialogue from your testimony under oath last year.

14            Question:  When you first talked to him at the

15   4:59 interview, initially did he indicate to you that he

16   didn't know anything about this?

17            Answer:  No.  He never admitted from the very

18   beginning that he knew about it.  He never made any

19   denials of being involved.

20            Do you recall that testimony?

21      A.   I don't believe that.

22      Q.   Would that testimony be correct and truthful if

23   you made it?

24      A.   That was -- if I said that, that is incorrect,

25   'cause at first he did deny that.

1  Q.  So if you testified that he in fact denied any

2  knowledge or involvement, that would be incorrect

3  testimony?

4  A.  Correct testimony is that at first he did deny

5  this for a few minutes.

6  Q.  Did you not just say a short time ago that he in

7  fact did not deny --

8         MR. DUNDES:      Judge, I'm going to object.

9  I think the witness has answered the question already.

10        THE COURT:      Well, he has.  I will

11  permit this question.

12 BY MR. ARNTZ:

13  Q.  Did you not tell me a few minutes ago he never

14 denied knowing what had happened?

15  A.  No, I never told you that.

16  Q.  And when you spoke to Tony, did you also tell him

17 at any time that it would look better for him if he

18 testified or spoke to you on videotape?

19  A.  I don't recall telling him that.

20  Q.  Is that a yes or no or I don't remember?

21  A.  I don't recall.  Possibly I did.  I could have

22 told him that.  I don't recall saying that exact words.

23 I asked him if he would be willing to give a videotaped

24 statement so we could have his, his statement what he

25 has to say about it on tape.

1    Q.   Do you recall that at the conclusion of the

2    videotaped interview that you had with Tony Elofskey,

3    you said something to him to the effect that you would

4    try to work out a deal for him?

5    A.   No, I did not.  Absolutely not.

6    Q.   That would be perfectly untruthful, wouldn't it?

7    A.   That I would try to work out a deal for him?

8    Q.   That's right.

9    A.   Yeah.  That's not true.

10              MR. SLAVENS:     May we approach, your

11   Honor?

12              (WHEREUPON, a side-bar conference was held

13   off the record.)

14   BY MR. ARNTZ:

15   Q.   Detective Lawson, as I understand it, Tony told

16   you that at neither one of these incidents, either the

17   McDonald incident or the Blazer incident, did he,

18   Elofskey, have a weapon with him?

19   A.   That's what he told me, yes.

20   Q.   Did he not tell you at one point he had a knife?

21   A.   Not on him but there was a knife in the car but

22   not on him.

23   Q.   And he certainly said to you that he didn't have

24   a gun with him, isn't that what he said?

25   A.   That's what he said, yes.

1    Q.   And, of course, you are familiar with the two

2    guns that were recovered in the course of the

3    investigation of these cases?

4    A.   Yes.

5    Q.   And, in fact, you made some effort to locate

6    where those guns had come from, didn't you?

7    A.   Yes.

8    Q.   And specifically, you tried to find out if you

9    could document who the owner of those guns was, didn't

10   you?

11   A.   Yes.

12   Q.   And you were able, as I understand it, to trace

13   that Bryco gun back to someone, weren't you?

14   A.   This was taken care of by Detective Tom Lawson.

15   As we speak, I'm not sure which gun it came back to.

16   Q.   You're familiar with the fact that someone at

17   least made the effort to locate who the owner of these

18   guns was and apparently was able to come up with some

19   names?

20   A.   Oh, yes, we came up with some information.

21   Q.   In fact, are you familiar with whether or not you

22   located or someone located the names of two different

23   persons who would have been the owners of two different

24   guns?

25               MR. DUNDES:    I will have to object, your

```
 1      Honor.  He's already testified that Tom Lawson is the
 2      one that did the background check on the guns.
 3              THE COURT:      I understand that.  I'm
 4      also concerned about the form of the question, Mr.
 5      Arntz.  I will sustain it for the time being.  Perhaps
 6      another question will solve the problem.
 7   BY MR. ARNTZ:
 8      Q.   And also according to Tony Elofskey, not only did
 9   he not have a gun, he never got any money out of either
10   these incidents?
11      A.   That's what he said.
12      Q.   And presented himself more or less as kind of a
13   victim of the circumstances?
14      A.   Oh, I wouldn't say that.
15      Q.   Well, he indicated to you that he was not
16   responsible for either of the shootings of those two
17   people?
18              MR. DUNDES:      Objection, your Honor.
19              THE COURT:      Overruled.
20      A.   Not at all.  That's not at all what he said.
21   He's part planning both robberies and part of each
22   robbery and going into the house and setting both up, so
23   hardly a victim of circumstance, sir.
24   BY MR. ARNTZ:
25      Q.   Well, let me ask you something else here.  You
```

1    looked at his car, his Monza automobile, didn't you?

