1   homosexual.  The car come back registered to 1617 Mack

2   Avenue which is close to the scene of the first homicide

3   on Findlay and Monument Street.  And things just sort --

4   well, at least there is a possibility.  And that was

5   when I first thought --

6      Q.   Is it fair to say that you thought there was a

7   possibility of a connection between the incidents

8   because of the homosexual connection?

9      A.   And that and having some information about Tony

10  Elofskey.  It's just an idea.  I thought possibly

11  they're connected.  We didn't have, at that point we had

12  nothing on the Mark McDonald's homicide.  We had no

13  suspect, very little information except that a witness

14  had, had seen a small car leaving after the shots were

15  fired.  A late '70 or early '80s model car which we had

16  in the Monza.  So I had something to go on but not a

17  lot.

18     Q.   And I think you testified that when you first

19  spoke to Polson or Elofskey, you said to them, quote, I

20  also know you were involved in the McDonald killing?

21     A.   Yes, I told him that.

22     Q.   When you say, I also know that you were involved

23  in the McDonald killing, at that time you still just had

24  that hunch, didn't you?

25     A.   Right.

1    Q.    So you were trying to lead them to believe that

2   you had more than a hunch, that you had some definitive

3   evidence?

4    A.    Sure did.

5    Q.    That they were involved?

6    A.    Sure did.

7    Q.    And you were misleading them, if you will?

8    A.    Well, I wanted to see what his response would be.

9   Certainly I was trying to solve a murder.

10   Q.    And you were exacerbating and misrepresenting the

11   state of your knowledge at the time you said to them, I

12   also know you were involved?

13   A.    Absolutely.

14   Q.    Right.  And that's part of your job to deceive

15   people in that fashion, isn't it?

16   A.    My job is to solve murders.  If I deceived him a

17   wee bit there, yes, I did.

18   Q.    Well, to be honest, part of your -- one of your

19   skills in interviewing persons is to lead them to

20   believe things that are not true, isn't that true?

21   A.    I don't lie to people.  If they're, if they take

22   something I say wrong, you know, that could happen,

23   sure.

24   Q.    And I think when you spoke to Tony Elofskey, you

25   also talked to him about still yet some other murders in

1   the Dayton area?

2    A.   Yes.

3               MR. ARNTZ:       That's all.  Thank you.

4               THE COURT:       Any redirect?

5               MR. DUNDES:      Could I have a minute, your

6   Honor?

7               THE COURT:       You may.

8               MR. DUNDES:      No redirect, your Honor.

9               THE COURT:       All right.  You may step

10   down.

11                           Thank you.

12                     * * * *

13               THE COURT:       Ladies and gentlemen of the

14   jury, we'll go ahead and take our morning recess.  We

15   will try to keep it to 15 minutes.

16                        Remember the usual

17   instructions not to discuss the case among yourselves

18   or with anybody else.  Do not form any opinions; you

19   have not heard all the evidence yet.  See you back in

20   about 15 minutes.

21

22            (WHEREUPON, a recess was taken.)

23

24

25

1       IN OPEN COURT - BEFORE THE JURY

2                                11:16 a.m.

3                 THE COURT:        You may call your next

4       witness.

5                 MR. SLAVENS:       Call Detective Tom Lawson,

6       your Honor.

7

8                 THOMAS G. LAWSON, having been first duly

9                 sworn according to law, was examined and

10                testified as follows:

11                     DIRECT EXAMINATION

12      BY MR. SLAVENS:

13        Q.    Sir, will you tell us your full name, please?

14        A.    Yes.  My name is Thomas G. Lawson.

15        Q.    And what is your employment or occupation?

16        A.    Employed by the City of Dayton Police Department.

17        Q.    And are you currently assigned to any specific

18      job duty or function?

19        A.    Yes, I am, sir.

20        Q.    And what is that, please?

21        A.    Homicide Investigations Unit.

22        Q.    And for how long have you been so employed?

23        A.    I been on the police department 24 years last

24      month, and I been on the homicide squad for the last

25      three, three and a half years.

1    Q.    And did you have occasion on the date of June

2    22d, 1992, to go to the location what I refer to as

3    Monument and Findlay near the bridge?

4    A.    Yes, I did.

5    Q.    And approximately what time did you get there?

6    A.    About 9:20.

7    Q.    And on that time upon your arrival, did you have

8    an occasion to see the body of Mark McDonald as it was

9    located in that field in that area?

10   A.    Yes, I did.

11   Q.    And did you have an opportunity on that occasion

12   to speak to any other members of your squad?

13   A.    Yes.

14   Q.    And were you, as to Mr. McDonald's homicide, were

15   you assigned any specific duty at that time?

16   A.    Did some checking around in the scene.  We had it

17   roped off and looking for any physical evidence.  Then I

18   talked with a couple of citizens.  Didn't learn anything

19   from them, but didn't have a whole lot at that time

20   connected with the investigation generally.

21   Q.    And so the record is clear, Monument and Findlay,

22   where you observed the body of Mark McDonald, is that

23   located within the City of Dayton, Montgomery County,

24   Ohio?

25   A.    Yes, it is, sir.

1    Q.   And for approximately what length of period of

2    time were you there?

3    A.   A couple of hours.

4    Q.   While there did you have -- you indicated you saw

5    his body how it was situated, glasses in the hand?

