1    Q.    And who brought that up?

2    A.    Tony did.

3    Q.    And did you make a response to him concerning

4    that subject matter?

5    A.    Yes.

6    Q.    And what, if anything, did you say to him?

7    A.    Told him I couldn't talk to him about any deals.

8    I could make no deals with him.  He was furnishing me

9    some information and wanted to talk to me about a deal,

10   making some kind of a plea bargaining arrangement.  I

11   told him I can't do it.  I can't enter into anything

12   with you like that.

13   Q.    Did you not see him until July 23rd then, is that

14   correct, almost about a month later?

15   A.    Yes, sir.

16   Q.    On the 23rd did he bring up the subject matter

17   about deals or assist you in any, in any fashion?

18   A.    Yes, he did.

19   Q.    On the 23rd what was his -- did he make any

20   proposals to you or anything of that nature?

21   A.    He wanted to give me some information and somehow

22   use, let that information be used in some kind of a

23   plea-type deal he could make with the prosecutor or

24   actually make it with me.  I told him, you know, I would

25   take any information he would have but I couldn't make

1    any deals with him.  He would have to go through his

2    attorney or, or through the prosecutor.

3        Q.   Did he give you information and, if so, what was

4    the subject matter of the information he gave you?

5        A.   Yes, he did give me some information on this

6    criminal activity, some particular garage, some garage

7    burglaries, B & E's.

8        Q.   And when you first met with him back at the, the

9    first time you met with him on, on June 28th or the

10   29th, did he, any of those two occasions, reiterate to

11   you what he had told earlier on the 22d?

12       A.   Yes.

13       Q.   Or the 23rd, really?

14       A.   It was on the 23rd, but, yes, he did.

15       Q.   Were the comments that he made to you on, let me

16   get my correct date again, on the 28th and/or the 29th

17   different than or consistent with what he told on the

18   22d or 23rd?

19       A.   He was always consistent.

20               MR. SLAVENS:     That's all I have.

21                                The attorneys may ask you

22   some questions.

23               THE COURT:     Cross-examination.

24

25

<u>CROSS-EXAMINATION</u>

BY MR. ARNTZ:

Q.    Afternoon, Detective Lawson.

A.    Good afternoon, Mr. Arntz.

Q.    Detective Lawson, I think we have already heard that you are a homicide detective with the Dayton Police Department and have been for sometime, is that true?

A.    That's true.

Q.    And worked together with your brother on these two cases that we are here on today?

A.    Yes, sir.

Q.    And not the first time the two of you have worked together, is it?

A.    No, sir.

Q.    And I think this morning you were talking to the prosecutor about the occasion that you had to meet with our client, Weston Howe, on June 23rd, I believe it was early in the morning, is that correct?

A.    Yes, sir.

Q.    And you told us that you met with Mr. Howe in an interview room in the detective section of the Dayton Police Department, is that correct?

A.    Yes, sir.

Q.    And that would have been on or about 2:49 in the morning?

1     A.    Yes, sir.

2     Q.    And 2:49 in the morning when you met with

3     Mr. Weston Howe for the first time would have been after

4     a detective had had an interview with Walter Polson,

5     isn't that true?

6     A.    Yes, sir.

7     Q.    And 2:49 when you first met with Mr. Weston Howe

8     would have been before any detective had an interview

9     with Tony Elofskey?

10    A.    Yes, sir.

11    Q.    And when you met with Mr. Howe in order to talk

12    with him, you had Detective Tony Spells along there with

13    you, didn't you?

14    A.    Yes, sir.

15    Q.    And Detective Tony Spells, for the information of

16    the jury, is the black man we saw interviewing Walter

17    Polson on the videotape that we just watched?

18    A.    Yes, sir.

19    Q.    And yourself and Detective Spells are sitting

20    with Weston Howe in the interview room while you talk to

21    him?

22    A.    Yes, sir.

23    Q.    And the interview room is a very small room?

24    A.    Yes, sir.

25    Q.    And its dimensions are about 5 by 5 feet?

1   A.   Roughly that, yes, sir.

2   Q.   All right.  And that would be maybe the width of

3   this area where the Court Reporter sits?

4   A.   Near that.  I think it's a little bit larger

5   than --

6   Q.   Just a little wider than that and it would be as

7   long as from the end of this railing here down to where

8   the podium is?

9   A.   Yes, it's about that size.

10   Q.   All right.  And that interview room, of course,

11   has walls on all four sides?

12   A.   Yes.

13   Q.   And no windows?

14   A.   No, sir.

15   Q.   And the three of you are seated in an area that

16   large or that small when you talk?

17   A.   Yes.

18   Q.   All right.  And in addition to the three persons

19   inside that room, there is also furniture, is there not?

20   A.   Yes, sir.

21   Q.   There's a table and a number of chairs?

22   A.   Yes.

23   Q.   How many chairs were in the room?

24   A.   There is three chairs.

25   Q.   And yourself and Detective Spells and Weston Howe

1    were seated in those chairs at the table, aren't you?

2    A.   Yes, sir.

3    Q.   And in that 5 by 5 room, room, or so, I think

4    Detective Spells is sitting across the table from Howe

5    and you're sitting at the end of the table?

