1    Q.    And as a deputy coroner, are you involved with

2    the medical field?

3    A.    Yes, I am.  I'm licensed to practice medicine in

4    the State of Ohio.

5    Q.    And will you be kind enough to give us a brief

6    explanation as to your educational background as it

7    relates to your medical profession and as it relates to

8    your job as a Assistant Montgomery County Deputy

9    Coroner?

10                MR. MONTA:       Judge, if it will assist

11       the proceeding, we will stipulate the doctor's

12       qualifications.

13                THE COURT:       Mr. Slavens.

14                MR. SLAVENS:     We will accept that.

15                THE COURT:       You may proceed.

16    BY MR. SLAVENS:

17    Q.    Doctor, you used the term forensic pathologist.

18    Can you explain to us what that term means or those

19    words mean to you?

20    A.    A forensic pathologist is a medical doctor

21    specializing in the field of forensic pathology which

22    deals with the study of persons who die of unnatural

23    causes.

24    Q.    As it relates to your functions as a deputy

25    coroner, have you had on occasion to perform autopsies

1    of deceased individuals and to determine their cause of

2    death?

3        A.    That's my primary job, yes.

4        Q.    And as a result of that, have you had an

5    opportunity on prior occasions to qualify and testify in

6    a court of law determining your autopsy findings?

7        A.    Yes, I have.

8        Q.    I would like to direct your attention to, I

9    believe, June 23rd, 1992, and ask if on that date you

10   had an occasion to see, if not before that date, the

11   body of that was identified to you, that of Mark

12   McDonald?

13       A.    I believe it was on June the 22d that I saw the

14   body of Mark McDonald.

15       Q.    And when you first saw the body of Mark McDonald,

16   where did it occur that you saw his body?

17       A.    I first saw the body up at the Montgomery County

18   Coroner's Office, which is in the same block as this

19   building.

20       Q.    And did you perform an autopsy on his body?

21       A.    Yes, I did.

22       Q.    And concerning Mr. McDonald's autopsy, have you

23   brought with you, at my request, certain slides or

24   transparencies that might assist you in explaining the

25   injuries you received that you viewed that was inflicted

1    on Mr. McDonald?

2    A.   Yes.

3    Q.   Generally speaking, Doctor, would you be kind

4    enough to explain to us just briefly what, externally

5    anyway, occurs when you perform an autopsy?

6    A.   When a body comes to our office, we will observe

7    and make notes of the condition of the body prior to

8    disturbing it.  We will look at the external aspect of

9    the body, the clothing to see if there is any injuries

10    or recoverable evidence.  After doing that examination,

11    the body is unclothed and again viewed.  Once it is

12    viewed the second time, the body is cleansed with soap

13    and water and then we examine it again specifically

14    looking for injuries, identifying marks, or other

15    evidence which might be recoverable on the body.

16    Q.   Now, after the examination, do you then conduct

17    an internal examination?

18    A.   Yes, we do.

19    Q.   Doctor, do one of your slides indicate, show at

20    least on the slide as to how Mr. McDonald's body was

21    when it was presented to the coroner's office?

22    A.   Yes.

23    Q.   And, Doctor, may we see State's Exhibit, I think

24    what's previously been marked, 80-A.  By the way, I'm

25    sorry, did you, during your external examination, make a

1    determination as to Mr. McDonald's height and weight?

2    A.    Yes, I did.

3    Q.    Do you recall what that was?

4    A.    He was 70 inches in length, approximately 156

5    pounds, and his appearance was appropriate for the age

6    that I was given as 26 years.

7    Q.    Now, Doctor, I interrupted you a little bit.

8    Would you please show us what's been marked as State's

9    Exhibit 80-A.

10         Doctor, for the record, will you tell us what is

11   depicted now on the screen?

12   A.    This is a photograph of the body as it arrived at

13   our office.  The body was removed from a transportation

14   bag and placed on the table.  As you can see, the body

15   arrived dressed.  The body came from the scene where the

16   body was found.

17         There's a placard in the lower right-hand corner

18   of the photograph with the numbers 1189 and 92.  That

19   reflects this was the 11 hundredth and 89th case

20   reported to our office in the year 1992.  L.M. are the

21   initials of the photographer who took these photographs

22   under my direction on this day, Laura McBride.

23   Q.    And, Doctor, does that exhibit 80 fairly and

24   accurately and correctly represent the scene or at least

25   the photograph or the condition of Mr. McDonald as he

1    was initially presented?

2       A.   Yes.

3       Q.   And, Doctor, why don't we move on to State's

4    Exhibit 80-B.

5            Now, Doctor, in conducting your examination of

6    Mr. McDonald, did you discover signs of recent gunshot?

7       A.   Yes, I did.

8       Q.   Now, before we get into that, can you tell us

9    what, for the record, is now depicted on the screen?

10      A.   This is a standard photograph taken by our

11   office.  The body has been unclothed and cleansed.

12   Again to the right of the head is a placard with the

13   identification numbers on it.

14           One can see in this photograph a dark purple

15   black area on the lower lip, which is gunshot wound,

16   entrance wound through the lip.  In addition, on the

17   face around that wound were some small areas or small

18   stipples which indicate -- and stippling are injuries

19   caused by gun powder as it is ejected from the barrel of

20   the gun and it gives an indication of a close range of

21   fire.

22      Q.   Based upon your experience, are you able to tell

23   us what range, other than close range?

