1    of those going to the jury.

2            THE COURT:        Joint Exhibit, what, Roman

3    Numeral --

4            MR. ARNTZ:        Joint Roman Numeral I is

5    the videotape cassette of the Elofskey interview.  And

6    State Exhibit 79 is the cassette of the Polson

7    interview.

8            THE COURT:        All right.  Dealing with

9    these then in the order to which they were objected

10   to.  All other objects not objected to, the Court will

11   admit.

12           MR. ARNTZ:        That's correct.

13           THE COURT:        All other exhibits then

14   with the exception of those objected to at the time

15   will be admitted.

16                            And the first numerical

17   objection relates to 38.  1 through 37 are admitted.

18   That is the gun envelope which includes the dark gun,

19   as I have it, the magazine and three life rounds.  Any

20   argument, Mr. Slavens?

21           MR. SLAVENS:      I think there's been a

22   sufficient gathering of the, the collection of that

23   gun by Rick Smith, who's marked it and tagged it and

24   so identified it in front of the Court.

25           THE COURT:        Does the defense want to be

1    heard on that?

2              MR. ARNTZ:      I think that item was not

3    connected to this defendant.  The recovery of it

4    specifically was not related in any way to this

5    defendant's possession immediately prior to it.

6              THE COURT:      All right.  The objection

7    to 38 will be overruled.  That will be admitted.

8                              Now, as it relates to

9    number 42 is the next one.

10             MR. ARNTZ:      That's correct.

11             THE COURT:      39 through 41 will be

12   admitted.

13                             42 is a package with a

14   shirt and stocking in it.  What's the State's position

15   on that?

16             MR. SLAVENS:    We believe as to that

17   specific exhibit with the two items, there is ample

18   testimony concerning the, what I will call, the

19   stocking as to where it was located and to one

20   witness, I recall, vividly described how this

21   defendant, Weston Lee Howe, did, in fact, did have the

22   stocking in his hand.  That was Patrolman Wiesman

23   coming up upon him.  And, therefore, I think

24   abundantly clear that matter is related to this

25   defendant.

1    Green shirt, it's in the

2    photograph itself.  Also, I mean, as a photograph

3    indicates and referenced in the exhibit as to where it

4    was found.  I will admit it's not in the exact

5    location as to where this defendant was finally

6    located and/or where Polson was located but it's

7    across the path that they traveled as they came

8    between the two houses.  And Polson's, if you will,

9    lack of shirt, well, as to the green shirt I still so

10   move it to be introduced.

11                    The stocking, I think, your

12   Honor, is quite clear as to this defendant.

13        THE COURT:      Any rebuttal or response?

14        MR. ARNTZ:      There was no testimony

15   connecting the green shirt to our client in any manner

16   whatsoever.  As the prosecutor pointed out, nor was

17   the green shirt related to either co-defendants.  It

18   was simply found on the ground during a chase, as I

19   understand it.  Its probative value is minimal to

20   none.

21                    Also, the stocking, if I

22   recollect correctly, the State's witness who made

23   mention of the stocking is, I believe, is the same

24   State's witness who failed to identify our client in

25   the course of his testimony and we made objection at

1    that time at side bar.  And I think asked the Court to

2    strike his testimony because, again, he was not able

3    to, apparently to point out our client as the person

4    he saw discard anything.

5               MR. MONTA:       That was Officer Jackson

6    for the record.

7               MR. SLAVENS:     Wiesman is the one who

8    testified about this defendant having a stocking and

9    who did, in fact, identify this defendant.

10              THE COURT:       Well, the Court is going to

11   permit the stocking.  I don't -- there is only one

12   exhibit though -- Let's do this, because, because the

13   defendant is objecting, the Court will exclude,

14   sustain the objection as it relates to the green

15   shirt, that portion of 43, 42, excuse me,  42.  That

16   portion of 42, which is the green shirt.  The stocking

17   will be admitted.

18                              Let's go off the record a

19   minute.

20              (WHEREUPON, a discussion was held off the

21   record.)

22              THE COURT:       42, the stocking has been

23   admitted and Mr. Slavens has suggested that it be

24   remarked 42-A for an individual package.  That will be

25   done.  The shirt will be kept with the rest of the

1      exhibits that are not admitted.

2                THE MR. SLAVENS:    You want to do that now.

3                (WHEREUPON, State's Exhibit 42-A was marked

4      for identification.)

5                THE COURT:    The next exhibit is,

6      objection is to what?

7                MR. SLAVENS:    43, the Raven.

8                THE COURT:    You want to be heard on

9      exhibit 43, the Raven?

10               MR. ARNTZ:    We feel that 43 was not

11     related to or connected to our client sufficiently to

12     be admitted.  We feel that no one has identified that

13     weapon to the effect that our client was actually in

14     possession of it or used it in any manner.

15               THE COURT:    Mr. Slavens.

16               MR. SLAVENS:    I don't believe that's the

17     correct test anyway but irrespective of that, I think

18     the gun has been fully properly marked, tagged,

19     identified and connected up, one, to this whole case,

20     basically all, or the two other defendants who

21     testified.

22               THE COURT:    All right.  Exhibit 43 will

23     be admitted.

24               All the exhibits 44 through

25     47 are admitted.

1         48 there is an objection.

2 That's the box of contents apparently found in the

3 sewer.  Does the defendant want to be heard on that?

