deliberations. This is an unreasonable application of United States Supreme Court caselaw to suggest that there had to be a specific case demanding a minimal amount of time. Due process requires that the sentencing body is to consider and give an effect to mitigating evidence in imposing sentence. This in effect mandates that a reasonable amount of time be spent in deliberations. Penry v. Johnson, 532 US 782, 784 (2001).

The record reflects that the three-judge panel began penalty phase deliberations at 3:37pm and returned one hour later. See Twenty-Third Ground. This time period was obviously insufficient for the panel to consider and weigh the *seventeen – 17 –* mitigating factors it found *–* more than *any Ohio court had ever found in a capital case*§§. See, e.g., State v. Watson, 61 Ohio St. 3d 1, 572 N.E.2d 97 (1991); State v. Lawrence, 44 Ohio St. 3d 24, 541 N.E.2d 451 (1989). These seventeen mitigators were required to be weighed against the aggravators for each count separately. In order to properly consider and give effect to these seventeen mitigating factors in this multi-count case, the panel must spend a reasonable and adequate amount of time deliberating. Here, it is obvious that the three-judge panel could not have considered and given effect to Mr. Keene's mitigation in one hour. Indeed, the panel clearly failed to give effect to some or all of the mitigating evidence. See Second Ground for Relief, supra.

Given the time reflected in the record, the panel spent no more than a matter of a few minutes finding, considering and weighing the mitigation against the aggravators in each count. This time was insufficient for the panel to rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. Without spending any reasonable amount of time deliberating on each count, the panel could not accurately determine whether death was an appropriate penalty for Mr. Keene.

When a capital defendant is convicted of more than one count of aggravated murder, the death penalty for each count must be assessed separately. State v. Cooey, 46 Ohio St. 3d 20, 544 N.E.2d 895, syllabus three (1989). In this case, one of the three panel judges admitted that the penalty was *not* assessed separately in Mr. Keene's case. Judge Bixler's unrebutted affidavit states that:

> In the deliberations, we did not go through each count of the Indictment and make a determination as to how and whether the mitigation testimony would impact our decision on each Count. Instead, we applied the mitigation evidence to the Indictment as a whole. In other words, we weighed the aggravating circumstances of all the Counts in the indictment collectively, against all the mitigating evidence presented.

Affidavit of Judge Lee A. Bixler, attached to Mr. Keene's Motion for Leave to Conduct Discovery, Doc. 24. This affidavit provides the only plausible reason that the panel completed the deliberations within an hour – it failed to follow Ohio's death penalty scheme. See First Ground for Relief, infra.

Regarding Judge Bixler's Affidavit, reasonable judges would disagree about the effect of any alleged contradictions between his Affidavit and the signed verdict forms. A court could find that this was a failure to follow the Ohio sentencing statutes and as a result a failure of due process. As to the Court's position that no diligence was shown as to why the Affidavit was not obtained sooner, a Court could find that the exception for newly acquired evidence should apply in this instance. Because the nature of the evidence itself is compelling and goes to the heart of the deliberative process, Court could find that this was a violation of the Petitioner's constitutional rights.

The Bixler Affidavit is not hearsay since it is a sworn statement. His recollection of the deliberative process is not hearsay. Even if it were hearsay, due to the inherent reliability of testimony from a judge who actually sat on the panel and was part of the deliberations, it would be

admissible under the residual exception under Fed. Evid. Rule 807. Lastly, the Affidavit of one of the original trial judges would indeed serve as clear convincing evidence that the statutory presumption of correctness is effectively rebutted. This is certainly an issue that the Court of Appeals should entertain as reasonable jurists would disagree with this Court's determination.

## FOURTH GROUND FOR RELIEF

THE TRIAL COURT ERRED BY INTERPRETING OHIO LAW TO REQUIRE A MANDATORY DEATH SENTENCE RATHER THAN DECIDING WHETHER DEATH WAS THE APPROPRIATE PUNISHMENT FOR MR. KEENE, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The three-judge panel's sentencing opinion in this case stated in relevant part that "the law of this State *requires* the imposition of the death penalty upon the Defendant." Keene, No. 92-CR-3469, slip op. *12. Either this was a correct statement, or it was an incorrect statement. If it was a correct statement, then the law of this State is invalid because mandatory death sentences are prohibited under the Eighth and Fourteenth Amendments. Woodson v. North Carolina, 428 U.S. 280 (1976). If it was an incorrect statement, then the panel's mistake in believing and adhering to this proposition prejudiced Mr. Keene.

Mandatory death sentences are prohibited. Woodson, supra. Indeed, the fundamental issue in a death penalty mitigation hearing is whether the particular defendant deserves to be executed for the particular crime. In Mr. Keene's case, he proved the existence of seventeen mitigating factors. Due to errors committed by the three-judge panel, including its refusal to follow Ohio's death penalty statutes, see First, Second, Third Grounds for Relief, supra, this mitigation was not properly considered and weighed. In addition, the panel believed that a death sentence was *required*. Indeed,

20

if the panel's belief was correct, then Ohio's death penalty scheme is invalid. If the panel's belief was erroneous, then this Court should have found that Mr. Keene was prejudiced. An erroneous belief that a death sentence was required surely caused the panel to impose death. In either case, the matter should be subject to appellate review.


**TWENTY-SECOND GROUND FOR RELIEF**

> IN THE EVENT THAT THIS COURT SHOULD FIND THAT THE ROBBERY AND BURGLARY OF MR. WILKERSON AROSE FROM THE SAME ACT OR INDIVISIBLE COURSE OF CONDUCT, THEN THE TRIAL COURT ERRED BY REFUSING MR. KEENE'S REQUEST TO MERGE THESE CAPITAL SPECIFICATIONS, THUS ARTIFICIALLY INFLATING THE NUMBER OF AGGRAVATING CIRCUMSTANCES IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.[3]

Mr. Keene argues that reasonable jurists could conclude that a failure to merge capital specifications, as discussed below, was so arbitrary and capricious as to constitute an independent due process violation or an Eighth Amendment violation. Lewis v. Jeffers, 497 U.S. 764, 774 (1990). In his Twentieth Ground for Relief, Mr. Keene addressed the errors that resulted from charging him with "robbery and/or burglary" in regard to the death of Mr. Wilkerson. One of the errors that arises from such an indictment is that it deprived Mr. Keene of a unanimous verdict. Assuming *arguendo* that this Court were to find that there was no deprivation of the right to a unanimous verdict, then the capital specifications for robbery and burglary should have been merged together instead of being weighed in favor of death twice.

---

[3] This Ground for Relief was asserted as an alternative to Petitioner's Twentieth Ground for Relief in the event that Ground were procedurally defaulted.

Mr. Keene was indicted on two counts of aggravated murder in connection with the death of Joseph Wilkerson. Count Three charged Mr. Keene with killing Mr. Wilkerson with prior calculation and design in violation of O.R.C. sec. 2903.01(A). Count Four charged Mr. Keene with committing a purposeful killing in the course of a "burglary and/or robbery" in violation of O.R.C. sec. 2903.01. The State elected to merge Count Three into Count Four, and therefore, only the felony murder (Count Four) remained. Jt. Ap. 876.

The State also used the allegations of robbery and burglary as capital specifications pursuant to O.R.C. sec. 2929.04(B)(7) in regard to both aggravated murder counts for Mr. Wilkerson. However, it charged the robbery and burglary as separate aggravating circumstances in separate capital specification counts. Jt. Ap. 14, 41. Therefore, unlike the felony murder charge, the capital specifications did not employ the improper "and/or" conjunction. Mr. Keene moved to have the robbery and burglary merged for sentencing purposes, but this request was denied by the trial court. Jt. Ap. 512.