2    A.    Yes.

3    Q.    And when you looked at the car, you took note of

4    some of the items which were in the interior of that

5    car, didn't you?

6    A.    Yes.

7    Q.    And where was the car at that time you looked at

8    it?

9    A.    The car was on McOwen Street just west of

10   Riverside Drive.

11   Q.    All right.  And was it your understanding that

12   that car was in the location where it had been stopped

13   when Elofskey had jumped out of it?

14   A.    When I first saw the car, I was aware that's

15   where the car had come to a stop when the police officer

16   followed the car.

17   Q.    And to the best of your knowledge, was the car

18   moved at any time when after it had been stopped by the

19   police?

20   A.    No, no.  Not until I had seen the car, that's

21   correct.

22   Q.    And when you looked inside the car, you noted

23   that you saw two speakers inside the car, didn't you?

24   A.    Right.  In the rear seat.

25   Q.    And more specifically, the two speakers were in

1    the area directly behind the driver seat of the Monza

2    automobile?

3      A.    That's correct.

4      Q.    And you also noted one or more cabinets of some

5    kind inside the car?

6      A.    I'm not sure.  I know there is some speakers and

7    tapes and stereo type stuff behind the driver.

8      Q.    And if I understand you correctly, when you

9    became involved in this investigation, I think you early

10   on went into the Helena Street location right next to

11   McOwen or McOwen?

12     A.    McOwen.

13     Q.    Where the automobile was located?

14     A.    I went to Helena first, 42 East Helena.

15     Q.    And then from Helena, shortly thereafter, you

16   went to the Tennyson Avenue address of Richard Blazer?

17     A.    No.

18     Q.    When was it that you went to the Blazer home in

19   relation to when you went to the Helena address?

20     A.    Just prior.  Just from Good Samaritan Hospital to

21   Tennyson to Helena to McOwen.

22     Q.    All right.  I had that reversed.  You went to

23   Tennyson then to Helena?

24     A.    Right.

25     Q.    And when you went to Tennyson, of course, you

1  understood that was a homicide site, that was Richard

2  Blazer's home?

3    A.   Right.  Yes.

4    Q.   And when you went to Helena, you were told that

5  there had been a chase of some persons in an automobile

6  prior to your arrival?

7    A.   Well, I knew that from, from earlier from even

8  from the time I was at the hospital and at Tennyson I

9  had known about the chase.

10   Q.   And you suspected that the two incidents, the

11  Tennyson Avenue incident and the Helena incident were

12  somehow connected?

13   A.   No.

14              MR. DUNDES:      Objection.

15              THE COURT:       Overruled.

16   A.   There came a point that I suspected they were

17  connected.

18  BY MR. ARNTZ:

19   Q.   And at what point did you first suspect that

20  those two incidents might be connected?

21              MR. SLAVENS:     Objection.  I want the

22     question of the two incidents --

23              THE COURT:       As to form.  And we

24     understand the rules on objections.

25

1   BY MR. ARNTZ:

2       Q.    Detective, I'm asking you at what point in time

3   did you first have the suspicion or feeling or hunch

4   there was a connection between the Tennyson Avenue

5   incident involving Richard Blazer and the Monument and

6   Findlay incident involving Mark McDonald?

7       A.    First crossed my mind when I ran the registration

8   on, on the red Monza and it came back to Tony Elofskey,

9   Tony D. Elofskey, 1617 Mack Avenue.  At that point I

10  thought possibly there was a connection.

11      Q.    And can you explain a little bit further why it

12  was that you, when you learned that the Monza was

13  registered to Tony Elofskey that you suspected there

14  would be a connection between the Monza automobile

15  located on McOwen Street and the incident out at

16  Monument and Findlay earlier that day?

17      A.    Yes, I can explain.

18      Q.    Please do.

19      A.    I knew -- I did not personally know Tony

20  Elofskey.  I, I knew of Tony Elofskey, other

21  investigations.  I knew that he had a reputation as a

22  hustler on Fifth Street.  That he would, I've had a lot

23  of contact with homosexuals, and would be on the river

24  levee.  I had information that Richard Blazer was a

25  homosexual.  I had information that Mark McDonald was