6    A.   Yes, sir.

7    Q.   Did you have an occasion to meet Sandra McDonald

8    on that day or talk to her?

9    A.   Yes, I did.

10    Q.   I would like to direct your attention as to

11    sometime that day, if, your normal duty hours or there

12    about, if you went home, if your work sort of terminated

13    for a while?

14    A.   We went, I say we, myself and Detective Wade

15    Lawson, we went to McDonald's home at 4 o'clock in the

16    afternoon.  And after conducting an inspection really of

17    Mark's room and the rest of the house, we went home from

18    there and it was probably 5:30 or so.

19    Q.   After arriving home, were you later that evening

20    dispatched from your home to go to the location of 1912

21    Tennyson?

22    A.   Yes, I was.

23    Q.   About what time did that occur?

24    A.   A little after 11.  It was 11:04, 11:04 p.m.

25    Q.   And did you go from your home alone?

1    A.    Yes.

2    Q.    And do you recall what the temperature was at

3    that time?

4    A.    Yes.  According to Ohio Bell, the temperature was

5    61 degrees.

6    Q.    And when you got to 1912 Tennyson, did you meet

7    other people?

8    A.    Yes.

9    Q.    And just so the record is clear, I would like to

10   show you a photograph marked State's Exhibit 55.

11   Obviously, it's a daytime photograph.  Is that the

12   location to which you went?

13   A.    Yes, it is.

14   Q.    And, but when you were there, am I correct it was

15   nighttime and it was dark?

16   A.    Yes, it was.

17   Q.    I would like to show you State's Exhibit 15, a

18   photograph, for identification purposes.  And do you

19   recognize that as a photograph of the area of the

20   doorstep there?

21   A.    Yes, I do.

22   Q.    And in that photograph, just so the record is

23   clear, do you see a pair of slippers?

24   A.    Yes, there is a pair of blue thongs or flip flop

25   type slippers just on the sidewalk in front of the front

1    your squad or, if so, who, somebody from your squad went

2    to the hospital?

3      A.    Yes.

4      Q.    Who was that?

5      A.    That was Detective Wade Lawson.

6      Q.    At the 1912 Tennyson, did you have an opportunity

7    to go inside the house?

8      A.    Oh, yes, yes, sir.

9      Q.    And generally speaking, how would you classify

10   the condition of the interior of that house?

11     A.    Well kept, very clean, very neat.

12     Q.    And did you have an opportunity to examine any

13   damage, if you will, to any windows of the front portion

14   of that house?

15     A.    Yes.

16     Q.    And I would like to direct your attention to

17   specifically the living room.

18     A.    Yes.

19     Q.    Did you notice anything there?

20     A.    Yes.

21     Q.    And what was that, please?

22     A.    There was a window pane that was broken on the

23   front of the house in the living room, is on the street,

24   let's call it, as you look at the house, it would be the

25   room on the right, the right of the front door.  And on

1    that window there was a broken window glass, appeared

2    that there was a bullet hole through that glass and, in

3    fact, a bullet projectile, a slug was found between the

4    two, between the interior window and the outer storm

5    window.

6        Q.    Now, as you indicated, looking to the right of

7    the, from the front door, referring your attention back

8    to State's Exhibit 55.

9        A.    Yes, sir.

10       Q.    Is any portion of that window depicted in this

11   photograph?

12       A.    Yes.  Just on the right edge of the photograph,

13   you can see part of the window and part of the awning

14   that covers that window.

15       Q.    Now, are you familiar with the person by the name

16   of Marshall Manning?

17       A.    Yes, sir.

18       Q.    And was he out there on the scene of 1912?

19       A.    Yes.

20       Q.    Were you present or did you point out any items

21   to him?

22       A.    Yes.

23       Q.    And what was that, please?

24       A.    The slug in particular and then there was a 25

25   shell, 25 caliber shell casing.

1     Q.    Where was that?

2     A.    It was on the carpet in front of a love seat

3   which was situated along one of the walls as you come

4   into that living room.

5     Q.    Now, so was the shell casing in the same room as

6   was the window that was damaged?

7     A.    Yes.

8     Q.    Did you have an occasion while there at the scene

9   on that evening to look at any of the hedges as one

10  would come out of the front door and, and turn to the

11  right towards the driveway?

12    A.    Yes.

13    Q.    And in that area did you, or did you see

14  anything, did you discover anything or did somebody else

15  discover anything?

16    A.    A shell, a shell jacket, a lead jacket.  I mean,

17  it's actually a copper jacket from a lead slug was

18  recovered to the right of the doorway as you come out

19  and go to the right toward, toward the driveway.  And it

20  was recovered underneath the hedge just to the right of

21  the doorway.

22    Q.    Like a copper jacket?

23    A.    A copper jacket where the bullet would separate,

24  the projectile would separate, have the two parts, a

25  lead outer core and the jacket, the outer core of the

1    jacket was found on the hedge.

2    Q.    There is two items found?

3    A.    Yes, the lead slug, the inner part of the bullet

4    was found on the sidewalk.

5    Q.    And did you point that out or did you discover

6    that?  How did that --

7    A.    Those items had been found, well, the lead slug

8    was found before my arrival.  It was marked.  The area

9    was secured.  It was roped off.  And the scene had been

10   maintained prior to my getting there.  It was found on

11   the sidewalk.  The shell casing was found by Officer

12   Watson under the shrubs.

13   Q.    Not to be confused, the shell casing, you mean

14   shell jacket?