6    A.   As I recall, that's correct.

7    Q.   So on one of your shoulders, here is Detective

8    Spells and on your other shoulder, here is Weston Howe?

9    A.   Yes.

10   Q.   Is that correct?

11   A.   Yes.

12   Q.   And those are fairly close quarters to have a

13   conversation in for three people, isn't it?

14   A.   It's a small room.

15   Q.   Yeah.

16        And you have been here present throughout the

17   trial pretty much the last five or six days, haven't

18   you?

19   A.   Yes, sir.

20   Q.   You heard the testimony of the arresting officer

21   to the effect that Howe told him that he was

22   claustrophobic?

23   A.   Yes, sir.

24   Q.   And were you aware of that at the time you talked

25   to him in this small room with Detective Spells?

1               MR. SLAVENS:     Objection to that, your

2     Honor.

3               THE COURT:      Well, if he knows.

4                               You can answer that yes or

5     no.

6                               Overruled.

7     A.    No, I wasn't aware of it.

8     BY MR. ARNTZ:

9     Q.    And when you talked to him in that room, I take

10    it you closed the door to the room before you began

11    speaking to him?

12    A.    I did.

13    Q.    And in the room I think one of the first things

14    you did was cover that Miranda Rights Pre-Interview Form

15    with him?

16    A.    Yes, we went through it with him, yes.

17    Q.    And I think you said Detective Spells filled out

18    the top part of that and then either you or he reviewed

19    the information with Howe that is on that form?

20    A.    I didn't say that.

21    Q.    Who reviewed the information with Howe from the

22    Pre-Interview Form?

23    A.    Detective Spells.

24    Q.    Okay.  And you were present when that happened?

25    A.    Yes, sir.

1    Q.    And you watched as Detective Spells reviewed the

2    form with Weston Howe?

3    A.    Yes.

4    Q.    And down at the bottom of that form is a section

5    entitled waiver of rights?

6    A.    Yes, sir.

7    Q.    And there is a signature of Lee Howe there, is

8    that correct?

9    A.    Yes, sir.

10    Q.    And you watched him sign that bottom of the form,

11    did you?

12    A.    Yes, sir, I did.

13    Q.    What hand did he sign it with?

14    A.    I have no idea.

15    Q.    Do you remember testifying under oath last year

16    you watched him sign it with his right hand?

17    A.    I don't know he's right handed now.  As far as I

18    know, he was using his right hand.  I don't recall that

19    testimony.

20    Q.    Do you recall being asked last year which hand he

21    signed the form with?

22    A.    I don't recall.

23    Q.    And after he signed the form, this is when

24    yourself and Detective Spells began to talk to him about

25    the Blazer investigation, is that right?

1  A. Yes, sir.

2  Q. Okay.  And as I understand it, you talked to Howe

3 in two different intervals.  That is, you talked to him

4 during one period then left the room and returned and

5 talked to him a second period?

6  A. That's correct.

7  Q. The second time you came back into the room

8 Detective Spells was not with you?

9  A. That's correct.

10  Q. All right.  The first period of time when you

11 talked to him, did either you or Detective Spells have a

12 pen with you?

13  A. I had a pen and I was taking notes.

14  Q. You were taking notes at that time?

15  A. Yes.

16  Q. And Detective Spells, did he have either a pen or

17 pencil with him?

18  A. I'm sure he did.

19  Q. And was he taking notes, as you recall?

20  A. No.

21  Q. So Detective Spells had an extra pen or pencil

22 but he didn't use it to take notes?

23    MR. SLAVENS: Objection, your Honor.

24 That's asked and answered.

25    THE COURT: Overruled.  You can answer.

1    A.    There was only one set of notes taken.  Detective

2    Spells always carries a pen in his pocket, but I don't

3    remember his pen coming into play.  In this instance, I

4    took the only set of notes.

5    BY MR. ARNTZ:

6    Q.    And I take it that you took the notes then when

7    you talked to Howe on the first period of time and also

8    the second session when Spells was not with you?

9    A.    That's correct.

10    Q.    And did yourself and Spells have access to a

11    blank piece of paper that day?

12    A.    I had a tablet in front of me.

13    Q.    You had a blank tablet to write on that day?

14    A.    Yes.

15    Q.    And does the Dayton Police Department also have

16    in its possession a tape recorder?

17    A.    Yes, we do.

18    Q.    A working tape recorder?

19    A.    I'm sure, yes, sir.

20    Q.    And probably a blank cassette also?

21    A.    I would imagine so, yes, sir.

22    Q.    All right.  And as I understand it, when you were

23    first talking to Lee Howe, he was answering your

24    questions?

25    A.    Yes.

1    Q.    In fact, didn't argue with you, fight with you,

2   or anything like that?

3    A.    Not at any time.

4    Q.    And you were always speaking to him in the same

5   tone and calm voice that you are speaking right now?

6    A.    Pretty much.

7    Q.    Was there an occasion when you did not?

8    A.    No.

9    Q.    So pretty much means you always did speak in the

10  same tone of voice?