24      A.   I don't have any knowledge about the gun itself.

25   The stippling, I believe I measured in a diameter of

1  about 3 inches in diameter.  I think you would have to

2  consult with a firearms examiner who may have looked at

3  the gun who fired it.

4      Q.    And did you determine, at least as to the gunshot

5  wound to the lip, as to what path it traveled?

6      A.    Certainly.

7      Q.    And did you note any internal damage or injuries?

8      A.    Yeah.  The bullet went through the lip, it struck

9  the lower two middle teeth and fractured them, knocking

10  them out.  The bullet proceeded underneath the tongue

11  and through the soft tissues in front of the spine.  The

12  bullet then struck the spine in the neck and bounced

13  back into the airway where it was aspirated into the

14  right lung where I recovered it.  There was quite a bit

15  of bleeding along the path of the wound.  There was

16  blood in the mouth.  And the direction that the bullet

17  took with the body in a standard position, upright,

18  facing forward, the bullet went from front to back and

19  slightly downward.

20      Q.    Do you know or are you able to determine from

21  your examination what position Mark McDonald's body was

22  in when it received any of the wounds we will be talking

23  about?

24      A.    No.

25      Q.    Concerning that slide 80-B, sir, does it fairly,

1    accurately, and correctly represent the scene that's

2    depicted on the screen?

3        A.    Yes.

4        Q.    You made reference to some internal damages.  May

5    we see 80-C, please.

6              Doctor, tell us what is now depicted.

7        A.    When pulling down the lower lip and up, the

8    pulling up the upper lip, one can see that the two lower

9    middle teeth are missing as well as a part of the gum

10   around that.  This is where the bullet struck the teeth

11   knocking them out and causing injury to the tissues

12   around the teeth.

13             One can see a dark area underneath the tongue

14   which is actual defect where the bullet went underneath

15   the tongue on its course through the body.

16       Q.    And the portion of the lip, that is an entrance

17   wound?

18       A.    Yes, this is a gunshot entrance wound.

19       Q.    Does that exhibit 80-C, does it fairly,

20   accurately, and correctly represent what you observed in

21   the autopsy?

22       A.    Yes.

23       Q.    Doctor, may we see State's Exhibit 80-D, please.

24             Doctor, please tell us what is now depicted.

25       A.    This is a photograph of the left side of the body

1    of Mark McDonald where one can see just above and toward

2    the midline of the left nipple another wound hole, which

3    is a gunshot wound to the chest, of the left side of the

4    chest.   There's a clear area around this wound in this

5    picture which is where I shaved away hair from that area

6    in order to see the wound a little bit better.

7        Q.    And are you able to determine whether or not that

8    is a wound entrance or wound exit?

9        A.    It's very typical gunshot entrance wound.

10       Q.    And while we are on that one, may we state --

11   Doctor, can you turn to State's Exhibit 80-E, please.

12             When you indicated a typical entrance wound, I

13   want you to describe for us what is now depicted on

14   80-E.

15       A.    This is a close-up view of that gunshot entrance

16   wound on the left side of the chest.   As reference, one

17   can see the left nipple.   And the head of the person

18   will be off the screen toward the ceiling.   The gunshot

19   entrance wound is very round.   The hole is very round.

20   And around the edges is a very uniform margin of

21   abrasion or scraping where the bullet pushes through the

22   skin scraping along the skin as it enters very

23   symmetric, very uniform, very typical of a gun, gunshot

24   entrance wound.

25       Q.    Around that wound did you observe what you

1    indicated earlier as being stippling as to that injury?

2        A.    I observed no stippling or soot around that

3    wound.

4        Q.    Does that exhibit 80-E and the previous exhibit

5    80-D each fairly, accurately, and correctly represent

6    what you observed as to those items during the autopsy?

7        A.    Yes, I did.  Yes, they do.

8        Q.    With reference to that particular wound, did

9    you -- that's now depicted on the screen as part of

10   80-E, are you able to recover a bullet from that wound?

11       A.    Yes.  Subsequently examining the wound, this

12   bullet went straight back into the body through the left

13   upper lung lobe, through the heart and through the left

14   lower lung lobe, it went through the rib cage and was

15   recovered underneath the skin on the left side of the

16   back.  The direction of the travel of this bullet in

17   relationship to a person standing straight up would have

18   been essentially from straight front to back.

19       Q.    And did that bullet, I think you indicated it

20   passed through what part of the heart, please?

21       A.    Well, it passed through the left, it passed the

22   left ventricle, which is the main pumping chamber of the

23   heart.

24       Q.    Did you note any injuries to either of the hands

25   of Mr. McDonald?

1    A.    There was an additional gunshot wound of the

2    right hand.

3    Q.    May we see State's Exhibit 80-F.

4         Now, Doctor, can you explain to us what is now

5    depicted in 80-F?

6    A.    This is a photograph of the right hand,

7    particularly the area between the ring and little

8    fingers.  Right between those two fingers in the web of

9    tissue is a small hole which is another gunshot entrance

10   wound.  One can see an area of red going along the inner

11   aspect of this ring finger which is where the bullet

12   grazed along that area before it entered in this web of

13   tissue.

14   Q.    Are you able to determine from your experience as

15   to whether or not the scraping from, I guess from the

16   knuckle down into the webbing, if that follows the

17   course or the path of the bullet as it enters or is it

18   an exit wound?