4    MR. MONTA:  Judge, what we are

5 objecting to are the items which are not clearly

6 marked as belonging to anybody involved in this case.

7 They were scattered in the sewer and collected.  Some

8 things are not identifiable and were not identified at

9 trial as belonging to the decedent McDonald.

10 Certainly the things that have his name on it, connect

11 up to some testimony that it was in that location but

12 not all of them.  We think if it all gets in, it will

13 be prejudicial.

14    THE COURT:  I'm not sure as to the

15 level of prejudice but what are we talking about, what

16 other kinds of items?

17    MR. MONTA:  There is a billfold.  I

18 don't know that that is identifiable.  There is

19 something called a prayer card, which I think would be

20 clearly prejudicial, arousing sympathy.

21    THE COURT:  Do you have a photograph of

22 what was found?

23    MR. SLAVENS:  Yeah, there is a photograph

24 of State's Exhibit 47 and it's basically a downward

25 shot into the sewer before the items were collected by

1    evidence technician Rick Smith.  And I think that

2    photograph is clear as to what was removed as well as

3    was Rick Smith's testimony from what he removed from

4    the sewer.

5              THE COURT:       Of these items that are

6    depicted in 47, how many of them have Mr. McDonald's

7    some form of identification.

8              MR. SLAVENS:     I don't know, your Honor.

9              THE COURT:       There were at least a

10   couple.

11             MR. SLAVENS:     Oh, definitely.

12             MR. LAWSON:      Several.

13             MR. SLAVENS:     Yeah.

14             THE COURT:       48 will be admitted.

15             MR. MONTA:       In its entirety?

16             THE COURT:       In its entirety.  Let the

17   record reflect after the review of State's Exhibit 47

18   and conjunction with the testimony of the witness who

19   retrieved the items, along with the testimony of the

20   other witnesses, specifically, but not necessarily

21   exclusive of Mr. Polson and Mr. Elofskey, it's rather

22   clear that, that these items are heavily

23   circumstantially connected.

24                             48 will be admitted.

25                             49 through 78 will be

1    admitted.

2                           80-A the coroner's slide

3    has already been objected.  Anything further for the

4    record.

5              MR. MONTA:        No.

6              THE COURT:        That will be admitted.

7    81-A through E is admitted.  The rest of 80 is

8    admitted.

9                           The objections to 79 and

10   Joint Exhibit I, Mr. Slavens, here's your opportunity

11   to make a record that you've been wanting to make.

12             MR. SLAVENS:      I'm done.

13             THE COURT:        Are these -- these are the,

14   one is a joint exhibit that apparently the defense is

15   objecting to, am I correct on that?

16             MR. MONTA:        Right.

17             THE COURT:        The other is State's

18   Exhibit 79.  In summary, it's the Elofskey taped

19   statement to the Dayton Police Department and the

20   Polson taped interview to the Dayton Police

21   Department.  Do you want to make a record on this?

22             MR. SLAVENS:      Well, I think we already

23   done so.  So the record is clear, we believe that both

24   tapes, one, have been properly authenticated, two,

25   that both tapes relayed to the various evidence rules

1    that we previously mentioned to the Court.  One of

2    which was the Evidence Rule 803(3)(B) an intent, plan,

3    motive or design as to the declarant's participation

4    therein.

5                      And also and more

6    specifically, these individuals, Mr. Polson and

7    Mr. Elofskey, having undergone extensive

8    cross-examinations as to their reason for this recent

9    fabrication and plea bargain and they're here to lie

10   today in court when in fact these defendants,

11   co-conspirators made prior oral and videotaped

12   statements to the police department and therefore

13   their prior consistent statements are admissible under

14   Evidence Rule 801(D)(1)(b) and we so move the Court.

15           THE COURT:        Does the defendant want to

16   be heard?

17           MR. ARNTZ:        Well, only --

18           THE COURT:        Over and above what's

19   already been said.

20           MR. ARNTZ:        No, nothing more than what

21   we would have said previously on the record.

22           THE COURT:        The objection is sustained.

23   Let the record reflect those two videotapes were

24   played to the jury ultimately with no objection, as I

25   recall, from either party in both cases and the Court

1    feels to admit them as exhibits would give undue

2    weight to that particular portion of the testimony.

3              MR. SLAVENS:    May we be heard on that

4    portion of the Court's ruling?

5                        We believe that there are,

6    I may be wrong in this, but as exhibits are in fact

7    admissible and then the question becomes, whether or

8    not the jury wants to see them and if the jury then

9    decides that they, the jury, wishes to review those

10   items, that a video playing mechanism be given to the

11   jury.  But I think at this point in time for the Court

12   to assume that the jury does not want to listen to the

13   tape, would be an infringement upon the jury's

14   deliberation process.  And we believe that the items

15   should be accepted into evidence, go to the jury, and

16   then if the jury wishes to view them, make them

17   available for a view.

18             THE COURT:    I'm not sure what I said in

19   the record but, Mr. Slavens, I think I said just the

20   opposite of what your argument -- read back was the

21   reason.

22             MR. SLAVENS:    You can restate it.

23             THE COURT:    Just read back, would you,

24   Joyce.

25             (WHEREUPON, the Court Reporter read back the

1       Court's last statement.)

2              THE COURT:        That's my reason.  And

3       sustained.

4              MR. SLAVENS:      Note our exception.

5              THE COURT:        Your exceptions are noted.

6                                Any other exhibits we need

7       to deal with?