Assuming *arguendo* that this Court rejects the unanimity argument of the Twentieth Ground for Relief, and finds that Mr. Keene was not deprived of a unanimous verdict because the robbery and burglary of Mr. Wilkerson were a single act or course of conduct, then clearly, they should have been merged under the rule in Jenkins v. State, 15 Ohio St. 3d 164, 197, 473 N.E.2d 264 (1984). By failing to merge the capital specifications as Mr. Keene requested, the number of aggravating circumstances for Mr. Wilkerson's homicide were increased from two to three, thus impermissibly tilting the proceedings in favor of death. Any procedure which biases the outcome of a capital sentencing hearing in favor of death cannot survive constitutional scrutiny. Sumner v. Schuman, 483 U.S. 66 (1987); Roberts v. Louisiana, 428 U.S. 325 (1976). Furthermore, a death sentence that is

based even in part upon an invalid aggravating circumstance must be reversed since the sentencer's

deliberations were skewed.  Johnson v. Mississippi, 486 U.S. 578 (1988); State v. Penix, 32 Ohio

St. 3d 369, 513 N.E.2d 744 (1987).  An appellate court could reasonably disagree with the outcome

issued by this Court.


## TWENTY-THIRD GROUND FOR RELIEF

**WHEN AN ERROR IN THE TRIAL RECORD IS BROUGHT TO THE ATTENTION OF THE TRIAL COURT AND THE TRIAL COURT DENIES A MOTION TO CORRECT THE RECORD, A CAPITAL APPELLANT IS DENIED HIS RIGHTS TO DUE PROCESS OF LAW, AN ADEQUATE APPELLATE REVIEW, AND A RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A valid means of avoiding arbitrariness and capriciousness in sentencing in capital cases, is

a thorough and functional review system.  *See,* Zant v. Stephens, 462 U.S. 862, 876 (1983).  Absent

a thorough review system to ensure the reliability of the sentencing procedure, capriciousness and

arbitrariness is inevitable.  The record inaccurately reflects the actual time that the panel spent in

deliberations.  The record reflects that the panel retired to deliberate at 3:37 p.m. and returned with

its verdicts at 4:55 p.m. On December 21, 1994, counsel for Mr. Keene filed a Motion to Correct the

Record in the trial court.  Attached to the Motion was an Affidavit from trial counsel, Michael

Monta, which stated that although the record reflected that the panel returned from deliberations at

4:55 p.m. the same day, the panel actually returned from deliberations at 4:40 p.m. (Jt. Ap. Vol. VII,

p.3030).  The Trial Court denied the Motion.  (Jt. Ap. p.3041).  By failing to require that the record

be corrected, the Ohio courts failed to meet their responsibilities required by Ohio R. App. P. 9(E)

and the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution

and the matter should be subject to appellate review.


**FIFTH GROUND FOR RELIEF**

> **THE PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN A TRIAL COURT REFUSED TO PERMIT DISCOVERY AND A HEARING UPON THE PRESENTATION OF SUFFICIENT EVIDENCE OF SELECTIVE PROSECUTION IN MONTGOMERY COUNTY.**

To obtain discovery one must show discriminatory intent and effect to selectively prosecute

on the basis of race. McCleskey v. Kemp, 481 US 279 (1987); United States v. Armstrong, 517 US

456, 465 (1996). The Petitioner had to make a "credible showing" that similarly situated individuals

of a different race were not prosecuted. Id. at 645. Petitioner Keene maintains that federal law was

not properly applied. Mr. Keene has cited the case of State of Ohio v. Weston Lee Howe, 92 CR

1673 (Montgomery County, 1993) as well as the case of State of Ohio v. Heather Matthews as

support for his position. Both the state and federal courts have improperly applied this precedent

by finding that these cases were not similarly-situated to Petitioner Keene's case. The misapplication

involved an extremely narrow construction of the precedent. The courts have mistakenly concluded

that the Petitioner's case needed to be exactly the same as all the other defendants' cases when in fact

the cases only needed to be similar in all relevant respects. There was more than sufficient evidence

for the Montgomery County Prosecutor to indict Howe's co-defendants, Polson and Elovsky, for

capital murder based upon the fact that two individuals were shot and killed. Neither defendant was

indicted despite the fact that they were part of a plan or scheme which ultimately resulted in murder.

Reasonable minds could differ as to whether or not this was "some evidence" which warranted

discovery. A lesser burden is required for Defendants seeking discovery under these circumstances. United States v. Carron, 541 F.Supp. 347, 350 (W.D.N.Y.1982).

There was also an equal protection and due process violation in the refusal to grant a hearing on selective prosecution. A hearing on the prosecutor's intent would have induced additional evidence on the issue of whether the Montgomery County Prosecutor intended to utilize race in the prosecution of defendants. There was an unreasonable application of the US Supreme Court authority of Batson v. Kentucky, 476 US 19, 94 (1986), which requires only that the totality of the relevant facts rise to an inference of discriminatory purpose.

A defendant is entitled to a hearing on a claim of prosecutorial discrimination if he presents "sufficient facts to take the question past the frivolous state and raises a doubt as to the prosecutor's purpose." United States v. Hazel, 696 F.2d. 473, 475 (6th Cir. 1983). Moreover, due process requires that when confronted with a claim of racial discrimination by a prosecutor, a court must undertake "a sensitive inquiry into the circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 US 252, 266 (1977). As a result of the fact that courts could disagree over the application of this precedent, these issues should be presented to the Court of Appeals.

25

## SIXTH GROUND FOR RELIEF

THE TRIAL COURT ERRED BY FAILING TO GRANT MR. KEENE'S MOTION TO DISMISS THE CAPITAL INDICTMENT AGAINST HIM ON THE BASIS OF THE MONTGOMERY COUNTY PROSECUTOR'S DEMONSTRATED RACIAL BIAS IN SEEKING THE DEATH PENALTY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Mr. Keene presented evidence to the Ohio courts that the Montgomery County Prosecutor:

1) has sought the death penalty almost twice as many times against African-Americans than against whites;

2) has jurisdiction over a county that is only 17% African-American, but has returned 64% of capital indictments against African-Americans;

3) did not seek the death penalty against white defendants who only a year prior to Mr. Keene's case were accused of crimes virtually identical to Mr. Keene's, involving multiple defendants who allegedly murdered, robbed, and burglarized multiple victims during a "killing spree"; and

4) originally did not seek the death penalty against Mr. Keene's only white co-defendant, then after amending the indictment to include capital specifications, dismissed them in a plea agreement, while at the same time refusing to even negotiate with the African-American defendant.

Jt. Ap. 350.

The most important limit upon a prosecutor's charging discretion is basing a choice of whom to prosecute upon "impermissible factors" such as race or religion. Wayte, 470 U.S. at 607, citing Oyler v. Boles, 368 U.S. 448, 456 (1962), in violation of the Fourteenth Amendment. A death sentence which is based on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as ... the race ... of the defendant" violates the Eighth Amendment as well. Zant v. Stephens, 462 U.S. 862, 885 (1983). Due process requires that when confronted with a claim of racial discrimination by a prosecutor, the court must undertake "a sensitive inquiry into

the circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977).

Circumstantial evidence of invidious intent such as that referenced above, may include proof of disproportionate impact. Batson v. Kentucky, 476 U.S. 79, 93 (1986). Circumstantial evidence "may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." Washington v. Davis, 426 U.S. 229, 242 (1976). The Court was critical of the use of statistics, however, the Supreme Court recognized the use of statistics in McCleskey, 481 U.S. 279, 286-289. Mr. Keene, also presented the trial court with the specific capital indictment record of the Montgomery County Prosecutor, as well as evidence that this demonstrable racial bias played a role in deciding to seek the death penalty in his particular case. Courts could disagree as to whether there was sufficient evidence warranting the dismissal of the indictment.

The Court reviewed the Eighth and Tenth Grounds for Relief together and as such, they are discussed together here.

## EIGHTH GROUND FOR RELIEF

**THE TRIAL COURT ERRED IN FAILING TO GRANT PETITIONER'S MOTION FOR CHANGE OF VENUE, EFFECTIVELY FORCING HIM TO INVOLUNTARILY WAIVE HIS CONSTITUTIONAL RIGHT TO A JURY TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The avalanche of pre-trial publicity was palpable. Some examples of the newspaper articles

run in the Dayton Daily News[4] are as follows:

January 10, 1993: "They told me that Marvellous (Keene) shot the man in his head and Laura (Taylor) shot him in the stomach," Gomez said. Keene handed here what looked like a 9mm handgun, she said. Police never recovered a 9mm but said the guns they found could be mistaken for such a weapon.