15   A.    Shell jacket.  Bullet jacket.

16   Q.    About how long were you there?  When did you

17   leave?

18   A.    I left there probably about a quarter till one

19   when I left there to go downtown.

20   Q.    All right.  Now, as you're there at 1912, were

21   you familiar with whether or not there had been with

22   Lieutenant Miller, I'm going to use the term chase?

23   A.    Yes, I was familiar with that.

24   Q.    And were you familiar with whether or not any

25   people, persons were apprehended after the chase?

1    A.   Yes.

2    Q.   And did you know where those people were when you

3    left 1912 at about -- I forget what time you said.

4    A.    I left there about 1:45 that morning on the

5    morning of the 23rd.  And, yes, I was aware that we had

6    two people that had, I had been informed they had been

7    taken downtown.

8    Q.   Downtown, you mean the Safety Building?

9    A.   Safety Building.

10   Q.   One building from this building?

11   A.   Yes, Dayton Police Headquarters.

12   Q.   Did you know then the identity of either of these

13   people?

14   A.   No.

15   Q.   That you recall?

16   A.   No, sir, I did not at that time.

17   Q.   Now, what I would like to do at this point, I

18   would like to take your attention now to the next day.

19   A.   Okay.  Yes, sir.

20   Q.   Well, it would be the same day?  If you left at

21   1:45, you're talking about June 23rd?

22   A.   Yes, sir.

23   Q.   So I want to take you now to sometime the next,

24   in that same numerical day but to a time in the daytime

25   of the 23rd.

1    A.    Okay.

2    Q.    And ask if the next day if you had an occasion in

3    daylight to go back out to 1912 Tennyson?

4    A.    Yes, sir, I did.

5    Q.    And will you tell us approximately what time you

6    went out there?

7    A.    It was after 10 that morning, about 10:15.

8    Q.    And when you went there, did you go with any

9    other people from the police department or did you go

10   alone?

11   A.    I went alone.

12   Q.    And while there did you make contact with any

13   people?

14   A.    Yes, I did.

15   Q.    And who was that, please?

16   A.    Loretta and Fred Blazer.

17   Q.    To your knowledge, are they related to Richard

18   Blazer?

19   A.    Brother and sister.

20   Q.    While there in the daylight, did you have an

21   opportunity to look outside or in the grass?

22   A.    Yes, I did.

23   Q.    Did you have an opportunity to look in the hedges

24   at that time also?

25   A.    Yes.

1    Q.    When you were looking in the grass or looking in

2    the hedges, tell us what you did, how do you do this?

3    A.    Well, I was -- reason for doing it was, I was

4    looking for additional shell casings.  And I tried to

5    use, the night before we looked as much as we could with

6    the lighting we had trying to find shell casings and

7    couldn't find any.  We had reason to -- in fact, by this

8    time we already knew that two weapons used were both

9    semiautomatic type pistols.  So I had a rake and finally

10   got down on my hands and knees and crawled around the

11   front yard and found two shell casings.

12   Q.    Now after finding the two shell casings, who, if

13   anybody, from the police department did you contact?

14   A.    Steve Bryant, an evidence crew, well, actually

15   called the dispatch and asked for an evidence crew and

16   he responded.

17   Q.    And had you designated somehow or another those

18   two shell casings?

19   A.    Yes.  To keep from losing them again, I placed my

20   business cards close proximity where they were found so

21   that I could locate them again.

22   Q.    I would like to hand you what's been marked as

23   State's Exhibit 57 and 56, and ask if you can tell me

24   what is depicted on those two particular photographs?

25   A.    56 and 57 shows my business cards.  And then

1   closer examination, you can see in front of, of my

2   business cards the shell casings that I was using my

3   business cards here to mark their location.

4       Q.    Now, let me hand you what's been marked State's

5   Exhibit 58 for identification purposes, and I will ask

6   you what that is?  First of all, is that a photograph?

7       A.    This is a photograph, yes, sir.

8       Q.    And what is that a photograph of?

9       A.    This is a photograph of the, well, actually the

10  front yard of 1912 Tennyson Avenue.

11      Q.    All right.

12      A.    And what's depicted in this photograph is, this

13  is an upper close shot of the business cards and this is

14  moved back in distance.  I'm showing two business cards

15  lying in the grass where I found the two shell casings.

16      Q.    I would like to -- in this particular photograph,

17  58, am I correct the sandals in the other photograph

18  have been removed?

19      A.    Yes, they have.

20      Q.    And I would like to point your attention out to

21  the material, if you will, that is here on the sidewalk

22  in this photograph, which is 58.  Is that some of your

23  handiwork?

24      A.    Yes, sir.  That's where I raked, raked from

25  underneath the shrubs.  As I also raked in the front

1    yard, you can see some of the material that is bunched

2    up here, sort of thatching, if you will.

3        Q.    After, well, did a person by the name of Steve

4    Bryant come out there when you were there?

5        A.    Yes, he did.

6        Q.    After, on the same day, I'm talking again June

7    23rd, after Steve Bryant was there -- by the way, did he

8    collect the two shell casings?

9        A.    Yes, he did.

10       Q.    Then did either you or he, did you go over to

11   what I'm going to call Coffey's Body Shop?