11   A.    Right.  There was, I raise my voice a time or two

12  just to get a point across but there was not a shouting

13  match.  It, it was just a conversation.

14   Q.    One of the points you did bring up later was when

15  you called him a liar, do you remember that?

16   A.    Yes.

17   Q.    And you called him a liar more than once, didn't

18  you?

19   A.    Yes, I did.

20   Q.    And on those numbers of times that you called him

21  a liar, did you ever raise your voice above the tone

22  that we are using today?

23   A.    No.

24   Q.    And I think you told us that you say Weston Howe

25  gave you more than one version of what had occurred at

1    the Blazer homicide?

2      A.   Yes, he did.

3      Q.   And what was it that caused him to change his

4    story from one story to the next if you spoke to him in

5    this low tone of voice that you're using today?

6      A.   I had told Weston some information had been

7    obtained during the course of the investigation and

8    information was that the hand swabbing had been done on

9    his hands and this was prior to our interview.  And I

10   told him that we had gotten the result on that AA.  And

11   that was false.  And I told him that the AA test was

12   positive on him handling the gun.  And it was at that

13   point that he changed his story from being in the car to

14   being up to grabbing the gun while Tony was firing the

15   last shot.

16     Q.   Are you finished?

17     A.   Yes.

18     Q.   Okay.  And this story you told him about AA

19   testing on his hand, that was a lie?

20     A.   That was a lie.

21     Q.   Okay.  And you heard me ask your brother some

22   questions this morning about the usefulness of lies in

23   the police work?

24     A.   Yes.

25     Q.   And do you agree with your brother that lies and

1    the ability to lie are one of the skills and talents

2    needed by a good policeman?

3        A.    Don't necessarily agree with that.    But on

4    occasion during interviews, I will more than stretch the

5    truth.

6        Q.    Sure.    And you more than stretched the truth when

7    you spoke to Weston Howe this particular day, didn't

8    you?

9        A.    Yes, I did.

10        Q.    And you were doing that in hopes he would believe

11    you and you could persuade him certain things were truth

12    even though they were not?

13        A.    I missed you on that one.

14        Q.    You're telling us you wanted him to believe there

15    was some sort of AA test done on his hand when in fact

16    that was not the case?

17        A.    No.    We done an AA test on his hand.    We just

18    didn't have the results of the swabbing at the time of

19    this interview.

20        Q.    You lied to him about the results of that

21    testing?

22        A.    At that time what I told him was a lie, yes, sir.

23        Q.    You wanted him to believe your lie?

24        A.    Absolutely.

25        Q.    And this is when he beared his sole and just told

1    you all these details about this other homicide?

2              MR. SLAVENS:      Objection to that, your

3       Honor.

4              THE COURT:      As to the form, sustained.

5    BY MR. ARNTZ:

6       Q.   Well, this is what caused him to change his story

7    when you persuaded him with a lie?

8              MR. SLAVENS:      Objection to that, your

9       Honor.

10             THE COURT:      It's the same general

11      basis, Mr. Arntz.   Sustained as to form.

12   BY MR. ARNTZ:

13      Q.   Well, in any event, there never came a time you

14   say that Weston would stop talking to you and refuse to

15   speak to you any further?

16      A.   No, sir.

17      Q.   And so far as you could tell, he was willing to

18   talk to you about anything?

19      A.   He seemed willing to, yes, sir.

20      Q.   In fact, he appeared to be willing to write out a

21   statement for you, had you asked him to do that?

22      A.   I didn't ask him to, but I don't know if he would

23   have or not.

24      Q.   Do you remember testifying under oath here last

25   year and being asked whether it was your opinion that he

1    would have willingly given you a written statement if

2    you asked him to do so?

3    A.   Looking back, I believe he would have.

4    Q.   And you have this blank tablet there in front of

5    you, and you know that you have a tape recorder and a

6    blank cassette there in the Dayton Police Department,

7    did it ever occur to you to ask this man who had

8    confessed to committing one or more homicides to write

9    that out in his own handwriting?

10    A.   No.  I was in fact in the process of trying or of

11    obtaining a video, just as the ones we've seen here in

12    court, of him.  And I did obtain a video confession --

13    Q.   Go ahead.

14    A.   No.  That answers the question.

15    Q.   So the answer to my question is that it never

16    occurred to you to ask him to write any of this out in

17    your own handwriting?

18    A.   No.

19    Q.   I take it, it also never occurred to you to

20    record on a taped cassette the interview that yourself

21    and Detective Spells had with him at that time?

22    A.   I attempted to record, make a video recording of

23    that.

24    Q.   Speaking of a tape recorder, now, we agreed you

25    had a tape recorder there available to you?

1    A.   I didn't have it available to me right there.   I

2  mean, the question was, do we have them?  Yes, we have

3  them.   I didn't have it with me there in the room with

4  him at that time.

5    Q.   But the tape recorder is fairly nearby, isn't it?

6  It's in the same building of the Dayton Police

7  Department?

8    A.   No closer than the video camera.

9    Q.   Well, my only question to you is, did it occur to

10  you that you might tape record the interview that you

11  were conducting with him and Detective Spells in the

12  interview room?