19   A.    This is an entrance wound because of the

20   characteristics of the wound.  If one looks at the

21   margins of this scraping along the inner aspect of the

22   finger, one sees these little tooth-like projections of

23   skin.  And these tooth-like projections of skin are

24   pointing more toward the tip of the finger.  And it's

25   characteristic of wounds, including gunshot wounds, that

1    when a bullet scrapes along skin in that fashion, that

2    the skin tears in such a way to leave these projections

3    in this orientation. So, yes, this is without question

4    a gunshot entrance wound.

5    Q.   As to the right hand of Mark McDonald, did you,

6    and that specific entrance wound, did you determine

7    corresponding exit wound?

8    A.   Yes, there was a exit wound on the palm of the

9    hand.

10    Q.   Can we see State's Exhibit 80-G, please.

11         For the record, what is now depicted on the

12    screen?

13    A.   This is the palm of the right hand of the body

14    showing there is an exit wound here and then an injury,

15    kind of a furrowed area as the bullet scrapes along the

16    palm of the hand. This is the corresponding exit wound

17    to the entrance wound that I showed in the previous

18    slide. The bullet passed through soft tissues between

19    these two wounds and caused some bleeding but I wasn't

20    able to detect any major nerve or blood vessel damage.

21    Q.   State's Exhibit 80-G, which is now there, and the

22    previous one, 80-F, do each one of those slides as

23    depicted fairly, accurately, and correctly represent

24    what you observe as to the wounds to the hand of

25    Mr. McDonald?

1    A.    Yes.

2    Q.    Now, did you have an opportunity, Doctor, to,

3    before making any removal of any of the missles or

4    bullets to do an x-ray of Mr. McDonald?

5    A.    Yes, we did.    Prior to any gunshot wound victim

6    or suspected gunshot victim, we will x-ray the body for

7    the localization of recoverable projectiles.

8    Q.    May we see State's Exhibit 80-H, please.    I think

9    the x-ray is the next photograph.    Well, let's stick

10    with this one while we are there.    That is 80-H.    What

11    is now depicted?

12    A.    Yes, this slide we were just looking at, which is

13    80-H.

14    Q.    Now, can you then go to 80-I without any

15    difficulty.

16    A.    In a moment.    I've got to get one of these slides

17    unstuck.    Okay.    Okay.    I've got the 80-H now.

18    Q.    Okay.    Now, for the record, Doctor, tell us what

19    is now depicted on 80-H?

20    A.    This is a photograph of the two bullets that I

21    recovered from the body.    The bullet on the, to your

22    left is the bullet that I recovered from the gunshot

23    wound of the mouth.    This bullet was recovered in one of

24    the airways to the right lung.    One can see the

25    impression of the two lower middle teeth on the face of

1    the bullet giving it this triangular appearance on the

2    front edge.  This other bullet to the, to your right is

3    the bullet that I recovered from the gunshot wound to

4    the chest.  That went through the left lung and the

5    heart.

6        Q.    And so the record is clear, that is 80-H, and is

7    it a fair and accurate and correct photograph or slide

8    of the two bullets?

9        A.    Yes, it is.

10       Q.    The other item that is there, would you explain

11   that to us, the vial?

12       A.    The object above the bullets is a plastic

13   container with the label that we use to identify

14   evidence in our office.  We place bullets into these

15   containers that are labeled in this fashion.

16       Q.    And now, Doctor, may we see 80-I.

17             And for the record, what is now depicted, please?

18       A.    This is the x-ray of the body we took prior to

19   doing the examination.  It shows two white bodies on the

20   x-ray.  One to the, to the right side of the slide,

21   which is really on the left side of the body, which is

22   the bullet that I recovered underneath the skin on the

23   left side of the back.  The other bullet on the right

24   side of the chest is the one that was actually within

25   one of the airways going to that right lung.

1    Q.    And does that transparency fairly, accurately,

2    and correctly represent the x-ray of Mr. McDonald as

3    depicted there?

4    A.    Yes.

5    Q.    Did the one concerning 80-H, did that fairly and

6    accurately and correctly represent the two bullets?

7    A.    Yes.

8    Q.    As to Mr. McDonald, Mark McDonald's autopsy,

9    three wounds of entrance, one wound of exit, and two

10   bullets recovered?

11   A.    That's correct.

12   Q.    I would like to hand you, Doctor, what's been

13   marked previously State's Exhibit 67.  Now, are you

14   familiar with those items?

15   A.    Yes.  This is the -- this is a package containing

16   the two containers in which I placed the bullets

17   recovered from the body of Mark McDonald.

18   Q.    Are both bullets in there?

19   A.    Yes, they are.

20   Q.    And are those the bullets that you did in fact

21   remove from Mark McDonald?

22   A.    Yes, they are.

23   Q.    Did you, during the course of your examination,

24   cause, what I will call, a toxicology examination?

25   A.    I ordered an examination, the toxicology screen

1    on the blood, yes.

2        Q.    And toxicology screen is screening or testing for

3    what, please?

4        A.    What we do is, the purpose is to test for alcohol

5    and drugs in the system of the deceased.

6        Q.    And did any of those tests indicate any alcohol

7    or drugs at that time?

8        A.    Yes.

9        Q.    What was revealed?

10       A.    The examination of the blood revealed a blood

11   alcohol level of approximately point 03, fairly small

12   amount.  As most people know, point one would be the

13   level at which a person would be considered intoxicated

14   to driving a vehicle.  So this is approximately a little

15   less than one-third of that.

16       Q.    And your screening for drugs, was there any

17   positive results of any type?