8              MR. ARNTZ:        None.

9              THE COURT:        All right.  Are we prepared

10      to go forward with the motions at this time or are we

11      going to wait?

12             MR. SLAVENS:      I think there is a couple

13      stipulations that we agreed to.

14             THE COURT:        Do you want to do that in

15      front of the jury?

16             MR. SLAVENS:      We can or we can do it now,

17      just so the lawyers are clear on it and we can redo.

18                               I, I think basically the

19      stipulations would be if Denise Rankin were called to

20      testify, she would testify that the blood sample

21      obtained by Marshall Manning at the Richard Blazer,

22      1912 homicide scene is in fact consistent with the

23      blood typing of Richard Blazer.

24                               Also, an additional second

25      stipulation that if -- to that one, am I correct?

```
1              MR. MONTA:        Answer, I made it here.
2    She made four reports.
3              MR. SLAVENS:      What I'm relating to is the
4    blood.
5              MR. MONTA:        That seems to be right.
6              MR. SLAVENS:      The other stipulation would
7    be that if John Marsh were called to testify, he would
8    testify concerning examinations he conducted regarding
9    latent prints viewed by him taken from the various or
10   the two weapons, I forget the exhibit numbers, but
11   specifically the Bryco and the Raven, and that there
12   are no fingerprints on either of those items of value
13   for him to make a comparison to Howe, Elofskey, or
14   Polson.
15                              Secondly, that that witness
16   would testify that he examined some latent prints from
17   the 1912 Tennyson address of Richard Blazer, those
18   prints, latent prints from an area of the door leading
19   out of the house.  They were taken and lifted by
20   Marshall Manning.  And that those prints matched the
21   known prints of Tony Elofskey.
22             THE COURT:        Is that correct, Mr. Arntz
23   or Mr. Monta, as to your understanding of the
24   stipulation?
25             MR. MONTA:        Well, we haven't discussed
```

1    all the elements of them.  That's generally what we

2    are talking about.

3                              I believe there were, as

4    far as Denise Rankin's testimony, I believe there was

5    also an indication that none of the blood samples from

6    either of the decedents were found on the clothing of

7    our client, Mr. Howe.  We would ask for a stipulation

8    of that.

9            THE COURT:       Well, apparently we are not

10   at this point prepared on the stipulations then, so.

11           MR. MONTA:       Well, the general topics,

12   that's what I just said, I think the general topics we

13   had and the general people who would have given.

14           MR. SLAVENS:     As to that one tin.  What

15   else?  I mean, I was only talking about that, the

16   blood, there some discussion about the blood at Mr.

17   Blazer's house and just that it was his blood.

18           MR. ARNTZ:       I think we can arrive at

19   some stipulations to the Court in final form first

20   thing in the morning, if that's of any assistance.  We

21   are not just down to the fine print.

22           THE COURT:       My only question, assuming

23   there are stipulations, first of all, Mr. Slavens has

24   to be advised because of the, obviously, the need for

25   a witness.  And hopefully we can do that.  That

1    doesn't necessarily have to be done on the record.

2    Whatever stipulation is worked out, we will put on the

3    record.

4                            Do counsel want the Court

5    to read the stipulation to the jury as opposed to

6    either one counsel?

7              MR. ARNTZ:      I think we prefer that.

8              MR. MONTA:      That will be fine.

9              THE COURT:      That's normally how a

10   stipulation is done in at least a lot of cases.

11             MR. SLAVENS:      I don't care about the

12   format, just as long --

13             THE COURT:      All right.  So with that

14   then, assuming the stipulations are worked out as to

15   these two witnesses, Marsh and Denise Rankin, the

16   State, although not formally, resting at this time?

17             MR. SLAVENS:      We are going to represent

18   we would more than likely be concluded.  Assuming that

19   it is concluded, we'll then be resting.

20             THE COURT:      Do we want to deal with the

21   motions then at this point?

22             MR. ARNTZ:      We prefer to do that in the

23   morning after we provide the Court with the final form

24   of the stipulation.

25             THE COURT:      All right.  Can we get

1    started at 9:30 as far as the jury is concerned?  So

2    that means everybody is here at 9, we will hit the

3    record at 9:15.  Any problem with that timing, Mr.

4    Slavens?  And hopefully get going with the jury at

5    9:30.  That means Mr. Howe is due back here at 9

6    o'clock.  And we'll go ahead and stand in recess.

7                          And if I could see counsel

8    for just a minute -- I'm already a half hour late for

9    another meeting -- as to schedule and potential jury

10   charge.

11

12                   (WHEREUPON, the proceedings for March 2,

13   1993, were then concluded at the hour of 4:48 p.m.)

14                       *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

1       (March 3, 1993 - Morning Session)

2                   9:52 a.m.

3

4    IN OPEN COURT - OUT OF THE PRESENCE OF THE JURY

5           THE COURT:       Let the record reflect we

6    are out of the presence of the jury.

7                           Mr. Slavens.

8        MR. SLAVENS:       Yes, your Honor.

9                           I believe, I'm not sure if

10   all of this was on the record yesterday but we'll be

11   resting.   I think we moved for the introduction of

12   into evidence the various exhibits.   The Court has

13   ruled on those.   I think those are on the record.   We

14   would like to reserve the right to rest in front of

15   the jury but we will for the record, subject to that

16   caveat, rest our case.

17          THE COURT:       All right.   Does the

18   defense have any motions?