December 30, 1992: A gang member who has asked not to be identified and remains in hiding says Keene talked about his brother after he had been drinking. "He just wanted to take revenge on people because of his brother's killing. It was all the anger built up inside," she said. "He made you scared of him because you didn't know if he was going to shoot you or not. He was always bragging and always showing off his guns."

December 30, 1992: Marvellous Keene...sought vengeance after his brother was shot in an attempted robbery... "He could not deal with his brother's death and vowed revenge at his brother's viewing," said a 20-year-old family friend who asked not to be identified. Keene's mother, Bernice Parker, agreed.

January 10, 1993: Neighbors described Keene as a quiet, dangerous type who could make people turn from his path with just a glare. "Keene always carried three guns underneath his thick, goose-down jacket," Gomez said. "He said if one ran out of bullets, he'd have the other one. 'If one don't shoot, I have another one,'" Gomez quoted him as saying. "He said he had different guns for different jobs."

January 10, 1993: "But they wanted to be gangsters and if you're a gangster you got to do what gangsters do – kill people," a source close to the case said. "These kids are not crazy. They knew exactly what they were doing. They went out to kill people during robberies."

---

[4]It should be noted that the television coverage of Mr. Keene was just as damaging and prejudicial as the newspaper coverage.

January 10, 1993: "It was like, 'Guess what. Here's my daily schedule, I killed somebody....' They killed some because they didn't have enough money. They killed one for her shoes, killed one 'cause she only had 50 cents, done another guy 'cause he was reaching for his glove box. They killed another guy for his car."

January 10, 1993: *Dayton Daily News* pressman Earl Harris ...was with [Washington] a week before Christmas. "Marvin said, 'These guys put a gun to my head and were going to kill me,'" Harris recounted. "He said he knew some people going around killing people for the fun of it. Marvin said they had been doing this for a while. He said he was scared...The day Washington left was the last time Harris saw him.

January 10, 1993: Mathews and other friends then told how they shot several people and planned to kill more. Gomez [a former gang member], in retelling the incident described a startling holiday scene where her friends, barely pausing between mouthfuls of turkey and collard greens, detailed their brutal crimes.

January 10, 1993: That night, Danita Gullette, an 18-year-old mother...was calling a girlfriend from a pay phone...when Mathews, cruising with the group...eyed Gullette's expensive tennis shoes...Someone in the car shouted: "Merry Christmas, b-----," and fired 11 shots, prosecutors say. The tennis shoes were pulled from Gullette's bloody body. At the Christmas Day dinner, Mathews bragged about her new Filas.

January 10, 1993: Some of the members headed to Wilkerson's house, where they drank cheap wine all night. Wilkerson's corpse still lay tied to a bedpost in his bedroom. The gang broke up the party to murder again.

December 29, 1992: As of late Tuesday afternoon, a young woman from a drug-laden Yuma Place project where Jeffrey Wright was shot four times was claiming she wanted Keene to brutally enact the shooting.

In addition, there were repeated articles referring to Mr. Keene as being a member of a gang. However, there was not a shred of admissible evidence linking him to a gang and indeed the prosecution at no point relied upon such a theory. This also added to the mountain of adverse and prejudicial pretrial publicity. As if these damaging pretrial representations by others (including his own mother, presupposing his guilt) were not enough, Mr. Keene was publicly psychoanalyzed by professionals on the front page of the *Dayton Daily News*:

"Now Keene is getting his first view from inside a jail cell. Dayton psychologist Dr. Michael Williams, who specializes in violence among young black men, said Keene may have been attracted by the power of guns and the mistique of the gangs he saw in California. "So he begins to take on the trappings of a villainous alter ego that he feels gives him status and recognition. The other three folks he ended up going with on this murderous spree were people who supported him."

Though the victims in the Christmas killing had nothing to do with Maurice Keene's death, psychologists and family members say it may have been Keene's answer to his bottled-up grief.

"It's possible that sending him away did not put any resolution behind his brother's death," said Ozell Early, a counselor at Nicholas Residential Treatment Center for Youth. "Even a year and a half later he could have been angry and thinking: 'Somebody has to pay for this.'"

Family members of victims of the crime were portrayed in the media and interviewed as well:

"There is nothing to justify my sister being shot down like a dog," said Richard Gullette, brother of victim Danita Gullette. "It's scary that there are people out there who just killed for the joy of it."

Solomon Abraham talks about his sister, Sarah, shot in the mouth after she was robbed..."She already had given them everything she had, but they still shot her. This wasn't for money. It was for blood. For the thrill..." His voice wavered and his brother clutched his shoulder to give support...His sister...had three young children... "I came here to see who these people are. To see who could do something so brutal," Solomon Abraham said. According to an account in the *Dayton Daily News*, in Courtroom 4B...the families of victims in what may be the most heinous crime rampage in the history of the city sat in nightmarish shock...Some held hands, come sobbed, some literally wreched in anger and anguish. One woman held photographs of her dead brother in trembling hands. Another man say praying for his dying sister and the three young children she left at home.

The following quotes, attributed in part to law enforcement officers or the prosecution, were

also printed in the *Dayton Daily News* on the dates noted:

December 29, 1992: "They weren't remorseful at all – just mad we stopped them before they could kill the others," a Dayton investigator said. "They even gave us the names of the other people they were going to kill."

December 30, 1992: He has been a police officer 23 years, a homicide detective six. "This is the worst I've ever seen," he said as he stood outside the courtroom. "People talk about Sammy Moreland, but there is no comparison." (He was referring to the man who killed two women and three children in an Ardmore Avenue home in 1985.)

"Sammy Moreland was a child compared to these kids...He killed all those people in one setting...These people killed over and over and over. These are some bad people. The community has to be shocked and afraid at the same time. The extent of the brutality is hard to fathom. Look at all these people standing here who have been hurt. The crime wave is truly a disaster to hit our city. And it is something the whole community has to come together on in order to cope with. We've got to pull together because you can't candy-coat what has happened." (Emphasis added.)

January 30, 1993: [The prosecutor] stopped short of deeming Keene the ringleader in the murders but said, "He is certainly an active participant in all of them." (Emphasis added.)

December 29, 1992: Shortly after their arrest, four Dayton murder suspects told police they were on their way to kill three more people.

December 29, 1992: [The police chief] "said he suspects that after the first slaying, the killing became easier."

December 29, 1992: Police say greed spurred the four to rob last Thursday, but they don't know how they went from that to a killing rampage that ranks as one of the city's worst.

December 30, 1992: A third gang member is recovering from four bullets pumped into him by one of the accused, police say...Police say no one served as a ringleader, and they all conspired to kill.

January 10, 1993: Seconds after [a Dayton Police sergeant] pulled behind the Grand Am, he saw Keene, Smith, Mathews and Taylor jump inside the Dodge Shadow and pull away. When he pulled his cruiser behind them, lights flashing, Smith jumped out of the car, weapon in hand, and ran to a house. Keene pulled over. "Heather looked high, Laura cried and Keene was mellow," [the police sergeant] said later.

Mr. Keene's former pastor was quoted with an alleged incriminating admission which was

printed in the *Dayton Daily News*:

At first, Keene was reluctant to face his pastor, who visited him in the jail. Then he sought forgiveness. "He seems to be regrettable [sic] and sorry," Jones said. "He's

31

promised to send me and the church a letter. He realizes what he has done and what
he is facing..."