12       A.    Yes, I did.

13       Q.    And can you tell us where that is?

14       A.    It has an address in the 8 hundred block of West

15   Third Street.  It actually sits in an alley behind 8

16   hundred block of West Third Street.  It's a body shop

17   and a towing company.

18       Q.    Did you have an opportunity on that time, at that

19   time to look at the, I think it's a '78 Chevy Monza

20   that's sort of maroon painted?

21       A.    Yes.

22       Q.    And did you at that time discover anything?

23       A.    Yes, I did.

24       Q.    And what did you discover?

25       A.    A shell casing, 25 caliber shell casing.

1    Q.    And was that specific shell casing collected by

2    Steve Bryant?

3    A.    Yes, it was.

4    Q.    Now, I want to show you what's been marked as

5    State's Exhibit 65 for identification purposes.  I think

6    I did say it's a photograph for the record.  Are you

7    able to recognize what that is a photograph of?

8    A.    Yes.  This is a -- I was present when this

9    photograph was taken, when this photograph was taken and

10   a photograph of the shell casing found in the Elofskey

11   car.

12   Q.    Now, I want to jump forward, if you will, one

13   more day, I think maybe, I think, the 24th, and ask if

14   you had an occasion to go back to that car again?

15   A.    Yes, I did.

16   Q.    And that would be your second trip to the car?

17   A.    Yes.

18   Q.    Same location?

19   A.    Yes.

20   Q.    And ask if you had an occasion on that day to

21   obtain what I'm going to hand you marked as State's

22   Exhibit 74?

23   A.    Yes, I did.  This was --

24   Q.    And on what date, so I'm clear or the record is

25   clear?

1    A.    On the 24th, 6/24/92.  It has my initials and the

2    date on it.

3    Q.    And that's the date that you obtained possession,

4    what I'm going to call the black book?

5    A.    Yes.

6    Q.    In that book do you see the designation of Dick

7    with a telephone number of 276-2215, I think?

8    A.    Yes, sir, I do.

9    Q.    If I may, Detective, now I want to now take you

10   back to June 22d at that time you left the 1912

11   Tennyson.  And are you with me now?

12   A.    Okay.

13   Q.    We are back to Monday evening actually the 23rd?

14   A.    Okay.

15   Q.    When you left Tennyson, I think you indicated it

16   was about 1:45?

17   A.    Thereabouts, yes, sir.

18   Q.    From that location of 1912 Tennyson, where then

19   did you go?

20   A.    To the detective section of the Dayton Police

21   Headquarters at 335 West Third Street.

22   Q.    And sometime after your arrival -- well, did you

23   make contact with any of the other detectives who were

24   involved in this particular case?

25   A.    Yes.

1    Q.    After that, did you have occasion to come in

2    contact with the person known as the name of Weston Lee

3    Howe?

4    A.    Yes, I did.

5    Q.    Where was Mr. Howe when you first saw him?

6    A.    Inside an interview room.

7    Q.    Was he alone at that time?

8    A.    Yes.

9    Q.    And when you had -- when you saw Mr. Howe, then

10   approximately what time was it?

11   A.    It was 2:49 a.m.

12   Q.    And when you first saw Mr. Howe, were you by

13   yourself or were you with any other detectives?

14   A.    I was with another detective.

15   Q.    And what is that person's name?

16   A.    It's Detective Tony Spells.

17   Q.    When you went in there to see Weston Lee Howe,

18   did you explain to him his Constitutional Rights to him?

19   A.    Actually Detective Spells did.

20   Q.    And how did Detective Spells do that?

21   A.    By use of a pre-interview rights form.

22   Q.    Now, the person you referred to as Weston Lee

23   Howe, is that person also sometimes known as Weston Lee

24   Howe, Junior?

25   A.    Yes, sir, he is.

1    Q.   And do you see the person that you're referring

2    to as having seen on June 23rd at approximately 2:49

3    hours present today in the courtroom?

4    A.   Yes, sir.

5    Q.   For the record will you tell us today where he's

6    seated and what he's wearing today?

7    A.   He's wearing a gray suit, white shirt, striped

8    tie, sitting at the defense table.

9             MR. SLAVENS:    Let the record reflect the

10   witness has indicated the defendant.

11   BY MR. SLAVENS:

12   Q.   Now, Detective, I would like to hand you what's

13   been marked as State's Exhibit 77 for identification

14   purposes, and for the record tell us what that is.

15   A.   This is a -- in fact, this is the pre-interview

16   rights form that was used by Detective Spells on 6/23/92

17   at 2:49 a.m. to advise Weston Lee Howe, Junior, of his

18   Constitutional Rights.

19   Q.   Can you explain to us in what manner that form

20   was used to explain to Mr. Howe his Constitutional

21   Rights?

22   A.   Yes, sir.  There's some blanks on the form.  It's

23   blank, the date and time and place.  And also the first

24   line reads:  You are being interviewed in regards to the

25   crime of blank.  I filled in the time, the date, and the

1    location and wrote in the blank the crime of aggravated

2    murder and aggravated robbery.  It's in my handwriting.

3    Then I gave the form to Detective Spells who was sitting

4    in the interview room across the table from Weston Lee

5    Howe.  He then asked Mr. Howe his name and wrote Weston

6    Lee Howe, Junior, 121 Valley Street, Apartment 3.  And

7    it gives his date of birth of 12/19/67.  That's in

8    Detective Spells' handwriting.

9          At the bottom of the form:  I have completed

10   blank years of schooling.  Detective Spells in response

11   to question that he asked Mr. Howe, wrote 11 years.  And

12   then at the end of it, put the initials GED, which is

13   what Mr. Howe had told Detective Spells that he had his,

14   in education, that he obtained a GED.