13    A.   No.

14    Q.   Okay.   And other than your testimony here today,

15  we don't have any documentation, written recordation, or

16  tape recording of any of these comments that you say

17  Howe made to you?

18    A.   That's correct.

19    Q.   What we have are your words telling us that is

20  so?

21    A.   That is true.

22    Q.   And of course you have become aware of the

23  physical evidence that's been collected in this case?

24    A.   Yes, sir.

25    Q.   And the various kind of testing that have been

1    done?

2       A.    Yes, sir.

3       Q.    And you're familiar with whether or not there is

4    any physical evidence that Weston Howe was ever out at

5    Monument and Findlay in Tony Elofskey's car on the

6    morning of June 22d?

7                      MR. SLAVENS:      Objection, your Honor.

8                      THE COURT:       Overruled.

9                                       Do you understand the

10      question?

11      A.    I think I understand the question.

12            And, yes, I feel there is physical evidence of

13      it.

14      BY MR. ARNTZ:

15      Q.    And you ordered that certain physical evidence be

16      collected and tested as part of your investigation here,

17      didn't you?

18      A.    Yes.

19      Q.    You ordered, for instance, some tape lifts, try

20      to remove some gun powder or gunshot residue from the

21      interior of Tony Elofskey's car?

22      A.    That was ordered but not by me.

23      Q.    And someone ordered that some kind of comparison

24      be made between the shoes of Weston Howe and footprint

25      impressions that, that were found out there at the

1    levee, Monument and Findlay area?

2      A.    Yes.

3      Q.    And you know that the physical evidence placing

4    Weston Howe at Monument and Findlay is virtually

5    nonexistent, don't you?

6      A.    The bullet, the shell casing that we found in

7    Elofskey's car.  We have the bullets out of Mark

8    McDonald that matched the bullets out of the body of

9    Dick Blazer.  We have two other co-defendants telling us

10   that he was the shooter on both.  I think that's

11   physical evidence.  And then with his statement, I think

12   that's physical evidence.

13     Q.    Well, setting aside what the co-defendants are

14   saying here, you don't have, for instance, any

15   fingerprints from Weston Howe at the scene at Monument

16   and Findlay, do you?

17     A.    No.

18     Q.    Don't have any footprints?

19     A.    No.

20     Q.    Don't have any matching hair samples?

21     A.    No.

22     Q.    Don't have any fibers from his clothing there at

23   the scene at Monument and Findlay?

24     A.    No.

25     Q.    Don't have any of Weston Howe's blood there at

1    the scene, do you?

2      A.    No.

3      Q.    And solving cases is your job or your profession,

4    isn't it?

5      A.    Yes, sir.

6      Q.    And better for you if you get a conviction in the

7    case that you're working on, isn't it?

8      A.    It pays no different.

9      Q.    The pay is no different, but it certainly looks

10   better, doesn't it?

11     A.    I feel good when I can come to the truth of

12   something after a trial to have people agree with me and

13   it's a conviction, I feel better about that.

14     Q.    And in a statement or so-called confession from a

15   suspect would certainly make your job easier in a case

16   where there is little or no physical evidence connecting

17   him to the offense, wouldn't it?

18              MR. SLAVENS:     Objection to that, also,

19      your Honor.

20              THE COURT:     Overruled.

21                             You can answer.

22     A.    Yes.

23   BY MR. ARNTZ:

24     Q.    The less physical evidence you have, the more you

25   have to rely on the word of mouth of other persons,

1   isn't that true?

2      A.    Generally, yes.

3      Q.    And you relied to some extent on the things that

4   Walter Polson and Tony Elofskey were telling you than

5   trying to solve these homicides, weren't you?

6      A.    Well, at the time I got the confession from Howe,

7   we didn't have Elofskey, we only had Mr. Polson.

8      Q.    Well, let's talk about Polson.  You used some of

9   the things Polson said to you in your conversation with

10  Howe, didn't you?

11     A.    Again, I hadn't spoken to Polson.

12     Q.    Well, what you did was you talked to your brother

13  Wade Lawson and then you went back and talked to Howe,

14  didn't you?

15     A.    Yes.

16     Q.    And it was because of what your brother said to

17  you about what Polson had said to him that you went back

18  and confronted Howe?

19     A.    That's correct.

20     Q.    All right.  So the answer is that you did use

21  some things that Polson said in speaking to Howe?

22     A.    That is correct.

23     Q.    All right.  You relied in part on what Polson was

24  telling you in order to interview Howe further?

25     A.    That is correct.

1    Q.    All right.   Now, taking you back to your

2    interviews with Tony Elofskey, what number of times have

3    you talked to Tony Elofskey prior to today?

4    A.    I talked to Tony Elofskey on the morning of the

5    23rd when I was booking him.   I talked to him on the

6    28th of June, 29th of June, the 30th of June.   I talked

7    to him on July the 23rd.   And I was present on Friday or

8    Saturday with the prosecutor in a pretrial situation a

9    couple of weeks ago.   And those are the times that I met

10   with Tony Elofskey.