18       A.    No.

19       Q.    Doctor, as a result of your autopsy of Mark

20   McDonald, and based upon your examination, and based

21   upon a reasonable degree of medical certainty, did you

22   arrive at an opinion as to his cause of death?

23       A.    Yes.

24       Q.    And what is that, please?

25       A.    He died as a result of multiple gunshot wounds.

1    Q.    And as to the cause of death of the multiple

2    gunshot wounds, did the hand wounds have any bearing?

3    A.    Probably not.  A very minor wound.  The two more

4    serious wounds were the wounds of the chest, certainly,

5    and the wound to the mouth.

6    Q.    Doctor, sometime after conducting your autopsy of

7    Mark McDonald, did you have an occasion to conduct an

8    autopsy on the body of Richard Blazer?

9    A.    Yes, I did.

10   Q.    And when did that occur?  Are you able to tell us

11   the date?

12   A.    That was on the 23rd of June.  I started that

13   examination around 9 o'clock in the morning.

14   Q.    And concerning your autopsy of Richard Blazer,

15   were you able to make a determination as to his height

16   and weight and age?  What did you determine?

17   A.    He was approximately 70 inches tall, 273 pounds,

18   and his appearance was appropriate for the age I was

19   given as 49 years.

20   Q.    And when Mr. Blazer's body was presented -- well,

21   was it presented to the coroner's office?

22   A.    Yes.

23   Q.    And could you determine if there had been any

24   prior or medical treatment?

25   A.    The body came to our office from a hospital.

1    Q.    Okay.  And then did you conduct an autopsy on the

2    body of Richard Blazer?

3    A.    Yes, I did.

4    Q.    And in conducting your autopsy of Mr. Blazer, did

5    you note any signs in addition, not related to recent

6    medical treatment, but did you note any injuries of a

7    gunshot variety or type?

8    A.    Yes.

9    Q.    Can you sort of tell us where the gunshot wounds

10   were on Mr. Blazer's body?

11   A.    Yes.  Mr. Blazer had three gunshot wounds.  One

12   wound was, had the entrance wound to the right backside

13   of the head.  There was another gunshot entrance wound

14   on the left, excuse me, on the right side, right side of

15   the chest some, just below the armpit.  And then there

16   was another gunshot entrance wound that was just beneath

17   or just below the right collarbone near the midline.

18   Q.    Now, in relationship to Mr. Blazer, are you able

19   to tell us based upon your examination as to, one, the

20   position of Mr. Blazer at the time he received either of

21   those injuries?

22   A.    No, not really.

23   Q.    Are you able to tell us in what order he received

24   those injuries or gunshot wounds?

25   A.    No.

1    Q.    Have you brought with you at my request some

2    slide transparencies concerning your examination that

3    were taken during your autopsy of Mr. Blazer?

4    A.    Yes.

5    Q.    If you would be kind enough to show us those and

6    we'll go through those, please, for the record.  We

7    would ask the witness to be kind enough now to show us

8    what has been previously marked 81-A.

9          Now, Doctor, that's 81-A.  Will you tell us what

10   is depicted on the screen, please?

11   A.    This is a photograph of the left side of the body

12   of Richard Blazer after we have removed some of the

13   medical therapy and cleaned the body.

14         The placard in the bottom portion of the picture

15   has the numbers 1192 and 92, meaning this was the 11

16   hundredth and 92d case reported to our office in 1992.

17   Again, the initials of the photographer are on the

18   placard, L.M., which were Laura McBride, also took these

19   photographs.

20   Q.    Does that transparency 80, does it fairly and

21   accurately, correctly represent the body of Richard

22   Blazer almost after you received it anyway but prior to

23   your autopsy?

24   A.    That's right.

25   Q.    Just before we go further, Doctor, the item that

1    is hanging or that is in Mr. Blazer's mouth, what is

2    that so we are not confused?

3        A.    There's a small tube coming out of the left side

4    of the mouth.  This was an endotracheal tube used in the

5    attempts of resuscitation of Mr. Blazer.

6        Q.    I believe you indicated that you observed an

7    entrance wound to Mr. Blazer's area behind his ear, I

8    think?

9        A.    Yes.

10       Q.    And may we see State's Exhibit 81-B, please.

11             Doctor, what is now depicted on the screen?

12       A.    This is a photograph of the right side of the

13   head of Richard Blazer.  One can, orientation, see the

14   ear on the lower portion of the picture.  Above that

15   ear, a little bit posterior to that ear one can see a

16   red spot, which is a gunshot entrance wound.  Again,

17   I've shaven the hair from around that wound in order to

18   be able to see it better.  The very similar

19   characteristics to the wound, wounds on Mr. McDonald, in

20   that it's a very typical gunshot entrance wound.  It's

21   circular and has a margin of abrasion around it.  Very,

22   very typical of a gunshot entrance wound.  This bullet

23   went through the skull and through both sides of the

24   brain.  The direction of travel went from right to left

25   and back to front.

1    Q.    Did you recover the bullet that made that

2    entrance wound?

3    A.    Yes.

4    Q.    Now, Doctor, did you note, I think you indicated

5    you did, an entrance wound in an area in the back or

6    behind the right arm of Mr. Blazer?