19       MR. MONTA:       Thank you, Judge.

20                       At this point under rule,

21   Criminal Rule 29, which allows the Court on motion of

22   defendant, or on its own motion after the State's

23   evidence is closed, to move for acquittal based upon

24   the fact that the evidence is insufficient to sustain

25   a conviction.   We make that motion as to all counts

1    and specifications.

2              THE COURT:        All right.  The motion for

3    the directed verdict, pursuant to Rule 29 of the Ohio

4    Criminal Rules, is overruled.

5                        Does the defendant have any

6    other motions as it relates to exhibits or any, or any

7    other matter we want to deal with before we bring the

8    jury in?

9              MR. ARNTZ:        We would move at this time

10   for admission of Defendant's exhibits as well.

11             THE COURT:        And they are A and B.  I

12   believe Joint Roman Numeral I was admitted by the

13   Court yesterday afternoon.  Is Joint Exhibit Roman

14   Numeral I the videotape statement?

15             MR. ARNTZ:        Excuse me.  That was agreed

16   that that would not be admitted.

17             MR. SLAVENS:        I disagree with that.

18             THE COURT:        As to the agreement?

19             MR. SLAVENS:        Yes.

20             THE COURT:        It is correct that the

21   Court has excluded the two videotaped versions of

22   Mr. Polson and Mr. Elofskey's testimony.

23                        Now as it relates to

24   Defendant's A, this is a hand diagram by Officer

25   Bryant.

1        MR. ARNTZ:        Correct.

2        THE COURT:        Any objection to that?

3        MR. SLAVENS:        No objection.

4        THE COURT:        B and C are request forms

5    to see Detective Lawson from Mr. Elofskey while in the

6    county jail.

7        MR. SLAVENS:        I voice an objection.  I

8    believe, I may be incorrect, that the testimony from

9    that came -- no, I stand corrected.  I think it

10   came -- there was testimony about that from Elofskey

11   but he denied one of them and therefore it's

12   inaccurate or has not been authenticated.

13       THE COURT:        He did deny one of the

14   four.

15       MR. ARNTZ:        If I recall correctly, I

16   think what he said was that he did not recognize one

17   of the four request slips and something he made out in

18   his own handwriting but he also went on to say that he

19   in fact did want to see Detective Lawson on that day,

20   something to that effect.

21       THE COURT:        Well, just a minute.  Let

22   me actually physically look.  I think he denied one of

23   them by case number, jacket number, or whatever it

24   was.

25       MR. SLAVENS:        He did.  And three of them

1   have the same jacket number.  One of them has a

2   different jacket number.

3           THE COURT:      The jail request form that

4   was specifically denied by Mr. Elofskey, which is part

5   of Defendant's Exhibit B for identification purposes,

6   its reference is jacket number A 8112-92, that would

7   be sustained and will not go to the jury.  It can be

8   eliminated or subtracted from the form upon the other

9   three.  Now, with that understanding --

10          MR. SLAVENS:      No objection, your Honor.

11          THE COURT:      There is no objection from

12  the State as to B and C as amended.  And B is the one

13  specifically effected and we'll deal with that.

14                          All right.  The defense

15  is -- we are over to the defense side of the case.

16  Does the defendant have any testimony to present?

17          MR. ARNTZ:      We would be resting as

18  well.

19          THE COURT:      And do you reserve the

20  right to do that in the presence of the jury also?

21          MR. ARNTZ:      Yes, sir, we would.

22          THE COURT:      All right.  Pursuant to our

23  discussions then in chambers, what the Court will do

24  is bring the jury in, permit the State to rest, permit

25  the Defendant to rest on the record, then explain to

```
 1       the jury what is next in the process, tell them that,

 2       we'll have another relatively brief break, so we can

 3       finalize any discussions on instructions, and we'll go

 4       from there.

 5                                So let's bring the jury in.

 6       Anything further before the jury comes in?

 7                    MR. SLAVENS:    No, your Honor.

 8

 9                         BEFORE THE JURY

10                    THE COURT:    Good morning, ladies and

11       gentlemen of the jury.

12                    THE JURY:    Good morning.

13                    THE COURT:    We are moving along.

14                                Mr. Slavens.

15                    MR. SLAVENS:    Yes, your Honor.  As we

16       previously indicated and for the record, State rests.

17                    THE COURT:    All right.  Ladies and

18       gentlemen of the jury, the State has rested its case.

19       And we are now over to the defense portion of this

20       matter.

21                                Mr. Arntz or Mr. Monta.

22                    MR. MONTA:    If the Court please, at

23       this time the defense would rest as well.

24                    THE COURT:    All right.  You've heard

25       the State and you've heard the Defense rest.
```

1          Now, ladies and gentlemen

2   of the jury, I wanted to bring you in here so you

3   would see this process.  The next stage in the

4   proceeding is what's called a closing argument.  We

5   are going to get to that in just a few minutes.  There

6   is a couple of minor things we need to deal with.  You

7   get to take another break.  The bottom line to what

8   I'm saying, you now know we are at the concluding

9   portions of the trial, closing arguments by counsel,

10  then the Court will give you instructions of law and

11  then the matter will be in your hands to decide.

12          So if you would give us

13  approximately 15 minutes, give or take a few either

14  direction, we'd appreciate that, so that counsel and

15  the Court, we have everything together.  We will not

16  go solidly through all the closing arguments and

17  instructions without a break.  We'll have a break at

18  some point mid route of the next series of events but

19  you should have the case and begin deliberating before

20  noon.  So with that, let's take a break.