The United States Supreme Court has held that the Fourteenth Amendment Due Process
Clause safeguards a defendant's Sixth Amendment right to be tried by "a panel of impartial,
"indifferent" jurors." Irvin v. Dowd, 366 US 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed. 2d. 751 (1961).
The requirement of impartiality includes the entire atmosphere in which a trial is conducted. Moore
v. Dempsey, 261 US 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923). In a case where there is a question as
to the fundamental fairness of a defendant's trial due to pre-trial publicity in the form of either
"presumed prejudice, or "actual prejudice, due process requires the trial court to grant a defendant's
motion for a change of venue. Rideau v. Louisiana, 373 US 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.
2d. 663 (1963). Prejudice is presumed from pre-trial publicity when it is sufficiently prejudicial and
inflammatory and it's saturated to the community where the trial is held. Rideau, *supra*, 373 US at
726-27, 83 S.Ct. at 1644, 45; Murphy v. Florida, 421 U.S. 794 at 798-99, 95 S.Ct. 2031 at 2035
(1975). There were also repeated articles referring to Mr. Keene as being a member of a gang. No
such evidence was adduced at trial. Nevertheless, this would be obviously prejudicial to a potential
pool of jurors. There is even a quote from Mr. Keene's former Pastor, which ran in the Dayton Daily
News:

> At first, Keene was reluctant to face his Pastor, who visited him in the
> jail. Then he sought forgiveness. "He seems to be regrettable [sic]
> and sorry," Jones said. "He's promised to send me and the Church a
> letter. He realizes what he has done and what he is facing..."

There was also television coverage of Petitioner Keene that was just as damaging and prejudicial as
the newspaper coverage.

32

The Trial Judge made it clear that he intended to defer ruling on a change of venue until *voir dire* had been completed which in effect constructively denied Mr. Keene's Motion and his right to a fair trial in view of the intensity and prejudicial quality of the pre-trial publicity.  Mr. Keene was thereupon forced to select a three-judge panel for his jury trial as opposed to having a jury of his peers in a locale that was not saturated with adverse pre-trial publicity.  Even the U.S. Supreme Court has stated "it is true that judges, too, are human."  Cox v. Louisiana, 379 US 559, 565, 85 S.Ct. 476, 481, 13 L.Ed. 2d. 487 (1965).  Judges themselves can also be affected by adverse pre-trial publicity against the Defendant.  Reasonable jurors could disagree as to whether or not the Court engaged in an unreasonable application of the US Supreme Court standards governing change of venue in the face of this mountain of adverse pre-trial publicity.


## NINTH GROUND FOR RELIEF

**THE TRIAL COURT ERRED IN FAILING TO SUPPRESS IDENTIFICATION OF MR. KEENE WHEN THE IDENTIFICATION PROCEDURES EMPLOYED IN THE CASE AT BAR WERE SO UNDULY SUGGESTIVE AS TO GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION IN VIOLATION OF MR. KEENE'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

An identification occurred which was made by witness Kathie Henderson.  Photographs of individuals who physically resembled Mr. Keene were shown to her by Dayton Police.  Ms. Henderson had referred to the "box style" haircut of Mr. Keene.  This is a distinctive hairstyle.  The Dayton Police should have shown Ms. Henderson photographs of other African-American males with a similarly distinctive hairstyle in order to comply with constitutional mandates.  This did not

happen and Mr. Keene was identified, not so much because he was an eyewitness but because he was the only person with a box haircut in the photo array.

The U.S. Supreme Court has held that a lineup or photo array implicates a defendant's right to due process when it is suggestive causing a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 US 377, 384, 88 S.Ct. 967, 971, 19 L.Ed. 2d. 1247 (1968). Eyewitness identification has inherent weaknesses and possesses the potential to cause miscarriages of justice. United States v. Wade, 388 US 218 (1967). "[T]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors then all other factors combined." Id. at 229. Here, the Court did not apply any federal precedent but relied upon the Ohio Supreme Court's determination that because there was other evidence identifying Mr. Keene and that that Court also reasonably applied United States Supreme Court precedent that there was no basis for disturbing the Ohio Supreme Court's decision in federal habeas corpus. However, because there were constitutional issues raised with all of the other evidence produced against Mr. Keene, the Court should have engaged in a constitutional analysis of this ground. It is reasonable to assume that reasonable minds would differ as to the application of the above-referenced federal standards to this fact pattern and as such an appeal on this ground for relief should go forward.

34

## TENTH GROUND FOR RELIEF

**WHEN A TRIAL COURT IS AWARE OF A CAPITAL DEFENDANT'S PROPENSITY TO ACQUIESCE TO AUTHORITY FIGURES, IT IS ERROR TO ACCEPT A JURY WAIVER AND PERMIT A CAPITAL TRIAL TO PROCEED BEFORE A THREE JUDGE PANEL, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A reviewing Court is to seek persuasive evidence of a knowing, intelligent, and voluntary waiver. Humphrey v. Cady, 405 US 504, 517 (1972); Patton v. United States, 281 US 276, 313 (1930). Based upon the examination of Dr. Eugene Cherry, who produced undisputed expert testimony regarding Mr. Keene's ability to act with the requisite knowledge for a proper waiver, it was an unreasonable application of the above authorities to conclude that Mr. Keene's waiver was knowing, intelligent or voluntary. The following colloquy occurred with the Petitioner regarding his right to trial by jury:

| | |
|---|---|
| THE COURT: | First of all, do you understand that you are entitled to have your case tried to a jury of twelve people? |
| MR. KEENE: | Yes, sir. |
| THE COURT: | Do you understand that in that event you could not be convicted of any one or more of these charges unless all twelve jurors were to agree on your guilt? |
| MR. KEENE: | Yes, sir. |
| THE COURT: | Now, you have the right under the statutes and the Constitution of the State of Ohio to waive or give up that right by jury [*sic*] and have your case tried to a court consisting of three judges. Do you understand that? |
| MR. KEENE: | Yes, sir. |
| THE COURT: | Now, after your discussion with your attorneys, do you understand that this is a constitutional as well as a statutory |

35

right to trial by jury?

MR. KEENE:          Yes, sir.

THE COURT:          And * * * you fully understand this right?

MR. KEENE:          Yes, sir.

THE COURT:          And you have discussed this with your attorneys on more
                    than one occasion, I'm sure. Is that right?

MR. KEENE:          Yes, sir.

THE COURT:          And after giving careful consideration to it, is it your
                    Desire to waive--and again by that I mean give up your
                    right to trial by jury and proceed before a three-judge
                    panel?

MR. KEENE:          Yes, sir.

THE COURT:          Do you understand that the panel will consist of the
                    Court—this Court * * * and two other judges to be designated
                    by the Chief Justice * * * ?

MR. KEENE:          Yes, sir.

After Mr. Keene signed the waiver form, the trial judge then continued:

THE COURT:          Before the Court accepts these waivers, Mr. Keene, has anyone
                    promised you anything in order to get you to give up that right?

MR. KEENE:          No, sir.

THE COURT:          Has anyone threatened you or otherwise brought pressure upon
                    you, twisted your arm, to get you to give up that right?

MR. KEENE:          No, sir.

THE COURT:          * * * I understand, therefore, that it's under careful consideration,
                    consultation * * * with your attorneys that you feel it is in your best
                    interests to proceed in this manner?  * * *

36

MR. KEENE:          Yes, sir.

The Court held that there was no clearly established federal law requiring a criminal defendant to have a change of venue motion decided by the trial court prior to the time the defendant makes a decision as to whether to waive his jury right. Nevertheless, there was an unreasonable application of the U.S. Supreme Court cases. With regard to the acceptance of the waiver of jury trial, the Court found that the Ohio Supreme Court's findings and conclusions were consistent with clearly established federal law and that Mr. Keene's mental impairment was not sufficient basis for impeaching his waiver. Based upon the information cited above, and the testimony of Dr. Cherry, a panel of the Court of Appeals would conclude that the Petitioner could not have knowingly, intelligently or voluntarily waived his constitutional right to a jury trial.