15     Q.   Do you see on that form after, after you are

16   being interviewed in regards to the crime of aggravated

17   murder and aggravated robbery there are a number of

18   paragraphs?

19     A.   Yes.

20     Q.   Well, there are a number of numbered paragraphs?

21     A.   Yes, sir.

22     Q.   Were those paragraphs specifically explained to

23   Mr. Howe?

24     A.   Yes, they were read to him by Detective Spells.

25   And after each one of the paragraphs that he read to

1    him, he asked him if he understood.  And after each one

2    of these paragraphs, Weston Lee Howe, Junior, said, yes,

3    that he understood his rights.

4        Q.    And did -- were all those numbered paragraphs

5    read to Mr. Howe?

6        A.    Yes, sir, they were.

7        Q.    And did Mr. Howe indicate on the form in his

8    conversation at that time whether or not he was willing

9    to have a conversation with you?

10       A.    Yes, he did.

11       Q.    And how did he so do that?

12       A.    By signing the form at the bottom, signed with

13   the name of Lee Howe.

14       Q.    After that was done or when you were explaining

15   to him in regards to the charge of aggravated murder and

16   aggravated robbery, did you then have a conversation

17   with Mr. Howe about an aggravated murder and an

18   aggravated robbery?

19       A.    Yes, I did.

20       Q.    And what did you say to Mr. Howe about what the

21   subject matter of your conversation would be?

22       A.    I told him that the man in the shooting that

23   night on Tennyson that was dead, that he had died.  And

24   that he, himself, now Howe, was a subject and a suspect

25   in an aggravated murder and aggravated robbery and I

1   need to talk to him about it.  And that being the

2   subject of the investigation and subject to the

3   interview which we began to talk.

4       Q.   Did he explain to you what he had done that

5   evening?

6       A.   Yes, he did.

7       Q.   Did he explain to you what he claimed he had done

8   that evening?

9       A.   Yes, he did.

10      Q.   And what did he indicate to you?

11      A.   He admitted being at Dick Blazer's house and

12  going there with -- at that time we didn't know Tony

13  Elofskey, who Tony Elofskey was.  And he gave me the

14  name of Tony and his brother Walt.  And that they had

15  gone there.  He stayed in the car and that Walt and Tony

16  had gone inside.  And they came outside the house, him

17  still being in the car.  Shooting started, they got in

18  the car and left.  And initially that's all he knew

19  about it.

20      Q.   Okay.  Did you have additional conversation with

21  him as to what he claimed occurred that evening?

22      A.   Yes.

23      Q.   Tell us about that, please.

24      A.   After the initial conversation, he stated that he

25  knew they were going there to get money from the person.

1    That Tony had known the person before.  And that they

2    were going to go there to get money from him.  He didn't

3    know they were going to rob him.  That Tony and Walt had

4    gone in the house and he again stayed in the car.  That

5    is he described after a few minutes, the fat guy came

6    out and the shooting started and that Tony was shooting

7    this guy.  And, and after Tony was shooting him, that

8    they got back in the car and left and he was specific

9    that Tony had been the one that triggered this.

10        Q.    Did you have additional conversation with him

11   about his claim as to what had occurred there with

12   Mr. Blazer?

13        A.    Yes.

14        Q.    Tell us about that.

15        A.    Well, he said that he had gotten out of the car.

16   And he remembered being out of the car.  And that as

17   Tony was shooting Mr. Blazer, that he had gone up and

18   had tried to grab the gun from Tony as Tony had the gun

19   in his hand.  And that the three ran back to the car.

20   That Mr. Howe had ended up with both the guns and that

21   he had given them back to Walt.  That Tony handed him

22   two guns and that Weston handed the guns back to Walt.

23   Then the police chased him and they got out and ran.

24   When they ran, that Walt had the, had the two guns.

25        Q.    During your conversation with him on this

1  occasion, at any time did he indicate to you whether or

2  not he had in his possession any pantyhose?

3      A.    No, he did not.

4      Q.    By the way, how was Mr. Howe dressed when you

5  were interviewing him?

6      A.    Well, he had on, starting from the skin out, he

7  had on a black T-shirt, a hooded sweat shirt, a Levis

8  jacket, a pair of denim jeans, and a pair of tennis

9  shoes.

10     Q.    Sometime later on that evening did you collect

11  those items?

12     A.    Yes, I did.

13     Q.    Did you at some point in time after receiving

14  these statements, if you will, from Mr. Howe, did you

15  leave the room?

16     A.    Yes.

17     Q.    Did Detective Spells leave the room with you?

18     A.    Yes.

19     Q.    About what time did you leave that particular

20  room, you and Detective Spells?

21     A.    Oh, it was about, about 3:30, I would imagine.

22  We were in there probably 30 minutes or so.

23     Q.    And do you subsequently after that go back inside

24  that same room and talk to Mr. Howe?

25     A.    Yes, I did.

1    Q.    Can you tell us what time that would have been?

2    A.    I went back in at 4:18 that morning.

3    Q.    During this period of time that -- well, when you

4    go back at, in at 4:18, do you go back in the same room?