11   Q.    All right.   That would be a total of five or six

12   roughly?

13   A.    Six, I think, but I'm not sure.

14   Q.    Let me take you backwards, if I can, that

15   Saturday that you talked to Tony Elofskey with the

16   prosecutors.   Would that have been Saturday three days

17   ago or Saturday ten days ago?

18   A.    It would have been, have been ten days ago.

19   Q.    Just before this trial started?

20   A.    Yes.

21   Q.    What was the purpose of you all meeting with Tony

22   just before the trial started?

23   A.    The prosecutor had not met with, with Tony and it

24   was just a pretrial interview.

25   Q.    Well, during the pretrial interview, was Tony

1    taken through his stories again?

2      A.    He was asked what happened, yes.

3      Q.    And, in fact, you all went through all the

4    stories that he would tell when he came in here to

5    testify, didn't you?

6                MR. SLAVENS:      Objection to that, your

7      Honor.

8                THE COURT:      Sustained as to form.

9                MR. ARNTZ:      All right.

10   BY MR. ARNTZ:

11     Q.    Well, back on June 23rd when you first met him,

12   you got to talking to him on a personal level and the

13   two of you became really friendly, isn't that what

14   happened?

15     A.    That's correct.

16     Q.    And you thought that he was taking a liking to

17   you on June 23rd, isn't that true?

18     A.    He seemed to.  That was at that time I was

19   booking him.

20     Q.    That paid off because five days later he asked to

21   see you, isn't that right?

22     A.    That's correct.

23                MR. SLAVENS:      Objection to that, your

24      Honor.

25                MR. ARNTZ:      Sorry?

1          THE COURT:        Overruled.

2     A.    I received a message through jail personal that

3   he wanted to see me.

4   BY MR. ARNTZ:

5     Q.    And you went to see him on June 28th.  This is

6   when he first talked to you about how he wanted you to

7   get him a deal from the prosecutor, isn't that true?

8     A.    No, sir.

9     Q.    And your testimony here today is that the first

10  time he ever raised the subject of a deal was on July

11  23rd?

12    A.    No, sir.  I believe it was the 30th.  As I

13  recall, it was the 30th is the first time he raised the

14  issue.

15    Q.    So your testimony is that on June 28th and June

16  29th he never raised the subject of a plea bargain or a

17  deal at all?

18    A.    No.  He was upset on the 28th, that's why he

19  wanted to see me.  Didn't come up.

20    Q.    Didn't come up.

21          And you took notes when you talked to Tony on the

22  28th and the 29th, then on July, June 30th and July

23  23rd, didn't you?

24    A.    I made some notes.

25    Q.    And on June 28th you made some notes that Tony on

1    that day was telling you that he believed Howe had shot

2    Blazer, am I right?

3    A.    I don't recall that.

4    Q.    Would your reports reflect what he told you on

5    June 28th?

6    A.    My notes would.

7    Q.    Do you have those available to you?

8    A.    They are.

9    Q.    Can you take a look at those now?

10    A.    If you hand me that folder that's on top.

11    Q.    Right here?

12    A.    Yes, sir.  Yes.  Now your question, sir?

13    Q.    My question was whether on June 28th when you

14    spoke to Tony Elofskey, he told you that he believed

15    Howe shot Blazer?

16    A.    I don't see that in my notes.  He recapped the

17    incidents for me on that day.  I interviewed talked to

18    him.  I advised him of his rights.  And he told me about

19    what had happened.  And he didn't make a reference to

20    believing that Howe had shot Blazer, no.

21    Q.    And then when you saw him on June 30th, this is

22    when you say he was talking to you for the first time

23    about wanting to make a plea arrangement with you?

24    A.    Yes.  Uh-huh.

25    Q.    And so at least since June 30th, Tony Elofskey

1    has been wanting to make a plea arrangement in his own

2    case, isn't that fair to say?

3      A.   Yes.

4      Q.   All right.  That would be just seven days after

5    he was arrested?

6      A.   Yes.

7      Q.   And he spoke to you about wanting to make a plea

8    arrangement in his own case, didn't he?

9      A.   On that occasion, and then on the 23rd.

10     Q.   All right.  And when you went to see him on June

11   30th, one of the reasons you went there was because you

12   wanted to go into the truthfulness of his prior

13   statements, isn't that true?

14     A.   I don't recall ever doubting the truthfulness of

15   his statements.  It was always the same.

16     Q.   Well, you testified to the prosecutor here that

17   Tony's versions to you were always consistent with each

18   other, isn't that what you said?

19     A.   Yes.

20     Q.   All right.  I will ask you whether you recall

21   these questions and answers from your testimony last

22   year under oath.  Page 191.

23          Question:  Before that, did Mr. Elofskey indicate

24   to you on the 30th as to why he contacted you or made

25   contact with you to come up to see him or how did that

1    develop?

2         Answer:   He sort of wanted to talk to me about

3    these things.   And then sort of recapped the truth

4    again.   I was going into it with him about the

5    truthfulness of his prior statements.

6         Do you remember that testimony?

7    A.    Uh-huh.

8    Q.    All right.   So the truth is that you were

9    inquiring into the truthfulness of his prior statements,

10   weren't you?