7    A.    Yes.

8    Q.    May we see State's Exhibit 81-C.

9         Tell us what is now depicted, please.

10   A.    This is a photograph of the right side of the

11   body.  We have raised the arm up in order to see this

12   gunshot wound a little bit easier.  There's a typical

13   round gunshot entrance wound on the right side of the

14   upper chest.  This bullet went straight from right to

15   left through the rib cage and through the right lung and

16   then into the spine in the chest where, where I

17   recovered it.

18   Q.    And I think you indicated, but let me ask with

19   reference to this wound and the wound to the entrance

20   wound to the head back by the ear.  As to those two

21   wounds, did you note any, any stippling in terms that

22   has been used earlier?

23   A.    I saw no stippling.

24   Q.    And I believe you indicated that there was

25   another entrance wound in an area above in the front

1    area of Mr. Blazer?

2    A.    Yes.

3    Q.    May we see State's Exhibit 81-E, please.    Excuse

4    me.    81-D.

5         Now, Doctor, can you tell us what is depicted?

6    Can you orient us as to what we would be looking at?

7    A.    This is a photograph of the right collarbone area

8    and neck region.    At the top of the screen one can see

9    the lower portion of the right ear.    And then along the

10   upper right hand side of the picture one can see the

11   angle of the face.    And in the mid portion of the

12   picture is a gunshot entrance wound which is in the

13   region of the right collarbone, pretty near the midline.

14   Again, I've shaven hair around the wound in order to see

15   it better.

16        Now this wound doesn't look quite as typical as

17   the other wounds do and part of that is because it

18   strikes the body in an area where it's not a flat

19   contour.    There is a bone in this vicinity.    So the, the

20   bullet is not going straight into the body.    It's going

21   at somewhat of an angle.    It's going from right to left

22   and from front to back.    But this bullet goes, as it

23   enters just underneath this right collarbone, it goes to

24   the left across the midline and then ends up between the

25   rib cage and the left shoulder blade.    As well as I

1    could determine, I could not detect any significant

2    nerve injuries or blood vessel injuries, although there

3    was a significant amount of bleeding along the course of

4    the bullet.

5    Q.    Does this exhibit, which would be 81-D and the

6    previous two, 81-C and 81-B, did they each fairly,

7    accurately, and correctly represent what was depicted on

8    the screen?

9    A.    Yes.

10    Q.    And I believe you indicated as to this injury

11    that's depicted on 81-D that you did in fact make a

12    recovery of a bullet?

13    A.    Yes, I did.

14    Q.    And could we see -- well, strike that.

15          Did you also or previous to the autopsy take an

16    x-ray photograph of certain areas of Mr. Blazer?

17    A.    Before the autopsy we x-rayed the body, yes.

18    Q.    May we see, for the record, Doctor, what's been

19    marked as 81-E.

20          Can you assist us and explain to us what is

21    depicted?

22    A.    This is a photograph -- I'm sorry.  This is,

23    actually it's a photograph of an x-ray.  This is the

24    x-ray of the head and neck and upper shoulder regions of

25    the body of Richard Blazer.  One can see in the head

1    portion of the x-ray to the right side of the screen a

2    white object which is the bullet that I recovered from

3    the head.   One can also see on the left side of the body

4    down below the neck region another white object which is

5    the bullet that I recovered in the region of the left

6    shoulder blade.  We don't see -- this x-ray is not low

7    enough to see, to see the bullet in the spine from the

8    gunshot wound on the right side of the chest.

9       Q.    Is that transparency, 81-E, a fair, accurate, and

10   correct reproduction of the x-ray taken during the

11   autopsy?

12      A.    Yes.

13      Q.    That's all I have now, Doctor, as to these

14   subject matters.  If you would like to resume your

15   chair, please.

16          During your autopsy, as a result of, of your

17   autopsy examination of Mr. Blazer, or as part thereof,

18   did you have a toxicology report prepared or

19   examination?

20      A.    Yes.

21      Q.    And again testing for any type of drugs or

22   alcohol?

23      A.    That's correct.

24      Q.    And as to Mr. Blazer what were the results,

25   please?

1    A.    There was a barely detectable level of ethanol or

2    alcohol in the blood.  Very, very small amount.  And no

3    other drugs detected on the screening in the urine.

4    Q.    Concerning the injuries received by Mr. Blazer,

5    is it, am I correct, or is it correct that each injury

6    came from right and went from right to left?

7    A.    Yes, that's correct.

8    Q.    And did you recover three bullets for each of the

9    three entrance wounds?

10   A.    I recovered a bullet from each of the entrance

11   wounds, yes.

12   Q.    Okay.  Thank you.

13         I would like to hand you what has been marked as

14   State's Exhibit 68, and I would like for you to tell us,

15   if you can identify those for us, please?

16   A.    This is a package containing the three containers

17   in which I placed the bullets I removed from the body of

18   Richard Blazer.  These bullets that I've just examined

19   are the bullets that I recovered from the body.

20   Q.    When you recovered the bullets either from

21   Mr. McDonald or Mr. Blazer -- let me break that down.

22   I'm sorry.

23         Concerning exhibit 67, the two bullets that you

24   recovered from Mr. Blazer, excuse me, Mr. McDonald, when

25   you removed those and mark them, are you then able to

1   determine from what specific type of weapon?  I'm not

2   talking caliber.  I'm talking specific type of weapon

3   those bullets were fired from.

4   A.    I can't, no.

5   Q.    And I believe you indicated that you removed

6   three bullets from Mr. Blazer on June 23rd, is that

7   correct?