21          Remember the usual

22  instructions of the Court not to discuss the case

23  among yourselves or with anybody else.  We'll see you

24  back in approximately 15 minutes.

25          (WHEREUPON, a recess was taken.)

1                          IN CHAMBERS

2                                    10:17 a.m.

3              THE COURT:        Let the record reflect that

4   we are in chambers and we are discussing the charge to

5   be given to the jury.

6                                    A couple of things.  First

7   of all, does the defense specifically waive the

8   defendant's presence for the purpose of this brief

9   record?

10             MR. ARNTZ:        Yes, we would.

11             THE COURT:        The second thing, Mr.

12  Monta, you might want to respond to this because we

13  were just talking about it while Mr. Arntz was not

14  present.  But does counsel desire the Court to,

15  defense counsel desire the Court to inquire of the

16  defendant as to whether or not he wants or should be

17  testifying in this case.

18             MR. MONTA:        I think we discussed that

19  and indications are at present it's not necessary.

20             MR. ARNTZ:        That's correct.

21             THE COURT:        All right.  So there is no

22  need for the Court to make personal or direct inquiry

23  of the defendant on that subject?

24             MR. ARNTZ:        No, sir.

25             MR. MONTA:        No.

1            THE COURT:    All right.  With that then,

2    let the record further reflect we've had a couple of

3    discussions in chambers as it relates to the jury

4    instructions.  The defendant has filed a requested set

5    of jury instructions, which the State of Ohio has a

6    copy of.

7            And the bottom line impact

8    is that the Court is sustaining the defendant's

9    request for, motion request for an instruction on the

10   lesser included offense of involuntarily manslaughter.

11   That's branch one.

12           Sustaining as to branch

13   two, labeling, mere presence.

14           The testimony of an

15   accomplice request, which is branch three of that

16   request, has, will also be approved and be given to

17   the jury.

18           Branch four of the

19   defendant's request has been granted, however, the

20   last sentence, that will be cut off.  The last

21   sentence will simply read:  In determining what

22   weight, if any, should be given the statement or

23   statements, you should consider all the matters in

24   evidence.  Period.

25           And the balance of the

1    defendant's requested instruction will not be given as

2    being not necessary and not necessarily the law.

3            MR. ARNTZ:        If the Court please, we

4    have also requested an instruction to the jury with

5    regard to what they should do in the event they find

6    equal inferences from the circumstantial evidence.

7    This is an instruction that has traditionally been

8    given for many years in criminal cases and we feel it

9    would be appropriate and necessary today.

10            THE COURT:        And that's correct.   That

11   also will be given.

12            And I believe I'm correct,

13   Mr. Slavens, when I state that the State has no

14   objection to any of the Court's rulings as it relates

15   to the defendant's request, albeit perhaps

16   reluctantly, but no specific objections.   Am I

17   correct?  If I'm not, please state.

18            MR. SLAVENS:        There is an objection to

19   equal inferences which we, but we recognize the Court

20   is going to give it, for the record, we voice an

21   objection.  I just make that objection for the record,

22   your Honor, for whatever purpose the record may have

23   and the State giving an objection.

24            THE COURT:        Let the record reflect that

25   for purposes of review, the Court is very much aware

1    of the state of the law as it relates to the requested

2    instruction as it relates to inferences that are

3    equally consistent with each other or are equally

4    consistent with either the defendant being guilty or

5    not guilty, that that's not a necessary instruction.

6    The defendant and the State have both provided copies

7    of the case in view of the nature of this case.  The

8    Court will go ahead and give this instruction at the

9    request of the defendant for whatever, whatever

10   purpose it may serve.

11                     Now, on the record, does

12   the defendant desire that I not make reference to the

13   fact that he did not testify or that I go ahead and

14   make the standard Ohio Jury Instruction reference that

15   it is his constitutional right not to testify?  Of

16   course, I'm summarizing that particular instruction.

17   Mr. Arntz.

18         MR. ARNTZ:    We request that the Court

19   give the traditional instruction that he has no

20   obligation to testify.

21         THE COURT:    All right.  That will be so

22   given.

23            All right.  Anything else

24   for the record?

25         MR. SLAVENS:    I think the record should

1   show, I think, is the Court going, has the Court, is

2   the Court going to give an instruction on aiding and

3   abetting?

4           THE COURT:       The Court will give an

5   instruction of aiding and abetting.

6           MR. ARNTZ:       We would object to the

7   Court giving a general instruction on aiding and

8   abetting as to all five of these counts for the reason

9   that the bill of particulars filed February 18th by

10  the State specified that with regard to the homicide

11  counts, the defendant was the principal and that he

12  did the shooting himself.

13          And with regard to the

14  aggravated robbery and aggravated burglary counts, the

15  bill of particulars specifies that he was a

16  participant and provided assistance to the

17  co-defendants with regard to those counts.

18          So our feeling is that the

19  prosecutor has bound himself to those theories of his

20  case which he set forth in the bill of particulars.