## ELEVENTH GROUND FOR RELIEF

**THE TRIAL COURT ERRED WHEN IT FAILED TO SUPPRESS THE STATEMENTS OF MR. KEENE TO THE DAYTON POLICE DEPARTMENT BECAUSE THE STATEMENTS WERE INVOLUNTARY AND MR. KEENE DID NOT MAKE A KNOWING AND INTELLIGENT WAIVER OF HIS RIGHTS. THE TRIAL COURT'S ACTION DENIED MR. KEENE HIS RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

With regard to this Ground for Relief, the Petitioner maintains that the United States Supreme Court authority in Miranda v. Arizona, 384 US 436, 467 (1966) was not properly applied. This authority mandates that custodial interrogations are inherently coercive and as a result to protect the Fifth Amendment privilege against self-incrimination, there are procedures by which officers are

37

to apprise defendants of their rights. The <u>Miranda</u> warnings require the police to inform a suspect of his rights not to talk to the police, to have a lawyer present, and to inform him that his statements can be used against him. A waiver of these rights must be voluntary, knowing and intelligent. Id., 384 U.S. at 444. In this case, there was testimony that Mr. Keene could not have possibly understood the waiver form that was used. Dr. Eugene Cherry, Ph.D., a Clinical Psychologist, testified as to the confusion inherent in the form. The form had two parts, an acknowledgment of one's rights and a waiver of rights. However, there was only one place for the accused to sign on the form-under the waiver. Pre-trial Tr. 172-173 (7-3-93 Hrg.). Reasonable jurists may disagree over whether this fact rendered the statements as voluntarily, intelligently and knowingly made.

There are also questions regarding possible coercive tactics utilized by the Dayton Police. Mr. Keene was taken to the Police Department and placed in a small room where he waited. He testified that no one advised him of his <u>Miranda</u> rights. Pre-trial, Tr. 187 (7-3-93 Hrg.). Dr. Cherry also offered undisputed testimony that Mr. Keene, who was 19, was naive and immature. He lacked the mental capacity to make a voluntary statement because he is a passive, dependant type who complied with what others around him wished to do and that he was suffering from serious depression and also may have been alcohol dependant at the time he was interrogated. Pre-trial Tr. 246 (7-3-93 Hrg.). There was also evidence that he was intoxicated and under the influence of drugs at the time of the arrest. <u>Id</u>. 186. There was evidence of trickery used by the police officers as they assured him if he answered their questions they would let the prosecutor know that he had cooperated with them. <u>Id</u>. No one advised Mr. Keene that he was entitled to an attorney and he was denied use of the restroom facilities for seven hours. <u>Id</u>. 52. Reasonable courts could disagree as to the voluntariness, intelligence and knowledge of the waiver.

38

The Court analyzed the Twelfth, Fifteenth, Sixteenth, and Eighteenth grounds together as Trial Court errors. They will be discussed together below.


## TWELFTH GROUND FOR RELIEF

> **THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OVER OBJECTION WHEN THE STATE FAILED TO SHOW THAT PHYSICAL EVIDENCE OFFERED AT TRIAL WAS IN SUBSTANTIALLY THE SAME CONDITION AS IT WAS AT THE TIME OF THE CRIME. THE ADMISSION OF SUCH EVIDENCE VIOLATED MR. KEENE'S RIGHTS TO DUE PROCESS, A FAIR TRIAL AND A RELIABLE VERDICT UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNTIED STATES CONSTITUTION.**

Here, the argument was that the admission of a pair of Fila gym shoes was improperly admitted because a proper chain of custody was not established by the prosecution. The Fila gym shoes were allegedly introduced as evidence that they belonged to one of the victims, Danita Gullette. Detectives Lawson and Pearson conflicted between each other as to who marked the shoes as evidence. Detective Lawson testified that he marked the shoes and then gave them to Detective Burke. Tr. 1181-1182. After Detective Lawson was informed by counsel that he had not given the shoes to Burke, Detective Lawson changed his story and said he had given the shoes to Detective Pearson. Id. 1182. Detective Pearson, however, testified that he had found the shoes lying alone and unattended, unmarked on his desk and that he marked the shoes himself. Id. 869. Detective Pearson pointed out his initials and date on the shoes. Id. Because the Ohio Supreme Court found that there was other overwhelming evidence of Mr. Keene's guilt and the fact that a problem in the chain of custody goes to the weight of the evidence and not its admissibility, it held that the Court's decision was consistent with federal mandates. However, reasonable jurists could disagree because there were constitutional problems with the other items of evidence as has been explained prior in this

brief and as will be explained in subsequent sections of this brief. If such is the case, and there will

have to be a re-weighing of the evidence against Mr. Keene. One can reasonably conclude that the

Fila gym shoes were improperly admitted as evidence and that this evidence was inconsistent with

the federal guarantees to due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).


## FIFTEENTH GROUND FOR RELIEF

> THE TRIAL COURT ERRED BY ALLOWING THE STATE TO
> REPEATEDLY INTRODUCE OTHER ACTS EVIDENCE AT MR. KEENE'S
> TRIAL, AND THUS DENIED HIS RIGHTS TO A FAIR TRIAL, DUE
> PROCESS AND A RELIABLE DETERMINATION OF HIS GUILT AND
> SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND
> FOURTEENTH AMENDMENTS TO THE UNITED STATES
> CONSTITUTION.

Similar to the Twelfth Ground for Relief, the constitutional guarantees to a fair trial

consistent with due process must be present. Donnelly, supra. A trial error that infects the trial with

such unfairness results in a constitutional violation. Id. Mr. Keene maintains that an unlawful

inference of guilt by association was permitted by evidence surrounding the murder of Richmond

Maddox by Laura Taylor. Also, improper evidence was admitted concerning the attempted murder

of Jeffrey Wright by DeMarcus Smith. In addition, plans to rob people, a shooting, a linkage to

personal effects of two murdered persons, the Fila gym shoes, and the stolen automobile of Joseph

Wilkerson were also improperly admitted. Co-Defendant DeMarcus Smith shot Heather Matthews'

ex-boyfriend, Jeffrey Wright, after they had an argument. Matthews also was permitted to testify

about the group's alleged plans to rob a variety of people. Nicholas Woodson was permitted to

testify that he and Mr. Keene intended to rob and shoot at a man. Mr. Keene was not charged with

any of these alleged incidents. The State did not identify the alleged individuals or offer their

testimony in court. The discussion of the FILA gym shoes was not relevant to any portion of the trial. It was alleged that the shoes were taken from Danita Gullette and found on DeMarcus Smith. However, DeMarcus Smith was not on trial. Lastly, Nicholas Woodson was permitted to testify about how he was stopped by the police and taken to the police department for driving Joseph Wilkerson's stolen vehicle. Tr. 662-666.

These activities occurred outside Mr. Keene's presence and had nothing to do with the crimes he was alleged to have committed. Evidence admitted that is outside the record runs counter to the basic concept of fairness if it prejudices a Defendant and invites conviction. United States v. Grossman, 400 F.2d. 951, 956 (4th Cir. 1968). As noted above, these admissions of evidence so infected the trial with unfairness so as to result in a denial of due process. Donnelly, supra. Reasonable judges may disagree as to the weight of the other evidence properly admitted. For instance, Courts may disagree that the statements issued by Petitioner Keene were inadmissible and as such there would not be overwhelming evidence of guilt in which case the admission of the improper other acts evidence would have had no effect on the trial. As a result, this matter should be subject to review on appeal.

## SIXTEENTH GROUND FOR RELIEF

**THE INTRODUCTION OF REPEATED INSTANCES OF VICTIM IMPACT TESTIMONY DURING THE CULPABILITY PHASE VIOLATED OHIO REVISED CODE §2943.041 AND 2945.07 AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The prosecution offered the testimony of Angela Martin to testify how close a relationship she had with victim Danita Gullette. Michael Abraham, victim Sarah Abraham's brother, testified

41

in detail about his sister's marital status, the number of brothers and sisters in the family and the ages of her children. Tr. 504-505. Mr. Abraham testified that one of Sarah's children now had to live with one of Sarah's other brothers. Id. 505. Mr. Abraham also testified about his visit to the hospital and his conversation with a priest and the fact that Ms. Abraham was on life-support. He discussed the painful experience of terminating her life-support. Id. 512. Joseph Wilkerson's sister testified about Mr. Wilkerson's going home to see his sister's baby. Id. 338. There was also testimony from Pamela Peary, a neighbor of Joseph Wilkerson, who testified that he came to her house after he got off work on December 23 to bring her grandson a Christmas gift. Tr. 310.