5    A.    Yes, sir.

6    Q.    At that point in time Mr. Howe, has he been by

7    himself?

8    A.    Yes, he has.

9    Q.    When you go back inside, do you go in with

10   Detective Spells or by yourself?

11   A.    I went in by myself.

12   Q.    When you go back inside the room where Mr. Howe

13   is, what do you say to him?

14   A.    I told him that we had been working on another

15   homicide and I knew that he was part of the homicide

16   that had occurred earlier that day, referring to Mark

17   McDonald.

18   Q.    Do you explain to Mr. Howe the location of this

19   other homicide?

20   A.    That's how I identified the homicide.

21   Q.    Tell us, if you can recall, what you said.

22   A.    I told him another homicide occurred that day by

23   the Findlay Street bridge and that our investigation, we

24   already knew that he was part of that homicide.  And I

25   needed to talk to him about that one additionally.  And

1    needed to get his side of what had taken place.  And he

2    started, he started to respond with what he knew about

3    it.

4      Q.    Other than explaining to Mr. Howe at that time

5    the location on the second homicide you would be talking

6    to him about, did you give him any other details other

7    than what you've already told us?

8      A.    I told him his brother had already told us about

9    his involvement.

10     Q.    Do you give to Mr. Howe any of the, any of the

11   details what his brother had said?

12     A.    No.  No, not at any time.

13     Q.    What does Mr. Howe say to you about the Findlay

14   and Monument Street, Mark McDonald's homicide?

15     A.    His first response was that he and Tony and Walt

16   were together on the river levee.  They had picked up a

17   guy in a blue car, small blue car.  He told me that he

18   was hiding in the front seat crouched down on the

19   floorboard.  And that Walter was laying down on the back

20   seat.  That after picking this guy up on the river levee

21   and him following thinking there was only one person in

22   the car, that he was led by Elofskey to the field.  And

23   he described the field by the river levee or actually by

24   the Findlay Street bridge.

25          When they pulled in and they parked, he described

1  him as a young white dude with blond hair, I believe,

2  yeah, with blond hair.  He described him as a white dude

3  with blond hair, came up to the car on the driver side

4  and that Tony says, now.  And Walt came up from the back

5  seat and shot the man and the guy fell down.  And that

6  Weston and Walt got out of the car and chased the guy.

7  He got back up, the victim had gotten back up and that

8  he and Walt chased the guy and the guy fell.  And that

9  he and Walt took the guy's billfold.

10   Q.   Now, after having that portion of the

11  conversation with him, do you continue your conversation

12  with him in regards to whether or not you believed that

13  Walt was the shooter?

14   A.   Yes, I did.

15   Q.   What did you say to him?

16   A.   I told him I didn't think he was being truthful

17  with me at that point, and, you know, we needed the

18  truth.  And talked to him more about what had happened

19  with the robbery and more detail about what had taken

20  place.

21   Q.   What did he then say?

22   A.   He recapped how that they had picked the guy up

23  and got him to the river or from the river levee to the

24  Findlay Street bridge field.  And the guy came up to the

25  car.  And that he and Tony were, were talking.  And that

1    Tony pulled the gun and shot the man in the face.  And

2    then again that he had chased him and Walt got out and

3    chased the guy down and took his billfold from him.

4        Q.    So in that scenario as in the first scenario, he

5    and Walt got out and chased the man down?

6        A.    Yes.

7        Q.    Did you tell him at that time whether or not you

8    believed him or didn't believe him?

9        A.    Again, I told him that I didn't believe him.

10   That he was lying to me.  And that it was important,

11   that he was looking at some very serious charges here

12   and we needed the truth out of him in this

13   investigation.  And it was at that point that he said,

14   okay, the truth.  I shot him.  And then he went on to

15   explain how he shot Mark McDonald across Tony Elofskey's

16   face, pulled the gun up.

17       Q.    Tell us what he said about that.

18       A.    That he was -- again, going start to finish.

19   He -- again, we picked the guy up on the levee.  And the

20   guy came up to the car.  He says that Tony was talking

21   to the guy.  Walt's hidden in the back seat or laying

22   down in the back seat.  And that he was down in the

23   passenger's floorboard.  And he says the guy came up to

24   the car, looked inside, and Tony began talking to him,

25   as he referred to it as about fag shit.  And while Tony

1    is talking to him about the fag shit, he comes up with

2    the gun across Tony's face and shoots the man three

3    times.  He says he brought the gun up to scare the guy

4    and the gun went off.  And then I said, how many times

5    did the gun go off.  And he said, I'm not sure, two or

6    three times, I believe was his quote.  But he said, I

7    didn't mean for the gun to go off.  And that was his

8    statement that he admitted being the truth.

9       Q.    So the last claim to you was the gun went off

10   accidentally?

11      A.    Accidentally.

12      Q.    Okay.  In what I'm going to call that third

13   scenario, if you will, did he indicate to you that

14   whether or not anybody got out of the car and chased the

15   man at that time?

16      A.    Yes.

17      Q.    And who was that, please?

18      A.    He and Walt got out and chased the guy and that

19   Walt took the man's billfold.

20      Q.    Did he indicate to you whether or not there was

21   any money in the billfold at any time?

22      A.    Yes.  Yes, he told me there was $5.00 in the

23   billfold.

24      Q.    Detective, let me hand you what's been marked as

25   State's Exhibit 78, and I want you to tell me what that

1    is, please.