11   A.    Right.

12   Q.    And, likewise, on June 30th, there came a time in

13   your interview with Tony Elofskey that you insisted upon

14   him telling you the truth, didn't you?

15   A.    I don't recall.

16   Q.    You don't remember having to insist that Tony

17   tell you the truth on June 30th?

18   A.    No.   I don't recall that.

19   Q.    216.   Do you recall these questions and answers

20   from your testimony under oath last year.

21        Question: Did he provide you any additional facts

22   other than had been previously provided to you during

23   the videotaped statement regarding the Blazer homicide

24   when you met with him on June 30th, 1992?

25        Answer:   I don't recall anything being different

1    significantly or new to the facts, just recapped them

2    and insisting upon him telling the truth about the whole

3    incident.

4        A.    Yes.

5        Q.    All right.  So the answer is that you did insist

6    with him that he tell the truth on that date?

7                MR. SLAVENS:      Objection, your Honor.

8        It's argumentative.

9                THE COURT:      Sustain the objection.

10   BY MR. ARNTZ:

11       Q.    Well, was there some reason you were insisting

12   upon his telling the truth that day?

13               MR. SLAVENS:      Objection, your Honor.

14               THE COURT:      Overruled.

15       A.    Well, obviously, I wanted him to be truthful with

16   me and feel that he told me the same, same information,

17   that it didn't change.  I feel that was truthful.

18   BY MR. ARNTZ:

19       Q.    Well, now, this would be the third time you had

20   an interview with Tony, June 28th, June 29th, and June

21   30th, so during your third interview with this man now

22   on June 30th, you have to insist that he tell you the

23   truth?

24               MR. SLAVENS:      Objection to that, your

25       Honor.  That's not the testimony.

1              THE COURT:        Sustain the objection.

2    BY MR. ARNTZ:

3      Q.    Were you involved in investigating the source of

4    the origin of the two handguns that were recovered in

5    your investigation?

6      A.    Yes.

7      Q.    And you in fact traced those handguns back to

8    certain owners, didn't you?

9      A.    Yes.

10     Q.    And neither one of those owners was Weston Howe?

11     A.    That's correct.

12     Q.    Now, the Monza automobile that Tony Elofskey

13   owned, you heard quite a bit about during this trial,

14   haven't you?

15     A.    Yes.

16     Q.    And you've heard descriptions about locations of

17   people and things that were supposedly done inside the

18   car?

19     A.    Yes.

20     Q.    And where would we find the car if we wanted to

21   show it to the jury today?

22              MR. SLAVENS:        Objection, your Honor.

23              THE COURT:        Overruled.

24     A.    It's been destroyed.

25

1    BY MR. ARNTZ:

2      Q.    It's been what?

3      A.    Destroyed.

4      Q.    The car has been destroyed?

5      A.    Yes, sir.

6      Q.    Who destroyed the car?

7      A.    Coffey's Body Shop became the owners of the car

8    and it was shredded.

9      Q.    When did Coffey's shred and destroy this car, if

10   you know?

11     A.    I believe it was in December of '92.

12     Q.    That would be two months ago?

13     A.    Yes.

14     Q.    And had the deal been worked out with Polson or

15   Elofskey at the time the car was shredded?

16     A.    No.

17     Q.    Are you sure about that?

18     A.    Yes.

19     Q.    Let me show you a couple of photographs that have

20   been previously been marked as State's Exhibit

21   numbers --

22               MR. SLAVENS:    Can we approach and be

23     heard?

24               THE COURT:    You may.

25               (WHEREUPON, a side-bar conference was held

```
 1        off the record.)
 2                    THE COURT:        You may continue, Mr.
 3        Arntz.
 4                    MR. ARNTZ:        Thank you.
 5   BY MR. ARNTZ:
 6        Q.    Detective, I think I handed you two State's
 7   Exhibits which have been previously marked as numbers 51
 8   and 55, is that correct?  I'm sorry, 15 and 55.
 9        A.    That's correct.
10        Q.    All right.  And 15 and 55 depict certain parts of
11   the exterior of Richard Blazer's home, is that correct?
12        A.    Yes.
13        Q.    And 55 here in my left hand depicts the exterior
14   of his house, particularly the front door of the area?
15        A.    Yes.
16        Q.    A closeup view of the front door area
17   particularly the sidewalk and the front door step, is
18   that right?
19        A.    Yes.
20        Q.    All right.  And then as you look at those two
21   photographs, can you give me some idea what the
22   elevation or the height of that step is into Richard
23   Blazer's home from the sidewalk up to the top of that
24   step?
25        A.    I would say about eight inches.
```

1    Q.    Eight inches?

2    A.    Uh-huh.  Yes, sir.

3              MR. ARNTZ:      Can I have just a moment?

4              THE COURT:      You may.

5              MR. ARNTZ:      Thank you.

6                              That's all I have.

7              THE COURT:      Redirect?

8

9                   REDIRECT EXAMINATION

10   BY MR. SLAVENS:

11   Q.    Concerning the automobile, are there photographs

12   here and were photographs taken of the Elofskey's

13   automobile?