8   A.    That's right.

9   Q.    And same question as to whenever it was but on

10  the 23rd of June, did you know from what specific weapon

11  if the same weapon or more than one weapon fired those

12  shots, bullets?

13  A.    I couldn't tell.  I can't make that

14  determination.

15  Q.    All right.  As a result of your autopsy

16  examination of Mr. Blazer, were you able to come to a

17  conclusion based upon a reasonable degree of medical

18  certainty as to his cause of death?

19  A.    Yes.

20  Q.    And what is that, please?

21  A.    He died as a result of multiple gunshot wounds.

22  Q.    And of those we talked about, three different

23  wounds, the one to the collarbone, was it attributing or

24  major contributing factor?  If you understand the

25  question.

1    A.    It certainly -- if when you look at the three

2    wounds as to severity, it was the less severe wound.

3    The other wounds certainly were much more severe and

4    each of those in and of themselves could be expected to

5    cause death.   The wound to the collarbone, it depends on

6    how much, it depends on other things.   The person could

7    still bleed to death but it wasn't as severe as the

8    other two, no.

9              MR. SLAVENS:     Thank you, Doctor.   I think

10      the other attorney has some questions.

11             THE COURT:      Cross-examination.

12             MR. MONTA:      Thank you.

13

14              CROSS-EXAMINATION

15    BY MR. MONTA:

16    Q.    Dr. Smith, you did your autopsy of Mark McDonald

17    on the 22d of June, is that correct?

18    A.    Yes.

19    Q.    And in connection with that, you made a report of

20    findings, conclusions whatever test you performed,

21    analysis, things like that, is that correct?

22    A.    Yes.

23    Q.    Which would be an accurate reflection of what you

24    did at that time?

25    A.    Yes.

1    Q.    When you first -- we'll talk about the first

2    autopsy of Mr. McDonald.  And you saw a slide, 80-A.

3    That's when he first came in.  Was there any detection

4    about the man's face of mud or dirt?

5    A.    I don't recall.  Let me look in my report just

6    for a moment.  I don't see any specific notation of

7    that, although frequently I don't.

8    Q.    And if you had noted that, you would have

9    reflected that in your report, would you not?

10   A.    If I had noted it, it would be in the report but

11   if I -- not necessarily if I just seen some mud.

12   Frequently if the body is moved from the scene to the

13   office -- I can't, it's difficult for me to know how the

14   body was handled from the scene between the time it was

15   removed from the scene until it got to our office.

16   Frequently dirt and mud can be in different locations

17   than they were seen where the body was at the scene.

18   Q.    At any rate, there is no notation of any mud or

19   dirt being embeded into this man's face?

20   A.    That's right.

21   Q.    I noted in your report that used and sometimes

22   you used the term soot, scorching, tattooing, all right.

23   Now soot is referenced to gun powder residue, does it

24   not?

25                    MR. SLAVENS:    I object to the form of the

1      question.  I don't necessarily object to the area.  I

2      don't think he's accurate.

3                      THE COURT:        Well, at least at this

4      point I'm going to overrule it.  Go ahead.

5      A.    Soot reflects material, basically smoke from the

6   discharge of the firearm.

7   BY MR. MONTA:

8      Q.    All right.  And scorching?

9      A.    Scorching refers to the heat effect caused by the

10   ejection of super heated gases from the end of the gun.

11      Q.    And tattooing?

12      A.    Tattooing referring to the impact of burning and

13   unburned powder particles on the skin in the vicinity of

14   the body.

15      Q.    And the other term you used was stippling?

16      A.    Stippling and tattooing are the same thing.

17      Q.    Leaving of gun powder residue?

18      A.    Well, they're all residues of gun powder.

19      Q.    Now, I noted, and I would ask you in the three

20   wounds that you've described in Mark McDonald, is it not

21   true that you found no soot, scorching or tattooing?

22      A.    In Mark McDonald I found tattooing on the face.

23   In the report the wound to the face I represent is

24   penetrating close range gunshot wound.  And in the

25   description of that wound I describe, widely scattered

1    stipples are relatively symmetrically placed around the

2    wound with an approximate diameter of 3 inches.

3        Q.    You did not find any soot or scorching?

4        A.    That's what I say, yes.

5        Q.    And you did not use the word tattooing at all, is

6    that correct?

7        A.    That's right.

8        Q.    And the tattooing would have reference as to gun

9    powder residue, is that correct?

10       A.    Stippling and tattooing are the same term or

11   different terms for the same thing, but yes.

12       Q.    Now, sometimes those have to do with the distance

13   of the entrance wound from the muzzle of the weapon, is

14   that correct?

15       A.    That's right.

16       Q.    And you indicated today, I believe, on direct

17   examination that you would defer that judgment to a

18   firearms examiner as to the distance?

19       A.    As to the exact distance, yes.

20       Q.    You also indicated that you were unable to tell

21   the order of the wounds, is that correct?

22       A.    That's right.

23       Q.    There's one wound in the hand that has an

24   entrance and then an exit, correct?

25       A.    Yes.

1    Q.   Is there any possibility that that bullet has

2    anything to do with any of the other wounds, do you

3    know?  Do you have an opinion?

4    A.   My opinion is that, no, it's a separate gunshot.

5    Q.   Were you able to make any determination after

6    examination as to the angle of entrance into the body of

7    each of those wounds?

8    A.   Yes.  And they're noted in the report.  The only

9    one that I don't make a notation for would be the wound

10   to the hand.  Since the hand can be put in so many

11   different positions, it would not be a useful

12   measurement.