21  And the purpose of the bill is to provide notice to

22  the defense what theory the prosecution intends to

23  present at trial.  The prosecution attempted to

24  present those theories at trial and we think it is

25  unfair for the prosecution at the conclusion of all

1    the testimony to offer up new theories of culpability

2    by now saying, well, if he wasn't the principal in

3    these homicides, he ought to be convicted as an aider

4    and abettor.  We think that defeats the whole purpose

5    of the bill of particulars, in that the prosecutor can

6    declare one theory in advance of trial and in fact

7    throughout the trial and then at the very end of the

8    trial insist that the Court instruct as to another

9    theory.  This is a practice which would violate our

10   client's right to due process and a fair trial.

11             THE COURT:       Mr. Slavens.

12             MR. SLAVENS:     If I may, your Honor, we

13   recognize that the purpose of the bill of particulars

14   is primarily to give the defendant notice.   In

15   essence, it is notice pleading.  The purpose of giving

16   a jury instruction is to educate the jury as to what

17   the law is, as that law would apply to the facts as

18   presented during the course of the trial.  The fact

19   that the State's theory has not, not changed as to

20   any, as who we claim to be the shooter but based upon

21   the evidence, primarily the, one, of the

22   cross-examination is and the inference is made by the

23   defense team in cross-examining Mr. Elofskey and

24   Mr. Polson, and also, based upon the testimony of

25   Detective Lawson concerning statements made by the

1    defendant Howe.  There is the possibility that the

2    jury could conclude that in one or both of the

3    homicides that this defendant was not in fact the

4    triggerman but that he was present with all the

5    culpability required as an aider and abettor,

6    therefore, they could so find, it's not a new theory,

7    but I mean the fact that our theory is not new but the

8    evidence, I think, justifies in order to prevent a

9    potential miscarriage of justice that this instruction

10   would be given as it is factually warranted.

11           THE COURT:      All right.  The Court has

12   indicated to counsel, prior to making the record, the

13   instruction would be given in its general context of

14   the entire factual situation.

15           MR. ARNTZ:      We would just like to note

16   our position is that an aiding and abetting

17   instruction might well be appropriate for the

18   aggravated robberies and aggravated burglary, but not

19   as to the homicides.

20           THE COURT:      All right.  Your position

21   is clear and the Court has ruled.  Okay.

22           MR. SLAVENS:     Two points.  We know the

23   Court has given counsel time in regards to complete

24   their closing arguments, the Court indicated to the

25   jury he will give them a break.  I would just, on

1    behalf of State, request at that break be a short one

2    so they can go to the necessary room and then back and

3    I would suggest maybe five minutes.

4            THE COURT:        Not only will it be short,

5    I was going to ask counsel as to a logical point,

6    probably at the conclusion of the defendant's closing

7    argument.

8            MR. ARNTZ:        We would prefer that the

9    break occur after the State's final argument finishes.

10           THE COURT:        Well, there is a rebuttal.

11           MR. ARNTZ:        That's what I mean, after

12   the rebuttal.

13           THE COURT:        Go through the entire

14   closing arguments then have a five minute break then

15   instructions.

16           MR. SLAVENS:       That's fine with me.

17   They're trying to prevent me from preparing for

18   rebuttal.  I think that's appropriate time.

19           THE COURT:        That's fine.  Remember the

20   jury will be sitting there.

21                             As we speak, we agreed on a

22   45 time limit, am I correct?

23           MR. ARNTZ:        With five minutes fudge

24   factor I think we said.

25           THE COURT:        Keep in mind, the longer

1    they're sitting here in the middle of the morning.    So

2    we'll do all the closing arguments, we will take a

3    brief break and then come back for the instructions.

4            MR. SLAVENS:    May I, your Honor, make a

5    comment?    In regards -- I recognize -- I hope the

6    Court does not take an offense to what I'm going to

7    say, but I, recalling back to voir dire examination,

8    not with Mr. Arntz but with comments made by the Court

9    in explaining to this jury the charges, and the Court,

10   I think, maybe at least as I looked at it, please

11   don't take offense to it, stressed quite seriously and

12   numerous occasions the fact that the defendant pled

13   not guilty.    And when you did that, you make an

14   inflection in your voice.    And your voice does carry

15   quite well.    And you denoted, if you will, the

16   seriousness of the situation.    I would just ask the

17   Court in giving the instructions to the jury that all

18   instructions be basically with the same inflection.    I

19   mean, I think the Court when it gets to certain areas

20   of instruction, may inform the jury this is very

21   important, this is very important.    I think all the

22   instructions are equally important.    I hope the Court

23   does not take offense.

24            THE COURT:    It's in the record.

25                        Any response?

1           MR. MONTA:     For the record, we didn't

2    notice those inflections.

3           THE COURT:     For the record, either did

4    the Court.  But I will do what I do.  I will let the

5    record speak for itself.

6           THE COURT:     Off the record.

7

8          IN OPEN COURT - BEFORE THE JURY

9                      10:37 a.m.

10          THE COURT:     Ladies and gentlemen of the

11   jury, we are at that point in the trial that's called

12   the closing arguments or closing statements by

13   counsel.  We will now proceed with those.  Remember,

14   what the lawyers tell you is not evidence.  You heard

15   the evidence from the witness stand and the various

16   exhibits.  The Court will tell you specifically what

17   the evidence is and what I can tell you is not

18   evidence is what the attorneys say to you at this

19   point.  It is a summary of the situation from the

20   attorney's standpoint.