Victim impact testimony is not permitted in any case except those specifically listed in the Ohio Revised Code. Although the Court cites to <u>Payne v. Tennessee</u>, 501 US 808, 827 (1991) for the proposition that if a state chooses to permit the admission of victim impact evidence in prosecutorial argument on that subject, the Eighth Amendment erects no bar *per se*. However, in <u>Booth v. Maryland</u>, 482 US 496 (1987) the Supreme Court held that the introduction of victim impact evidence during the penalty phase of a capital trial is constitutionally impermissible. Id. at 502.; *reaffirmed*, <u>South Carolina v. Gathers</u>, 490 US 805 (1989), overruled in part by <u>Payne v. Tennessee</u>, *supra*. Although <u>Booth</u> and <u>Gathers</u> were overruled in part by <u>Payne v. Tennessee</u> which held that victim impact evidence is not categorically barred by the Eighth Amendment, the <u>Payne</u> Court expressly pointed out that in both <u>Booth</u> and <u>Gathers</u> exclusions of victim statements about the crime, the Defendant's character, and the appropriate sentence to be imposed remain.

> Our holding today is limited to the holdings of <u>Booth</u>...and <u>Gathers</u>...that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. <u>Booth</u> also held that the admission of a victim's family members' characterizations and opinions about the

42

crime, the Defendant, and the appropriate sentence violates the Eighth
Amendment. ...Id. at note 2. (citations omitted).

Thus, giving characterizations and opinions about the crime and the appropriate punishment in a

capital case are still violative of the Eighth Amendment. Also, Payne allows certain impact

testimony at the sentencing hearing, not at the culpability phase as occurred in this case.

The Court relied upon the procedural default rule and held that because contemporaneous

objections were not made to the testimony of Mr. Abraham, Mr. Wilkerson's sister, or for Ms. Peary,

they were waived. The Court ruled that Ohio's contemporaneous objection rule is an "adequate and

independent" state ground for purposes of procedural default analysis. The Court held that even if

Mr. Keene were able to establish the cause requirement that he cannot establish the prejudice

requirement. Mr. Keene disagrees, and maintains that reasonable judges could also hold that the

contemporaneous objection rule was not regularly enforced and was not an adequate and

independent ground justifying foreclosure of federal review. Even if it were, a ruling could be made

that cause and prejudice exist and that a finding of procedural default would result in a miscarriage

of justice.

The Court maintains that it was reasonable for the prosecutor to introduce Mr. Abraham's

testimony for the purpose of establishing elements of the crimes and could be construed as other than

victim impact testimony. However, a reasonable jurist could argue that the testimony was designed

for victim impact and not for purposes of establishing elements of the crimes. Similarly, with regard

to the testimony of Ms. Oxendine, the Court maintains that this testimony was offered for another

purpose i.e. establishing the commission of the crimes against Mr. Wilkerson and the discovery of

the crime as well as for linking Mr. Keene to the aggravated robbery, aggravated burglary, and the

killing of Mr. Wilkerson. Once again, a reasonable jurist can disagree and find that the intent was to introduce victim impact testimony and not for these legitimate purposes.

The testimony of Ms. Peary, the Court argues, was to establish a timeline with respect to the crimes committed against Mr. Wilkerson. However, reasonable minds can disagree on this issue and maintain that this was solely for victim impact. Even if there were a proper purpose, the fact that an improper purpose were mixed in with a proper purpose would render the testimony prejudicial and subject to constitutional error.

Lastly, the testimony of Ms. Martin with regard to the jacket Ms. Gullette was wearing at the time of the crimes could be reasonably interpreted as victim impact testimony and not being introduced for the alleged proper purpose of establishing how Ms. Martin could identify the jacket Ms. Gullette wore at the time she was killed as well as the timeline for the events which led to Ms. Gullette's killing. These matters should be subject to appellate review.

## EIGHTEENTH GROUND FOR RELIEF

**THE TRIAL COURT ERRED BY ADMITTING THE TESTIMONY OF NICHOLAS WOODSON WHICH WAS IRRELEVANT, HIGHLY PREJUDICIAL, USED TO SHOW PROPENSITY, IN VIOLATION OF THE MR. KEENE'S RIGHT TO SUBSTANTIVE AND PROCEDURAL DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

One of the State's key witnesses was Nicholas Woodson. His testimony occupied two hundred and forty (240) pages of the record – more than any other witness except co-defendant Mathews. Tr. 572-812. However, Mr. Woodson's testimony was patently irrelevant, did not relate

to any crime for which Marvellous Keene stood on trial, and largely consisted of propensity evidence used to try to demonstrate that Mr. Keene was the "kind of person" who would commit murder.

Mr. Woodson testified over objection that DeMarcus Smith admitted to shooting Jeff Wright. Tr. 589. Mr. Woodson was then allowed to testify in great detail that DeMarcus Smith admitted that he, not Mr. Keene, had shot Jeff Wright several times. Tr. 589. (Mr. Woodson failed to mention that Mr. Keene was not present). Mr. Woodson also claimed that he and Marvellous Keene robbed a man, and then Marvellous shot the man. Tr. 597. However, Mr. Keene was not charged for this alleged crime and was not on trial for the shooting or robbery of Jeff Wright or the "man," which renders the testimony irrelevant. Ohio R. Evid. 402. This testimony's prejudice substantially outweighed its probative value, under Ohio R. Evid. 403(B). Its only conceivable use was to show Mr. Keene's propensity to commit murder, which is utterly improper. Mr. Woodson was also allowed to repeatedly testify, over objection, about his fear of Mr. Keene. Tr. 691, 695, 701. Such evidence could be found inadmissible and to have so infected the trial with unfairness as to make the resulting conviction or sentence a denial of due process. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Pulley v. Harris, 465 U.S. 37 (1984). The Court held that Woodson's testimony regarding a plan to rob people and his subsequent testimony was procedurally defaulted because counsel did not object at trial. As argued before, Petitioner maintains that Ohio contemporaneous objection rule was not regularly enforced and was not an adequate and independent ground justifying foreclosure of federal review. Even if it were, cause and prejudice exist. A finding of procedural default would result in a miscarriage of justice.

**FOURTEENTH GROUND FOR RELIEF**

**THE STATE FAILED TO INTRODUCE SUFFICIENT EVIDENCE TO CONVICT MR. KEENE OF AGGRAVATED MURDER AND THEREFORE HIS CONVICTION DEPRIVED HIM OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Fourteenth Ground for Relief should be certified for appeal. The State failed to offer sufficient evidence at trial.    First, the State failed to prove that Cottril and Washington were witnesses to an offense under the aggravator of "being a witness to an offense and being killed to prevent testimony in a criminal proceeding." O.R.C. sec. 2929.04(A)(8). The language of sec. 2929.04(A)(8) requires that the victim be a witness to a crime. The Court held that the statutory provision only requires that the victim be a witness to any crime. On the other hand, the Petitioner maintains that the witness needed to be a witness to a crime alleged committed by himself. The Petitioner maintains that this question should be presented for appellate review. This issue is adequate to deserve encouragement to proceed further. Slack v. McDaniel, 120 S. Ct. 1595, 1603-1604 (2000). The State presented no evidence to indicate that either of these individuals actually witnessed or could offer admissible testimony in the commission of a crime. For example, neither of these individuals were present during the commission of any of the crimes in which Mr. Keene was involved. Thus, they could not have any personal knowledge of those crimes and could not have testified about them in any criminal proceeding.

Second, Mr. Keene was charged with aggravated felony murder of Mr. Wilkerson during the course of an "aggravated burglary and/or aggravated robbery," and with being the principal offender in the murder. See, O.R.C. sec. 2929.04(A)(7).   In State v. Penix, 32 Ohio St.3d 369, 371, 513 N.E.2d 744 (1987), the Ohio Supreme Court determined that in order to be eligible for the death

46

penalty as the principal offender, the defendant must have been the actual killer. *See also*, State v. Taylor, 66 Ohio St. 3d 295, 308, 612 N.E.2d 316 (1993). There was no evidence presented to show that Mr. Keene was the actual killer of Mr. Wilkerson. Mr. Wilkerson was still moving after Marvellous shot through the pillows at him. Tr. 79. Laura Taylor then fired a shot at his head, and he stopped moving. Tr. 80-81. Taylor thus fired the fatal shot. The Court relied on testimony from Dr. Smith, Montgomery County Deputy Coroner and forensic pathologist, who concluded that either shot could have been the fatal shot. Reasonable minds could conclude that this was insufficient evidence to convict.