2      A.    Let me put my glasses on to make sure.

3           This is the clothing of Weston Lee Howe, tagged,

4    taken by me and tagged as pair of white Converse tennis

5    shoes, blue sweat shirt, it's a hooded sweat shirt, pair

6    of blue jeans, a pair of -- scratch that.  It's a blue

7    jean jacket, a pair of black jeans and then there is a

8    black T-shirt.

9      Q.    Is that card filled out in your hand?

10      A.    Yes sir.

11      Q.    And would you be kind enough to open up, here's a

12    pair of scissors, that sack and bag.

13      A.    Okay.  This is the blue hooded sweat shirt.  And

14    my initials TGL and the date 6/23/92 on the tag of the

15    sweat shirt.  That's the sweat shirt that came from

16    Weston.

17      Q.    Weston Lee Howe?

18      A.    Yes, sir.  And this is the black T-shirt that

19    came from Weston Lee Howe.  And my initials appear on

20    the front of that.  These were not tagged by me but were

21    in the clothing and were left there and were tagged by

22    the evidence people at the lab.

23           Pair of black jeans that had been tagged with my

24    initials and the date on the inside right pocket.  Jeans

25    that he was wearing.  And my initials appear on the, it

1    looks like a letter tag inside of the Levis jacket and

2    the date of 6/23/92.

3    Q.   So the other items are the shoes?

4    A.   Likewise, they'll have my initials and the date

5    on the shoes here.  They're on the insides of the shoe

6    on the bottom.  That one.  And that one.

7    Q.   Now as to regards to the T-shirt, the jean

8    jacket, blue jeans, and I'm going to call it the hanging

9    hood, would you put those back in the sack.  We'll

10    probably put those in another sack also.

11    A.   The tag is inside.

12    Q.   Detective, I would like to inquire as to if

13    sometime after or in the morning hours of the 23rd, if

14    you will, if you had occasion to be present when a video

15    recordation of a Walter Polson interview occurred?

16    A.   Yes, sir.

17    Q.   And did you have any participation in that

18    particular interview?

19    A.   Yes.

20    Q.   And what was that?

21    A.   I ran the video recording equipment.

22    Q.   And approximately what time did that recordation

23    of that interview occur?

24    A.   About 7 o'clock that morning.

25    Q.   Since that time, have you, I'm going to -- strike

1    that.

2        I'm going to hand you what's now been marked 79

3    for identification purposes, and ask you to tell me what

4    that is, please.

5    A.    Yes, sir, it's a videocassette.  It's a recording

6    of the conversation with Walter Polson that was done on

7    the morning of 6/23/92.

8    Q.    And as to that exhibit, have you had an

9    opportunity since the recordation to view in its

10   entirety the recordation?

11   A.    Yes, I have.

12   Q.    And is that recordation and videotape a fair,

13   accurate, and correct reproduction of the interview that

14   you observed with Walter Polson?

15   A.    It is.

16   Q.    And you indicated you were operating the camera?

17   A.    Yes.

18   Q.    Do you ask any questions or do you recall?

19   A.    I don't recall.  I believe at the end I may have

20   asked --

21   Q.    Is your name mentioned?

22   A.    Yes, it is.  My name is mentioned at the front.

23   Q.    When this is played, who will we see on the video

24   portion of this?

25   A.    Detective Tony Spells and Walter Polson.

1       MR. SLAVENS:    We ask this be played, your

2   Honor.

3       THE COURT:    Could I see counsel at the

4   side please and Joyce.

5                   AT SIDE BAR

6       THE COURT:    What is the defendant's

7   position as to the playing of this videotape?

8       MR. ARNTZ:    We're objecting the playing

9   the videotape.

10      THE COURT:    Okay.  Now let's go ahead

11  and break for lunch.  The Court's concerned that we

12  have a different set of scenario now in terms of this

13  tape, but I will talk to counsel about that as soon as

14  we break.  We will come back a little early.  I will

15  have them come back at 1:30.

16

17                  BEFORE THE JURY

18      THE COURT:    Ladies and gentlemen of the

19  jury, we will go ahead and break for lunch.  We'll try

20  to have everything ready to go when we get started.

21  The Court has some other matters to deal with.  We

22  will recess until 1:30.

23                      Remember the usual

24  instruction from the Court not to discuss the case

25  among yourselves or with anybody else.  Don't form any

1   opinions.  Keep away from any news media.  We've gone

2   through that.  See you back at 1:30.

3                  (WHEREUPON, a luncheon recess was taken.)

4                          *   *   *   *

5

6   <u>IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY</u>

7              THE COURT:       All right.  Let the record

8   reflect that we are out of the presence of the jury.

9                             Immediately before lunch

10  the prosecutor proposed to play the taped statement of

11  Walter Polson shortly after the time of his arrest.

12  There was a discussion held on the record, another

13  discussion held off the record.  And it's the Court's

14  understanding that the defendant is withdrawing any

15  objection to the playing of that tape, the videotaped

16  statement of Walter Polson that was made to detective,

17  at least in the presence of Detective Tom Lawson and

18  Tony Spells of the Dayton Police Department.

19                             Is that correct, Mr. Arntz?

20             MR. ARNTZ:       Yes, sir, it is.

21             THE COURT:       Now we've dealt with that.

22             MR. SLAVENS:     Well, before we begin,

23  maybe we can have Shirley get it ready to play.