14   A.    Yes, sir.

15   Q.    Were photographs taken of the Elofskey automobile

16   as it was parked at McOwen Street where it had come to a

17   rest after the chase?

18   A.    Yes, sir.

19   Q.    And were photographs taken of the automobile as

20   it sat over at Coffey's automobile shop?

21   A.    Yes, sir.

22   Q.    And you indicated that you ran, I want to say, a

23   check or trace of the two handguns that have been marked

24   and are as exhibits in this particular case the Bryco

25   and the Raven?

1    A.    Yes, sir.

2    Q.    And is it correct that the Raven came back as one

3    time being purchased by a Walter Polson?

4    A.    Yes.

5    Q.    And the other gun, the Bryco, do you recall, have

6    you had available today to tell us what the check of

7    that gun indicated?

8    A.    Yes.

9    Q.    Can you do so, please?

10    A.    Hand me the green folder.

11          Yes, sir.  That gun, our last record of that gun

12    was bought on 11/3 of '89 at Don's Pawn Shop by a person

13    known as Thomas Cockran.

14    Q.    Now that's registered to the Bryco?

15    A.    Yes, sir.  Uh-huh.

16    Q.    And when you say your last record, what do you

17    mean by that?

18    A.    It's the last record that the Dayton Police

19    Department could ever establish on that gun.  And then

20    we found that we had a record on a Thomas Cockran who

21    bought the gun.  We have not been able -- the checks we

22    attempted to locate him were unsuccessful.  So our last

23    record of that gun as we stand here today is Thomas

24    Cockran bought that gun in 1989.

25    Q.    And so after Mr. Cockran, if he's the purchaser

1   of that gun, purchased that gun in 1989?

2     A.   Yes, sir.

3     Q.   What happened to Mr. Cockran or to the gun up

4   until June 22d, you don't know?

5     A.   I have no idea.

6     Q.   And if Mr. Cockran lost the gun or the gun was

7   stolen from Mr. Cockran and no report would be made,

8   would there be any record made of that?

9     A.   No, sir.

10               MR. ARNTZ:        We object to that

11     speculation.

12               THE COURT:        Overruled.

13   BY MR. SLAVENS:

14     Q.   If a gun is sold or traded on the street not

15   going through any shop or gun dealer, would there be a

16   record of that?

17     A.   No, sir.

18     Q.   Now, I believe you were asked questions in

19   regards to written documentation of your interview with

20   Weston Lee Howe.  You made reference also of the fact

21   you had notes?

22     A.   Yes, sir.

23     Q.   Do you have those with you today?

24     A.   Yes, sir.

25     Q.   May I see them, please?

1      MR. ARNTZ:      May we approach?

2      THE COURT:      You may.

3                      AT SIDE BAR

4      MR. ARNTZ:      We are going to object to

5  the admission of any notes at this time or recitation

6  of the contents because they were not provided on the

7  discovery as demanded in numerous pleadings prior to

8  trial.  They are summaries of our client's alleged

9  statements.  They come under Rule 16.  And they've

10  been specifically demanded numerous times.

11      MR. SLAVENS:      These are the detective's

12  own notes which are, we submit, are basically his work

13  product.  However, all of the notes are summarized in

14  written reports which were in fact given to defense

15  counsel in discovery.  And the fact of the notes is,

16  in fact, brought up by his cross-examination of

17  written documentation and things of that nature.  He's

18  opened the door for that.

19      THE COURT:      Well, as I understand, the

20  question is, did you make notes, at least now by the

21  State, do you have the notes, questions along that

22  line.  I'm going to permit that area of questioning.

23  Now if the notes actually get marked, I don't know

24  they will or won't, if they do, we will deal with the

25  admissibility of that once they're moved to be

1   admitted.  But at this point in time, I think this is

2   proper redirect in view of the cross.

3           MR. ARNTZ:       Well, as I say, we object

4   to the production of the notes, the marking of the

5   notes as an exhibit, any admission of the notes as an

6   exhibit.  But we also object to the recitation of any

7   portions of the notes, because again, they are

8   summaries of statements allegedly made by our client

9   which fit directly under Rule 16 and have been

10  demanded numerous times prior to this trial.  We don't

11  know what those notes look like, how they read, what

12  they say, what they don't say, and we've not be given

13  sufficient notice to be prepared to make them --

14          THE COURT:       I understand that.  But we

15  are not at that point, that is, to the actual

16  contents.  That's what the defense is objecting to, of

17  the notes.  And if the question is asked, obviously,

18  the Court would entertain an objection to the actual

19  contents of those notes.  But the fact that he made

20  them, he's got three pages of notes, things like that,

21  I think the prosecutor is allowed to demonstrate to

22  the jury in view of the cross-examination.

23          MR. SLAVENS:       Now also while we are here,

24  they were questions on direct, or cross-examination in

25  regards to videotaping or cassette taping.  Now, this

1    defendant is on video, given the opportunity to do a

2    video, choose not to do so.  I think it's fair game to

3    get that in front of the jury.