13   Q.   The wound to the man's face, did you indicate

14   that that came on a downward angle?

15   A.   I listed as front to back and slightly downward,

16   yes.

17   Q.   That's when it entered regardless of what

18   happened after?

19   A.   That's upon evaluation of the entire wound tract

20   itself, yes.

21   Q.   And the wound to the man's chest you indicated

22   was approximately straight or parallel with what would

23   be the ground, I guess?

24   A.   If the person were standing in such as a fashion

25   as you are now, yes, the wound is going straight front

1    to back.

2        Q.    All right.  All right.  Let me ask you a couple

3    of questions with regard to your second autopsy, which

4    was with regard to Mr. Blazer.

5            Is it not true that in those three wounds there

6    was no soot, scorching, tattooing, or stippling?

7        A.    I didn't see any.

8        Q.    On any of the wounds?

9        A.    That's correct.

10       Q.    Were you able, as result of your examination --

11   and I guess we should take them in the order in which

12   you showed them.  You indicated the wound to the man's

13   head was from the back toward the front and right to

14   left, is that correct?

15       A.    I list them as right to left and front to back,

16   yes, or, I'm sorry, right to left and back to front.

17       Q.    Okay.  If I didn't say that, that's what I meant

18   to ask you.

19            Were you able to determine angle, say higher to

20   lower, lower to higher, or anything like that?

21       A.    I couldn't detect any deviation upward, downward.

22       Q.    Again, if a person were standing straight up, it

23   would be, would you consider, parallel with the ground?

24       A.    That's right.

25       Q.    Now, the second wound you showed us was the one

1  under the arm, under the right arm?

2    A.   That's right.

3    Q.   Is that correct?

4       And in the photograph I believe you had to move

5  the person's arm to show the wound?

6    A.   In the way we took the picture, yes.

7    Q.   All right.  Was there any wounds to his arm?

8    A.   No, there weren't.

9    Q.   And you indicated that was a right to left path.

10 Do you have any opinion as to the angle upward or

11 downward?

12   A.   I didn't detect a significant upward or downward

13 angulation.

14   Q.   Again, if the person were standing straight up,

15 it would be like a parallel to the ground?

16   A.   Yes.

17   Q.   All right.  With regard to the third wound, which

18 was in the collarbone or near the collarbone?

19   A.   It's in the region of the right collarbone, yes.

20   Q.   You're pointing to just about where your collar

21 of your shirt is?

22   A.   That's right.

23   Q.   Just off to the right of your tie.

24      Again, that was a right to left.  Now when you

25 talk about right to left, you're talking about his body‾

1    A.    Yes, in relationship to his body from the body's

2    right to left.

3    Q.    And front to back?

4    A.    That's correct.

5    Q.    Were you able to form an opinion as to whether

6    the angle of this bullet was upward, downward, downward

7    to upward?

8    A.    I wasn't able to detect significant upward or

9    downward angle.

10   Q.    Does that mean you -- I suppose an inference

11   would be it was straight or parallel.  Again, is that

12   the opinion you have or you can form no opinion at all?

13   A.    In a person such as you standing upright, the

14   bullet has no upward or downward deviation as far as I

15   can determine.

16   Q.    All right.  So that would be like a parallel path

17   if the person --

18   A.    Just like the other two wounds, yes.

19   Q.    -- were standing?  All right.

20        With regard to the wounds in this second

21   homicide, the absence of scorching, soothing, tattooing,

22   stippling would indicate a wound which was more than

23   three feet away or of a gunshot more than three feet?

24   A.    That's difficult to answer since the body came to

25   me unclothed, and I have no knowledge of what he was

1    wearing at that time he was shot.

2    Q.    Again, referring to the appropriate expert?

3    A.    Right.

4    Q.    Firearms examiner?

5    A.    Or whoever has knowledge of what he was wearing

6    or whoever examined the clothing, yes.

7    Q.    Okay.

8           MR. MONTA:        I have no more questions.

9                              Thank you, Doctor.

10          THE COURT:        Redirect, Mr. Slavens.

11

12                    REDIRECT EXAMINATION

13   BY MR. SLAVENS:

14   Q.    Just so I understand as to Mr. Blazer's wounds,

15   you indicated that they all came from right to left?

16   A.    Yes.

17   Q.    Is that correct?

18   A.    Yes.

19   Q.    But you cannot, am I correct or incorrect, you

20   cannot tell us the position of Mr. Blazer's body as the

21   exact time he received any one of those three wounds?

22   A.    That's correct.

23   Q.    And can you tell us anything in reference, not

24   anything -- strike that.

25          Are you able to make any determination as to the

1    order of his receiving those three wounds?

2      A.    No.

3      Q.    Or the quickness that he received those three

4    wounds?

5      A.    No.

6      Q.    Or the location, the exact location of the

7    shooter of those three wounds?

8      A.    That's correct.

9      Q.    And in regards to Mr. McDonald, you indicated, I

10   think, on cross-examination that there was some

11   stippling discernible as to the injury of the mouth of

12   Mr. McDonald?

13     A.    Yes.

14     Q.    You indicated you also saw that Mr. McDonald had

15   on, how he was dressed upon when he was received to the

16   coroner's office, a jacket and T-shirt, do you recall

17   that?

18     A.    Yes.

19     Q.    Would those items of clothing have any affect

20   upon his skin receiving stippling?