21                 Now I want to caution you

22   on a couple of things here.  I'm sure I speak for all

23   the lawyers involved.  That if an attorney misstates

24   the evidence that you remember to be, I'm saying two

25   things here, I'm sure that it is not done

1    deliberately.  There is one of them.  That's why there

2    is 12 of you.  The second part of that statement is if

3    your recollection differs from that of what you hear

4    the attorneys say that the evidence showed, you rely

5    on your collective memories to determine what the

6    evidence in fact was.

7                        With that then, is the

8    State ready to proceed?

9            MR. DUNDES:        Yes, your Honor.

10           THE COURT:         Defense ready?

11           MR. ARNTZ:         (Nodded in the

12   affirmative.)

13           THE COURT:         You may proceed, Mr.

14   Dundes.

15           MR. DUNDES:        Judge Dodge, counsel, Mr.

16   Slavens, ladies and gentlemen of the jury.  I would

17   like to take a brief second to thank you for your time

18   and your patience, your attention you've given us in

19   the last two weeks.  I know it's been a difficult

20   time.  We are close to the end, so I thank you for

21   that.

22                        At the beginning of this

23   trial you heard inferences that the State of Ohio

24   would not be able to connect the Mark McDonald

25   homicide and the Richard Blazer homicide.  There were

1    statements made that there was no one there to

2    testify.  All the State of Ohio had were witnesses

3    what people said happened out there.  In a case of

4    this nature we know, counsel knows that the victims,

5    Mark McDonald and Richard Blazer, are deceased.  They

6    couldn't come in and testify.  They're dead.  I wasn't

7    there.  Counsel wasn't there.  Mr. Slavens wasn't

8    there.  You weren't there.

9                     At the beginning of this

10   trial you heard testimony from police officers who

11   arrived on the scene where Mark McDonald was murdered

12   at Monument and Findlay.  They came in and testified

13   to what they found when they got there.  You also

14   heard testimony from police officers at the 1912

15   Tennyson Avenue residence, homicide of Richard Blazer.

16   They came in and they testified what they found when

17   they got there.  They weren't there when it happened.

18                     But we do know from

19   testimony in this trial from this witness stand that

20   there were people there at each homicide.  And how do

21   we know that?  Well, we know that this defendant was

22   there.  We know that because he told Detective Tom

23   Lawson that he was out there.  He was at the Monument

24   and Findlay Street address.  In fact, he told this

25   detective that he killed Mark McDonald.  We also know

1    that he told this detective that he was at the 1912

2    Tennyson Avenue residence of Richard Blazer.  He was

3    there.  He told that to Detective Lawson.

4                    Who else was there?  You've

5    heard testimony from Walter Polson.  You've heard

6    testimony from Tony Elofskey.  They were there at the

7    Findlay and Monument Street location.  They told you

8    that this defendant killed Mark McDonald.  They were

9    also present at the 1912 Tennyson Avenue residence of

10   Richard Blazer.  And there is no dispute they told you

11   that this defendant killed Richard Blazer.  They were

12   there.

13                   They came in, Walter Polson

14   and Tony Elofskey, and they told you in the early

15   morning hours of June 22d, 1992, that they were

16   together along with this defendant, Weston Lee Howe,

17   Junior.  And they met up with Mark McDonald in the

18   area of Deeds Park and Helena Avenue area.  And later

19   that evening they met him again in a field at Monument

20   and Findlay Avenue.  And they told you when they went

21   out there, that Weston Lee Howe had hid in the front

22   seat and Walter Polson was hidden in the back seat and

23   Walter Polson had a gun, a 25 caliber Raven, silver or

24   nickel plated gun.  And that this defendant also had a

25   gun a 25 caliber semiautomatic handgun, a Bryco, which

1    was black in color.  They told you they went out there

2    to rob someone.  They go out there.  And testimony was

3    that this defendant shot Mark McDonald three times.

4                         Later that evening they get

5    together again and they talk about going out and

6    robbing a person by the name of Richard Blazer.  They

7    met him earlier in the afternoon, Walter Polson and

8    Tony Elofskey.  The three of them, Tony Elofskey,

9    Walter Polson, and Weston Lee Howe, Junior, went out

10   to 1912 Tennyson Avenue residence.  And while there,

11   in an attempt to rob him, he was killed.  And he was

12   killed by this defendant as he was exiting his house.

13                         Due to the commission of

14   these crimes, this defendant was indicted by the

15   Montgomery County Grand Jury on five specific counts.

16   And as Mr. Slavens told you earlier, the State has to

17   prove and believes has proved beyond a reasonable

18   doubt each and every element of those separate counts.

19                         Weston Lee Howe, Junior, in

20   this particular case, Count One, was indicted and

21   charged with aggravated murder, that count carrying

22   with it a firearm specification.  Count Two -- that

23   particular count is with regard to Mark McDonald.

24                         Count Two, aggravated

25   murder with regard to Richard Blazer.  That count

1    carries with it a firearm specification.

2                        Count Three, aggravated

3    robbery as it relates to Mark McDonald.  That count

4    also carries with it a firearm specification.

5                        Count Four, aggravated

6    robbery.  That counts relates to Richard Blazer.  That

7    also carries with it a firearm specification.

8                        Count Five, aggravated

9    burglary.  That counts relates to Richard Blazer.  It

10   also carries with it a firearm specification.

11                       Count One, aggravated

12   murder.  The State of Ohio has shown beyond a

13   reasonable doubt that in Montgomery County, Ohio,

14   Weston Lee Howe, Junior, on or about June 22d, 1992,

15   did purposely cause the death of Mark McDonald while

16   committing or attempting to commit or while fleeing

17   immediately after committing or attempting to commit

18   an aggravated robbery.