Third, Mr. Keene was charged with aggravated felony murder for the killing of Danita Gullette in the course of an aggravated robbery and being the principal offender. Again, the coroner failed to provide any testimony about the actual killer. Tr. 1060; 1095-1096. Only one of several bullets struck a vital organ. Tr. 1096. The State failed to present sufficient evidence to prove that Mr. Keene was the one who fired the fatal shot. Because the State failed to introduce sufficient evidence as to these offenses and aggravators, the conviction violates Mr. Keene's federal due process rights. See Jackson v. Virginia, 443 U.S. 307 (1979).

**SEVENTEENTH GROUND FOR RELIEF**

**THE PROSECUTOR'S MISCONDUCT DURING MARVELLOUS KEENE'S TRIAL DENIED MR. KEENE HIS SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

A.    Prosecutorial Misconduct

Taken in its entirety, the misconduct of the prosecuting attorney so infected Mr. Keene's trial with unfairness that he was denied due process of law and a reliable sentencing proceeding. *See, e.g.*, Donnelly v. DeChristoforo, 416 U.S. 637 (1974). This Court held that a three judge panel was unlikely to have been misled by any improper argument of counsel. However, as argued before, judges are human and can be adversely influenced. Cox, *supra*. Also, the Court held that the arguments made during the mitigation phase were isolated. Reasonable minds could differ over whether the remarks were isolated and not part of a pattern of misconduct. However, even assuming that they were isolated, the remarks were still potent and inflammatory and could still have affected the outcome. See, Donnelly, supra. Lastly, the Court again looks at the entirety of the evidence against the Petitioner and concludes that the effect of the misconduct would have been minimized. However, if some or all of the other evidence should have been excluded, reasonable minds could conclude that the prosecutorial misconduct could have infected the trial so as to violate due process. Id.

The misconduct occurred as follows:

1.    Closing Arguments Guilt Phase

During the closing arguments of the guilt phase, the prosecutor made several inflammatory derogatory remarks about Mr. Keene, for example:

48

> Mr. Monta began his closing argument by telling this Court a truth,
> the truth that life is precious, and indeed we all know how precious
> life is. I submit to you that the evidence has shown that that is a truth
> that is not held by this defendant, because only a person without
> regard for or concern for or appreciation of the value of human life
> could commit the crimes that this defendant has committed.

Tr. 1293.

In addition, the prosecutor frequently made reference to the manner in which the crimes were committed:

> I'm sure that all of you have asked yourselves at least once during the
> course of this trial,... how's it possible that he could have committed
> all of those brutal, heinous, violent crimes during such a short period
> over Christmas of last year....

Tr. 1293. These statements did not have any connection to the guilt or innocence of the defendant.

The prosecutor made the statements for the purpose of expressing his opinions about the horrific

nature of the crimes in order to appeal to the court's emotion and secure a conviction. Prosecutorial

misconduct in closing argument may result in reversal. United States v. Carter, 236 F.3d 777 (6th

Cir. 2001). The prosecutor also pointed out the fact that during closing argument defense counsel

did not assert that Mr. Keene was innocent:

> [I] would like to point out one very important factor, and that is in
> everything he said, every point that he made, every piece of evidence
> that he called to the attention of this Court, not once did his words or
> the evidence ever indicate that this defendant is not guilty of the
> crimes with which he has been charged.

Tr. 1293. Such a statement is improper and warrants relief. See, Griffin v. California, 380 U.S. 609

(1965) (the prosecutor's remarks so prejudiced a specific right, such as the privilege against

compulsory self-incrimination, as to amount to a denial of that right); O'Connor v. Ohio, 385 U.S.

92 (1966). In addition, this statement improperly shifted the burden of proof to the defendant, in

violation of the Due Process Clause of the Fourteenth Amendment. <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979).

During closing, the prosecutor vouched for the credibility of the state's witness Edward Thompson. Tr. 1277. In addition to vouching for Mr. Thompson, the prosecutor, in an attempt to downplay the confusion expressed by State's witness Jones Pettus, used Mr. Pettus' confusion to gain sympathy from the Court:

> But I submit to you that Jones Pettus was important for this Court to see and to hear far more than what he had to say, but because he epitomizes the helplessness and vulnerability of each and every one of the witnesses killed by this defendant.

Tr. 1303.

Finally, the prosecutor stated in the closing argument that the only reason that the State did not have better witnesses was because of the defendant:

> [We] were left here with those witnesses given to us by this defendant. The State of Ohio would have loved to have put on Joe Wilkerson to testify about what happened in his home or Danita Gullette to tell us what they did as she talked on the phone, or Sarah Abraham to say what occurred after the two walked into her store early on Saturday morning, or Wendy Cottrill to explain to us what was said and what it felt like to be there deserted in that gravel pit with these two people holding guns.

Tr. 1298-1299. It has been held that:

> "[The prosecutor] may prosecute with earnestness and vigor indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

<u>Berger v. United States</u>, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), and

> "The law is clear: [A]ny person charged with a crime *** is entitled to be tried in a proceeding which is conducted by the prosecutor with dignity and propriety, free from name-calling, gratuitous insult and unnecessary inflammatory comment, repeated expressions of outrage, frequently recurring and transparent appeals to the emotions of jurors, and other such unacceptable conduct which this Court has repeatedly condemned. This Court cannot close its eyes to prosecutorial misconduct, conduct it when it occurs, nor tolerate further recurrences."

Griffin v. Mississippi, 557 So.2d 542, 553 (1990). The special role played by the American

prosecutor in the search for truth in criminal trials is the representative not of an ordinary party, but

of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern

at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that

justice shall be done. Berger, supra.


       2.     Victim Impact Testimony

As referenced above in the Sixteenth Ground for Relief, the prosecutor repeatedly injected

improper victim impact evidence into the culpability phase of the trial. The Court heard this

testimony over the repeated objections of trial counsel. Tr. 335, 344. For instance, the sister of

Joseph Wilkerson testified about Mr. Wilkerson going home to see his sister's baby. Tr. 338.

Pamela Peary, a neighbor, testified that Mr. Wilkerson came to her house after he got off work on

December 23rd to bring her grandson a Christmas gift. Tr. 310. The sister of Danita Gullette

offered testimony about how close she was with her sister. Tr. 345. Michael Abraham, the brother

of Sarah Abraham, testified in detail about his sister's marital status, the number of brothers and

sisters in the family and the ages of her children. Tr. 504-505. Mr. Abraham testified that one of

Sarah's children now had to live with one of the brothers. Tr. 505. Mr. Abraham also testified about

his initial visit to the hospital to see his sister, Sarah; Mr. Abraham was met by the priest who told

them that "... [Sarah] was shot bad, and she was on a life support machine." Tr. 512. Finally, Mr.

Abraham testified about the painful experience of terminating Sarah's life support. Tr. 512. This

testimony offered by relatives and neighbors of the victims was irrelevant to the issues being tried;

its only possible purpose was to elicit sympathy from the Court.

Ohio statutory law also prohibits the introduction of victim-impact testimony into evidence

where an accused is capitally charged. O.R.C. §2947.051(A), O.R.C. §2929.12 and O.R.C.

§2929.14. When a state opts to act in a field where its action has significant discretionary elements,

such as the establishment of rights such as those embodied in O.R.C. §§2947.051(A), 2929.12 and

2929.14, it must act in accord with the dictates of the Constitution, and in particular, the Due Process

Clause. Evitts v. Lucey, 469 U.S. 387 (1985).


### 3.    Prosecutor's Closing Arguments Mitigation Phase.

The prosecutor made several improper comments during closing arguments of the mitigation

phase, for example:

> As to the defendant's lack of a prior criminal conviction, I ask this Court to consider
> what possible weight can be given to that in light of the fact that during a course of
> conduct which took less than 60 hours this defendant killed not one, not two, not
> three, not four, but five human beings.