24             THE COURT:       We can do that.  It will be

25  the same.  Is there anything on the tape that needs to

1    be eliminated from the jury's hearing?

2            MR. ARNTZ:        Not that I'm aware of.

3            MR. SLAVENS:      It's been supplied to all

4    counsel, this set of counsel.  I don't believe there

5    is any similar references as were in the other tape.

6    Any disagreement?

7            MR. MONTA:        I don't think so.

8            THE COURT:        All right.  We'll play the

9    tape in its entirety, number one.

10                            Number two, let the record

11   reflect that the tape will speak for itself as to the

12   words that are used and will become a part of the

13   record and it won't be necessary for the Court

14   Reporter to record the taped statement.

15                            Also for the record, the

16   State has provided defense copies of the proposed

17   slides to be used by the coroner in his testimony.

18   The Court has reviewed all the slides and it's the

19   Court's understanding that there are -- well, I don't

20   want to speak for the defense.

21                            What is the defendant's

22   position as it relates to the slides proposed to be

23   used by the State?

24           MR. MONTA:        Your Honor, we object to

25   the very first slide in the McDonald case.  We feel

1   that the coroner's testimony should be a clinical

2   analysis of wounds to the person shot and not inflame

3   or prejudice or arouse sympathy in the jury.  We think

4   that that one slide may have a tendency to do that.

5           THE COURT:        Response by the State?

6   Well, wait.  Before I do that, any objections to any

7   other slides?

8           MR. MONTA:        No, Judge.

9           MR. SLAVENS:      The one slide is the one of

10  Mr. McDonald?

11          MR. MONTA:        Yes.

12          MR. SLAVENS:      More or less as received?

13          MR. MONTA:        Prior to the examination.

14          MR. SLAVENS:      I have no response.  I

15  mean, it's very -- the slide shows how the body was in

16  fact presented at the coroner's office.  And it shows

17  there's been no, if you will, the differentiation of

18  the body from the time of his recovery in the field

19  which is the photograph of at the time he's

20  transported to the autopsy area indicating there is

21  no, showing no marked change, therefore, showing

22  there's been no marked change.

23          THE COURT:        The Court will overrule the

24  objection and permit the slide to be used as a Court

25  exhibit.

1                      Now, we are not at that

2    point.  Let the record reflect the Court is now

3    addressing the gallery.  We are not at that point.

4    The coroner will be testifying probably in a half hour

5    after Mr. Lawson gets through testifying.  Obviously,

6    the slides depict people that are close to members of

7    the family who are present in the courtroom.  I assume

8    that you have not viewed these slides before, if you

9    have, that may or may not have any impact on what I'm

10    about to say.  All I'm simply saying, you may not want

11    to look at them.  You may not want to listen to any of

12    the testimony.  That's up to you.  My only request is

13    that if you decide to start the testimony of the

14    coroner and you decide you just don't want to listen

15    for any reason, try, if you do, leave the courtroom,

16    please leave quietly.  Again, I'm just warning you

17    that these slides will be shown of not only

18    Mr. McDonald but of Mr. Blazer.

19                      So is there anything else

20    for the record that need be stated before we bring the

21    jury in?

22           MR. SLAVENS:    May I have one moment, your

23    Honor?

24           THE COURT:     Yes.

25           (Pause in the proceedings.)

1          THE COURT:          All right.  Let's bring the

2     jury in.

3                    BEFORE THE JURY

4          THE COURT:          You may proceed, Mr.

5     Slavens.

6   BY MR. SLAVENS:

7     Q.    If it please the record, you're Detective Tom

8   Lawson who was testifying at the time of the break at

9   noontime?

10    A.    Yes, sir.

11    Q.    You're still under oath, you recognize that?

12    A.    Yes, sir.

13    Q.    Now, Detective, I think that you told us a little

14  bit about State's Exhibit 79, which was the tape of the

15  interview that you did, the camera, for, with Mr. Walter

16  Polson and Tony Spells?

17    A.    Yes, sir.

18          MR. SLAVENS:          We are going to ask that

19     that be played, your Honor.

20          THE COURT:          All right.

21          (WHEREUPON, the videotape was played at the

22     hour of 1:40 p.m.)

23          THE COURT:          Mr. Slavens.

24  BY MR. SLAVENS:

25    Q.    Now, Detective, is that, was that an accurate

1     recordation of the interview with Mr. Polson?

2       A.    Yes, it was, sir.

3       Q.    Now, I would like to direct your attention to

4     three other dates, specifically, June 28th, June 29th,

5     June 30th, and July 23rd, and ask you if on those dates

6     you made contact with a person by the name of Tony

7     Elofskey?

8       A.    Yes, I did.

9       Q.    And when you made contact with Mr. Elofskey,

10    where was he?

11      A.    The first three dates he was in the city jail and

12    then on the fourth date you mentioned in July, he was in

13    Montgomery County Jail.

14      Q.    Okay.  With reference to the first date.  On that

15    particular date, did he or you bring up any of the

16    subject matter what I'm going to call deals or plea

17    negotiations or plea bargains?

18      A.    No.

19      Q.    On the second date that you spoke to him, did

20    that subject matter in any fashion come up?

21      A.    No.

22      Q.    And on the third date that you spoke to him, June

23    30th, did either you or he bring up the subject matter

24    of any form of negotiated plea?

25      A.    Yes.