4              THE COURT:       It depends how you do it.

5    I think you got to do it gently, very gently.  It

6    depends on how the question is worded.  Mr. Lawson has

7    been on the stand.  You got to be careful, John.

8              MR. SLAVENS:     He has opened the door.

9              THE COURT:       Now, his questions related

10   to audio tapes.

11             MR. SLAVENS:     He cannot select and choose

12   and use it on --

13             THE COURT:       I understand that.  The

14   problem is going to be is that he exercised his right

15   to an attorney.   Now I think -- and if you want to

16   clarify this, you can.  I thought that he's already

17   testified he offered him the opportunity to do a

18   video.  And that Howe said, no.  I thought he

19   testified to that on cross.

20             MR. ARNTZ:       He has.

21             MR. SLAVENS:     Then I can at least clarify

22   that up.

23             THE COURT:       Yes.  Stay away from the

24   lawyer aspect of it.  That's the only place I'm on the

25   line.  I'm not drawing onto the subject matter.

1          MR. SLAVENS:      Okay.

2          MR. ARNTZ:        Thank you.

3                    BEFORE THE JURY

4          MR. SLAVENS:      Let the record reflect the

5    witness has handed me seven pages, yellow.

6    BY MR. SLAVENS:

7      Q.   And for the record, sir, are these your notes

8    made by you during the times of your two interviews with

9    Weston Lee Howe, Junior?

10     A.   Yes, sir.

11         MR. ARNTZ:        Same objections.

12         THE COURT:        Overruled.

13   BY MR. SLAVENS:

14     Q.   You were asked whether or not you or the Dayton

15   Police Department had recording, tape recording system,

16   or a recording device when you were asked questions by

17   Mr. Arntz.

18     A.   Yes, sir.

19     Q.   Did you, while you were conducting the, while you

20   were there with Mr. Weston Lee Howe have access to a

21   video recording camera?

22     A.   Yes.

23     Q.   And was Mr. Howe offered the opportunity to talk

24   to you on the video and, if so, did he decline?

25     A.   He was offered.  He did decline.

1          MR. SLAVENS:    Thank you.  That's all I

2     have.

3          THE COURT:    Recross examination?

4          MR. ARNTZ:    No thank you.

5          THE COURT:    You may step down.

6                         Thank you very much.

7          THE WITNESS:    Thank you, your Honor.

8                    *  *  *  *

9          MR. SLAVENS:    May we approach one more

10    moment?  Not about this witness.

11         THE COURT:    All right.

12         (WHEREUPON, a side-bar conference was held

13    off the record.)

14         THE COURT:    Ladies and gentlemen of the

15    jury, we'll go ahead and take our afternoon break at

16    this point in time.  We are going to try to keep this

17    a little short.  The next witness is a professional

18    type witness.  When I say that, he's a doctor.  All

19    right.  And apparently he's got another commitment

20    sometime later in the afternoon.  So let's try to keep

21    this break down to about a 12 minute break.  I don't

22    know where that puts us because you know me, in 10

23    minutes versus 12 minutes versus 15.  In any event, we

24    do have the next witness and we'll get to him as soon

25    as the break is over.

1               Remember the usual

2   instructions from the Court not to discuss the case

3   among yourselves or with anybody else.  Don't form any

4   opinions, you have not heard all the testimony.  And

5   we'll see you back in approximately 12 minutes.

6         (WHEREUPON, a recess was taken.)

7

8   <u>IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY</u>

9       THE COURT:     All right.  Let the record

10  reflect we are out of the presence of the jury.

11              We've already stated into

12  the record the Court's rulings as it relates to the

13  coroner's slides.  I believe, Mr. Monta, you wanted to

14  be specific and identify a slide.

15      MR. MONTA:     Right.  Just for continuity

16  of the testimony, Judge, we would like to object to

17  the slide by number for the record now so we don't

18  have to do it --

19      THE COURT:     You may do so.

20      MR. MONTA:     If we might have that.

21      MR. SLAVENS:    80-A is the one.

22      MR. MONTA:     80-A is the exhibit.  We

23  would object to showing.

24      THE COURT:     All right.  The Court has

25  previously ruled that motion or objection would be

1    overruled.  This is 80 and, 80 and 81.

2              MR. MONTA:       So the Court is clear, the

3    McDonald slides would be number 80-A through 80-I.

4              THE COURT:       Then Blazer slides are 81-A

5    through E.

6              MR. SLAVENS:     That is correct.

7              THE COURT:       All right.

8                               You may bring in the jury.

9                        BEFORE THE JURY

10                              3:08 p.m.

11             THE COURT:       You may call your next

12   witness, Mr. Slavens.

13             MR. SLAVENS:     Call Dr. David M. Smith.

14

15             DAVID M. SMITH, having been first duly

16             sworn according to law, was examined and

17             testified as follows:

18                     DIRECT EXAMINATION

19   BY MR. SLAVENS:

20   Q.    For the record, sir, will you tell us your name,

21   please?

22   A.    David M. Smith.

23   Q.    And what is your profession or occupation?

24   A.    I'm a medical doctor, deputy coroner and forensic

25   pathologist with the Montgomery County Coroner's Office.