21     A.    Skin of the face are you talking about?

22     Q.    No.  Skin to the chest wound.

23     A.    Certainly, they can have an affect.

24            MR. SLAVENS:    Thank you.  That's all I

25   have, Doctor.

```
1              THE COURT:      Any recross?

2              MR. MONTA:      No, Judge.  Thank you.

3              THE COURT:      You may step down.

4                              Thank you very much.

5                        *  *  *  *

6              THE COURT:      Could I see counsel a

7    minute.

8              (WHEREUPON, a side-bar conference was held

9    off the record.)

10             THE COURT:      Ladies and gentlemen of the

11   jury, we will go ahead and, you will go ahead and

12   recess for the evening.  What we are going to be doing

13   at this point, the Court will be dealing with several

14   legal issues and the exhibits, things of that nature

15   that are not in your presence for which is not

16   required.  And, obviously, if we do it this evening

17   while you're doing other things, then that eliminates

18   the time tomorrow while you're sitting around doing

19   whatever jurors do in the jury room.  In any event,

20   we'll stay here and try to complete some legal

21   business and you will be then recessed for the

22   evening.

23                             We will start tomorrow

24   morning at 9:30.  Assume, as we speak, that you will

25   probably, now this is no guarantee, you will probably
```

1    begin deliberations sometime tomorrow.  The reason

2    that I'm mentioning that to you now and in advance, is

3    that obviously you get into a routine of getting out

4    of here let's say 4 to 4:30 and it's possible if you

5    begin deliberation sometime whenever it is you do

6    begin them, it will be beyond that time.  All I'm

7    doing is alerting you to the situation, baby-sitters,

8    where you park, little details at the end of the day

9    that a lot of people forget about in the routine of

10   their day.  Remember, you may be here, for example,

11   tomorrow as late as you want to, assuming you are

12   deliberating.  You may not be.  I'm just saying that

13   it's possible, all right.  And I just wanted you to

14   alert whoever is needed for transportation, that type

15   of thing.  And, of course, Shirley is here to assist

16   you in her own amicable fashion.  So with that then,

17   and again, all good plans, as we know the expression,

18   so but be alert for that tomorrow.

19                         Remember the usual

20   instructions of the Court not to discuss the case

21   among yourselves or with anybody else.  Don't form any

22   opinions.  Again, keep away from any news media

23   coverage.  Just because you don't see the camera in

24   the courtroom today doesn't mean they won't be showing

25   things what happened the last three days ago.  I don't

1    want to say anything derogatory about the news media,

2    but that's the easy way to do things.  Of course,

3    there has been a newspaper reporter here in and out

4    throughout the course of the trial, which again, is a

5    classic reason why you are not supposed to read the

6    news media or listen to it.

7                        In any event have a nice

8    evening.  9:30.  See you back then.

9                   (WHEREUPON, the jury left the courtroom at

10   the hour of 4:09 p.m.)

11

12   IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY

13             THE COURT:       All right.  For the record,

14   the State is going --

15             MR. SLAVENS:     The State will be resting,

16   your Honor.  Prior to that, we would move for the

17   introduction of evidence of all the exhibits that have

18   been marked and about which have, have been testimony

19   during the course of this trial.  Subject to the

20   Court's ruling on that motion, we will represent to

21   the Court we would more than likely rest depending on

22   if there is any need to recall other witnesses or

23   whatever maybe depending the Court's rulings.  We

24   think there is sufficient basis for the introduction

25   of evidence of the exhibits.

1    THE COURT:    All right.  For the record,

2    the Court's independent unrelated notes indicates in

3    sequence, 1 through 81 exhibits.

4    MR. SLAVENS:    I might state for the

5    record, here is a copy of the Court Reporter's related

6    notation, which I'm willing to accept, at least use as

7    sort of a map to go through these exhibits with.

8    THE COURT:    But 1 through 81, we can

9    agree on that?

10    MR. SLAVENS:    That is correct.

11    THE COURT:    And some exhibits have,

12    obviously have some sub-parts.

13    Can we do this the easy way

14    or hard way?  I'm simply asking counsel, do you want

15    to go through 1 through 81?

16    MR. ARNTZ:    We are going to try to do

17    it the easy way.

18    THE COURT:    Which always turns out to

19    be the hard way.

20    MR. ARNTZ:    Can we go off the record a

21    minute?

22    THE COURT:    If it's necessary.

23    MR. ARNTZ:    I don't want all my

24    extraneous remarks.

25    THE COURT:    Go ahead, you're off the

```
 1        record.
 2                    (WHEREUPON, a discussion was held off the
 3        record.)
 4                    MR. ARNTZ:      Our response is, we object
 5        to the following State exhibits.  We object to the
 6        admission of number 38, the Bryco firearm.
 7                               We object to number 42
 8        which, among other things, is a stocking and a green
 9        shirt.
10                               We object to number 43 which
11        is the Raven firearm.
12                               We object to number 48
13        which is the box of miscellaneous items.  I think the
14        testimony was that these were recovered from a sewer.
15                               We object to slide 80-A
16        which we argued to the Court earlier with regard to
17        whether it was excessive during the coroner's
18        testimony.
19                    THE COURT:      All right.  What about the
20        two videotapes.  What are they marked as?
21                    MR. ARNTZ:      Those are marked as State's
22        Exhibit 79 and Joint Exhibit Roman Numeral I.
23                    THE COURT:      All right.  Is there any
24        objection to either one of those?
25                    MR. ARNTZ:      We will object to each one
```