19                       How do we know that?  Well,

20   we know from the testimony that Tony Elofskey, Walter

21   Polson, and Weston Lee Howe, Junior, went to Monument

22   and Findlay Street address with their purpose to rob

23   Mark McDonald.  That was their plan and they did it

24   together.  When we went out there, we know that -- let

25   me strike.  We know that Walter Polson had a 25

1    caliber gun, a nickel plated gun.  We also know that

2    Weston Lee Howe, Junior, had a 25 caliber

3    semiautomatic black Bryco gun.  They get out there and

4    Weston Lee Howe, Junior, shoots Mark McDonald three

5    times.  Shoots him once in the mouth, once in the

6    chest, and once in the hand.  Caused the death of

7    another.

8                        We heard testimony from Dr.

9    Smith that Mark McDonald died from multiple gunshot

10   wounds.  We also heard testimony he retrieved two

11   bullets from his body.  Those particular bullets were

12   compared by Bud Haemmerle, a firearms examiner.  He

13   told you those bullets came from a 25 caliber

14   semiautomatic Bryco, the black gun you saw here as

15   part of evidence.

16                        Aggravated robbery.  Well,

17   there was testimony that Weston Lee Howe, Junior, had

18   on or about his person that black gun after shooting

19   Mark McDonald.  We know that Weston Lee Howe, Junior,

20   chased him down.  We heard testimony that he followed

21   him and chased him.  And after catching him, he took

22   his wallet.  He got 5 dollars, 5 dollars from him.

23   There was also testimony that when he got to him, that

24   his gun jammed and he would have shot him again if

25   that wouldn't have happened.  And you heard testimony

1    that Walter Polson heard a siren and they both ran to

2    get back in the car with Tony Elofskey.  He would have

3    shot him again at that point.  That's purposeful.

4                        Firearm specification.  You

5    heard Bud Haemmerle testify that the 25 caliber Bryco,

6    the black gun, was fully operable.

7                        Count Two, aggravated

8    murder.  On or about June 22d, 1992, in Montgomery

9    County, Ohio, this defendant, which was identified in

10   this courtroom, Weston Lee Howe, Junior, did purposely

11   cause the death of another, Richard Blazer, while

12   committing or attempting to commit or while fleeing

13   immediately after committing or attempting to commit

14   an aggravated robbery.

15                        How do we know that?  Well,

16   the witnesses testified at this stand, Walter Polson,

17   Tony Elofskey, they got together with Weston Lee Howe,

18   Junior, on June 22d, 1992, and they got together at

19   the Valley Street residence and they discussed that

20   they were going to go out to Richard Blazer's house

21   and rob him.  In fact, Weston Lee Howe, Junior said

22   when he got there, he was going to take things of

23   value and sell them.

24                        Weston Lee Howe, Junior,

25   goes out to the residence with Tony Elofskey and

1    Walter Polson and waits outside.  You heard their

2    plan.  They were working together.  Weston Lee Howe,

3    Junior, was to stay outside, the other two guys were

4    to go in.  That's what happened.  Inside is an

5    argument.  Richard Blazer comes out the door following

6    Tony Elofskey, he's shot three times by Weston Lee

7    Howe, Junior, shot three times.  Shot once in the

8    head, once in the chest and once in the right

9    collarbone, all from the right side as he's exiting

10   the door.

11                    And you heard testimony

12   from Dr. Smith that Richard Blazer died from multiple

13   gunshot wounds.  And he extracted three bullets from

14   Richard Blazer's body.

15                    Bud Haemmerle came in and

16   testified and he told you that the three bullets taken

17   from the body of Richard Blazer came from the same 25

18   caliber Bryco semiautomatic handgun that killed Mark

19   McDonald, same gun, his gun, Weston Lee Howe, Junior's

20   gun, while committing or attempting to commit or fleeing

21   immediately thereafter, aggravated robbery.

22                    We know from the testimony

23   that the plan was to go out to Richard Blazer's house

24   and rob him, take things of value.  You heard that from

25   Walter Lee -- Walter Polson and Tony Elofskey.  They

1    told you that.  They were there.  We weren't.  They know

2    what was going on.  Weston Lee Howe told you he was

3    going to take things and sell them -- I'm sorry -- the

4    evidence would show that is what he was going to do.

5    And when he went out there, he had on or about his

6    person a deadly weapon, a firearm.  And you heard

7    testimony from Walter Polson and Tony Elofskey that he's

8    the one that shot and killed Richard Blazer.  He had the

9    gun on him.

10                            This count also carries a

11    firearm specification.  And Bud Haemmerle again came in

12    and testified that the 25 caliber Bryco semiautomatic

13    black handgun is the gun that the bullets from Richard

14    Blazer's body was extracted.  It works.

15                            Count Three, aggravated

16    robbery.  On or about the 22d day of June, 1992, in

17    Montgomery County, Ohio, Weston Lee Howe, Junior, again

18    identified in the courtroom, in attempting or committing

19    a theft offense or in fleeing immediately after such

20    attempt or offense, did have a deadly weapon, a firearm,

21    on or about his person or under his control.  This count

22    relates to Mark McDonald.  And you've heard testimony

23    over and over again that he was there at the Monument

24    and Findlay Avenue area.  And you heard testimony that

25    he had the 25 caliber semiautomatic Bryco black handgun