Tr. 491-492. O.R.C. §2929.04(B) requires that the three judge panel shall consider the mitigating

factors raised by the defendant. This statute imposes a duty upon the Court to consider and weigh

all mitigating factors. The prosecutor may not attempt to circumvent this requirement, by urging the

court to ignore mitigation.

52

The prosecutor also turned Mr. Keene's faith into a non-statutory aggravating circumstance, arguing that the reason Mr. Keene committed murder was because he "turned his back on God" by failing to follow the ten Commandments and being "ungrateful for the gifts that God ... tried to give him." "I'm sure that that congregation likewise taught him all ten of God's Commandments including 'Thou shalt not steal' and 'Thou shalt not kill.'" Penalty Tr. 494-495. The prosecutor also argued to the Court that turning to God in prayer was evidence that the defendant had no remorse and asked that this be used against him. Penalty Tr. 497-498. Such appeals to religion are far outside of the boundaries of proper prosecutorial behavior. Romine v. Head, 253 F.3d 1349 (11th Cir. 2001) (habeas relief granted because prosecutor made references to the Bible); Sansoval v. Calderon, 241 F.3d 765 (9th Cir. 2000) (arguing that god would want a death sentence).

The prosecutor also grossly mischaracterized mitigation evidence by stating that the mitigating evidence offered by Mr. Keene did not "justify" the killings:

> Are we supposed to believe that this defendant's being raised without his natural father, or having lost his elderly grandmother when he was 19, or that even the death of his brother somehow made him or justified the fact that he got two guns and went on a shooting spree over the Christmas holiday which resulted in the deaths of five innocent people.

Penalty Tr. 492-493. These arguments were improper.

The prosecutor also impermissibly downplayed the mitigation evidence presented by Mr. Keene by stating that Marvellous was "lucky" to have the kind of father that he did, and that many young men would be grateful to have the kind of support he had. Penalty Tr. 493-495. The evidence actually was that Marvellous' father left the family the day that Marvellous was brought home from the hospital, one week old. Penalty Tr. 16. After that, the defendant had little to no contact with his father until it became convenient for his father to allow him back into his life.

53

Finally, the prosecutor attempted to denigrate the testimony of the psychologist by characterizing it as "nonsense." (Penalty Tr. 496, 521) This commentary about the defense expert was improper. Categorical and conclusory opinions by the prosecutor regarding the veracity of the defense expert invades the province of the trier of fact. *See, e.g.*, Harris v. United States, 402 F.2d 656 (D.C. Cir. 1968).

In Penry v. Lynaugh, 492 U.S. 302 (1989), the Court again stressed the need for individualized treatment of each capital defendant: "The sentencer must *** be able to consider and give effect to (mitigating) evidence in imposing sentence. (Citation omitted.) Only then can we be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." Id. at 319.

An appellate court could conclude that these errors and omissions violated Petitioner Keene's rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.


## TWENTY-FIRST GROUND FOR RELIEF

**SIMULTANEOUSLY SENTENCING ON THE CHARGES OF FELONY MURDER AND ON THE SUBSTANTIVE UNDERLYING FELONY CHARGE VIOLATES THE DOUBLE JEOPARDY CLAUSES OF THE UNITED STATES CONSTITUTION IN VIOLATION OF MR. KEENE'S RIGHT TO DUE PROCESS, IN VIOLATION OF MR. KEENE'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The Constitution provides that "no person shall be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. Amend. V, cl. 2. The Double Jeopardy Clause is applicable to the States through the Due Process Clause of the Fourteenth Amendment. Benton v.

<u>Maryland</u>, 395 U.S. 784 (1969). The Double Jeopardy Clause prohibits a state from convicting a defendant of two separate offenses where one of the offenses contains all of the elements necessary to prove the other. <u>Ball v. United States</u>, 470 U.S. 856 (1985); <u>United States v. Dixon</u>, 509 U.S. 688 (1993). In addition, the Double Jeopardy Clause protects "against multiple punishments for the same offense." <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717 (1969) (footnote omitted). Reasonable jurists could disagree as to whether or not double jeopardy was present.

Of the five death sentences that Mr. Keene received, three were based upon convictions for "felony murder" under O.R.C. sec. 2903.01(B). These felony murder convictions were for the purposeful killing during the burglary "and/or" robbery of Mr. Wilkerson (Count 4), purposeful killing during the robbery of Ms. Gullette (Count 6), and purposeful killing during the robbery of Ms. Abraham (Count 10). In addition, Mr. Keene was also sentenced to consecutive terms of imprisonment of ten (10) to twenty-five (25) years on the very same burglary and robbery of Mr. Wilkerson (Counts 1 and 2), robbery of Ms. Gullette (Count 5), and robbery of Ms. Abraham (Count 9). Jt. Ap. 994.

A felony murder charge contains all of the elements necessary to prove the underlying felony. The State cannot establish a violation of O.R.C. sec. 2903.01(B), ["purposely cause the death of another while committing ... aggravated robbery"] without first establishing all of the elements necessary to prove aggravated robbery under O.R.C. sec. 2911.01. Therefore, it arguably was a violation of the Double Jeopardy Clause to simultaneously punish Mr. Keene for both felony murder based on robbery, and the very same robbery, because felony murder based on robbery contains all of the elements necessary to prove robbery.

55

**TWENTY-FIFTH GROUND FOR RELIEF**

**OHIO'S DEATH PENALTY SCHEME IS UNCONSTITUTIONAL AND VIOLATED PETITIONER KEENE'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Even though the Court rejected the Petitioner's Twenty-Fifth Ground for Relief, he maintains that the ground should be subject to appellate review. The Eighth Amendment to the United States Constitution and Article I, sec. 9 of the Ohio Constitution prohibit the infliction of cruel and unusual punishment. The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment. Robinson v. California, 370 U.S. 660 (1962). Punishment that is "excessive" constitutes cruel and unusual punishment. Coker v. Georgia, 433 U.S. 584 (1977). The underlying principle of governmental respect for human dignity is the Court's guideline to determine whether this statute is constitutional. See Furman v. Georgia, 408 U.S. 238 (1972) (Brennan, J., concurring); Rhodes v. Chapman, 452 U.S. 337, 361 (1981); Trop v. Dulles, 356 U.S. 86 (1958). The Ohio scheme offends this bedrock principle in the following ways.

**A.      Arbitrary and Unequal Punishment.**

The Fourteenth Amendment's guarantee of equal protection requires similar treatment of similarly situated persons. This right extends to the protection against cruel and unusual punishment. Furman, 408 U.S. at 249 (Douglas, J., concurring). A death penalty imposed in violation of the equal protection guarantee is a cruel and unusual punishment. See id. Any arbitrary use of the death penalty also offends the Eighth Amendment. Id.

Ohio's capital punishment scheme allows the death penalty to be imposed in an arbitrary and discriminatory manner in violation of Furman and its progeny. Prosecutors' virtually uncontrolled

56

indictment discretion allows arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because they lacked standards for imposition of a death sentence and were therefore removed from judicial review. Woodson v. North Carolina, 428 U.S. 280 (1976). Prosecutors' uncontrolled discretion violates this requirement.

Ohio's system imposes death in a racially discriminatory manner. Blacks and those who kill white victims are much more likely to get the death penalty. While African-Americans are less than twenty (20%) percent of Ohio's population, about half of Ohio's death row inmates are African-American. Ohio Public Defender Death Penalty Statistics, 10/22/99. While few Caucasians are sentenced to death for killing African-Americans, more than forty-five (45) African-Americans sit on Ohio's death row for killing a Caucasian. Ohio's statistical disparity is tragically consistent with national findings. The General Accounting Office found victim's race influential at all stages, with stronger evidence involving prosecutorial discretion in charging and trying cases. "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990).

Ohio courts have not evaluated the implications of these racial disparities. While the General Assembly established a disparity appeals practice in post-conviction that may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race, O.R.C. sec. 2953.21(A)(2), no rule has been adopted. Further, this practice does not track the victim's race and does not apply to crimes committed before July 1, 1996. In short, Ohio law fails to assure against race discrimination playing a role in capital sentencing.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest. Commonwealth v. O'Neal II, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J.,